# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE JOHNSON & JOHNSON DERIVATIVE LITIGATION | Civil Action No. 10-2033 (FLW) |
| IN RE JOHNSON & JOHNSON FCPA SHAREHOLDER DERIVATIVE LITIGATION | Civil Action No. 11-2511 (FLW) |
| COPELAND v. PRINCE, ET AL. | Civil Action No. 11-4993 (FLW)<br><br>Judge Freda L. Wolfson<br>Date: September 28, 2012<br>Time: 10:00 a.m.<br>Courtroom: 5E<br><br>ORAL ARGUMENT REQUESTED |

## OBJECTION OF MARK G. PETRI TO ATTORNEYS' FEES AND MEMORANDUM IN SUPPORT OF MOTION TO DISMISS UNDER RULE 23.1(a)

Theodore H. Frank
CENTER FOR CLASS ACTION FAIRNESS
1718 M Street NW, No. 236
Washington, DC 20036
Telephone: (703) 203-3848
Email: tedfrank@gmail.com

David M. Nieporent
SAMUEL & STEIN
38 West 32nd Street, Suite 1110
New York, NY 10001
Phone: (212) 563-9884
Fax: (212) 563-9870
Email: dnieporent@samuelandstein.com

Atorneys for Intervenor/Objector Petri

# Table of Contents

Table of Contents...................................................................................................i

Table of Authorities ............................................................................................iii

Introduction ..........................................................................................................1

Preliminary Statement..........................................................................................2

Argument..............................................................................................................4

I.      Intervening Objector Petri Is a J&J Shareholder......................................4

II.     The Court Has a Fiduciary Duty to Guard the Rights of Absent
        Shareholders. ...........................................................................................5

III.    This Court Should Dismiss the Case Because Plaintiffs Cannot Satisfy
        the Adequacy Requirements of Rule 23.1(a). .........................................7

        A.      The Settlement Compensates Plaintiffs' Attorneys for Preexisting
                Governance Changes and Cosmetic Changes to Preexisting Policies.....10

                1.   The "Core Objective" Is Not a Material Benefit. ..................................12

                2.   The "RCGC Charter and Operating Procedure" Is Not a Material
                     Benefit.................................................................................................13

                3.   The Product Risk Management Standard Is Not a Material Benefit. .14

                4.   The Evaluation/Compensation Standards Are Not a Material Benefit.
                     ..............................................................................................................15

                5.   The Funding of Governance Reforms Is Not a Material Benefit. ......15

        B.      J&J's Promise to Obey the Law Provides No Valuable Benefit under the
                Settlement............................................................................................16

        C.      The Market Agrees that the Proposed Settlement Provides No Benefit to
                the Company. ......................................................................................18

IV.     Plaintiffs' Self-Dealing Clauses in the Settlement Provide Additional
        Grounds for Rule 23.1(a) Dismissal. ....................................................20

        A.      The Settlement Is Rife With Evidence of Self-Dealing. ...........................22

        B.      The Risks of Establishing Liability Highlight the Impermissible Self-
                Dealing.................................................................................................27

V.      In the Alternative, Petri Objects to the Exorbitant Request for a $10.45
        Million Fee Award. ....................................................................................................29

Conclusion..................................................................................................................30

# Table of Authorities

## Cases

*Amchem Prods. v. Windsor,*
    521 U.S. 591 (1997) ........................................................................................8

*Annex Books, Inc. v. Indianapolis,*
    624 F.3d 368 (7th Cir. 2010) ........................................................................19

*Bell Atl. Corp. v. Bolger,*
    2 F.3d 1304 (3d Cir. 1993) .......................................... 5-6, 20-21, 27-28

*BTZ, Inc. v. Great N. Nekoosa Corp.,*
    47 F.3d 463 (1st Cir. 1995) ...........................................................................27

*Dewey v. Volkswagen AG,*
    681 F.3d 170 (3d Cir. 2012) ...........................................................................3

*Felzen v. Andreas,*
    134 F.3d 873 (7th Cir. 1998),
    *aff'd by an equally divided Court,*
    *California Public Employees' Retirement System v. Felzen,*
    525 U.S. 315 (1999) ..................................................................................22-23

*Franks v. Kroger Co.,* 649 F.2d 1216 (6th Cir. 1981),
    *vacated on other grounds and modified,*
    670 F.2d 71 (6th Cir. 1982) .....................................................................16-17

*G.A. Enterprises, Inc. v. Leisure Living Communities, Inc.,*
    517 F.2d 24 (1st Cir. 1975) .............................................................................8

*Girsh v. Jepson,*
    521 F.2d 153 (3d Cir. 1975) ..........................................................................20

*Hanlon v. Chrysler Corp.,*
    150 F.3d 1011 (9th Cir. 1998) .................................................................23, 25

*In re Aqua Dots Prod. Liab. Litig.,*
    654 F.3d 748 (7th Cir. 2011) ...............................................................1-2, 8-9

*In re AT & T Corp.*,
    455 F.3d 160 (3d Cir. 2006)................................................................20-21

*In re: Bank of Am. Corp. Sec., Der., and Empl. Ret. Income Sec. Act (ERISA) Lit.*,
    2012 U.S. Dist. LEXIS 67730 (S.D.N.Y. May 14, 2012)...........................5

*In re Bluetooth Headset Prod. Liab. Litig.*,
    654 F.3d 935 (9th Cir. 2011) ........................................ 3, 21, 23-26

*In re Cendant Corp. Prides Litig.*,
    243 F.3d 722 (3d Cir. 2001)................................................................18

*In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Litig*,
    418 F.3d 277 (3d Cir. 2005).............................................................25-26

*In re Gen. Motors Corp. Pickup Truck Fuel Tank Prod. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995)....................................................14, 24, 26

*In re Gen. Tire & Rubber Co. Sec. Litig.*,
    726 F.2d 1075 (6th Cir. 1984) ..........................................................18

*In re Hotel Tel. Charges*,
    500 F.2d 86 (9th Cir. 1974) ................................................................8

*In re J&J Deriv. Litig.*, --- F. Supp. 2d ---,
    2011 U.S. Dist. LEXIS 112292 (D.N.J. Sept. 29, 2011) ....................27

*In re Mercury Interactive Corp. Sec. Lit.*,
    618 F.3d 988 (9th Cir. 2010) ...........................................................29

*In re Oracle Sec. Litig.*,
    829 F. Supp. 1176 (N.D. Cal. 1993)................................................10

*In re Oracle Sec. Litig.*,
    132 F.R.D. 538 (N.D. Cal. 1990)..................................................10-11

*In re Pittsburgh & Lake Erie R.R. Co. Sec. & Antitrust Litig.*,
    543 F.2d 1058 (3d Cir. 1976) .......................................................20-22

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
    148 F.3d 283 (3d Cir. 1998)....................................................18, 21, 29

*In re Schering-Plough/Merck Merger Litig.*, No. 09-CV-1099,
    2010 U.S. Dist. LEXIS 29121 (D.N.J. Mar. 25, 2010) ...........................................21

*Kaplan v. Pomerantz*,
    132 F.R.D. 504 (N.D. Ill. 1990) ....................................................................5

*Kaplan v. Rand*,
    192 F.3d 60 (2d Cir. 1999) ............................................................................5

*Levell v. Monsanto Research Corp.*,
    191 F.R.D. 543 (S.D. Ohio 2000) ..............................................................16

