# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE JOHNSON & JOHNSON DERIVATIVE LITIGATION | Civil Action No. 10-2033 (FLW) |
| IN RE JOHNSON & JOHNSON FCPA SHAREHOLDER DERIVATIVE LITIGATION | Civil Action No. 11-2511 (FLW) |
| COPELAND v. PRINCE, *et al.* | Civil Action No. 11-4993 (FLW) |

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF DERIVATIVE LITIGATION SETTLEMENT AND AWARD OF ATTORNEY'S FEES AND REIMBURSEMENT OF EXPENSES

---

James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
 OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
 Roseland, New Jersey 07068
(973) 994-1700
*Attorneys for Demand Futile Plaintiffs*

Gary Graifman
KANTROWITZ, GOLDHAMER &
GRAIFMAN, P.C.
210 Summit Avenue
 Montvale, New Jersey 07645
(201) 391-7000
*Attorneys for Demand Refused Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

I.      INTRODUCTION ........................................................................................... 1

II.     PROCEDURAL AND FACTUAL BACKGROUND ..................................... 4

        A.      Demand Futility Action ....................................................................... 5

        B.      Demand Letters and Demand Refused Actions .................................. 6

        C.      The Settlement Negotiations ............................................................... 8

III.    THE PROPOSED SETTLEMENT MERITS FINAL APPROVAL ............. 10

        A.      The Final Approval Standard ............................................................ 10

        B.      The Substantial Benefits of the Settlement to J&J
                and its Shareholders Warrants Final Approval ................................. 12

                1.      J&J's Adoption of the Q&C Core Objective ......................... 13

                2.      Making Adherence to the Q&C Core Objective a Factor in
                        the Evaluation and Compensation of All J&J Employees ...... 15

                3.      Adoption of the RCGC Charter and Operating Procedure ..... 16

                4.      Adoption of the Product Risk Management Standard ............. 18

                5.      New Adverse Event Management and Non-Conformance
                        Management Standards ........................................................... 21

                6.      Settlement Commitment Term and Funding Provisions ......... 21

        C.      Application of the *Girsh* Factors Further Supports Final Approval ... 23

                1.      The Risks of Continuing to Litigate, and of Establishing Liability
                        and Damages and the Complexity, Expense and Likely Duration
                        of the Litigation .................................................................... 23

                2.      The Reaction of J&J Shareholders to the Settlement .............. 24

i

3.   The Stage of the Proceeding and the Amount of Discovery
     Completed .......................................................................................... 25

4.   The Risks of Maintaining the Derivative Actions through Trial ......... 26

5.   The Ability of Defendants to Withstand a Greater Judgment ............. 26

6.   Range of Reasonableness of the Settlement Compared to the
     Best Possible Recovery ........................................................................ 26

D.   Transmission of the Notice of Settlement to J&J Shareholders was
     Adequate ....................................................................................................... 27

1.   The Notice Procedure ........................................................................... 27

2.   The Notice Procedure Satisfies Due Process ....................................... 28

IV.   THE REQUESTED FEE AWARD IS FAIR AND SHOULD BE APPROVED ....... 29

A.   Legal Standard Governing Fee Applications ................................................. 29

B.   Application of the Legal Standard Supports Approval of the
     Agreed-Upon Fee Award ............................................................................... 31

1.   Plaintiffs Have Provided a Substantial Benefit to the Corporation ...... 31

2.   Other Relevant Factors Further Support the Requested Fee Amount ... 32

     a.   Awards in Other Derivative Cases ............................................. 32

     b.   Skill and Efficiency of Attorneys, Complexity of the Case
          and the Risk of Nonpayment Support the Requested Fee
          Award ......................................................................................... 34

     c.   The Amount of Time Devoted ..................................................... 37

C.   Other Factors Support the Requested Fee Award .......................................... 39

D.   The Amount of Litigation Costs and Expenses is Reasonable ....................... 40

V.   CONCLUSION ...................................................................................................... 41

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bell Atlantic Corp v. Bolger*,
    2 F.3d 1304 (3d Cir. 1993)..................................................................................11, 28

*City of Pontiac Gen. Employees' Ret. Sys. v. Langone*,
    No. 2006-cv-122302, slip op. (Fulton County, Ga. June 10, 2008) (Exh. 12 hereto) ............34

*Cohn v. Nelson*,
    375 F. Supp. 2d. 844 (E.D. Mo. 2005)...........................................................................39

*Girsh v. Jepson*,
    521 F.2d 153 (3d Cir 1975) ...........................................................................11, 23, 26, 27

*Granada Investments, Inc. v. DWG Corp.*,
    962 F.2d 1203 (6th Cir. 1992) ....................................................................................35

*In re AOL Time Warner S'holder Derivative Litig.*,
    No. 02-civ-6302 (SWK), 2006 WL 2572114 (S.D.N.Y. Sept. 6, 2006)...........................11, 12

*In re AT & T Corp. Secs. Litig.*,
    455 F.3d 160 (3d Cir. 2006)........................................................................................30, 39

*In re BP PLC Derivative Litig.*,
    No. 3AN-06-11929CI, slip op. (Al. Sup. Ct. May 7, 2008) (*see* Exh. 11 hereto) ..................34

*In re Cendant Corp. Litig.*,
    264 F.3d 201 (3d Cir. 2001).......................................................................................25

*In re Cendant Corp. Derivative Action Litig.*,
    232 F. Supp. 2d 327 (D.N.J. 2002)..................................................................11, 33, 36, 37

*In re Corel Corp. Sec. Litig.*,
    293 F. Supp. 2d 484 (E.D. Pa. 2003) ............................................................................28

*In re Diet Drugs*,
    582 F.3d 524 (3d Cir. 2009).......................................................................................37

*In re Fed. Home Loan Mortg. Corp. Sec. & Derivative Litig.*
    ("*Freddie Mac*"), MDL 1584, Case Nos. 05-cv-2596 & 04-cv-2634 (S.D.N.Y. Oct.
    26, 2006) (Exh. 13 hereto) .........................................................................................34

*In re Ikon Office Solutions, Inc. Sec. Litig.*,
    194 F.R.D. 166 (E.D. Pa 2000)....................................................................................36

*In re Merck & Co., Inc. Vytorin Erisa Litig.*,
   No. 08-cv-285 (DMC), 2010 WL 547613 (D.N.J. Feb. 9, 2010) ...........................38

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
   148 F.3d 283 (3d Cir. 1998).................................................................................37

*In re Remeron End-Payor Antitrust Litig.*,
   No. Civ. 02-2007 FSH, 2005 WL 2230314 (D.N.J. Sept. 13, 2005).....................38

*In re Rite Aid Corp. Sec. Litig.*,
   396 F.3d 294 (3d Cir. 2005)..................................................................................37

*In re Sch. Asbestos Litig.*,
   921 F.2d 1330 (3d Cir. 1990) ...............................................................................12

*In re Schering-Plough Corp. S'holder Derivative Litig.*,
   Civ. Action No. 01-1412, 2008 WL 185809 (D.N.J. Jan. 14, 2008) ............... *passim*

*In re Warner Communications Sec. Litig.*,
   618 F. Supp. 735 (S.D.N.Y. 1985) .......................................................................36

*In re: Warfarin Sodium Antitrust Litig.*,
   391 F.3d 516 (3d Cir. 2004)..................................................................................12

*Kyriazi v. Western Elec. Co.*,
   647 F.2d 388 (3d Cir.1981)...................................................................................28

*Lambrecht v. Taurel*,
   08-cv-68-WTL-TAB, 2010 WL 2985946 (S.D. Ind. June 8, 2010) .................33, 34

*Maher v. Zapata Corp.*,
   714 F.2d 436 (5th Cir. 1983) ................................................................................35

*McCoy v. Health Net, Inc.*,
   569 F. Supp. 2d 448 (D.N.J. 2008) .......................................................................38

*Milliron v. T-Mobile USA, Inc.*,
   423 Fed. Appx. 131 (3d Cir. 2011)........................................................................38

*Mills v. Elec. Auto-Lite Co.*,
   396 U.S. 375 (1970)........................................................................................29, 31

*Ramey v. Cincinnati Enquirer, Inc.*,
   508 F.2d 1188 (6th Cir. 1974) ..............................................................................40

*Rowe v. E.I. DuPont de Nemours & Co.*,
   Civ. Nos. 06-1810, 06-3080, 2011 WL 3837106 (D.N.J. Aug. 26, 2011)..............38

*Shlensky v. Dorsey,*
    574 F.2d 131 (3d Cir. 1978)...........................................................11, 23, 29, 39

*Unite Nat'l Ret. Fund v. Watts,*
    No. 04-cv-3603 (DMC), 2005 WL 2877899 (D.N.J. Oct. 28, 2005)............................ *passim*

*Varacallo v. Mass. Mut. Life Ins. Co.,*
    226 F.R.D. 207 (D.N.J. 2005)...............................................................38

*Weber v. Gov't Employees Ins. Co.*
    262 F.R.D. 431 (D.N.J. 2009)...............................................................39

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23.1(b)(3)(A).....................................................................1

Fed. R. Civ. P. 23.1(b)(3)(B).....................................................................1

Fed. R. Civ. P. 23.1(c).........................................................................10

Lead Counsel in the above captioned Derivative Actions[1] respectfully submit this memorandum of law in support of their Motion for Final Approval of the Derivative Actions Settlement, which this Court preliminarily approved on July 16, 2012, and for approval of attorneys' fees and reimbursement of expenses.

## I.   INTRODUCTION

The proposed settlement of the Derivative Actions (the "Settlement") provides substantial benefits to Johnson & Johnson ("J&J" or the "Company") and its shareholders, and is the product of contentious litigation and arm's-length negotiations. Plaintiffs prosecuted this action to rectify alleged systemic failures in J&J's corporate governance and oversight of its healthcare compliance and quality control systems, which caused unprecedented product recalls, substantial reputational harm and significant civil and criminal penalties and jury verdicts. Defendants disputed Plaintiffs' theories of liability, and the Court dismissed the Amended Complaint in the consolidated Demand Futility Actions, holding that Plaintiffs needed to provide more specific allegations tying the Board to notice of the wrongdoing in order to establish a case for director liability. Motion practice on the Demand Refused Actions has been stayed pending settlement negotiations.

