## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE JOHNSON & JOHNSON DERIVATIVE LITIGATION | Civil Action No. 10-2033 (FLW) |
| IN RE JOHNSON & JOHNSON FCPA SHAREHOLDER DERIVATIVE LITIGATION | Civil Action No. 11-2511 (FLW) |
| COPELAND v. PRINCE, ET AL. | Civil Action No. 11-4993 (FLW) Judge Freda L. Wolfson Date: September 28, 2012 Time: 10:00 a.m. Courtroom: 5E |

## DECLARATION OF KATHERINE LITVAK
## IN SUPPORT OF OBJECTION OF MARK G. PETRI AND
## IN SUPPORT OF MOTION TO DISMISS

Theodore H. Frank
CENTER FOR CLASS ACTION FAIRNESS
1718 M Street NW, No. 23-6
Washington, DC 20036
Telephone: (703) 203-3848
Email: tedfrank@gmail.com

David M. Nieporent
SAMUEL & STEIN
38 West 32nd Street, Suite 1110
New York, NY 10001
Phone: (212) 563-9884
Fax: (212) 563-9870
Email: dnieporent@samuelandstein.com

Attorneys for Objector Mark G. Petri

Katherine Litvak declares as follows:

1. I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

2. Counsel for Mark Petri have asked me to provide an expert opinion on whether certain corporate governance changes provide value to shareholders of Defendant Johnson & Johnson and whether the expert opinions of Harvey L. Pitt and Dr. Mitchell Glass have the level of scientific reliability that experts in the field of corporate governance rely upon.

3. As discussed below, I conclude that plaintiffs have provided no scientifically reliable evidence that the proposed governance changes in this case are valuable to Johnson & Johnson shareholders. I further conclude that there is no scientifically reliable evidence in support of plaintiffs' proposition.

4. I requested counsel for Petri to provide me with documents related to this litigation in connection with this report. Exhibit 2 provides a list of the documents I reviewed to prepare this report. I conducted a detailed review and analysis of this material, focusing primarily on the corporate governance issues raised throughout. In reviewing this material and reaching the opinions outlined herein, I applied my expertise in corporate law and corporate governance developed as a professor of business associations and law and economics at the Northwestern University School of Law and the University of Texas Law School. I also relied on my knowledge of the academic literature on corporate governance, which I have developed as an author of peer-refereed papers on the subject and as a journal referee

1

for such leading finance and economic publications as the *Journal of Finance*; *Journal of Financial Economics*, *Journal of Corporate Finance*, *American Law and Economics Review*; *International Review of Law and Economics, European Financial Management Journal, Journal of Financial Econometrics, Economica*, and *Journal of Accounting Research*.

### Qualifications

5.   I am a Professor of Law at Northwestern University School of Law, where I have taught since 2009. I was previously an Assistant Professor at University of Texas Law School, a clerk for both the Hon. Ralph K. Winter of the U.S. Court of Appeals for the Second Circuit and the Hon. Frank H. Easterbrook of the U.S. Court of Appeals for the Seventh Circuit, as well as a John M. Olin Fellow in Law and Economics at Columbia Law School. I have taught and teach the following courses: Business Associations; Contracts; Payment Systems; Deals; Law and Economics.

6.   I have written on a variety of corporate law topics related to the issues raised in this litigation. These are listed in my CV, attached as Exhibit 1. In addition, I am a journal referee for such leading economic publications as the *Journal of Finance*; *Journal of Financial Economics*, *American Law and Economics Review*; *International Review of Law and Economics, Journal of Financial Econometrics, Economica*, and *Journal of Accounting Research*. I have also served as a referee for leading academic conferences, such as the Annual Meeting of the European Finance Association and the Annual Meeting of the Society of Empirical Legal Studies.

7.   I have presented at more than fifty national and international conferences, workshops, and seminars in finance, economics, accounting, and law, many of which were competitive and peer-refereed.

8. I received my BA from the University of California-Los Angeles (1996), an MA from Harvard (1998), and my JD from Stanford Law School (2001). I completed two years of Ph.D.-level coursework in finance and accounting at Kellogg School of Management (Northwestern University) and Booth School of Business (University of Chicago).

9. Based on my training and experience, I am deeply familiar with state and federal law on corporate governance; the accepted practice of experts in quantifying the value of corporate governance changes; and the legal, economics, finance, and accounting literature on the value of corporate governance. I believe that my practical and academic experience makes me qualified to render an expert opinion on corporate governance issues raised by this litigation. This is my first expert opinion for litigation.

10. In accordance with the ethics of the legal profession, my fees for preparing this report and testifying in this case are not contingent on the outcome of the proceedings or on the opinion presented herein. My fee for this report is $2500, and I will be compensated at $750 per hour for any deposition or trial time.

### Scientifically Measuring the Effect of Corporate Governance Changes

11. Experts in the field of corporate governance do not rely on *ipse dixit* opinions of whether a corporate governance change is beneficial. Instead, we use modern econometric techniques to estimate the effect of corporate governance on specific measures of shareholder value, firm performance, managerial behavior, and so on. There is a large and growing scientific literature studying this relationship, none

of which was cited by Mr. Pitt and Dr. Glass. None of the modern empirical literature supports the assertions that Mr. Pitt and Dr. Glass made in their reports.

