### REPORT OF PROFESSOR M. TODD HENDERSON

I.    SCOPE OF REPORT & EXECUTIVE SUMMARY

Counsel for objector Mark Petri asked me to provide an expert opinion on whether certain corporate governance changes provide value to shareholders of Defendant Johnson & Johnson, and whether the expert opinions of Harvey L. Pitt and Dr. Mitchell Glass are grounded in the sort of reliable methodology that experts in the field of corporate governance use.

As I detail below, in my opinion, plaintiffs have provided no scientifically reliable evidence that governance changes are valuable to Johnson & Johnson shareholders. They have offered only unsupported opinions. There are more reliable, scientifically accepted methods for determining the value to shareholders of governance changes (or other legal changes), and the changes proposed as part of this settlement are capable of being measured by these readily available techniques. In the absence of a rigorous analysis of the change in stock valuation based on the proposed changes, plaintiffs' experts have no reliable basis for their conclusion that the changes "will provide J&J and its shareholders with substantial benefit."[1] This conclusion, which is not grounded in any reliable methodology, is a bald assertion that the court is asked to believe because of the apparent authority of plaintiffs' experts. As such, it is an

---

[1] Pitt Declaration at 2.

ipse dixit conclusion, and therefore insufficient evidence as a matter of law.

In order to prepare this report, I requested Petri's counsel provide me with access to documents in connection with this litigation. Appendix 3 provides a list of the documents I reviewed to prepare this report. I conducted a detailed review and analysis of this material, focusing primarily on the corporate governance issues raised throughout. In reviewing this material and reaching the opinions outlined herein, I applied my expertise in corporate and securities law developed as a professor of corporate law, corporate governance, law and economics, and securities law at the University of Chicago Law School. I also relied on my knowledge of the academic literature on corporate governance, to which I am a frequent contributor and peer-reviewer for two of the top journals in law and economics (that is, the Journal of Legal Studies and the Journal of Law and Economics).

II.   SUMMARY OF QUALIFICATIONS

I, M. Todd Henderson, am a Professor of Law at the University of Chicago Law School.  I have taught at the Law School since 2004. I am also a Member, National Adjudicatory Council, Financial Industry Regulatory Association ("FINRA"), and the Fresco Chair in Corporate Law at the University of Genoa (Italy) and a fellow of the Max Planck Institute for International, European, and Regulatory Procedural Law, Luxemburg.

I recently served as Roger J. Traynor Summer Professor in Corporate Law at the University of California, Hastings School of Law and as a Visiting Professor at the Bergen (Norway).

I have taught and teach the following courses: Corporate Law, Mergers & Acquisitions, Corporate Governance, Securities Regulation, and other business-law courses. I also have taught at the University of Chicago Graduate School of Business "Directors' Consortium" executive education program for corporate directors, on subjects such as corporate governance and executive compensation.

Prior to becoming a corporate law academic, from 2001 to 2004, I was a management consultant for McKinsey & Company, where I worked with companies of all sizes on business and regulatory strategy, corporate governance, and other high-level management issues.

I have written on a variety of corporate law topics related to the issues raised in this litigation. These are listed in Appendix 1. In addition, I serve as a referee for the two leading peer-review journals in law and economics—the Journal of Law & Economics and the Journal of Legal Studies—especially on papers involving corporate governance. I have also served as an expert on corporate governance in litigation in state and federal court on several occasions for both plaintiffs and defendants. These are listed in Appendix 2. Furthermore, I am a frequent speaker to corporations, the American Bar Association, law schools, and others on matters of corporate governance and law.

I have a J.D. with high honors from the University of Chicago Law School (1998), and a B.S.E. with honors from Princeton University (1993).  I am a member of the Maryland Bar (inactive) and numerous federal district and appellate courts.

Based on my training and experience, I am deeply familiar with state and federal law on corporate governance, the accepted practice of experts in court considerations of the value of corporate actions, and the legal, economics, and finance literature on the value of corporate governance.  I believe that my practical and academic experience makes me qualified to render an expert opinion on corporate governance issues raised by this litigation.

I have set forth in this report a summary of the testimony I would expect to provide during a deposition and at any evidentiary hearing. This report does not provide a verbatim account of every detail of such testimony, and I may address additional topics in response to arguments or assertions offered by the plaintiffs or their experts during the course of the proceedings.

In accordance with the ethics of the legal profession, my fees for preparing this report and testifying in this case are not contingent on the outcome of the proceedings or on the opinion presented herein.  My fee for this report is $2500, and I will be compensated at $750 per hour for any deposition or trial time. These rates are below my normal commercial rate, reflecting my willingness to assist the non-profit *pro bono* work of

4

the Center for Class Action Fairness. My curriculum vitae is attached as Appendix 1; my experience as a expert witness is attached as Appendix 2; and a list of documents I considered in performing my analysis of the issues in this case is attached as Appendix 3.

III.   EVENT STUDIES

The value shareholders receive or can be expected to receive from corporate governance reform is not a matter for speculation by so-called "experts" on corporate governance. The question of whether *shareholders* will receive value from corporate governance changes is something for *shareholders* to determine, not "experts." Unlike outside experts, shareholders are betting their own money on the value of firms, and, in aggregate, they are the best source of determining the value of firm actions. This is a non-controversial statement of both modern finance theory and of indisputable Supreme Court precedent and widespread government practice.

