

| | | |
|---|---|---|
| SIDLEY AUSTIN LLP<br>ONE SOUTH DEARBORN STREET<br>CHICAGO, IL 60603<br>(312) 853 7000<br>(312) 853 7036 FAX<br><br>wcarlson@sidley.com<br>(312) 853 7734 | BEIJING<br>BRUSSELS<br>CHICAGO<br>DALLAS<br>FRANKFURT<br>GENEVA<br>HONG KONG<br>HOUSTON<br>LONDON<br><br>FOUNDED 1866 | LOS ANGELES<br>NEW YORK<br>PALO ALTO<br>SAN FRANCISCO<br>SHANGHAI<br>SINGAPORE<br>SYDNEY<br>TOKYO<br>WASHINGTON, D.C. |

September 21, 2012

**BY CM/ECF**

Honorable Freda L. Wolfson
Clarkson S. Fisher Building & U.S. Courthouse
402 East State Street, Room 2020
Trenton, NJ 08608

      Re:    Johnson & Johnson Derivative Litigation, Case Nos. 10-2033, 11-2511, and 11-4993

Dear Judge Wolfson:

      We write on behalf of Johnson & Johnson in support of final approval of the settlement and in response to Mark G. Petri's Motion to Intervene (Dkt. 190),[1] Motion to Dismiss (Dkt. 191), and Supplemental Objection (Dkt. 195).[2] J&J strongly supports the Court's approval of the settlement.

      As Your Honor knows, over the past several years a number of J&J shareholders raised concerns about quality and compliance issues and regulatory actions at J&J and certain of its subsidiaries. Some of those shareholders brought their concerns directly to J&J's Board of Directors by presenting shareholder demand letters. Others filed derivative litigation in this Court claiming that demand was futile.

      The Company took the shareholder concerns seriously and undertook an extensive Special Committee investigation in response, which encompassed the allegations of both the demand letters and the demand futile litigation. The Company also litigated the matters pending before Your Honor. In July 2011, the Board adopted the Special Committee's recommendations that the Company should establish a new Board committee to focus on oversight of regulatory and compliance issues, and also should pursue dismissal of the pending litigation. Thereafter, certain shareholders who had made demands filed a demand refused action challenging the work

---

[1] J&J does not oppose Mr. Petri's Motion to Intervene, but we note that under Third Circuit law intervention is not required for a shareholder to object to a settlement or pursue an appeal. *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1310 (3d Cir. 1993).
[2] All docket references are to the 10-2033 docket.



Honorable Freda L. Wolfson
September 21, 2012
Page 2

of the Special Committee (Case No. 11-4993). That action remains pending. Your Honor dismissed the main consolidated demand futile action without prejudice on September 29, 2011, and gave those plaintiffs several options, including the option to attempt to re-plead (Case No. 10-2033). The demand futile action related to FCPA issues also remains pending (Case No. 11-2511).

Last fall, the parties to all three pending matters entered into settlement discussions on a global basis. The settlement process took many months. Plaintiffs reviewed and commented on a number of improvements that J&J already had undertaken. In addition, there were extensive negotiations with respect to additional corporate governance and quality measures that were proposed by the plaintiffs. Reaching an agreement was no small feat, and we firmly believe the settlement is in the best interests of J&J and its shareholders.

Only one J&J shareholder has filed a substantive objection to the settlement: Mr. Petri, represented by Mr. Frank of the Center for Class Action Fairness. We appreciate the objector's concern about the impact that shareholder derivative litigation can have on corporations. But, in the context of this matter, Mr. Petri's objection simply misses the mark. Nothing in his objection undermines the benefits to J&J that are achieved by the settlement. J&J has approximately 2.7 billion shares of common stock outstanding and one shareholder owning 1,249 shares has filed a substantive objection. The settlement should be approved.

### 1. The Principal Issue Is Whether J&J Benefits From The Settlement

The principal factor in determining whether a shareholder derivative settlement should be approved as fair and reasonable is the benefit to the corporation, which is the intended beneficiary of the litigation. *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1311 (3d Cir. 1993). When assessing the benefit derived by the corporation, the Court should consider the adequacy of the recovery "in the light of the best possible recovery, of the risks of establishing liability and proving damages in the event the case is not settled, and of the cost of prolonging the litigation." *Id.*

The law is clear that monetary recovery to the corporation is not required for a settlement to benefit the corporation: governance and management reforms are an appropriate form of relief in derivative action settlements. *Bell Atlantic*, 2 F.3d at 1310-11; *In re Schering-Plough Corp. S'holders Deriv. Litig.*, Master Derivative Docket C.A. No. 01-1412 (Hon. Katharine S. Hayden), 2008 U.S. Dist. LEXIS 2569, at *2-11 (D.N.J. Jan. 14, 2008) (approving derivative settlement providing for corporate governance and compliance reforms for period of five years); *Unite Nat'l Ret. Fund v. Watts*, No. 04-CV-3603 (Hon. Dennis M. Cavanaugh), 2005 U.S. Dist. LEXIS 26246, at *17-18 (D.N.J. Oct. 27, 2005) (approving derivative settlement providing for governance reforms).

