## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE JOHNSON & JOHNSON DERIVATIVE LITIGATION | Civil Action No. 10-2033 (FLW) |
| IN RE JOHNSON & JOHNSON FCPA SHAREHOLDER DERIVATIVE LITIGATION | Civil Action No. 11-2511 (FLW) |
| COPELAND v. PRINCE, *et al.* | Civil Action No. 11-4993 (FLW) |

-------------------------------------------------------------------------------------------------------------

## PLAINTIFFS' BRIEF RESPONDING TO OBJECTIONS AND IN FURTHER SUPPORT OF SETTLEMENT OF DERIVATIVE ACTION

-------------------------------------------------------------------------------------------------------------

James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI
 OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
 Roseland, New Jersey 07068
(973) 994-1700
*Attorneys for Demand Futile Plaintiffs*

Gary S. Graifman
KANTROWITZ, GOLDHAMER &
 GRAIFMAN, P.C.
210 Summit Avenue
 Montvale, New Jersey 07645
(201) 391-7000
*Attorneys for Demand Refused Plaintiffs*

1

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................... 1

II.     PETRI'S SPECULATIVE ARGUMENTS ARE BASELESS................................... 6

  A.     Petri's Arguments Are Refuted by the Record ............................................... 6

  B.     The Settlement Addresses Plaintiffs' Core Allegations, And Is.................................. 8

    Anything But Cosmetic.................................................................................... 8

  C.     Petri's Arguments Based on the J&J Stock Price Prove Nothing............................. 14

  D.     Petri's Supposition of Collusion Is Utterly Baseless .................................. 14

III.     ARGUMENT ....................................................................................... 15

  A.     The Settlement Confers Substantial Benefits on J&J by Preventing Future Wrongdoing ................................................................................................ 15

  B.     J&J's Shareholders Support Approval of the Settlement ........................................... 22

  C.     The Requested Fee And Reimbursement of Expenses Should Be Approved ............ 23

    1.     The Work Performed by Plaintiffs' Counsel Warrants the........................................ 23

    Payment of the Requested Attorneys' Fees ...................................................... 23

    2.     Payment of a Reasonable Multiplier Is Appropriate.................................................. 25

    3.     The Unsupported Fee Objections Should Be Rejected................................................ 28

IV.     CONCLUSION......................................................................................... 31

i

## TABLE OF AUTHORITIES

**Cases**

*Bell Atlantic Corp. v. Bolger, et al.*, 2 F.3d 1304 (3d Cir. 1993)................................................. 12

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477 (1977).......................................... 8

*City of Burlington v. Dague*, 505 U.S. 557 (1992) ..................................................................... 28

*Eichenlaub v. Township of Indiana*, 214 Fed. Appx. 218 (3d Cir. 2007)..................................... 25

*Floorgraphics, Inc. v. News America Marketing In-Store Svcs., Inc.*,
    546 F. Supp. 2d 155 (D.N.J. 2008) ................................................................................ 19, 21

*In re AOL Time Warner S'holder Derivative Litig.*,
    2006 WL 2572114 (S.D.N.Y. Sept. 6, 2006)............................................................................ 16

*In re AOL Time Warner S'holder Derivative Litig.*, 2010 WL 363113 (S.D.N.Y. Feb. 1, 2010) 16

*In re Cendant Corp. Litig.*, 243 F.3d 722 (3d Cir. 2001).............................................................. 23

*In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235 (D.N.J. 2000)...................................... 22, 26

*In re Cendant PRIDES Litigation*, 243 F.3d 722 (3d Cir. 2001) ................................................. 26

*In re Diet Drugs*, 582 F.3d 524 (3d Cir. 2009) .......................................................................... 25

*In re GMC Pickup Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768 (3d Cir. 1995)................. 23

*In re Intel Corp. Derivative Litigation*, 2010 WL 2955178 (D.Del., July 22, 2010) .................. 30

*In re Jacoby Airplane Crash Litigation*, 2007 WL 5037683 (D.N.J. 2007)................................ 18

*In re Merck & Co., Inc. Vytorin Erisa Litigation*,
    No. 08-CV-285 (DMC), 2010 WL 547613 (D.N.J. Feb. 9, 2010) .......................................... 26

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
    148 F.3d 283 (3d Cir. 1998) .................................................................................. 23, 24, 25

*In re Remeron End-Payor Antitrust Litig.*,
    Civ. 02-2007 FSH, 2005 WL 2230314 (D.N.J. Sept. 13, 2005)....................................... 26, 30

*In re Rite Aid Corp. Sec. Litig*, 396 F.3d 294 (3d Cir. 2005)................................................ 22, 24

*In re Schering-Plough Corp. S'holder Derivative Litig.*,
    No. 01-1412, 2008 WL 185809 (D.N.J. Jan. 14, 2008)............................................................ 16

*In Re: Pfizer Inc. S'holder Derivative Litig.*, 780 F. Supp. 2d 336 (S.D.N.Y. 2011).................. 17

*Kannankeril v. Terminix International*, 128 F.3d 802 (3d Cir. 1997) ........................................ 18

*Kumho Tire Co, Ltd. v. Carmichael*, 526 U.S. 137 (1999)......................................................... 18

*Lenahan v. Sears Roebuck and Co.*, 2006 WL 2085282 (D.N.J. July 24, 2006)......................... 22

*Loughner v. Univ. of Pittsburgh*, 260 F.3d 173 (3d Cir. 2001) .................................................. 25

*Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742 (4th Cir. 1998).............................................. 25

*McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448 (D.N.J. 2008) ................................................. 26

*McLendon v. Continental Group, Inc.*, 872 F. Supp. 142 (D.N.J. 1994)..................................... 28

*Merola v. Atlantic Richfield Co.*, 515 F.2d 165 (3d Cir. 1975) .................................................. 21

*Milliron v. T-Mobile USA, Inc.*, 423 Fed. Appx. 131 (3d Cir. 2011) ......................................... 26

*Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970)...................................................................... 16

*Polselli v. Nationwide Mut. Fire. Ins. Co.*, 126 F.3d 524 (3d Cir. 1997) ................................... 28

*Robert F. Booth Trust v. Crowley*, 687 F.3d 314 (7th Cir. 2012)................................................. 8

*Rowe v. E.I. DuPont de Nemours and Co.*,
    Civ. Nos. 06-1810 (RMB/AMD), 2011 WL 3837106 (D.N.J. Aug. 26, 2011)....................... 26

*Smith v. Dominion Bridge Corp.*, 2007 WL 1101272 (E.D. Pa., April 11, 2007)....................... 22

*Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115 (3d. Cir. 1990)....................................................... 22

ii

*Unite Nat. Retirement Fund v. Watts*, 2005 WL 2877899 (D. N.J., October 28, 2005) ............... 16

*Varacallo v. Massachusetts Mut. Life Ins. Co*., 226 F.R.D. 207 (D.N.J. 2005) ........................... 26

## I.       INTRODUCTION

Plaintiffs' August 31, 2012 submissions demonstrate that the Settlement resulted from hard-fought litigation and extended arm's-length negotiations, and provides substantial (and in many respects unique) benefits to J&J and its shareholders.[1]  The Settlement should be approved as fair, reasonable and adequate, and Lead Counsel's Fee Application should be approved as fitting well within existing precedent for comparable achievements.

From the time the Derivative Actions began, there was no real question that J&J as an entity had, in fact, experienced problems and deficiencies in complying with current good manufacturing practices ("cGMP") and federal drug marketing and anti-corruption laws.  Nor could anyone question that these deficiencies and legal violations significantly harmed J&J's business reputation and led to what may well amount to over four billion dollars of fines and liability payments.

Rather, the parties' principle dispute focused on who should be held accountable for these problems.  Plaintiffs alleged that J&J's board of directors (the "Board") and senior management breached their fiduciary duties in allowing J&J's systemic problems to persist and deteriorate. For their part, the Board and management insisted that they could not be expected to prevent J&J's problems given J&J's decentralized operations, and that they did not breach their duties. When the Court assessed the Demand Futility Action at the motion to dismiss stage, the Court rightly expressed concern about the severity of J&J's compliance and quality control problems. Nevertheless, the Court dismissed the complaint without prejudice for failure to sufficiently detail the basis to hold the Board accountable.  Having made its concerns about J&J's problems clear, the Court gave Plaintiffs the opportunity to, among other things, amend the complaint to

---

[1] In this reply brief, capitalized terms have the same meaning as in Plaintiff's Memorandum of Law in Support of Final Approval, dated August 31, 2012 ("FAB," ECF No. 192-1), unless otherwise indicated.

meet their pleading burden. Before Plaintiffs could do so, the parties found common ground by looking forward in order to establish ways to protect J&J's value in the future. Through aggressive negotiations on all sides, the parties ultimately reached agreement on the Settlement.

