James E. Cecchi
Lindsey H. Taylor
Caroline F. Bartlett
CARELLA, BYRNE, CECCHI
OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700
*Attorneys for Demand Futile Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE JOHNSON & JOHNSON DERIVATIVE LITIGATION | Civil Action No. 10-2033 (FLW) |
| IN RE JOHNSON & JOHNSON FCPA SHAREHOLDER DERIVATIVE LITIGATION | Civil Action No. 11-2511 (FLW) |
| COPELAND v. PRINCE, *et al.* | Civil Action No. 11-4993 (FLW) |

## DECLARATION OF JAMES E. CECCHI

I, JAMES E. CECCHI, of full age, hereby declare as follows:

1.      I am an attorney licensed to practice in New Jersey and am a member of the law firm of Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C.  I submit this declaration in support of Plaintiffs' Response to Objections and in Further Support of Settlement.

2.      Attached hereto as Exhibit 1 is a true and correct copy of the Supplemental Declaration of Harvey L. Pitt, dated October 11, 2012.

3.      Attached hereto as Exhibit 2 is a true and correct copy of Mr. Clifton's Objection to the Proposed Settlement and Attorneys' Fee, and Notice of Intent to Appear and be Heard Either in Person or by Telephone filed in *In re: Classmates.com Consolidated Litigation*, Case No. C09-00045-RAJ in the United States District Court for the Western District of Washington.

4.      Attached hereto as Exhibit 3 is a true and correct copy of the Objection of Michael I. Krauss to the Proposed Settlement and Proposed Attorneys' Fee Aware filed in *In re: Classmates.com Consolidated Litigation* submitted by *pro hac vice* counsel Theodore H. Frank.

5.      Attached hereto as Exhibit 4 is a true and correct copy of a selection taken from the National Law Journal's 2010 Billing Survey setting forth the range of rates billed by Locke Lord Bissel & Liddel LLP's attorneys in Dallas, Texas.

6.      Attached hereto as Exhibit 5 is Mr. Clifton's Locke Lord Bissel & Liddel LLP attorney biography, which is available at http://www.lockelord.com.

7.      Attached hereto as Exhibit 6 is a true and correct copy of the transcript for the March 7, 2011 hearing before the Hon. Jed S. Rakoff in *In re: Pfizer Shareholder Derivative Litigation*, Civil Action No. 09-cv-7822 (JSR) in the United States District Court for the Southern District of New York.

I hereby declare under penalty of perjury that the foregoing is true and correct.


                                        /s/ James E. Cecchi
                                        JAMES E. CECCHI

Dated:  October 11, 2012

Exhibit 1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

————————————————————x
:
**IN RE JOHNSON & JOHNSON** :      Civil Action No. 10-2033 (FLW)
**DERIVATIVE LITIGATION** :
————————————————————x
:
**IN RE JOHNSON & JOHNSON FCPA** :      Civil Action No. 11-2511 (FLW)
**SHAREHOLDER DERIVATIVE** :
**LITIGATION** :
————————————————————x
:
**COPELAND v. PRINCE,** *et al.* :      Civil Action No. 11-4993 (FLW)
————————————————————x


**SUPPLEMENTAL DECLARATION OF HARVEY L. PITT IN FURTHER**
**SUPPORT OF PROPOSED SETTLEMENT AND RESPONDING TO SPECIFIC**
**OBJECTIONS**

I, Harvey L. Pitt, an attorney admitted to practice in the State of New York and District of Columbia, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746:

**I.     Introduction**

1.     I submit this Supplemental Declaration (a) in further support of the proposed settlement ("Proposed Settlement") of various shareholder derivative claims ("Derivative Claims") brought for the benefit of Johnson & Johnson ("J&J" or the "Company"),[1] and (b) in response to objections by certain shareholders questioning the benefits of the Proposed Settlement[2] and the basis for my opinions as an expert in

---

[1]     My initial Declaration ("Initial Declaration"), dated August 28, 2012, was filed on August 31, 2012 (10-2033, ECF No. 192-11); a copy is appended to this Supplemental Declaration for the Court's convenience.

[2]     These objections were filed pursuant to the Court's Amended Order, dated September 25, 2012, and include the objection of Brent and Kimberly J. Clifton, adopting in their entirety the objections of Mark G. Petrie in document 61-2 (Objection of Mark G. Petrie to Attorneys' Fees and Memorandum in Support of Motion to Dismiss Under Rule 23.1(a)) and stating, among other things, that the settlement "is of no benefit to the shareholders," *see* Brent and Kimberly J. Clifton's Objection to the Proposed Settlement and Attorneys' Fee Notice of Intent to Appear and to be Able to Listen by Telephone, filed on October 5, 2012, ¶¶ 5 and 12, and shareholder Robert D. Stuart, asserting that "the

corporate governance matters, as well as the opinions of two academics filed in support of these objections.[3]

2.     The views expressed in this Supplemental Declaration are solely mine and are based on my experience and background (described at length in ¶¶ 14-31 of my Initial Declaration), and my review of the objections to the Proposed Settlement and materials filed in support of those objections referenced in this Supplemental Declaration.

## II.     Summary of, and Basis for, My Opinions and Conclusions

3.     My Initial Declaration reflected that the Proposed Settlement's corporate governance reforms—if implemented properly—would help ensure that J&J will not encounter future problems of the type alleged in the Derivative Claims.[4]

4.     I concluded further that the Proposed Settlement's corporate governance reforms would thus provide a significant benefit to the Company and its shareholders—among other things, by substantially reducing the likelihood of future legal and regulatory violations, mitigating the risk of significant adverse outcomes from governmental and other actions and the attendant adverse financial consequences those actions might have on the Company and its shareholders.[5]

5.     My opinions and conclusions were predicated upon my more than four decades of "real world" experience as a: (a) regulator; (b) independent board member; (c) audit committee member and chair; (d) public independent representative on various governance committees of public companies and other institutions; (e) private lawyer advising and representing public companies, audit committees and boards of directors on corporate governance matters; and (f) currently, provider of compliance and governance advice to clients of my firm, Kalorama Partners, LLC.

---

settlement is not in [his] interest as a shareholder because the company does not appear to benefit," *see* Objection to Settlement, filed September 24, 2012, ¶ 7.

[3]     *See* Supplemental Objection of Mark G. Petrie ("Petrie"), filed September 14, 2012, and supporting documents, including the Report of Professor M. Todd Henderson ("Henderson Report"), and the Declaration of Professor Katherine Litvak ("Litvak Declaration"), and accompanying exhibits.

[4]     Initial Declaration, *e.g.*, ¶¶ 7-8, 61, 128.

[5]     *Id., e.g.*, ¶¶ 96, 128.

## III.   Assessing the Prospective Benefits of the Proposed Settlement's Governance Reforms

6.      Contrary to objectors' assertions, effective corporate governance and compliance mechanisms are clearly beneficial. Reflecting the importance of effective governance, long-established government policy—embodied in a large variety of legal and policy directives—require or provide incentives to corporations to maintain effective systems of internal control and corporate governance to ensure full compliance with applicable legal requirements and prevent problems and wrongdoing.[6]

7.      Among such key prospective benefits is that good corporate governance and effective compliance/ethics programs can shield companies from civil or criminal liability, since the absence or presence of effective programs is among the factors government considers in deciding to (a) prosecute a company; (b) enter into a deferred or non-prosecution agreement; or (c) decline prosecution.[7]

8.      Effective corporate governance also is rewarded—and thus mitigates material losses—under the Federal Sentencing Guidelines for Organizations (FSGO).   Organizations with "effective compliance and ethics" programs—*i.e.,* programs designed to prevent and detect violations of law—and which "otherwise promote an organizational culture that encourages ethical conduct and a commitment to compliance with the law," receive substantial reductions in penalties; by contrast, those

---

[6]      *See generally* 2011 Federal Sentencing Guidelines Manual, § 8B2.1. (*Effective Compliance and Ethics Program*), available at http://www.ussc.gov/Guidelines/2011_guidelines/Manual_HTML/Chapter_8.htm; *OIG Compliance Program Guidance for Pharmaceutical Manufacturers*, U.S. Department of Health and Human Services, Office of the Inspector General, 68 Fed. Reg. 23,731, 23,732 (May 5, 2003), available at http://www.gpo.gov/fdsys/pkg/FR-2003-05-05/pdf/03-10949.pdf.

[7]      The SEC's position on cooperation was first articulated in 2001 in the "Seaboard Release," which I authored, *see* Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934, Exchange Act Release No. 44969 (Oct. 23, 2001), available at http://www.sec.gov/litigation/investreport/34-44969.htm#P16_499 (describing factors relevant to whether the SEC will bring an enforcement action against a corporation).  Since the Seaboard Release, the SEC has issued several statements further emphasizing the benefits of cooperation, *see, e.g.*, Robert Khuzami, Remarks at News Conference Announcing Enforcement Cooperation Initiative and New Senior Leaders (Jan. 13, 2010), available at http://www.sec.gov/news/speech/2010/spch011310rsk.htm.

companies that ignore, tolerate, encourage or condone improper behavior regularly receive more severe penalties.[8]

9.     In fact, the focus on effective compliance and ethics programs in connection with regulatory enforcement efforts is only likely to increase over time.  A recent report on the 20th Anniversary of FSGO[9] by the Ethics Resource Center's Independent Advisory Group recommended, among other things, that government law enforcement agencies promote compliance and ethics programs through more consistent (as well as transparent) recognition of these programs when determining fines and other monetary penalties.[10]  At the same time, the ERC Advisory Group emphasized that it is the responsibility of the private business sector to satisfy the full intent of the FSGO and that this cannot be achieved through a mechanistic approach.

10.     Further, in recommending that private sector organizations fully embrace the intent of the FSGO, the ERC Advisory Group observed:

> Prosecutors assert that they are only "impressed by … living, breathing, practical programs," and research affirms that companies that have taken the message of the FSGOs to heart and have focused on core values and building strong cultures are the ones with "living, breathing, practical programs."[11]

11.     In my opinion, the corporate governance reforms and enhancements in the Proposed Settlement—with their focus on core compliance and ethical values, comprehensive guidelines for the operation of the Regulatory, Compliance & Government Affairs

---

[8]     2011 Federal Sentencing Guidelines Manual, § 8B2.1. (*Effective Compliance and Ethics Program*), at (a)(1) and (a)(2), available at http://www.ussc.gov/Guidelines/2011_guidelines/Manual_HTML/Chapter_8.htm.

[9]     *The Federal Sentencing Guidelines for Organizations at Twenty Years: A Call to Action for More Effective Promotion and Recognition of Effective Compliance and Ethics Programs*, available at http://www.ethics.org/files/u5/fsgo-report2012.pdf (hereinafter "ERC Advisory Group Report").  In 2011, the Ethics Resource Center ("ERC") initiated an independent evaluation of the FSGO and put together a distinguished panel of former law enforcement officials, judges, prosecutors, academics and compliance/ethics practitioners to review the FSGO and offer suggestions for improvements (the "ERC Advisory Group").  *Id.* at ii.  Their efforts resulted in the publication of this lengthy "call to action" report.

[10]     ERC Advisory Group Report at App. B, 2-3 (urging the Department of Justice to describe more clearly the "reduction in financial penalty" that a company will receive as a result of its compliance/ethics program).

[11]     *Id.* at 99 (footnotes omitted).

Committee that are designed to ensure and support the continuous and thorough oversight of J&J's compliance and quality programs, and the Product Risk Management Standard—are precisely the type of compliance and ethics programs likely to receive credit by prosecutors.

12.     Other regulators, including the Department of Health and Human Services Office of Inspector General—which has the ability to level fines in amounts measured in billions of dollars against companies like J&J—also recognize the benefit of effective compliance programs in reducing penalties to redress violative conduct:

> [A] good faith effort by the company to comply with applicable statutes and regulations as well as federal health care program requirements, demonstrated by an effective compliance program, significantly reduces the risk of unlawful conduct and any penalties that result from such behavior.[12]

13.     In addition, based on my experience, I know first-hand that pre-existing effective compliance and ethics programs are frequently a factor government considers in determining if an enforcement action should be instituted and, even when such actions are instituted, pre-existing compliance efforts are relevant in reducing the level and extent of monetary (and other) sanctions.

14.     Further, in my experience, where, as in this case, the reforms are designed to ensure the timely and effective remediation of product-related issues and problems, there is also the prospective benefit of increased consumer confidence in the Company and its products over time.

15.     The fact that benefits are often realized prospectively and therefore cannot presently be quantified in terms of absolute dollars, and in some cases may be considered as "insurance" against future losses, does not detract from their real value.

> [C]orporate executives who fail to push for stronger compliance/ethics programs may fall behind in their own markets.  Consumers are increasingly taking account of which companies have high ethical standards and those that do not, and market research shows that customers are willing

---

[12]   *OIG Compliance Program Guidance for Pharmaceutical Manufacturers*, U.S. Department of Health and Human Services, Office of the Inspector General, 68 Fed. Reg. 23,731, 23,732 (May 5, 2003), available at http://www.gpo.gov/fdsys/pkg/FR-2003-05-05/pdf/03-10949.pdf.

to pay more for a brand that they associate with integrity. Similarly, investors are more willing to put their money in companies they trust.   High ethical standards can be a competitive advantage.[13]

## IV.   Criticism of My Opinion Is Misplaced

16.   In support of his supplemental objections, Petrie proffers two academics—Professors Henderson and Litvak—who assert that my opinions are speculative and provide "insufficient evidence as a matter of law,"[14] because I did not reference any scientific methodology that measures the precise economic value of the Proposed Settlement's corporate governance reforms.   The entire premise of this argument is that absent an "event study" measuring shareholder reaction (*i.e.*, impact on the price of J&J's shares) to the disclosure of the proposed corporate governance reforms, or other economic indicators, it cannot be determined whether the settlement will benefit the Company and its shareholders.[15]

17.   However, this argument fails to consider that:

(a)   Prospective benefits cannot be measured in hard-and-fast dollar terms, nor can they be determined as the result of a shareholder plebiscite; and

(b)   Benefit can be demonstrated not solely by improved share prices but also by future losses avoided.

18.   Moreover, in my experience, the objectors' focus on event studies is disconnected from real world practice.   Companies do not conduct "event studies" to measure—either prospectively or retrospectively—the benefits that will be, or have been, derived from any particular corporate reforms.   Nor do companies consider such studies when designing and implementing corporate governance and compliance systems and processes.   Indeed, in my forty plus years of experience, I am unaware of any company that conducted an "event study" for either of these purposes.

---

[13]   *ERC Advisory Group Report, supra* note 12, at 99 (footnote omitted).

[14]   Henderson Report at p. 2; *see also* Litvak Declaration, *e.g.*, ¶3 ("I conclude that plaintiffs have provided no scientifically reliable evidence that the proposed governance changes in this case are valuable…").

[15]   *See*, *e.g.*, Henderson Report at pp. 1-2, 5-7, 18-21; Litvak Declaration, ¶¶ 11-12.

## V.     Conclusion

19.    For the foregoing reasons, as well as the opinions expressed in my Initial Declaration, it is my expert opinion that the Proposed Settlement will confer a substantial benefit on the Company and its shareholders.

20.    And, for the reasons discussed above, the absence of an "event study" or other statistical quantification of the ample benefits that will be conferred by the Proposed Settlement does not provide any basis to question the benefits of the Proposed Settlement.

October 11, 2012

_____
**Harvey L. Pitt**

Exhibit 2

Web-Based Email :: Print                                                    Page 1 of 1 ·

Print | Close Window

Subject: In Re: Classmates.com Consolidated Litigation
   From: "Sibley Firm Office Mgr" <legal@juris.cc>
   Date: Fri, Nov 18, 2011 8:32 am
     To: <objections@cmemailsettlement.com>
     Cc: "'Gary Sibley'" <g@juris.cc>, <jl@juris.cc>
 Attach: objection to class certification.11-18-2011.pdf

Attached is Brent Clifton's Objection to the Proposed Settlement and Attorneys' Fee, and Notice of Intent to
Appear and be Heard Either in Person or by Telephone for filing in the above case.

Gary Sibley
The Sibley Firm
2414 N. Akard Street, Suite 700
Dallas, TX 75201
214-522-5222
214-855-7878 (fax)
g@juris.cc

Copyright © 2003-2011 All rights reserved



**09-CV-00045-CVSHT**

1

2        UNITED STATES DISTRICT COURT
3     FOR THE WESTERN DISTRICT OF WASHINGTON
           AT SEATTLE
4
                                    Case No.: C09-00045-RAJ
5    IN RE: CLASSMATES.COM
     CONSOLIDATED LITIGATION          BRENT CLIFTON'S OBJECTION TO
                                      THE PROPOSED SETTLEMENT
6                                     AND ATTORNEYS' FEE, AND
                                      NOTICE OF INTENT TO APPEAR
7                                     AND BE HEARD EITHER IN
                                      PERSON OR BY TELEPHONE
8

9

10   To The Honorable Judge Richard A. Jones:

11        1.    Brent Clifton ("Objector"), objects to the proposed settlement in *In Re:*
12
     *Classmates.Com*, Consolidated Litigation, Case No. 09-45-RAJ.
13
14        2.    Objector intends to appear at the fairness hearing through counsel either in

15   person or by telephone and requests to speak on his objections to this settlement.

16                        **Objector is a Class Member**
17
          3.    Objector declares that he is a class member.  Objector received an email
18
19   notice of the settlement on September 13, 3011, with claim number 125444996 and

20   control number 0160545600.  A copy of the email notice is attached.

21        4.    Objector subscribed to www.classmates.com as described in the notice.
22
     Objector deposited this objection in the United States mail as directed by the email notice
23
24   received and by email to objections@cmemailsettlement.com, on or prior to November

25   18, 2011.

26        5.    This is the second attempt at approval for this settlement.  While the
27
     revised settlement is an improvement it still lacks sufficient benefits to warrant approval
28
     and Objector objects to the settlement for the following reasons:

1

A.      In determining if a class action settlement is fair and reasonable the factors in a court's fairness assessment will naturally vary from case to case, but courts generally must weigh:

(1)     the strength of the plaintiff's case;

(2)     the risk, expense, complexity, and likely duration of further litigation;

(3)     the risk of maintaining class action status throughout the trial;

(4)     the amount offered in settlement;

(5)     the extent of discovery completed and the stage of the proceedings;

(6)     the experience and views of counsel;

(7)     the presence of a governmental participant; and

(8)     the reaction of the class members of the proposed settlement.

Given these factors that the court must consider in the fairness hearing, the Court should reject the settlement as a nuisance settlement to enrich class counsel at the expense of the estimated 60 million class members and the settlement is not fair and reasonable for the class members.

B.      Pre-certification settlement merits higher scrutiny.

C.      The attorney fees are not proportionate to the class benefit and recovery.

Is the Settlement Fair, Reasonable and Adequate for Class Members

The Court owes a fiduciary duty in the settlement phase of a class action. *See Reynolds v. Beneficial National Bank,* 288 F.3d 277 (7th Cir. 2002), *Grant v. Bethlehem Steel Corp,* 823 20 (2nd Cir. 1987) and *In re Washington Public Power Supply Sys Lit.,* 19 F.3d 1291 (9th Cir. 1994). Objections to the prior proposed settlement, notably the

2

1   Michael Krauss Objection Dkt 102, set out the correct standard that the Court in

2   reviewing a proposed settlement must consider, this objection will not repeat what is

3   already before the Court. The fact that the Court rejected in the initial settlement shows

4   that the Court is aware of its obligation to the class. Here in arguing for approval, Dkt

5   159, class counsel take the position that the revisions to the settlement have dramatically

6   improved the settlement. However, the fact remains that a class of an estimated 60

7   million members received only 2.5 million and the amount each class member receives is

8   entirely dependent on the number of claims filed.