*Levit v. Filmways, Inc.*,
    620 F. Supp. 421 (D. Del. 1985) ..................................................................27

*Lobatz v. U.S. West Cellular of Cal., Inc.*,
    222 F.3d 1142 (9th Cir. 2000) .......................................................................8

*Malchman v. Davis*,
    761 F.2d 893 (2d Cir. 1985)....................................................................26-27

*Mirfasihi v. Fleet Mortg. Corp.*,
    356 F.3d 781 (7th Cir. 2004) .................................................................22, 24

*Murray v. GMAC*,
    434 F.3d 948 (7th Cir. 2006) .........................................................................8

*Nachshin v. AOL*,
    663 F.3d 1034 (9th Cir. 2011) .......................................................................3

*Parker v. Time Warner Entm't Co.*,
    631 F. Supp. 2d 242 (E.D.N.Y. 2009) ......................................................10

*Reich v. Walter W. King Plumbing & Heating Contractor, Inc.*,
    98 F.3d 147, 150 (4th Cir. 1996) ................................................................17

*Robert F. Booth Trust v. Crowley*,
    687 F.3d 314,
    2012 U.S. App. LEXIS 11927 (7th Cir. June 13, 2012) .......... 2-3, 6, 9, 14, 22, 27

*Shlensky v. Dorsey*,
    574 F.2d 131 (3d Cir. 1978).................................................................20-21

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ................................................................7, 12, 23-24, 26

*United States v. Miami*, 614 F.2d 1322 (5th Cir. 1980),
    *modified on other grounds*,
    664 F.2d 435 (5th Cir. 1981) (en banc) .................................................................6

*Vanderbilt v. Geo-Energy, Ltd.*,
    725 F.2d 204 (3d Cir. 1983)............................................................................ 7, 20

*Weinberger v. Great N. Nekoosa Corp.*,
    925 F.2d 518 (1st Cir. 1991).........................................................................26-27

*Young v. Higbee Co.*,
    324 U.S. 204 (1945) ............................................................................................8


Rules and Statutes

Fed. R. Civ. Proc. 23 ...............................................................................................8

Fed. R. Civ. Proc. 23(a)(4)...............................................................................1-2, 8

Fed. R. Civ. Proc. 23.1 ........................................................................ 2, 5, 7-8, 22

Fed. R. Civ. Proc. 23.1(a) ..............................................................................*passim*

Fed. R. Civ. Proc. 23.1(c) ...................................................................................5-6


Other Authorities

Alexander, Janet Cooper, *Do the Merits Matter? A Study of Settlements in Securities
    Class Actions*, 43 Stan. L. Rev. 497 (1991) ..............................................23

American Law Institute,
    Principles of the Law of Aggregate Litig. § 3.05 *comment b* (2010)..........24

American Law Institute,
    Principles of the Law of Aggregate Litig. § 3.13 (2010)...........................29

Brunet, Edward, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003 U. CHI. LEGAL F. 403 ....................................................................3

Coffee, Jr., John C., *The Regulation of Entrepreneurial Litigation: Balancing Fairness and Efficiency in the Large Class Action*, 54 U. CHI. L. REV. 877 (1987)...................................................................24

Coffee, Jr., John C., *The Unfaithful Champion: The Plaintiff as Monitor in Shareholder Litigation*, 48 LAW & CONTEMP. PROBS. 5 (1985) .........................................6, 18, 28

*Court Awarded Attorney Fees*, Report of the Third Circuit Task Force, 108 F.R.D. 237 (1985) ...................................................................25

Cross, Mark L., Wallace N. Davidson & John H. Thornton, *The Impact of Directors' and Officers' Liability Suits on Firm Value*, 56 J. RISK & INSURANCE 128 (1989) ...................................................................23

Easterbrook, Frank H. and Daniel R. Fischel, *The Economic Structure of Corporate Law* 17-20 (1991) ...................................................................20

Fischel, Daniel R. & Michael Bradley, *The Role of Liability Rules and the Derivative Suit in Corporate Law: A Theoretical and Empirical Analysis*, 71 CORNELL L. REV. 261 (1986) ...................................................................23

Frankel, Allison, *Legal Activist Ted Frank Cries Conflict of Interest, Forces O'Melveny and Grant & Eisenhofer to Modify Apple Securities Class Action Deal*, American Lawyer Lit. Daily (November 30, 2010) ...................................................................3

Jones, Ashby, *A Litigator Fights Class-Action Suits*, Wall St. J. (Oct. 31, 2011) ...................................................................2-3

Karlsgodt, Paul & Raj Chohan, *Class Action Settlement Objectors: Minor Nuisance or Serious Threat to Approval*, BNA: Class Action Litig. Report (Aug. 12, 2011) ...................................................................3

Kraakman, Reinier, Hyun Park & Steven Shavell, *When are Shareholder Suits in Shareholder Interests?*, 82 GEO. L.J. 1733 (1994) ...................................................................23

Macey, Jonathan R. and Geoffrey P. Miller, *The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform*, 58 U. CHI L. REV. 1 (1991) ...................................................................5-6

Romano, Roberta, *The Shareholder Suit: Litigation Without Foundation?*,
7 J.L. ECON. & ORG. 55 (1991) ...........................................................................23

### Introduction

This is a typical fee-driven settlement of strike suits brought against the best interests of the shareholders for the benefit of the plaintiffs' attorneys. By threatening to force the corporate defendant and its directors to spend time and money and resources defending against meritless lawsuits and complying with discovery requests, plaintiffs' attorneys can extract value from shareholders. Here, at the threat of such suits, the settling parties have devised a Settlement pursuant to which Johnson & Johnson (J&J) shareholders receive valueless relief. Specifically, the Settlement proposes the adoption of a "Core Objective" that affirms J&J's commitment to quality and compliance. This generic precatory relief is merely J&J's promise to provide quality products—a core objective J&J has had for nearly 70 years—and is only a cosmetic sheen on actions J&J would be taking anyway. Further, the Settlement proposes "governance changes" that have *already* been implemented by J&J based on recommendations from a Special Committee formed to investigate demand letters the J&J Board received from February through November 2010.

The proposed cosmetic changes to preexisting J&J policies and procedures come at the tune of $10 million in attorneys' fees. Because plaintiffs have permitted their attorneys to negotiate worthless relief and pursue these proceedings solely for the benefit of the plaintiffs' attorneys, plaintiffs cannot fairly and adequately represent the shareholders under Rule 23.1(a). *Cf. In re Aqua Dots Prod. Liab. Litig.*, 635 F.3d 748 (7th Cir. 2011) (holding class representatives failed to meet Rule 23(a)(4) adequacy requirement class because they permitted class counsel to bring class litigation to

benefit themselves, rather than their putative class clients). If the plaintiffs (and their attorneys) were acting in the best interests of the shareholders, rather than themselves, they would not have brought this lawsuit. Based on plaintiffs' inability to meet the adequacy requirements, this action must be dismissed under Rule 23.1. *See* Fed. R. Civ. Proc. 23.1(a) ("The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders ….").

If, however, plaintiffs are permitted to maintain this action, the proposed attorney award of $10.45 million—coming at the direct expense of the shareholders they purport to represent—are wildly disproportionate to the minimal, if any, value of the proposed relief. Plaintiffs should not be allowed to profit at the expense of shareholders, and the fees must be cut substantially.