The core allegations raised in the Derivative Actions were that J&J's board of directors (the "Board") and senior management breached their fiduciary duties in allowing widespread violations of current good manufacturing practices ("cGMP") and drug marketing laws across

---

[1] The "Derivative Actions" include demand letters (the "Demand Letters") sent by shareholders to the Board, actions in which Plaintiffs allege pursuant to Fed. R. Civ. P. 23.1(b)(3)(B) that it would have been futile to demand that the Board investigate and pursue litigation against the Individual Defendants (the "Demand Futile Actions"), and actions wherein Plaintiffs allege pursuant to Fed. R. Civ. P. 23.1(b)(3)(A) that the Board wrongfully refused demands that were made on the Board (the "Demand Refused Actions"). Unless otherwise defined herein, capitalized terms have the same meaning as set forth in the Stipulation and Agreement of Settlement (the "Stipulation," No. 10-2033, ECF No. 181-2).

J&J's operating companies, resulting in J&J recalling millions of products and paying substantial fines.  As described more fully below, the corporate governance reforms achieved by the proposed Settlement address these allegations directly by providing for the adoption of management level systems and procedures designed to ensure early detection and remediation of all product issues across the array of J&J products, and for corporate governance reforms designed to ensure the flow of information necessary to senior management and the Board to support robust oversight of compliance and quality control issues throughout J&J's worldwide operations.  The proposed Settlement was designed and negotiated with extreme care and attention to the formulation of, and agreement to, highly detailed provisions which support the conclusion of Plaintiffs' experts of the substantial benefits the proposed Settlement provides to J&J and its shareholders.  The Settlement terms are also discussed in detail below and are addressed in the Declaration of Harvey L. Pitt in Support of Settlement (the "Pitt Decl.") and the Report of Dr. Mitchel Glass in Support of Settlement of the Johnson & Johnson Derivative Actions (the "Glass Report").  The Pitt Decl. and Glass Report are annexed hereto as Exhs. 9 and 10 respectively to the Attaching Declaration of James E. Cecchi (the "Cecchi Decl.").

The principle benefits of the proposed Settlement include the adoption by the Board of a comprehensive Quality and Compliance ("Q&C") Core Objective, the adoption by the newly created Regulatory, Compliance & Government Affairs Committee ("RCGC") of a detailed Charter and Operating Procedure, and the implementation of an expansive Product Risk Management ("PRM") Standard, directed to all J&J products.  These are far-reaching reforms. As former SEC Chairman Harvey L. Pitt explains, for example, the Q&C Core Objective is an overarching governance reform that forms the basis for the other governance and operational improvements achieved by the Settlement.  *See* Pitt Decl. ¶ 64.  The Board resolution adopting

J&J's new Q&C Core Objective reflects the Board's understanding that it is imperative for the Board to make sure that J&J has rigorous quality and healthcare compliance systems to comply with cGMP and the drug marketing laws, and establishes the appropriate "tone at the top." *See* Glass Report ¶ 21. Likewise, the Charter and Operating Procedure adopted under the Settlement will ensure that the J&J Board, through reporting from the RCGC, will be appropriately informed in a timely manner of the operating companies' compliance with healthcare compliance and quality requirements, and of potentially significant problems that could affect J&J and its shareholders. Moreover, the adoption of the RCGC Charter and Operating Procedure will allow this specialized Board committee to focus on systemic compliance risk while the J&J Audit committee continues to focus on J&J's financial reporting, thereby improving the overall effectiveness of J&J's Board. *See* Pitt Decl. ¶ 48. Importantly, as detailed below, the PRM Standard will support compliance with the Q&C Core Objective, by, *inter alia*, providing an enterprise-wide structure that imposes accountability for identifying, resolving and reporting quality and compliance problems related to J&J's products over their entire life cycle, and requiring tracking and escalation of unresolved problems up to, and including, the RCGC. Thus the PRM Standard will ensure that quality-related product issues cannot linger and remain unresolved at the operating company level, potentially damaging the J&J franchise. *See* Glass Report ¶¶ 53-54. For all of these reasons, and as more fully discussed below, Plaintiffs believe that the proposed Settlement warrants the Court's approval as fair, reasonable and adequate.

As described in the Joint Declaration of James E. Cecchi, Mark Lebovitch, Karen L. Morris, Travis Downs, Jeffrey S. Abrahams and Gary S. Graifman in Support of Final Approval of Proposed Settlement and Approval of Award of Agreed Upon Attorneys' Fees and Reimbursement of Expenses (the "Joint Attorney Declaration" or "JAD") (Exh. 8 to the Cecchi

Decl.), the Settlement was achieved through vigorous advocacy, and following prolonged, detailed and contentious settlement negotiations. This result would not have been possible without the investment and determination of Plaintiffs' Counsel[2] to pursue the Derivative Actions, all of which was done on a fully contingent basis. The fee negotiations themselves were entered into only after the settlement terms were agreed upon. As discussed more fully below, the fee negotiations were contentious and fully at arm's-length. Accordingly, based on the scope and facts of this case and the substantial benefits provided by the Settlement, Plaintiffs respectfully request that the Court approve the Settlement and award Plaintiffs' Counsel their requested fees of $10 million plus reimbursement of expenses.

## II.   PROCEDURAL AND FACTUAL BACKGROUND

The Derivative Actions are shareholder derivative actions brought for the benefit of J&J against the Individual Defendants[3] (who, together with J&J, are referred to herein as the "Defendants"). The Derivative Actions allege that from the late 1990s until 2010, the Individual Defendants breached their fiduciary duties to the Company and its shareholders in connection with the manufacturing, production, distribution and marketing of various J&J products and devices. JAD ¶ 6.

---

[2] As used herein, "Plaintiffs' Counsel" has the same meaning as in the Joint Attorney Declaration, being the Court-appointed Co-Lead Counsel in the Demand Futility Actions and the Lead and Liaison Counsel in the Demand Refused Actions.

[3] The following Individual Defendants are named in the Derivative Actions: Dominic J. Caruso, Mary Sue Coleman, James G. Cullen, Robert J. Darretta, Ian E.L. Davis, Russell C. Deyo, Michael Dormer, Seth Fischer, Colleen Goggins, Alex Gorsky, Michael M.E. Johns, Ann Dibble Jordan, Arnold G. Langbo, Ralph S. Larsen, James T. Lenehan, Susan L. Lindquist, Peter Luther, Ashley McEvoy, Robert Miller, Ann M. Mulcahy, Leo F. Mullin, William D. Perez, Christine Poon, Charles O. Prince, Steven S. Reinemund, David Satcher, Henry B. Schacht, Joseph C. Scodari, Ted Torphy, Nicholas Valeriani, William C. Weldon, and Robert N. Wilson. JAD ¶ 4.

A.    **Demand Futility Actions**

From April 21 through June 24, 2010, six Demand Futility Actions were filed in this Court, alleging that the Individual Defendants violated fiduciary duties owed to the Company by, *inter alia*, failing to ensure that the Company complied with FDA-mandated cGMP, resulting in massive product recalls and the closure of manufacturing facilities, failing to prevent the illegal marketing of major J&J drugs for unapproved uses and through the payment of kickbacks and bribes (the "Demand Futility Actions").[4]  *Id.* ¶ 20.

On August 17, 2010, the Court ordered the consolidation of the Demand Futility Actions under the caption *In re Johnson & Johnson Derivative Litigation*, No. 10-2033-FLW (the "Consolidated Action") and appointed the law firms of Bernstein Litowitz Berger & Grossmann LLP; Morris and Morris LLC Counselors At Law; Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C.; and Robbins Geller Rudman & Dowd LLP as Co-Lead Counsel for the Demand Futility Actions.  *See* No. 10-2033, ECF No. 65.  On December 17, 2010, Plaintiffs filed a Consolidated Amended Complaint.  No.10-2033, ECF No. 94; JAD ¶ 25.

Defendants moved to dismiss the Demand Futility Consolidated Amended Complaint on February 21, 2011.  No. 10-2033, ECF No. 105.  Following extensive briefing and oral argument on July 28, 2011, by Order dated September 29, 2011, the Court granted Defendants' motion to dismiss without prejudice ("Order on Motion to Dismiss").  No. 10-2033, ECF Nos. 170 and 171.  The time for the Demand Futility Plaintiffs to determine whether they intended to

---

[4] The Demand Futility Actions are: (i) *Calamore v. Coleman, et al.*, Case No. 10-cv- 2033-FLW-DEA, filed April 21, 2010); (ii) *Carpenters Pension Fund of W. Va.  v. Weldon, et al.*, Case No. 10-cv-2275- FLW-DEA, filed May 5, 2010; (iii) *Feldman v. Coleman, et al.*, Case No. 10-cv-2386-FLW-DEA, filed May 6, 2010; (iv) *Hawaii Laborers Pension Fund v. Weldon, et al.*, Case No. 10-cv-2516-FLW-DEA, filed May 14, 2010; (v) *Ryan v. Weldon, et al.*, Case No. 10-cv-3147-FLW-DEA, filed June 18, 2010; and (vi) *Minneapolis Firefighters' Relief Ass'n v. Weldon, et al.*, Case No. 10-cv-3215-FLW- DEA, filed June 24, 2010.  JAD ¶ 20 n. 2.

file an amended complaint, pursue a demand for production of books and records or take any other action was extended by the Court while the parties engaged in the negotiations leading to settlement. JAD ¶ 54.

On May 2, 2011 and May 10, 2011, two additional demand futility actions were filed in the Court, alleging that the Individual Defendants violated the fiduciary duties they owed to the Company in connection with the Company's compliance with the Foreign Corrupt Practices Act (the "FCPA Actions"). The Court consolidated the FCPA Actions under Case No. 11-2511.[5] *Id.* ¶ 32. Following the Defendants' filing of a motion to dismiss the FCPA Actions, the parties agreed to defer further proceedings pending the negotiations leading to the proposed settlement. Other Demand Futility actions were filed in the Superior Court of New Jersey.[6] Those actions were either voluntarily stayed or stayed as duplicative of the prior-filed federal actions. *Id.* ¶ 34.

**B.     Demand Letters and Demand Refused Actions**

From February through November 2010, a number of Demand Letters were submitted to the Board of Directors of J&J (the "Board"), demanding that the Board investigate various matters including, *inter alia*, illegal marketing of J&J drugs for unapproved uses and through the payment of kickbacks and bribes, lack of compliance with cGMP, violations of the Foreign

---

[5] Those actions were: *Wollman v. Coleman, et al.*, No. MID-2511-FLW and *Cafaro v. Coleman, et al.*, No. 11-2652-FLW. The Court consolidated those cases under Case No. 11-2511. Co-Lead Counsel in the Consolidated Action, Robbins Geller Rudman & Dowd LLP, is plaintiffs' counsel in Case No. 11-2511. JAD ¶ 32 n. 3.