12. The first common scientific method we use to establish the value of corporate governance is to measure market prices of securities. This approach is consistent with the view articulated by the United States Supreme Court "that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business". Corporate governance is among such material information. For example, academic literature uses this approach to estimate the value of firm-level takeover defenses (Paul Gompers, Joy L. Ishii, and Andrew Metrick, "Corporate Governance and Equity Prices", *Quarterly Journal of Economics*, Vol. 118, No. 1, pp. 107-155, February 2003, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=278920); the effect of the Sarbanes-Oxley Act (Kate Litvak, "The Effect of the Sarbanes-Oxley Act on Non-US Companies Cross-Listed in the US", *Journal of Corporate Finance*, Vol 13, pp. 195-228, 2007; Ivy Xiying Zhang, "Economic Consequences of the Sarbanes-Oxley Act of 2002", *Journal of Accounting and Economics*, 2007, Vol 44, issue 1-2, pp. 74-115, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=961964), the effect of the shareholder proxy access rule (Bo Becker, Daniel Bergstresser, and Guhan Subramanian, "Does Shareholder Proxy Access Improve Firm Value? Evidence from the Business Roundtable Challenge" (Harvard Business School Finance Working Paper No. 11-052, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1695666), and so on. Mr. Pitt and Dr. Glass offered no price-based literature to support of their assertions that the

4

changes specified in the settlement agreement will have any value. To the best of my knowledge, no such price-based evidence exist for the changes proposed in the settlement agreement.

13. A second common scientific method we use to establish the impact of changes in corporate governance is to measure firm value. This approach has been used, for example, to estimate the aggregate value of Delaware corporate law (*see* Robert Daines, "Does Delaware law improve firm value?" *Journal of Financial Economics*, 2001, vol. 62, issue 3, pages 525-558 (available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=195109); the value of outside directors and other changes in Korean corporate governance (*see* Bernard Black, Hasung Jang, and Woochan Kim, "Does Corporate Governance Predict Firms' Market Values? Evidence from Korea", 22 *Journal of Law, Economics and Organization* 366-413 (2006) (available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=311275); the value of anti-takeover defenses (*see* Lucian A. Bebchuk, Alma Cohen, and Allen Ferrel, "What Matters in Corporate Governance?", Review of Financial Studies, Vol. 22, No. 2, pp. 783-827, February 2009 (available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=593423); *see also* Martijn Cremers and Allen Ferrell, "Thirty Years of Shareholder Rights and Firm Valuation" (February 1, 2010). CELS 2009 4th Annual Conference on Empirical Legal Studies Paper (available at http://ssrn.com/abstract=1413133). Mr. Pitt and Dr. Glass offered no firm-value based evidence in support of their assertions. To the best of my knowledge, such evidence does not exist for the changes proposed in the settlement.

14. A third common scientific method is to estimate at the relationship between corporate governance and specific aspects of corporate behavior, such as risk taking. This would be a relevant approach for Mr. Pitt and Dr. Glass to take, given the changes proposed in the settlement. For example, empirical scholars studied the effect of the Sarbanes-Oxley Act on corporate risk-taking (*see* Kate Litvak, "Defensive Management: Does the Sarbanes-Oxley Act Discourage Corporate Risk-Taking?" (November 1, 2008) (revise-and-resubmit in *American Law and Economics Review*, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1120971); Leonce Bargeron, Kenneth Lehn, and Chad Zutter, "Sarbanes-Oxley and Corporate Risk Taking", *Journal of Accounting and Economics*, Vol 49, pp. 34-52 (2009) (available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1104063). Mr. Pitt and Dr. Glass offered no such evidence in support of their assertions. To the best of my knowledge, such evidence does not exist for the changes proposed by the settlement agreement.

15. A fourth common scientific method is to estimate the relationship between corporate governance and the firm's accounting measures, such as abnormal accruals, accounting restatements, conservatism, timeliness, smoothness, persistence, value relevance, accrual quality, and so on. A large empirical literature in academic accounting and finance uses this approach. *See, for example*, David F. Larcker, Scott A. Richardson, and Irem Tuna, "Corporate Governance, Accounting Outcomes, and Organizational Performance", *The Accounting Review*, Vol. 82, No. 4, 2007, pp. 963-1008 (available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=976566). *See also* April Klein, "Audit Committee, Board of Directors Characteristics, and Earnings

Management, *Journal of Accounting and Economics*, Vol. 33, No. 3, August 2002, pp. 375-400 (available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=246674); Biao Xie, Wallace N. Davidson III, and Peter J. DaDalt, "Earnings Management and Corporate Governance: The Roles of the Board and the Audit Committee, *Journal of Corporate Finance*, Vol. 9, issue 3, pp. 295-316 (available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=316695). Mr. Pitt and Dr. Glass provided no accounting-based evidence in support of their assertions. To the best of my knowledge, such evidence does not exist for the changes proposed in the settlement agreement.