Courts need not, and under clearly established law and the Federal Rules of Evidence cannot, rely on the guesses of expert witnesses as to the value of corporate events for shareholders.[2] Fortunately, the impact of governance changes is something that can be measured scientifically and systematically using modern techniques of econometrics.[3] All that is

---

[2] See, for example, *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

[3] See, for example, See Sanjai Bhagat & Roberto Romano, "Event Studies and the Law - Part I: Technique and Corporate Litigation," 4 AM. L. & ECON. REV. 141 (2002); and

required to *prove* shareholders will receive value from changes is to measure how *shareholders* react when the changes are announced. If shareholders expect to receive value from the changes going forward, the price of the firm's shares should increase to reflect the value from the change.[4] If shareholders expect the changes to have no value, the stock price will remain unchanged. And if the shareholders expect the changes to destroy shareholder value, then the stock price will fall when the changes are announced. In short, the value of a corporate governance reform is an empirical question that can be measured by examining changes to the stock market valuation of the firm in question. This is the state-of-the-art technique for measuring the value of changes to corporate governance in the social sciences, and any other methodology for assessing value is merely guesswork. For instance, as a referee for two leading, peer-review law journals that routinely publish articles assessing the value of laws, policies, or governance changes, I can say that a paper making an argument about shareholder value without offering empirical evidence would be recommended for rejection on that basis alone.

The basic technique for measuring shareholder value is the "event study" of shareholder reaction to an event. In an event study, an "event,"

---

Sanjai Bhagat & Roberto Romano, "Event Studies and the Law: Part II: Empirical Studies of Corporate Law," 4 AM. L. & ECON. REV. 380 (2002).

[4] Modern finance theory tells us that the stock price is discounted present value of all future cash flows, and therefore changes in the market's view about the cash the firm will produce in the future will be reflected in the current stock price.

like a change in the law or a firm decision (such as to merge, to incorporate in a particular state, to hire a particular CEO, or to enact a governance change) is isolated from other news or information that might impact a firm's stock price. Once other factors that could influence a firm's stock price (such as market-wide forces, like unemployment numbers) are accounted for, the change in the stock price (and thus market value of the firm) can be determined by comparing the stock price before the event and the stock price after the event. The logic is straightforward: if a governance change will make shareholders better off, when investors hear about the change, they should value the stock more than they did before they heard about the change, and therefore demand at a given price should increase, thus driving up the price. Both theory and hundreds of academic papers support this logic, finding statistically significant changes from even relatively small changes in firm policy.[5]

---

[5] See, for example, John J. Binder, "Measuring the Effects of Regulation with Stock Price Data," 16 Rand J. Econ.167 (1985); Yaron Brook and Ramesh K.S. Rao, "Shareholder Wealth Effects of Directors' Liability Limitation Provisions," 29 J. Fin. & Quant. Analy. 481 (1994); Bradford Cornell and R. Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," 37 UCLA L. Rev. 883 (1990); Marcia Millon Cornett and Hassan Tehranian, "Stock Market Reactions to the Depository Institutions Deregulation and Monetary Control Act of 1980," 13 J. Bank. & Fin. 81 (1989); Marcia Millon Cornett and Hassan Tehranian, "An Examination of the Impact of the Garn-St. Germain Depository Institutions Act of 1982 on Commercial Banks and Savings and Loans," 45 J. Fin. 95 (1990); Larry Y. Dann and Christopher M. James, "An Analysis of the Impact of Deposit Rate Ceilings on the Market Values of Thrift Institutions," 37 J. Fin. 1259 (1982); Sudip Datta and Mai Iskandar-Datta, "Takeover Defenses and Wealth Effects on Securityholders: The Case of Poison Pill Adoptions," 20 J. Bank. & Fin. 1231 (1996); Daniel R. Fischel and Michael Bradley, "The Role of Liability Rules and the Derivative Suit in Corporate Law: A Theoretical and Empirical Analysis," 71 Cornell L. Rev. 261 (1986); Randall A. Heron and Wilbur G. Lewellen, "An Empirical Analysis of the Reincorporation Decision," 33 J. Fin. & Quant. Analy. 549 (1998); Vijay Janjigian and P. Bolster, "The Elimination of Director Liability and Stockholder Returns: An Empirical Investigation," 3 J. Fin. Research 53 (1990); Marilyn F. Johnson, Ron Kasznik and Karen K. Nelson, "Shareholder Wealth Effects of

For example, consider the announcement of a governance change by a firm, such as a decision to de-stagger the board of directors. If the announcement is made on Wednesday, June 15th of a particular year, one can compare the change in stock price from Tuesday, June 14th to Thursday, June 16th, to see how the market processed the news of the de-staggering. If the decision to de-stagger makes shareholders better off, the price should rise, all else being equal, and if not, to stay the same or perhaps even fall. To determine the market reaction to that announcement, as opposed to something else, social scientists employ various econometrical techniques to determine the impact of other information released on Wednesday, June 15th, and then to remove it from the valuation calculation. Once isolated, the impact of only the announcement to de-stagger the board can be determined. This is called