Case 3:10-cv-02033-FLW-DEA   Document 203   Filed 09/21/12   Page 3 of 6 PageID: 6032



Honorable Freda L. Wolfson
September 21, 2012
Page 3

### 2. The Settlement Benefits J&J

Mr. Petri's central contention – that the settlement does not benefit J&J but instead leaves J&J "empty handed" – is wrong. (Petri Mtn. to Dismiss at 7.) Mr. Petri argues that the settlement "merely provides cosmetic changes to preexisting policies and procedures." (*Id.* at 10.) In support of this, he references Exhibit B to the Stipulation of Settlement, in which the parties recognize that J&J itself – consistent with its commitment to the values set forth in the Company's Credo – had enhanced and changed its corporate governance and compliance framework since early 2010. (*Id.* at 11.) Mr. Petri misses the point of Exhibit B. Exhibit B sets forth a number of enhancements made by J&J after J&J's receipt of the demand letters and the filing of the derivative litigation, and acknowledges that those changes were a consequence of multiple factors, including the demand letters and derivative actions along with the Special Committee's investigation and findings.

The most notable of the enhancements in Exhibit B in fact stemmed from the shareholder demands and lawsuits: the Board's decision to create the Regulatory, Compliance & Government Affairs Committee ("RCGC") based upon the Special Committee's recommendation. (Ex. B to Stlmt. Agmt., p. 2, Dkt. 182-2.) The establishment of a new Board-level committee specifically focused on oversight of quality and compliance strongly supports approval of the settlement.

The additional items specifically negotiated for in the settlement are reflected in Exhibit A to the Stipulation of Settlement. (Dkt. 182-1.) The commitments in Exhibit A include the following new J&J-wide quality and compliance policies that are designed to further enhance J&J's quality systems:

- <u>Quality & Compliance Core Objective</u>: The Q&C Core Objective is plainly consistent with and flows from J&J's Credo. However, it commits J&J to certain actions to implement the principles of the Credo. For example, the Q&C Core Objective requires that J&J design and/or maintain "robust quality control and quality assurance systems to prevent, detect and correct noncompliance with the Quality Policy and standards." It also requires that "[c]ompliance with applicable laws, regulations, and internal policies, procedures and standards" be reviewed regularly throughout the life-cycle of products "including those related to the marketing and promotion of drugs and devices." (Ex. A, Dkt. 182-1, at pp. 1-2.) Additionally, J&J has agreed to an annual Company-wide dissemination of the Q&C Core Objective with an instruction that the Q&C Core Objective be considered in the evaluation and compensation of all J&J employees.


SIDLEY AUSTIN LLP

Honorable Freda L. Wolfson
September 21, 2012
Page 4

- **RCGC Charter and Operating Procedure**: Although the Board had determined to create the RCGC before settlement discussions were commenced, both the RCGC Charter and Operating Procedure were the subject of the settlement negotiations. Mr. Petri claims otherwise, but he is mistaken. The RCGC Charter he references on J&J's website reflects discussions between the parties. The RCGC needed to commence its operations prior to the completion of settlement discussions, so it began operating pursuant to the then-negotiated draft of the Charter. The additional changes made to the Charter in final settlement negotiations will be adopted after the settlement receives final approval. Additionally, the RCGC Operating Procedure was wholly the product of the settlement negotiations.

- **New Quality Standards**: J&J also agreed to develop and implement three new J&J-wide quality standards. These new standards will be mandatory and applicable across the J&J Enterprise, and will be subject to oversight by J&J's independent Enterprise Regulatory Compliance Group. Most notably, the Product Risk Management standard will address the overall quality process for reporting, escalation, and remediation of issues arising with products. It includes requirements for adopting timelines for the resolution of product issues, tracking remediation against those timelines, and escalation of unresolved issues.

- **Website Disclosure**: For five years, J&J will post an annual report on its website confirming the operations of the RCGC.

J&J made a number of commitments in the settlement documents, and J&J takes those commitments seriously. Work already is underway at the Company to develop the new standards and implement other agreed-upon changes. The Stipulation of Settlement includes J&J's acknowledgement and agreement that the enhancements set forth in Exhibit A and Exhibit B are of substantial benefit to J&J. (Stlmt. Agmt., p. 9, Dkt. 182.) Mr. Petri's accusation that these changes are solely "cosmetic" is without merit.

Moreover, the substantial benefit to J&J and its shareholders to put this litigation behind it is plain. This settlement brings all three cases and the matters raised in the shareholder demands to a close. Ending the litigation is of substantial value to the Company on a standalone basis.