As a direct result of the Derivative Actions, J&J agreed to make significant changes to its governance and compliance processes that directly address Plaintiffs' core allegations and concerns. The Settlement requires the Board to adopt a comprehensive Quality and Compliance Core Objective, which *requires* the Board and management to design and/or maintain robust quality control and quality assurance systems to prevent, detect and correct noncompliance with, *inter alia*, cGMP and drug marketing laws. Those systems must include timelines and benchmarks for remediating identified violations, and metrics to monitor and assess compliance.

The Settlement also implements a new system for Board oversight of compliance with cGMP and drug marketing laws, through the adoption of a detailed Charter and Operating Procedure for the Board's new Regulatory, Compliance & Government Affairs Committee (the "RCGC"). The Charter and Operating Procedure ensure that the Board receives timely information concerning quality and compliance problems at J&J, and makes the Board accountable to undertake action and address identified problems before they spin out of control. The Settlement also requires the adoption of a new, mandatory companywide Product Risk Management ("PRM") standard imposing accountability for identifying, resolving and escalating product-related issues. Thanks to the Settlement's RCGC Charter and Operating Procedure, as well as the adoption of the PRM framework, the risk of systemic non-compliance with cGMP and the drug marketing laws will be substantially reduced, if not eliminated. Plaintiffs therefore believe that the Settlement dramatically improves J&J's governance and compliance systems.

The undisputed record shows that the Settlement was achieved through contentious

2

litigation and settlement negotiations, and with the help of former SEC Chairman Harvey L. Pitt and medical doctor and pharmaceutical expert Dr. Mitchell Glass, both of whom assisted in the design of the corporate governance and compliance reforms from the outset of the negotiations.[2]  Chairman Pitt and Dr. Glass explained in their respective August 31, 2012 expert reports that the Settlement provides substantial benefits to J&J because, *inter alia*, it gives the *entire* J&J organization – including the Board – the tools and the responsibility to detect and prevent future systemic misconduct.  Lead Counsel's Joint Attorney Declaration ("JAD") demonstrates the vigor with which this matter was prosecuted, as well as the adversarial nature of Settlement negotiations.  In sum, this Action is precisely the type of derivative suit that should be filed (since it seeks to correct real harm to a corporation and to protect the corporation from the recurrence of the same types of problems and wrongdoing) and the Settlement clearly achieves the legitimate objectives of the lawsuit.

The response from J&J's shareholders to the Settlement has been overwhelmingly positive.  None of the 1,769 sophisticated institutional investors, who collectively hold approximately 65% of J&J's outstanding shares (*i.e.* 1.8 billion shares) has objected to the Settlement.  Declaration of Karen Morris dated September 21, 2012 ("Morris Decl."), Exhibit 1 (showing that 65% of J&J's approximately 2.75 billion outstanding shares of common stock are held by 1,769 institutional investors).  The Settlement is also supported by the J&J Board, which, in its business judgment, approved it as in the best interest of J&J.  Of the hundreds of thousands of other shareholders who hold J&J's approximately 2.75 billion shares, only five shareholders,

---

[2] *See* Declaration of Harvey L. Pitt, dated August 31, 2012, ECF No. 192-11 ("Pitt Decl."), ¶¶ 2. Report of Dr. Mitchell Glass, dated August 31, 2012, ECF No. 192-12 ("Glass Report"), ¶¶ 3, and Joint Declaration of James E. Cecchi, Mark Lebovitch, Karen L. Morris, Travis Downs, Jeffrey S. Abraham, and Gary S. Graifman dated August 31, 2012, ECF No.192-10 ("JAD"), Decl. ¶¶ 10.

(Messrs. Petri, Simmons, Schnitzer, Walpin and Keegan) have submitted any objection to either the settlement or the requested attorneys' fee. *See* Morris Decl., Exhibit 2 (showing that as of July 1, 2012, J&J had 2,757,041,143 outstanding common shares).

Mr. Petri – the sole shareholder objecting to the substantive terms of the Settlement – claims to be the beneficial owner of 1,249 shares in J&J.  On August 31, 2012, Petri and his lawyer, Theodore H. Frank ("Frank") (who runs an entity called the Center for Class Action Fairness), submitted their objection to the Settlement *before* Plaintiffs had filed their motion in support of final approval, including the JAD and reports of Chairman Pitt and Dr. Glass discussing the governance, compliance and risk management improvements achieved by the Settlement.  Although expressly invited to do so in the Court-approved Notice of Settlement (ECF No. 181-6), Petri and Frank failed to review any of the evidence that Plaintiffs relied on in support of final approval, nor did they ever seek to obtain or review the underlying J&J documentation that Plaintiffs' Counsel and their experts reviewed and analyzed in designing settlement proposals and negotiating the terms of Exhibit A (ECF No. 181-3) and Exhibit B (ECF No. 181-4) to the Stipulation and Agreement of Settlement (ECF No. 181-2).  Petri and his counsel's lack of knowledge of the facts and fundamental misunderstanding of the case is reflected in Petri's objection, which (1) ignores Plaintiffs' detailed allegations of J&J's systemic violations of cGMP and drug marketing laws that formed the bases for the Derivative Actions; (2) ignores the substance of the reports of Chairman Pitt and Dr. Glass, and the Joint Attorney Declaration; (3) incorrectly contends that the new governance, compliance and risk management structures existed before the Derivative Actions and are not the result of the Settlement; and (4) fails to consider the substantial benefits resulting from the Settlement.  This is not surprising, as the Center for Class Action Fairness is ideologically driven with the goal of undermining the

effectiveness of class and derivative actions generally.  Morris Decl. Ex. 2

On September 14, 2012, Petri submitted a supplemental objection ("Petri Supp. Br.," ECF No. 195), arguing that the Settlement must be rejected because Plaintiffs did not submit an event study analyzing the stock price movement following the Settlement announcement.  As detailed herein, the law does not require settling parties to conduct an event study of stock price movements to value the benefits of a settlement requiring defendants to enact governance enhancements and reforms directed to detect and prevent future misconduct.  Indeed, in asking this Court to create an entirely new paradigm for assessing the value of corporate governance relief, Frank and Petri cite no prior case requiring such an event study.  Rather, it is entirely appropriate for this Court (consistent with the practice of dozens of other courts around the country) to independently assess the benefits of the proposed Settlement *to the Company* – the true party in interest in this derivative litigation – giving due weight to, among other things, the judgment of the Company's board about those benefits, as well as (in this case) the uncontested declarations of experts such as Chairman Pitt, a renowned corporate governance expert who routinely advises boards on the design and implementation of corporate governance and compliance structures and Dr. Glass, a medical doctor with almost forty years' experience and expertise in the pharmaceutical industry as an executive, director and instructor.

Four J&J shareholders (Messrs. Simmons, Walpin, Schnitzer and Keegan) object to Plaintiffs' fee request.  As detailed is below, none of the objections references the record, including the JAD or the reports of Chairman Pitt and Dr. Glass, and none actually assesses the value Lead Counsel provided to J&J and its shareholders through their efforts.

As explained in Plaintiffs' opening brief, the Settlement meets the *Girsh* factors.  The few objectors elected not to submit evidence rebutting the substantial record before the Court.  Their

5

unsubstantiated objections should be rejected and the Settlement and Lead Counsel's fee award application, which seeks a reasonable fee considering the benefits achieved and the circumstances involved, should be approved.

## II.      PETRI'S SPECULATIVE ARGUMENTS ARE BASELESS

### A.      Petri's Arguments Are Refuted by the Record

Consistent with his ideological opposition to class action plaintiffs' lawyers generally, Petri argues that this is a "typical fee-driven settlement of strike suits brought against the best interest of the shareholders for the benefit of the plaintiffs' attorneys." Petri Br. at 1. Petri's rhetoric, however, is baseless.

Plaintiffs commenced the Derivative Actions in early 2010 following multiple adverse regulatory actions affecting J&J, including, *inter alia*, (1) the $98 million DOJ settlement with Onmicare, the largest nursing home pharmacist in the United States, regarding illegal kickbacks from J&J in exchange for promoting J&J drugs, including Risperdal (a powerful anti-psychotic drug with serious side-effects) for off-label and non-approved uses by nursing home patients (Amended Complaint, or "AC" (10-2033, ECF No. 94), ¶¶ 108, 173, 270); (2) the District of Northern California's denial of J&J's motion to dismiss the U.S. government's complaint alleging pervasive off-label promotion of Natrecor (*id.* ¶ 239); (3) the Company's agreement to enter into a deferred prosecution agreement and to pay a criminal fine for the widespread illegal promotion of Topamax (*id.* ¶ 207); and (4) the OIG settlement with DePuy regarding the payment of kickbacks and other improper promotional activities in connection with the sale of orthopaedic devices. *Id.* ¶ 227. J&J and its operating companies had received multiple regulatory subpoenas and been named in *qui tam* actions for alleged illegal sales practices. *Id.* ¶ 85.