9

10

11                    **Pre-certification Settlements Merit Higher Scrutiny**

12          The Court's attention has been called to the proper standard for review and this

13   objection specifically adopts the reason in the *Krauss* objection, Dkt 102, but the fact

14   remains that just a large settlement class stands to recover very little for the grievous

15   wrong inflicted on the class. From the Court's July 18, 2011, Order it is apparent that the

16   Court considered that this is exactly the type of class action designed with the needs of

17   class counsel's fee needs rather than the interests of the class and that without meaningful

18   relief approval should have been denied again.

19

20          **The Attorneys' Fees are not Proportionate to the Class Benefit and Recovery**

21          The amount of the proposed fees in relation to the alleged benefits to the class

22   renders the settlement unfair and unreasonable  The amount of the proposed attorneys'

23   fees is an integral element in determining whether the settlement is fair, reasonable, and

24   adequate.

25

26          Objector objects to the request for fees to class counsel.  Objector specifically

27   objects to any modifier being applied to class counsel's lodestar and here, where counsel

28

3

1  is requesting fees of $1,050,000 and where the class is getting $2,500,000. Objector

2  expressly objects to an award of attorneys' fees that exceeds 1/4 of the value to class.

3                          **Relief Requested**

4          Wherefore, Objector prays that the Court deny the proposed settlement, deny

5  certification of the settlement class, deny the requested fees to class counsel and grant

6

7  Objector such other and further relief as to which Objector may be entitled.

8

9

10  Gary W. Sibley

11  2414 North Akard Street, Suite 700
    Dallas, Texas 75201

12  214-522-5222
    Fax 214-855-7878

13  Email: g@juris.cc

14  Dated: November 18th, 2011.

15

16                          **Certificate of Service**

17          I hereby certify that a copy of the above and foregoing document has been served
    upon the following by U.S. Mail on November 18th, 2011:

18

19  Clerk of the Court
    United States District Court

20  Classmates Litigation 09-45RAJ
    700 Stewart Street, Suite 13128

21  Seattle, WA 98101

22  Mark A. Griffin

23  Keller Rohrback, L.L.P.
    1201 Third Avenue, Suite 3200

24  Seattle, WA 98101

25  Stellman Keehnel

26  DLA Piper, LLP (US)
    701 Fifth Avenue, Suite 7000

27  Seattle, WA 98101

28
                                                        Gary Sibley

4

Case 3:10-cv-02033-FLW-DEA Document 219-1 Filed 10/11/23 Page 17 of 108 PageID: 6434
Case 2:09-cv-00045-RAJ Document 174-2 Filed 12/07/11 Page 69 of 114
Web-Based Email : Print
Page 1 of 1

Print | Close Window

RECEIVED - SEATTL

NOV 18 2011

GARDENCITYGROUI

Subject: RE: In Re: Classmates.com Consolidated Litigation
From: "Sibley Firm Office Mgr" <legal@juris.cc>
Date: Fri, Nov 18, 2011 1:25 pm
To: <objections@cmemailsettlement.com>
Cc: "'Gary Sibley'" <g@juris.cc>, <ji@juris.cc>
Attach: Supplemental Objection to Class Certification.11-18-2011.pdf

Attached is Brent Clifton's Supplemental Objection to the Proposed Settlement and Attorneys' Fee, and Notice of Intent to Appear and be Heard Either in Person or by Telephone for filing in the above case

Gary Sibley
The Sibley Firm
2414 N Akard Street, Suite 700
Dallas, TX 75201
214-522-5222
214-855-7878 (fax)
g@juris.cc

Copyright © 2003-2011 All rights reserved

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| IN RE: CLASSMATES.COM CONSOLIDATED LITIGATION | Case No.: C09-00045-RAJ<br><br>BRENT CLIFTON'S SUPPLEMENTAL OBJECTION TO THE PROPOSED SETTLEMENT AND ATTORNEYS' FEE, AND NOTICE OF INTENT TO APPEAR AND BE HEARD EITHER IN PERSON OR BY TELEPHONE |

To The Honorable Judge Richard A. Jones:

Now Comes Brent Clifton ("Objector"), and files this his Supplemental Objection to the Proposed Settlement and Attorneys' Fee, and Notice of Intent to Appear and be Heard Either in Person or by Telephone, and would show the Court as follows:

1.      Brent Clifton ("Objector"), objects to the proposed settlement in *In Re Classmates.Com.*, Consolidated Litigation, Case No. 09-45-RAJ.

2.      Objector intends to appear at the fairness hearing through counsel either in person or by telephone and requests to speak on his objections to this settlement.

**Objector is a Class Member**

3.      Objector declares that he is a class member.  Objector received an email notice of the settlement on September 13, 3011, with claim number 125444996 and control number 0160545600.  A copy of the email notice is attached.

4.      Objector subscribed to www.classmates.com as described in the notice. Objector deposited this objection in the United States mail as directed by the email notice received and by email to objections@cmemailsettlement.com, on or prior to November 18, 2011.

1

5.     This is the second attempt at approval for this settlement.   While the revised settlement is an improvement it still lacks sufficient benefits to warrant approval and Objector objects to the settlement for the following reasons:

A.     In determining if a class action settlement is fair and reasonable the factors in a court's fairness assessment will naturally vary from case to case, but courts generally must weigh:

      (1)     the strength of the plaintiff's case;

      (2)     the risk, expense, complexity, and likely duration of further litigation;

      (3)     the risk of maintaining class action status throughout the trial;

      (4)     the amount offered in settlement;

      (5)     the extent of discovery completed and the stage of the proceedings;

      (6)     the experience and views of counsel;

      (7)     the presence of a governmental participant; and

      (8)     the reaction of the class members of the proposed settlement.

Given these factors that the court must consider in the fairness hearing, the Court should reject the settlement as a nuisance settlement to enrich class counsel at the expense of the estimated 60 million class members and the settlement is not fair and reasonable for the class members.

B.     Pre-certification settlement merits higher scrutiny.

C.     The attorney fees are not proportionate to the class benefit and recovery.

**Is the Settlement Fair, Reasonable and Adequate for Class Members**

6.     The Court owes a fiduciary duty in the settlement phase of a class action. *See Reynolds v. Beneficial National Bank*, 288 F.3d 277 (7th Cir. 2002), *Grant v. Bethlehem Steel Corp* 823 20 (2nd Cir. 1987) and *In re Washington Public Power Supply Sys. Lit*, 19 F.3d 1291 (9th Cir 1994). Objections to the prior proposed settlement, notably the Michael Krauss Objection (Dkt 102), set out the correct standard that the Court in reviewing a proposed settlement must consider, this objection will not repeat what is already before the Court. The fact that the Court rejected in the initial settlement shows that the Court is aware of its obligation to the class. Here in arguing for approval (Dkt 159), class counsel take the position that the revisions to the settlement have dramatically improved the settlement. However, the fact remains that a class of an estimated 60 million members received only 2.5 million and the amount each class member receives is entirely dependent on the number of claims filed.

**Pre-certification Settlements Merit Higher Scrutiny**

7.     The Court's attention has been called to the proper standard for review and this objection specifically adopts the reason in the *Krauss* objection (Dkt 102), but the fact remains that just a large settlement class stands to recover very little for the grievous wrong inflicted on the class. From the Court's July 18, 2011, Order it is apparent that the Court considered that this is exactly the type of class action designed with the needs of class counsel's fee needs rather than the interests of the class and that without meaningful relief approval should have been denied again.

3

**The Attorneys' Fees are not Proportionate to the Class Benefit and Recovery**

8.    The amount of the proposed fees in relation to the alleged benefits to the class renders the settlement unfair and unreasonable.   The amount of the proposed attorneys' fees is an integral element in determining whether the settlement is fair, reasonable, and adequate.

9.    Objector objects to the request for fees to class counsel   Objector specifically objects to any modifier being applied to class counsel's lodestar and here, where counsel is requesting fees of $1,050,000 and where the class is getting $2,500,000, Objector expressly objects to an award of attorneys' fees that exceeds 1/4 of the value to class.

**Reservations**

10.    Objector reserves the right to amend his objection prior to the hearing and incorporates the objections of other objectors in this action.

**Relief Requested**

Wherefore, Objector prays that the Court deny the proposed settlement, deny certification of the settlement class, deny the requested fees to class counsel and grant Objector such other and further relief as to which Objector may be entitled.

Gary W. Sibley
2414 North Akard Street, Suite 700
Dallas, Texas 75201
214-522-5222
Fax 214-855-7878
Email: g@juris.cc

Dated: November 18th, 2011

4

1

**Certificate of Service**

2

    I hereby certify that a copy of the above and foregoing document has been served

3 upon the following by U.S. Mail on November 18th, 2011:

4 Clerk of the Court

United States District Court

5 Classmates Litigation 09-45RAJ

6 700 Stewart Street, Suite 13128

Seattle, WA 98101

7

8 Mark A. Griffin

Keller Rohrback, L.L.P.

9 1201 Third Avenue, Suite 3200

Seattle, WA 98101

10

11 Stellman Keehnel

DLA Piper, LLP (US)

12 701 Fifth Avenue, Suite 7000

Seattle, WA 98101

13

14                                 Gary Sibley

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

Exhibit 3

The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| IN RE<br><br>CLASSMATES.COM CONSOLIDATED<br>LITIGATION | CASE NO. C09-00045-RAJ<br><br>OBJECTION OF MICHAEL I. KRAUSS<br>TO PROPOSED SETTLEMENT AND<br>PROPOSED ATTORNEYS' FEE<br>AWARD<br><br>**CLASS ACTION**<br><br>**Note on Motion Calendar:**<br>**December 16, 2010 at 1:30 p.m.** |

OBJECTION OF MICHAEL I. KRAUSS TO PROPOSED
SETTLEMENT AND PROPOSED ATTORNEYS' FEE
AWARD
CASE NO. C09-00045-RAJ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................................ 1

II.    ARGUMENT ............................................................................................................... 2

    A.    Objector Michael I. Krauss Is a Member of the Class. ............................. 2

    B.    This Pre-Certification Settlement Merits High Scrutiny. ......................... 3

    C.    Attorneys' Fees Must Be Proportionate to the Actual Class Recovery of
          $117 Thousand. ...................................................................................... 4

    D.    The Addition of *Cy Pres* Relief Is a Breach of Class Counsel's Fiduciary
          Duty. ..................................................................................................... 8

          1.    The Addition of *Cy Pres* Relief Is a Material Modification of the
               Settlement Requiring New Opportunity to Object. ................................... 8

          2.    The *Cy Pres* Relief Impermissibly Violates Accepted Standards and
               Is a Breach of Fed. R. Civ. Proc. 23(a)(4). .......................................... 9

          3.    In Any Event, the *Cy Pres* Relief Should Not Be Calculated as a
               Class Benefit When Calculating Attorneys' Fees. ................................. 12

    E.    New Notice Is Also Required Because Existing Notice Was Misleading. ........... 12

    F.    Because Notice Was Misleading and the Objections Process Was Unduly
          Burdensome, the Court Should Discount Attempts by the Settling Parties to
          Infer Class Approval From the Low Number of Objections. ............................... 13

III.    CONCLUSION .......................................................................................................... 16

OBJECTION OF MICHAEL I. KRAUSS TO PROPOSED
SETTLEMENT AND PROPOSED ATTORNEYS' FEE
AWARD - i
CASE NO. C09-00045-RAJ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

# TABLE OF AUTHORITIES

**CASES**

*Amalgamated Meat Cutters & Butcher Workmen v. Safeway Stores, Inc.*,
52 F.R.D. 373 (D. Kan. 1971) ................................................................................................ 16

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ................................................................................................................. 3

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980) ................................................................................................................. 6

*Crawford v. Equifax Payment Services, Inc.*,
201 F.3d 877 (7th Cir. 2000) ................................................................................................. 12

*Diaz v. Trust Territory of Pacific Islands*,
876 F.2d 1401 (9th Cir. 1989) ................................................................................................. 3

*Dunleavy v. Nadler*,
213 F.3d 454 (9th Cir. 2000) ................................................................................................... 3

*Ellis v. Edward D. Jones & Co.*,
527 F. Supp. 2d 439 (W.D. Pa. 2007) ................................................................................... 15

*Grant v. Bethlehem Steel Corp.*,
823 F.2d 20 (2d Cir. 1987) ...................................................................................................... 3

*Grove v. Principal Mut. Life Ins. Co.*,
200 F.R.D. 434 (S.D. Iowa 2001) .......................................................................................... 14

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) .............................................................................................. 4, 8

*In re Airline Ticket Comm'n Antitrust Litig.*,
307 F.3d 679 (8th Cir. 2002) ................................................................................................... 8

*In re American Tower Corp. Securities Litig.*,
648 F. Supp. 2d 223 (D. Mass. 2009) ..................................................................................... 8

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
2005 U.S. Dist. LEXIS 16468 (D. Me. Aug. 9, 2005) ............................................................. 8

*In re Corrugated Container Antitrust Litig.*,
643 F.2d 195 (5th Cir. 1981) ................................................................................................. 15

*In re General Motors Corp. Engine Interchange Litigation*,
594 F.2d 1106 (7th Cir. 1979) ............................................................................................... 15

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
55 F.3d 768 (3d Cir. 1995) ......................................................................................... 14, 15, 16

*In re Grand Theft Auto Video Game Consumer Litig.*,
251 F.R.D. 139 (S.D.N.Y. 2008) ............................................................................................. 5

*In re Mercury Interactive Corp. Sec. Litig.*,
618 F.3d 988 (9th Cir. 2010) .............................................................................................. 9, 12

OBJECTION OF MICHAEL I. KRAUSS TO PROPOSED
SETTLEMENT AND PROPOSED ATTORNEYS' FEE
AWARD - ii
CASE NO. C09-00045-RAJ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

*In re Pharmaceutical Industry Avg. Wholesale Price Lit.*,
588 F.3d 24 (1st Cir. 2009)................................................................9

*In re Washington Public Power Supply Sys. Lit.*,
19 F.3d 1291 (9th Cir. 1994).............................................................3

*In re Wells Fargo Securities Litig.*,
991 F. Supp. 1193 (N.D. Ca. 1998)...................................................8

*Kirchoff v. Flynn*,
786 F.2d 320 (7th Cir. 1986)..............................................................4

*Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co.*,
834 F.2d 677 (7th Cir. 1987)............................................................15

*Masters v. Wilhemina Model Agency, Inc.*,
473 F.3d 423 (2d Cir. 2007)..............................................................8

*Mirfasihi v. Fleet Mortgage Corp.*,
356 F.3d 781 (7th Cir. 2004)........................................................3, 12

*Molski v. Gleich*,
318 F.3d 937 (9th Cir. 2003)....................................................3, 8, 12

*Moody v. Sears*,
2007 NCBC 13 (N.C. Bus. Ct. May 7, 2007).....................................5

*Murray v. GMAC Mortgage Corp.*,
434 F.3d 948 (7th Cir. 2006)......................................................12, 13

*Nachsin v. AOL LLC*
No. 10-55129 (pending in the Ninth Circuit......................................11

*Petruzzi's, Inc. v. Darling-Delaware Co.*,
880 F. Supp. 292 (M.D. Pa. 1995)...................................................15

*Schwartz v. Dallas Cowboys Football Club, Ltd.*,
362 F. Supp. 2d 574 (E.D. Pa. 2005)................................................8

*SEC v. Bear, Stearns & Co.*,
626 F. Supp. 2d. 402 (S.D.N.Y. 2009).............................................8

*Silber v. Mabon*,
957 F.2d 697 (9th Cir. 1992)..............................................................3

*Six Mexican Workers v. Arizona Citrus Growers*,
904 F.2d 1301 (9th Cir. 1990)............................................................8

*Staton v. Boeing Co.*,
327 F.3d 938 (9th Cir. 2003)..............................................................7

*Strong v. BellSouth Telecommunications, Inc.*,
137 F.3d 844 (5th Cir. 1998)..............................................................6

*True v. Am. Honda Motor Co.*,
2010 U.S. Dist. LEXIS 23545 (C.D. Cal. Feb. 26, 2010)....................5

*Union Life Fidelity Ins. Co. v. McCurdy*,
781 So. 2d 186 (Ala. 2000)................................................................5

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
396 F.3d 96 (2d Cir. 2005)................................................................4

OBJECTION OF MICHAEL I. KRAUSS TO PROPOSED
SETTLEMENT AND PROPOSED ATTORNEYS' FEE
AWARD - iii
CASE NO. C09-00045-RAJ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

*Williams v. MGM-Pathe Communications Co.*,
129 F.3d 1026 (9th Cir. 1997) .......................................................................6

*Wise v. Popoff*,
835 F. Supp. 977 (E.D. Mich. 1993) ...........................................................6

**STATUTES**

15 U.S.C. § 77z-1(a)(6) ...................................................................................6

15 U.S.C. § 78u-4(a)(7) .................................................................................12

28 U.S.C. § 1711 ..............................................................................................5

28 U.S.C. § 1711 note § 2(a)(3)(A) ..............................................................6

28 U.S.C. § 1712(a) ......................................................................................5, 6

**RULES**

Fed. R. Civ. Proc. 23(a)(4) .....................................................................1, 4, 9

Fed. R. Civ. Proc. 23(c)(2)(B) ......................................................................12

Fed. R. Civ. Proc. 23(e) ..................................................................................4

**OTHER AUTHORITIES**

American Law Institute, *Principles of the Law of Aggregate Litigation* § 3.07 (2010) ..................9

American Law Institute, *Principles of the Law of Aggregate Litigation* § 3.07(a) (2010) ...........9

American Law Institute, *Principles of the Law of Aggregate Litigation* § 3.07(b) (2010) ...........9

Beisner, John, *et al.*, *Cy Pres: A Not So Charitable Contribution to Class Action Practice*
(2010).......................................................................................................10, 11

Editorial, *When Judges Get Generous; A better way to donate surpluses from class-action
award*s, WASH. POST (Dec. 17, 2007) ........................................................10

Eisenberg, Theodore & Geoffrey Miller, *The Role of Opt-Outs and Objectors in Class
Action Litigation: Theoretical and Empirical Issues*, 57 VAND. L. REV. 1529, 1532
(2004).............................................................................................................15

Federal Judicial Center, *Manual for Complex Litigation (Fourth)* § 21.71 (2004).......................6

Frank, Theodore H., *Cy Pres Settlements*, CLASS ACTION WATCH (March 2008).......................10

Grow, Brian, *The Great Rebate Runaround*, BUSINESS WEEK (Dec. 5, 2005).............................5

Klonoff, Robert H., *Making Class Actions Work: The Untapped Potential of the Internet*,
69 U. Pitt. L. Rev. 727 n. 251 (2008) ..........................................................16

Koppel, Nathan, *Proposed Facebook Settlement Comes Under Fire*, WALL ST. J. (Mar. 2,
2010)...............................................................................................................11

Leslie, Christopher R., *The Significance of Silence: Collective Action Problems and Class
Action Settlements*, 59 Fla. L. Rev. 71 (2007) ........................................14, 15

Liptak, Adam, *Doling Out Other People's Money*, N.Y. TIMES (Nov. 26, 2007) .................10, 11

Notes of Advisory Committee on 2003 Amendments to Rule 23(h) .............................................6

Redish, Martin H., *et al.*, *Cy Pres Relief and the Pathologies of the Modern Class Action:
A Normative and Empirical Analysis*, 62 Fla. L. Rev. 617 (2010)...........................................10

OBJECTION OF MICHAEL I. KRAUSS TO PROPOSED
SETTLEMENT AND PROPOSED ATTORNEYS' FEE
AWARD - iv
CASE NO. C09-00045-RAJ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Silver, Charles, *Due Process And The Lodestar Method: You Can't Get There From Here*, 74 Tulane L. Rev. 1809 (2000)................................................................4

Tharn, James & Brian Blockovich, *Coupons and the Class Action Fairness Act*, 18 Geo. J. Legal Ethics 1443 (2005) ................................................5

Yospe, Sam, *Cy Pres Distributions in Class Action Settlements*, 2009 COLUMBIA BUS. L. REV. 1014................................................................10

Zahorsky, Rachel M., "Unsettling Advocate," *ABA Journal* (April 2010) ..................................3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

OBJECTION OF MICHAEL I. KRAUSS TO PROPOSED
SETTLEMENT AND PROPOSED ATTORNEYS' FEE
AWARD - v
CASE NO. C09-00045-RAJ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

# I.   INTRODUCTION

It is ironic that this is a case about false and misleading advertising, because class counsel has engaged in false and misleading claims to this Court and to the class.  Class counsel, in their motion for attorneys' fees, and in their announcements to the world, repeatedly call this a $9.5 million settlement—even though their clients only received $117,000, and the defendant keeps the other $9.4 million.  As such, class counsel's request for fees is not "11%," but rather nearly 900%, impermissibly far above the 25% figure that class counsel acknowledge is the appropriate benchmark.  Class recovery is so low because class counsel—either collusively or incompetently—negotiated a settlement structure that made it unduly burdensome for class members to collect.  If this Court rewards class counsel based on a fictional "settlement fund" which provided no real chance of actual recovery to the class, then it will provide no incentive for future class counsel to negotiate settlements that create actual recovery.  This failure is reason enough to reject the settlement, but even if this Court does not reject the settlement, it would be an abuse of discretion, and a violation of the Class Action Fairness Act and the Federal Rules of Civil Procedure to award more than $30,000 in fees.