In sum, the proposed relief does not make J&J and its shareholders better off. The only thing this lawsuit has done is transfer money from shareholders (like Objector Petri) to the plaintiffs and defense attorneys and to distract executives and board members from more important and pressing issues. *See Robert F. Booth Trust v. Crowley*, 687 F.3d 314, 2012 U.S. App. LEXIS 11927, at *11 (7th Cir. June 13, 2012) (reversing district, permitting intervention, and dismissing case because "[t]he suit serves no goal other than to move money from the corporate treasury to the attorneys' coffers"). This is wrong and requires dismissal.

## Preliminary Statement

Petri has retained the non-profit Center for Class Action Fairness to represent him *pro bono*. Attorneys affiliated with the Center litigate on behalf of class members

and shareholders against unfair class-action and derivative-action procedures and settlements, and have won millions of dollars on their behalf. *See, e.g.*, Ashby Jones, *A Litigator Fights Class-Action Suits*, Wall St. J. (Oct. 31, 2011); Allison Frankel, *Legal Activist Ted Frank Cries Conflict of Interest, Forces O'Melveny and Grant & Eisenhofer to Modify Apple Securities Class Action Deal*, American Lawyer Lit. Daily (November 30, 2010). While attorneys affiliated with the Center have represented multiple objectors (including those who successfully appealed in *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011); *Nachshin v. AOL*, 663 F.3d 1034 (9th Cir. 2011); *Dewey v. Volkswagen AG*, 681 F.3d 170 (3d Cir. 2012); and *Robert F. Booth Trust v. Crowley*, 687 F.3d 314, 2012 U.S. App. LEXIS 11927 (7th Cir. Jun. 13, 2012)), the Center is not a "professional objector." A "professional objector" is a specific legal term referring to a for-profit attorney who files objections to blackmail plaintiffs' attorneys for payment in exchange for withdrawing his or her objections. Paul Karlsgodt & Raj Chohan, *Class Action Settlement Objectors: Minor Nuisance or Serious Threat to Approval*, BNA: Class Action Litig. Report (Aug. 12, 2011) (distinguishing the Center from professional objectors); Edward Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003 U. Chi. Legal Forum 403, 437 n.150 (public interest groups are not "professional objectors"). The Center has never agreed to a *quid pro quo* payment to withdraw an appeal of an objection. This objection is brought in good faith to overturn an unfair settlement, and to create precedent deterring future plaintiffs and defendants from agreeing to abusive settlements designed to benefit attorneys at the expense of shareholders. This Court is familiar with the Center's work. *See* Objection

of Daniel Greenberg (Dkt. No. 77), *In re Nutella Mktg. and Sales Pract. Litig.*, No. 3:11-cv-1086 (D.N.J.).

Petri intends to appear through his attorney Theodore H. Frank (*pro hac vice* admission pending) at the final approval hearing, in the above captioned matter, scheduled for September 28, 2012 at 10:00 a.m. Mr. Frank wishes to discuss matters raised in this Objection and Memorandum in Support of Motion to Dismiss and in Petri's Memorandum in Support of Motion to Intervene. Petri intends to call no witnesses at the fairness hearing, but reserves the right to make use of all documents attached as exhibits to the declarations of Theodore H. Frank and Mark G. Petri or any other documents entered on to the docket by any settling party or objector. Petri also reserves the right to cross-examine any witnesses who testify at the hearing in support of final approval.

## Argument

### I.  Intervening Objector Petri Is a J&J Shareholder.

Intervening Objector Mark G. Petri (9822 North Valley Hill Drive, Mequon, Wisconsin 53092, (262) 241-3537) is a Johnson & Johnson (J&J) shareholder. *See* Declaration of Mark G. Petri ¶¶ 1-2 (Petri Decl.). Petri is retired and was the former President and CEO of a private company, Rite-Hite Holdings, Inc. *See id.* ¶ 2. Prior to Rite-Hite Holdings, Petri was a partner of Foley & Lardner LLP. *See id.*

Petri first acquired shares of J&J in 1988 and since then has continuously held J&J shares. *See id.* ¶ 3. Petri holds Johnson & Johnson stock in two accounts. *See id.* ¶¶

3-4. In his Computershare Trust Account he owned 1,035.245181 shares on July 11, 2012, and the same amount as of the date of this submission. *See id.* ¶ 3. In his Charles Schwab account he owned 214.7419 shares on July 11, 2012, and the same amount as of the date of this submission. *See id.* ¶ 4.[1]

## II.   The Court Has a Fiduciary Duty to Guard the Rights of Absent Shareholders.

Settlement of derivative litigation requires judicial approval under Fed Rule of Procedure 23.1(c). Rule 23.1 settlement approval is intended to be "an 'adversarial process' that tests the fairness of a proposed settlement." *In re: Bank of Am. Corp. Sec., Der., and Empl. Ret. Income Sec. Act (ERISA) Lit.,* 2012 U.S. Dist. LEXIS 67730, *21-22 (S.D.N.Y. May 14, 2012) (citing *Kaplan v. Rand*, 192 F.3d 60, 67 (2d Cir. 1999)). The Third Circuit recognizes, however, that among the challenges of assessing settlements of derivative litigation, "judges no longer have the full benefit of the adversarial process." *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1310 (3d Cir. 1993). Instead, "plaintiffs' attorneys' and defendants' interests coalesce and mutual interest may result in mutual indulgence." *Id.*; *see also* Jonathan R. Macey and Geoffrey P. Miller, *The Plaintiffs'*

---

[1] Attached to the Declaration of Mark G. Petri are brokerage statements reflecting Petri's ownership of J&J shares. *See* Exhibits 1-3 to Petri Decl. The brokerage statements are redacted to exclude account information and information regarding other stocks in the brokerage accounts. *Cf. Kaplan v. Pomerantz*, 132 F.R.D. 504 (N.D. Ill. 1990) (noting court's order "allowing redaction of information concerning stocks other than the stock at issue" in class action securities fraud law suit). Upon this Court's request, Petri will provide unredacted versions for *in camera* review. *See* Petri Decl. ¶ 5.

*Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform*, 58 U. CHI L. REV. 1, 44 (1991) ("settlement hearings are typically pep rallies jointly orchestrated by plaintiffs' counsel and defense counsel"). As Judge Easterbrook recently explained, "Rule 23.1(c) requires judicial approval of settlements in derivative suits precisely because the self-appointed investors may be poor champions of corporate interests and thus injure fellow shareholders." *Robert F. Booth Trust v. Crowley*, 687 F.3d 314, 2012 U.S. App. LEXIS 11927, at \*7 (7th Cir. June 13, 2012); *see also* John C. Coffee, Jr., *The Unfaithful Champion: The Plaintiff as Monitor in Shareholder Litigation*, 48 LAW & CONTEMP. PROBS. 5, 23 (1985) ("In any class or representative action, there is always the possibility that the plaintiff's attorney will exchange a cheap settlement for a high award of attorney fees.").

In light of these challenges, a district court must exercise "careful scrutiny … to guard against settlements that may benefit the class representatives or their attorneys at the expense of absent class members or shareholders." *United States v. Miami*, 614 F.2d 1322, 1330-31 (5th Cir. 1980), *modified on other grounds,* 664 F.2d 435 (5th Cir. 1981) (en banc). The district court must act as "*fiduciary* serving as guardian" for those absent shareholders. *Id.* at 1331 (emphasis added). To fulfill its fiduciary obligation, the Court may turn to objectors—like Petri— who "play an important role by giving courts access to information on the settlement's merits." *Bell Atl. Corp.,* 2 F.3d at 1310.