[6] *See Wolin v. Weldon, et al.*, No. MID-C-188-10 (Sup. Ct. N.J. Sept. 23, 2010), alleging essentially identical claims as *In re Johnson & Johnson Derivative Litig.*; and *Clark v. Coleman, et al.*, No. MID-C-116-11 (Sup. Ct. N.J. May 24, 2011) and *King v. Coleman, et al.*, No. MID-C-159-11 (Sup. Ct. N.J. Aug. 4, 2011) (consolidated under *In re Johnson & Johnson S'holder Derivative Litig.*, No. MID-C-116-11 (Sup. Ct. N.J. May 24, 2011)), alleging substantially identical claims as *In re Johnson & Johnson FCPA S'holder Derivative Litig.*. JAD ¶ 34 n. 4.

Corrupt Practices Act, and sales of defective products.[7]  *Id.* ¶ 35.

On April 22, 2010, the Board appointed a Special Committee to investigate, review and analyze the allegations made in the Demand Letters, and to recommend to the Board what actions, if any, should be taken. *Id.* ¶ 36.  On June 15, 2010, in response to additional Demand Letters and the allegations in the Demand Futile Actions, the Board expanded the authority of the Special Committee to investigate, review, and analyze the additional allegations made.  *Id.*  On June 27, 2011, the Special Committee issued a report recommending that the Board not pursue litigation on behalf of J&J against any J&J executive or Board member.  No. 10-2033, ECF No. 149 at 120-21.  The Board adopted the Special Committee recommendations on July 18, 2011.  JAD ¶ 44.

On August 29, 2011, two shareholders who previously had served Demand Letters filed derivative complaints in this Court, alleging that the Board had wrongfully refused the Demand Letters (the "Demand Refused Actions").[8]  *Id.* ¶ 47.  Following a motion for consolidation and appointment of lead counsel, by Order dated November 21, 2011, the Court consolidated the Demand Refused Actions under Case No. 11-4993, and named Abraham, Fruchter, & Twersky, LLP as Lead Counsel and Kantrowitz, Goldhamer & Graifman, P.C. as Liaison Counsel for the Demand Refused Actions.  *Copeland v. Prince, et al.*, No. 11-cv-4993, ECF No. 24.  Pursuant to the settlement discussions, the parties agreed to extend the dates for the Defendants to answer or otherwise respond to the Demand Refused Actions.  JAD ¶¶ 18, 54.

---

[7] The following shareholders made demands upon the J&J Board from February through November 2010: Leslie Katz, Jeffrey Tarson, and Joan Tarson (February 17, 2010 and July 7, 2010); the New Jersey Building Laborers Annuity & New Jersey Building Laborers Pension Funds (March 23, 2010); Glenn Bassett (April 15, 2010); Howard Lipschutz (May 11, 2010); Martha Copeland (May 20, 2010); Dan Miran (May 26, 2010); S.L. Lerner (June 17, 2010); and Michael Waber (Nov. 12, 2010).  JAD ¶ 35 n. 5.

[8] *See Copeland v. Prince, et al.*, No. 11-4993 (D.N.J. Aug. 29, 2011) and *Katz v. Weldon, et al.*, No. 11- 4994 (D.N.J. Aug. 29, 2011).

### C.    The Settlement Negotiations

Following oral argument on the motion to dismiss the Consolidated Amended Complaint filed in the Demand Futile Actions, Plaintiffs' Counsel and Defendants' Counsel commenced settlement negotiations. *Id.* ¶ 49. Lead Demand Futile Counsel, working with governance and compliance and pharmaceutical experts, drafted corporate governance, health care compliance, and quality control reforms. Specifically, Demand Futile Counsel engaged Harvey L. Pitt to provide guidance on crafting corporate governance reforms, and worked with Dr. Mitchell Glass to provide guidance on pharmaceutical quality control and product risk management issues. *Id.* ¶ 50.

Working with their experts, Lead Demand Futile Counsel designed and, beginning by letter dated August 31, 2011, presented a series of detailed settlement proposals directed at both the Board and management levels. *Id.* ¶ 53. The Company carefully reviewed these proposals and negotiated extensively with Lead Demand Futile Counsel for seven months and thereafter with respect to them. *Id.* ¶ 57.

Lead Demand Refused Counsel also engaged pharmaceutical and medical device consultants to propose corporate governance, health care compliance, and quality control reforms. *Id.* ¶ 56. Working with their experts, Dr. Robert Israel and Dr. Paul Higham, Demand Refused Counsel designed and presented settlement proposals directed at both the Board and management levels. *Id.* ¶ 57. The Company carefully reviewed these proposals and requests, and negotiated with Lead Demand Refused Counsel with respect to them. *Id.* ¶ 61.

The Settling Parties engaged in dialogue regarding relevant policies and procedures in place at the Company, and how the Company could effectively achieve the goals of the proposed reforms. *Id.* ¶ 57. This dialogue included numerous face-to-face meetings among

counsel, including in-house counsel for J&J, as well as with Plaintiffs' pharmaceutical consultants and J&J's Chief Quality Officer.   The Parties also negotiated extensively in teleconferences, and through the exchange of multiple drafts of the proposals and counter-proposals. *Id.* ¶¶ 57, 58.

During the course of the settlement process, the Company made a series of productions of documents relevant to the corporate governance and compliance structure and policies within the J&J organization, including improvements implemented by the Company since 2010, during the pendency of the Derivative Actions. *Id.* ¶¶ 62, 63, 67.  These documents were reviewed in detail by Plaintiffs' Counsel and their experts, and assisted in the negotiation of the settlement terms. *Id.* ¶ 64.

Plaintiffs' Counsel also conducted a thorough investigation into the underlying facts and merits of the Derivative Actions.  *Id.* ¶ 21.  This investigation began in advance of filing the Demand Futility complaints and sending the Demand Letters, and continued, with the assistance of their experts, through to the settlement of the Derivative Actions.  *Id.* ¶¶ 21, 64.  The investigation included: (i) independent factual and legal analysis; (ii) review of publicly available information including news reports, securities analyst reports and J&J public filings with the Securities and Exchange Commission ("SEC"); (iii) consultation with their experts, (iv) the review and evaluation of the Special Committee findings; (v) the review of the documents produced by the Company pursuant to the settlement process, as described above; (vi) review of court filings, including trial transcripts and exhibits from other related actions; and (vii) discussions with Company representatives. *Id.* ¶¶ 21, 64.  Plaintiffs' Counsel's investigation was integral to their assessment of the claims, the design of their settlement proposals and counter-proposals and the negotiation of the settlement terms. *Id.* ¶¶ 21, 64.  After months of

intense, arm's-length negotiation, the parties finally agreed on the terms of the Settlement as reflected in the Stipulation and Exhibits A and B thereto (No. 10-2033, ECF Nos. 181-2, 181-3 and 181-4, respectively). *Id.* ¶ 68. Based on their review and analysis of the relevant facts, allegations, defenses, and controlling legal principles, the Settling Parties believe that the Settlement set forth herein confers substantial benefits upon, and is in the best interests of, J&J and its shareholders. *See* Stipulation ¶ R.

On July 10, 2012, Plaintiffs filed their Notice of Motion (No. 10-2033, ECF No. 181) and Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Approval of Derivative Action Settlement (No. 10-2033, ECF No. 181-1). On July 16, 2012, the Court entered its Order Preliminarily Approving Proposed Settlement, Directing the Issuance of Notice, and Setting a Final Settlement Hearing on September 28, 2012 ("Preliminary Approval Order," No. 10-2033, ECF No. 184). JAD. ¶ 70.

## III.    THE PROPOSED SETTLEMENT MERITS FINAL APPROVAL

The proposed settlement provides significant benefits to J&J, is the result of intense and protracted arm's-length negotiations between experienced counsel, and merits final approval. *See, e.g.*, Stipulation at ¶¶ R and 8.3. If finally approved by the Court, Plaintiffs will voluntarily dismiss with prejudice their claims against Defendants in return for the significant corporate governance improvements achieved for the benefit of J&J and its shareholders.

### A.    The Final Approval Standard

Plaintiffs filed this action pursuant to Rule 23.1, which provides that "[a] derivative action may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23.1(c). In this regard, the central question is whether the proposed settlement is "fair, adequate, reasonable, and proper." *Unite Nat'l Ret. Fund v. Watts*, No. 04-cv-3603

10

(DMC), 2005 WL 2877899 at *2 (D.N.J. Oct. 28, 2005) ("*Shell Derivative Litig.*"), citing *Bell Atlantic Corp v. Bolger*, 2 F.3d 1304, 1317 (3d Cir. 1993).  "[T]he principal factor to be considered in determining the fairness of a settlement concluding a shareholders' derivative action is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." *Shlensky v. Dorsey*, 574 F.2d 131, 147 (3d Cir. 1978); *Bell Atlantic*, 2 F.3d at 1311 (same).  In addition to considering the benefit of the settlement to the corporation and its shareholders, a trial court should also consider the nine factor test developed in *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir 1975*). Shlensky*, 574 F.2d at 148 ("the *Girsh* criteria apply also to the approval of the settlement of a shareholders' derivative suit."); *In re Cendant Corp. Derivative Action Litig.*, 232 F. Supp. 2d 327, 332 (D.N.J. 2002) ("In evaluating the settlement of a derivative action, the courts of this district should consider the factors applied initially to class action settlement agreements, and later to derivative actions.").