16. A fifth common scientific method is to estimate the relationship between corporate governance and actual detected fraud or other corporate misbehavior like the failure to comply with regulations. *See, for example*, David B. Farber, "Restoring Trust after Fraud: Does Corporate Governance Matter?", *The Accounting Review*, April 2005, Vol 80, No. 2, pp. 539-561 (available at http://aaapubs.org/doi/abs/10.2308/accr.2005.80.2.539?journalCode=accr). Such approach would be particularly appropriate to support Mr. Pitt's and Dr. Glass's claims that governance changes proposed by the settlement will change firm's behavior. However, they have not supplied any such evidence. To the best of my knowledge, none exists with respect to the governance changes they are advocating.

17. Even if Mr. Pitt and Dr. Glass were able to show empirical evidence supporting their claim that proposed changes in governance will increase compliance, they still need to show that such increase in compliance benefits shareholders. As long as the efforts to reduce misbehavior are costly, the optimal level of corporate fraud is

not zero, just as the optimal level of street crime is not zero. As an extreme example, imagine a corporate governance change requiring a corporation to spend 50% of its revenues on compliance and the CEO and COO to each devote sixty hours a week to the task. Even if such changes were to improve a corporation's compliance with the law and reduce "adverse regulatory enforcement action" (it would be up to Mr. Pitt and Dr. Glass is to provide scientific evidence that such effect would occur, which they have not done), such change would eventually bankrupt the corporation and leave shareholders unambiguously worse off. The job of an expert is to show that the proposed changes not only will improve firm's compliance, but will benefit shareholders. Mr. Pitt and Dr. Glass have provided no scientific evidence to support this assertion.

18. To summarize, the expert reports of Mr. Pitt and Dr. Glass cite no empirical studies supporting their conclusions. All they offer is speculation that certain corporate governance changes will be beneficial to shareholders. This is contrary to the modern scientific approach of estimating the effects of corporate governance through econometric analysis. Such unsupported claims would not survive peer review in the academic literature.

19. The core problem of Mr. Pitt's and Dr. Glass' reports is not that they merely failed to cite an important scientific authority to support their claims. The problem is that no such authority exists.

20. I am unaware of any modern econometric studies showing that creating a "core objective" of "affirm[ing] resolve" to "compl[y] with applicable laws regulations and J&J policies and standards, to deliver high quality products … [and] to

8

minimize adverse regulatory enforcement action" creates firm value, especially when, as here, the corporation already had a "credo" emphasizing quality. In fact, I am not aware of any modern econometric studies showing that creating such "core objective" has any effect of any corporate characteristic whatsoever.

21. I am unaware of any modern econometric studies supporting the view that creating a "Regulatory, Compliance and Government Affairs Committee" separate from an Audit Committee increases firm value—or even improves compliance.

22. I am unaware of any modern econometric evidence that creating a "Product Risk Management Standard" increases firm value or causes any relevant improvements at all.

23. I am unaware of any modern econometric evidence that additional amorphous evaluation and compensation standards relating to a core objective of quality and compliance increases firm value. If anything, it is likely that such change would decrease firm value, because it would create incentives for officers and managers to overinvest in compliance at the expense of shareholders. At least two empirical studies find the effect consistent with this contrary hypotheses. *See* Litvak (2008) and Bargeron et al. (2009), *supra* point 14.

24. While directors and officers of a corporation could certainly independently choose to engage in all of the proposed measures as an exercise of their business judgment, I know no modern econometric studies showing that failing to do so causes harm to shareholders, and thus I see no reason to think it would be a breach of fiduciary duty not to do so.

9

25. For these reasons, it is my opinion that plaintiffs have failed to demonstrate that the proposed corporate governance changes in the settlement provide benefit to shareholders.

26. It is my further opinion that the expert opinions of Mr. Pitt and Dr. Glass to the contrary are not scientifically reliable and fail to use the scientific methodologies that experts in the field of corporate governance use in determining whether corporate governance changes are beneficial to shareholders.

Executed on September 13, 2012, in Chicago, Illinois.

_____

Katherine Litvak

## CERTIFICATE OF SERVICE

The undersigned certifies he caused to be served via FedEx overnight shipment a copy of this Declaration upon the following:

Clerk of Court
U.S. District Court for the District of New Jersey
Clarkson S. Fisher Building & U.S. Courthouse
402 East State Street, Room 2020
Trenton, NJ 08608

Carella, Byrne, Cecchi, Olstein,
Brody & Agnello, P.C.
Attn: James E. Cecchi
5 Becker Farm Road
Roseland, NJ 07068

Kantrowitz, Goldhamer &
Graifman, P.C.
Attn: Gary Graifman
210 Summit Avenue
Montvale, NJ 07645

Patterson Belknap Webb & Tyler
Attn: Erik Haas
1133 Avenue of the Americas
New York, NY 10036

Sidley Austin LLP
Attn: Kristen R. Seeger
One South Dearborn Street
Chicago, IL 60603

I declare under penalty of perjury that the foregoing is true and correct.

_David M. Nieprent_
SIGNATURE

September 14, 2012
DATE