---

the Private Securities Litigation Reform Act of 1995," REV. ACCT. STUD. (2000); Marilyn F. Johnson, Karen K. Nelson and A.C. Pritchard, "In Re Silicon Graphics Inc.: Shareholder Wealth Effects Resulting from the Interpretation of the Private Securities Litigation Reform Act's Pleading Standard," 73 S. CAL. L. REV. 773 (2000); S. Kamma, J. Weintrop and P. Wier, "Investors' Perceptions of the Delaware Supreme Court Decision in Unocal v. Mesa," 20 J. FIN. ECON. 419 (1988); Jonathan M. Karpoff and Paul H. Malatesta, "The Wealth Effects of Second Generation Takeover Legislation," 25 J. FIN. ECON. 291 (1989); Richard Lambert and Donald Larcker, "Golden Parachutes, Executive Decision-making and Shareholder Wealth," 7 J. ACCT. & ECON. 179 (1985); Donald G. Margotta, Thomas P. MacWilliams and Victoria B. MacWilliams, "An Analysis of the Stock Price Effect of the 1986 Ohio Takeover Legislation," 6 J. L. ECON. & ORG. 235 (1990); William N. Pugh and John S. Jahera, "State Antitakeover Legislation and Shareholder Wealth," 13 J. FIN. RESEARCH 221 (1990); Michael Ryngaert, "The Effects of Poison Pill Securities on Shareholder Wealth," 20 J. FIN. ECON. 377 (1988); Michael Ryngaert and Jeffry Netter, "Shareholder Wealth Effects of the Ohio Antitakeover Law," 4 J. L. ECON. & ORG. 373 (1988); Laurence Schumann, "State Regulation of Takeovers and Shareholder Wealth: The Case of New York's 1985 Takeover Statutes," 19 RAND J. ECON. 557 (1988); G. William Schwert, "Using Financial Data to Measure Effects of Regulation," 24 J. L. & ECON. 121 (1981); D. Katherine Spiess and Paula A. Tkac, "The Private Securities Litigation Reform Act of 1995: The Stock Market Casts Its Vote," 18 MANAGERIAL & DECISION ECON.545 (1997).

the "abnormal return" of the stock price, meaning the change that is beyond what would normally be expected in the absence of the event in question.[6]

The assumptions underlying this approach to valuing a firm decision are well grounded in the theory of finance, Supreme Court precedent, and the practice of courts and administrative agencies. The most fundamental principle of modern finance theory is that stock prices incorporate new information about publicly traded firms quickly and efficiently.[7] While the degree to which stock markets efficiently process new information is the subject of some debate, no one doubts that for a widely followed, publicly traded firm like Johnson & Johnson, the best available metric for determining the value of corporate decisions is by examining the stock price reaction to those decisions.

Writing in 1982, then-law professor Daniel Fischel advocated for a more reliable method of expert analysis in securities fraud cases.[8] In this article, Fischel criticized the common practice of courts relying solely on the opinions of experts about issues like materiality.[9] Instead, he offered a more reliable methodology, one grounded in the science of formal economics. He argued that his market approach "provides a relatively

---

[6] Typically econometrical analysis looks at the abnormal return over a three or five day period. This is known as the "cumulative abnormal return" or "CAR".

[7] This is known as the semi-strong theory version of the Efficient Capital Markets Hypothesis, and it is widely accepted in courts addressing securities fraud cases, as well as academics in finance, economics, and law.

[8] See Daniel R. Fischel, "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," 38 BUS. LAW. 1 (1982).

[9] Id at 3-5.

precise method for measuring whether an alleged omission or misrepresentation injured investors."[10]

Fischel's proposal has been adopted by litigants and courts; it has now entirely supplemented the less rigorous methodologies that proceeded it. Today courts rely on more reliable methodologies, like the econometrical techniques described above. The Supreme Court adopted a market approach in <u>Basic v. Levinson</u>, where it deployed the "fraud on the market" theory to create a rebuttable presumption that information, such as an alleged misrepresentation by a firm, was quickly incorporated into the firm's stock price, and thus plaintiff investors could rely on that stock price instead of showing they relied on the misstatement.[11]  Every court and administrative agency considering securities fraud cases has adopted this methodology for determining liability and determining damages.[12]

In academia, events studies provide "a fruitful means for evaluating the welfare implications of private and government actions."[13]

---

[10] Id at 19.

[11] See *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988) ("The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business." (internal quotations omitted)).

[12] See Bhagat & Romano, *supra* note 3 at 32 ("The Supreme Court has taken the premise of the methodology–that stocks trade in efficient markets–as the basis for establishing reliance in civil actions for fraud under the federal securities laws and, paralleling the Court's line of reasoning, the SEC has used the methodology to establish liability and the measure of damages in insider trading actions.")

[13] See id. at 1.