*Bell Atlantic* instructs that the adequacy of these benefits should be assessed "in the light of the best possible recovery, of the risks of establishing liability and proving damages in the event the case is not settled, and of the cost of prolonging the litigation." 2 F.3d at 1311. The plaintiffs already have provided their analysis of these factors. (Pl. Mem. Final Approval, Dkt. 192-1, 23-27.) We will simply note that in light of the exculpatory provision in J&J's charter



Honorable Freda L. Wolfson
September 21, 2012
Page 5

(*see, e.g.,* J&J's Mtn. to Dismiss, Dkt. 105-4, pp. 20-21), the indemnification rights afforded to both directors and officers under New Jersey law (*see* N.J.S.A. 14A:3-5), the comprehensive investigation already undertaken by the Special Committee, and the fact that the settlement affirms the defendants' express denial of any liability (Stlmt. Agmt., pp. 8-9, Dkt. 182), the "best possible recovery" for J&J is limited and the cost to J&J of allowing the litigation to continue would be high. These factors strongly support approval of the settlement.[3]

### 3. Shareholder Response Supports Approval

Courts also consider "the response of other shareholders" to the proposed settlement. *Bell Atlantic*, 2 F.3d at 1311. The reaction of J&J's shareholders to the settlement soundly favors approval. Mr. Petri has filed the only substantive objection to the settlement and his ownership of 1,249 shares represents just 0.00000045 percent of J&J's more than 2.7 billion outstanding shares. *Compare* Mtn. to Intervene at 2 (Mr. Petri holds 1,249 shares) *with* J&J Form 10-K for fiscal year ended Jan. 1, 2012, at 1 (J&J had 2,745,078,671 shares of common stock outstanding as of Feb. 17, 2012) (filing available at http://www.sec.gov/Archives/edgar/data/200406/000119312512075565/d281803d10k.htm). *See also Bell Atlantic*, 2 F.3d at 1313 (factor favored settlement where "infinitesimal" 30 out of 1.1 million shareholders objected); *cf. In re Cendant Corp.*, 232 F. Supp. 2d 327, 333-34 (D.N.J. 2002) ("Although over 200,000 notices of the settlement were sent out to Cendant's common stockholders and a Summary Notice was published in the Wall Street Journal, only four shareholders (representing less than 0.000009 percent of Cendant's outstanding shares) questioned the settlement, and none filed an official objection with the Court."). Several additional individual shareholders have questioned

---

[3] Mr. Petri's assertion that an event study is required to find a benefit in a shareholder derivative settlement has no foundation in case law. Courts regularly approve settlements of shareholder derivative suits without requiring event studies. *See, e.g., Plymouth County Contributory Ret. Sys. v. Hassan*, No. 08-CV-1022 (Hon. Dennis M. Cavanaugh), 2012 U.S. Dist. LEXIS 26334, at *7-13 (D.N.J. Feb. 28, 2012) (approving a settlement of a shareholder derivative action for corporate governance reforms, and concluding that the benefit was "substantial" without addressing any event study); *Schering-Plough*, 2008 U.S. Dist. LEXIS 2569, at *2-11 (relying on expert testimony similar to that provided by plaintiffs in this case to determine that the benefit of corporate governance reforms is substantial); *In re Pfizer Inc. S'holder Deriv. Litig.*, 780 F. Supp. 2d 336, 340-41 (S.D.N.Y. 2011) (same, relying on opinion of Harvey Pitt). Indeed, the case law states that benefit to the *corporation* must be considered, *e.g. Bell Atlantic*, 2 F.3d at 1311, and Mr. Petri provides no citation supporting his assertion that only "shareholder benefit" as measured by stock price movement can provide support.



Honorable Freda L. Wolfson
September 21, 2012
Page 6

the settlement's benefit to shareholders or objected to the prospective award of fees to plaintiffs' counsel.[4]  No institutional investors have objected to the settlement.

Finally, Mr. Petri argues that the fees sought by plaintiffs' counsel should be reduced. We presume that plaintiffs' counsel will address these arguments in detail, and we recognize that the amount of the fee award is in the sound discretion of the Court. That said, J&J stands by the agreement it made.

The parties negotiated for months to reach a settlement that is of benefit to J&J and its shareholders. J&J respectfully requests that the Court grant final approval of the settlement.

Respectfully submitted,

SIDLEY AUSTIN LLP

By: _/s/ Walter C. Carlson_
Walter C. Carlson

ROBINSON, WETTRE & MILLER LLC

By: _s/ Donald A. Robinson_
Donald A. Robinson

cc: All Counsel of Record (By CM/ECF)

---

[4] To date, we are aware of seven. A shareholder sent a letter to the Court and plaintiffs' counsel dated August 14, 2012, in which he expressed concern about the prospective award of fees to plaintiffs' counsel and requested additional information from plaintiffs' counsel. (Dkt. 196.) A shareholder objection to the prospective award of fees was filed on the docket on September 20, 2012. (Dkt. 197.) Plaintiffs' counsel received an email on September 20, 2012, from a shareholder objecting to the settlement with respect to the prospective fee award. (Dkt. 198.) A shareholder sent a letter to the Court and counsel dated September 18, 2012, which objected on several grounds. We received phone calls from two J&J shareholders on September 19, 2012, and a note from a shareholder on September 20, 2012 (Dkt. 202), all of which were directed to the prospective fee award.