Plaintiffs' investigation further revealed that J&J employed similar illegal marketing

practices for these key products, including payments of illegal kickbacks, use of Key Opinion

Leaders, and ghostwritten articles in medical journals.  ¶¶169, 201.  In addition, J&J repeatedly

violated mandatory FDA cGMP requirements, resulting in the recall of hundreds of millions of

dollars of J&J products, and inflicting severe reputational harm to the Company.  *Id.* ¶85.  In

April 2010, J&J closed its Fort Washington, Pennsylvania facility in the face of major FDA

adverse findings, including a finding that "[t]here are no written procedures for production and

process controls designed to assure that the drug products have the identity, strength, quality and

purity they purport or are represented to possess."  *Id.* ¶ 114.  Moreover, during the course of this

action, J&J has faced multiple State Attorney General actions alleging illegal sales of Risperdal

which have resulted in jury verdicts (presently under appeal) totaling more than $1.75 billion.

*See* Morris Declaration, Ex. 4.

      In short, J&J's alleged lack of compliance and controls had created severe problems for

the Company.  Plaintiffs brought the Derivative Actions in order to hold J&J's Board and senior

management accountable for overseeing the Company's systemic misconduct and to force them

to adopt rigorous systems and procedures to timely detect and prevent such misconduct from

recurring in the future.  *See, e.g.*, A.C., Prayer for Relief ¶ iv; JAD ¶8.  Against this historical

backdrop, it is clear that the Derivative Actions were filed and prosecuted in good faith, and for

the proper purpose of fixing very real problems at J&J, which in turn could only help J&J and its

shareholders.  The Settlement achieves these laudable objectives.

      Besides ignoring the context that shows why the Action is the type of suit that ***should*** be

filed in the first place, Petri ignores that this Court has already held that "Plaintiffs' allegations

are disconcerting" and that "if Plaintiffs amend their Complaint and add more particularized

facts, they may be able to satisfy Rule 23.1's heightened pleading standard."  ECF No. 170, p.

62.  As detailed in the JAD, Plaintiffs used the leverage of a potential amendment of the Demand Futility complaint and the pending Demand Refused Actions, supported by their review and analysis of internal J&J document production, to achieve the Settlement.  *Id.* ¶¶ 18, 60-64.[3]

Petri's arguments also fail to address the uncontroverted evidence of Plaintiffs' Counsel's efforts in pursuing the Derivative Actions.  As set forth in the JAD, Plaintiffs' Counsel retained well-regarded experts to assist in crafting potential settlement proposals directed to address Plaintiffs' allegations in the Derivative Actions, and to reduce and prevent the risk of future systemic wrongdoing.  JAD, ¶ 5.  In this effort, Plaintiffs' Counsel invested more than two years and thousands of hours, in the face of aggressive litigation, prosecuting the Derivative Actions on a fully contingent basis.  JAD, ¶ 74.  No such efforts would have been made if this were a true strike suit, as Petri contends.

**B.      The Settlement Addresses Plaintiffs' Core Allegations, And Is Anything But Cosmetic**

Frank and Petri rest much of their attack on the objectively wrong assertion that the Settlement does not present anything new to J&J.  The corporate governance and compliance

---

[3] In support of his "strike suit" contention, Frank cites his own arguments in *Robert F. Booth Trust v. Crowley*, 687 F.3d 314 (7th Cir. 2012).  This case is nothing like *Booth Trust.*.  There, derivative plaintiffs alleged violation of the Clayton Act prohibition of interlocking directorates, but the nominal defendant corporation had suffered no prior harm from this alleged violation and there was virtually no risk that it ever would face harm from adverse regulatory enforcement action. *See Booth Trust,* 687 F.3d at 319.  Moreover, as noted by the Seventh Circuit's opinion, the *Booth Trust* derivative action was not viable due to the antitrust injury requirement established in *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477 (1977).  *See Booth Trust,* 687 F.3d at 317.  In other words, because the company had suffered no harm and never would, and because the asserted cause of action was not legally viable under federal antitrust law, the case never should have been filed.  Here, by contrast, J&J has indisputably suffered hundreds of millions of dollars in losses as a result of the compliance issues raised in this litigation, stands to suffer billions of dollars in harm from regulatory enforcement actions and court awards for its past conduct, and will continue to operate in a heavily regulated industry in which regulatory enforcement is aggressive and future compliance failures would likely lead to a similar or even greater magnitude of harm.

8

reforms included in Exhibit A of the Stipulation are *new* to J&J.  *See* Stipulation ¶¶ 2.1, V.  As detailed in the Pitt Declaration and the Glass Report, the Settlement provides substantial benefits to J&J and its shareholders, and directly addresses Plaintiffs' core allegations in this case.  The Settlement requires the Board to adopt a comprehensive Quality and Compliance ("Q&C") Core Objective and a carefully negotiated Charter and Operating Procedure for the newly created Regulatory, Compliance & Government Affairs Committee of the Board ("RCGC").  Pitt Decl. ¶7; Glass Report ¶¶ 13.  The Settlement also requires adoption at the management level of an enterprise-wide Product Risk Management ("PRM") Standard, requiring the establishment of benchmarks and metrics for identifying and escalating problems.  Glass Report ¶ 15.  Contrary to Petri's unsupported claims, none of these provisions were preexisting at J&J or reflect cosmetic changes to J&J's governance and compliance policies.

*First*, Petri argues that "[p]laintiffs' attorneys should not be rewarded for adding J&J's longstanding objective to an *existing* charter of an *existing* committee."  Petri Br. at 13-14 (emphasis in original).  Petri is objectively wrong.  The uncontested record shows that J&J did not have an RCGC or equivalent Board committee until ***after*** Plaintiffs brought the Derivative Actions.  The Special Committee – which ultimately recommended the creation of such a Board-level committee – was itself instituted in direct response to Plaintiffs' allegations in the Derivative Actions.  *See* Special Committee Report, ECF No. 149-1, at 1-2.  The Settlement provides for the adoption of a rigorous Charter and Operating Procedure for this new board committee.  Exhibit A, Section III.A. and B.  Pursuant to this Charter and Operating Procedure, the Board will now be required to assume direct oversight over J&J's compliance with cGMP and drug marketing laws, and can no longer credibly claim ignorance of systemic problems at J&J's decentralized operating companies.  As a result, cGMP violations can no longer linger

9

for indefinite periods of time without triggering a response from J&J's senior management and Board. The "preexisting" RCGC Charter identified by Petri posted on J&J's website is plainly ***not*** a preexisting charter that is unrelated to the Settlement, as Petri asserts. The Charter on the website is actually the Charter that Plaintiffs negotiated with Defendants over the course of many months. The final version of the Charter and Operating Procedure, reflecting further negotiation by the parties, will be adopted by the RCGC when the Settlement is approved by the Court. The fact that the parties wanted J&J to begin enjoying the benefits of the Settlement immediately only provides further reason to approve the Settlement and thereby ensure that those benefits will remain an obligation of J&J for years to come. Tellingly, Petri does not dispute that the new RCGC Charter and Operating Procedure provide substantial benefits to J&J by, *inter alia*, making that committee, and through it, the J&J Board, accountable for ensuring J&J's companywide compliance with cGMP and drug marketing laws and making it responsible for oversight of the organization, implementation and effectiveness of the Company's compliance and quality programs, including the adequacy of their resourcing. Thus, once his factual error is taken into account, his objection fails.

*Second*, Petri also wrongly asserts that "there is no evidence that the PRM standard proposed by the Settlement provides any benefit." Petri Br. at 14. Petri's unsupported conclusion is refuted by the declaration of Dr. Glass, who was directly involved in the design of J&J's new PRM Standard, and who made a detailed presentation to J&J's Chief Quality Officer that helped gain her support for adopting PRM for the Company. *See, e.g.*, JAD ¶¶ 53, 61, 68; Glass Report ¶ 2. As Dr. Glass explains,

> Crucial to the design of the PRM Standard, in my opinion, are the requirement for early identification of issues, the assignment of direct responsibility for resolution, the establishment of defined timelines for resolution, and the implementation of an escalation process that will provide a mechanism for independent notification

10

> and intervention through the Quality organization to ensure risk mitigation that will bring the appropriate resources and levels of responsibility to bear at the earliest possible time.