But this Court should reject the settlement.  After the objection deadline, the parties materially modified the settlement to include a *cy pres* component that violates both the American Law Institute's guidelines for *cy pres* awards and the class counsel's fiduciary duty to the class.  Due process and Ninth Circuit precedent require this court to permit class members to object to the materially modified settlement.  By putting the interests of third parties ahead of their own clients and the unnamed members of the class, the class counsel and the class representative have demonstrated that they cannot fairly and adequately represent the class under Fed. R. Civ. Proc. 23(a)(4).  It would be an abuse of discretion to approve the settlement.

The settlement is further problematic because class counsel's notice effectively misled the class into thinking that a $117 thousand settlement was a $9.5 million settlement.  As press coverage of the settlement shows, the public was actually deceived.  It would be inequitable to

OBJECTION OF MICHAEL I. KRAUSS TO PROPOSED
SETTLEMENT AND PROPOSED ATTORNEYS' FEE
AWARD - 1
CASE NO. C09-00045-RAJ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1  reward class counsel for this false advertising in a false advertising case.  The court cannot

2  approve the settlement without providing a fair opportunity for class members to object to the lack

3  of actual relief.

4                                    **II.    ARGUMENT**

5  **A.    Objector Michael I. Krauss Is a Member of the Class.**

6          Michael I. Krauss (business address George Mason University School of Law, 3301 North

7  Fairfax Drive, # 316, Arlington, Virginia  22201, 703-993-8024) was registered with

8  classmates.com during the relevant class period.

9          The putative settlement class is defined as "All Persons, excluding Settlement Subclass

10  members, residing in the United States who were registered with or subscribed to

11  www.classmates.com at any time between October 30, 2004 and April 19, 2010." Professor

12  Krauss is thus a class member with standing to object.  He intends to appear at the fairness hearing

13  through his counsel, Theodore H. Frank of the Center of Class Action Fairness and local counsel

14  Lawrence C. Locker of the Summit Law Group.

15          Professor Krauss teaches torts and legal ethics at George Mason University School of Law,

16  and objects to the proposed attorneys' fees and to the settlement as unethical and a breach of the

17  class attorneys' fiduciary duty to their clients.  The class counsel have put payment to themselves

18  and to unrelated third parties ahead of their clients' interests.

19          The Center for Class Action Fairness, founded by legal academic and attorney

20  Theodore H. Frank in 2009, is a project of the non-profit Donors Trust:  a public-interest law firm

21  that represents consumers *pro bono*.  A number of "professional objectors" are for-profit attorneys

22  that attempt to or threaten to disrupt a settlement unless plaintiffs' attorneys buy them off with a

23  share of the attorneys' fees; thus, some courts presume that the objector's legal arguments are not

24  made in good faith.  But this is not the business model of the Center for Class Action Fairness.

25  While the Center focuses on bringing objections to unfair class action settlements, it makes no

26  effort to engage in *quid pro quo* settlements to extort attorneys, and has never settled an objection.

---

OBJECTION OF MICHAEL I. KRAUSS TO PROPOSED
SETTLEMENT AND PROPOSED ATTORNEYS' FEE
AWARD - 2
CASE NO. C09-00045-RAJ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

The Center analyzes complaints from consumers aggrieved by class action settlement notices to determine whether a settlement is objectionable under the law because it favors attorneys over class members; as a non-profit with limited resources, it must restrict itself to objecting only to the most egregiously bad settlements. The Center's litigation on behalf of consumers has been covered by *Forbes*, the *National Law Journal*, and the *Wall Street Journal*, among others. *See, e.g.,* Rachel M. Zahorsky, "Unsettling Advocate," *ABA Journal* (April 2010) ("'What Ted is doing is something very necessary: being there to protect classes from potentially collusive settlements between businesses and lawyers,' says Todd Zywicki, a George Mason University law professor.").

**B.      This Pre-Certification Settlement Merits High Scrutiny.**

A "district court ha[s] a fiduciary responsibility to the silent class members." *Grant v. Bethlehem Steel Corp.,* 823 F.2d 20, 23 (2d Cir. 1987); *cf. also In re Washington Public Power Supply Sys. Lit.,* 19 F.3d 1291, 1302 (9th Cir. 1994). "Because class actions are rife with potential conflicts of interest between class counsel and class members, district judges presiding over such actions are expected to give careful scrutiny to the terms of proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole." *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 785 (7th Cir. 2004). "Both the class representative and the courts have a duty to protect the interests of absent class members." *Silber v. Mabon*, 957 F.2d 697, 701 (9th Cir. 1992). *See also Diaz v. Trust Territory of Pacific Islands*, 876 F.2d 1401, 1408 (9th Cir. 1989) ("The district court must ensure that the representative plaintiff fulfills his fiduciary duty toward the absent class members").

Where a court is confronted with a settlement-only class certification, the court must look to factors "designed to protect absentees." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003). "Settlements that take place prior to formal class certification require a higher standard of fairness." *Molski*, 318 F.3d at 953 (*quoting Dunleavy v. Nadler*, 213 F.3d 454, 458 (9th Cir. 2000)).

OBJECTION OF MICHAEL I. KRAUSS TO PROPOSED
SETTLEMENT AND PROPOSED ATTORNEYS' FEE
AWARD - 3
CASE NO. C09-00045-RAJ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1   "These concerns warrant special attention when the record suggests that settlement is

2   driven by fees; that is, when counsel receive a disproportionate distribution of the settlement."

3   *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1021 (9th Cir. 1998).

4   This is a fee-driven settlement: the attorneys are requesting fees nine times the amount they

5   recovered for the class. It is unclear whether the lack of recovery for class members is because

6   class counsel tacitly colluded with the defendant or because class counsel simply recklessly

7   disregarded their obligation to negotiate a settlement that was likely to provide meaningful

8   recovery to their clients. But in either situation, the attorneys have failed to meet the standard of

9   Fed. R. Civ. Proc. 23(a)(4), and the settlement fails to meet the standard of Fed. R. Civ. Proc.

10  23(e).

11  **C.    Attorneys' Fees Must Be Proportionate to the Actual Class Recovery of $117
        Thousand.**

12  Professor Krauss agrees with class counsel that it is appropriate to base attorneys' fees on a

13  percentage of the recovery. "The contingent fee uses private incentives rather than careful

14  monitoring to align the interests of lawyer and client. The lawyer gains only to the extent his client

15  gains. This interest-alignment device is not perfect. . . . But [an] imperfect alignment of interests

16  is better than a conflict of interests, which hourly fees may create." *Kirchoff v. Flynn*, 786 F.2d

17  320, 325 (7th Cir. 1986). *See generally* Charles Silver, *Due Process And The Lodestar Method:

18  You Can't Get There From Here*, 74 Tulane L. Rev. 1809 (2000) (citing authorities that show a

19  "broad consensus that percentage-based formulas harmonize the interests of agents and principals

20  better than time-based formulas like the lodestar approach."). The percentage method "directly

21  aligns the interests of the class and its counsel and provides a powerful incentive for the efficient

22  prosecution and early resolution of litigation." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396

23  F.3d 96, 121 (2d Cir. 2005). In contrast, the "lodestar create[s] an unanticipated disincentive to

24  early settlements, tempt[s] lawyers to run up their hours, and compel[s] district courts to engage in

25  a gimlet-eyed review of line-item fee audits." *Id.*

26

OBJECTION OF MICHAEL I. KRAUSS TO PROPOSED
SETTLEMENT AND PROPOSED ATTORNEYS' FEE
AWARD - 4
CASE NO. C09-00045-RAJ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1    Class counsel also correctly note that the appropriate benchmark for percentage of

2    recovery is 25%. But they are wrong in claiming that the "recovery" is $9.5 million. They neglect

3    to mention that this is largely a coupon settlement, and, as such, attorneys' fees "shall be based on

4    the value to class members of the coupons that are redeemed" rather than the theoretical value of

5    the coupons available for redemption. 28 U.S.C. § 1712(a). *See also True v. Am. Honda Motor*

6    *Co.,* 2010 U.S. Dist. LEXIS 23545 (C.D. Cal. Feb. 26, 2010).

7    Class counsel knew or should have known when they negotiated the settlement that,

8    because of the unduly burdensome claims procedure, there was no chance class members would

9    actually recover $9.5 million. There was no reason to require an opt-in process for class recovery

10   other than to depress the amount of money going to the class. Defendants have records of every

11   class member's payments, and could simply cut a check or reverse charges to class members'

12   credit cards. Claims forms are a marketing science, akin to the rebates used in selling electronics

13   equipment. Parties can reasonably predict response rates based on the hoops that they require

14   claimants to jump through, just as marketers can predict how many fewer rebates will be claimed

15   if they require customers to cut out a UPC symbol to claim a rebate. *See, e.g.,* Brian Grow, *The*

16   *Great Rebate Runaround*, BUSINESS WEEK (Dec. 5, 2005).

17   The low redemption rate for class action coupons and claims is well-known, and was one

18   of the motivating factors behind the Class Action Fairness Act. *See* 28 U.S.C. § 1711 note

19   § 2(a)(3)(A). The rule of thumb is that a redemption rate for a coupon without a secondary market

20   is between 1% and 3%. *See generally* James Tharn & Brian Blockovich, *Coupons and the Class*

21   *Action Fairness Act*, 18 GEO. J. LEGAL ETHICS 1443 (2005). But even that figure may be an

22   overestimate. *See, e.g.*, *In re Grand Theft Auto Video Game Consumer Litig.,* 251 F.R.D. 139

23   (S.D.N.Y. 2008) (only 2676 claimants out of 10 million class members); *Moody v. Sears*, 2007

24   NCBC 13 (N.C. Bus. Ct. May 7, 2007) (337 redemptions in 1.5 million-member class); *Union Life*

25   *Fidelity Ins. Co. v. McCurdy*, 781 So. 2d 186, 188 (Ala. 2000) (113 redemptions in 104,000-

26   member class). Sure enough, barely 1% of the fund was claimed in this case.

OBJECTION OF MICHAEL I. KRAUSS TO PROPOSED
SETTLEMENT AND PROPOSED ATTORNEYS' FEE
AWARD - 5
CASE NO. C09-00045-RAJ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1    Using claim and rebate forms instead of simply requiring the defendant to cut a check is a

2  form of price discrimination against the disorganized and against those with high opportunity

3  costs. There is nothing inherently evil about price discrimination—but there is no reason for it in

4  a class action settlement other than to reduce class recovery. Attorneys should not be rewarded

5  when they do so.

6    Class counsel cite 1997 Ninth Circuit precedent for the proposition that attorneys' fees

7  should be based on the size of the fund available to the class. But *Williams v. MGM-Pathe*

8  *Communications Co.*, 129 F.3d 1026 (9th Cir. 1997), was written before the 2003 amendments to

9  the Federal Rules of Civil Procedure and the 2005 Class Action Fairness Act, and is no longer

10  good law. (Class counsel fails to cite either legal development.) *See* Notes of Advisory

11  Committee on 2003 Amendments to Rule 23(h) (fee award should not exceed a "reasonable

12  percentage of the amount of any damages and prejudgment interest *actually paid* to the class"

13  (emphasis added)) (*citing* 15 U.S.C. §§ 77z-1(a)(6); 78u-4(a)(6)). Because the settlement involved

14  "coupons" for future Classmates.com memberships, the Class Action Fairness Act requires fees to

15  be based on actual class recovery: attorneys' fees "shall be based on the value to class members of

16  the coupons that are redeemed" rather than the theoretical value of the coupons available for

17  redemption. 28 U.S.C. § 1712(a). *See also* Federal Judicial Center, *Manual for Complex*

18  *Litigation (Fourth)* § 21.71 (2004) ("the fee awards should be based only on the benefits actually

19  delivered"); 28 U.S.C. § 1711 note § 2(a)(3)(A) (Congress enacted Class Action Fairness Act out

20  of concern over abuses of the class action device that "harmed" class members, "such as where …

21  counsel are awarded large fees, while leaving class members with coupons *or other awards of*

22  *little or no value*." (emphasis added)).

23    Similarly, nothing in *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980) *requires* courts to

24  award fees based on unclaimed funds, especially in a case like this one where the results would be

25  manifestly unjust. *Strong v. BellSouth Telecommunications, Inc.*, 137 F.3d 844, 852-53 (5th Cir.

26  1998); *Wise v. Popoff*, 835 F. Supp. 977, 982 (E.D. Mich. 1993). The preferability of the modern

OBJECTION OF MICHAEL I. KRAUSS TO PROPOSED
SETTLEMENT AND PROPOSED ATTORNEYS' FEE
AWARD - 6
CASE NO. C09-00045-RAJ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1   rule of basing fees on actual recovery is readily demonstrated by imagining two hypothetical

2   settlements in the imaginary class action *Coyote v. Acme Co.*:

3       **In Hypothetical Settlement #1**, the defendant refers to its records, and sends a $15 check

4   to each of the million class members who purchased mail-order rocket skates from Acme Co., for

5   a total of $15 million in class benefit.

6       **In Hypothetical Settlement #2**, the defendant offers $15 for anyone who fills out a claim

7   form that requires the claimant to answer several questions about the time and place of purchase,

8   provide the serial number of the rocket-skates and a copy of the front-page of the owner's manual,

9   swear under penalty of perjury that they believe they were defrauded, and mail the entire package

10  to a claims-processing service within thirty days. Only 1% of the million class members submit

11  valid claim forms, resulting in $150,000 in recovery from the possible $15 million class recovery.

12      According to class counsel, these settlements, with hundred-fold differences in class

13  recovery, are *identical*, and merit identical attorneys' fees payouts. This is an absurd result, and

14  one that creates perverse incentives for class counsel and defendants to collude—explicitly or

15  tacitly—to minimize recovery by making it difficult for class members to make claims, while

16  exaggerating illusory "recovery funds" to guarantee that the attorneys will obtain the majority of

17  recovery. The Ninth Circuit has recognized this principle. "If fees are unreasonably high, the

18  likelihood is that the defendant obtained an economically beneficial concession with regard to the

19  merits provisions, in the form of lower monetary payments to class members or less injunctive

20  relief for the class than could otherwise have obtained." *Staton v. Boeing Co.*, 327 F.3d 938, 964

21  (9th Cir. 2003). No explicit collusion is needed: defendants are naturally trying to limit their

22  expenditures, and class counsel knows that an illusory settlement fund will produce a higher

23  proportion of attorneys' fees from the total actual settlement than a settlement fund that actually

24  provides class benefits.

25      The only way for this Court to fulfill its duty to protect the interests of absent class

26  members and to align class counsel's incentives with their putative clients is to refuse class

1    counsel's request to base attorneys' fees on illusory relief. Fees should be based on the recovery

2    of $117 thousand of cash and redeemed coupons, and should not be above $30,000.

3        Any other result would violate the Federal Rules and the Class Action Fairness Act.[1]

4    **D.     The Addition of *Cy Pres* Relief Is a Breach of Class Counsel's Fiduciary Duty.**

5        **1.     The Addition of *Cy Pres* Relief Is a Material Modification of the Settlement
     Requiring New Opportunity to Object.**

6        Courts, including the Ninth Circuit, have repeatedly rejected settlements because of

7    inappropriate *cy pres* awards. *See, e.g., Molski*, 318 F.3d at 954-55 (reversing settlement

8    approval); *Masters v. Wilhemina Model Agency, Inc.*, 473 F.3d 423 (2d Cir. 2007) (reversing

9    settlement approval); *In re Airline Ticket Comm'n Antitrust Litig.*, 307 F.3d 679, 682 (8th Cir.

10   2002) (reversing settlement approval); *In re American Tower Corp. Securities Litig.*, 648 F. Supp.

11   2d 223, 224-25 (D. Mass. 2009); *SEC v. Bear, Stearns & Co.*, 626 F. Supp. 2d. 402, 415

12   (S.D.N.Y. 2009); *Schwartz v. Dallas Cowboys Football Club, Ltd.*, 362 F. Supp. 2d 574, 577

13   (E.D. Pa. 2005); *In re Wells Fargo Securities Litig.*, 991 F. Supp. 1193, 1197 (N.D. Ca. 1998); *In*

14   *re Compact Disc Minimum Advertised Price Antitrust Litig.*, 2005 U.S. Dist. LEXIS 16468 (D.