When assessing the settlement, it is insufficient that the settlement happened to be at "arm's length" without express collusion between the settling parties; the

6

settlement must be objectively reasonable as well. The Court must protect absent shareholders from settlements driven by fees where "plaintiffs' attorneys' fees are disproportionate to any relief obtained for the corporation." *Id.*; *cf. Staton v. Boeing Co.*, 327 F.3d 938, 964 (9th Cir. 2003) (noting in class action settlements that "[i]f fees are unreasonably high, the likelihood is that the defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members or less injunctive relief for the class than could otherwise have obtained"). Here, the proposed settlement provides $10 million to the plaintiffs' attorneys while leaving the company empty handed. This is wrong and requires dismissal of the action, or at a minimum, rejection of the proposed settlement.

III.    **This Court Should Dismiss the Case Because Plaintiffs Cannot Satisfy the Adequacy Requirements of Rule 23.1(a).**

Federal Rule of Civil Procedure 23.1 provides that: "[t]he derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association." Fed. R. Civ. Proc. 23.1(a). To meet the adequacy requirements, "the plaintiff must not have interests antagonistic to those of the class." *Vanderbilt v. Geo-Energy, Ltd.,* 725 F.2d 204, 207 (3d Cir. 1983). A court should dismiss a derivative action when plaintiffs fail to meet the adequacy requirements of 23.1(a). *See id.*

7

The recently decided *In re Aqua Dots Products Liability Litigation* regarding class representative adequacy is instructive here: the Seventh Circuit recognized that when class representatives permit class counsel to bring class litigation to benefit themselves, rather than their putative class clients, they cannot meet the adequacy requirements of Rule 23(a)(4). 654 F.3d 748 (7th Cir. 2011); *Murray v. GMAC*, 434 F.3d 948, 952 (7th Cir. 2006) ("untenable" when "class device had been used to obtain leverage for one person's benefit") (*citing Young v. Higbee Co.*, 324 U.S. 204, 211-14 (1945) (shareholder suit)); *Amchem Prods. v. Windsor*, 521 U.S. 591, 619-20 (1997) ("hom[ing] in on settlement terms in explain why…the absentees' interests [are] inadequately represented…[is] altogether proper."). *Cf. In re Hotel Tel. Charges*, 500 F.2d 86, 91-92 (9th Cir. 1974) ("Whenever the principal, if not the only, beneficiaries to the class action are to be the attorneys for the plaintiffs and not the individual class members, a costly and time-consuming class action is hardly the superior method for resolving the dispute."); *Lobatz v. U.S. West Cellular of Cal., Inc.*, 222 F.3d 1142, 1147 (9th Cir. 2000) ("If … class counsel agreed to accept excessive fees and costs to the detriment of class plaintiffs, then class counsel breached their fiduciary duty to the class."). While *Aqua Dots* made its adequacy ruling under Rule 23(a)(4), rather than Rule 23.1(a), this is not a material difference. *G.A. Enterprises, Inc. v. Leisure Living Communities, Inc.*, 517 F.2d 24, 26 n.3 (1st Cir. 1975) ("cases interpreting Rule 23 may be effectively utilized in analyzing the requirements of 23.1").

This case is akin to *Aqua Dots*: the only potential beneficiaries from this litigation are the plaintiffs' attorneys. This Settlement involves "strike suits" resolved

8

by offering superficial remedies that dressed up existing corporate protocols with flashy new appellations and acronyms, both positively inscrutable, and ostensibly vapid in substance. Analogously, the inadequate representatives in *Aqua Dots* sought "relief that duplicates a remedy that most buyers already have received, and that remains available to all members of the putative class." 654 F.3d at 752. Unscrupulous plaintiffs' attorneys bring a meritless lawsuit, and then threaten to force defendants to incur expensive discovery and litigation expenses unless the defendants agree to pay the plaintiffs' attorneys to go away. "The suit serves no goal other than to move money from the corporate treasury to the attorneys' coffers." *Robert F. Booth Trust*, 2012 U.S. App. LEXIS 11927, at *11 (ordering district court to dismiss derivative action because "[t]he only goal of this suit appears to be fees for the plaintiffs' lawyers").

But in so doing, these attorneys make their putative clients worse off. This is a breach of the attorneys' fiduciary obligation to their clients to not put their interests ahead of their clients. Fed. R. Civ. Proc. 23.1(a) requires the derivative shareholder to fairly and adequately represent shareholders. A derivative shareholder who brings litigation designed to benefit the plaintiffs' attorneys at the expense of the shareholder clients without any material benefit accruing to shareholders is plainly inadequate; it would be an abuse of the Court's equitable power to reward the attorneys for this self-dealing. Because the proposed settlement pays $10 million to plaintiffs' attorneys with no corresponding benefit to J&J, the shareholders are worse off and plaintiffs are unable to meet the adequacy requirements.

**A.**     **The Settlement Compensates Plaintiffs' Attorneys for Preexisting Governance Changes and Cosmetic Changes to Preexisting Policies.**

The proposed Settlement provides for J&J to adopt quality and compliance objectives and governance measures that have effectively been in place before this Settlement. Because the proposed Settlement merely provides cosmetic changes to preexisting policies and procedures it provides no benefit to the company or its shareholders. *See, e.g., Parker v. Time Warner Entm't Co.*, 631 F. Supp. 2d 242, 269 n.28 (E.D.N.Y. 2009) (finding that remedial relief of privacy notice and appointment of Chief Privacy Officer were "essentially cosmetic steps" with minimal value).

*In re Oracle Securities Litigation*, involved a similar situation. The district court rejected the settlement of the derivative litigation which proposed improvements to Oracle's insider trading policy and revenue recognition policies and practices, awarded $750,000 in attorneys' fees and provided releases for the individual defendants. 829 F. Supp. 1176, 1184-85 (N.D. Cal. 1993). The court noted that the settlement "confers a substantial benefit on the individual defendants and derivative plaintiffs' counsel," but it was unclear what benefit Oracle was receiving. *Id.* at 1185. Specifically, the court questioned plaintiffs' contention "that their lawsuit, rather than some other stimulus, actually caused Oracle to make [the policy] changes." *Id.* at 1184. "[T]he need to improve investor confidence in Oracle was itself a ***primary motivator*** behind Oracle's decision to change its revenue recognition policies," as well as "[f]ear of further class actions." *Id.* (emphasis added). *See also In re Oracle Sec. Litig.*, 132 F.R.D. 538, 544-45 (N.D. Cal. 1990) ("The classic manifestation of the problem in a class action involves

a non-pecuniary settlement (e.g., injunctive relief), 'expert valued' at some fictitious figure, together with arrangements to pay plaintiffs' lawyers their fees. The defendants thus get off cheaply, the plaintiffs' (and defendants') lawyers get the only real money that changes hands and the court, which approves the settlement, clears its docket of troublesome litigation. Little wonder that 'all the dynamics conduce to judicial approval of such settlements.'").