Courts routinely recognize that settlements of derivative actions providing non-monetary benefits (such as material changes in corporate management or policies) provide real and substantial benefits meriting approval.  *See, e.g., Shell Derivative Litig.*, 2005 WL 2877899 at *2 (approving derivative action settlement that provided governance and compliance relief and noting that "the most important factor in evaluating the fairness of the settlement agreement is the benefit to the corporation"); *In re AOL Time Warner S'holder Derivative Litig.*, No. 02-civ-6302 (SWK), 2006 WL 2572114 *4 (S.D.N.Y. Sept. 6, 2006) (approving settlement because "the governance and compliance provisions memorialized in the Settlement directly address the failure of internal controls that precipitated the instant lawsuits.  The preventive aspect of these provisions is itself a significant benefit of the Settlement.").  Indeed, the recognition of the importance of these types of corporate reforms has increased in the post-Enron era, particularly

where, as here, the reforms are aimed at preventing future harm. *AOL Time Warner*, 2006 WL 2572114 at *4. Furthermore, there is an overriding public interest in settling and quieting litigation, in particular derivative, class actions and other complex litigation. *See, e.g., In re: Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) ("there is an overriding public interest in settling class action litigation, and it should therefore be encouraged"); *In re GMC Pick- up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) ("the law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation") (internal citation omitted); *In re Sch. Asbestos Litig.*, 921 F.2d 1330, 1333 (3d Cir. 1990) (noting that the court encourages settlement of complex litigation "that otherwise could linger for years").

### B.   The Substantial Benefits of the Settlement to J&J and its Shareholders Warrants Final Approval

Under the terms of the Settlement, Defendants and J&J agree to adopt corporate governance and compliance reforms that will support the early identification, upward reporting, prevention and timely resolution of noncompliance with drug marketing laws, cGMP regulations and internal policies, procedures and standards. These reforms go to the heart of the concerns that gave rise to the Derivative Actions. As detailed in the Pitt Declaration and the Glass Report, the Settlement thus provides substantial financial benefits to the Company and its shareholders, and will place J&J at the forefront of best practices in the industry. As Chairman Pitt explains, the corporate governance improvements achieved by the settlement will "(a) help ensure that J&J does not encounter future problems with product manufacture and marketing, such as those alleged in the Amended Complaint; and (b) substantially reduce the likelihood of future legal and regulatory violations and thereby mitigate the risk of significant adverse outcomes from governmental and other actions and the attendant adverse financial consequences

that these actions might have on the Company and its shareholders." Pitt Decl. ¶ 128.

Critically, these far-reaching reforms were negotiated for J&J, one of the largest and most diverse health care providers, with operating entities located around the world.   Plaintiffs' Counsel were required to demonstrate sophistication and expertise in the design and negotiation of governance, compliance and product risk management proposals, taking into account, as they did, for example the fact that J&J has a highly decentralized operational structure, with over 250 operating companies located around the world.  In addition, the alleged problems at J&J crossed product lines – entailing not just drugs or medical devices, but also the production of myriad individual over-the-counter consumer products as well.   Moreover, the proposed reforms were directed not just to one aspect of product development, for example, medical risk, but rather were directed to all aspects of product development and marketing for all J&J products, over their entire life cycle at the Company.  Key aspects of the proposed Settlement include:

### 1.     J&J's Adoption of the Q&C Core Objective

Under the terms of the Stipulation, the J&J Board, by resolution, will adopt the new Q&C Core Objective, pursuant to which the Company will affirm its resolve to operate J&J's businesses, sectors, entities and franchises in compliance with applicable laws, regulations and J&J policies and standards and to have policies and procedures in place so as to minimize adverse regulatory enforcement action.  The Q&C Core Objective is a Board commitment to make sure that J&J design and maintain robust company-wide quality control and quality assurance systems to prevent, timely detect and correct noncompliance with drug marketing laws, cGMP regulations, and J&J's internal policies, procedures and standards, including the PRM Standard.  The Q&C Core Objective acknowledges the commercial success of J&J's decentralized business culture while strengthening centralized compliance and quality oversight by the J&J parent company.  To ensure problems and issues are not permitted to remain

unresolved at the operational company level, the Q&C Core Objective further requires that the company-wide control and quality assurance systems include tracking remediation against established timelines and are subject to benchmarks and metrics. *See* Stipulation, Ex. A, Section I.

The Board's adoption of the Q&C Core Objective reflects the Board's recognition of its own obligations and oversight responsibilities with respect to compliance throughout the entire life cycle of J&J products, including as related to marketing and promotion of drugs and devices, and of its oversight responsibility in connection with the expanding role of independent compliance and quality functions at the Company, including oversight of resource allocations to these critical functions. As Chairman Pitt explains, the Q&C Core Objective "is the overarching governance reform in the proposed settlement, [which] serv[es] as the basis for other of the proposed reforms and to 'inform' the work of the RCGC." Pitt Decl. ¶ 64. Chairman Pitt opines that the Q&C Core Objective "achieve[s] several significant goals," including:

- facilitating "the Board's full understanding of the importance of imposing rigorous health care compliance and quality systems in connection with all the Company's commercial endeavors;"

- confirming "the Board's commitment that J&J's operating companies must conduct their business activities in conformity with applicable laws, regulations and internal policies;" and

- implementing "a Board-level *direction* to the Company to adopt and maintain appropriate policies, procedures and standards and systems to *prevent and detect* instances of noncompliance; develop tools to measure the efficacy of its systems; monitor for possible breaches of law, regulations and the Company's internal standards; develop escalation processes and remediation tracking; and to conduct regular review for compliance with applicable laws, regulations and internal standards throughout development of product."

*Id.* ¶ 68 (emphasis in original).

Dr. Glass agrees that "the adoption of the Q&C Core Objective by the Board is critical

for J&J going forward and . . . provides substantial benefits to the Company and its shareholders." Glass Report ¶ 19.  In Dr. Glass' opinion, particularly important is the Q&C Core Objective's requirement of "explicit oversight responsibilities" of the Board "to ensure adequate and timely information flow about these and other critical functions up through the enterprise and to the Board." *Id.* ¶ 20.  "This Board-level oversight of resources protects these critical functions, ensures their robust resources and sends an important message to the enterprise regarding tone at the top recognition of their importance at J&J." *Id.* ¶ 21.

> ### 2.   Making Adherence to the Q&C Core Objective a Factor in the Evaluation and Compensation of All J&J Employees

Under the terms of the Settlement, the Core Objective must be communicated every year to all 120,000 J&J employees.  *See* Stipulation, Ex. A, Section II. These communications will instruct that adherence to and furtherance of the Q&C Core Objective will be considered in the evaluation and compensation of J&J's employees, including senior management.

Plaintiffs believe that this last requirement is of particular importance.  One of the most effective ways to ensure that directives from the top are embraced and adhered to below is to tie individual employee compensation to compliance with such directives, and to tie the compensation of management to the successful implementation of such directives throughout their functional areas of responsibility.  *See* Glass Report ¶ 25.  The new RCGC Charter and Operating Procedure further helps to ensure the effective implementation of the Q&C Core Objective by providing that the RCGC must "consult with the Compensation and Benefits Committee of the Board regarding the application of the Quality and Compliance Core Objective in employee performance evaluations and compensation."  Stipulation, Ex. A, Section III.A., Duties & Responsibilities of the Committee, ¶ 12.

Chairman Pitt explains that the mandatory "Core Objective, along with the RCGC, will

be critical in reaffirming J&J's commitment to compliance and quality, and as such, would provide a substantial benefit to the Company and its shareholders." Pitt Decl. ¶ 71.  Dr. Glass opines that tying employee compensation and evaluation to adherence to and furtherance of the Q&C Core Objective "will create an important linkage between strengthened corporate culture and compensation under the proposed settlement."  Glass Report ¶ 25.

### 3.    Adoption of the RCGC Charter and Operating Procedure

The Settlement provides for a detailed Charter and Operating Procedure ("C/OP") for the RCGC. Stipulation, Ex. A, Section III., A. and B.  The C/OP ensures that oversight and control over J&J's compliance with drug marketing laws and cGMP are centralized at the J&J Board.  To ensure that the RCGC receives adequate information to carry out its critical responsibilities, the C/OP requires that the Committee receive regular reporting from relevant management areas at the Company, including quarterly compliance updates from the J&J Chief Compliance Officer ("CCO"), the J&J Chief Quality Officer ("CQO"), and the Vice President Corporate Internal Audit ("V.P. CIA"), to support and track the effective implementation and operation of regulatory compliance, and compliance and quality programs and systems at J&J. This reporting on the implementation and effectiveness of quality programs will include CQO reporting regarding the implementation and effectiveness of the PRM Standard at the Company. Moreover, the CCO, CQO and V.P. CIA will have direct access to the Committee and its Chairman, and the RCGC will hold separate private meetings at least semi-annually with these officers, among others.  Stipulation, Ex. A, Section III, A. Charter, "Meetings of the Committee," ¶ 2.  Recognizing that issues may arise that require reporting to the RCGC even more promptly than on a quarterly basis, the Settlement also provides for interim reporting directly to the RCGC Chair.  *See* Stipulation, Ex. A, Section III, B. Charter, "RCGC

Operating Procedure," ¶ 3.a., b., c. and d.

The C/OP achieved by the Settlement includes a number of self-executing provisions that will assist J&J in meeting its compliance and cGMP requirements in a dynamic and changing environment. For example, the C/OP requires the RCGC to regularly assess the adequacy of the information it is receiving to support its oversight functions set forth in the C/OP. *See* Stipulation, Ex. A, Section III, A. Charter, "Oversight of Committee Matters," ¶ 3. The C/OP requires the RCGC to assess new developments and trends affecting the Company's compliance with the drug marketing laws and cGMP, and, "as appropriate, plans of action to respond to such trends from a preventive standpoint." *See* Stipulation, Ex. A, Section III, B. Charter, "RCGC Operating Procedure," ¶¶ 3. a., b, and d. The C/OP also requires the RCGC, at least biennially, to consider the effectiveness of, and recommend changes to, J&J's enterprise risk management ("ERM") program for those ERM areas under the Committee's purview, and to report any recommended changes to the full Board. *See* Stipulation, Ex. A, Section III, B. Charter, "RCGC Operating Procedure," ¶ 4. And the C/OP makes the RCGC responsible for assessing the adequacy of funding of the compliance and quality functions, thereby providing a critical safeguard against the pressure to underfund these areas. *See* Stipulation, Ex. A, Section III, A. Charter, "Duties and Responsibilities of the Committee," ¶¶ 3, 4.