The scientific basis for the methodology is not in dispute.[14] According to a leading academic survey of the event study literature:

> The event study methodology is well-accepted and extensively used in finance. Event study results have been used in several hundred scholarly articles in leading academic finance journals to analyze corporate finance issues, such as stock repurchases and stock splits and the relation between stock prices and accounting information, by examining the impact of earnings releases.[15]

This survey concludes that "the benchmark for evaluating the benefit of corporate and securities laws is whether they improve investor welfare, and this can be ascertained by what event studies measure, whether stock prices have been positively affected."[16]

Social scientists have used the event study methodology to estimate the impact of countless legal changes, policies, and corporate decisions on shareholder value.[17] These include, the value of state

---

[14] See, for example, C. Ball and W. Torous, "Investigating Security Price Performance in the Presence of Event Date Uncertainty," 22 J. FIN. ECON. 123 (1988); J. Binder, "On the Use of the Multivariate Regression Model in Event Studies," 23 J. ACCT. RESEARCH 370 (1985). E. Boehmer, et al. , "Event- Study Methodology Under Conditions of Event-Induced Variance," 30 J. FIN. ECON. 253 (1991); S. Brown and J. Warner, "Using Daily Stock Returns: The Case of Event Studies," J. FIN. ECON. 14, (1985); E. Fama Foundations of Finance. New York: Basic Books (1976); E. Fama, et. al, "The Adjustment of Stock Prices to New Information," INTERNATIONAL ECON. REV. 10 (1969); P. Malatesta, "Measuring Abnormal Performance: The Event Parameter Approach Using Joint Generalized Least Squares," J. FIN. & QUANT. ANALY. 21 (1986); S. Sefcik and R. Thompson, "An Approach to Statistical Inference in Cross-sectional Models with Security Abnormal Returns as Dependent Variable," J. ACCT. RESEARCH 24 (1986); R. Thompson, "Conditioning the Return-Generating Process on Firm Specific Events: A Discussion of Event Study Methods," Journal of Financial and Quantitative Analysis 20 (1985).

[15] See Bhagat & Romano, *supra* note 3 at 2.

[16] See id at 1.

[17] See, for example, John J. Binder, "Measuring the Effects of Regulation with Stock Price Data," 16 RAND J. ECON. 167 (1985); see also A. Craig MacKinlay, "Event Studies in Economics and Finance," 13 J. Econ. Lit. 35 (1997); William Schwert, "Using Financial Data to Measure Effects of Regulation." 24 J. Law & Econ. 121 (1981).

corporate law in general;[18] specific state laws (e.g., anti-takeover statutes);[19] corporate governance changes mandated by law (e.g., Sarbanes-Oxley Act);[20] changes to board members (both in general and specific board members);[21] changes in executive compensation policies;[22] shareholder proposals;[23] shareholder derivative suits;[24] changes to banking rules;[25] and countless other rules, laws, or policies that might influence shareholder value. (A partial list of studies is presented in Exhibit 4.)  While several decades ago, law had to rely on the informed guesses of academics to estimate the value of legal changes or corporate decisions, the gold standard today for proving the impact of policies is the use of econometrical analysis. It is the only scientifically accepted, reliable methodology for determining the value of firm decisions on shareholder value.

---

[18] See, for example, Robert M. Daines, "Does Delaware Law Improve Firm Value?," 62 J. Fin. Econ. 525 (2001).

[19] See, for example, Jonathan M. Karpoff & Paul H. Malatesta, "The Wealth Effects of Second-Generation State Takeover Legislation." 25 J. Fin. Econ. 291 (1989).

[20] See, for example, Vidhi Chhaochharia & Yaniv Grinstein, "Corporate Governance and Firm Value: The Impact of the 2002 Governance Rules," 62 J. Fin. 1789 (2007).

[21] See, for example, Lucian A. Bebchuk & Alma Cohen, "Cost of Entrenched Boards." 78 J. Fin. Econ. 409 (2005).

[22] See, for example, Lucian A. Bebchuk, et al. "Golden Parachutes and the Wealth of Shareholders," Working Paper.

[23] See, for example, David F. Larker, et al., "The market reaction to corporate governance regulation," 101 J. Fin. Econ. 431 (2011).

[24] See, for example, Bo Becker, et al., "Does Shareholder Proxy Access Improve Firm Value? Evidence from the Business Roundtable Challenge." Working Paper (2010).

[25] See, for example, Larry Y. Dann & Christopher M. James, "An Analysis of the Impact of Deposit Rate Ceilings on the Market Values of Thrift Institutions," 37 J. Fin. 1259-1275 (1982).

IV.    MEASURING THE VALUE OF CORPORATE GOVERNANCE CHANGES

Some corporate governance structures help shareholders, while others harm shareholders, and many others are probably insignificant. Corporate officials, law makers, corporate observers, and academics debate which governance policies fall into these categories. Increasingly such debates are informed by econometrical analysis designed to provide an empirical, scientific answer to these questions. After all, if we wanted to measure the impact on shareholders of a particular business decision, say opening a new factory in China or developing a new product, the metric we would use is how shareholders reacted to the proposal. This reaction would be reflected in the firm's stock price. Decisions that shareholders value will increase the value shareholders put on their shares, while those that do not will not move the price or will make it fall. In this sense, governance is no different than anything else that shareholders care about. If they value it, they will pay for it.