Glass Report ¶ 57.  Thus, J&J's new PRM Standard will "provide for assignment of operational responsibility, monitoring and escalation of open issues as they occur and at the source of the issue" namely at the product team level for all J&J products over their entire life cycle at the Company.  *Id.* ¶ 58.  The PRM Standard requires the establishment of metrics and benchmarks to ensure timely resolution and escalation of identified product issues and problems.  *Id.* ¶60.  As a result, product issues can no longer become "sidelined" or "remain unresolved for indeterminably long periods of time."  *Id.* ¶ 61.

Chairman Pitt agrees that the new PRM standard ensures "early awareness and timely resolution of problems – before they rise to the level of disrupting J&J's business activities or cause reputational harm" and provides "a core tool for improving quality controls across the Company."  Pitt Decl. ¶ 99.  J&J's adoption of this new, companywide PRM Standard indisputably addresses Plaintiffs' allegations regarding J&J's systemic product issues and the resulting unprecedented recalls, and will have a direct impact on J&J's ability to prevent the recurrence of these types of problems going forward.  This provides substantial benefits to J&J and its shareholders.  *See, e.g.*, Glass Report ¶¶78-79; Pitt Decl. ¶¶ 127-128.

*Third*, Petri incorrectly asserts that the adoption of the Quality & Compliance ("Q&C") Core Objective constitutes nothing but an agreement to obey the law,[4] and provides nothing beyond J&J's credo.  Petri Br. at 11-12.  However, there is a material difference between an

---

[4] Likewise, Petri does not (and cannot) offer any factual support for his unsubstantiated assertion that the corporate governance and compliance reforms provided for in the Settlement were the result of regulatory actions by the government.  *See* Petri Br. at 16-18.  The undisputed record shows that the corporate governance and compliance reforms provided for by the Settlement were achieved pursuant to the Derivative Actions.  *See, e.g.*, Stipulation ¶ 2.1; JAD ¶¶ 9, 61.

11

aspirational "credo" and a Board resolution that imposes specific, binding requirements on J&J's Board, management and organization to implement companywide preventive processes and systems.  As Chairman Pitt explains, J&J's new Q&C Core Objective:

> includes a Board-level *direction* to the Company to adopt and maintain appropriate policies, procedures and standards and systems to prevent and detect instances of noncompliance; develop tools to measure the efficacy of its systems; monitor for possible breaches of law, regulations and the Company's internal standards; develop escalation processes and remediation tracking; and to conduct regular review for compliance with applicable laws, regulations and internal standards throughout development of product."

*Id.* ¶ 68 (emphasis in original).  Such binding resolutions are how boards direct the companies they oversee, and Petri has offered no evidence rebutting the benefits of the Settlement.  As the Third Circuit recognized in response to virtually identical arguments:

> [Objector] asserts the structural relief merely amounts to a promise to obey the law.  This mischaracterizes the agreement which answers the question *how, not whether*, the parent corporation will obey the law and provides specific mechanisms to ensure employees of Bell Atlantic and all its subsidiaries behave appropriately.

*Bell Atlantic Corp. v. Bolger, et al.*, 2 F.3d 1304, 1312 (3d Cir. 1993) (emphasis added).

*Fourth*, the Settlement ensures that J&J's 114,000 employees have a financial incentive to faithfully implement J&J's new Q&C Core Objective.  Under the terms of the Settlement, adherence to, and furtherance of, the Q&C Core Objective – which expressly includes the new PRM Standard – must "be considered in the evaluation and compensation of *all* Johnson & Johnson employees."  Stipulation, Exhibit A, Section II.  This provides powerful incentives to improve J&J's governance and compliance systems and culture.  As Dr. Glass explains,

> In my experience in the pharmaceutical industry, one of the most effective ways to ensure directives from the top are embraced and adhered to below is to tie individual employee compensation to compliance with such directives and tie the compensation of management to the successful implementation of such directives throughout their functional areas of responsibility.  J&J will create this important linkage between a strengthened corporate culture and compensation under the

12

proposed settlement.

Glass Report ¶ 25.  Petri's assertion that quality and compliance are already included in J&J's "credo" and "already a factor in determining compensation" misses the point.  Petri's argument relies on a J&J document stating that the compensation *of the CEO* is based in part on furthering the J&J credo, but does not even mention the compensation of J&J's 114,000 other employees. *Cf.* Petri Ex. D.  Petri's objection rests on a mistake of fact.  Once corrected, the objection fails.

*Fifth*, the full funding commitment is a valuable part of the settlement consideration, ensuring the adequate funding of the implementation of the settlement terms for the five year commitment period.  *See, e.g.*, Pitt Decl. ¶¶ 108, 110 (the funding requirement is "an explicit recognition and assurance by the Company that funding demands will not stand in the way of its implementation and maintenance of the governance reforms and enhancements," and also provides "a safeguard against any possible reluctance by management to allocate the necessary financial resources to the envisioned corporate governance and compliance and quality reforms and enhancements;" Glass Report ¶¶ 77-78 ("In my opinion, to have any lasting impact on a company's corporate culture, it is necessary for there to be a clear and unambiguous signal from the Board and senior management regarding the importance of such provisions, a firm commitment to ensure their adequate funding going forward, and a mechanism to evaluate these signals and resources over an adequate period of time.  The Settlement Commitment Term and funding obligations under the proposed settlement do this in a meaningful way.").  Nor can Petri impose his own personal agenda to override the Board's considered judgment about the use of J&J funds to finance the governance and compliance reforms that are achieved by the Settlement.  *See* Petri Br. at 16 (arguing that the settlement is "an improper restriction on management's sound judgment").

13

### C.    Petri's Arguments Based on the J&J Stock Price Prove Nothing

The undisputed evidence shows that Plaintiffs' Counsel achieved significant reforms that impose affirmative obligations on Defendants to create new corporate governance and reporting structures that will enhance J&J's quality and compliance efforts going forward.  Pitt Decl, ¶¶ 127-28, Glass Decl., ¶¶ 4, 79, JAD ¶¶ 9.  Petri nevertheless argues that the "market agrees that the proposed settlement provides no benefits" because J&J's stock price declined more than the Dow Jones Industrial Average ("DJIA") between the announcement of the settlement on Friday July 20, 2012 and close of trading on July 24.  Petri Br. at 18-20.  Not only is this argument irrelevant to an assessment of whether the Settlement provides substantial benefits to J&J, it is premised on incorrect facts.

Petri's assertion that J&J underperformed the DJIA depends entirely on his unexplained and unfounded selection of the close of business on **_Tuesday_**, July 24 as the "appropriate" cut-off date.   In fact, during the trading day immediately following the announcement of the settlement – Monday, July 23, 2012 – J&J's stock **_outperformed_** the DJIA, as well as the S&P 500, the NASDAQ composite index, and the stock of GlaxoSmithKline ("GSK"), AstraZeneca ("AZN"), and Roche ("RHHBY").  *See* Morris Decl., Ex. 5 (historical stock price information from www.nasdaq.com).  Thus, Petri's contrived and irrelevant stock price argument depends entirely on his misleading selection of the wrong measurement date.

### D.    Petri's Supposition of Collusion Is Utterly Baseless

Having gotten the facts about the Settlement wrong in every way, Petri attempts to disparage Lead Counsel and Defendants' counsel alike by accusing them of collusion in breach of their own fiduciary duties.  Petri Br. at 22-28.  Petri's aspersions are baseless and disproven in the record.  The record shows that Plaintiffs' counsel achieved the benefits of the Settlement

14

through vigorous, adversarial prosecution of the Derivative Actions and with the assistance of experienced corporate governance and pharmaceutical experts.  *See* JAD ¶¶ 5, 9; Pitt Decl. ¶ 3; Glass Report, ¶2.  The settlement negotiations unfolded over many months, were intensive and contentious (*see* JAD ¶ 18) and required the parties to seek a number of extensions as they negotiated key aspects of the proposed resolution of the Derivative Actions.  The adversarial nature of the litigation and settlement negotiations was again highlighted when J&J sent the Court a letter because it "strongly disagreed" with Plaintiffs' brief in support of preliminary approval of the Settlement.   ECF No. 183 (not objecting to preliminary approval of the settlement).

Petri's argument that the Settlement is the result of self-dealing because "Plaintiffs face an uphill battle in proving liability" and "defendants have the additional defense of the Special Committee's findings" is a *non sequitur*.  Petri's argument applies to any settlement of complex litigation, and merely underscores that he is pursuing this objection in support of his own personal agenda – not the interests of J&J or its shareholders.  Moreover, Frank and Petri ignore the substantial nature of the relief achieved.  Far from self-dealing, plaintiffs fought for the relief they believed was necessary to detect and prevent the type of wrongdoing at the heart of the Derivative Actions.  *See, e.g.*, JAD ¶¶ 8-9.  This record undermines any hint of collusion.