15   Me. Aug. 9, 2005).

16       Moreover, in the Ninth Circuit, a *cy pres* award "will be rejected when the proposed

17   distribution fails to provide the 'next best' distribution." *Six Mexican Workers v. Arizona Citrus*

18   *Growers*, 904 F.2d 1301, 1308 (9th Cir. 1990). Any such distribution must "adequately target the

19   plaintiff class." *Id.* But class members have been given no notice of the *cy pres* award (which

20   was not established until after the objection deadline had passed) and do not even have notice of

---

[1] Class counsel's motion for attorneys' fees does not attempt to quantify the value of the injunctive relief to the class. Nor can it. The proposed injunction affects future customers of Classmates.com, not the class. It is tautological that injunctive relief is not a class benefit unless it provides benefit to the class. It is appropriate to consider injunctive relief a benefit to the class when the injunctive relief is targeted to the class. For example, in *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998), the parties agreed to a settlement whereby Chrysler would provide "a redesigned improved replacement latch to be installed free of charge." *Id.* at 1018. This injunction provided a direct benefit to the class of Chrysler owners that had purchased an allegedly faulty vehicle. The injunction in this case does nothing for the class members injured by false advertising in this case, and cannot be counted towards the attorneys' fees.

OBJECTION OF MICHAEL I. KRAUSS TO PROPOSED
SETTLEMENT AND PROPOSED ATTORNEYS' FEE
AWARD - 8
CASE NO. C09-00045-RAJ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1   who the *cy pres* recipient will be even now.  This is wrong.  Class members have not had a "full

2   and fair opportunity" to contest the proposed *cy pres* distribution.  Under *In re Mercury*

3   *Interactive Corp. Sec. Litig.*, 618 F.3d 988 (9th Cir. 2010), the court cannot approve the settlement

4   without providing that full and fair opportunity to object to the materially changed settlement.

5   New notice is required before the court approves the settlement.

**2.      The *Cy Pres* Relief Impermissibly Violates Accepted Standards and Is a Breach of Fed. R. Civ. Proc. 23(a)(4).**

7        This Court, however, need not require a wasteful third notice in this case, because the

8   proposed *cy pres* is a breach of class counsel's fiduciary duty to the class by valuing the recovery

9   of a third party over the recovery to the unnamed class members, and demonstrates that they

10  cannot fairly and adequately represent the class.  American Law Institute, *Principles of the Law of*

11  *Aggregate Litigation* § 3.07 (2010) ("ALI *Principles*").  This Court should simply accept

12  Professor Krauss's objection to the *cy pres* relief and reject settlement approval.

13       Class counsel owes a fiduciary duty to their putative class clients to put the clients'

14  interests first in negotiating a settlement.  *Cy pres* may be appropriate when the class is not easily

15  ascertainable, or where the transaction costs of distributing a small settlement among many class

16  members is not feasible.  ALI *Principles* § 3.07(a) .  But because this settlement already creates a

17  method to distribute funds for class members, *cy pres* is inappropriate here.  Nor is distribution of

18  any leftover funds appropriate under the ALI *Principles*, which states that "the settlement should

19  presumptively provide for further distributions to participating class members unless the amounts

20  involved are too small to make individual distributions economically viable or other specific

21  reasons exist that would make such further distributions impossible or unfair." *Id.* § 3.07(b) .  The

22  class has not been fully compensated, so additional *pro rata* distributions would not be a windfall

23  requiring *cy pres*. *Cf. In re Pharmaceutical Industry Avg. Wholesale Price Lit.*, 588 F.3d 24 (1st

24  Cir. 2009) (approving *cy pres* of unclaimed funds because district court ensured full treble

25  recovery of class members first).

26

OBJECTION OF MICHAEL I. KRAUSS TO PROPOSED
SETTLEMENT AND PROPOSED ATTORNEYS' FEE
AWARD - 9
CASE NO. C09-00045-RAJ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1      There is no reason to have *any cy pres* distribution in this settlement, other than the class

2 counsel's preference to assign a discrete and influential third party hundreds of thousands of

3 dollars at the expense of providing a few dollars to thousands of faceless clients.  And no doubt

4 the class counsel wishes to be able to issue a press release making it seem like the class counsel

5 are generous donors to charity, when in fact they are spending their putative clients' money.  The

6 charity-to-be-named is not the class counsel's client; the class members are.  And the failure of

7 class counsel and the class representative to put the interests of the class first in negotiating this

8 settlement raises severe Rule 23(a)(4) concerns: how can they be said to fairly and adequately

9 represent the class when they are pursuing the interests of third parties at the class's expense?  *See*

10 Declaration of Michael I. Krauss ¶ 2.

11      The ALI is not alone in noting the inherent conflicts of interest raised by *cy pres*

12 distributions.  *See, e.g.*, Martin H. Redish, *et al.*, *Cy Pres Relief and the Pathologies of the Modern*

13 *Class Action: A Normative and Empirical Analysis*, 62 FLA. L. REV. 617 (2010) (*cy pres*

14 "threatens to undermine the due process interests of absent class members by disincentivizing the

15 class attorneys in their efforts to assure [classwide] compensation of victims of the defendant's

16 unlawful behavior"); John Beisner, *et al.*, *Cy Pres: A Not So Charitable Contribution to Class*

17 *Action Practice* (2010); Sam Yospe, *Cy Pres Distributions in Class Action Settlements*, 2009

18 COLUMBIA BUS. L. REV. 1014; Theodore H. Frank, *Cy Pres Settlements*, CLASS ACTION WATCH

19 (March 2008); Editorial, *When Judges Get Generous; A better way to donate surpluses from class-*

20 *action award*s, WASH. POST (Dec. 17, 2007) ("Federal judges are permitted to find other uses for

21 excess funds, but giving the money away to favorite charities with little or no relation to the

22 underlying litigation is inappropriate and borders on distasteful. In all but the rarest of

23 circumstances, those funds should be made available to individual plaintiffs and not to outside

24 organizations—no matter how worthy"); Adam Liptak, *Doling Out Other People's Money*, N.Y.

25 TIMES (Nov. 26, 2007).

26

OBJECTION OF MICHAEL I. KRAUSS TO PROPOSED
SETTLEMENT AND PROPOSED ATTORNEYS' FEE
AWARD - 10
CASE NO. C09-00045-RAJ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1    It is further inappropriate to settle a case by providing a sum of money to a judge to issue

2    to a judge's preferred charity. When the charitable distribution is related to the judge, or left

3    entirely to the judge's discretion, the ethical problems and conflicts of interest multiply. Class

4    action settlements require judicial approval: one can readily envision a scenario where a judge

5    looks more favorably upon a settlement that provides money for a judge's preferred charity than

6    one that does not. Even if a judge divorces herself from such considerations, the parties may still

7    believe that it would increase the chances of settlement approval to throw some money to a charity

8    associated with a judge.

9    Moreover, charities that know that a judge has discretionary funds to distribute can—and

10   do—lobby judges to choose them, blurring the appropriate role of the judiciary. "[A]llowing

11   judges to choose how to spend other people's money 'is not a true judicial function and can lead to

12   abuses.'" Liptak, *supra* (quoting former federal judge David F. Levi); *see also id.* (quoting Judge

13   Levi as saying "judges felt that there was something unseemly about this system" where "groups

14   would solicit [judges] for consideration as recipients of *cy pres* awards"). As tempting as it is to

15   permit judges to play Santa Claus with settlement money, Congress has not given courts this

16   authority, and the judiciary should not seize this ethically and constitutionally problematic power

17   for themselves. *See also* Declaration of Michael I. Krauss, ¶¶ 2-4.

18   Lead class counsel in this case, Kabateck Brown Kellner, already has a notable track

19   record of abusing *cy pres*; the case of *Nachsin v. AOL LLC* (pending in the Ninth Circuit, 10-

20   55129) received nationwide criticism for a $0 settlement consisting entirely of *cy pres*—including

21   a donation to a charity affiliated with the judge's spouse. Nathan Koppel, *Proposed Facebook

22   Settlement Comes Under Fire,* WALL ST. J. (Mar. 2, 2010); Beisner, *supra,* at 11-13.

23   The way to avoid these conflicts of interest is to forbid *cy pres* awards except in the narrow

24   circumstances where non-windfall pecuniary relief to the class is not feasible. The settlement

25   must be rejected.

26

OBJECTION OF MICHAEL I. KRAUSS TO PROPOSED
SETTLEMENT AND PROPOSED ATTORNEYS' FEE
AWARD - 11
CASE NO. C09-00045-RAJ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

### 3. In Any Event, the *Cy Pres* Relief Should Not Be Calculated as a Class Benefit When Calculating Attorneys' Fees.

In the event this Court decides to disregard the ALI *Principles* and Ninth Circuit precedent on the availability of *cy pres* relief without notice to the class, it should not count the $500,000 *cy pres* as a class benefit when calculating attorneys' fees. *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir. 2004) ("There is no indirect benefit to the class from the defendant's giving the money to someone else."); *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 952 (7th Cir. 2006); *Crawford v. Equifax Payment Services, Inc.*, 201 F.3d 877, 882 (7th Cir. 2000).

### E. New Notice Is Also Required Because Existing Notice Was Misleading.

Class counsel issued public statements claiming that the class would receive $9.5 million; in the second notice of attorneys' fees, class counsel never corrected this deliberate or negligent error, even though class counsel knew that total class recovery was only $117 thousand. Notice is not adequate if it misleads potential class members. *Molski*, 318 F.3d at 952. In this case, there is much evidence that the notice is misleading: multiple press accounts stated that Classmates.com would pay $9.5 million to class members, when in fact Classmates.com is paying barely one percent of that amount. *See* Declaration of Theodore H. Frank Exhibits 1 and 2. Class counsel have breached their duties to the class by failing to provide accurate notice and instead exaggerating class recovery.

Fed. R. Civ. Proc. 23(c)(2)(B) requires "the best notice practicable under the circumstances." There was no reason for class counsel to omit this material information other than to artificially limit the number of objections. *Cf. also* 15 U.S.C. § 78u-4(a)(7) (PSLRA) (notice should include aggregate class recovery and amount recoverable if plaintiff prevailed on each claim alleged).

Class members have not been given a full and fair opportunity to object to a settlement that only provides $117 thousand of relief and seeks to pay attorneys' fees of nearly nine times that amount. *Mercury Interactive*, *supra*. This Court cannot approve this settlement without fair and

OBJECTION OF MICHAEL I. KRAUSS TO PROPOSED
SETTLEMENT AND PROPOSED ATTORNEYS' FEE
AWARD - 12
CASE NO. C09-00045-RAJ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1   accurate notice, though, as mentioned in Section II.D., *supra*, this Court should simply reject

2   settlement approval.

3        The proposed settlement fund of $9.5 million already reflected a compromise of the class's

4   much larger claim.  In reality, the class only realized $117 thousand of benefit, barely 1% of the

5   settlement fund, and an even smaller percentage of the alleged damages.

6        In *Murray v. GMAC Mortgage Corp.*, a 1% ratio of recovery to alleged damages and a

7   high ratio of representative-to-individual recovery was enough to call the settlement untenable: "if

8   the reason other class members get relief worth about 1% of the minimum statutory award is that

9   the suit has only a 1% chance of success, then how could Murray personally accept 300% of the

10  statutory maximum? And, if the chance of success really is only 1%, shouldn't the suit be

11  dismissed as frivolous and no one receive a penny?"  434 F.3d 948, 952 (7th Cir. 2006).  Here, the

12  "success" of plaintiffs is similar to the failure criticized in *Murray*.  Plaintiffs have either breached

13. their fiduciary duties by selling the class short or brought an extortionate "strike suit" for their

14  own selfish benefit.  Neither should be condoned by approving the settlement or attorneys' fees.

15  And the class should be given the opportunity to object to the settlement actually realized, rather

16  than the misleading settlement terms that were announced publicly.

17  **F.**    **Because Notice Was Misleading and the Objections Process Was Unduly**
18      **Burdensome, the Court Should Discount Attempts by the Settling Parties to Infer**
    **Class Approval From the Low Number of Objections.**

19       Class Counsel implausibly contends that the 27 objections received in response to the

20  settlement is evidence that the other absent class members *support* the proposed settlement.  Dkt.

21  No. 93 at 8-9.  There is no reason to draw that inference; Class Counsel has made no effort to poll

22  a representative sample of the putative class members, and they have no basis to claim the class

23  has reacted positively—let alone that millions of class members affirmatively approve the

24  settlement.  This is especially true here, where class counsel gave inadequate disclosure that

25  misled class members into believing that the settlement was worth ninety times as much as it was.

26

OBJECTION OF MICHAEL I. KRAUSS TO PROPOSED
SETTLEMENT AND PROPOSED ATTORNEYS' FEE
AWARD - 13
CASE NO. C09-00045-RAJ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Yes, only a few dozen class members objected, but why should class members want to jump through time-consuming procedural hoops to object? The natural predominant response is apathy, because objectors—unless they can obtain *pro bono* counsel—must spend time and money to attempt to improve the settlement for millions of fellow class members with little potential gain for themselves. In this case, a class member wishing to object had to jump through procedural hoops in terms of formatting the objection, and then had to spend $1.76 in postage to make four first-class mailings—all over a settlement worth only $2.00 or $3.00 to them. Little wonder that most class members ignored the settlement notice.

Silence is simply *not* consent:

> There may be many reasons why class members in this case didn't register their concerns about the settlement: lack of interest, time, information, etc. Like the Third Circuit in the *General Motors* case, the Court is unwilling to automatically equate class silence with a showing of "overwhelming" support for the settlement. Therefore, the fact that statistically few people bothered to opt-out or file an objection ultimately counts little in the Court's overall fairness analysis.

*Grove v. Principal Mut. Life Ins. Co.*, 200 F.R.D. 434, 447 (S.D. Iowa 2001), *citing In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 789 (3d Cir. 1995). "Silence may be a function of ignorance about the settlement terms or may reflect an insufficient amount of time to object. But most likely, silence is a rational response to any proposed settlement even if that settlement is inadequate. For individual class members, objecting does not appear to be cost-beneficial. Objecting entails costs, and the stakes for individual class members are often low." Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 FLA. L. REV. 71, 73 (2007).

There is usually little hope that opt-outs can recover for their claims—the entire purpose of class actions is to aggregate claims that would be uneconomical to bring individually. "Almost by definition, most class members have too little at stake to warrant opting out of the class litigation and filing an individual lawsuit. Thus, opting out is probably not a viable option even though a

OBJECTION OF MICHAEL I. KRAUSS TO PROPOSED SETTLEMENT AND PROPOSED ATTORNEYS' FEE AWARD - 14
CASE NO. C09-00045-RAJ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1 proposed settlement is unfair or inadequate." Leslie, *supra*, 59 FLA. L. REV. at 109. Without *pro*
2 *bono* counsel to look out for the interests of the class, filing an objection or opting out is
3 economically irrational for any individual.

4    "[A] combination of observations about the practical realities of class actions has led a
5 number of courts to be considerably more cautious about inferring support from a small number of
6 objectors to a sophisticated settlement." *In re GMC Pick-Up Litig.*, 55 F.3d at 812, *citing In re*
7 *Corrugated Container Antitrust Litig.*, 643 F.2d 195, 217-18 (5th Cir. 1981); *cf. Petruzzi's, Inc. v.*
8 *Darling-Delaware Co.*, 880 F. Supp. 292, 297 (M.D. Pa. 1995) ("[T]he silence of the
9 overwhelming majority does not necessarily indicate that the class as a whole supports the
10 proposed settlement. . . ."). "[A] low number of objectors is almost guaranteed by an opt-out
11 regime, especially one in which the putative class members receive notice of the action and notice
12 of the settlement offer simultaneously." *Ellis v. Edward D. Jones & Co.*, 527 F. Supp. 2d 439,
13 446 (W.D. Pa. 2007). "[W]here notice of the class action is, again as in this case, sent
14 simultaneously with the notice of the settlement itself, the class members are presented with what
15 looks like a *fait accompli*." *Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co.*, 834
16 F.2d 677, 680-681 (7th Cir. 1987). "Acquiescence to a bad deal is something quite different than
17 affirmative support." *In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106,
18 1137 (7th Cir. 1979) (reversing approval of settlement).

19    When class members have little at stake, as in a consumer fraud class action where the
20 maximum recovery was three dollars, the rate of response is famously low. Theodore Eisenberg
21 & Geoffrey Miller, *The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical*
22 *and Empirical Issues*, 57 VAND. L. REV. 1529, 1532 (2004). This is especially true when class
23 members have to follow procedures that artificially deter them from objecting or opting out. For
24 example, class members were required to affix postage and mail their opt-outs or objections.

25    In the year 2010, there is absolutely no reason that those who settle a class action cannot
26 establish either a dedicated e-mail address or a dedicated form on a website allowing potential

OBJECTION OF MICHAEL I. KRAUSS TO PROPOSED
SETTLEMENT AND PROPOSED ATTORNEYS' FEE
AWARD - 15
CASE NO. C09-00045-RAJ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1    objectors to object or opt out without jumping through burdensome procedural hoops—especially

2    in a case such as this one where the defendant was an Internet website and class notice was

3    achieved through e-mail.  For objections and opt-outs, "the ease and cost-efficiency of such direct

4    internet submissions increases the likelihood of absent class member participation."  Robert H.

5    Klonoff, *Making Class Actions Work: The Untapped Potential of the Internet*, 69 U. PITT. L. REV.

6    727, 766 n. 251 (2008).  Given that a dedicated website and dedicated email address was

7    established as part of the settlement notice, the only reason *not* to permit objections through

8    costless means is to artificially lower the number of objections made.  As such, the Court should

9    draw the adverse inference that a majority of the class objects to the settlement.  *Cf. also In re*

10   *GMC Pick-Up Litig.*, 55 F.3d at 813 (finding that "class reaction factor" does not weigh in favor

11   of approval, even when low number of objectors in large class, when "those who did object did so

12   quite vociferously").

13          The judge must act as a guardian for *all* class members—whether or not they have jumped

14   through the hoops of formally objecting.  "[T]he absence or silence of class parties does not

15   relieve the judge of his duty and, in fact, adds to his responsibility." *Amalgamated Meat Cutters*

16   *& Butcher Workmen v. Safeway Stores, Inc.*, 52 F.R.D. 373, 375 (D. Kan. 1971).  The settlement's

17   proponents have the burden to show the proposed settlement and the proposed fee award is

18   fundamentally fair, adequate, and reasonable, and class counsel have simply not carried this

19   burden.

20                        **III.    CONCLUSION**

21          This is not a $9.5 million settlement: it is a $117 thousand settlement, and attorneys' fees

22   should be calculated appropriately.  Any other result would encourage the tacit collusion to benefit

23   defendants and class counsel at the expense of the absent class members that occurred in this case.

24          The class notice failed to give class members an opportunity to object to the $117 thousand

25   recovery, the disproportionate attorney fee request, or the impermissible proposed *cy pres*

26   distribution.  New notice and a full and fair opportunity to object to these provisions is required

OBJECTION OF MICHAEL I. KRAUSS TO PROPOSED
SETTLEMENT AND PROPOSED ATTORNEYS' FEE
AWARD - 16
CASE NO. C09-00045-RAJ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1 | under *Mercury Interactive* before this Court can approve the settlement. However, it would be

2 | more efficient if this Court simply accepted and upheld Professor Krauss's objection to these

3 | impermissible terms of the settlement.

4 |     DATED this 18th day of November, 2010.