So too here. The settling parties acknowledge that beginning in early 2010, J&J's "corporate governance and compliance organizational structure, policies, protocols and procedures have been enhanced and changed." Exhibit B to Stipulation of Settlement (Dkt. No. 182-2) at 1. In April 2010, a Special Committee of the J&J Board was formed to investigate demand letters the J&J Board received from February through November 2010 by shareholders alleging breaches of fiduciary duties by J&J officers and directors. *See* Special Committee Report (Dkt No. 149-1) at 1-2. The proposed Settlement notes that the Special Committee conducted an "extensive investigation" with independent counsel at the conclusion of which it recommended the creation of a committee responsible for oversight of the J&J's quality and compliance systems and issues, which the independent directors unanimously approved on July 18, 2011. *See* Stipulation of Settlement (Dkt No. 182) at 3. Now, well after the company has adopted and implemented these changes, the plaintiffs' counsel asks this Court to conclude that the litigation and proposed Settlement is conferring a benefit for such changes that were the product of the independent Special Committee's recommendations motivated by J&J's desire to

11

improve investor confidence and avoid further litigation. *See Staton v. Boeing Co.*, 327 F.3d 938, 961 (9th Cir. 2003) (expressing concern about "the incorporation in the agreement of promotion and complaint programs Boeing had already developed and implemented").

The Settlement proposes five elements of relief which involve either cosmetic changes to preexisting policies or changes that were implemented by J&J based on recommendations by the Special Committee. Thus, plaintiffs cannot show that the Settlement provides any actual benefit to J&J or its shareholders.

### 1.     The "Core Objective" Is Not a Material Benefit.

The Settlement proposes the adoption by the Board of a Quality and Compliance Core Objective pursuant to which the company "will affirm its resolve to operate … in compliance with applicable laws, regulations and J&J policies and standards, to deliver high quality products … [and] to minimize adverse regulatory enforcement action." Notice of Proposed Settlement at 4. This objective, however, is encompassed in J&J's "Our Credo" that was first crafted in 1943. *See* Our Credo Values, http://www.jnj.com/connect/about-jnj/jnj-credo/ (Declaration of Theodore H. Frank ("Frank Decl.") Exh. A). The Credo provides:

> We believe our first responsibility is to the doctors, nurses and patients, to mothers and fathers and all others who use our products and services. In meeting their needs everything we do must be of high quality. … We must provide competent management, and their actions must be just and ethical. …

*See* J&J Credo (Frank Decl. Exh. B). Not only does the Credo recognize quality and compliance as a core objective, but emphasizes that quality is J&J's *principal* objective as J&J's "first responsibility." *See id.* The Credo guides J&J's "decision making." *See* Our Credo Values (Frank Decl. Exh. A). The Settlement's proposed adoption of a core objective that has been guiding J&J for nearly 70 years is redundant and provides no benefit to J&J or its shareholders.

### 2.   The "RCGC Charter and Operating Procedure" Is Not a Material Benefit.

The Settlement also proposes the adoption of the Charter and Operating Procedures of the Regulatory, Compliance and Government Affairs Committee (RCGC). The Special Committee issued a report on June 27, 2011 recommending, *inter alia*, the creation of RCGC for monitoring and oversight of Health Care Compliance and Quality and Compliance systems and issues. *See* Special Committee Report (Dkt No. 149-1) at 121. The independent directors unanimously approved the Report on July 18, 2011. *See* Stipulation of Settlement (Dkt No. 182) at 3. The J&J Board has already created RCGC and RCGC's current charter is nearly *identical* to the proposed charter outlined in the Settlement. *Compare* Stipulation of Settlement (Dkt. No. 182-1) at 2-9, *with* RCGC Charter (Frank Decl. Exh. C) (available at http://www.investor.jnj.com/documentdisplay.cfm?DocumentID=10722).      The proposed charter in the Settlement differs only by mention of the Settlement's Core Objective. *See id.* Plaintiffs' attorneys should not be rewarded for adding J&J's long-standing objective to an *existing* charter of an *existing* committee created by the Board

in response to the Special Committee's recommendation. Indeed, the settling parties have not demonstrated how any changes to RCGC's current charter and operating procedures provided by the Settlement Agreement would provide any benefit to J&J and its shareholders. The Seventh Circuit recently elaborated on the plaintiffs' basic theory: "In order to avoid a risk of…litigation, the company should be put through the litigation wringer (this suit) with certainty! How can replacing a 1% or even a 20% chance of a bad thing with a 100% chance of the same bad thing make investors better off?" *Robert F. Booth Trust*, 2012 U.S. App. LEXIS 11927, at *10.

### 3. The Product Risk Management Standard Is Not a Material Benefit.

The Settlement further proposes the adoption of a Product Risk Management (PRM) Standard "under the Quality Policy and Quality Framework" for "reporting, escalation and remediation of issues arising with products." Notice of Proposed Settlement at 7. The only explanation of the benefit of this standard is that "[p]laintiffs believe that the PRM Standard will be an important tool in the Company's compliance with requirements of the Q&C Core Objective." *Id.* at 8. What is wholly lacking is any explanation of what reporting and escalation standards are currently in place under the Quality Policy and how the PRM standard improves upon these standards.  Other than plaintiffs' self-serving statement, there is no evidence that the PRM standard proposed by the Settlement provides any benefit. *See In re Gen. Motors Corp. Pickup Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768, 785-86 (3d Cir. 1995)

(explaining that the proponents of the settlement bear the burden of proving value of the relief thereof); *id.* at 806-10 (concluding that the parties had failed to so prove).

### 4. The Evaluation/Compensation Standards Are Not a Material Benefit.

The Settlement proposes the inclusion of the Core Objective as a factor in the evaluation and compensation of J&J Employees. Notice of Settlement at 5. J&J's Credo—which encompasses the core objective of quality and compliance—is already a factor in determining compensation. *See* Compensation & Benefits Committee Charter (http://www.investor.jnj.com/documentdisplay.cfm?DocumentID=1264) (Frank Decl. Exh. D) (CEO compensation determined "against the background of the factors and principles outlined in the Credo"). Further, the parties provide no evidence how the proposed addition will change J&J's existing compensation policies, much less how such changes provide any benefit.

### 5. The Funding of Governance Reforms Is Not a Material Benefit.

The final proposed item involves funding the governance reforms and maintaining such changes for five years. *See* Notice of Settlement at 8; Stipulation of Settlement at 9.) Notably, the Settlement does not provide an estimate of the cost of such funding. Indeed, if J&J spends more money to implement cosmetic and superfluous changes than it would have spent in its normal business judgment in pursuit of the Credo, shareholders will actually be *worse* off as the company will be spending money it otherwise would not have spent.

Further, requiring J&J to maintain these particular policies for five years is an improper restriction on management's sound judgment. While J&J implemented changes to improve quality and compliance in early 2010, management exercising their business judgment may wish to amend policy to further improve J&J's quality and compliance systems. But with the Settlement in place, management's hands will be tied and unable to make any changes. There is no evidence that eliminating flexibility of management in 2017 is a benefit to shareholders, and it could very well hurt shareholders.

All of the proposed items in the Settlement reflect preexisting governance changes or merely incorporate J&J's pre-existing aspirational goal of quality and compliance. Making the proposed cosmetic changes in exchange for $10 million in plaintiffs' attorneys fees demonstrates that the plaintiffs are inadequate to represent the shareholders.