Chairman Pitt notes that through the adoption of the C/OP for the newly formed RCGC "[f]or the first time in the history of J&J, there is now a standing committee of the Board dedicated to providing oversight of J&J's compliance with regulatory requirements and internal policies." Pitt Decl. ¶ 72. Chairman Pitt highlights the benefits of the RCGC, including, for example, the required membership of "at least three members of Board, all of whom are to be

independent directors, who will 'report to and assist the Board . . . by providing oversight of regulatory, compliance, quality and governmental affairs matters that may impact the Company.'" *Id.* ¶ 79. Chairman Pitt also explains the critical importance of the RCGC's "regular, mandatory reporting from J&J's senior management responsible for compliance and quality," (*id.* ¶ 87), concluding that the RCGC promotes "ownership through self-assessment of its own performance in fulfilling" its mandate. *Id.* ¶ 91. "As a Board-level committee, not only will [the RCGC's] authority be unassailable, but it also will unify and centralize high-level oversight of legal, regulatory, compliance and quality matters across the myriad operating companies. As an independent committee, it will be able to exercise its best judgment unimpaired by potential commercial pressures." *Id.* ¶ 93.

Dr. Glass highlights the RCGC's imposition of Board level "oversight of compliance related to all J&J products throughout their entire life cycle." Glass Report ¶ 28. Such oversight will apprise the RGCG, "with reporting to the full Board, [with] knowledge of and direct oversight responsibility for issues of compliance with regulations, policies and standards affecting products, both in development and in the marketplace," which, in Dr. Glass's view, "constitutes best practice for a board committee of a major pharmaceutical company, and provides a substantial benefit to J&J and its shareholders." *Id.* In addition, the responsibilities of the Board and the RCGC set forth under the Settlement, "together with the reporting requirements described in the Charter and the Operating Procedure, provide the crucial foundation to support the robust implementation of PRM and to empower key executives, including the CCO, CQO and Sector CMOs, within the organization." *Id.* ¶ 32.

### 4.    Adoption of the Product Risk Management Standard

The Stipulation requires J&J to design and implement a new company-wide PRM

Standard under the Quality Policy and Quality Framework. The PRM Standard will be a mandatory standard applicable across the J&J enterprise. Responsibility for the design and implementation of the PRM Standard will rest with the CQO and the J&J Quality organization. The PRM Standard will address, among other things, the requirement to develop resolution timelines and action plans, and quality metrics for evaluating issue resolution, including tracking remediation of issues against established timelines. The CQO also will be responsible for ensuring the design and adoption of appropriate implementing sector standards and SOPs. Responsibility for oversight of compliance with the PRM Standard will rest with the independent Enterprise Regulatory Compliance Group and the J&J Quality organization. The CQO will report to the RCGC on the implementation and effectiveness of the PRM Standard in accordance with the C/OP. Dr. Glass explains that this critical responsibility, vested with the CQO and the independent Quality organization, will provide important safeguards against any commercial pressures that may be brought to bear in the identification and timely resolution of product issues at J&J. Glass Report ¶ 31.

Likewise, Dr. Glass (a seasoned pharmaceutical executive) notes that the PRM Standard will provide for the effective identification of product issues at the level of the product team (or its equivalent) at J&J's numerous operating companies, thereby addressing the serious concern that systemic problems were not identified across subsidiaries and lingered at J&J subsidiaries until they spun out of control. *Id.* ¶ 54. Thus, a critical component of the new PRM Standard is a new centralized escalation process for issues up the J&J quality assurance organization. *Id.* ¶ 62. Quality personnel will apply quality metrics to evaluate issue resolution, including whether identified issues are being remediated in accordance with established timelines. *Id.* ¶ 61. The PRM Standard also encourages the active sharing of best practices with respect to

product risk management across J&J. *Id.* ¶ 69. Dr. Glass firmly believes that the PRM Standard, once implemented across J&J, will ensure the early identification, timely remediation and accountability for resolution of product issues at the Company. *Id.* ¶ 54.

Critically, Defendants have agreed to implement the new PRM standard in 2013. This undertaking, across the enterprise, will require leadership at the highest levels of the Company and a significant commitment of financial resources. As Dr. Glass explains, "the adoption of the PRM Standard at J&J pursuant to the proposed settlement directly addresses major problems plaintiffs allege occurred at the Company, and is designed to identify issues as they occur and to prevent the recurrence of similar problems." *Id.* ¶ 54. This is so because, the PRM Standard provides "at least four far-reaching benefits. First, the PRM Standard explicitly provides a major tool for achieving the preventive requirement of the Q&C Core Objective. Second, PRM provides the basis for broadening the scope of product-related risk management to encompass all aspects of product development and marketing at J&J. Third, PRM will provide for the effective identification of product issues at the product team level (or its equivalent at J&J operating companies enterprise-wide). Fourth, PRM establishes the Quality organization responsibility, from the product team up through the J&J CQO." *Id.* Had the PRM Standard been in place during the relevant time period, Dr. Glass believes that much of the alleged misconduct could have been avoided. *Id.* ¶ 64.

Chairman Pitt agrees, noting that:

> the PRM Standard achieves a number of benefits: first, it implements the directives in the Core Objective; second, it provides an enterprise-wide quality structure imposing accountability and resolution expectations at the product team level; third, it requires tracking of problems and their timely remediation within the independent Quality organization; and fourth, it requires identification of problems, resolution against established timelines and escalation of unresolved issues.

Pitt Decl. ¶ 97.

Chairman Pitt concludes that the PRM Standard "will help prevent the future recurrence of problems similar to those alleged in the Amended Compliant." *Id.* ¶ 96.

### 5. New Adverse Event Management and Non-Conformance Management Standards

The Stipulation provides that J&J will design and implement both an Enterprise-wide Adverse Event Management ("AE") Standard and a Non-Conformance Management ("NC") Standard under the Quality Policy and the Quality Framework. The AE Standard will enhance existing AE standards, and will address the process for health authority reporting of undesirable experiences associated with the use of regulated J&J products. The NC Standard will address the process for documenting and processing non-conformances in manufacturing or distribution in order to control and prevent the release of J&J products that do not conform to specified requirements. Both the AE and NC Standards will be implemented prior to or during 2014.

### 6. Settlement Commitment Term and Funding Provisions

The Company has agreed to maintain the provisions of the Stipulation as set forth in Exhibits A and B thereto, for a period of not less than five years from the Effective Date of the Settlement (the "Settlement Commitment Term"). *See* Stipulation, ¶ 2.3. Plaintiffs believe that the Settlement Commitment Term is a substantial period of time sufficient to permit these reforms to become part of the J&J culture going forward. If corporate governance improvements are mandated for too short a time, the company and its employees may not sufficiently integrate the mandatory terms of the Settlement into the firm's culture so that they keep it even after the mandatory terms expire. On the other hand, corporate governance and firm management evolve over time. Thus, the Settlement term requires implementation of changes to firm culture, and future management and directors can enjoy the freedom to further improve on

these structures when the Settlement term expires.

The Company has also agreed that, for the Settlement Commitment Term, it will spend such funds as required to implement and maintain the Exhibit A and B provisions of the Stipulation, and that the CQO or CCO will have the discretion to make funding recommendations directly to the Board, or an appropriate committee of the Board. *Id.* ¶ 2.2. The ability of the CQO and the CCO to seek direct Board intervention in funding determinations significantly strengthens their ability to ensure that the funding necessary to implement fully these reforms is provided.

Chairman Pitt finds the proposed Settlement's terms providing for the Company's provision of funds to effectuate the obtained corporate governance reforms to be "not insignificant: the Company will be required to commit considerable financial resources to satisfy this term.  It is also an explicit recognition and assurance by the Company that funding demands will not stand in the way of its implementation and maintenance of the governance reforms and enhancements."  Pitt Decl. ¶ 108.  Similarly, Dr. Glass explains that the "funding commitment also ensures that should a determination be made that the activity of the CCO or the CQO, or any other key member of management is inadequately resourced, the Company has committed to ensuring necessary resources to guarantee that these key members of management can meet their obligations, and that improvements in the J&J systems can be realized consistent with the Q&C Core objective, Quality Framework and Quality Policy."  Glass Report ¶ 76.

In sum, the provisions of the Settlement significantly benefit both the Company and its shareholders by providing important and essential changes to J&J's governance and reporting structures and systems, and by strengthening the centralization of J&J's quality and compliance going forward.  Plaintiffs respectfully submit that the proposed Settlement therefore plainly falls

within the range of possible approval.  *See, e.g., Shell Derivative Litig.*, 2005 WL 2877899 at *5 ("the great benefit conferred upon Shell as a result of the new corporate governance principles provided for in the settlement agreement . . . will serve to prevent and protect Shell from the reoccurrence of certain alleged wrongdoings."); *In re Schering-Plough Corp. S'holder Derivative Litig.,* Civ. Action No. 01-1412, 2008 WL 185809 at *3-4 (D.N.J. Jan. 14, 2008) ("*Schering*") (approving settlement seeking to protect the "corporate governance structure, particularly with regard to oversight functions" and resulting in "significant changes to Schering's corporate governance structure").

## C.    Application of the *Girsh* Factors Further Supports Final Approval

While not as crucial to analyzing settlements in derivative actions as in class action settlements, the *Girsh* factors[9] remain helpful to evaluate whether a derivative settlement should be approved.  *Shlensky*, 574 F.2d at 147 (the *Girsh* factors "have accordingly been applied, although perhaps with somewhat less rigor, in the settlement of shareholders' derivative suits."). As shown below, application of these factors fully supports final approval here.

### 1.    The Risks of Continuing to Litigate, and of Establishing Liability and Damages and the Complexity, Expense and Likely Duration of the Litigation

When assessing whether to approve settlements of derivative actions, courts routinely

---

[9] The *Girsh* factors include:

"(1) the complexity, expense and likely duration of the litigation. . .; (2) the reaction of the class to the settlement. . .; (3) the stage of the proceedings and the amount of discovery completed. . .; (4) the risks of establishing liability. . .; (5) the risks of establishing damages. . .; (6) the risks of maintaining the class action through the trial. . .; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery . . .; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. . . ."

*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) (ellipses in original) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974).

recognize their complexity and inherent unpredictability. *See, e.g., Shell Derivative Litig.*, 2005 WL 2877899 at *3 ("[d]erivative suits are by their nature undeniably complex").  Indeed, derivative actions contain a variety of procedural and factual hurdles, and their attenuated risks, that are generally absent from other complex class actions.  The Court recognized many of these issues in its Order on Motion to Dismiss.  For example, Plaintiffs faced the uphill battle of demonstrating the Individual Defendants' bad faith and breach of loyalty, the effect of J&J's exculpatory charter on the Defendants' liability, the significant obstacles to realizing the injunctive relief that would bring about the corporate governance and compliance changes sought, as well as demonstrating and then quantifying money damages.  Plaintiffs recognized these hurdles and knew that they faced substantial obstacles had they decided to forego the immediate benefits of the Settlement.