A good example of the use of a scientific approach to measure the impact of governance choices involves section 407 of the Sarbanes-Oxley Act, which required publicly traded firms to disclose whether they had a "financial expert" on their audit committee.[26] As with any other governance changes, this one is susceptible to argument one way or the other. When it proposed a rule implementing the statute, the SEC

---

[26] Pub. L. 107-204, 116 Stat. 745 (2002).

received over 200 comments making arguments about what requirements would most increase shareholder value.[27] For instance, an initial proposal that would have deemed only accountants to be financial experts was ridiculed as excluding people like Alan Greenspan and Warren Buffet.[28] The SEC was moved by these arguments, and adopted a rule allowing firms to include within the definition of "financial expert" individuals without an accounting background.[29]

Was this good policy? We could ask experts, but a better approach would be to measure shareholder response to the naming of accounting versus non-accounting experts. Ultimately it is an empirical question about whether a particular disclosure requirement increases shareholder value. A recent event study of the rule as adopted by the SEC does just this.[30] The authors looked at the three-day cumulative abnormal returns around the announcement of new directors appointed to audit committees to determine how the market reacted.[31] They measured how shareholders value the governance choices made by firms they were invested in. The evidence shows that the announcement of an accounting expert increased firm value, while the announcement of a non-

---

[27] See, SEC Release Nos. 33-8177; 34-47235, "Disclosure Required by Sections 406 and 407 of the Sarbanes-Oxley Act of 2002," available at http://www.sec.gov/rules/final/33-8177.htm#footbody_11.

[28] See Geoffrey Colvin, "Sarbanes & Co. Can't Want This: Under Reform Law, Alan Greenspan Would Not Qualify as a Board's Financial Expert," Fortune, Dec. 30, 2002.

[29] See, SEC Release Nos. 33-8177; 34-47235, "Disclosure Required by Sections 406 and 407 of the Sarbanes-Oxley Act of 2002," available at http://www.sec.gov/rules/final/33-8177.htm#footbody_11.

[30] See Mark L. Defond, et al., "Does the Market Value Financial Expertise on Audit Committees of Boards of Directors?," 43 J. ACCT. RESEARCH 153 (2005).

[31] Id.

accounting expert did not: "We find positive and significant [cumulative abnormal returns] around the appointment of *accounting* financial experts to the audit committee but not around the appointment of *nonaccounting* financial experts or directors without financial expertise."[32] The lesson from this study, and hundreds more like it, is that firm choices that impact shareholder value are amenable to scientific analysis.

Another example involves the recent passage of the controversial shareholder access to the proxy provisions included in the Dodd-Frank Wall Street Reform and Consumer Protect Act.[33] Corporate academics and politicians debated the issue of shareholder access to the corporate proxy for years, the SEC proposed then tabled regulations that would have required it in limited circumstances, the SEC finally passed proxy access rules, but these were struck down by the DC Circuit in a recent case.[34] Despite the unresolved academic debate, Congress included a version of shareholder access to the proxy as part of the Dodd-Frank reforms.

While countless stories could be told by "experts" as to whether more shareholder control is a good thing or bad thing *for shareholders*, the debate can be made more scientific by examining the evidence about whether changes in shareholder access to the proxy impact firm value.

---

[32] Id.
[33] Pub.L. 111-203, H.R. 4173 (2010)
[34] See, for example, Jessica Holzer, "Court Deals Blow to SEC, Activists" Wall St. J., July 23, 2011.

Two recent studies try to elevate the debate to this level. In one paper, David Larker et al. provide evidence that shareholders reacted negatively to certain announcements regarding potential for a legal change requiring shareholder access to the proxy.[35] In another recent paper, Jonathan Cohn et al. look at additional evidence and find a positive shareholder reaction to the legal change.[36] While the empirical evidence is mixed at this point, the debate about shareholder access to the proxy is now being had in an empirical and scientific manner. The ultimate resolution of whether shareholder access to the proxy enhances shareholder value will ultimately be determined by science, not guesswork.

The market prices governance choices (be they legislative or firm-specific) when they impact shareholder value. Some of these have a positive impact on firm value. For instance, numerous empirical studies provide evidence that insulating board members from removal – using so-called "staggered boards" – results in decreases in shareholder value, either through reduced firm profits or lower takeover premia.[37] While there are arguments in theory and practice in favor of and against the staggering of boards, the matter is subject to empirical analysis that can

---

[35] See, for example, Larker, et al., *supra* note 24.

[36] See, Jonathan B. Cohn, "On the Optimality of Shareholder Control: Evidence from the Dodd-Frank Financial Reform Act," Working Paper (January 17, 2011).

[37] See Lucian A. Bebchuk & Alma Cohen, "Cost of Entrenched Boards." 78 J. Fin. Econ. 409 (2005); Olubunmi Faleye, "Classified Boards, Firm Value, and Managerial Entrenchment." Journal of Financial Economics 83: 501-529 (2007); Lucian A. Bebchuk, et al., "The Powerful Antitakeover Force of Staggered Boards: Theory, Evidence & Policy," 54 Stan. Law Rev. 887 (2002).

demonstrate the actual impact on shareholder value. Such evidence is provided by event studies and other empirical tests using econometrical and statistical tools.

Some governance changes have a negative impact on firm value. A recent study looked at potential governance changes in the areas of proxy access, executive pay, and specific firm choices regarding governance.[38] The study found many of these changes were associated with a negative market reaction, and therefore concluded that, *from the perspective of shareholders*, they were not valuable changes.[39] For instance, the study examined the stock price reaction to eight "events" that would impact executive compensation, and found that the stock market reaction was negative in a statistically significant amount.[40]

The central lesson from these examples is that courts, legislatures, agencies, policy makers, and academics all agree that rules and policies (be they of states or firms) are subject to empirical analysis, and that when determining the value of any change from the perspective of shareholders, the appropriate methodology is to do an econometrical study of shareholder reaction to the change.