The detailed record demonstrates that the Settlement creates significant benefits for J&J. Petri's unfounded objection is contrary to the record, and should be rejected.

## III.     ARGUMENT

Plaintiffs' opening brief shows that consideration of each *Girsh* factor fully supports approval of the proposed Settlement.  *See* FAB at 23-17.  The objectors offer no evidence rebutting the record, and the Settlement and the request for attorneys' fees should be approved.

### A.     The Settlement Confers Substantial Benefits on J&J by Preventing Future

15

**Wrongdoing**

The benefits of a settlement providing for governance and compliance improvements can be shown by demonstrating that the proposed improvements are designed to prevent the reoccurrence of the harmful conduct that gave rise to the litigation. *See Bell Atlantic*, 2 F.3d at 1310, 1312 (affirming District Court, which found that "the settlement furnished a real benefit to Bell Atlantic because it required the parent corporation to institute internal mechanisms to prevent improper sales and marketing methods," and further finding that settlement "provides specific mechanisms to ensure employees of Bell Atlantic and all its subsidiaries behave appropriately."). As the Supreme Court noted in *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970), "[a] substantial benefit must be something more than technical in its consequence and be one that accomplishes a result which ***corrects or prevents an abuse which would be prejudicial to the rights and interests of the corporation or affect the enjoyment or protection of an essential right to the stockholder's interest.*" *Id.* at 396 (emphasis added). *See also Polonski v. Trump Taj Mahal Associates*, 137 F.3d 139, 147 (3d Cir. 1998) (noting that a substantial benefit under *Mills* typically "impacts the future conduct of the defendant's affairs"). Thus, courts around the country routinely approve settlements of derivative actions providing governance improvements aimed at preventing future wrongdoing.[5]

---

[5] *See, e.g., Unite Nat. Retirement Fund v. Watts*, 2005 WL 2877899 at *5 (D. N.J., October 28, 2005) (governance relief "will serve to prevent and protect Shell from the reoccurrence of certain alleged wrongdoings."); *In re AOL Time Warner S'holder Derivative Litig.*, 2006 WL 2572114 at *4 (S.D.N.Y. Sept. 6, 2006) ("the governance and compliance provisions memorialized in the Settlement directly address the failure of internal controls that precipitated the instant lawsuits. The preventative aspect of these provisions is itself a significant benefit of the Settlement"); *In re Schering-Plough Corp. S'holder Derivative Litig.*, No. 01-1412, 2008 WL 185809 at *4 (D.N.J. Jan. 14, 2008) (The changes implemented by the settlement will serve to prevent or deter misconduct at the Board and middle-management levels, while also providing mechanisms to identify emerging misconduct"); *In re AOL Time Warner S'holder Derivative Litig.*, 2010 WL 363113 at *3, 15 (S.D.N.Y. Feb. 1, 2010) (where governance relief was "designed to avoid future crises akin to the wrongs alleged here and to enhance corporate responsibility and

*In re Schering-Plough Corp. Shareholders Derivative Litigation*, 2008 WL 185809 (D.N.J. 2008) is instructive.  Based on a review of the complaint at issue there, Judge Hayden determined that:

> the fundamental aim of the litigation was to correct the Board's failure of oversight, and the resulting damage to Schering, by implementing specific changes to the Schering's corporate governance mechanisms. The monetary losses and the regulatory troubles with the FDA are the fruit of the same tree, stemming directly from a breakdown in Schering's managerial structure. Thus, the most important motivation for maintaining this action was to prevent future losses of this ilk by changing how the corporation's directors oversee the running of the corporation.

*Id*. at *2.  The *Schering* court further noted that it relied on declarations from corporate governance experts "[i]n making a determination of whether the litigation accomplished [its preventive goal]."  *Id.*

Here, the Pitt and Glass declarations unambiguously show that the Settlement provides for new governance systems to prevent the systemic wrongdoing alleged in the Derivative Actions.  As Dr. Glass explains, "one of the single most important contributions of this settlement is in its focus on prevention of issues *before* they become major problems."  Glass Report ¶ 44.  *See also id*. ¶¶ 4, 13-14, 18, 38, 46, 54-55, 79.  Chairman Pitt agrees:

> Any evaluation of the proposed governance reforms and enhancements must focus, in my opinion, on whether they will create a more robust governance framework than that which previously existed, and ***whether the reforms and enhancements have been designed to prevent or mitigate a recurrence of the types of underlying problems alleged in the Amended Complaint.***  More broadly, the assessment must consider whether the terms of the Settlement Agreement are

---

profitability," and derivative action alleged "billions of dollars in accounting irregularities," substantial benefit existed and "[t]hough the value of these reforms cannot be reduced scientifically to dollars and cents, counsel are entitled to sizable compensation for this corporate mea culpa and measures that enhanced the company's goodwill, standing and profitability into the future"); *In Re: Pfizer Inc. S'holder Derivative Litig.*, 780 F. Supp. 2d 336, 342 (S.D.N.Y. 2011) ("the settlement is likely to provide considerable corporate benefits to Pfizer and its shareholders, in the form of a significantly improved institutional structure for detecting and rectifying the types of wrongdoing that have, in recent years, caused extensive harm to the company.").

likely to provide a benefit to the Company and its shareholders.  In my opinion, based on my experience both with allegations of the nature alleged here, and the form of relief being proposed, *it is my strong view that the proposed governance reforms and enhancements will accomplish these goals*.

Pitt Decl. ¶ 61 (emphasis added).  *See also id.* ¶¶ 68, 96.  Petri has not offered any facts or evidence contesting the findings of Chairman Pitt and Dr. Glass.  Petri's only challenge on this score is to ask the Court to ignore the submissions by Chairman Pitt and Dr. Glass as not being appropriate expert reports because they did not do an event study of J&J's stock price.

Petri gets the law wrong.  Expert opinions are not limited to objective, scientific proof, as he argues.  The law is well settled that experts may rely upon their own experience in rendering opinions.  In *Kumho Tire*, the Supreme Court noted that "no one denies that an expert might draw a conclusion based on extensive and specialized experience."  *Kumho Tire Co, Ltd. v. Carmichael,* 526 U.S. 137, 156 (1999).  Indeed, Rule 702 expressly contemplates that an expert may be qualified on the basis of experience and "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."  *In re Jacoby Airplane Crash Litigation*, 2007 WL 5037683, at *37 (D.N.J. 2007) (quoting Fed. R. Evid. 702 advisory committee notes).  "*Daubert* does not set up a test of which opinion has the best foundation, but rather whether any particular opinion is based on valid reasoning and reliable methodology."  *Kannankeril v. Terminix International*, 128 F.3d 802, 806 (3d Cir. 1997).

Here, Petri and Frank do not dispute, because they cannot, that Chairman Pitt and Dr. Glass are experts in the fields of corporate governance generally and governance and product risk management within the pharmaceutical industry specifically.  Nor do they contest Chairman Pitt's and Dr. Glass' expertise to opine with respect to the preventive value of the Settlement.  *See, e.g.*, Pitt Decl., ¶¶ 19-31 and Glass Report, Ex. 2 (resume).  Chairman Pitt and Dr. Glass plainly have "adequate specialized knowledge" to be qualified to testify in their respective areas

of expertise.  *Floorgraphics, Inc. v. News America Marketing In-Store Svcs., Inc.*, 546 F. Supp. 2d 155, 165 (D.N.J. 2008).  Nor are Chairman Pitt's and Dr. Glass's detailed declarations "conclusory," as Petri argues.  Petri Br. at 7-8.

 The record is also uncontroverted as to Mr. Pitt and Dr. Glass' opinions, based on their recognized expertise, that the proposed Settlement provides substantial benefits to J&J and its shareholders, including in the detection and prevention of the recurrence of the types of issues and problems that underlay the Derivative Actions.  Each declaration makes clear that Chairman Pitt and Dr. Glass directly assisted with the design of the corporate governance and compliance reforms of the Settlement.  Pitt Decl. ¶ 3; Glass Report ¶ 2.  In addition, each expert, in his declaration, notes his experience, providing the basis for his conclusions, and supporting why his experience is relevant in reaching and supporting those conclusions.  Nothing more is required. *See Floorgraphics*, 546 F. Supp. 2d at 165.