6 |         Respectfully submitted,

7 |         CENTER FOR CLASS ACTION FAIRNESS

8 |         By */s/ Theodore H. Frank*
           Theodore H. Frank (*pro hac vice*)

9 |            Center for Class Action Fairness
           1718 M Street NW, No. 236

10 |            Washington, DC 20036
           Tel: (703) 203-8848

11 |            *tfrank@gmail.com*

12 |         SUMMIT LAW GROUP PLLC

14 |         By */s/ Lawrence C. Locker*
           Lawrence C. Locker, WSBA #15819

15 |            315 Fifth Avenue S., Suite 1000
           Seattle, WA 98104-2682

16 |            Tel: (206) 676-7000
           *larryl@summitlaw.com*

17 |         Attorneys for Objector Professor Michael Krauss

OBJECTION OF MICHAEL I. KRAUSS TO PROPOSED
SETTLEMENT AND PROPOSED ATTORNEYS' FEE
AWARD - 17
CASE NO. C09-00045-RAJ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Mark A. Griffin, Esq.
Amy C. Williams-Derry, Esq.
Keller Rohrback
1201 Third Avenue, Suite 3200
Seattle, WA 98101
*mgriffin@kellerrohrback.com*
*derry@kellerrohrback.com*

Richard L. Kellner, Esq.
Kabateck Brown Kellner L.L.P.
644 S. Figueroa Street
Los Angeles, CA 90017
*rlk@kbklawyers.com*

Stellman Keehnel, Esq.
Russell B. Wuehler, Esq.
DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA 98104
*stellman.keehnel@dlapiper.com*
*russell.wuehler@dlapiper.com*

I hereby further certify that on this day I caused a true and correct copy of the foregoing to be served via First Class Mail upon addressees designated above.

DATED this 18th day of November, 2010.

Marcia A. Ripley

OBJECTION OF MICHAEL I. KRAUSS TO PROPOSED
SETTLEMENT AND PROPOSED ATTORNEYS' FEE
AWARD - 18
CASE NO. C09-00045-RAJ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Exhibit 4

**2010 NLJ Billing Survey**

| Fiscal Year | Firm Name | Location | Partner Billing Rate High | Partner Billing Rate Low | Associate Billing Rate High | Associate Billing Rate Low | Associate Billing Rate Average | Partner Billing Rate Average | Firmwide Billing Rate Average | Associate Billing Rate Med | Partner Billing Rate Med | Firmwide Billing Rate Med | Annual billable h |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2010 | Lewis, Rice & Fingersh | St. Louis | $460.00 | $260.00 | $315.00 | $150.00 | | | | | | | Yes, 1650 Membe |
| 2010 | Lindquist & Vennum | Minneapolis | | | | | $235.00 | $415.00 | $330.00 | 230 | 410 | 410 | Yes |
| 2010 | Littler Mendelson | San Francisco | $650.00 | $290.00 | $480.00 | $210.00 | $296.00 | $445.00 | $372.00 | 285 | 435 | 435 | Yes, 1900 |
| 2010 | Locke Lord Bissell & Liddell | Dallas | $1120.00 | $400.00 | $525.00 | $215.00 | $320.00 | $599.00 | $486.00 | 300 | 600 | 600 | Yes, 1900 |
| 2010 | Loeb & Loeb | New York | $975.00 | $475.00 | $575.00 | $275.00 | | | | | | | Yes, 1900 |
| 2010 | Lowenstein Sandler | Roseland, NJ | $825.00 | $440.00 | $575.00 | $235.00 | | | | | | | No |
| 2010 | Luce, Forward, Hamilton & Scripps | San Diego | $670.00 | $350.00 | $445.00 | $245.00 | | | | | | | Yes, 1950 Associa |
| 2010 | Manatt, Phelps & Phillips | Los Angeles | $850.00 | $525.00 | $525.00 | $200.00 | $405.00 | $651.00 | $568.00 | 410 | 650 | 650 | No |
| 2010 | Marshall, Dennehey, Warner, Coleman & | Philadelphia | $410.00 | $145.00 | $320.00 | $130.00 | | | | | | | Yes, 2,200 to 2,25 |
| 2010 | Maynard, Cooper & Gale | Birmingham, AL | $600.00 | $325.00 | $295.00 | $235.00 | | | | | | | No |
| 2010 | McAndrews, Held & Malloy | Chicago | $675.00 | $260.00 | $350.00 | $225.00 | | | | | | | Yes, 2000 |
| 2010 | McCarter & English | Newark, NJ | $825.00 | $360.00 | $405.00 | $215.00 | $313.00 | $498.00 | $355.00 | 315 | 485 | 485 | Yes, For associate |
| 2010 | McElroy, Deutsch, Mulvaney & Carpenter | Morristown, N.J. | $550.00 | $295.00 | $275.00 | $150.00 | $190.00 | $280.00 | $210.00 | 185 | 260 | 260 | Yes, 1700.198 |
| 2010 | McGuireWoods | Richmond, Va. | $830.00 | $325.00 | $600.00 | $220.00 | $355.00 | $543.00 | $455.00 | 350 | 535 | 535 | Yes |
| 2010 | McKenna Long & Aldridge | Atlanta | $775.00 | $375.00 | $490.00 | $220.00 | $366.00 | $540.00 | $455.00 | 355 | 525 | 525 | Yes, 1850 |
| 2010 | Michael Best & Friedrich | Milwaukee | $650.00 | $235.00 | $320.00 | $190.00 | $239.00 | $400.00 | $346.00 | 230 | 390 | 390 | Yes, 1850 (Associ |
| 2010 | Miles & Stockbridge | Baltimore | $695.00 | $325.00 | $370.00 | $220.00 | | | | | | | Yes, 1800 |
| 2010 | Miller & Martin | Chattanooga, TN | $610.00 | $235.00 | $275.00 | $180.00 | $218.00 | $361.00 | $328.00 | 210 | 365 | 365 | Yes, Associates 1 |
| 2010 | Miller, Canfield, Paddock and Stone | Detroit | | | | | | | | | | | Yes, Variable |
| 2010 | Montgomery, McCracken, Walker & Rhoads | Philadelphia | $625.00 | $380.00 | $395.00 | $205.00 | $284.00 | $461.00 | | | | | Yes, Partners 170 |
| 2010 | Moore & Van Allen | Charlotte N.C. | $785.00 | $265.00 | $350.00 | $180.00 | $257.00 | $441.00 | $364.00 | 250 | 425 | 425 | No |

Exhibit 5

# Locke Lord LLP



## R. BRENT CLIFTON
PARTNER

With almost 30 years of experience, R. Brent Clifton focuses his work on real estate related transactions representing institutional investors, sponsors and developers.  Recognized by *Texas Monthly* as a "Texas Super Lawyer" and listed in *The Best Lawyers in America* and internationally, Mr. Clifton has a long history of representing fund sponsors and real estate developers of all property types in the structuring of their equity ventures and exit strategies (private and public) as well as representing institutional investors in their fund formations and project investments.  Recent representative transactions include the tax planning and structuring of a REIT-based fund for distressed asset investing, designing a tax-efficient structure for recapitalization of a large, regional homebuilder which allowed the partial collateralization of the institutional fund's investment with the homebuilder's NOL tax refunds, negotiation of the sponsor agreements for a foreign infrastructure investment fund, and the representation of a national multi-family developer in the restructuring of its debt, equity and governance. Mr. Clifton also regularly deals with transactions involving partnership roll-ups, credit tenant leases, like-kind exchanges (tenancy-in-common structures), and corporate joint ventures.

He is a licensed Certified Public Accountant in the State of Texas. He currently serves on the Committee for Government Submissions and recently served as Committee Chair of the Partnerships and LLCs Committee for the Section of Taxation of the American Bar Association.  Mr. Clifton has served on committees for the revision of the Texas LLC and REIT statutes and as past Chair of the UPL Task Force, the State Bar of Texas; past Chair of the Section of Taxation, State Bar of Texas; as well as past Chair of the Tax Section of the Dallas Bar Association.

2200 Ross Avenue, Suite 2200
Dallas, Texas 75201
(214) 740-8555
(214) 740-8800 Fax
bclifton@lockelord.com

### Related Practice Areas

Corporate
Tax

### Education

M.Div., Abilene Christian University, 2011
J.D., Southern Methodist University School of Law, 1982
B.A., Accounting, Abilene Christian University, 1976

### Bar Admissions

Texas, 1982

## REPRESENTATIVE EXPERIENCE

Represented founding investor in formation of $200 million multi-

family developmental fund (2011)

Represented management in sponsor agreements for $500 million foreign infrastructure fund (2011)

Represented developer/sponsor in series of multi-family development projects (2011)

Represented management in restructuring of privately-held national real estate development company (2011)

Represent sponsor in formation of distressed debt real estate fund (2010)

---

**PUBLICATIONS & PRESENTATIONS**

Published numerous articles on topics such as partnership and real estate taxation; REITs; limited liability companies; cancellation of indebtedness; family limited partnerships.

---

**PROFESSIONAL HISTORY**

Partner, Locke Lord LLP

Attorney, licensed in Texas (1982)

Certified Public Accountant, licensed in Texas (1978)

---

**PROFESSIONAL AFFILIATIONS & ACHIEVEMENTS**

Past Chair, Partnerships and LLCs Committee, Section of Taxation, American Bar Association

Past Chair, UPL Task Force, State Bar of Texas

Past Chair, Section of Taxation, State Bar of Texas

Past Chair,  Tax Section, Dallas Bar Association

Member, State Bar of Texas
    Section of Business Law

    Corporation Committee
        Ad Hoc Committee for Proposed Amendments to Texas
        LLC Act

        Ad Hoc Committee for Proposed Amendments to Texas
        Real Estate Investment Trust Act

Member, American Institute of Certified Public Accountants

Member, Texas Society of Certified Public Accountants

Member, NAREIT, Government Relations Committee

Euromoney Legal Media World's Leading Tax Advisers

Named, *Chambers USA Client's Guide of America's Leading Lawyers for Business* (Tax)

Named, *The Best Lawyers in America*, Tax Law

Named, Texas Super Lawyer, *Texas Monthly Magazine*

Named, Best Lawyers in Dallas, *D Magazine*

---

**COMMUNITY LEADERSHIP**

Vice Chair, Board of Directors, Hope Network Ministries

Advisory Board, New Friends/New Lives

Sponsor Chaplain, SMU Dedman School of Law Christian Legal Society

Exhibit 6

```
     137kpfia                    Argument
 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 2
 3   IN RE:  PFIZER SHAREHOLDER
 3   DERIVATIVE LITIGATION              09 CV 7822 (JSR)
 4
 4   ------------------------------x
 5                                      New York, N.Y.
 5                                      March 7, 2011
 6                                      5:12 p.m.
 6
 7   Before:
 7
 8                       HON. JED S. RAKOFF,
 8
 9                                      District Judge
 9
10                       APPEARANCES
10
11   BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
11        Attorneys for Plaintiffs
12   MAX BERGER
12   MARK LEBOVITCH
13   DAVID WALES
13   JEROEN VAN KWAWEGEN
14
14   DLA PIPER
15        Attorneys for Nominal Defendant Pfizer
15   JOHN DOUGHERTY
16
16   CADWALADER WICKERSHAM & TAFT LLP
17        Attorneys for Individual Director Defendants
17   DENNIS BLOCK
18   HAL SHAFTEL
18   ERIKA B. ENGELSON
19
19   DAVIS POLK & WARDWELL LLP
20        Attorneys for Individual Nondirector Defendants
20   ROBERT FISKE
21   JAMES ROUHANDEH
21   ROSS GALIN
22
22   BALLON STOLL BADER & NADLER PC
23        Attorneys for Objector Nora Vides
23   IRVING BIZER
24
25
```

2

137kpfia                    Argument

 1              (In open court)
 2              THE DEPUTY CLERK:  In re:  Pfizer Shareholder
 3    Derivative Litigation, Docket No. 09 CV 7822.  Please be seated
 4    and identify yourselves for the record.
 5              MR. LEBOVITCH:  Your Honor, Mark Lebovitch, Bernstein
 6    Litowitz for the plaintiffs.
 7              MR. BERGER:  Max Berger, same firm, your Honor.
 8              MR. WALES:  And David Wales, same firm.
 9              THE COURT:  Good afternoon.
10              MR. BLOCK:  Good afternoon, your Honor.  Dennis Block,
11    Hal Shaftel and Erika B. Engelson from Cadwalader Wickersham &
12    Taft on behalf of the director defendants.
13              MR. FISKE:  Robert Fiske, Jim Rouhandeh and Ross Galin
14    from Davis Polk on behalf of the nondirector defendants.
15              THE COURT:  Good afternoon.
16              MR. DOUGHERTY:  Good afternoon, your Honor.  John
17    Doherty, DLA Piper, for Pfizer.
18              MR. BIZAR:  Irving Bizar on behalf of the objector
19    Nora Vides.
20              THE COURT:  You want to come on up and sit maybe at
21    plaintiff's counsel -- not too close of course -- so that
22    you're not way in the back there?
23              Well, I'm a great believer in tradition.  And,
24    therefore, I felt that we couldn't possibly start this hearing
25    until at least an hour and a quarter after the time it was
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

3

137kpfia                    Argument
1    originally called for, in keeping with prior practice.  But
2    actually unexpectedly I had a visit from one of the court of
3    appeal judges in the U.K., the British Court of Appeals and so
4    I had to spend some time with him.  So I apologize for the
5    delay.
6           So we're here both on the proposed settlement and on
7    the hearing on whether or not to give it final approval and
8    also on the question of attorneys' fees.  So I think probably
9    we should hear first from the objector.
10          MR. BIZAR:  Thank you, your Honor.  May it please the
11   Court, I appear for objector Nora Vides.  We object to the
12   settlement.  Let me say at the outset that I believe
13   improvement in corporate governance is an important way to
14   settle a stockholder derivative case.  But at bar, the proposed
15   settlement has two major deficiencies, which make this
16   settlement nothing less than window dressing in a case in which
17   Pfizer was fined $4 billion for civil and criminal penalties,
18   an amount probably larger than the gross national product of
19   any three third-world countries because, in the words of the
20   U.S. Attorney, Pfizer was guilty of recidivism.  And that's
21   apart from the amounts of money Pfizer had to pay to reimburse
22   the defendant directors pursuant to its bylaws and Delaware law
23   in the current case.
24          Now, why do we say there are two fundamental
25   deficiencies?  The first relates to what I believe are
                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

4

137kpfia                    Argument

```
 1  clawbacks.  It's a fundamental principle that an agent who
 2  causes his principal to violate the law loses his compensation.
 3  And if you want to prevent Pfizer from violating the law again
 4  in the future, you must have very firm clawback provisions
 5  where the guilty people lose their compensation.
 6          THE COURT:  Of course it hasn't been established that
 7  they are guilty --
 8          MR. BIZAR:  That's why the regulatory committee was
 9  presumably formed, to do the investigations, to do and to point
10  the fingers and to direct and identify who did what and why it
11  was wrong.  But the weakness of that is --
12          THE COURT:  Well, no, I think the regulatory committee
13  that is here proposed is more looking towards the future.
14          MR. BIZAR:  That's true.
15          THE COURT:  Preventing recurrences.
16          MR. BIZAR:  That's correct.  And what I believe is
17  deficient about this is that the regulatory committee, despite
18  all of its powers, at the end of the day can only make
19  recommendations to the board, contrary to what plaintiffs say
20  in their reply brief.  If you look at paragraph 5 of the
21  settlement agreement, you will see that it's only
22  recommendations.  There's no mandate.
23          THE COURT:  Just as a matter of corporate law, how
24  could it be, even as pursuant to a settlement, that a
25  corporation could bind itself so that the determinations of a
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

5

137kpfia                         Argument

1  committee would, without any review by the board, be binding on
2  the corporation?  Wouldn't that be an abdication of the
3  responsibilities of the board?
4           MR. BIZAR:  Then it must be that the board must be
5  mandated to do the clawback provisions.  And why am I concerned
6  about the Pfizer board?  If I were a betting man, I would say
7  that there would be a very serious question that the Pfizer
8  board would do anything with respect to the recommendations of
9  the regulatory committee.  Why do I say that?  From 2001 to
10 2008, the board received a steady stream of reports of
11 government investigations, FDA investigations, grand jury
12 investigations, criminal lawsuits, whistleblower letters,
13 whistleblower suits, letters to the chairman of the board,
14 whatever.
15          And throughout all of this time, throughout all of
16 this time, the board amended -- and defendants tell us they
17 spent countless hours.  All they did -- indeed let me step
18 back.  They even received reports from their independent
19 auditors that the system had broken down.  And all they did was
20 approve the system of the law or the good conduct codes that
21 they had, and nothing, no penny, of clawback compensation was
22 ever sought or obtained from any of the wrongdoers.
23          Now, why do I then believe that the board will
24 continue?  The prior track record reflects that.  It seems to
25 me that the major deficiency of this proposed settlement is

6

137kpfia                        Argument
 1  that the board must be mandated, after it receives this
 2  exhaustive investigatory body and report by the regulatory
 3  committee, it must be mandated to obtain these clawback
 4  compensation.  If you want Pfizer to obey the law and not be
 5  fined again -- and in the drug industry it is the norm to
 6  violate the law, and that's true not just for Pfizer but other
 7  companies as well, as it's been written about repeatedly -- is
 8  to have people threatened with the loss of compensation and to
 9  have it enforced.
10          The second deficiency which I say exists in this
11  settlement is the requirement that the committee operate for a
12  period of five years.  Yes, there's some provision that the
13  committee will continue, but the funding may be subject to
14  board's business judgments or whatever.  We submit that the
15  committee should be, as part of the bylaws, made a standing
16  committee, as is the audit committee.
17          With those amendments, we say then you've done
18  something good for corporate governance.  Absent that, we
19  oppose this settlement.
20          THE COURT:  All right.  Thank you very much.  Who
21  wants to respond first?  Mr. Block, are you up first here?  I
22  can see you're both so anxious.
23          MR. BLOCK:  Well, I'm happy to start off the response
24  by pointing out that while the U.S. Attorney did make certain
25  comments about Pfizer in connection with its press release and
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

137kpfia                    Argument

1   announcement of the litigation that Mr. Bizar is referring to,
2   I point out that none of the individuals who are defendants in
3   this case were defendants in that case nor were subject of any
4   comments that the U.S. Attorney made.  So he may have said
5   something -- but it's hearsay anyway -- but it didn't apply to
6   the individuals we are here talking about.
7           Two, more importantly:  There have been two points
8   that Mr. Bizar has made regarding what's, in his view, weak and
9   not acceptable in the settlement.  And in his papers there's a
10  third point his papers point out -- there's no monetary relief
11  here.  And I suggest there's $75 million in monetary relief
12  that's being paid by the carriers on behalf of the defendants
13  in this case.
14          But with respect to the two points that Mr. Bizar did
15  make:  Number one, the five years:  In five years, the board of
16  directors of Pfizer, whoever they are -- and they could be a
17  totally different group of people than the people who are there
18  today, whoever the shareholders elect to be the directors --
19  will determine how well this committee has operated and whether
20  continuing this committee is in the best interests of the
21  company.  Moreover, the settlement itself requires that at the
22  end of the five-year period, the company will tell the
23  shareholders in their proxy statement whether or not they chose
24  to continue the committee and, if not, why not.
25          So this is basically --

                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

8

137kpfia                    Argument