## B.   J&J's Promise to Obey the Law Provides No Valuable Benefit under the Settlement.

The proposed Core Objective includes J&J's promise to comply with applicable laws and regulations. Notice of Settlement at 4. While the Core Objective merely affirms J&J's pre-existing objectives, *see* Section II.A.1, any promise by J&J "to do that which the law already requires is not a valuable benefit." *Levell v. Monsanto Research Corp.*, 191 F.R.D. 543, 544-45 (S.D. Ohio 2000) (citing *Franks v. Kroger Co.*, 649 F.2d 1216, 1224 (6th Cir. 1981), *vacated on other grounds and modified*, 670 F.2d 71 (6th Cir. 1982) (finding little benefit to class members from settlement agreement provisions

which obligated the defendant "to do what the law generally requires")); *Reich v. Walter W. King Plumbing & Heating Contractor, Inc.*, 98 F.3d 147, 150 (4th Cir. 1996) (defendant not the "prevailing party" under a settlement that merely obligated plaintiff to do that which the law already required). Affirming J&J's commitment to follow the law does not provide a benefit to the company and its shareholders. The fact that the plaintiffs have permitted their attorneys to negotiate an award of $10 million in fees in exchange for J&J's affirmed promise to obey the law reflects that plaintiffs are inadequate to represent the shareholders.

Indeed, J&J's affirmed commitment to compliance is more likely the result of regulatory actions. The Special Committee reported on several regulatory actions including:

- A Consent Decree of Permanent Injunction with the U.S. Food and Drug Administration (FDA) was entered against J&J subsidiary McNeil on March 10, 2011 to improve quality systems at U.S. manufacturing facilities. *See* Special Committee Report (Dkt No. 149-1) at 55-58.

- J&J subsidiary DePuy's deferred prosecution agreement (DPA) with the U.S. Attorney's Office for the District of New Jersey regarding a complaint containing anti-kickback allegations that was dismissed with prejudice on March 30, 2001 based on Depuy's full compliance. *See id.* at 94.

- J&J entered into a DPA with the DOJ in April 2011 regarding allegations of FCPA violations. *See id.* at 115-16. Pursuant to the DPA,

17

J&J agreed to pay $21.4 million and continue to implement its FCPA compliance program. *Id.* J&J also agreed to pay the SEC $48.6 million in disgorged profits pursuant to a Judgment to which J&J consented without admitting or denying SEC's allegations. *Id.*

Any governance or policy changes resulting from these regulatory actions is based on the government's investigations and not the plaintiffs' negotiation of the Settlement. "Allowing private counsel to receive fees based on the benefits created by public agencies would undermine the equitable principles which underlie the concept of the common fund, and would create an incentive for plaintiffs attorneys to 'minimize the costs of failure . . . by free riding on the monitoring efforts of others.'" *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 336-37 (3d Cir. 1998); *see also In re Cendant Corp. Prides Litig.*, 243 F.3d 722, 741 (3d Cir. 2001) (same); John C. Coffee, Jr., *The Unfaithful Champion: The Plaintiff as Monitor in Shareholder Litigation*, 48 LAW & CONTEMP. PROBS. 5, 29 (1985) (recognizing that "real moving force" in *In re Gen. Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075 (6th Cir. 1984) was not the plaintiff, but "the SEC, the FCC, or perhaps even General Tire's board itself"). Plaintiffs' counsel should not be compensated for any preexisting policies implemented due to government investigations.

### C. The Market Agrees that the Proposed Settlement Provides No Benefit to the Company.

The settling parties have provided no evidence demonstrating that the proposed Settlement will benefit the shareholders. Indeed, the market agrees. J&J

announced the proposed Settlement in its 8-K filing on July 20, 2012. *See* J&J 8-K dated July 20, 2012 (Frank Decl. Exh. E). Between the release of the 8-K and the close of trading July 24, 2010, J&J's stock price dropped from $69.35/share to $67.35 (blue line), a slightly larger percentage drop than the Dow Jones Industrial Average (red line) over the same period. *See* Frank Decl. ¶¶ 10-11 (obtaining historical quote information from www.nasdaq.com).



While the stock price drop relative to the broader market may not have been caused by the announcement of the Settlement, "these data do imply that the [Settlement's proposed changes] did not produce any measurable benefit." *Annex Books, Inc. v. Indianapolis*, 624 F.3d 368, 370 (7th Cir. 2010). The market appears to have rejected the idea that the settlement of this litigation benefited J&J in any material way. In the absence of a showing by plaintiffs' counsel that J&J stock would have dropped even

further in the absence of the settlement, the market reaction is dispositive evidence that shareholders are not better off from the settlement. *See generally* Frank H. Easterbrook and Daniel R. Fischel, *The Economic Structure of Corporate Law* 17-20 (1991) (stock price reflects value of corporate governance structure).

In sum, the company is paying $10 million to plaintiffs' attorneys to affirm *already existing* company objectives. Because the plaintiffs brought the litigation to benefit the plaintiffs' attorneys at the expense of shareholders, the plaintiffs have "interests antagonistic to those of the class," *Vanderbilt*, 725 F.2d at 207, and cannot "fairly and adequately represent the interests of shareholders," Fed. R. Civ. Proc. 23.1(a). Accordingly, this "derivative action may not be maintained." *Id.*

## IV.   Plaintiffs' Self-Dealing Clauses in the Settlement Provide Additional Grounds for Rule 23.1(a) Dismissal.

In evaluating whether a derivative settlement agreement is fair and reasonable, the court should "consider factors applied initially to class action settlement agreements, *Girsh v. Jepson*, 521 F.2d 153, 156-57 (3d Cir. 1975), and subsequently to derivative actions, *Shlensky v. Dorsey*, 574 F.2d 131, 147-49 (3d Cir. 1978)." *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304. 1311 (3d Cir. 1993) (citing *In re Pittsburgh & Lake Erie R.R. Co. Sec. & Antitrust Litig.*, 543 F.2d 1058, 1070 (3d Cir. 1976)).

*Girsh's* list, however, contains only "some of the factors," *Girsh*, 521 F.2d at 156, and are far from dispositive: "because of a 'sea-change in the nature of class actions' since Girsh was decided in 1975, district courts should also consider other potentially relevant and appropriate factors." *In re AT & T Corp.*, 455 F.3d 160, 165

(3d Cir. 2006) (citing *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 323 (3d Cir. 1998)). Another factor whose relevance this Court must consider is "whether any provisions for attorneys' fees are reasonable." *Id. Accord In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946-47 (9th Cir. 2011) (multi-factor test is necessary but not sufficient for settlement approval); *In re Schering-Plough/Merck Merger Litig.*, No. 09-CV-1099, 2010 U.S. Dist. LEXIS 29121, at *17 n. 4 (D.N.J. Mar. 25, 2010). Finally, in performing this analysis, "[t]he principal factor . . . is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." *Id.* (quoting *Shlensky*, 574 F.2d at 147); *In re Pittsburgh*, 543 F.2d at 1068 ("Since the corporation is the intended beneficiary of the suit, fairness of the settlement must in the first instance, we suppose, be measured by the benefit or detriment to [the corporation].").

This Settlement is impermissibly lawyer-driven. Here, it is clear that the settlement proposes valueless relief in the form of cosmetic changes to preexisting company policies at the cost of $10 million to plaintiffs' attorneys. In a case less egregious than this, the Third Circuit had "no hesitation" in holding approval of the settlement to be an abuse of discretion. *In re Pittsburgh*, 543 F.2d at 1071 (finding "minimal if not non-existent benefit" to the company, "costs [to] that corporation [of] $2,100,000," and "actual benefits [that] flow only to plaintiffs' attorneys and the 7% minority stockholders."). *Contrast Bell Atlantic*, 2 F.3d at 1307 (comparatively small fee award of approximately $400,000). Though the lawsuit alleges wrongdoing by the directors of the corporation at the expense of the corporation, the settlement requires

payment by the corporation to the plaintiffs' attorneys. To the extent the lawsuit has any merit, J&J loses twice.