Plaintiffs also faced the risks inherent in any complex litigation.  These risks included, *inter alia*, a long and uncertain road towards possible recovery including the resolution of Defendants' summary judgment and pretrial motions, other pretrial challenges and likely challenges to Plaintiffs' experts, a lengthy trial, post trial motions and an almost certain appeal. In light of this myriad of factual and legal issues, there is no way to predict how the resolution of this case would have played out.  In light of the substantial benefits of the Settlement, such palpable risks facing Plaintiffs if they continued to litigate only reinforces that the Settlement was well within the range of reasonableness.

## 2.     The Reaction of J&J Shareholders to the Settlement

While the time for shareholders to object to the Settlement has not yet been reached, to date, counsel has received an objection from Mr. John R. Simmon dated August 14, 2012, based on concerns for a perceived lack of documentation filed with the Court in support of the

proposed award of attorney's fees.  As detailed in the Declaration of Karen L. Morris in Support

of Award of Agreed Upon Attorney's Fees and Reimbursement of Expenses, filed herewith,

immediately upon receipt of the objection, Ms. Morris contacted Mr. Simmons and told him that

additional supporting documentation would be filed on or about September 31, 2012, that a set of

all documents so filed would be provided to him by Federal Express overnight delivery, and that

Ms. Morris would be available to answer any questions he might have upon review of the

materials.  *See* Exh. 4 to the Cecchi Decl. ¶ 7.   As required by the Preliminary Approval Order,

by the September 14, 2012 deadline, Plaintiffs' Counsel will file responsive papers regarding any

objections.

   **3.**  **The Stage of the Proceeding and the Amount of Discovery**
      **Completed**

   These factors attempt to capture the "degree of case development that . . . counsel have

accomplished prior to settlement."  *In re Cendant Corp. Litig.*, 264 F.3d 201, 234 (3d Cir. 2001)

(internal citations omitted).   Prior to final approval, the court should determine whether the

parties have "an adequate appreciation of the merits in settling a case."  *Shell Derivative Litig.*,

2005 WL 2877899 at *3 (internal citations omitted).   While this case was still in the pre-trial

stage when the Settlement was finalized and formal discovery had not commenced, Plaintiffs'

Counsel nevertheless had ample opportunity to fully investigate its claims prior to entering into

the Settlement.   That investigation included, *inter alia*, a comprehensive review of J&J's SEC

filings, securities analysts' reports and recommendations, press releases and news reports,

independent factual and legal analysis, a review and evaluation of the findings of the Special

Committee, discussions with Company representatives, and a review of court filings and

transcripts from other, related actions.  Stipulation, ¶ Q.  In addition, during the settlement

process, J&J made available a series of productions of documents relevant to its corporate

governance and compliance structure and policies. Stipulation, ¶ P. These documents were reviewed in detail by Plaintiffs' Counsel in coordination with their experts, and assisted them in the conduct of the settlement negotiation. JAD ¶¶ 63-64. Similarly, Plaintiffs' Counsel sought the advice of their experts, who included the former chairman of the SEC and pharmaceutical industry experts. These experts assisted with the design and structure of the settlement proposals and also provided meaningful contributions to Plaintiffs' Counsel's factual investigation. *Id.* ¶ 64.

As a result of the foregoing, Plaintiffs' Counsel fully understood the merits of the case prior to consummating the settlement agreement, which weighs in favor of final approval. *See, e.g.*, *Shell Derivative Litig.*, 2005 WL 2877899 at *3.

### 4.    The Risks of Maintaining the Derivative Actions through Trial

This *Girsh* factor is generally used to measure the risk of maintaining class certification through trial. However, because "[a] derivative action does not present the same concern," this factor does not weigh for or against final approval. *Id.* at *4.

### 5.    The Ability of Defendants to Withstand a Greater Judgment

This factor looks at whether the defendants in a particular action could withstand a judgment for an amount significantly greater than the settlement. *Id.* Here, the settlement is non-pecuniary in nature. Accordingly, this factor does not weigh for or against final approval. *Id.*

### 6.    Range of Reasonableness of the Settlement Compared to the Best Possible Recovery

Lastly, comparing the relief achieved via the settlement with how much could have been gained had Plaintiffs prevailed at trial and on appeal supports approval. Importantly, while money damages were a possible outcome, it is not clear that the Court could have ordered the

significant company-wide corporate governance improvements achieved by the Settlement. Moreover, even if the Individual Defendants would have been able to satisfy a significant damages award, it is highly unlikely that such an award would have made a material impact on a company with a market capitalization of approximately $190 billion.  By contrast, it is critically important for the Board to implement effective, preventive governance and compliance reforms going forward, which will help to restore faith in J&J's governance and compliance programs so that the Company can regain the trust of the public and the state and federal governments, and begin to reestablish some of its lost good will.  Accordingly, even a complete victory at trial many years down the road would not have provided significantly more relief to the Company and its shareholders than does the Settlement.  Indeed, the aim of the Derivative Actions was to address what Plaintiffs determined to be the source of the problems with J&J's governance and compliance programs, which the Settlement achieves.  As a result, Plaintiffs obtained much of the relief they sought when instigating the Derivative Actions, and this factor also supports final approval.

In sum, an analysis of the relevant *Girsh* factors further illustrates why the settlement is in the best interest of the Company and its shareholders and should be approved.

**D.      Transmission of the Notice of Settlement to J&J Shareholders was Adequate**

**1.      The Notice Procedure**

The approved forms of individual and publication notice to J&J's shareholders were disseminated pursuant to the Court's Preliminary Approval Order by J&J. As detailed in the Preliminary Approval Order, J&J provided notice to all shareholders that were of record as of the date of execution of the Stipulation via first class U.S. mail within five (5) business days following the entry of the Order. J&J also posted on its website copies of the Stipulation,

Exhibits A and B and the Notice, filed a form 8-K with the Securities and Exchange commission regarding the Settlement, with those same settlement documents provided as exhibits, and published the Summary Notice in the national additions of *The Wall Street Journal*, the *USA Today* and over *PR Newswire* in accordance with the terms of the Preliminary Approval Order. As further provided in the Preliminary Approval Order, counsel for J&J shall file with the Court at, or prior to, the Final Settlement Hearing an appropriate affidavit with respect to its satisfaction of the notice requirements.

## 2. The Notice Procedure Satisfies Due Process

The Notice fairly and reasonably apprised J&J shareholders of the essential terms of the Settlement and of information regarding Plaintiffs' Counsel's fee application. It also set forth the procedure for objecting to the Settlement or to the request for an award of attorneys' fees and reimbursement of expenses and the implications of not doing so, the date and location of the final settlement hearing, the parties' contentions, and the reasons for the Settlement. Thus, the forms of notice fully satisfy due process requirements. *See Bell Atlantic*, 2 F.3d at 1317 (notice held adequate because it "summarized the Bell of Pennsylvania matter, the procedural history, the parties' contentions, the issues involved, the reasons each party recommended settlement, and the terms of the settlement agreement" and it "advised shareholders of their right to object, the consequences of not doing so, and how to go about obtaining further information available on file with the court") (citing *Kyriazi v. Western Elec. Co.*, 647 F.2d 388, 395 (3d Cir. 1981)); *In re Corel Corp. Sec. Litig.*, 293 F. Supp. 2d 484, 491 (E.D. Pa. 2003). Finally, the length of the notice period provided for in the Preliminary Approval Order is sufficient and provided shareholders with a reasonable time to object and appear at the final fairness hearing.

As such, the form and manner of Notice to Class members satisfies both the Preliminary Approval Order and Rule 23.

## IV.   THE REQUESTED FEE AWARD IS FAIR AND SHOULD BE APPROVED

As set forth in detail above, Plaintiffs' Counsel achieved significant reforms that provide for affirmative obligations on J&J to create new corporate governance and reporting structures that will enhance its quality and compliance efforts going forward, immediately inuring to the benefit of the Company and its shareholders.   Plaintiffs' Counsel achieved this result through vigorous prosecution of the Derivative Actions, in the face of numerous factual challenges and legal hurdles, litigating against determined and skilled adversaries.   For its efforts in achieving the substantial benefits under the Settlement, Plaintiffs' Counsel seek Court approval of the agreed-upon award of attorney's fees in the amount of $10 million, and the reimbursement of expenses in the amount of $450,000.

The amount of attorney's fees was agreed upon in the wake of an intense arms-length negotiation between highly experienced counsel, and commenced only after the corporate governance terms of the Settlement had been finalized.   JAD ¶¶ 68-70.   Accordingly, Defendants had no incentive other than to negotiate the lowest possible fee.   Under the circumstances of this case, and when measured against the applicable legal standards, Plaintiffs respectfully submit that the agreed-upon award of attorney's fees is reasonable, and respectfully request the Court's approval thereof.

### A.   Legal Standard Governing Fee Applications

It is well established that where a derivative action provides substantial non-monetary benefits to the nominal defendant corporation, plaintiffs' counsel are entitled to an award of reasonable attorneys' fees. *See, e.g.*, *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 395 (1970).

Where the benefit is non-pecuniary in nature, the payment of attorney's fees is justified pursuant to the substantial benefit doctrine. *Shlensky*, 574 F. 2d at 149 ("The plaintiffs in a shareholders' derivative action may, thus, recover their expenses, including attorneys' fees, from the corporation on whose behalf their action is taken if the corporation derives a benefit, which may be monetary or nonmonetary, from their successful prosecution or settlement of the case."); *Schering*, 2008 WL 185809 at *4 (awarding $9.5 million in attorney's fees based on changes to Schering's corporate governance structure pursuant to the substantial benefit doctrine); *Shell Derivative Litig.*, 2005 WL 2877899 at *4 (approving $9.2 million in attorney's fees pursuant to the substantial benefit rule where settlement was non-pecuniary). Under the substantial benefit doctrine, the benefit achieved to justify an award of attorney's fees must be more than merely technical, it "must be one that accomplishes a result which corrects or prevents an abuse which would be prejudicial to the rights and interests of the corporation or would affect the enjoyment or protection of an essential right to the shareholder's interest." *Id.* at * 5.