---

[38] See Larker, et al., *supra* note 24.
[39] See id.
[40] See id.

V.    MEASURING THE VALUE OF GOVERNANCE CHANGES IN THIS CASE

In this case, the expert reports claim the benefits of the corporate governance changes proposed by the settlement outweigh the costs. These claims are asserted baldy, without any empirical support, either directly or from the academic literature. They rely instead entirely on the *ipse dixit* of the experts.

The report of Mr. Harvey L. Pitt is an example. Mr. Pitt's opinion is based entirely on his "experience with respect to corporate governance matters."[41] His experience is impressive. He led a global law firm, was Chair of the SEC, and is prominent consultant and advisor. Based entirely on this experience, Mr. Pitt asserts that:

> [V]iewed holistically, I believe that the proposed "Governance Reforms" together with the "Governance Enhancements and Changes" that the Company has already implemented, or is in the process of implementing, should lead to a more effective internal compliance regime and increased accountability by senior management, and strengthen Board oversight of the Company's compliance with applicable drug manufacturing and marketing rules and regulations.[42]

But Mr. Pitt's conclusion – that these governance changes "*should*" lead to better outcomes for shareholders – is not based on competent scientific evidence. He is speculating. His report may be informed speculation, it may be competent speculation, and it may be correct speculation. But nevertheless it is just a guess. Where the court has nothing else, such a guess might be valuable, although subject to the

---

[41] Pitt Declaration at 2.
[42] Id.

18

rules of evidence on admissibility of such plainly non-scientific evidence. But where, as here, there is an accepted, widely practiced, and straightforward method for determining the actual value shareholders ascribe to the proposed governance changes, such speculation is inappropriate and inconsistent with both the methodology used by experts in the field and thus inconsistent with settled law. When matters are easily susceptible to scientific proof, there is simply no need for even the most well informed guess.

There are two ways in which the proposed governance changes could be tested empirically. The first and best method would be to look at how the market reacted to the announcement of these proposed changes by measuring the change in J&J stock around the announcement. The methodology, as discussed above, is not limited to changes that are implemented, but can evaluate probabilistic events, such as proposed legislation or changes. In addition, the methodology can, if done well, account for other factors that could have impacted the price of J&J stock over the relevant three or five-day window.

Instead of taking Mr. Pitt's word for it that these changes are good for shareholders, the court can "ask" shareholders what they thought, by looking at how shareholders reacted to the news that J&J was going to adopt the "Core Objective." The virtue of this approach is that it avoids speculation, post-hoc analysis, and the possibility of bias. It also relies on the opinions of many thousands of individuals, as opposed to one or

two non-randomly chosen "experts." In addition, it relies on individuals aggregating their views backed by bets of their own money and in a way that reflects the intensity of preferences held by buyers and sellers. It is, in short, the only way that we can get anywhere close to an assessment of the value shareholders put on the governance changes.

In securities fraud cases, experts routinely deploy such event studies to inform the court about whether the alleged misrepresentation or omission caused the increase/decrease in stock price, as well as the magnitude of damages.[43] It would be possible for "experts," like Mr. Pitt, to opine on whether or not shareholders would care about certain disclosures and to estimate the value shareholders would give to them. But I know of no case in which an expert opinion like this has been accepted by a court in a securities fraud case. Instead, the accepted practice is to look at the facts instead, to see how shareholders did in fact react to various disclosures. This can be a complex analysis, which is why leading economic consultants have built a thriving business out of offering this analysis to litigants. But there is a scientific basis for this evidence. Corporate governance changes are not different, because the entire premise of the analysis done by Mr. Pitt is an estimate of what and how much the shareholders would value a particular corporate decision. Instead of guessing how they would value it, we have a ready method for

---

[43] See, for example, *United States v. Schiff,* 602 F.3d 152, 173 (2010) (noting the event study is "the tool most often used by experts to isolate the economic losses caused by the alleged fraud" (internal quotations omitted) and admitting government's event study expert under *Daubert*).

actually determining how they did value it.

A second possibility would be to look at the academic literature to see whether there are studies examining shareholder reaction to governance changes akin to the ones proposed in this settlement. If the literature suggests that shareholders generally react positively to changes like these, then one could argue that *J&J shareholders* would benefit in this case. Such a claim would be subject to objection, perhaps based on the scientific rigor or methodology of the studies or on the grounds that the J&J case was different for one reason or another, but at least it would be a piece of admissible data from which a court could draw a conclusion. Anything else is just not evidence, but merely speculation.

In this particular case, I am unaware of any academic literature supporting the conclusions reached by Mr. Pitt and Dr. Glass that the shareholder changes proposed by the settlement in this case have positive marginal value to shareholders.

VI.   CONCLUSION

I do not know whether J&J shareholders value the proposed changes. Maybe they do; maybe they don't. To determine this, one would have to conduct an event study to estimate the shareholder reaction to the disclosure of the proposed changes. If shareholders think they are valuable, the stock price should rise, and this is something that economists can readily determine from available data. Without such

evidence, the claims of plaintiffs' experts are rank speculation.