 Chairman Pitt opines that the "institution of the proposed corporate governance reforms should . . . substantially reduce the likelihood of future legal and regulatory violations and thereby mitigate the risk of significant adverse outcomes from governmental and other actions and the attendant adverse financial consequences that these actions might have on the Company and its shareholders."  Pitt Decl., ¶ 128.  Reflecting the nature of such "adverse financial consequences" that Mr. Pitt discusses, Plaintiffs have provided evidence of the costs to J&J of compliance failures over the years leading up to and including the pendency of the derivative litigation – in other words, the losses that precipitated the Derivative Actions and which the proposed settlement relief is designed to prevent in the future.  As reflected in the record, J&J presently has incurred and/or faces potential liability totaling over $4 billion for the conduct at

19

issue in the Derivative Actions.[6]  This does not include the reputational damage the Company

has suffered.[7]   The Settlement clearly offers tremendous monetary value to J&J and its

shareholders if even a fraction of the $4 billion plus economic impact on J&J can be avoided in

the future.  *See, e.g.*, *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1206 (6th Cir. 1992)

(affirming settlement approval and fees based on quantum of harm to corporation prompting

derivative action and governance relief designed to prevent similar harm in future).

In his supplemental submission, Petri argues that Plaintiffs were required to submit an

event study of J&J's stock price movements in order to establish that the Settlement creates

substantial benefits to the Company.  According to Petri, in the absence of such event study

evidence, "the Court must value the proposed benefits at zero."  Petri Supp. Br. at 9.   This

argument misapprehends the law.  Tellingly, Petri does not cite a single case holding that an

event study is the only admissible evidence to determine the benefits of a settlement that

provides prophylactic governance and compliance improvements aimed at preventing future

wrongdoing.  Plaintiffs have found no case requiring such evidence in this context.  Although

event studies are commonly used in securities cases to show changes *in the stock price* due to an

external event, Plaintiffs are unaware of a single case holding that event studies must be used to

determine a change in *the value of a company* following a settlement providing for substantial

governance and compliance reforms.  Moreover, the law is settled that "[w]hen challenging the

---

[6]   *See, e.g.*, Demand Refused Compl. (11-4994 ECF No. 1) ¶ 123 (over $900 million in lost sales); Amended Complaint ¶ 207 (Topamax settlement of $81.2 million); Amended Complaint ¶ 277 (DePuy Kickback settlement of $84.7 million); Morris Decl. Ex. 4 (jury verdicts regarding Risperdal of approximately $1.78 billion); Demand Refused Compl. ¶ 161 (Risperdal (and other drug) reserve for expected DOJ settlement approximately $1.71 billion).

[7]   *See, e.g.*, Glass Report ¶ 52 ("life science companies are particularly sensitive to reputation, and the problems J&J has experienced have had a direct impact on the public's perception of the Company, as evidenced by, among other facts, J&J's removal from the *Forbes* List of America's Most Admired Companies in 2011, and its failure to regain that coveted position in 2012.")

admissibility of Plaintiff's expert testimony, a party must move beyond empty criticisms and demonstrate that a proposed alternative approach would yield different results." *Floorgraphics*, 546 F. Supp. 2d at 172. Here, neither Petri nor his experts have demonstrated that an event study would (or even could) show that the Settlement did not provide substantial benefits to J&J.

In addition, Petri cuts snippets from the Third Circuit's opinion in *Merola v. Atlantic Richfield Co.*, 515 F.2d 165 (3d Cir. 1975) to argue that Plaintiffs have not shown that the Settlement results in a substantial benefit to J&J because, according to Petri, there is a "lack of 'informed economic judgment' pertaining to the settlement that is needed for 'assessing its value.'" Petri Supp. Br. at 9, citing *Merola*, 515 F.2d at 172. Petri grossly misstates the holding in *Merola*. In *Merola*, the Third Circuit held that:

> If probative evidence of the monetary value of such a benefit is available, it should of course be used. If the benefit *is not susceptible of being rationally reduced to monetary terms*, the court must compare the value of the legal services and the benefit obtained *on the basis of its best economic judgment*. To the extent possible, the court should articulate the factors influencing its judgment either to award the objective value of the services as adjusted to reflect contingency or to adjust that figure to reflect the worth of the benefit which the court has identified and evaluated.

*Id.*, 515 F.2d at 172 (emphasis added). Thus, this Court's inquiry into the benefits of the Settlement is not a mere financial valuation exercise in which the Court is constrained to find no substantial benefit or a benefit of "zero" in the absence of an event study or other econometric evidence. As discussed above, the record provides the Court more than sufficient evidence on which it may exercise its "best economic judgment" to determine that the proposed Settlement provides substantial benefit to J&J and its shareholders and fully supports the award of the requested fee.

In sum, the uncontroverted record before the Court shows that the Settlement requires Defendants to implement new governance and compliance reforms that will provide substantial

benefits to J&J – most notably by substantially reducing the risk of future systemic wrongdoing at issue in these Derivative Actions.  Petri's contrary arguments have no factual or legal basis, and should be rejected.

> **B.    J&J's Shareholders Support Approval of the Settlement**

A positive reaction of the class is "persuasive evidence of the fairness and adequacy of the Proposed Settlement."  *Lenahan v. Sears Roebuck and Co.*, 2006 WL 2085282, at *13 (D.N.J. July 24, 2006) (affirming settlement where "[o]f the 16,252 Technicians to whom notices of the settlement were sent, *only 190 class members* opted out") (emphasis added); *see also In re Rite Aid Corp. Sec. Litig*, 396 F.3d 294, 301 n.9 (3d Cir. 2005).  Moreover, the lack of objections by institutional investors with the largest stake in litigation and settlement provides additional support for finding that the class has positively reacted to a proposed settlement.  *See, e.g.*, *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235, 257 (D.N.J. 2000) (noting "the absence of institutional investor-objectors" and no objections from sophisticated institutional shareholders); *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305 (3d Cir. 2005); *Smith v. Dominion Bridge Corp.*, 2007 WL 1101272 at *4 (E.D. Pa., April 11, 2007) (absence of sophisticated institutional shareholder objectors "provides strong circumstantial evidence in favor of the settlement," and "weighs strongly in favor of settlement").

Here, out of hundreds of thousands of shareholders holding J&J's 2.75 billion outstanding shares, including more than 1,700 institutional investors, only four shareholders are objecting to the Settlement.  Thus, the reaction of J&J's shareholders weighs overwhelmingly in favor of approving the Settlement.  *See Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d. Cir. 1990) (finding that only twenty-nine objectors out of 281 class members "strongly favors settlement"); *Lenahan*, 2006 WL 2085282, at *13 (class reaction favors settlement "given the sufficient notice that has been provided to class members, and the relatively small amount of

exclusions and objections").

> **C.      The Requested Fee And Reimbursement of Expenses Should Be Approved**

The benefits achieved through the proposed Settlement clearly warrant the Court's approval of the requested fee and reimbursement of expenses.  Plaintiffs respectfully submit that the requested fee award is reasonable, appropriate for the nature of the litigation and reforms achieved, and well-supported by fee awards in comparable cases this District and elsewhere. *See, e.g.*, FAB, Section IV.B.2.a.

> **1.      The Work Performed by Plaintiffs' Counsel Warrants the Payment of the Requested Attorneys' Fees**

The lodestar method is appropriate in cases "where the nature of the recovery does not allow the determination of the settlement's value required for application of the percentage-of-recovery method." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 333 (3d Cir. 1998).[8]  Plaintiffs' Counsel has provided a detailed record in support of the requested fee award.   Plaintiffs' Counsel's declarations (ECF Nos. 192-4 through 192-9) describe with particularity the hours undertaken, the nature and categories of work performed, how that work was assigned and accomplished among relevant Plaintiffs' firms in both the Demand Futility Actions and the separate Demand Refused Actions, and the billing rates of

---

[8] Petri's cited cases are inapposite.  In *In re Cendant Corp. Litig.*, 243 F.3d 722, 734 (3d Cir. 2001), the court awarded percentage-of-the-fund fees in a case where, unlike here, the settlement dollar value was reasonably ascertainable.  Similarly, in *In re GMC Pickup Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 821 (3d Cir. 1995), the settlement included $1,000 refunds to all purchasers of a certain vehicle, which rendered a dollar value estimate.  Even there, however, the Third Circuit explained that while "the court should probably use the percentage-of-recovery rather than the lodestar method as the primary determinant …, the ultimate choice of methodology will rest within the district court's sound discretion." *Id.*  Further, "the lodestar rationale has appeal where as here, the nature of the settlement evades the precise evaluation needed for the percentage of recovery method."  *Id.*  Thus, the Court should exercise its discretion to award attorney's fees based on a lodestar calculation.

counsel who performed work in both of these actions.[9]  Courts in this District routinely base fee determinations on similarly detailed summarized information.  *See, e.g.*, *Rite Aid*, 396 F.3d at 306-307 ("district courts may rely on summaries submitted by the attorneys and need not review actual billing records"); *see also Prudential*, 148 F.3d at 341-42 (finding no abuse of discretion where district court "reli[ed] on time summaries, rather than detailed time records").