```
 1            THE COURT:  Well, let me ask you this.  First of all,
 2    I was glad that the objector did not raise the monetary issue
 3    in the same way that he had raised it in his papers, because it
 4    seems to me that's something of an irrelevancy in this
 5    derivative action.  The point here is not to impose a monetary
 6    penalty on the company, which it would not be in the interests
 7    of its shareholders, who are the real parties in action, so to
 8    speak.  The point here is either, as the original lawsuit
 9    wanted, to recover for the company monies from directors or
10    others who it alleged had engaged in wrongdoing that hurt the
11    company; or, as the settlement took the tact of, essentially
12    expending the necessary resources to make sure that for real
13    this time this kind of alleged misconduct did not occur again.
14            So the money only comes up as an objection, it seems
15    to me, with respect to the clawback point that the objector is
16    making.  And his point there, in effect, is that the real force
17    of preventing future misconduct, he asserts, would come from
18    requiring any officer and director who has failed to have acted
19    not in the company's best interests in the events that led to
20    the huge monetary penalty imposed in the criminal case, to have
21    to pay some money back.  So his first objection, which you may
22    want to address then is really, he thinks you're giving up an
23    important deterrent effect, and since the whole point of this
24    settlement has been promoted to the Court on the grounds of
25    preventing future mistakes, he says that without that clawback
```

9

137kpfia                        Argument
1   provision, which he would make mandatory, it won't really have
2   that effect.
3           But let me ask you, in that regard, before you
4   respond:  The recommendations of the regulatory committee, are
5   they made public?
6           MR. BLOCK:  No.
7           THE COURT:  Are they to be made public?  Why not?
8           MR. BLOCK:  There's no intention of making it public.
9           THE COURT:  Why not?
10          MR. BLOCK:  It might not be in the interests of making
11  it public.
12          THE COURT:  But it might be in the interests of having
13  this Court approve the settlement.
14          MR. BLOCK:  It's a question for the board's
15  determination.  If, in fact, there is a recommendation made by
16  the regulatory committee, it will be considered by the board
17  after the comp committee expresses its view; and if they
18  believe it's appropriate to do so, they will do so.  The --
19          THE COURT:  I put on the table, so everyone can
20  address -- and I've been thinking about this further since the
21  preliminary approval -- I am bothered by the fact there does
22  not seem to be built into this settlement any way to assure
23  that the recommendations of the regulatory committee are given
24  their due deserts except for the pablum of saying it will be
25  considered by the board and company in good faith and as part

137kpfia                    Argument

1  of their business judgment and all like that, all of which, it
2  seemed to me, when I wrote my opinion in this case, had
3  arguably failed to operate in the past.  I made no findings; I
4  was only dealing with allegations and whether they were
5  sufficient.  But as counsel have frequently pointed out, the
6  remaining claim in this case was one that is very rarely
7  sustained, even on a motion to dismiss.  It was the strength of
8  the allegations that made me think this was that rare case.
9           So I'm troubled by the fact that no one will ever
10 know --
11           MR. BLOCK:  Well, your Honor --
12           THE COURT:  -- what the regulatory committee
13 recommends.
14           MR. BLOCK:  I apologize.  You're assuming that's the
15 case.  The way the settlement works is, the regulatory
16 committee can make whatever recommendations it believes
17 appropriate.  The regulatory committee is going to be made up
18 of five independent directors, and those directors are presumed
19 to act in good faith.  And to the extent that the board fails
20 to accept -- and the board is an independent board as well --
21 the recommendations of the regulatory committee, well, the
22 company is supposed to report annually what the committee has
23 done.  There's a requirement that the regulatory committee
24 report be put forth in the proxy statement.
25           So, one might suspect, if the regulatory committee

137kpfia                        Argument

1     which writes its own report, were to say that we've recommended
2     that the following be done and the board didn't agree with
3     them, they'll say, in their report, in the proxy statement,
4     well, we made certain recommendations, the board didn't follow
5     through.  So the assumption that it's not going to be reported
6     is incorrect.
7            THE COURT:  I'm sorry, maybe I misunderstood --
8            MR. BLOCK:  There's no requirement to disclose -- this
9     is not a judicial organization.  This is a board of directors;
10    it has a committee with certain responsibilities.  One of those
11    responsibilities will be to report in summary fashion what the
12    committee did.  Now, if the committee makes a recommendation
13    and the board doesn't accept it, I'm sure the committee has
14    every ability, because it controls its own report, to say we
15    made certain recommendations which weren't accepted.  They can
16    do that.
17           THE COURT:  But they're certainly not required to
18    report their recommendations.
19           MR. BLOCK:  Nor should they be.  Because it could be a
20    circumstance where the committee made a recommendation, it was
21    debated before the board, and somebody on the board pointed out
22    something that hadn't been considered by the regulatory
23    committee, which indicated to the regulatory committee that --
24    it wouldn't be in the interests of the company as a whole to
25    publicize that.  And the regulatory committee may agree with

137kpfia                    Argument

```
 1    that.  Or something might come up at the board where the
 2    regulatory committee learns of something that's inconsistent
 3    with a conclusion it previously made and determines maybe
 4    that's not the appropriate conclusion or the appropriate
 5    result.
 6            A corporation --
 7            THE COURT:  Well, I have to say, Mr. Block, if nothing
 8    else, I stand in awe of the fact that, as most of us love our
 9    mothers, you feel the same passion for the business judgment
10    and corporate responsibilities of the board of directors, and
11    it is --
12            MR. BLOCK:  Our system is built on that, your Honor.
13            THE COURT:  Ah, gee, where in the Constitution does it
14    say that?
15            MR. BLOCK:  That's not --
16            THE COURT:  I'm sorry, you're right --
17            MR. BLOCK:  That's not Article I?
18            THE COURT:  It's Article I?  Shucks, I'll have to go
19    back and read it.
20            Anyway, let's get serious.  The point I'm trying to
21    figure out is, do I have it correct that there is no
22    requirement that the board report its recommendations, either
23    before or after they are presented to the board but it has the
24    power to make those public, or is it only in the proxy
25    statement that they would appear?
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

13

137kpfia                    Argument

1      MR. BLOCK:  Well, they'd always have the power to do
2  it in any forum they wished to do it, but the settlement says
3  that there will be a report annually of what the committee did.
4  It's a committee report.  The committee can say whatever it is
5  the committee believes is appropriate to be said.  That should
6  cover the issue, your Honor.
7      THE COURT:  Now, on the other point raised -- then
8  I'll hear from plaintiffs' counsel in a minute -- on the other
9  point raised, about the five years, I'm not as troubled by that
10  because, from everything you presented me with earlier, this is
11  in some ways in the nature of an experiment, and no experiment
12  should be presumed to go on forever.  Usually the only
13  experiments that go on forever are those enacted by Congress.
14      But my question is:  I'm a little vague on exactly how
15  the decision is made and on what grounds, at the end of five
16  years.
17      MR. BLOCK:  The board will use its business judgment
18  to determine whether the experiment, as you correctly described
19  it, is the right way to do this, or if there's a better way to
20  do this, or make a determination whether to perpetuate the
21  committee or do something else.  And whatever it does, it is
22  required by the settlement to report to the shareholders its
23  decision.  Remember that a board is dynamic, your Honor; the
24  people who sit today, five years from now, in this case for
25  sure, will not be the same directors, and it will be whoever

14

137kpfia                    Argument
1    the shareholders elect.  And that board will look at how the
2    five years have evolved and whether this is the correct
3    experiment to perpetuate or is there a better way to do this.
4    The law keeps changing, especially in the pharmaceutical
5    industry -- more and more regulation keeps being adopted -- and
6    there may be other or better ways to do this.
7           We think this is a good way.  Five years is a good
8    period of time to see if this is the right way.  It may be it's
9    too cumbersome.  It may be having the divide of the audit
10   committee and the regulatory and compliance committee is not
11   the right way to go because there's too much overlap.  Five
12   years from now we'll see how it worked and whether or not
13   tinkering is necessary to make it better, or maybe this just
14   was a bad idea and shouldn't be perpetuated.  However, if we
15   think it's a bad idea and shouldn't be perpetrated, we'll have
16   to tell the shareholders; and if they disagree, well, they have
17   a very easy way of dealing with this.  They can remove the
18   directors and put new directors in.  But it's an experiment,
19   it's meant to be an experiment, and I think the board is
20   looking forward to it as an experiment.
21          THE COURT:  Let me hear from plaintiffs' counsel.
22   Thank you.
23          MR. LEBOVITCH:  Thank you, your Honor.  First to
24   address the two issues:  As you might imagine, we're not a big
25   fans of the business judgment rule as a Holy Grail.  If
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

15

137kpfia                    Argument
1    anything, we're a lot --
2              THE COURT:  You didn't know it was in the First
3    Amendment?
4              MR. LEBOVITCH:  I didn't know that.
5              But I will cite some constitutional law, I guess.
6    Justice Holmes spoke about the bad men theory -- I believe it
7    was Justice Holmes -- and we're a lot closer to that.  We just
8    don't just assume the board will always do the right thing.
9    However, in the settlement that we put together we do require
10   disclosures.  There's a reality, which is, Pfizer is a high
11   profile company, it's one of the largest companies in the
12   world -- one of the largest pharmaceuticals, one of the largest
13   companies in the world, and it is under a microscope.  If there
14   is any hint -- whether it's in the annual report where we would
15   expect detail about what the committee recommended or any other
16   hint of a regulatory problem -- by making this settlement
17   public, the shareholders of the company, going into the future,
18   they knew exactly what's happened because we have a mandatory
19   recommendation.  It's not going to be easy for this board to
20   ignore a recommendation.  And if they do, there will be a
21   shareholder who says, well, I know you're required to get a
22   recommendation, I want to know what happened.  And while the
23   books and records avenue is not favored by at least by most
24   shareholders, it is an avenue.  And there will be people who
25   will say, I want to know what happened.  It's very different
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

16

137kpfia                     Argument
1    from the situation we found --
2             THE COURT:  Well, what would be the harm in saying
3    that any recommendations of the regulatory committee must, at a
4    minimum, be prominently reported in the next proxy statement,
5    together with any response if the response has already occurred
6    from the board?
7             MR. LEBOVITCH:  There would be no harm, your Honor.
8    And I think the answer is -- I think it's pretty rare to see
9    even a term sheet negotiated in a very short period of time
10   that has as much detail that is one did.  And in the end, you
11   negotiate things.  We required an annual report.  That language
12   is not specific as to exactly what has to be in there.
13            THE COURT:  Yeah, in fact, when I said proxy
14   statement, we should talk maybe in terms of quarterly reports.
15            MR. LEBOVITCH:  It could be.  There's going to be
16   disclosure.  The world knows this committee is created, the
17   world knows what the obligations are and what the powers of the
18   committee are.  I suspect if Pfizer says, we have a committee
19   and they met four times, that would be objectionable.  How much
20   detail has to go in is subject to debate but this was
21   negotiated.  And we took the view that I just articulated,
22   which is, in the tradeoff -- what happens in a negotiation --
23   do we draw the line at this specific issue and say no, you have
24   to disclose what the recommendation was?  We said, there's
25   these other benefits and if we start micromanaging how the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

17

137kpfia                          Argument

1   disclosure is made in the annual report, we might have to give
2   up something else.
3            THE COURT:  Yeah.  Of course negotiations are
4   important, and this Court pays a lot of deference to that.  But
5   last I checked, there was another party that had to sign off on
6   this settlement and could only sign off if that person found
7   that it was reasonable, adequate, fair, and in the public
8   interest, and that person is the Court.
9            MR. LEBOVITCH:  Absolutely, your Honor.  And, frankly,
10  there would be no opposition from our side to require that
11  disclosure.  All I'm saying is, factually in terms of the
12  process, there are certain tradeoffs that are made.  Of course
13  we want more disclosure rather than less.  We think for a
14  company like Pfizer, if they were to -- they obviously have to
15  disclose what happens at the end of five years; they can't just
16  make the committee disappear because everyone will know.  There
17  will be a question, and we required a recommendation about the
18  committee's continued existence, by the committee itself.  So
19  this was thought out.  Obviously if we could make it better, we
20  want to make it better.  We think it's great to begin with.
21           Perhaps if it's helpful, I'll continue to respond to
22  the objector's points and then make I can go through the
23  litigation and settlement process and address the settlement
24  more broadly.
25           THE COURT:  Well, save -- I want to deal with the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

137kpfia                         Argument

1    objector first.  Then we'll come back.  But anything further
2    you wanted to say on --
3             MR. LEBOVITCH:  Yes.  Wall, first of all, as far as
4    clawbacks of the compensation of the directors, your Honor,
5    when we filed the complaint there was an unjust enrichment
6    claim.  Your Honor may recall that was dismissed.
7             THE COURT:  Yes.
8             MR. LEBOVITCH:  So it's just not a realistic statement
9    to say, well, they have to give back their comp, there's other
10   remedies.
11           Now, as far as the board binding itself to the
12   committee's recommendation, I try that all the time in other
13   cases, I try to tell a board as part of settlement, you have to
14   agree never to put in place a poison pill, you have to agree to
15   do X, Y and Z in this situation.  And I always hear from my
16   friends on the corporate side, Section 141(d) of the Delaware
17   code would be violated if we were to ex ante bind ourselves to
18   specific business judgments.  We can create a committee but we
19   can't tell that committee what to do, and we definitely can't
20   tell the board exactly what to do.
21           This didn't come up in the briefing, but the most
22   recent case would be AFSCME versus Computer Associates, where
23   the Supreme Court rejected a bylaw written, I believe, by the
24   defendant's corporate governance expert, Lucien Bebchuk, and
25   they said, you can't do this bylaw because the board has to

137kpfia                          Argument

1    have the judgment and then there's mechanisms to check that
2    judgment.  So I just don't think that's realistic.
3            I think as far as the five years go, we have to go
4    back to the preliminary approval.  I have it right here.
5    Professor Gordon's subsequent affidavit, which is very
6    detailed, talks about the benefit of the settlement.  It
7    doesn't go back on his point about the five years and how he
8    proposed -- again, a negotiated point -- well, Professor Gordon
9    was not brought in afterwards to give a stamp of approval, good
10   housekeeping to what we did, he was there with us, we brought
11   him in -- and this was his idea, he felt very strongly about
12   it -- and he writes about it at paragraph 33 of his affidavit
13   in support of the preliminary approval.  He says that --
14           THE COURT:  That's part of the First Amendment too,
15   right?
16           MR. LEBOVITCH:  That is, yes.
17           He does explain the benefits.  He says he believes --
18   and I think former chairman Pitt and former chairman Breeden
19   use very strong words about the precedence this sets for other
20   highly regulated companies, this committee.  And Professor
21   Gordon agrees, but he says:  Such a regulatory and compliance
22   committee is likely to become such an obvious improvement for
23   corporate governance for Pfizer, that its origins will be
24   irrelevant.  Hopefully, people won't punish the committee
25   because it came from us.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

137kpfia                    Argument

1           THE COURT:  See, this is the other side of the
2    mother-son relationship that I was just describing.  The
3    professor is in effect the parent here.  And he says, "Of
4    course my child will be the star pupil of the corporation and
5    of course they will want to continue beyond kindergarten."  But
6    I don't know how much weight to give to that.
7           MR. LEBOVITCH:  Well, one would hope.  But, actually,
8    it wouldn't be fair to call him the tiger mom here, your Honor,
9    because he's very well aware, he knows this child may not work,
10   he even says it.  He says, "On the other hand, because of
11   circumstances that cannot now be imagined, what is now a
12   positive reform may in the future require modification.  A
13   five-year term with a subsequent decision on continuation to be
14   made by a fully informed future board that will be somewhat
15   removed from this litigation therefore seems appropriate."  So
16   he was aware of it and actually that goes into -- I think this
17   is also in response to the suggestion about the committee's --
18   I guess the judgment suggested to the committee.
19          THE COURT:  Charlie Sheen has tiger blood.  Who was
20   his committee?  Anyway, go ahead.
21          MR. LEBOVITCH:  I won't go into the substance, but one
22   point, I think, goes to the judgment, I guess the trust at some
23   level, notwithstanding our skepticism about the business
24   judgment rule and our skepticism about the Pfizer board
25   historically, to be honest, why are we putting trust in this

```
        137kpfia                    Argument
 1    committee?  Well, first of all, again, this isn't a committee
 2    where we have an agreement that says go create a committee and
 3    we just left it to Mr. Block and Mr. Fiske, very creative
 4    corporate advisors, to go make that committee.  We don't think
 5    they'd come up with this committee.  We did it, it's very
 6    specific.  I don't think you can find another example where
 7    litigators essentially acted kind of as corporate advisors
 8    structuring the details.
 9            But also, we now know -- and this wasn't in our
10    papers, but one of the, I guess, understandings that I reached
11    with Mr. Block is, we want to know who the people are going to
12    be.  And the board has not formally identified the members of
13    the committee because of course your Honor would have to
14    approve the creation of the committee, but we do take
15    comfort -- and we had discussions about which members perhaps
16    should be suggested to the board, so Mr. Block knew my
17    recommendation, our recommendations.  And this is not binding
18    on Pfizer, and I hope I'm not getting Mr. Block in trouble, but
19    our understanding is the recommendation would be that the
20    chairperson would be Frances Fergusson.  This is a new director
21    who joined after this lawsuit was filed.  This is a former
22    chairman of the Mayo Clinic board, a former president -- a
23    president emeritus of Vasser College.  And the point is, brand
24    new and has a history in the medical field, fits the specific
25    criteria we identified.  Another member will be John Mascotte,
```

137kpfia                        Argument

1     who also joined later on.
2             So even if we're skeptical about the older board
3     members -- and I take some comfort in the identity of the kind
4     of prior board members who are expected to be nominated to the
5     committee because we deposed them and we know them and we know
6     their qualities, strengths and weaknesses.  But John Mascotte
7     also joined later.  He's, I guess, active or a former president
8     and CEO of Blue Cross Blue Shield of Kansas City, so he too
9     could have been qualified to be the chairperson with his
10    background.  These are people who are kind of coming in
11    afterwards.  So we do take comfort that this committee is not
12    going to be a hack rubber-stamp committee, even though we had
13    very serious criticisms of what the board did in the past.
14            I don't know if -- I can go through the other members
15    if your Honor wants.
16            THE COURT:  No, let's leave it for the moment.  First,
17    let me find out, before I hear from objector's counsel again,
18    if there's anyone else on the defense side who want to be heard
19    from.
20            OK, let me hear from objector's counsel.
21            MR. BIZAR:  Thank you, your Honor.  First, what
22    happens after the matters are reported in the proxy statement?
23    Do the violations get removed?  Does the misconduct get somehow
24    alleviated?  Simply the shareholders are told that the
25    committee looked at it, saw A, B, C, D, but the full board

137kpfia                        Argument

1   decided not to do anything about A, B, C, D.  Does that mean
2   that the shareholder now can bring a litigation?  Lots of luck
3   on that.  With all the rules that prevent normal litigation in
4   stockholder derivative actions, what stockholder would be
5   prepared to bring the suit?  What should be done here --
6            THE COURT:  But let me ask you this:  At least one
7   part of what the parties here are saying is, that this is not
8   just some unknown company whose only scrutiny is through
9   whatever shareholders may learn through proxy statements; it's
10   under the microscope, and has been for some years now -- by the
11   U.S. Attorney's Office in Boston, by the federal regulatory
12   authorities and so forth -- so that if recommendations were
13   made by the regulatory authorities and they were not carried
14   out and there were subsequently misconduct that was the subject
15   of investigation by any of these governmental authorities, it
16   would surely, if there was some relationship between the
17   disregard of the regulatory recommendations and the subsequent
18   misconduct, it would surely be focused on and be an important
19   aspect of whatever action those regulatory authorities would
20   take.
21            So I think the suggestion is, that the mechanism here
22   that you're suggesting, not without some force I think, would
23   not operate in terms of shareholder action, would, in this
24   unusual situation, nevertheless take place.  Putting it in
25   practical terms, if the regulatory committee says to the board,