Though *Pittsburgh* would normally preclude settlement approval, Petri prefers the remedy of dismissal to a rejection of the settlement; but if the Court will not dismiss the litigation, it should recognize that the only thing worse than this settlement for shareholders would be to force J&J to continue to spend money on litigation. (Indeed, it was surely the substantial costs of litigation that motivated J&J to agree to such an extortionate settlement at the expense of shareholders.) Thus, as in *Robert F. Booth Trust*, the Court should dismiss for failure to meet the Rule 23.1(a) adequacy requirement. But if the Court is not going to dismiss, then it should approve the settlement—with the caveat that the fee award should be reduced to a level that will sufficiently deter similarly abusive strike suits where the sole beneficiaries are the attorneys.

### A.    The Settlement Is Rife With Evidence of Self-Dealing.

Courts have repeatedly recognized that "class actions are rife with potential conflicts of interest between class counsel and class members." *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 785 (7th Cir. 2004) (citing cases). The dynamic is no different in shareholder derivative litigation. *Felzen v. Andreas* recognized this problem a decade ago:

> Rule 23.1 provides for notice to shareholders only in the event of dismissal or settlement, so that other investors may contest the faithfulness or honesty of the self-appointed plaintiffs; we do not doubt that this monitoring is often useful and that intervention to facilitate an

22

appeal could be justified. Many thoughtful students of the subject conclude, with empirical support, that derivative actions do little to promote sound management and often hurt the firm by diverting the managers' time from running the business while diverting the firm's resources to the plaintiffs' lawyers without providing a corresponding benefit. Janet Cooper Alexander, *Do the Merits Matter? A Study of Settlements in Securities Class Actions*, 43 Stan. L. REV. 497 (1991); Reinier Kraakman, Hyun Park & Steven Shavell, *When are Shareholder Suits in Shareholder Interests?*, 82 GEO. L.J. 1733 (1994); Roberta Romano, *The Shareholder Suit: Litigation Without Foundation?*, 7 J.L. ECON. & ORG. 55 (1991); Mark L. Cross, Wallace N. Davidson & John H. Thornton, *The Impact of Directors' and Officers' Liability Suits on Firm Value*, 56 J. RISK & INSURANCE 128 (1989); Daniel R. Fischel & Michael Bradley, *The Role of Liability Rules and the Derivative Suit in Corporate Law: A Theoretical and Empirical Analysis*, 71 CORNELL L. REV. 261 (1986). The two shareholder-appellants in this case believe that the modest settlement, half of which will be paid to counsel, exemplifies this problem.

134 F.3d 873, 876 (7th Cir. 1998), *aff'd by an equally divided Court, California Public Employees' Retirement System v. Felzen*, 525 U.S. 315 (1999). This settlement is even worse than the one in *Felzen*: the attorneys get $10 million while J&J gets zero in cash.

The concerns about the potential conflict of interest between class counsel and their clients "warrant special attention when the record suggests that settlement is driven by fees; that is, when counsel receive a disproportionate distribution of the settlement…" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1021 (9th Cir. 1998*); accord In re Bluetooth Headset Prod. Liability Litig.*, 654 F.3d 935, 947 (9th Cir. 2011). "If fees are unreasonably high, the likelihood is that the defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members or less injunctive relief for the class than could

23

otherwise have obtained." *Staton v. Boeing Co.*, 327 F.3d 938, 964 (9th Cir. 2003); *accord Bluetooth*, 654 F.3d at 947; John C. Coffee, Jr., *The Regulation of Entrepreneurial Litigation: Balancing Fairness and Efficiency in the Large Class Action*, 54 U. CHI. L. REV. 877, 883 (1987) ("The classic agency cost problem in class actions involves the 'sweetheart' settlement, in which the plaintiff's attorney trades a high fee award for a low recovery.").

There need not be explicit collusion to create the sort of self-dealing unfairness that benefits class counsel at the expense of their clients, only acquiescence: "a defendant is interested only in disposing of the total claim asserted against it" and "the allocation between the class payment and the attorneys' fees is of little or no interest to the defense." *Staton*, 327 F.3d at 964 (*quoting In re GM Trucks*, 55 F.3d at 819-20); *accord Bluetooth*, 654 F.3d at 949; *cf. Mirfasihi*, 356 F.3d at 785. Thus, courts judging the fairness of a settlement should not just simply ask whether a settlement was negotiated at arms' length, but whether the attorneys are unfairly pursuing their self-interest at the expense of the class. *Mirfasihi*, 356 F.3d at 785; *Bluetooth*, 654 F.3d at 947; *cf. also* AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 3.05, comment b at 208 (2010) ("a proposed settlement in which the class receives an insubstantial payment while the fees requested by counsel are substantial could raise fairness concerns").

*Bluetooth* suggests a nonexclusive list of possible signs of self-dealing. *Bluetooth*, 654 F.3d at 947. Two of these "multiple indicia" of unfairness are present here. *Id.* First, "counsel receive[d] a disproportionate distribution of the settlement"—in this

case, all of it. *Id.* (quoting *Hanlon*, 150 F.3d at 1021). Plaintiffs' counsel is requesting $10 million for itself; the shareholders and company they purport to be representing will get no cash at all.

While the plaintiffs argue that they did not negotiate their attorneys' fees until after the rest of the settlement was negotiated, *see* Notice of Settlement at 9, as a matter of economic analysis, this is irrelevant to the question of self-dealing. The settling parties are rational economic actors. Even when the negotiations over fees are severed, the parties know in advance that those negotiations are coming, that the defendants have a reservation price based on their internal valuation of the litigation, and that every dollar negotiated for the shareholders reduces the amount the defendants are willing to pay plaintiffs' counsel. The defendants can further reasonably estimate in advance what plaintiffs will claim their lodestar to be from their own defense costs. Because these future fee negotiations are not an unexpected surprise, and because the parties know a settlement will not occur unless the parties agree to an attorney-fee clause, the overhang of the future fee negotiations necessarily infects the earlier settlement negotiations. "Even if the plaintiff's attorney does not consciously or explicitly bargain for a higher fee at the expense of the beneficiaries, it is very likely that this situation has indirect or subliminal effects on the negotiations." *Court Awarded Attorney Fees*, Report of the Third Circuit Task Force, 108 F.R.D. 237, 266 (1985). Moreover, the Third Circuit has directly held that such separation does nothing to allay any conflict unless "fee negotiations [are] postponed until the settlement has been judicially approved, not merely until the date the parties allege to

have reached an agreement." *In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Litig.*, 418 F.3d 277, 308 (3d Cir. 2005) (quoting *GM Trucks,* 55 F.3d at 804); *cf. also Bluetooth*, 654 F.3d at 948 (neither presence of neutral mediator nor separation of fee negotiations from other settlement negotiations demonstrates that a settlement is fair). "In other words, the negotiation of class counsel's attorneys' fees is not exempt from the truism that there is no such thing as a free lunch." *Staton*, 327 F.3d at 964.