To determine the reasonableness of a requested fee, courts in this District typically review awards in similar cases, the skill and efficiency of the attorneys, the complexity and duration of the litigation, the risk of nonpayment, and the amount of time devoted.[10] The Third Circuit has cautioned that these factors are not to be applied in a formulaic manner, but rather in

---

[10] *See, e.g., AT&T Corp. Secs. Litig.*, 455 F.3d 160, 165-66 (3d Cir. 2006) (quoting *Gunter*, 223 F.3d at 195 n.1) (in addition to substantial nature of benefits, other factors courts consider in determining a reasonable award of attorney's fees include "(1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases"). Two of these factors - the size of the fund created and the presence or absence of objectors are irrelevant at this juncture. There is no common fund involved in this derivative settlement and the deadline for filing objections is not until September 14, 2012 - two weeks after the deadline for filing the instant motion. Plaintiffs will respond to any objections that may be filed pursuant to the deadlines set in the Preliminary Approval Order.

a way that evaluates "what class counsel actually did and how it benefitted the class." *In re AT&T Corp.*, 455 F.3d at 165-66.  An analysis of the relevant factors illustrates that the agreed upon fee award is reasonable here.

**B.    Application of the Legal Standard Supports Approval of the Agreed-Upon Fee Award**

**1.    Plaintiffs Have Provided a Substantial Benefit to the Corporation**

As discussed *supra*, the reforms brought about because of the Settlement represent significant corporate governance, compliance and product risk management reforms at J&J. Those changes will begin to be implemented immediately, and will enhance J&J's quality and compliance efforts going forward, inuring to the benefit of the Company and its shareholders. As discussed above at Section III.B., each of the significant governance changes – including adoption by J&J's Board of the Quality and Compliance Core Objective, the detailed Charter and Operating Procedure for the new RCGC, and implementation of the PRM Standard enterprise-wide – are tailored to address Plaintiffs' core concerns underlying the Derivative Actions.  As a result of the Settlement, the J&J Board is responsible and accountable for ensuring that critical compliance information is reported and adequately addressed in a timely manner.

The provisions of the proposed Settlement provide specific solutions to what Plaintiffs' viewed as the core problems that precipitated the filing of Derivative Actions - namely early identification and tracking to resolution of issues across the range of products that J&J manufactures and sells, over their entire life cycle at the Company.  Accordingly, the Settlement, as set forth in the Stipulation and Exhibits A and B thereto, and detailed at Section III.B. above, clearly provides a substantial benefit to the Company and its shareholders, and therefore support an award of attorney's fees. *Mills,* 396 U.S. at 395 ("a corporation may receive a 'substantial

benefit' from a derivative suit, justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature."); *Schering*, 2008 WL 185809 at *4 ("These corporate governance changes are substantial non-pecuniary benefits to Schering and justify an award of counsel fees under the substantial benefit doctrine.").

> ### 2.   Other Relevant Factors Further Support the Requested Fee Amount

Having established that the Settlement provides substantial benefits to J&J and its shareholders, warranting the payment of attorney's fees to Plaintiffs' Counsel, we turn to relevant additional factors considered by the Third Circuit in assessing the reasonableness of a fee award.

> #### a.   Awards in Other Derivative Cases

As discussed above, Plaintiffs' Counsel addressed, via the Settlement, important and valuable governance and compliance-related deficiencies that they believe have affected J&J for a number of years, and that have exposed the Company to substantial monetary damage and reputational harm. Over the past six or seven years, the nature of derivative litigation and its resolution have shifted significantly, with derivative settlements reaching more deeply into management and board level governance and reporting processes. A review of fee awards in prior settlements of derivative actions based on governance and compliance reforms in the District of New Jersey illustrates this fact, and supports that the requested fee award here is reasonable. For example, in 2005 in the *Shell Derivative Litig.*, plaintiffs' counsel was awarded $9.2 million in fees and $300,000 in expenses for securing a non-pecuniary settlement that provided for corporate governance changes. *See* 2005 WL 2877899 at *2. In that case, the derivative settlement provided for changes in the policies and standards related to, among other things, board composition; qualifications and nomination process; membership and functions of

board committees; compensation of directors and senior management; financial reporting and control, including proved oil and gas reserve estimates; insider trading controls; and corporate ethics and legal compliance. *See, e.g., id.* at *1. Similarly, in early 2008, the court in *Schering* approved an award of $9.5 million in attorney's fees (reflecting a lodestar multiplier of 1.37) in connection with a non-pecuniary settlement that brought about changes to the corporate governance structure. *See* 2008 WL 185809 at *5. That settlement included, *inter alia*, governance and compliance reforms focused on the centralized oversight of compliance systems, the increased independence of the board of directors and compliance personnel, the design and implementation of an expanded operational audit function to complement the company's enhanced audit procedures, and a funding commitment to fully implement and support all governance and compliance systems for a period of at least four years.[11] The Settlement here represents a step beyond these prior, significant resolutions. The multiple product lines at issue, the size and scope of J&J's world-wide operations, their highly decentralized nature and J&J's recognized leadership posture in the pharmaceutical industry combined to present a next level of complexity which Plaintiffs' Counsel and their experts had to address to ensure the effective implementation of the governance reforms.

Fee awards in other Districts further support that the requested fee award here is reasonable. For example, the derivative action brought against Eli Lilly & Company in *Lambrecht v. Taurel,* No. 08-cv-68-WTL-TAB, 2010 WL 2985946 (S.D. Ind. June 8, 2010) alleged breaches of fiduciary duty in connection with, *inter alia*, the illegal off-label sales of Lilly's drugs, particularly its blockbuster drug Zyprexa. The settlement provided for substantial corporate governance and compliance reforms, including adoption by the board of both a

---

[11] *See also Cendant Derivative Litig.*, 232 F. Supp. 2d at 341-42 (fee award of $12 million in derivative action with monetary and governance and compliance benefits, reflecting a lodestar multiplier or "risk factor" of 2.59).

Compliance Core Objective and a Product Safety and Medical Risk Management Core Objective, enhanced oversight responsibilities by designated board committees and required reporting obligations by senior officers to those committees. In addition, the settlement provided for medical risk management policies and procedures directed to Lilly products to ensure public safety. The *Lilly* court awarded $8.75 million in fees, reflecting a lodestar multiplier of approximately 1.25. *Id.* at *1-2.

In another recent case, *In re BP PLC Derivative Litig.*, No. 3AN-06-11929CI, slip op. (Al. Sup. Ct. May 7, 2008) (*see* Exh. 11 to the Cecchi Decl.), the settlement included, *inter alia*, the creation of two operations committees with responsibilities related to operational and financial risk management; creation of a new management team, including a new technical directorate, and of the positions of VP Compliance & Ethics and VP Safety Operations and Assurance. In addition, the board approved, restated and updated board governance policies. The BP settlement did not include a either a full funding or term provision. The *BP* court approved a $9.75 million fee, plus costs and expenses incurred.[12]

Accordingly, a review of attorney's fee awards in similar cases supports court approval of the agreed upon fee here.

---

[12] *See also City of Pontiac Gen. Employees' Ret. Sys. v. Langone*, No. 2006-cv-122302, slip op. (Fulton County, Ga. June 10, 2008) (awarding $14.5 million fee in connection with corporate governance stock option backdating settlement where "[m]uch of the prolonged settlement process was focused on the corporate governance reforms") (Exh. 12 to the Cecchi Decl.); *In re Fed. Home Loan Mortg. Corp. Sec. & Derivative Litig.* ("*Freddie Mac*"), MDL 1584, Case Nos. 05-cv-2596 & 04-cv-2634 (S.D.N.Y. Oct. 26, 2006) (granting attorneys' fees of $15.25 million where derivative actions conferred "substantial benefits" to Freddie Mac because they were "a factor in . . . making material corporate governance changes" and, separately, awarding additional aggregate attorneys' fees of $2.4 million from $9 million in payments to Freddie Mac, one-half from Citigroup and one-half from Morgan Stanley) (Exh. 13 to the Cecchi Decl.).

**b.      Skill and Efficiency of Attorneys, Complexity of the
Case and the Risk of Nonpayment Support the
Requested Fee Award**

An analysis of these overlapping factors further supports why the agreed-upon award of

attorney's fees here is reasonable.  First, the complexity of the issues presented in the Derivative

Actions created a meaningful risk that Plaintiffs would not prevail, and that Plaintiffs' Counsel –

who accepted this case on a fully contingent fee basis – would not recover their expenses or the

value of their time.  *See, e.g., Shell Derivative Litig.*, 2005 WL 2877899 *3 ("Derivative suits are

by their nature undeniably complex.").  As other courts have noted, and as this Court recognized

in its Opinion granting Defendants' Motion to Dismiss without prejudice ("Order on Motion to

Dismiss," No. 10-2033, ECF No. 171), derivative litigation is inherently highly risky.  *See, e.g.,

Granada Investments, Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992); *Maher v. Zapata

Corp.*, 714 F.2d 436, 455 (5th Cir. 1983) ("Settlements of shareholder derivative actions are

particularly favored because such litigation is 'notoriously difficulty and unpredictable.'"

(citations omitted)).  Accordingly, the risk of nonpayment here was considerably higher than in

most complex class actions, and Plaintiffs' Counsel were by no means assured that Defendants

would be willing to settle on terms acceptable to Plaintiffs, or that they would ever recoup their

investment in the Derivative Actions.

Furthermore, this was not a standard derivative litigation case.  Instead, it involved

challenges to the corporate and regulatory structure of one of the world's largest health care

companies, as well as numerous legal and procedural complexities as reflected in the Order on

Motion to Dismiss.  Indeed, the central focus of the litigation – directly responding to and

resolving governance and compliance-related problems that Plaintiffs believe led to J&J's

significant regulatory and legal problems relating to drug marketing, medical product and device

35

quality controls – presented unique issues that required the development of a sophisticated and carefully tailored set of settlement proposals.

Commensurate with the complexity of the case and attendant risks of nonpayment were the skill and efficiency of the attorneys involved. Highly experienced counsel who are regularly involved in complex commercial litigation matters and complex class actions represented Defendants. *See, e.g., In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 194-95 (E.D. Pa. 2000); *In re Warner Commc'n Sec. Litig.*, 618 F. Supp. 735, 749 (S.D.N.Y. 1985) ("The quality of opposing counsel is also important in evaluating the quality of plaintiffs' counsel's work."). Similarly, the standing of Plaintiff's Counsel is known to this Court.[13] Indeed, the complexity of this case and the attendant risk of nonpayment required it to be brought by sophisticated counsel who not only have the experience and knowledge necessary to recognize that the Derivative Actions were an appropriate method to pursue meaningful corporate governance changes to J&J, but who also have the skill to negotiate a settlement that would actually bring about such changes. It was only through the perseverance and skill of Plaintiffs' Counsel that such a complex and sophisticated Settlement could be achieved.