I thus conclude that (1) Mr. Pitt and Dr. Glass have failed to support their conclusions using reliable methodology that economists would use in propounding similar conclusions in studies submitted to peer-reviewed journals; and thus (2) plaintiffs have provided no scientifically reliable evidence that the governance changes in this case have positive value for Johnson & Johnson shareholders.

EXHIBIT 1: CURRICULUM VITAE OF PROFESSOR M. TODD HENDERSON

**M. Todd Henderson**
Professor of Law
The University of Chicago Law School
(773) 834-4168
toddh@uchicago.edu

**Current positions:**

2004-Present          **The University of Chicago Law School**
                      Professor of Law
                      Assistant professor (2004-2009)

2011-2014             Member, National Adjudicatory Council, Financial
                      Industry Regulatory Association ("FINRA")

2011                  Roger J. Traynor Summer Professor in Corporate Law
                      at the University of California, Hastings School of Law

2011-2014             Fresco Chair in Corporate Law at the University of
                      Genoa, Italy

2012                  Visiting Professor, University of Bergen, Norway

2012-Present          Fellow, Max Planck Institute for International,
                      European and Regulatory Procedural Law, Luxemburg

**Subjects:**         Corporations; Securities Regulation; Mergers &
                      Acquisitions; Executive Compensation; Banking;
                      Derivatives; Corporate Governance; Torts

**Awards:**           Paul M. Bator Award for Excellence in Teaching,
                      Scholarship and Public Service awarded by the
                      Federalist Society, 2009

                      Faculty Hooder, as elected by students of the Class of
                      2007

**Prior Experience:**

2001-2004     **McKinsey & Company**, Washington, D.C., Boston, Mass.
              Engagement manager (telecommunications, private
              equity)

| 1999-2001 | **Kirkland & Ellis**, Washington, D.C.<br>Associate (telecommunications, appellate litigation) |
| --- | --- |
| 1998-1999 | **Judge Dennis Jacobs**, Second Cir. Ct. of Appeals<br>Law clerk |

**Education:**

| 1995-1998 | **The University of Chicago Law School**, Chicago, Ill.<br>J.D. with high honors<br>Order of the Coif<br>Editor, University of Chicago Law Review |
| --- | --- |
| 1989-1993 | **Princeton University**, Princeton, N.J.<br>B.S.E. Civil Engineering & Operations Research, cum laude<br>J. Rich Steers Award for Academic Excellence<br>Elected to Sigma Xi honor society |

**Academic publications:**

"Reverse Regulatory Arbitrage: An Auction Approach to Regulatory Assignments," *Iowa Law Review*, forthcoming 2012

"Voice and Exit in Health Care Policy," *Pathology Case Review*s, forthcoming 2012

"Pay for Regulator Performance," *University of Southern California Law Review*, forthcoming 2012

"Paying Bank Examiners for Performance," *Regulation*, Spring 2012

"Insider Trading and CEO Pay," *Vanderbilt Law Review*, forthcoming 2011 (selected as one of the best securities law articles of 2011 and included in the *Securities Law Review 2012*, Donald Langevoort, ed.)

"Hiding in Plain Sight: Can Disclosure Enhance Insiders' Trade Returns?," under review at the *Journal of Management Science* (with Alan Jagolinzer and Karl Muller)

"Do Accounting Rules Matter: The Dangerous Allure of Mark to Market" *Journal of Corporation Law* (with Richard Epstein),

forthcoming 2011 (selected for inclusion in *Corporate Practice Commentary 2011)*

"Justifying Jones." 77 *University of Chicago Law Review* 1027 (2010)

"Predicting Crime." 52 *Arizona Law Review* 15 (2010)

"Credit Derivatives Are Not 'Insurance'." 16 *Connecticut Insurance Law Journal* 1 (2009)

"The Nanny Corporation." 76 *University of Chicago Law Review* 1517 (2009)

"Introduction to *The Going Private Phenomenon: Causes and Implications*." 76 *University of Chicago Law Review* 1 (2009) (with Richard Epstein)

"The Impotence of Delaware's Taxes: A Response to Barzuza's Delaware's Compensation." 95 *Virginia Law Review In Brief* 49 (2009)

"Corporate Philanthropy and the Market for Altruism." 109(5) *Columbia Law Review* 571 (2009) (with Anup Malani)

"One Hat Too Many? Investment Desegregation in Private Equity." 76(1) *University of Chicago Law Review* 45 (2009) (with William Birdthistle)

"Two Visions of Corporate Law." 77(3) *George Washington Law Review* 708 (2009)

"Citing Fiction." 11 *Green Bag 2nd* (2008)

"From 'Seriatim' to Consensus and Back Again: A Theory of Dissent." *Supreme Court Review* (2008)

"Other People's Money." 60 *Stanford Law Review* (2008) (with Douglas Baird)

"Deconstructing Duff and Phelps." 74 *University of Chicago Law Review* 1739 (2007) (Special Issue: Commemorating Twenty-Five Years of Judge Richard A. Posner)

"Paying CEOs in Bankruptcy: Executive Compensation When Agency Costs Are Low." 101 *Northwestern University Law Review* 1543 (2007)

"Prediction Markets for Corporate Governance." 82 *University of Notre Dame Law Review* 1343 (2007) (with Michael Abramowicz)

"Corporate Heroin: A Defense of Perks, Executive Loans, and Conspicuous Consumption." 93 *Georgetown Law Journal* 1835 (2005) (with James C. Spindler)