Based on this uncontroverted record, it is clear that Plaintiffs' Counsel expended more than 10,000 professional hours over a period extending more than two years to prosecute the Derivative Actions on a fully contingent basis.  Moreover, the record shows that (1) Plaintiffs' Counsel faced skilled and determined adversaries who availed themselves of every opportunity to challenge Plaintiffs; and (2) Plaintiffs' Counsel made every effort to avoid duplicative efforts and to assign work efficiently and effectively.  JAD ¶ 78.

Despite the unambiguous record, Petri argues that time spent in support of "fruitless pursuits" (Petri Supp. Br. at 16) should not be compensated.  Petri's argument is wrong.  Plaintiffs' Counsel requests a fee award based on the benefits achieved by the Settlement – *i.e.* their efforts were not fruitless and the Settlement could not have been achieved without those efforts.  Here, the totality of the effort expended by Demand Futility and Demand Refused Counsel over the course of several years, and the synergies and pressures the aggressive litigation of these actions brought to bear – including the fact that counsel for Demand Futility Plaintiffs made clear that it was ready and willing to amend the complaint, and that the Demand Refused Actions expected to be able to conduct discovery – were essential elements in Plaintiffs' Counsel's leverage to achieve the substantial reforms set forth in the proposed Settlement.  Thus,

---

[9] Moreover, although Lead Counsel did not burden the Court with time submissions from the various law firms who filed actions that were consolidated and who supported the prosecution of the case in a non-lead counsel capacity, those lawyers expect to be compensated for their efforts as well.

...

both the Demand Futility and Demand Refused Actions were successful claims in producing the settlement relief.

Moreover, Counsel's efforts led directly to a significant benefit to J&J and its shareholders. As described herein and in the record before the Court, the proposed Settlement confers substantial benefits on J&J and its shareholders by requiring the implementation of mechanisms that will help ensure that, going forward, systemic noncompliance with cGMP and the drug marketing laws do not go unnoticed and unremedied. Because the proposed Settlement confers such a substantial benefit here, the requested fee award is fair and reasonable. *See Prudential*, 148 F.3d at 342 ("What is important is that the district court evaluate what class counsel actually did and how it benefitted the class.").[10]

### 2.   Payment of a Reasonable Multiplier Is Appropriate

"After a court determines the lodestar amount, it may increase or decrease that amount by applying a lodestar multiplier. 'The multiplier is a device that attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work.'" *In re Diet Drugs*, 582 F.3d 524, 540 n.33 (3d Cir. 2009) (citation omitted). Multipliers are also used as an incentive for counsel to undertake socially beneficial litigation. *See, e.g.*, *id.* "By nature [lodestar multipliers] are discretionary and not susceptible to objective calculation." *In re*

---

[10] The cases cited by Petri are inapposite. First, in *Loughner v. Univ. of Pittsburgh*, 260 F.3d 173, 181 (3d Cir. 2001), an "uncomplicated" fee shifting case, the court remanded the action back to the district not because time records were insufficient but because the district court failed to properly analyze those time records. Further, *Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742 (4th Cir. 1998) is inapposite because it dealt with a fee application after trial in litigation where only 3 out of 50 claims were successful. Even if "unsuccessful claims" cases were relevant, Third Circuit law holds that attorneys' fees may be denied for unsuccessful claims only where such claims are "distinct in all respects from' claims on which the party did succeed." *Eichenlaub v. Township of Indiana*, 214 Fed. Appx. 218, *222 (3d Cir. 2007). Here, both the demand futility and demand refused actions arose from "a common core of facts" and "related legal theories," *id.*, and both were essential in yielding the relief provided in the proposed Settlement.

*Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,* 148 F.3d 283, 340 (3d Cir. 1998). In this Circuit, "[m]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." *Id.* at 341.[11]

Plaintiffs' Counsel seek approval of payment of $10 million in attorneys' fees, equaling a lodestar multiplier of 1.51. *See* FAB at 39. This request is amply supported by the efforts of Plaintiff's counsel in achieving the substantial benefits of the Settlement, the contingent nature of the litigation, and the quality of the representation. *See, e.g.*, FAB at 31-37. As set forth in the FAB, derivative litigation and the scope and depth of relief it has been able to achieve, has progressed substantially. *Id.* at 11-12. Derivative Actions, particularly in the health care industry, have achieved an increasing level of reform designed to prevent cGMP, anti-kickback and drug marketing violations. Courts have approved significant fee awards in derivative settlements achieving corporate governance changes less meaningful and extensive than here. For example:

- In the *Pfizer* derivative action, the court awarded a fee of $22 million and approved a settlement that created a new regulatory committee of the board to oversee Pfizer's compliance with the drug marketing laws, funded with $75 million paid by Pfizer's insurance carriers.[12] The *Pfizer* settlement had no analogue to PRM, as seen here.

---

[11] *Accord In re Cendant Corp. Derivative Litig.*, 232 F. Supp. 2d at 341-42 (approving 2.59 lodestar multiplier); *Rowe v. E.I. DuPont de Nemours and Co.*, Civ. Nos. 06-1810 (RMB/AMD), 2011 WL 3837106, at *22 (D.N.J. Aug. 26, 2011); *see also In re Cendant PRIDES Litigation*, 243 F.3d 722, 735-36 (3d Cir. 2001) (approving 2.99 lodestar multiplier); *see also Milliron v. T-Mobile USA, Inc.*, 423 Fed. Appx. 131, 135 (3d Cir. 2011) (2.21 multiplier); *In re Merck & Co., Inc. Vytorin Erisa Litigation*, No. 08-CV-285 (DMC), 2010 WL 547613, at *13 (D.N.J. Feb. 9, 2010) (2.786 multiplier); *McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448, 479 (D.N.J. 2008) (2.3 multiplier); *Varacallo v. Massachusetts Mut. Life Ins. Co.*, 226 F.R.D. 207, 256 (D.N.J. 2005) (2.83 multiplier); *In re Remeron End-Payor Antitrust Litig.*, Civ. 02-2007 FSH, 2005 WL 2230314, at *31 (D.N.J. Sept. 13, 2005) (multiplier of 1.73 was "on the low end of the spectrum") (citing cases).

[12] The stipulation of settlement in *In re Pfizer Derivative Shareholder Litigation*, 09 cv-7822 (JSR) (S.D.N.Y. Dec. 2, 2010) is attached to the Morris Decl. as Ex. 6.

- In the *Schering-Plough* derivative action, the court awarded a fee of $9.5 million and approved a settlement, reached prior to motion practice, that implemented governance changes at the board level and provided for the adoption of a centralized global compliance function at the management level, but did not create "bottoms-up" reporting structures as seen here.[13]

- In the *Eli Lilly* derivative action, the court awarded a fee of $8.75 million and approved a settlement that expanded the role of preexisting board and management committees over Eli Lilly's compliance systems and implemented a medical risk management system at the company, but did not affect the breadth of operational areas as seen here.[14]

- In the *Shell* derivative litigation, the court awarded $9.2 million in attorneys' fees and approved a settlement that gave institutional investors an opportunity to be involved in the nomination of directors, strengthened independence and stock ownership standards for the board, and expressed a commitment to comply with generally accepted accounting principles.[15]

- In the *Home Depot* derivative action, the court awarded $14.5 million in attorneys' fees and approved a settlement resolving challenged executive compensation. In the settlement, Home Depot adopted corporate governance provisions, including the requirement to have a written charter available to the public on the Company's website for the Audit Committee, the Nominating and Corporate Governance Committee, the Leadership Development Committee and the Compensation Committee; changes to director qualifications and nominating procedures, altering compensation practices; and enhancing shareholder access to the CEO.[16]

Plaintiffs' Counsel were lead counsel in a number of these actions, and respectfully submit that the governance changes, albeit clearly valuable, were not as comprehensive as those provided by the present Settlement. Here, what has been achieved is broader in scope and deeper in the management reforms supporting the Board's oversight responsibilities. Plaintiffs' Counsel

---

[13] The stipulation of settlement in *In re Schering-Plough*, 01-1412 (KSH) (D.N.J. October 3, 2007) is attached to the Morris Decl. as Ex. 7.

[14] The stipulation of settlement in *Lambrecht v. Taurel*, 08 cv-0068 (WTL) (S.D. Ind. July 27, 2010) is attached to the Morris Decl. as Ex. 8.

[15] The stipulation of settlement in *Unite National Retirement Fund v. Watts*, No. 04-cv-3603 (D.N.J. Oct. 27, 2005) is attached to the Morris. Decl. as Ex. 9.