24

137kpfia                    Argument

 1  we think the only way to really prevent future misconduct of
 2  some sort is to take steps X, Y and Z, and the board, for
 3  whatever reason, says, no, that board is taking its life in its
 4  hand or the company's life in its hands in making those
 5  decisions because of the regulatory scrutiny.
 6          MR. BIZAR:  That may subject Pfizer to regulatory
 7  penalties by the government.  However, the shareholders in that
 8  case have been harmed when what should have happened was that
 9  individuals who caused these violations should be punished in
10  some fashion in the compensation area so that they do not do it
11  again.  There is nothing described here --
12          THE COURT:  Well, I have no way of knowing, and
13  express no opinion on, the merits of the allegations here.  But
14  if there were to occur the kind of misconduct that you're
15  hypothesizing, wouldn't you think that that would also lead to
16  individuals being named, whatever regulatory actions would be
17  taken?
18          MR. BIZAR:  I have not examined the federal criminal
19  prosecutions, but my sense was, that the individuals were not
20  individually named in those proceedings.
21          THE COURT:  Correct.
22          MR. BIZAR:  And I don't know that that would be the
23  case in the future.  And simply gambling that somehow the
24  future actions, taken by either the federal government or
25  others, would somehow make the individuals party defendants is

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

137kpfia                        Argument

1    a guess and a hope, when I would think that what Pfizer ought
2    to do at the inception is to identify these individuals and
3    punish their compensation so it doesn't happen again in the
4    future.  How many times does it have to happen before Pfizer
5    says, gee, something is wrong?
6              THE COURT:  All right, I will take the objection under
7    advisement.  I'm not going to make a decision today on any of
8    the issues before me.  I do throw out, as whatever guidance it
9    may have, that I'm not troubled by the five-year limitation.
10   Indeed, I would be more troubled if this, what I think is in
11   the nature of a noble experiment, were completely ingrained in
12   the company's regimen before its efficacy had been determined.
13   But I am a little concerned about the ability of shareholders
14   to really find out what the regulatory committee has
15   recommended.  How can a shareholder really assess whether the
16   board is doing its job in this very significant area, that has
17   embroiled this company in so much trouble for so long, if the
18   shareholders don't know, not as a matter of grace but as a
19   matter of predetermined requirement, what the regulatory
20   committee has recommended?
21             MR. BLOCK:  I only wanted to add, as your Honor
22   pointed out, pharmaceutical companies are under a microscope.
23   If you signed a CIA, you report to the government on a realtime
24   basis any violations of law within the company, period.  You
25   just report, and that's done by every pharmaceutical company

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

137kpfia                       Argument

1   under a CIA.  So there's no issue here of misconduct being
2   uncovered and not being reported.  What we're talking about are
3   individuals and their compensation.  This goes to the issue of
4   privacy and it goes to issues of real business judgment.  If in
5   fact we have the regulatory committee determining that somebody
6   did something and that person earned $150,000 a year and in the
7   view of the regulatory committee he may have done something
8   inappropriate and they feel very strongly that something
9   inappropriate was done, to say that we should make disclosure
10  to shareholders that we have an impropriety and we're not going
11  to seek to claw back the money because it would cost us
12  $500,000 to chase $150,000, doesn't tell shareholders a whole
13  lot.
14          The importance of the regulatory committee is that
15  it's going to look at conduct that it views as questionable,
16  and if it determines to fire somebody -- which would be a
17  logical thing to do, to insist upon someone being fired -- to
18  embarrass somebody by disclosing it in a proxy statement is
19  really not in the interests of the company.  There are certain
20  things that the board ought to be able to determine, if the SEC
21  doesn't believe that's disclosable, ought not to be disclosed.
22  However, the committee itself has the authority to say what it
23  thinks is appropriate in its report.  So we shouldn't put
24  constraints on them, we shouldn't put obligations on them that
25  are counterproductive, that will make them say, my goodness, if

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

27
```
137kpfia                    Argument
```
1    we determine so-and-so did X, look at what we're starting as a
2    requirement.
3              These are things that the committee will understand
4    what it's appropriate to do and has the authority to do.  These
5    are outside independent directors, and they will know that
6    everything they're looking at is being reported realtime to the
7    government to begin with.  So if there is impropriety and they
8    believe it should be disclosed, it will be disclosed.  But to
9    have a requirement that they talk about a recommendation --
10             THE COURT:  Well, maybe -- something you just said
11   gives me a little pause.  If the committee is required -- and I
12   don't believe this is the case, so maybe I misheard you -- the
13   committee is required to report everything --
14             MR. BLOCK:  Not the committee, the company.  Pfizer
15   reports all impropriety to the government because of the CIA.
16             THE COURT:  So what's the harm then in having that
17   equally reported to the shareholders?
18             MR. BLOCK:  Well, I don't think because what is done
19   is anything that could be considered a problem gets reported,
20   that the company putting that out into the marketplace would be
21   in the best interests of the company.  Pfizer is very
22   conservative, its reporting is very conservatively done and
23   that is confidential information.  So having the company
24   reporting everything internally that happens really wouldn't be
25   in the best interests of the company and would have impacts on

137kpfia                    Argument

1   people.  If you're reporting something that may not be
2   inappropriate -- may not be improper but is enough that the
3   company feels it necessary or warranted to report it -- it
4   shouldn't mean that we should be announcing to the world that
5   some individual did X, which turns out to be not improper at
6   all.
7             There is something called privacy, even in a public
8   company, that we don't have to say everything that might be
9   determined by someone to be inappropriate.  That's not what the
10  securities laws require.  Moreover, that's not in the interests
11  of a company.
12            THE COURT:  Yes, sir?
13            MR. BIZAR:  If it please your Honor:  If Mr. Block is
14  correct, how is it that Pfizer got fined $4 billion?  It must
15  have obviously been the gremlins who did all this, because they
16  couldn't tell who did it, there was probably some minor clerk
17  who caused all this.
18            MR. BLOCK:  It was 2 billion, your Honor, and it was a
19  settlement, OK.  There was a settlement -- a guilty plea
20  that --
21            THE COURT:  Yes, it was a guilty plea.  I think, it
22  was not, if I recall, a plea of nolo contendere, it was a
23  guilty plea.
24            MR. BLOCK:  And it was a guilty plea because the
25  company decided it was in the best interests -- one drug, one

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

137kpfia                     Argument

1   drug the company determined it was in the best interests of the
2   company not to be out there litigating with the federal
3   government in public and harming the company, and it was in the
4   best interests to give that plea in that regard.  To make
5   everything that the company does an issue for public
6   consummation, that is not in the best interests of this
7   company.
8           THE COURT:  Well, I will need to keep this in mind the
9   next time someone pleads guilty in my court and I impose all
10  the standard requirements of supervised release, which almost
11  literally require the defendant, for example, in a drug case,
12  to report every time he goes to the bathroom, and I will now
13  know, this is a terrible invasion of his privacy, at least
14  under Delaware corporate law.
15          Go ahead.
16          MR. LEBOVITCH:  Your Honor, the fact is that the
17  company does report a wide range of incidents to the
18  government.  We've seen these lists and the way that the
19  government's informed.  I think what matters is this:  In fact,
20  a lot of conduct that turns out -- and may in fact turn out not
21  to be in any way improper, gets reported.  And that's just
22  because the standard for reporting is much stricter than the
23  standard for even necessarily doing an investigation.  However,
24  I don't agree with the privacy point, but what I do agree with
25  is, the government is out there, they're getting all this

30

```
     137kpfia                    Argument
 1   information --
 2            THE COURT:  I thought, by the way, apropos to that, I
 3   know we're drifting somewhat afield, but the Supreme Court just
 4   determined earlier this week that the privacy exemption of the
 5   Freedom of Information Act did not apply to corporations.
 6            MR. LEBOVITCH:  Well, your Honor, no, absolutely.  I
 7   think, to focus on the point about the disclosure, which,
 8   again, if your Honor wants them to disclose if they would agree
 9   to it, that's great as far as what the committee's
10   recommendations are, I don't know what our view would be on
11   disclosing every potential incident; however, the committee has
12   to make recommendations.  And our view is, there's a huge
13   hammer over the committee and the board, and it ties in the
14   government because what we've learned -- I did look to see how
15   the government focused on the senior officials at Pfizer,
16   actually researched how the government has approached senior
17   officials at other companies, we educated ourselves as part of
18   this case.  And what we see is that there's a recent
19   development, which is that the DOJ and the FDA are working
20   their way up the food chain, that they didn't do in the past.
21   Part liability is one avenue for this.
22            I think by requiring this committee to look at
23   information that in the past the board didn't necessarily have
24   to look at, by requiring the committee to get reports and
25   create reports that in the past didn't have to be created, and
```

31

137kpfia                        Argument
1  from different avenues -- there's management reports outside,
2  advisory reports, all of this stuff comes in, the government's
3  going to be aware of that.  I think for the committee or for
4  the board, because of the detail we put into the settlement,
5  for them to play games like improperly rejecting a
6  recommendation by the committee, I think they have a tough time
7  to reject any recommendations by five of their fellow board
8  members, they could be exposing themselves to liability.  The
9  DOJ and the FDA are all over them.
10         THE COURT:  Well, the objector -- I think there's a
11  lot of weight to that point, but the objector's point on that
12  score is, that's fine but this is a derivative lawsuit and we
13  should be concerned with protecting the shareholders.  And they
14  are left, in his view, with no hammer of the sort you say that
15  the regulatory authority has.
16         MR. LEBOVITCH:  Well --
17         MR. BLOCK:  Excuse me, your Honor.  That's just not
18  true.  As Mr. Lebovitch said before, there is something called
19  books and records.  A shareholder can get the committee minutes
20  of the regulatory committee by asking the Court for those
21  minutes.  So there is a means of oversight for that.  And
22  that's a simple request you ask for.  Mr. Bizar, in this very
23  case, got the minutes of the audit committee in connection with
24  his 220 request.  So they're not left homeless, so to speak,
25  they're not without a remedy.  There is no need to say that any
                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

137kpfia                    Argument

1   recommendation has to be subject to disclosure, because there
2   are going to be -- there's always the possibility of putting
3   pressure on the committee not to make recommendations only
4   because the recommendation might be a questionable one, it's
5   not all that clear, and we don't think it's appropriate to put
6   out into the public people's names where it's not -- you know,
7   they're not judges, they don't make decisions as to whether
8   people did it or didn't do it.  They make their best judgment
9   and their recommendation.  And if the board determines that
10  that recommendation, for whatever reason, doesn't make sense,
11  well, there is a majority of independent directors on the
12  board.  I agree with what Mr. Lebovitch said -- these are five
13  independent directors; if they make a recommendations, this
14  board is going to do it, period.  That's the way corporate
15  America works.  You have an independent committee with strong
16  independent directors; they make a recommendation, that
17  recommendation is going to be carried out.
18            MR. LEBOVITCH:  And, your Honor, the shareholders do
19  have a hammer here.  This is it's not just a large company but
20  it's held -- there's 8 billion shares.  71 percent of those
21  shares are held by institutions.  If we looked at the list of
22  who those institutions are, these are institutions that have
23  their own in-house corporate governance offices and whatnot.
24  Mr. Bizar says, well, what are shareholders going to do, bring
25  a derivative suit?  I think we're here because we did and our

33

137kpfia                        Argument

1    clients, our institutional clients, can bring a suit and the
2    220 action, I'll just say, if you've got a transcript that we
3    just got of Pfizer's counsel -- he can confirm that, but
4    Pfizer's counsel basically saying, oh, yeah, you can get the
5    minutes, if you hold the shares, make a demand, you can get the
6    minutes -- I think Pfizer would be hard pressed to challenge
7    the proper purpose in a shareholder who sends a little letter
8    and says, I would like to see the minutes.
9            So, again, it's part of the tradeoff, but I think
10   shareholders -- about 71 percent are institutions, they watch
11   Pfizer, they've seen the performance, it hasn't been great --
12   believe me if there's a hint of suspicion that this committee's
13   not doing what it's supposed to do or the board is not doing
14   what it's supposed to do, people have avenues.  And again,
15   disclosure can be good, disclosure of exactly what the
16   committee did can be good, but there's part of the tradeoffs,
17   there's a lot of other detail of what we got for the committee.
18   I consider them obligations.  This isn't powers.  The idea that
19   this committee is something that the Pfizer board or that the
20   company really wanted to bring on?  We negotiated this;
21   Mr. Berger negotiated this with Mr. Fiske and Mr. Block.
22           Sure, we reached agreement in the end, but you get
23   things because of leverage, and that's what we did.  And
24   there's a lot of detail in what we are imposing on a board,
25   obligations that there are five people on this board that now

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

34

137kpfia                        Argument

1   have to take on more of an obligation than they ever took on
2   before, changing the work that they do, very significant
3   things.  And so I do think there's tremendous value, even
4   independent of whether the annual report, which, again, is
5   required on the committee -- there's tremendous value in
6   saying, well, maybe that annual report doesn't require specific
7   line items.
8           Because I think when you open up just -- one final
9   thought -- I think if you open up to, well, you have to
10  disclose your recommendations, there could be other things,
11  once we open the door and say, well, you have to disclose which
12  are the high-risk drugs -- they have to see what the high risk
13  drugs are.  They get reports on three drugs that sell at more
14  than $500 million.  They get reports about qui tam suits, which
15  may be unsealed, even to Pfizer but the company always learns
16  something about them.  They got a lot of information from
17  different sources and I'm not sure where you can draw the line
18  on the comp.  And I think when you open it, you might have to
19  say everything they do -- essentially publicize their minutes,
20  and that's just not something we asked for.
21          THE COURT:  All right.
22          MR. BIZAR:  Yes, your Honor.  Please.
23          THE COURT:  Please, go ahead.
24          MR. BIZAR:  Mr. Block has mentioned a 220 procedure.
25  Let me tell you, I'm a veteran of 220 in Delaware, even up to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

```
        137kpfia                    Argument
 1      the Delaware Supreme Court.  It is a minefield.  It does not
 2      give the stockholder the information.  He has to battle through
 3      all kinds of motions and briefs and whatnot before he gets to
 4      see it --
 5              THE COURT:  Yeah, certainly that has been my
 6      experience in other cases.  Now, of course I only see, if you
 7      will, the contested situations.  So it may be that many, many
 8      times the material is turned over voluntarily, but in the cases
 9      in which it's been brought to my attention that a 220 request
10      was made, which is often raised in connection with the
11      defendants' own motion to dismiss -- there wasn't an adequate
12      basis to bring this lawsuit, they could have asked for 220
13      information, they didn't ask for it, and then it turns out that
14      they did pursue the 220 relief and were thwarted at every step
15      of the way through various time-consuming and expensive
16      litigation processes raised by the company.  I want to stress
17      I'm not talking about Pfizer here -- I'm talking about other
18      cases -- but I think there's something to that point that you
19      are making.
20              MR. BIZAR:  And is often edited, so that what you get
21      is not necessarily a complete picture.  At the end of the day,
22      your Honor, the issue is, if the regulatory committee sees that
23      X, Y and Z violated the law, why should it now be the board's
24      business judgment not to punish these X, Y and Z people by
25      getting a clawback of their compensation?  If you want
```

```
         137kpfia                    Argument
  1   adherence to the law, the FDA laws and rules and regulations,
  2   it seems to me compensation is the best way to ensure that
  3   compliance rather than business judgment, which covers a whole
  4   slew of things and allows at the end of the day Pfizer perhaps
  5   to be sued again by the U.S. Government.
  6              THE COURT:  So let's turn to the general
  7   considerations that the Court must reach.  Putting aside any
  8   view I may have with respect to the specific objections raised,
  9   in other respects, I had preliminarily already determined that
 10   this was a fair, reasonable and adequate settlement that met
 11   all the requirements, which I won't go through the litany now
 12   but which, when I issue the opinion, if I do approve the
 13   settlement, I will cover.  And I guess what I'm saying is that
 14   I don't need to hear a great deal on that subject now since I
 15   have your written submissions I have your previous arguments,
 16   there was preliminary approval and there's only been the single
 17   objection.
 18              On the other hand, it's only ten after 6:00, so we've
 19   got plenty of time.  So take as long as the want, but you may
 20   want to take not too much time.
 21              MR. LEBOVITCH:  Thank you, your Honor.  Well, I will
 22   try not to take too much time.
 23              Just since we finished with the objection there was
 24   one -- the one objection, someone with the 200 shares, there's
 25   no doubt that every shareholder has the right to object, but
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

37

137kpfia                        Argument

1   there's overwhelming support this was a very high profile case,
2   a high profile company and a very high profile settlement.  So
3   we're very confident that at least the 71 percent of the
4   company's shares held by institutions have been reviewed,
5   commented on.  These are people who read the papers that talked
6   about the settlement.  So you don't have any objections like
7   that.
8           Going to the other elements that I think are
9   considered:  This was a very aggressively litigated case.  In
10  fact, we had our hands full at the motion-to-dismiss argument
11  that your Honor remembers, and I remember fondly, we had our
12  hands full with Mr. Block and his team, and the DLA lawyers
13  were aggressive, very savvy, and their team.  And then after
14  the motion to dismiss, Pfizer brought in Bob Fiske and his
15  team.  So what happened --
16          THE COURT:  Well, of course this is always the great
17  irony -- we'll get back to this in part when we talk about
18  attorneys' fees in a few minutes, but there's always at this
19  stage the argument being made by plaintiffs' counsel, "this was
20  an impossible case, there were so many strong legal defenses,
21  all of which we previously ridiculed in our papers, that it's
22  amazing, and to the shareholders' great benefit, that we were
23  able to succeed at all."  And then we have the defense counsel
24  saying, "although we regard the allegations as completely
25  without merit, we thought it would be a nice thing to pony up

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
     137kpfia                    Argument
 1   $75 million just in the interests of settling this case."  So
 2   I've heard all that, but you can continue.
 3            MR. LEBOVITCH:  Your Honor, you're actually not going
 4   to hear that from me in the sense that I'll acknowledge that's
 5   a very high standard, I'll acknowledge that our adversaries are
 6   as skilled as they get and put up a fight, every day senior
 7   lawyers on every meet-and-confer, every discovery fight --
 8   there was a fight.  What you'll hear from me, your Honor, is,
 9   we earned every little bit of the settlement, in the sense that
10   we fought for it, we developed a record and, yeah, there was a
11   high standard.  But from day one we were preparing for trial,
12   and the defendants knew that.  And I don't think someone who
13   came in and I guess whined about the high standard or said, oh,
14   we'll never do it, they couldn't have done this.  And I really
15   think the settlement is that good and that's why people are
16   saying it's precedent-setting.  It's because we believed that
17   we were going to trial and we knew we were ready to go to
18   trial.
19            And I'll give you some things that aren't in the
20   papers, some examples of decisions we made that I think reflect
21   this.  But the defendants saw it when they saw these guys are
22   serious, they're really willing to take us to trial.  And when
23   they saw that there was real risk for them, that's when we got
24   this settlement.  And I know we lived it.  This was not
25   something that anyone willingly did.  We got the leverage,
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

137kpfia                          Argument

1   through our litigation efforts, to get this settlement and it
2   was hard.
3           THE COURT:  I'm sorry, it's my fault for opening up an
4   issue that relates more to attorneys' fees.  You were going to
5   go through the factors before we get to the issue of attorneys'
6   fees and I think probably we should deal with that first.
7           MR. LEBOVITCH:  OK, I will go through it.  The bottom
8   line, your Honor, is, every aspect of the case was very
9   aggressively litigated, which should give the Court comfort in
10  the judgments that we make.  Your Honor saw us even at the
11  preliminary approval hearing, and I think it's fair to say
12  there was a little bit of sniping.  But we don't agree on the
13  facts.  The documents that we got, we reviewed them in realtime
14  we had to be prepared to depose Ph.D.s, Nobel Prize winners,
15  CEOs of companies, a very well-heeled board, and we challenged
16  them.  We got through those documents, we challenged them.  We
17  took over 30 depositions.
18          And I mentioned that the defendants understood from
19  the beginning -- or at least at some point they learned we
20  really were taking this to trial.  And I think this goes,
21  again, to the approval of the settlement itself, in terms of
22  the procedural fairness.  It's not just how the settlement was
23  negotiated, which is the element that's discussed, but also how
24  it was litigated.
25          A couple of examples of things we did that really you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

137kpfia                    Argument

1    don't do if you're just trying to push a settlement and you
2    never have an intention to try the case:  We listed our
3    experts, your Honor.  What we didn't really identify in the
4    papers is, one of our experts was Dr. Richard Guarino -- he's
5    an expert, he's written an book about the FDA drug approval
6    process -- he gave a factual opinion about what the FDA does
7    and how they monitor drugs.  It has no pertinence to summary
8    judgment and it would never have been cited by anyone at
9    summary judgment.  I don't even know if Pfizer would disagree
10   with his opinion.  He was there for a jury.  And I think the
11   defendants probably figured that out at some point, as this is
12   someone who would explain a process at trial, not for summary
13   judgment.
14          Professor Black, who was our corporate governance
15   expert in the litigation, is not the person who gave affidavits
16   in connection with the settlement.  We wanted to keep him pure
17   for trial because up until the moment that we had settlement --
18          THE COURT:  Again, I apologize for interrupting,
19   because all that you say is relevant, but I wonder whether we
20   need to go down that road.  The heart of this lawsuit in its
21   original form sought basically two kinds of relief -- monetary
22   relief, which the Court precluded as a matter of law in effect
23   when it ruled that the unjust enrichment claim would not
24   survive, and perspective relief.  And what has been proposed
25   here by the parties jointly is a novel and, at least on paper,

41

137kpfia                    Argument
1    creative, in the most positive sense, way to deal with the
2    problems that have allegedly beset this company and its
3    subsidiaries for some years.
4            So it seems to me, from the standpoint of someone
5    who's asked to look at whether this settlement makes sense,
6    against the background of the claim that remained and the
7    purposes of the litigation and the ultimate responsibility that
8    this Court has in effect to the shareholders in the derivative
9    action, that the only reason why I would not approve this
10   settlement is if I felt it had been shown that it was either
11   window dressing or ineffective or camouflage of some sort.  And
12   for better or worse, that's what the objector is also saying as
13   well.  But short of that, it seems to me there's not much here
14   that you need to justify, so to speak, other than, I will darks
15   in any written opinion, go through all the elements required by
16   law.
17           MR. LEBOVITCH:  I think with that, your Honor -- if
18   your Honor has any questions --
19           THE COURT:  You took the hint.  Very good.
20           MR. BLOCK:  If I could very quickly echo what was
21   said, put it in terms of the Time Warner case, which tells the
22   Court, as you know, what the standard is for approving a
23   settlement in legal terms:  It's procedural fairness and it's
24   substantive fairness.
25           Procedural fairness:  As Mr. Lebovitch said, before,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