*Second*, the settlement has a "clear sailing" arrangement providing for the payment of attorneys' fees without challenge from the defendants. *Bluetooth*, 654 F.3d at 948. A clear sailing clause stipulates that attorney awards will not be contested by opposing parties. "Such a clause by its very nature deprives the court of the advantages of the adversary process." *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 525 (1st Cir. 1991). The clear sailing clause lays the groundwork for lawyers to "urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees." *Id.* at 524; *accord Bluetooth*, 654 F.3d at 947. Here, class counsel put its own fees ahead of the interests of the shareholders by negotiating a provision that insulated those fees from challenge by the defendant. *See* Notice of Settlement at 9. The "clear sailing" provision in the settlement whereby J&J agrees not to challenge the $10 million attorney-fee request is further evidence of the self-dealing nature of the settlement meriting additional scrutiny. *Weinberger*, 925 F.2d at 524; *Malchman v. Davis*, 761 F.2d 893, 906-908 (2d Cir. 1985) (Newmn, J., concurring) ("It is unlikely that a defendant will gratuitously accede to the plaintiffs' request for a 'clear

sailing' clause without obtaining something in return. That something will normally be at the expense of the plaintiff class"); *BTZ, Inc. v. Great N. Nekoosa Corp.*, 47 F.3d 463, 465 (1st Cir. 1995); *Levit v. Filmways, Inc.*, 620 F. Supp. 421, 423-24 (D. Del. 1985).

In short, the proposed Settlement by itself provides substantial evidence of self-dealing that requires dismissal under Rule 23.1(a).

## B.    The Risks of Establishing Liability Highlight the Impermissible Self-Dealing.

Plaintiffs face an uphill battle in proving liability. This Court dismissed Civil No. 10-2033 without prejudice for failure to make a demand on J&J's board. *See In re J&J Deriv. Litig.*, --- F. Supp. 2d ---, 2011 U.S. Dist. LEXIS 112292, *99 (D.N.J. Sept. 29, 2011). This Court found that they could not proceed because the shareholders failed to make a particularized demonstration that demand would have been futile. *Id.* at *22-24. Specifically, this Court held that "none of the various types of red flags [alleged by plaintiffs] suggest that the Board acted in bad faith." *Id.* at *92. J&J filed a similar motion to dismiss for failure to make a demand in Civil No. 11-2511. *See* J&J Mot. to Dismiss FCPA Deriv. Litig (Dkt. No. 49-5). *Cf. Robert F. Booth Trust*, 2012 U.S App. LEXIS 11927 at *12 ("Derivative litigation in the teeth of the demand requirement … is not the way to handle this subject.").

Even if the proceedings at issue could survive dismissal, defendants have the additional defense of the Special Committee's findings. In *Bell Atlantic Corp. v. Bolger*, the Third Circuit noted the defendants' strong defenses including the fact that "a special committee armed with independent counsel undertook an investigation and

27

determined Bell Atlantic management had acted reasonably and in the best interests of the company [which] meant it would be difficult for plaintiffs to show recklessness or intentional misfeasance by the Bell Atlantic directors." 2 F.3d at 1313; *see also* John C. Coffee, Jr., *The Unfaithful Champion: The Plaintiff as Monitor in Shareholder Litigation,* 48 LAW & CONTEMP. PROBS. 5, 32-33 (1985) ("The primary consequence of judicial deference to special litigation committees may be not to abolish the derivative action, but to minimize the possibility of a substantial corporate recovery."). The Third Circuit in *Bell Atlantic* concluded:

> [The objector] complains the corporation did not get much. Now we may know why. Even if plaintiffs hoped to secure a large damage award, this would have to be drastically discounted by the improbability of their success on the merits given the individual defendants' strong defenses. Thus, even if we attach a small figure to the value of the corporate governance changes (as [objector] urges), this small value may be fair consideration for and accurately reflect the expected payout at trial net of the costs of trial.

2 F.3d at 1313.  Here, the worthless relief offered by the proposed Settlement may very well be fair in light of the defendants' strong defenses. But given J&J's strong defenses and the minimal, if any, value of the proposed relief, however, it is clear that the $10.45 million "clear-sailing" request for an award to the attorneys is wholly disproportionate to such relief and the product of impermissible self-dealing that requires rejection of the fee award.

**V.      In the Alternative, Petri Objects to the Exorbitant Request for a $10.45 Million Fee Award.**

If these lawsuits are not dismissed for failure to meet the Rule 23.1(a) adequacy ground, Petri does not object to approval of the settlement: it is better for Johnson & Johnson shareholders to end the litigation expenses of this strike suit.

But if the Settlement is approved the proposed $10.45 million attorney award should, at a minimum, be heavily truncated to reflect the actual, minimal value of the proposed relief. Plaintiffs' counsel is requesting $10 million in fees and $450,000 in expenses, backed by the comfort of a clear sailing clause, for only cosmetic benefits to the class. The plaintiffs taking credit for preexisting governance changes or provisions that merely incorporate J&J's pre-existing aspirational goal of quality and compliance is akin to a rooster taking credit for the sun rising. It is not a grounds for awarding attorneys' fees. *See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 336-37 (3d Cir. 1998); AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 3.13 Illustration 2 (2010).

Petri joins any objection to the attorney-fee request not inconsistent with the arguments made in this brief. Plaintiffs' counsel has not yet filed their fee request, and their briefing may provide additional grounds for objection; Petri thus reserves the right to supplement his objection to the fee request by the objection deadline. *Cf. In re Mercury Interactive Corp. Sec. Lit.*, 618 F.3d 988, 995 (9th Cir. 2010) (requiring class counsel to submit its basis for attorneys' fees well before objections are due to permit class members to address the claims made). He further reserves the right to cross-examine any witnesses presented in support of the settlement at the fairness hearing.

## Conclusion

These strike suits should be dismissed for failure to meet the adequacy requirements of Fed. R. Civ. Proc. 23.1(a). If the action is not dismissed, Petri does not wish the settlement rejected: further litigation would only cause additional harm to shareholders. But in conjunction with the Court's approval of the Settlement, the attorneys' fees should be reduced to $1.00 or another amount that does not reward the plaintiffs for bringing a strike suit that has drained the corporate treasury and harmed shareholders for no good reason.

Dated: August 31, 2012                    Respectfully submitted,

*David M. Nieporent*

David M. Nieporent
SAMUEL & STEIN
38 West 32nd Street, Suite 1110
New York, NY 10001
Phone: (212) 563-9884
Fax: (212) 563-9870
Email: dnieporent@samuelandstein.com

Theodore H. Frank (*pro hac vice* pending)
CENTER FOR CLASS ACTION FAIRNESS
1718 M Street NW, No. 23-6
Washington, DC 20036
Telephone:  (703) 203-3848
Email:  tedfrank@gmail.com

Attorneys for Intervenor and Objector
Mark G. Petri

## CERTIFICATE OF SERVICE

The undersigned certifies he caused to be served via FedEx overnight shipment a copy of this Objection and Memorandum in Support of Motion to Dismiss upon the following:

Clerk of Court
U.S. District Court for the District of New Jersey
Clarkson S. Fisher Building & U.S. Courthouse
402 East State Street, Room 2020
Trenton, NJ 08608


Carella, Byrne, Cecchi, Olstein,          Patterson Belknap Webb & Tyler
Brody & Agnello, P.C.                      Attn: Erik Haas
Attn: James E. Cecchi                      1133 Avenue of the Americas
5 Becker Farm Road                         New York, NY 10036
Roseland, NJ 07068

                                           Sidley Austin LLP
Kantrowitz, Goldhamer &                    Attn: Kristen R. Seeger
Graifman, P.C.                             One South Dearborn Street
Attn: Gary Graifman                        Chicago, IL 60603
210 Summit Avenue
Montvale, NJ 07645


I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 31, 2012

*David M. Nieporent*
David M. Nieporent