Furthermore, the quality of Plaintiffs' Counsel is also measured by the benefits achieved for the corporation, which, as described above, are substantial. *See Cendant Derivative Litig.*, 232 F. Supp. 2d at 338 (noting that the "single clearest factor reflecting the quality of counsel's services is the result obtained"). That Plaintiffs' Counsel were able to achieve such

---

[13] *See, e.g.*, regarding Demand Futility Counsel: the Order Consolidating Cases and Approved Proposed Organizational Structure (No. 10-2033, ECF No. 65), and the Memorandum of Law in Support of the Motion of the Moving Plaintiffs for Consolidation and Approval of Their Organizational Structure (No. 10-2033, ECF No. 34-1); regarding Demand Refused Counsel: the Order (No. 11-4993, ECF No. 24), and the Memorandum of Law in Support of Motion to Consolidate Related Actions and Appoint Abraham, Fruchter & Twersky, LLP and Kantrowitz, Goldhamer & Graifman, P.C. as, Respectively, Lead Counsel and Liaison Counsel (No. 11-4993, ECF No. 5-2).

comprehensive governance and compliance reforms at one of the largest healthcare companies in the world supports approval of the requested fee award. *See Shell Derivative Litig.*, 2005 WL 2877899 at *5 (awarding attorney's fees based on "the great benefit conferred upon Shell as a result of the new corporate governance principles provided for in the settlement agreement.").

In sum, consideration of the complexity of this case and the attendant risk of nonpayment, combined with the skill and efficiency of the attorneys involved, further supports court approval of the agreed-upon fees.

### c.   The Amount of Time Devoted

Courts will often employ the lodestar method in order to determine the reasonableness of the requested fee in cases such as the Derivative Actions. *See, e.g., Schering*, 2008 WL 185809 at *4. This approach is appropriate where the corporation received non-monetary benefits. *Id.* at *5; *see also In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005).

The first step under a lodestar analysis "is to arrive at the lodestar amount, which is calculated by multiplying the number of hours counsel worked on a case by a reasonable hourly billing rate for such services." *Schering*, 2008 WL 185809 at *4 (quoting *In re AT & T Corp. Secs. Litig.*, 455 F.3d 160, 164 (3d Cir. 2006) (internal citations omitted)). Once the lodestar amount is calculated, the court "may increase or decrease that amount by applying a lodestar multiplier," which "attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work." *In re Diet Drugs*, 582 F.3d 524, 540 n.33 (3d Cir. 2009) (citations omitted). In the Third Circuit, multipliers are used to account for the risks of non-recovery, as an incentive for counsel to undertake socially beneficial litigation, or as an award for an extraordinary result and to compensate for the risk of nonpayment. "By nature they

are discretionary and not susceptible to objective calculation." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,* 148 F.3d 283, 340 (3d Cir. 1998). The court in *Prudential,* found that "[m]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." *Id.* at 341; *see also Cendant Derivative Litig.*, 232 F. Supp. 2d at 341-42; *Rowe v. E.I. DuPont de Nemours & Co.,* Civ. Nos. 06-1810, 06-3080 (RMB/AMD), 2011 WL 3837106 at *22 (D.N.J. Aug. 26, 2011). In *In re Remeron End-Payor Antitrust Litig.*, No. Civ. 02-2007 FSH, 2005 WL 2230314, at *31 (D.N.J. Sept. 13, 2005), for example, the Court found a multiplier of 1.73 was "on the low end of the spectrum" (citations omitted); *see also Milliron v. T-Mobile USA, Inc.*, 423 Fed. Appx. 131, 135 (3d Cir. 2011) (2.21 multiplier); *In re Merck & Co., Inc. Vytorin Erisa Litig.*, No. 08-cv-285 (DMC), 2010 WL 547613, at *13 (D.N.J. Feb. 9, 2010) (2.786 multiplier); *McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448, 479 (D.N.J. 2008) (2.3 multiplier); *Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 256 (D.N.J. 2005) (2.83 multiplier).

Here, the combined lodestar of Plaintiffs' Counsel is $6,614,268.25, based on total of 10,975.5 hours. Attached as Exhibits 2-7 to the Cecchi Decl. are the lodestar charts for from each of Plaintiffs' Counsel's firms, broken down by attorney and category of work performed. Because Defendants sought a global settlement of all claims in the Derivative Actions, Plaintiffs' Counsel include the time spent on each of their cases when calculating the loadstar amount. In addition, the hourly rates (provided in Exhibits 2-7 of the Cecchi Decl.) are what Plaintiffs' Counsel normally charge in similar complex derivative and class litigation, and are well within the hourly rates for other complex class action attorneys in this District. *See* ALM New Jersey Billing Summary, which is annexed as Exh. 2 to Cecchi Decl. Exh. 2.

In this case, the agreed-upon award of attorney's fees would result in a reasonable

loadstar multiplier of 1.51. As noted above, the loadstar multiplier requested here is comparable to, or below, those awarded in other cases in this Circuit, particularly in light of the inherent risks and complexities of derivative litigation.

### C.    Other Factors Support the Requested Fee Award

In addition to the traditional factors, the Court should consider any additional relevant factors that support the award of attorney's fees. *In re AT&T Corp*, 455 F.3d 160, 165 (3d Cir. 2006) (*Gunter*'s list of factors for reviewing reasonableness of attorneys' fee award "was not intended to be exhaustive."). Plaintiffs' Counsel respectfully contend that two such additional relevant factors support Plaintiffs' request for approval of the agreed-upon award of attorney's fees in this case. First, the fee amount is the product of an arm's-length compromise between Plaintiffs' Counsel and Defendants' Counsel (including counsel for J&J), undertaken only after the parties reached agreement on the substantive terms of the Settlement. The Third Circuit has recognized that "the presence and active involvement of the corporation against which an award of the plaintiffs' attorneys' fees and other litigation costs may be assessed distinguishes a shareholders' derivative suit from a class action for purposes of the fee award." *Shlensky*, 574 F.2d at 150; *see also Cohn v. Nelson*, 375 F. Supp. 2d. 844, 861 (E.D. Mo. 2005) ("[W]here, as here, the parties have agreed on the amount of attorneys' fees and expenses, courts give the parties' agreement substantial deference."). Moreover, the fact that there were no discussions regarding potential attorneys' fees until after the terms of the settlement had been finalized avoids the type of concerns that have been held to arise when settlement relief and attorney's fees are negotiated simultaneously. *See, e.g., Weber v. Gov't Employees Ins. Co.* 262 F.R.D. 431, 447 n.7 (D.N.J. 2009).

39

Second, courts recognize that derivative cases, particularly those that bring about socially desirable corporate reforms, such as strengthening the corporate governance and compliance structure and processes of large health care companies, are socially beneficial.   *See, e.g.*, *Schering*, 2008 WL 185809 at *5 (awarding $9.5 million in attorneys' fees based in part because "the results of counsels' efforts achieve the socially laudable goal of promoting regulatory compliance, which is particularly important in  light of Schering's role as one of the world's largest pharmaceutical companies.").   Therefore, courts should incentive specialized and experienced counsel to bring these types of high-risk, high-stakes derivative actions.  *See, e.g.*, *Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1194-96 (6th Cir. 1974) (court must make sure that counsel is fairly compensated for the amount of work done as well as for the results achieved, so as to ensure such compensation recognizes "society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others").  The type of powerful governance and compliance reforms the Settlement provides at J&J, one of the world's largest healthcare providers, will have an impact on the pharmaceutical companies generally, acting to raise the bar industry-wide as to what constitute best practices in the area of governance, compliance and product risk management.

Accordingly, for all of these reasons, approval of the agreed upon attorneys fees is warranted.

### D.      The Amount of Litigation Costs and Expenses is Reasonable

Plaintiffs' Counsel have incurred $452,016.76 in unreimbursed litigation costs and expenses.  A chart of the costs and expenses incurred by Plaintiffs' Counsel in the litigation of the Derivative Actions, broken down by category, is provided as Exhibit 1 to the Cecchi Decl. These costs and expenses, which consisted mainly of expert costs were reasonable and necessary

40

for the prosecution of the Derivative Actions, and are therefore properly reimbursed by Defendants. *See, e.g., Schering*, 2008 WL 185809 at *6 ("The Court also determines that the proposed reimbursement of up to $300,000 in expenses, which consist mostly of experts' fees, is reasonable under the facts and circumstances of this matter."). The Court should approve Defendants' agreement to reimburse Plaintiffs' Counsel up to $450,000 for such reasonable costs and expenses.

## V.   CONCLUSION

Plaintiffs respectfully request that the form of [Proposed] Final Order and Judgment (Exhibit F to the Stipulation, No.10-2033, ECF No. 181-8), be entered, and that an award of attorney's fees and reimbursement of expenses in the amount agreed to be the parties be approved.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO Co-
Lead Counsel for Demand Futile Plaintiffs

By:_____ /s/James E. Cecchi_____
          JAMES E. CECCHI


KANTROWITZ, GOLDHAMER &
GRAIFMAN, P.C.
Liaison Counsel for Demand Refused Plaintiffs

By: _Gary S. Graifman / DAF_
          GARY S. GRAIFMAN

Dated: August 31, 2012

Mark Lebovitch
Jeroen van Kwawegen
Jeremy Friedman
BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 554-1400

41

Karen L. Morris
Patrick F. Morris
R. Michael Lindsey
MORRIS AND MORRIS LLC
COUNSELORS AT LAW
4001 Kennett Pike, Suite 300
Wilmington, Delaware 19807
(302) 426-0400

Darren J. Robbins
Travis E. Downs III
David W. Mitchell
ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, California 92101
(619) 231-1058
*Attorneys for Demand Futile Plaintiffs*

Jeffrey S. Abraham
ABRAHAM, FRUCHTER &
TWERSKY, LLP.
One Penn Plaza, Suite 2805
New York, NY 10119
(212) 279-5050
*Attorneys for Demand Refused Plaintiffs*