"The Influence of F. A. Hayek on Law: An Empirical Analysis." *NYU Journal of Law and Liberty* (2005)

**Books:**

The Law & Economics of Wall Street (with Charles Senatore) (in progress)

The Logic & Limits of Pay for Performance (with Fred Tung) (in progress)

In Coase's Footsteps: 20 Years of Law & Economics Ideas from the University of Chicago (in progress)

**Book Chapters:**

"Firms Without Boards: Unleashing the Hayekian Firm," in *Austrian Law and Economics*, forthcoming 2012

"The Changing Demand for Insider Trading Regulation," in *Insider Trading Anthology*, Edgar Elgar, forthcoming 2012

"Second Best Is Good Enough: The Case of Jones v. Harris Associates," in *Business and the Roberts Court*, Jonathan Adler, ed., Oxford University Press, forthcoming 2012

"Insider Trading and Executive Compensation: What We Can Learn from the Experience with Rule 10b5-1." in *Executive Pay Handbook.* Edgar Elgar, forthcoming 2012

"Everything Old Is New Again: Lessons from *Dodge v. Ford Motor Company*," in *Corporate Law Stories.* Foundation (2009)

**Works-in-progress:**

"Why Banking Regulation Failed . . . and Will Continue to Fail" (with James Spindler)

"The Future of Licensing Lawyers" (with Dan Currell)

"The Fifth Branch" (with William Birdthistle)

"Layering of Law," Working Paper

"Bankruptcy for Competitive Advantage" (with Todd Zywicki)

"The Changing Demand for Insider Trading Regulation"

**Selected presentations:**

American Law and Economics Association, "Paying Regulators for Performance," Annual Meeting 2012 (accepted paper)

Coase Lecture, University of Chicago Law School, 2012

Stanford Directors' Roundtable, Invited Faculty, 2006-08

Chicago Booth School of Business Directors' Consortium, Faculty, 2005-Present (executive compensation)

Investment Management Consultants Association, Chartered Private Wealth Advisor program, Invited Faculty, 2009 (executive compensation, valuation of closely held businesses)

European Financial Management 2009 Symposium: Corporate Governance and Control, "Scienter Disclosure" (accepted paper)

NBER Summer Workshop, "Scienter Disclosure," 2008 (accepted paper)

Conference on Empirical Legal Studies, "Scienter Disclosure," 2008 (accepted paper)

American Law and Economics Association, "Paying CEOs in Bankruptcy," Annual Meeting 2005 (accepted paper)

**Professional affiliations:**

American Law and Economics Association

Referee: Journal of Legal Studies; Journal Law & Economics

**Bar admissions:**

Maryland (inactive)

EXHIBIT 2: LITIGATION EXPERIENCE OF PROFESSOR M. TODD HENDERSON

1.  CareerBuilder.com v. Stirling Bridge Corp. (2007)
    Court: Arbitration of state-law claims
    Location: Chicago, IL
    Role: Expert witness on piercing the corporate veil for plaintiff
    (represented by Latham & Watkins)

2.  CDX v. Venrock (2008-2012)
    Court: Federal District Court, Northern District of Illinois
    Location: Chicago, IL
    Role: Expert witness on corporate governance for plaintiff
    (represented by McBreen & Kopko)

3.  Reuter v. Advance America, Cash Advance Centers of Florida, Inc.
    (2009)
    Court: Florida State Court (Circuit Court of the Fifteenth Judicial
    Circuit in and For Palm Beach County, Florida)
    Location: Palm Beach, FL
    Role: Expert witness on law and economics for defendants
    (represented by Buckley Sandler LLP)

4.  Patterson v. iPCS, Inc. (2009)
    Court: Illinois State Court (Circuit Court of Cook County –
    Chancery Division)
    Location: Chicago, IL
    Role: Expert witness on corporate governance and
    telecommunications industry best practices for defendants
    (represented by Mayer Brown LLP)

5.  Backe v. Novatel Wireless, Inc. (2010-present)
    Court: Southern District of California
    Location: San Diego, California
    Role: Expert witness on executive compensation and insider
    trading for plaintiff (represented by Robbins Geller Rudman &
    Dowd LLP)

6.  Sylla v. Kataname, Inc. (2010-2011)
    Court: California state court
    Location: San Jose, California
    Role: Expert witness on corporate governance and valuation for
    plaintiff

EXHIBIT 3:  DOCUMENTS CONSIDERED

1. Stipulation and Agreement of Settlement (10-cv-2033 Dkt. 182)

2. Memorandum of Law in Support of Plaintiff's Motion for Final Approval of Derivative Litigation Settlement and Award of Attorney's Fees and Reimbursement of Expenses (10-cv-2033 Dkt. 192-1)

3. Objection of Mark G. Petri to Attorneys' Fees and Memorandum in Support of Motion to Dismiss Under Rule 23.1(a) (10-cv-2033 Dkt. 191-2)

4. Attaching Declaration of James E. Cecchi (10-cv-2033 Dkt. 192-2)

5. Report of Dr. Mitchell Glass in Support of Settlement of the Johnson & Johnson Derivative Actions (10-cv-2033 Dkt. 192-12)

6. Declaration of Harvey L. Pitt in Support of Settlement  (10-cv-2033 Dkt. 192-11)