[16] The stipulation of settlement in *City of Pontiac General Employees' Retirement System v. Langone and the Home Depot, Inc.*, C.A. 2006-cv-122302 (Sup. Ct. Ga. June 20, 2008) is attached to Morris Decl. as Ex. 10.

27

undertook to fundamentally improve the way J&J, a far more complex organization, with issues crossing multiple product lines and encompassing pharmaceuticals, medical devices and diagnostics and hundreds of thousands of over the counter products, developed and marketed its products through a highly decentralized worldwide corporate structure.  As reflected in the Amended Complaint, to ensure the efficacy of preventive reforms, counsel were also required to address the development of systems and processes applicable to J&J's decentralized operational structure and active acquisition program, which plaintiffs alleged gave rise to significant exposure.  The RCGC Charter and Operating Procedure, together with the Q&C Core Objective, and the enterprise-wide adoption of PRM directed to all J&J products worldwide throughout their entire lifecycle, go beyond other pharmaceutical derivative settlements in their depth of reporting, scope of board level oversight responsibility and specified commitment to the development of the processes at the management level.  The record is uncontroverted that the governance reforms provide substantial benefits to J&J and its shareholders,[17] supporting the award of counsel's requested fee.

### 3.      The Unsupported Fee Objections Should Be Rejected

Four J&J shareholders (Messrs. Simmons, Walpin, Schnitzer and Keegan) object to Plaintiffs' fee request.  None of these objections references the record in this action, including the JAD and the reports of Chairman Pitt and Dr. Glass.

On August 14, 2012, Mr. Simmons objected to the requested fee because he believed that

---

[17] Petri's arguments against applying a multiplier misapprehend the law.  *City of Burlington v. Dague*, 505 U.S. 557, 567 (1992) was a statutory fee shifting case and has no application here.  *See Polselli v. Nationwide Mut. Fire. Ins. Co.*, 126 F.3d 524, 534 (3d Cir. 1997) (*Dague* stands for the proposition "that the *fee-shifting provisions of two federal statutes* do not permit enhancement beyond the lodestar amount …") (emphasis added)   *See also McLendon v. Continental Group, Inc.*, 872 F. Supp. 142, 145-146 (D.N.J. 1994) (distinguishing *Dague* as limited to statutory fee-shifting cases and finding lodestar multiplier appropriate).

the fee request was unsubstantiated and that Plaintiffs' counsel had previously entered into a contingent fee agreement with J&J and intended to "change their fee agreement" by requesting Court approval for payment of Plaintiffs' counsel's fees of up to $10 million in this Action.  ECF No. 196 (stating that "[i]f there is any integrity or virtue left in the legal profession, these so-called attorneys must abide by their own contract").   Following a conversation with Mr. Simmons to correct his evident confusion about the facts, Plaintiffs' counsel sent him copies of the final approval papers, including the JAD and the reports of Chairman Pitt and Dr. Glass. Counsel invited Mr. Simmons to discuss any aspect of the papers once he had an opportunity to review them.  *See* ECF No. 192-6, ¶ 7.  Since receipt of the final approval documents, Mr. Simmons has not returned counsel's call and he is not expected to appear at the hearing to pursue his written objection.

Mr. Walpin objected to the fee request in a letter dated September 17, 2012.  ECF No. 170.  Mr. Walpin's letter generally objects to derivative litigation and class actions.  Mr. Walpin does not reference the record, including this Court's finding that "Plaintiffs' allegations are disconcerting" and that "if Plaintiffs amend their Complaint and add more particularized facts, they may be able to satisfy Rule 23.1's heightened pleading standard."  ECF No. 170, p. 62.  Mr. Walpin also does not reference the reports of Chairman Pitt and Dr. Glass detailing the substantial benefits of the Settlement.  Thus, Mr. Walpin has offered nothing to support a finding that his preconceived notions about plaintiffs' lawyers apply to this Action.

On September 20, 2012, Mr. Schnitzer sent an email to Lead Counsel objecting to the fee request because it is purportedly unsubstantiated.  ECF No. 198.  Likewise by letter dated September 18, 2012, Mr. Keegan objected to the fee with one line: "Shareholders are losing the value of up to $10,450,000 proposed to be paid to Plaintiffs' Counsel without gaining any

shareholder value beyond what could be expected without the settlement."[18]  Morris Decl., Ex.

11.  However, like Mr. Simmons and Mr. Walpin, Messrs. Schnitzer and Keegan offer no

support for their assertions, which are contrary to the uncontroverted record before the Court.[19]

The Simmons, Walpin, Schnitzer and Keegan objections lack any factual basis and

should be overruled.  *See, e.g., AOL Time Warner*, 2006 WL 903236 at *15 (none of the

objections provide "a legal or factual basis for the alleged insufficiency of the Settlement, nor do

they consider the legal or factual context in which the Settlement was reached"); *In Re Remeron*

*End-Payor Antitrust Litig.*, No. Civ. 02-2007 FSH, 2005 WL 2230314 *18 n.8 (rejecting

objections that were "entirely unsupported, too vague to comprehend, or clearly without merit").

---

[18] Mr. Keegan also claims that the settlement only requires J&J "to follow good business practices in the future which is reasonable to assume would have been followed without the settlement," which, as detail above, is contrary to the record before the Court.

[19] Mr. Keegan also contends that "[b]ased on the delayed receipt of our three notices it is probable that notices were not delivered to all holders in a timely manner for objection."  Rule 23.1 of the Federal Rules of Civil Procedures requires notice be given to shareholders in derivative actions "in such manner as the court directs." The notice satisfied the requirements set forth by Rule 23.1, as well as the terms of the Court's Order (*see* ECF. Nos. 199-201), and otherwise fulfills the due process rights of J&J's shareholders in that adequate notice was received, since it informed shareholders of the Settlement's terms, "the availability of further information from the court,. and the right . . . to object and be heard."  *Bell Atl.*, 2 F.3d at 1317.

Mr. Keegan's claim that some shareholders may have received the notice after the objection deadline does not undermine the legal adequacy of the notice.  As the District Court held in *In re Intel Corp. Derivative Litigation*, 2010 WL 2955178 (D.Del., July 22, 2010):

> courts have recognized that untimely notice is an attendant risk of owning stock in "street name," and that the ultimate question with respect to notice is " 'not whether some individual shareholders got adequate notice, but whether the class as a whole had notice adequate to flush out whatever objections might reasonably be raised to the settlement.' " *Fidel v. Farley*, 534 F.3d 508, 514 (6th Cir.2008) (quoting *Torrisi v. Tucson Elec. Power Co.,* 8 F.3d 1370, 1375 (9th Cir.1993) and collecting cases).

*Id.* 2010 WL 2955178 at *2.  Here, as in *Intel*, the notice period was appropriate and the notice procedure was fully adequate to flush out objections to the Proposed Settlement.  And in all events, Plaintiffs are not asking the Court to reject any objections based on the deadline.

IV.     **CONCLUSION**

For the reasons set forth in the record before the Court, including the Final Approval Brief, the Pitt Declaration, the Glass Report and the Joint Attorney Declaration, and as set forth above, the Court should approve the Settlement and the request for attorneys' fees and expenses, and should reject the objections to the Settlement and the award of attorneys' fees.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
Co-Lead Counsel for Demand Futile
Plaintiffs

By:____*/s/James E. Cecchi*_____
          JAMES E. CECCHI

KANTROWITZ, GOLDHAMER &
GRAIFMAN, P.C.
Liaison Counsel for Demand Refused
Plaintiffs

By:_____*/s/ Gary S. Graifman*_____
          GARY S. GRAIFMAN

Dated: September 21, 2012

| | |
|---|---|
| Mark Lebovitch | Darren J. Robbins |
| Jeroen van Kwawegen | Travis E. Downs III |
| Jeremy Friedman | David W. Mitchell |
| BERNSTEIN LITOWITZ BERGER | ROBBINS GELLER RUDMAN |
| & GROSSMANN LLP | & DOWD LLP |
| 1285 Avenue of the Americas | 655 West Broadway, Suite 1900 |
| New York, New York 10019 | San Diego, California 92101 |
| (212) 554-1400 | (619) 231-1058 |
| | *Attorneys for Demand Futile Plaintiffs* |
| Karen L. Morris | |
| Patrick F. Morris | Jeffrey S. Abraham |
| R. Michael Lindsey | ABRAHAM, FRUCHTER & |
| MORRIS AND MORRIS LLC | TWERSKY, LLP. |
| COUNSELORS AT LAW | One Penn Plaza, Suite 2805 |
| 4001 Kennett Pike, Suite 300 | New York, NY 10119 |
| Wilmington, Delaware 19807 | (212) 279-5050 |
| (302) 426-0400 | *Attorneys for Demand Refused Plaintiff* |