```
      137kpfia                    Argument
1     this was a hard-fought settlement negotiation that took place
2     after, totally after, all discovery in the case was concluded,
3     both factual and expert.  So both sides had before them all
4     facts that would be unveiled to the Court.  So you had a
5     knowledgeable group of people, representing very sophisticated
6     clients, negotiating the settlement.  Mr. Lebovitch's clients
7     are institutional holders who hold millions of shares of Pfizer
8     stock.  So because the procedural arm's-length negotiation was
9     what it was, I believe we satisfied that element.
10             Substantive fairness:  This is, according to former
11    Chancellor Allen of the Delaware Chancery Court, the most
12    difficult claim to prove, that is, failure of oversight by a
13    board of directors failing to prevent misconduct.  The risks of
14    failure, the risks that the case would be unsuccessfully tried,
15    are higher in this context than in any other context.  And as
16    we've said from day one in this case, we believe our defenses
17    were very, very strong, not just the defense of oversight where
18    the board was -- and I think even the information Mr. Bizar put
19    before your Honor showing what took place at board meetings,
20    shows this to be an attentive active board, attentive active
21    audit committee, and that defense would have been there as well
22    as the two additional defenses of reliance under 141(e) of the
23    Delaware statute which gives absolute protection to directors
24    who rely on officers and other experts within a company in
25    connection with advice given to the audit committee, which is
```

43

137kpfia                         Argument
 1   exactly what the record here would have shown.
 2           Additionally, 102(b)(7) of the Delaware statute says
 3   directors cannot be liable at least for monetary damages in
 4   connection with their oversight responsibilities unless they
 5   violate the duty of loyalty or get what the Court already
 6   dismissed in this case, which was an improperly earned benefit.
 7   So if one looks at the two components of the requirement for
 8   this Court to approve a settlement, procedural and substantive
 9   fairness, I think you couldn't find the situation where those
10   two concepts weren't more in play.  I think this was a very
11   hard-fought negotiation, with full knowledge by both sides of
12   the facts, and indeed a case that would have been very, very
13   difficult, as a matter of law, for the plaintiffs to prevail
14   on, with us saying then and us saying now that we had very
15   strong defenses and we don't believe there was any violation of
16   anything.  This board, in our view, performed exactly the way a
17   board is supposed to perform.  And the fact that they couldn't
18   stop all misconduct within the corporate --
19           THE COURT:  So why did you settle?
20           MR. BLOCK:  Your Honor, we had directors who we would
21   have had to put through a trial and explain to them that they
22   had a risk that there would be a judgment in excess of
23   $2.3 billion of their own personal money if we lost the case.
24   We did not have insurance to cover $2.3 billion in judgments.
25   Thus, it was unfair to these directors to put them through a
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

137kpfia                    Argument

1    trial where they would have been at that risk.  It was that
2    reason.  Plus, it was the directors' own view that the
3    settlement that was worked out by the lawyers for the
4    plaintiffs and the defendants made sense, it was a good idea,
5    did good things for the corporation and did no harm to anybody,
6    it was all positive, this is a win-win situation.  We have what
7    we believe are even better procedures than we had before, and
8    we formalized some very good procedures we did have.  So this
9    was something that was in the interests of the company and its
10   shareholders.
11         THE COURT:  Well, as usual, counsel for plaintiffs and
12   defendants are in total agreement on virtually nothing except
13   the bottom line.  And one trouble with any settlement, in any
14   high-visibility case involving issues that are of importance to
15   the public, as the issues in this case are, is that one will
16   never know who was right and who was wrong, either factually or
17   legally.  But that's not a reason for ever disapproving a
18   settlement, regretful though it may be.
19         There was an article, famous article, written about 25
20   years ago by Professor Fiss, Owen Fiss at Yale Law School, in
21   which he said no settlements should ever be approved -- in
22   fact, no settlement should ever be permitted of any lawsuit
23   that has any public interest aspect because it deprives the
24   public of knowing what the real truth was.  But that view, much
25   as I respect Professor Fiss, has not been seconded by virtually

```
            137kpfia                      Argument
    1   anyone, either in the academy or in the courts, because there
    2   is an equal benefit in having disputes that are brought to
    3   court by disputing parties, settled amicably.
    4            And what most caught my ear in Mr. Block's statement
    5   just a minute ago was the second reason he mentioned, which was
    6   this is a positive settlement from the company's standpoint in
    7   at way that many settlements are not.  In many settlements --
    8   class actions, for example -- the company wrongly, from its
    9   point of view, though rightfully obviously from the point of
   10   view of the plaintiffs, is paying out lots of money.  Here,
   11   it's taking prophylactic measures to prevent future potential
   12   recurrences of mistakes that may or may not have been made in
   13   the past.  And I think one of the more attractive aspects of
   14   this settlement is that forward-looking dimension; it's not
   15   just a case about money, to minimize money, but it's a case
   16   about what is in the public's interests as well as in the
   17   shareholders' interests as well as in the board's interests,
   18   which is, making sure that this company abides in the future by
   19   standards that for whatever reason appear not to have been
   20   meant in the past.
   21            So let's turn to -- I'm sorry, was there anyone else
   22   on the defense side who wanted to be heard?
   23            OK, let's turn to the issue of attorneys' fees.  I
   24   knew Mr. Berger would rise to that.
   25            MR. BERGER:  I didn't want Mr. Lebovitch to have to
                        SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300
```

137kpfia                         Argument

```
 1   bear that responsibility, your Honor.
 2           I realize the hour is late, your Honor, and if you'll
 3   bear with me for under ten minutes, I think I'll be done.  We
 4   respectfully submit that the requested fee is eminently fair
 5   and reasonable under the standards set by the Second Circuit
 6   for such fee awards.  But I will say that whatever your Honor
 7   decides with respect to the fee, I and my colleagues are
 8   extremely proud of the work that we and our co-counsel did to
 9   achieve this resolution.  Not that it's relevant, your Honor,
10   but it will stand, at least in my mind, as one of the
11   highlights of my career, in the sense that I do believe there
12   was something extraordinarily good accomplished by this
13   settlement.  And it is our hope that it will also form a
14   template for future settlements where regulatory and compliance
15   issues are at issue in cases.
16           So likewise, of course, we believe that the monies
17   expended to prosecute the case are reasonable under the
18   circumstances.  The Second Circuit standards are set forth in
19   the Goldberger decision, and they are addressed in our papers
20   in support of approval.  With the Court's permission, I would
21   like to briefly review them here.
22           THE COURT:  Well, let me -- because, again, and I
23   apologize, I'm familiar -- I think there are six standards
24   altogether and if I recall correctly, and you --
25           MR. BERGER:  I was just going to -- OK, sorry.
```

```
        137kpfia                    Argument
1                THE COURT:  It's just so you can know where my head is
2       at.
3                MR. BERGER:  OK.
4                THE COURT:  I have no doubt that plaintiffs' counsel
5       performed admirably in this case.  Like most judges, I've had
6       cases where I've had the misfortune to feel that plaintiffs'
7       counsel were extracting monies or requesting monies well above
8       the merits of what they had accomplished and the skill with
9       which they had performed.  That is certainly not true in this
10      case.  I've been very impressed by the work that plaintiffs'
11      counsel has done, in a case which, as defense counsel points
12      out, had many significant legal defenses, some of which already
13      resulted in dismissal of certain claims at the
14      motion-to-dismiss stage.  And yet, coming back to my favorite
15      theme, which is the public interest, this was a case where one
16      could well perceive a public interest in the case being brought
17      if the allegations were as represented.
18               The only thing that bothers me is that out of
19      $75 million, you're asking for approximately 30 percent of that
20      to go to legal fees, which means just that much less is left to
21      go for the purposes of this pioneering experiment.  And that's
22      what gives me a little pause.  And in some ways that's a little
23      bit different from the usual kinds of questions, although it's
24      not irrelevant, but if we talk about the benefit achieved, the
25      magnitude and complexity of the litigation, the risk of the
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

48

137kpfia                         Argument
1   litigation, the quality of the representation, counsel's time
2   and labor, and in the broader sense, public policy
3   considerations, I think you satisfy those terms.  But there's
4   lurking there the problem of taking away too much from the
5   ultimate achievement you've accomplished if too much of the
6   money goes for counsel's fees.  That's really the only concern
7   I have.
8           MR. BERGER:  Could I address that, your Honor?
9           THE COURT:  Sure.  That's why I raised it.
10          MR. BERGER:  So, your Honor, first, let me just set
11  forth, so far as the committee is concerned and the initial
12  funding of the committee:  If your Honor approved the fee that
13  was requested and the expenses that were requested, that would
14  still leave well over 50 million, roughly $51.5 million to fund
15  as initial funding for this regulatory committee but it doesn't
16  stop there.  Your Honor, if you take a look at the regulatory
17  committee, once that fund is exhausted, the regulatory
18  committee has the right to go to Pfizer and have Pfizer
19  continue its funding for its entire term, for whatever the
20  regulatory committee believes is necessary.
21          THE COURT:  That's a fair point, although the board is
22  not required to approve that request.
23          MR. BERGER:  Yes.  But I think, your Honor --
24          THE COURT:  I read in the New York Times today that
25  all the pharmaceutical companies are about to declare
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

49

137kpfia                         Argument
```
 1    bankruptcy because --
 2             MR. BERGER:  It's a problem.
 3             THE COURT:  -- they're losing all their patents.
 4             MR. BERGER:  I saw that too, your Honor.  But, again,
 5    focusing back again on the whole issue of transparency and the
 6    public nature of this regulatory committee and its exposure and
 7    the fact that the shareholders and everyone knows about it,
 8    it's hard to imagine that this regulatory committee, consisting
 9    of the prominent people that it will have on it from the board,
10    would actually go to the board and say, you know, we want money
11    to hire an expert, to hire outside lawyers, to hire others for
12    X, Y and Z reason, and that a board would say, sorry, the
13    spigot is off.  So that's one.  I just wanted to address that
14    one thing.
15             The second point on that is, your Honor, while we
16    try -- this is a subjective process, fee requests are a
17    subjective process, it's clearly -- we had to weigh and measure
18    what we thought was appropriate.  And understand that while the
19    percentage that we've requested, which I think is 29-point
20    something percent, is within the ranges approved by both your
21    Honor and other judges in the circuit, it also represents only
22    1.4 --
23             THE COURT:  Yeah, but I'm well-known to be a soft and
24    magnanimous judge.
25             MR. BERGER:  Well, I think your Honor has recognized
```
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

50

137kpfia                         Argument
1    30 percent as being appropriate.  This is under that.
2           But I think, more importantly, in those cases the
3    lodestar multipliers --
4           THE COURT:  Barely under it, but anyway --
5           MR. BERGER:  The lodestar multipliers were significant
6    to two and a half, almost three times.  We have 1.4 times our
7    time.  And, in addition, your Honor, that 1.4 -- those hours
8    were spent in a concentrated period of time where our firm and
9    our co-counsel and important lawyers at our firm were working
10   seven days a week, literally day and night, to try to
11   accomplish this result, so those were not easy hours.  And so
12   we thought that the multiplier was a very modest multiplier.
13          But I want to submit to your Honor that we're all
14   talking about the high visibility nature of this settlement,
15   and we recognize that, and clearly your Honor recognizes the
16   importance of what you have to do, in terms of the whole
17   approval process.  But I respectfully submit, this is a case on
18   behalf of the shareholders of Pfizer.  The current shareholders
19   of Pfizer.  And I just want to reiterate, there are 8 billion
20   shares outstanding.  70 percent of those shares are owned by
21   virtually every institutional investor in the world, not just
22   the United States, and many of those institutional investors
23   have their own in-house compliance people and departments and
24   general counsel, and they are not shy about objecting to
25   settlements, not shy about objecting to fees certainly.  And I

137kpfia                        Argument

1  think, considering the kind of criticism that has been leveled
2  at attorneys' fees in cases where the merits are
3  questionable -- these institutions have come in and attacked
4  those requests and those fees and the settlements and so on and
5  so forth -- it is literally extraordinary to me, quite
6  frankly -- but I understand why, and I have tremendous
7  gratitude about it -- that not one, not one of those
8  institutions, not one shareholder out of 8 billion shares
9  outstanding, has chosen to even write a letter to this Court
10 saying, we object to the fee.  Not one.  And only a 200-share
11 shareholder -- not to minimize the statements that the objector
12 has made, I think anybody and any shareholder, I'd be the first
13 one to argue, has a right to express themselves and we have to
14 defend our settlement on the merits just like we have to defend
15 our fee request on the merits, but it is quite extraordinary
16 that not one shareholder of all of them, despite the publicity
17 that this settlement and fee request have gotten, has not
18 chosen to file any sort of objection to the settlement.
19         So I just think, on the basis -- and I want to raise
20 one more point, your Honor, addressing your point of the
21 30 percent.  I respectfully submit that there are -- certainly
22 we're now at the convergence of both Delaware law and Second
23 Circuit law.  And most derivative settlements -- I shouldn't
24 say "most."  Many derivative settlements -- none have, I think,
25 the kind of relief that we've achieved here, but most

52

137kpfia                          Argument

1  derivative settlements involve corporate governance changes
2  that could be characterized as either real or not so real but
3  always involved the payment of a fee for nonmonetary relief,
4  OK.  And judges have to approve them.
5          I respectfully submit that if your Honor believes that
6  the relief that we've achieved with this regulatory committee,
7  which is nonmonetary relief, admittedly, quite aside from the
8  $75 million that we've achieved, which we believe is -- the fee
9  is justified enough alone, just from looking at that, but if
10  you take a look at the committee, I respectfully suggest to
11  your Honor it's like the MasterCard commercial, it's maybe not
12  priceless but it is worth a considerable amount because --
13          THE COURT:  I think that's a fair point.  The point
14  is, if this company were to engage again in misconduct that led
15  to its guilty plea, which however narrowly described, still led
16  to a $2 billion fine, the results for the company would
17  probably be catastrophic.  So what is being promoted as the
18  benefit of the settlement here, and which, frankly, the Court
19  is so far inclined to respect, is that it will be a real step
20  in preventing such misconduct in the future.  If that were to
21  be the case, the benefit to the shareholders would be, in real
22  monetary terms, huge.
23          Now, the objector has given me some issues that I need
24  to consider, so this is all said without prejudice to my
25  assessment of his objections.  But I think the point you're
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

53

137kpfia                    Argument

1   making is a good one, which is, the distinction between
2   monetary and nonmonetary relief in this particular context is
3   somewhat artificial.  The point of this settlement is to
4   prevent an economic financial catastrophe to the company in the
5   future because that's what would follow, almost certainly, if
6   it were to engage yet again in the alleged --
7               MR. BERGER:  That was both our hope, your Honor, our
8   expectation and, quite frankly, our motivation throughout the
9   days that we were prosecuting this case.
10              THE COURT:  Although I was struck by your reference to
11  the concurrence of Second Circuit law and Delaware law.  This
12  presumably -- I never knew an immovable object to be in
13  concurrence with an irresistible force, but anyway.
14              All right, anything else?
15              MR. BERGER:  I think -- thank you, your Honor, thank
16  you for listening.
17              THE COURT:  Thank you very much.  Anyone else want to
18  be heard on this issue?  All right, I will take all of this
19  sub judice.  Thank you very much.
20              COUNSEL:  Thank you, your Honor.
21                              * * *
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300