*** FOR PUBLICATION ***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | : |  |
| IN RE JOHNSON & JOHNSON | : | Civil Action No. 10-2033 (FLW) |
| DERIVATIVE LITIGATION | : | Civil Action No. 11-4993 (FLW) |
|  | : | Civil Action No. 11-2511 (FLW) |
|  | : |  |
|  | : | **OPINION** |
|  | : |  |
|  | : |  |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | : |  |

**WOLFSON,  United States District Judge:**

Presently before the Court is a motion to approve the final settlement reached between Plaintiffs-shareholders and nominal Defendant J&J Corporation ("J&J") in several consolidated shareholder derivative actions, as well as motions to intervene and dismiss by an objector to the settlement.  Through the settlement, J&J agrees to institute corporate governance changes and pay up to $10 million in attorney's fees and $450,000 in costs, subject to this Court's approval. For the following reasons, the Court will approve the settlement and appoint a special master to aid the Court in determining reasonable attorney's fees and costs.  The Court denies the objector's motions to intervene and to dismiss.

## I.      BACKGROUND

### A.      Overview

This consolidated shareholder derivative action is a merger of several suits—eight separately filed demand-futility suits[1], and two suits by plaintiffs who filed demand letters with

---

[1]      Calamore v. Coleman, et al., No. 10-cv-2033 (FLW); Carpenters Pension Fund of West Virginia v. Weldon, et al., No. 10-2275 (FLW); Feldman v. Coleman, et al., No. 10-

J&J requesting, <u>inter alia</u>, that J&J institute litigation against members of its Board of Directors ("the Board"), but these requests were refused.  I refer to these groups, respectively, as "Demand-Futility Plaintiffs" and "Demand Refused Plaintiffs."  I refer to all suits collectively as "the Derivative Suits."

For a more complete factual background leading up to the filing of these suits, as well as the substantive allegations of the demand-futility complaint, the Court refers to its prior opinion granting, without prejudice, J&J's motion to dismiss those complaints.  Suffice it to say here that the Demand-Futility Plaintiffs alleged that there were "red flags," such as Food and Drug Administration warning letters, that should have alerted the Board about three substantive categories of alleged corporate misconduct: (a) product recalls; (b) off-label marketing of drugs; and (c) illegal kick-backs.  Those plaintiffs further alleged that J&J failed to comply with current good manufacturing practices, referred to as "cGMP."[2]  The Demand-Futility Plaintiffs assert violations of Section 14 (a) of the Exchange Act, as well as breach of fiduciary duty claims against the Board.  The Demand Refused Plaintiffs assert similar claims.

**B.    Procedural History**

From February through November 2010, several J&J shareholders submitted demand letters to the Board, demanding that the Board investigate, institute litigation, and take other remedial action regarding, <u>inter alia</u>, J&J's product recalls, off-label drug marketing, illegal kick-back schemes, and lack of good manufacturing practices.  While these letters were in the process

---

2386(FLW); <u>Hawaii Laborers Pension Fund v. Weldon, et al.</u>, No. 10-2516 (FLW); <u>Ryan v. Weldon, et al.</u>, No. 10-3147 (FLW); <u>Minneapolis Firefighters' Relief Association v. Weldon et al.</u>, No.10-3215 (FLW); <u>Wollman v. Coleman, et al.</u>, No. 11-2511(FLW); <u>Cafaro v. Coleman</u>, No. 11-2652 (FLW).

[2]      Two of the demand-futility complaints—<u>Wollman</u> and <u>Cafaro</u>—also assert violations of the Foreign Corrupt Practice Act.

of being submitted, the Demand-Futility Plaintiffs filed their complaints, beginning with the first complaint filed on April 21, 2010 and ending with the final one filed on June 24, 2010.

Meanwhile, on April 22, 2010, the Board appointed a Special Committee, along with independent counsel, to consider the allegations of those shareholders who filed demand letters. The Special Committee was comprised of four independent directors who had recently joined the Board around the time the Committee was formed.  Although the committee initially considered only the first-filed demand letters, on June 15, 2010, the Board expanded the committee's mandate to include review of the allegations of the demand-futility complaints, along with any subsequently-received demand letters or derivative complaints.  See Report of the Special Committee at 2-3.

On July 19, 2010, while the Special Committee was considering the aforesaid allegations, three of the shareholders who filed demand letters (Leslie Katz, Jeffrey Tarson and Joan Tarson) moved to intervene in the demand-futility actions in which counsel had moved for leave to consolidate.  The demand-futility complaints were ultimately consolidated, by Order of this Court, on August 17, 2010.  In that same order, the Court appointed as co-counsel the following firms:  Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C., Morris and Morris Counselors at Law LLC, Robbins Geller Rudman & Dowd LLP, and Bernstein Litowitz Berger & Grossmann LLP.  Counsel stipulated to this arrangement, arguing that appointing them to a co-counsel organizational structure would ensure that their efforts were not duplicated and would streamline representation of all Demand-Futility Plaintiffs. After the Court consolidated the demand-futility actions, the motion to intervene was administratively terminated pending the Special Committee's decision.  The Demand-Futility Plaintiffs  then filed a consolidated amended complaint on December 17, 2010.  A few months later, on February 21, 2011, J&J filed a motion

to dismiss that complaint.

While the J&J motion to dismiss the demand-futility consolidated amended complaint was still pending, the Special Committee issued its report, on June 27, 2011. The Committee recommended that the Board not pursue litigation on behalf of J&J against any J&J Board member or executive. The Board subsequently adopted the Special Committee's recommendation on July 11, 2011.

In addition, the Board adopted a series of internal controls designed to ensure that quality control and other issues that underlay the allegations of wrongful conduct in the Derivative Suits were reported upstream to the directors. Specifically, the Board accepted the Special Committee's recommendation that the Regulatory and Compliance Committee be expanded in the following manner:

> [The Committee should be] authorized to retain outside expert consultants, to assist the Committee in its work as the need arises. Among other things, the Regulatory and Compliance Committee, in consultation with management and an expert consultant, should develop metrics and a report card that would provide insight into and perspective on J&J's Compliance systems and organizations. The new Committee should have an initial term of five years, commensurate with the McNeil Consent Decree. Members of the Special Committee will make themselves available to consult and confer with the members of the Regulatory and Compliance Committee, to provide the latter with the former's insights gained as a consequence of its investigation.

Report of the Special Committee at 121.

Once the Special Committee's report was filed, the Court granted the parties the opportunity to submit supplemental briefing on J&J's motion to dismiss. Thereafter, on July 28, 2011, the Court heard oral argument on the motion and reserved its ruling for a formal opinion. Also at the hearing, the Court addressed the previously-administrative terminated motion to

intervene by the Demand Refused Plaintiffs[3], and denied that motion.  Rather than consolidating those plaintiffs into the demand-futility action, the Court consolidated the suit brought by Leslie Katz, Jeffrey Tarson and Joan Tarson with one brought by another shareholder whose demand was refused—M.J. Copeland.  These actions, together, comprise the Demand-Refused Plaintiffs. The Court appointed Abraham, Fruchter & Twersky, LLP as lead counsel, and Kantrowitz, Goldhamer & Graifman, P.C., as liasion counsel, for this group of plaintiffs.

After thoroughly considering the parties' arguments and extensive briefing, on September 29, 2011, the Court issued a formal opinion granting J&J's motion to dismiss without prejudice.  The central question posed by the motion was whether the plaintiffs satisfied the Federal Rule of Civil Procedure 23.1 heightened pleading standard applicable solely to demand-futility actions.  In granting J&J's motion, the Court ruled that, while the complaint alleged the numerous "red flags" that the demand-futility plaintiffs believed should have alerted Board members to J&J's alleged malfeasance, the plaintiffs did not sufficiently allege that the specific Board members actually had knowledge of those red flags.

The plaintiffs engaged in settlement negotiations with J&J following oral argument on the motion to dismiss but before the opinion was issued.  Throughout the negotiations, the parties reviewed documents from their respective, multiple, experts and J&J provided informal discovery.  In the parties' initial negotiations, around August 31, 2011, Demand Futility Plaintiffs provided a settlement proposal to the Board that included both corporate governance reforms and a monetary payment to J&J.  Joint Decl., ¶ 53.  Demand Refused Plaintiffs also participated in the settlement negotiations.  Id. at ¶ 56.  However, once the Court granted J&J's

---

[3]     In administratively terminating the motion to intervene, the Court indicated that counsel could re-list the motion by way of letter request.  Counsel requested that the motion be

motion to dismiss on September 29, 2011, the Board was not willing to entertain a monetary component to the settlement and the negotiations from that point forward focused primarily on injunctive relief.  See id. at ¶ 53-54, 60-61.

After seven months of negotiations, the parties entered into a proposed settlement agreement on July 11, 2012.  Generally, Plaintiffs characterize these reforms as providing for adoption of management level systems and procedures designed to ensure early detection and remediation of all product-related issues.  Pl. Open. Br. at 2.  The key features of the agreement are: (1) the adoption of a Quality and Compliance ("Q&C") Core Objective; (2) the creation and adoption of a Regulatory, Compliance & Government Affairs Committee ("RCGC"); and (3) the implementation of a Product Risk Management ("PRM") Standard, directed at all J&J products.  Each of these components will be addressed in more detail below.

Plaintiffs then moved for preliminary approval of the settlement, which this Court granted by way of an Order dated July 16, 2012.  In that Order, the Court also directed that all shareholders be notified of the proposed settlement and given the opportunity to object.  The Court, further, set a final settlement hearing date of September 28, 2012.  Following the Court's order, Objector Mark Petri filed a motion to intervene in the Derivative Suits as well as a motion to dismiss, on August 31, 2012.

As the September 28, 2012 hearing date approached, the Court became aware that some individual investors had not received timely notice of the proposed settlement.  To ensure that objections by late-notified individual investors could be heard, the Court ordered a second round of notices and adjourned the approval hearing to October 18, 2012.

Altogether, the Court received 15 objections, mostly focusing on the amount of fees

re-listed by letter dated April 19, 2011.

sought by Plaintiffs' counsel and agreed to by J&J, and one request to opt out of the settlement. The consensus amongst the objectors was that, though they question the merits of the Derivative Suit and what precise benefit the corporate governance reforms confer, the settlement should be approved in order to prevent J&J from incurring further litigation costs.  Objector Petri raised more substantive challenges that will be discussed in connection with his motions to intervene and to dismiss.  A few additional objectors adopted Petri's substantive arguments as well.

The settlement approval hearing was held on October 18, 2012.  At the hearing, the Court heard argument from Plaintiffs and objections by Petri, who was represented by counsel.  No other objectors appeared.  After considering the parties' arguments, the Court indicated that it would approve the settlement and issue a formal opinion setting forth its reasons.  With respect to attorney's fees, the Court indicated that it would appoint a special master for reasons explained in the opinion.

### C.     Settlement Terms

As noted, the settlement includes:  J&J's adoption of the Quality and Compliance Core Objective, the creation of the Regulatory, Compliance & Government Affairs Committee; and (3) the implementation of a Product Risk Management Standard.  I provide a brief synopsis of each reform.

Q&C Core Objective

The Q&C Core Objective is a Board commitment to create quality control and assurance systems that will prevent, timely detect, and correct noncompliance with drug marketing laws, cGMP regulations, and the PRM Standard.  This objective is designed to remedy one of the core allegations in the Demand-Futility Plaintiffs' suit—that the J&J Board insulated itself from the reckless and lackluster quality control systems present in J&J subsidiaries.  One of the ways the

objective does this is by creating company-wide control and assurance systems that are designed to effectively supplement J&J's decentralized management approach.

According to Plaintiffs' governance and compliance expert, former SEC Chairman Harvey L. Pitt, the Q&C Core Objective achieves several goals that are significant.  First, the objective facilitates "the Board's full understanding of the importance of imposing rigorous health care compliance and quality systems ...."  Pitt Decl., ¶ 68.  Second, he opines that the objective confirms "the Board's commitment that J&J's operating companies must conduct their business activities in conformity with applicable laws, regulations, and internal policies ...."  Id. Third, he notes, the objective is "a Board-level direction" to the Company that it expects the Company to prevent and detect instances of noncompliance.  Id.  Similarly, Plaintiffs' pharmaceutical quality control and product risk management expert, Dr. Mitchell Glass, agrees that adoption of the objective provides substantial benefit to J&J by sending "an important message to the enterprise regarding tone at the top," and, further, acknowledges the importance of quality control systems at J&J.  Glass Report, ¶ 21.  Moreover, he finds it significant that the compensation and evaluations of J&J employees are tied to the objective.

Regulatory, Compliance & Government Affairs Committee

The RCGC, which is created by the settlement agreement, further assists the Board in overseeing J&J's compliance with drug marketing laws and cGMP on a more centralized basis. By way of example, the RCGC Charter and Operating Procedure ("C/OP") directs the Committee to assess the information it is receiving to support its oversight functions on an annual basis.   See Stipulation of Settlement, Ex. A, Section III., A. Charter, Oversight of Committee Matters, ¶ 3.  Under the C/OP, the Board must also annually review and approve J&J's "internal audit plans related to compliance and quality."  Id. at Duties and Responsibilities

of the Committee, ¶11.

Plaintiffs' expert, Chairman Pitt, opines that the creation of this committee is historic in that it is the first time a standing committee was created to provide oversight over J&J's compliance with regulations and internal policies.  Pitt Decl., ¶72.  He, further, highlights that this committee is comprised of at least three independent directors who should be unaffected by commercial pressures when carrying out their duties.  Id. at 93.  In his view, the committee will also unify the oversight of legal and regulatory compliance, and quality control, over J&J's numerous operating companies.  Id.  Dr. Glass adds that the creation of the committee constitutes a best practice, and helps "provide a crucial foundation to support the robust implementation of [J&J's internal controls, like the PRM Standard discussed below] and to empower key executives . . . within the organization."  Glass Report,  ¶32.

Product Risk Management Standard

Per the Stipulation, J&J agrees to design and implement a new PRM Standard, mandatory for all J&J subsidiaries.  The PRM Standard is comprised of a Quality Policy and Quality Framework.  Among other things, the standard will "set forth the independence and role of Quality personnel in the PRM process, and provide that all quality issues subject to the PRM Standard will be managed in accordance with the escalation reporting line defined in the Quality Policy."  Stipulation of Settlement, Ex. A, Section IV., A. New PRM Standard, ¶ 1.  The design and implementation of the PRM Standard will rest with J&J's Chief Quality Officer ("CQO").  He or she will, further, ensure that specific standards applicable to certain business sectors are designed and adopted.  Id.  The independent Enterprise Regulatory Compliance Group will serve as an additional oversight over the CQO.  Id.

Having set forth the relevant background, I now turn to the parties' motions.  Currently,

there are three motions before the Court: (A) a motion for final approval of settlement by the shareholder Plaintiffs, including the award of $10 million in attorney's fees and $452.016.76 in costs; (B) a motion to intervene by Objector Mark Petri; and (C) a motion to dismiss by that same objector.   I address Mr. Petri's motions first and, thereafter, turn my attention to the fairness of the proposed settlement and the requested attorney's fees.

## II.   MOTIONS TO INTERVENE AND DISMISS

Federal Rule of Civil Procedure 24 governs motions to intervene.   Objector Mark Petri argues that he is entitled to intervene as of right for the purpose of asserting that the named plaintiffs do not adequately represent the class and, therefore, that the class action should not be certified and the suit dismissed.   Alternatively, he moves for permissive intervention for the limited purpose of preserving his appellate rights.

### A.   Intervention as of Right

Subsection (a) of Federal Rule of Civil Procedure 24, which addresses intervention as of right, provides:

> On timely motion, the court must permit anyone to intervene who:
> (1) is given an unconditional right to intervene by a federal statute;
> or (2) claims an interest relating to the property or transaction that
> is the subject of the action, and is so situated that disposing of the
> action may as a practical matter impair or impede the movant's
> ability to protect its interest, unless existing parties adequately
> represent that interest.

Fed.R.Civ.P. 24(a).

The Third Circuit has interpreted Rule 24(a)(2) to require proof of the following four elements from the applicant seeking to intervene: first, a timely application for leave to intervene; second, a sufficient interest in the litigation; third, a threat that the interest will be impaired or affected, as a practical matter, by the disposition of the action; and fourth, inadequate

representation of the prospective intervenor's interest by existing parties to the litigation. Kleissler v. U.S. Forest Service, 157 F.3d 964, 969 (3d Cir. 1998). "Failure to satisfy any one of these requirements is a sufficient ground to deny the application."   In re Bank of New York Derivative Litig., 320 F.3d 291 (2d Cir. 2003) (quoting Catanzano by Catanzano v. Wing, 103 F.3d 223, 232 (2d Cir. 1996) (internal quotation marks omitted).

Plaintiffs do not dispute the first prong, i.e., the timeliness of Petri's motion to intervene. Nor do they dispute the third prong—whether there is a threat that the proposed intervenor's interest will be impaired or affected, as a practical matter, by the disposition of the suit.

While these two prongs are met, Petri does not satisfy the second or fourth prongs. The second prong asks whether the proposed intervenor has a sufficient interest in the litigation. Courts in the Third Circuit have held that shareholders with only an economic interest in the outcome of the litigation do not have "sufficient interest," reasoning that

> allowing a current shareholder to intervene in a securities class action settlement merely because the value of the common stock may be diluted would set a very dangerous precedent because it would sanction the intervention of any stockholder in any suit in which the trust or corporation whose stock the stockholder owns is a party .... The logical result of this would be that a corporation could not prosecute or settle any suit by or against it without obtaining the approval of every shareholder (and perhaps every holder of a debt instrument as well). Clearly the corporate entity was never intended to be so limited in its ability to make decisions and to act on them.

In re Cendant Corp. Sec. Litig., 109 F.Supp.2d 273, 277 (D.N.J. 2000) (quoting Kusner v. First Pennsylvania Corp., 74 F.R.D. 606 (E.D.Pa. 1977), aff'd, 577 F.2d 726 (3d Cir. 1978) (Table); Landy v. Federal Deposit Ins. Corp., 486 F.2d 139 (3d Cir. 1973); Swanson v. Traer, 249 F.2d 854 (7th Cir. 1957); and Levin v. Mississippi River Corp., 59 F.R.D. 353 (S.D.N.Y.), aff'd, 486 F.2d 1398 (2d Cir. 1973)) (internal quotation marks omitted).   Cf. Liberty Mut. Ins. Co. v.

11

Treesdale, Inc., 419 F.3d 216, 222 (3d Cir. 2005) (concluding that party seeking proceeds from insurance company could not intervene as of right in insurance coverage dispute between company and third party because they had only a "mere economic interest in the outcome of litigation").  See also In re Community Bank of Northern Virginia, 418 F.3d 277, 315 (3d Cir. 2005) ("[W]e are in no way suggesting that absent class members who merely express dissatisfaction with specific aspects of the proposed settlement or that attorneys (who, after finding one or more class members as clients, and wish to share in the forthcoming fee), have the right to intervene.")

Petri relies on the Seventh Circuit's recent decision in Robert F. Booth Trust v. Crowley, 687 F.3d 314 (7th Cir. 2012), which held that an objecting shareholder was entitled to intervene as of right.  Review of Crowley makes clear, however, that the basis of the court's ruling was that, under Seventh Circuit law, "the only way [an objecting shareholder] can get appellate review is to become a party."  Id. at 318.  The Third Circuit has no such rule, see In re Rite Aid Corp. Securities Litig., 396 F.3d 294, 298 (3d Cir. 2005), thus, Crowley's analysis does not attend here.  Moreover, Petri acknowledged at oral argument that, under Third Circuit law, he does not need to intervene in order to preserve his appellate rights.  Hrg. Tr. 28:24-29:5.

In addition, to the extent that Petri argues he should be granted intervention in order to pursue dismissal of the suit, courts have denied motions to intervene where the movant's sole interest is in dismissing an action.  See, e.g., Glover v. Ferrero USA, Inc., Civil Action No. 11–1086, 2011 WL 5007805, at *6 (D.N.J. 2011); Worthington v. Bayer Healthcare LLC, Civil Action Nos. 11–2793, et al., 2011 WL 6303999, at *6 (D.N.J. 2011).[4]

---

[4]        Petri also cites to In re Community Bank of Northern Virginia, 418 F.3d 277 (3d Cir. 2005), which states that "[i]n the class action context, the second and third prongs of the

As for the fourth prong of the intervention analysis, that prong addresses whether the prospective intervenor's interest is adequately represented by existing parties to the litigation. Representation will be considered inadequate where, "although the applicant's interests are similar to those of a party, they diverge sufficiently that the existing party cannot devote proper attention to the applicant's interests." Brody v. Spang, 957 F.2d 1108, 1123 (3d Cir. 1992). In other words, "the proposed intervenor must ordinarily demonstrate adversity of interest, collusion, or nonfeasance on the part of a party to the suit." In re Community Bank, 418 F.3d at 315.

Petri argues that his interests are not adequately represented by the named shareholders and is, indeed, contrary to their interest as he seeks outright dismissal of the Derivative Suits in order to save J&J from incurring further litigation costs. Although Petri contends that his ultimate objective is to dismiss the suit, in more general terms, his objective (as is the objective of all shareholders) is for the corporation to succeed, comply with governing laws, and be profitable. Keeping this larger objective in mind, Petri's interests are not unaligned with the named plaintiffs. Rather, his dispute with the named plaintiffs boils down to litigation and management strategy—he would have preferred that the suit not have been brought. However, "[t]hat [intervenors] would have been less prone to agree to the facts and would have taken a different view of the applicable law does not mean that the [current parties] did not adequately represent their interests in the litigation." Pennsylvania v. Rizzo, 530 F.2d 501, 505 (3d Cir.

---

Rule 24(a) . . . inquiry are satisfied by the very nature of Rule 23 representative litigation." Id. at 314. Shareholder derivative litigation, however, differs from the garden variety class action in that derivative actions are brought on behalf of the corporation, thus, the named shareholders are not parties to derivative suits who serve to represent the interests of the non-named shareholders. Felzen v. Andreas, 134 F.3d 873, 875-76 (7th Cir. 1998). Rather, they stand in the shoes of the corporation itself. Accordingly, I do not find In re Community Bank's reasoning on the second

1976) (internal quotations omitted).

In addition, most adequacy of representation contentions involve derivative plaintiffs who fail to vigorously prosecute the claim against the Board, or who are so antagonistic to a non-named plaintiff shareholders that they "disregard their interests."  Greco v. Local.com Corp., 806 F.Supp.2d 653, 658-59 (S.D.N.Y. 2011).  Here, in contrast, Petri appears to argue that the named plaintiffs have disregarded his interest in having the suit dismissed, yet he acknowledges that settling the suit will have the same effect of freeing J&J from incurring any additional litigation costs.  Thus, whether through dismissal or settlement, his goal of decreasing losses will be realized.  This demonstrates that his interests are not "disregarded" by the named plaintiffs. Moreover, in acknowledging that settlement also benefits the corporation, Petri reveals his true point of contention—the amount of attorney's fees sought by Plaintiffs' counsel.  As noted, Petri does not need to intervene in order to voice his objection to fees, and I will consider these objections in detail below.

To the extent Petri hinges his motion on alleged collusion between class counsel, the named plaintiff-shareholders, and J&J, he must do more than simply point to an agreement to a sizeable fee award; he points to no facts in the record to support his contention.  See In re Community Bank, 418 F.3d at 315 (declining to find, based solely on proposed intervenor's assertion, that collusion existed where class counsel "failed to assert, inter alia, what appear to be facially viable TILA and HOEPA claims, conducted no formal discovery, and negotiated an extremely generous fee" but remanded to district court to develop a "full record" on the issue of adequate representation); Salovaara v. Jackson Nat. Life Ins. Co., 246 F.3d 289, 297 (3d Cir. 2001) ("Salovaara has not shown the existence of any improper collusion or bad faith in reaching

prong dispositive here.

14

this [derivative settlement] Agreement.") (emphasis added).  Moreover, case law explains that there are other remedies available to Petri "if he believes [the Board] breached a duty towards the shareholders by entering into the Settlement."  Salovaara, 246 F.3d at 297.

In short, through his role as an objector, Petri can protect his own interests in challenging the fairness of the proposed settlement.  As a J&J shareholder, he, like any other "class member may object to a propos[ed settlement] ....," Fed.R.Civ.P. 23(e)(5), and, if unsuccessful in challenging the settlement, he may appeal.  Indeed, he has filed a separate objection that the Court will consider in addressing the merits of the settlement.  And, Petri acknowledged at oral argument that his objections mirror the substantive arguments he would advance as an intervenor.  Hrg. Tr. 29:6-10.   Accordingly, Petri's motion to intervene as of right is denied.

### B.    Permissive Intervention

Pursuant to Fed. R. Civ. P. 24(b), a person or an entity, who is not a named party in an action, may seek to intervene in the interested litigation.  See PA Prison Soc. v. Cortes, 622 F.3d 215, 232 (3d Cir. 2010).  Rule 24(b) provides:

> [U]pon timely application anyone may be permitted to intervene in an action ... when an applicant's claim or defense and the main action have a question of law or fact in common .... In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

Fed. R. Civ. P. 24(b).  In short, then, a proposed intervenor must show that: (1) its motion is timely; (2) it has questions of law or fact in common with the anchoring suit; and (3) intervention will not cause undue delay or prejudice for the original parties.  If a third party can satisfy all of these requirements, the court may, in its discretion, grant that third party permissive intervention.

I will not grant Petri permission to intervene under Rule 24(b).  For one, as stated above,

Petri does not need to intervene in order to perfect his right to appeal.  Moreover, granting Petri's motion to intervene will cause some delay in requiring this Court to render a decision on his motion to dismiss.  In addition, were his motion to dismiss granted, it would prejudice the adjudication of the rights of the original parties—all of whom seek to settle the instant litigation rather than have it dismissed.  As noted, J&J has filed a motion to dismiss the Demand Refused Plaintiffs' complaint, yet, while that motion was pending, entered into the instant settlement.  Thus, it is clear that both parties favor an amicable resolution to this matter.  Furthermore, addressing Petri's motion to dismiss would add "superfluous and add unnecessary complexities that could potentially cause undue delay in the resolution of this case" as the substantive challenges raised in his motion can be addressed as objections to the settlement.  PA Prison Soc. v. Cortes, 622 F.3d 215, 232 (3d Cir. 2010).  As noted, Petri conceded as much at oral argument. Finally, while Petri's challenges certainly share common questions of fact with the derivative suit, this commonality undermines application for permissive intervention, because this is not a situation where he seeks to intervene to assert his own rights.  Rather, he seeks to assert the rights of J&J, whose interests are already represented by the Board.  Accordingly, Petri's request to intervene pursuant to Rule 24(b) is denied.

Having denied Petri's motion to intervene, I do not reach his motion to dismiss.  As suggested above, I treat the substantive challenges he raises in his motion as objections and address them in connection with my ruling on the fairness of the proposed settlement.  To that issue, I now turn.

## III.    MOTION TO APPROVE SETTLEMENT

Under Federal Rule of Civil Procedure 23.1, parties to a shareholder derivative action must obtain the Court's approval to settle.  The Court must find that the settlement is "fair,

adequate, reasonable and proper, and in the best interests of the class and the shareholders." Bell Atlantic Corp. v. Bolger, 2 F.3d 1310, 1317 (3d Cir. 1993). While the shareholders' interest is relevant, the Third Circuit has made clear, that the "principal factor" to be considered "is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." Shlensky v. Dorsey, 574 F.2d 131, 147 (3d Cir.1978) (citations omitted).

A.      Settlement Approval Standard

To assess the fairness of the settlement, the Court must consider the following factors, referred to by courts as the "Girsh" factors:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the shareholders to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the derivative action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement agreement in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

Girsch v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975) (quotation omitted); see also Shlensky, 574 F.2d at 147 (applying the Girsh factors in the context of a shareholder derivative action). Ultimately, the decision to grant or deny approval of a settlement rests within the discretion of the Court, Shlensky, 574 F.2d at 147, and the Court "is free to consider other relevant circumstances and facts involved in [the] settlement." Plymouth County Contributory Retirement System v. Hassan, Civ. Action No. 08-1022 (DMC), 2012 WL 664827, at *2 (D.N.J., Feb. 28, 2012).

Before turning to may application of the Girsh factors, I first explain what distinguishes shareholder derivative actions from the typical class action.

> Derivative suits are the procedural mechanism to enforce state fiduciary duty law.  In a derivative suit, the corporation is the functional plaintiff-that is, the real party in interest-and the allegations are that the corporation's current or former officers and directors breached their fiduciary duties to the corporation.  Any recovery in a derivative suit is returned to the corporation.  In a derivative suit, despite the fact that the suit is brought in its name, the corporation's role is limited because shareholders, whom I will call derivative plaintiffs, file these suits on behalf of corporations.  The law gives shareholders this power because corporate officers and directors, who normally decide whether corporations should file lawsuits, are often implicated in the alleged wrongdoing and cannot be trusted to make unbiased decisions regarding the merits of these suits.

Jessica Erickson, Corporate Governance in the Courtroom: An Empirical Analysis, 51 Wm. & Mary L. Rev. 1749, 1756 (2010).

To the extent that there are monetary damages awarded in a shareholder derivative suit, that money comes from the individual officers and directors (i.e., the corporation's officer and director insurance) and is deposited into the corporation's coffers.  In re Pittsburgh & L. E. R. Co. Securities and Antitrust Litig., 543 F.2d 1058, 1068 (3d Cir. 1976) ("The proceeds of the action belong to the corporation and it is bound by the result of the suit.") (quoting Ross v. Bernhard, 396 U.S. 531, 538, 90 S.Ct. 733, 738, 24 L.Ed.2d 729 (1970)).  This creates an indirect benefit to the shareholders but, unlike typical class actions, shareholder derivative actions do not involve a "common fund," or pool of money, that must be distributed to members of the class.  See generally William Meade Fletcher, Derivative v. "Pure" Class Action, 12B Fletcher Cyc. Corp. § 5908 (2012).

That said, shareholder derivative suits are far less likely to involve a monetary component than typical class action suits. Erickson, supra at 1804.  Indeed, an empirical study of shareholder derivative actions concluded that the overwhelming majority of settlements result solely in

corporate governance changes like those presented here.  Id.  Experts and scholars dispute the value of such changes, and I will address that issue in connection with my analysis.

In addition, the total amount of attorney's fees payable by the plaintiff corporation, in most instances, greatly outweighs those paid by a defendant corporation in typical class action. In the typical class action suit, an unsuccessful corporate defendant pays its own attorney's fees plus any fees due plaintiffs' counsel under fee-shifting statutes.  Where there is no fee-shifting statute, and the case settles, the defendant will often agree to pay plaintiffs' counsel fees as part of the settlement.  Conversely, for shareholder derivative suits:

> First, the corporation has to hire lawyers to represent the corporation's interests in the litigation. Second, the corporation often has to pay the legal bills of its officers and directors pursuant to indemnification agreements. Third, . . . corporations often form a special litigation committee [("SLC")]to investigate the allegations in the suit. The cost of forming such a committee can dwarf the other expenses in the litigation because SLCs typically hire a law firm with no connection to the case to ensure the firm's independence, and the law firm then commences a full-blown investigation, complete with extensive document review and interviews of dozens of people close to the alleged events. Fourth, the corporation incurs additional indirect costs when its key personnel have to divert attention from other corporate duties to assist with the litigation. These costs can be considerable, . . . on average, more than six law firms [are] involved in [the] lawsuit.

Erickson, supra at 1085.

In light of the unique characteristics of shareholder derivative actions, and the potential for abuse and collusion inherent in cases that involve large attorney's fee awards, I probe the settlement terms here carefully to examine whether the specific reforms agreed to here result in a fair settlement to the corporation.  To that end, I now turn to my application of the Girsh factors.

**B.     Girsh Factors**

Applying the Girsh factors here, I conclude that, taken together, they favor approval of

the settlement.

### 1.    Complexity, expense and likely duration of the litigation

The first factor involves a consideration of the "probable costs, in both time and money of continued litigation." In re Cendant, 264 F.3d at 233.  As an initial matter, I note that shareholder derivative actions are, by their nature, "undeniably complex." Unite Nat. Retirement Fund v. Watts, Civil Action No. 04-3603 (DMC), 2005 WL 2877899 at *3 (D.N.J. 2005).  This is particularly true here, as J&J's decentralized management structure necessitates delving into the practices and records of several of J&J's 250 subsidiary corporations.

Moreover, if the Derivative Suits were to proceed, it would involve extensive discovery and trial preparation.  While the parties engaged in motion practice and settlement discussions, the Court stayed discovery.  Hence formal discovery has not even begun.  That said, the parties did engage in informal discovery, including the production of documents relevant to corporate governance and compliance, see Joint Decl., ¶ 62.  Thus, some of the discovery costs have already been incurred by the corporation.  Nevertheless, given the complexity of the legal issues and that many of the allegations relate to J&J subsidiaries located in various regions of the country and world, this litigation has the potential to be both time-consuming and expensive for the parties.

In addition, expert fee expenditures are likely to increase.  For example, the record reveals that the Demand-Futility Plaintiffs' co-counsel Morris and Morris LLC has already incurred $200,700.00 in expert fees, Morris Decl., Exh. 2, and demand refused counsel Abraham, Fruchter & Twersky, LLP has incurred $21,282.75 in expert fees, Abraham Decl., Exh. 2.  Although these amounts relate, in part, to the use of experts in the settlement negotiations, see Joint Decl., ¶ 64, should Plaintiffs ultimately prevail, additional testimony and

reports will be required at the damages stage of litigation.  This will result in further, hefty litigation costs.

Furthermore, there would be significant motion practice.  Although J&J succeeded in its initial motion to dismiss against the Demand-Futility Plaintiffs, should the suit progress, Plaintiffs would file an amended complaint.  Because J&J has been steadfast in its assertion that it did not engage in culpable conduct, and that its directors are protected by J&J's exculpatory charter, it would undoubtedly file a second motion to dismiss that complaint.  Then, if the Derivative Suits were to proceed beyond the pleading stage, J&J would likely file summary judgment motions against the Demand-Futility Plaintiffs as well.  With regard to the Demand Refused Plaintiffs, J&J has also filed a motion to dismiss against them, which was stayed pending settlement negotiations.  Finally, the post-trial motion and the appeals process would further extend the length of the litigation.  Accordingly, a significant amount of money and resources would be required to pursue this litigation to a final judgment, which would ultimately delay final resolution of the suit and require J&J to incur additional attorney's fees for its own counsel.  Taking into consideration each of these likely costs, I conclude that this factor favors settlement.

## 2.    The Reaction of Class Members

There are over 380,728 J&J shareholders, yet the Court has received only 15 objections.[5] The substance of these objections will be addressed below, but suffice it to say here that many of the objections focus on Plaintiffs' request for attorney's fees as opposed to the fairness of the settlement itself.  For the purpose of this factor, the few objections made to the underlying

_____

[5]        In addition, David K. Stricker and Judith M. Stricker jointly filed a letter asking the Court to "take [their] name[s] out of this class action suit."  See Stricker Ltr. dated Sept. 22,

settlement from the class members as compared to the potential number of class members creates a presumption that this factor weighs in favor of settlement.  In re Cendant, 264 F.3d at 235 ("The vast disparity between the number of potential class members who received notice of the Settlement and the number of objectors creates a strong presumption that this factor weighs in favor of the Settlement").

Indeed, under Girsch, such a small number of negative responses favors approval of a class action settlement.  See, e.g., Stoetzner v. U.S. Steel Corp., 897 F.2d 115, 119 (3d Cir. 1990) (objections by 29 members of a class comprised of 281 "strongly favors settlement"); In re Prudential Ins. Co. of America Sales Practices Litig., 962 F.Supp. 450, 537 (D.N.J. 1997)(small number of negative responses to settlement favors approval); Weiss v. Mercedes-Benz of North America, 899 F.Supp. 1297, 1301 (D.N.J. 1995) (100 objections out of 30,000 class members weighs in favor of settlement).

At the settlement approval hearing, the Court further noted that none of the objections have been made by institutional investors.  Objector Mark Petri argued that the Court should not draw any conclusion from the failure of institutional investors to object because "it would be economically irrational [for such an investor] to spend $50,000 on an attorney and their experts to come in and object to the settlement."  Hrg. Tr. 24:21-23.  Thus, in Petri's view, this factor should not weigh heavily in the Court's fairness evaluation.  As noted at the hearing, however, an institutional investor could simply spend $1.32 on postage to send a letter objection, just as the few individual investors did here.

That said, the Third Circuit has indicated that "the practical realities of class actions has led a number of courts to be considerably more cautious about inferring support from a small

2012, Civil Action No. 10-2033, Docket Entry No. 211.

22

number of objectors to a sophisticated settlement." In re General Motors Corp., 55 F.3d 768, 812 (3d Cir. 1995) (citing In re Corrugated Container Antitrust Litig., 643 F.2d 195, 217–18 (5th Cir. 1981)).  As noted, derivative litigation is, by its nature, complex and the Derivative Suits, in particular, involve complex issues involving federal statutes and regulations.  In addition, the typical investor may not possess the tools with which to value injunctive relief such as corporate governance reforms.  Thus, while the small number of objectors still favors approval, accord McLennan v. LG Electronics USA, Inc., Civil Action No. 10-3604, 2012 WL 686020, *6 (D.N.J. Mar 02, 2012) (concluding that 107 opt-outs out of 418,411 class members favored approval of class action settlement), Chakejian v. Equifax Information Services, LLC, 275 F.R.D. 201, 212 (E.D.Pa. 2011) (concluding that a total of 9 opt-outs and objections out of 40,000 favored settlement), I do not place great weight upon this factor in light of the sophisticated nature of the suit and the valuation problems inherent in the injunctive relief that makes up the substance of the settlement here.

### 3.    The Stage of Proceedings and the Amount of Discovery Completed

This factor "captures the degree of case development that class counsel have accomplished prior to settlement.  Through this lens, courts can determine whether class counsel had an adequate appreciation of the merits of the case before negotiating." In re Cendant, 264 F.3d at 235 (citations omitted).  Even settlements reached at a very early stage and prior to formal discovery are appropriate where there is no evidence of collusion and the settlement represents substantial concessions by both parties.  Weiss, 899 F. Supp. at 1301 (discussing General Motors, 55 F.3d at 790-92).  Indeed, courts in this district have approved settlements while the case was in the pre-trial stage and formal discovery had not yet commenced.  See, e.g., O'Brien v. Brain Research Labs, LLC, Civ. Action No. 12-204 (Schwartz, J.), 2012 WL 3242365

23

at *17 (D.N.J. Aug. 9, 2012 ); <u>Watts</u>, 2005 WL 2877899.  The Third Circuit has further indicated that, when a case is settled at an early stage, this factor may strongly favor approval if the liability case against the defendant is clear.  <u>In re Cendant</u>, 264 F.3d at 236.

As noted, formal discovery has not begun in the Derivative Suits.  However, the parties have engaged in informal sharing of documents relating to J&J's corporate governance structure. This document sharing enhanced Plaintiffs' counsel's appreciation of the strength of their cases. In addition, the parties have engaged in extensive motion practice regarding the Demand-Futility Plaintiffs' complaint, which further shaped counsel's appreciation of the merits.  <u>Accord</u> <u>Weber v. Govt. Employees Ins. Co.</u>, 262 F.R.D. 431, 445 (D.N.J. 2009).  Although J&J has filed a motion to dismiss against the Demand Refused Plaintiffs which was not adjudicated, it nonetheless informed Plaintiffs' counsel of J&J's potential defenses to liability.  <u>Id.</u>

Apart from documents shared through litigation, Plaintiffs counsel also reviewed news reports, securities analyst reports, J&J public filings with the Securities and Exchange Commission ("SEC"), and court documents in related cases.  In addition, counsel submitted a Freedom of Information Act request to the Food and Drug Administration, and reviewed the documents produced in response.  Those documents relate to the problems at J&J subsidiary McNeil Consumer Healthcare and the January 15, 2010 FDA warning letter sent to McNeil. Joint Decl., ¶ 37.  As explained in more detail in my decision on J&J's motion to dismiss the demand futility complaint, the FDA warning letter is one of the central documents related to Plaintiffs' breach of fiduciary duty claims against the Board.

Furthermore, Plaintiffs' counsel consulted with experts and reviewed the Special Committee's findings.  For example, counsel in one of the demand futility actions worked with Dr. Glass in drafting their allegations relating to off-label drug marketing.  Joint Decl., ¶ 21.  In

addition, Demand Refused Counsel engaged Dr. Robert Israel, a pharmaceutical company senior vice-president with responsibility over compliance issues, who assisted counsel in preparing their settlement demands.  Id. at ¶¶ 56-57.

Based on all of Plaintiffs' counsel's research, the Court finds that counsel had sufficient information to make an informed decision regarding settlement.  The Court recognizes that there has not been a ruling on J&J's liability as the Court's prior opinion dealt only with whether the Demand-Futility Plaintiffs had pled sufficient facts to justify their decision to file suit without first demanding action from the Board, and J&J has not admitted wrongdoing.  Nevertheless, in light of the abundance of publically available documents that call into question J&J's oversight practices, the informal discovery exchanged, the motion adjudicated and papers filed in the motion to dismiss the demand refused complaint, I conclude that this factor weighs in favor of approval.

### 4-5.     Risks in Establishing Liability and Damages

The fourth and fifth factors "survey the potential risks and rewards of proceeding to litigation in order to weigh the likelihood of success against the benefits of an immediate settlement."  In re Warafin, 391 F.3d at 537.  In other words, these factors attempt "to measure the expected value of litigating the action rather than settling it at the current time."  In re Cendant, 264 F.3d at 238.  Both factors strongly weigh in favor of approval in this case.

Here, Plaintiffs face significant hurdles in proving their cases.  J&J succeeded in its motion to dismiss against the demand-futility plaintiffs, and no amended complaint has been filed for the Court to assess whether an amended complaint could withstand a second attack.  As I suggested in granting J&J's dismissal motion, while J&J's alleged conduct was troubling, it was not clear that the Board members were aware of red flags and chose to ignore them. And,

mere negligence is not enough to create liability.  As for the Demand Refused Plaintiffs, they currently face a motion to dismiss should this suit not settle.  Because that motion was stayed during settlement negotiations, the Court has not undertaken a review of the merits, however, that the motion has been filed creates the possibility that the Demand Refused Plaintiffs may not succeed on the merits if the cases do not settle.  In terms of damages, it is not clear how much J&J would have likely obtained and, even if the amount was sizeable, it would likely have little monetary effect on a company of J&J's size—with a market capitalization exceeding $190 billion.

Even if either group of Plaintiffs were successful at trial, J&J would likely appeal, which would further delay resolution of the suit and impede finality.  Accordingly, given the real and extensive risks involved in Plaintiffs' cases, these two factors weigh heavily in favor of approval of the settlement.  <u>Accord</u> <u>O'Brien</u>, 2012 WL 3242365 at *18 (concluding that this factor weighs in favor of settlement where plaintiffs faced "numerous hurdles to overcome" and had yet to withstand motion practice on defendant's defenses and/or appeal); <u>In re Suprema Specialties</u>, 2008 WL 906254 at *5-6 (approving settlement where plaintiffs would have difficulty establishing liability and damages); <u>In re Genta Sec. Litig.</u>, 2008 WL 2229843 (D.N.J. May 28, 2008) (same).

The risk of maintaining the class action throughout trial factor is inapplicable to shareholder derivative actions and, therefore, omitted.  <u>See</u> <u>Watts</u>, <u>supra</u> at *4.

### 6.    Defendants' Ability to Withstand a Greater Judgment

This factor addresses whether Defendants "could withstand a [monetary] judgment for an amount significantly greater than the [proposed] Settlement."  <u>In re Cendant</u>, 264 F.3d at 240. Here, there is the possibility that the Derivative Suits would have succeeded at trial and a

monetary judgment would have been imposed against the individual director and officer defendants.  If that were to occur, the individual defendants would likely tender the claims to their insurance carriers.  But even assuming there are sufficient funds to pay a greater judgment, the Third Circuit "has found that a defendant's ability to pay a larger settlement sum is not particularly damaging to the settlement agreement's fairness as long as the other factors favor settlement."  O'Brien, supra at *19 (citing In re Prudential, 148 F.3d at 322).

### 7-8.   The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and in Light of Litigation Risks

The last two factors evaluate whether the settlement represents a fair and "good value for a weak case or a poor value for a strong case."  In re Warfarin, 391 F.3d at 538.  "In conducting this evaluation, it is recognized that 'settlement represents a compromise in which the highest hopes for recovery are yielded in exchange for certainty and resolution and [courts should] guard against demanding to[o] large a settlement based on the court's view of the merits of the litigation."  In re Safety Components, 166 F.Supp.2d at 92; In re AT&T Corp. Sec. Litig., 455 F.3d 160, 170 (3d Cir. 2006) (finding settlement was an "excellent" result in light of the risk of establishing liability and damages despite the fact that settlement possibly represented only 4% of the total damages claimed).

Because Plaintiffs have a real risk of proving their claims, as discussed above, these two factors also weigh in favor of approving settlement for the reasons described above.  Moreover, even if Plaintiffs ultimately obtained similar corporate governance reforms through a successful trial and appeal, settling at this juncture benefits J&J by ensuring that the reforms are implemented more expeditiously, and by eliminating future litigation costs.  See Watts, supra at *4 ("The settlement provides immediate and substantial benefits for all parties and represents a

better option than little or no recovery at all."); id. (" The best possible recovery, while arguably more than the settlement, is tempered by the risks of further litigation.")  Therefore, these factors weigh in favor of approving the Settlement.

Having weighed all the Girsh factors, the Court finds that these factors strongly suggest that the proposed settlement is fair, reasonable and adequate.  This matter is complex and would require an extensive trial.  Should the matter reach trial, there is "no guarantee whom the jury would believe," In re Cendant, 264 F.3d at 239, which means that Plaintiffs run the risk of not prevailing on their claims.  Only a few shareholders object to the settlement, and only one objector voiced substantive objections to the settlement itself, with the majority of the objections being focused on  the attorney's fee amount.  While the Derivative Suits are still in the early stages of litigation, counsel's research, the numerous publically-available documents, and J&J's filing of its motions to dismiss, facilitated counsel's appreciation of the merits of their cases.  Finally, not approving the settlement would lead J&J to incur substantial attorney's fees and expenses for the remainder of litigation before this Court and on appeal.

## C.    Additional Factors

As noted, courts are "free to consider other relevant circumstances and facts involved in [the] settlement" in addition to the Girsh factors.  Plymouth County, 2012 WL 664827, at *2. Here, I find compelling that Plaintiffs' counsel was able to achieve significant injunctive relief that is tailored to remedy the corporate governance failings inherent in J&J's decentralized management structure.   Below, in my attorney's fee analysis, I explain in more detail the significance of the corporate governance reforms incorporated into the settlement here. Moreover, while some may argue that monetary relief would amount to a greater recovery, the Supreme Court and Court of Appeals have made clear that injunctive relief, on its own, may

constitute a significant benefit for the corporation.  See Mills v. Electric Auto-Lite Co., 396 U.S. 375, 391-95 (1970); Shlensky v. Dorsey, 574 F.2d 131, 149 (3d Cir. 1978).

### D.     Adequacy of Notice

Several objectors have complained about the adequacy of the notice.  According to the Third Circuit law, "[n]onparty shareholders must be given notice of a proposed settlement of a shareholder's derivative action."     Bolger, 2 F.3d at 1317 (citing Maher v. Zapata Corp., 714 F.2d 436, 450 (5th Cir. 1983)).  Federal Rule of Civil Procedure 23.1 instructs district judges to direct the manner in which notice should be given.  Fed.R.Civ.P. 23.1(c).  The notice "must be sufficiently informative and give sufficient opportunity for response," in order to allay any due process concerns.  Id. (quoting Kyriazi v. Western Elec. Co., 647 F.2d 388, 395 (3d Cir. 1981)).[6]

Here, I directed in my Preliminary Approval Order that J&J provide notice to all shareholders who were of record as of the date of execution of the parties' Stipulation concerning settlement.  Consistent with my order, J&J provided notice to those shareholders via first class mail within five (5) business days following the entry of the Order.  In addition, J&J published notices in the Wall Street Journal, USA Today, and over PR Newswire.  Moreover, J&J posted copies of the Stipulation and proposed settlement agreement on its website.

While many shareholders were notified of the settlement through these methods, a few shareholders complained to the Court that they did not receive notice until after the deadline for

---

[6]     For the typical class action suit, the adequacy of the notice is governed by Rule 23(e)(1), which provides that "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the [settlement] proposal."  Fed. R. Civ. P. 23(e)(1). Similarly, with respect to attorney's fees, Rule 23(h)(1) provides that "[n]otice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner."  Fed. R. Civ. P. 23(h)(1).  Because these notice requirements are akin the reasonableness test that the Third Circuit has applied to shareholder derivative actions, I find the typical class action cases analogous and rely on them as persuasive authority.

objections had passed.  In response to these complaints, the Court held a telephone conference with the parties to discuss the adequacy of notice.  It appeared to the Court, after discussing this issue with counsel, that the late-noticed shareholders were individual shareholders whose shares were held in a street name, most likely that of a brokerage house.  Indeed, counsel also informed the Court that Fidelity Investments, rather than forwarding notices to the shareholders for whom it held stock in street name, requested that J&J mail notices directly to those shareholders.

Cases addressing the adequacy of notice under these circumstances have held that notice to a nominee is sufficient and, if the nominee "fails to forward the notice to the beneficial owner within the time allotted, so that the time to . . . object [ ] passes, the beneficial owner is still bound."  Joseph M. McLaughlin, 1 McLauglin on Class Actions § 5:80 (8th ed.) (2011); In re Intel Corp. Derivative Litigation, Civil Action No. 09-867, 2010 WL 2955178, at *2 (D.Del. July 22, 2010) ("With respect to lack of notice, courts have recognized that untimely notice is an attendant risk of owning stock in 'street name,' and that the ultimate question with respect to notice is not whether some individual shareholders got adequate notice, but whether the class as a whole had notice adequate to flush out whatever objections might reasonably be raised to the settlement.") (citations omitted).  Nevertheless, out of an abundance of caution, I extended the deadline for objections and directed J&J to provide notice of the extended deadline to those shareholders who received late notice.  Accordingly, I conclude that the notice here was reasonable and adequate based on the present circumstances.[7]

_____

[7]    None of the objectors challenge the sufficiency of the notice itself.  Nonetheless, for sake of completeness, I find that the notice was substantively adequate because it advised shareholders of the hearing date, summarized the subject matter of Derivative Suits and their procedural history, it addressed the parties' contentions and the issues involved, and it specified the reasons each party recommended settlement along with the terms of the settlement agreement. The notice, further, appraised shareholders of "their right to object, the consequences

E.    **Attorney's Fees and Costs**

Having concluded that the <u>Girsh</u> factors favor approval of the settlement, and that notice was adequate, I now turn to whether the settlement confers a substantial benefit on the corporation. If I conclude that the settlement does not confer a substantial benefit, Plaintiffs' counsel may not be awarded attorney's fees.  <u>See</u> <u>Shlensky</u>, 574 F.2d at 149.

While, under the "'American' rule ordinarily applied in our courts, a prevailing litigant is not entitled to recover attorneys' fees from a losing party absent statutory authority . . . [t]he plaintiffs in a shareholders' derivative action may . . . recover their expenses, including attorneys' fees, from the corporation on whose behalf their action is taken if the corporation derives a benefit, which may be monetary or nonmonetary, from their successful prosecution or settlement of the case."   <u>Id.</u>   In making this assessment, courts should consider case law addressing fee awards in class action suits alongside derivative suit case law.  <u>See</u> <u>id.</u> at 150.

To determine whether a settlement confers a substantial benefit, courts in this circuit consider the following factors in class action suits:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

<u>In re AT & T Corp.</u>, 455 F.3d 160, 165 (3d Cir. 2006).  In addition, courts may consider "(1) the value of benefits accruing to class members attributable to the efforts of class counsel as opposed

---

of not doing so, and how to go about obtaining further information available on file with the court."  <u>Bolger</u>, 2 F.3d at 1317.  The Third Circuit has held that a notice including these sort of disclosures satisfies the requisites of due process.  <u>Id.</u>

to the efforts of other groups, such as government agencies conducting investigations; (2) the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained; and (3) any 'innovative' terms of settlement." Id. The first factor—the size of the fund created and the number of persons benefitted—is not relevant where, as here, the settlement is comprised of only injunctive relief.  Also, the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained is not relevant here where the injunctive relief has not been monetized.[8]

Many of these inquiries were addressed in my analysis of the Girsh factors and, as that analysis suggests, I conclude that the factors favoring settlement also demonstrate that this proposed settlement confers a substantial benefit on the corporation.  There are, however, several factors that were not addressed in my Girsh analysis.  Those factors are:  (a) the skill and efficiency of the attorneys involved, (b) the amount of time devoted to the case by plaintiffs' counsel; (c) the awards in similar cases; (d) the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations; and (e) any 'innovative' terms of settlement. I take these factors into consideration in my substantial benefit analysis.

### 1.    Substantial Benefit

Before addressing each of these factors, I briefly discuss corporate governance reforms generally as much of my substantial benefit analysis turns on whether these sorts of reforms

---

[8]    Plaintiffs' counsel conceded at oral argument that Plaintiffs' experts did not quantify the value of the corporate governance reforms.  Hrg. Tr. at 34:21-36:3 ("They haven't opined on a dollar number.").  I explain the effect of this failure to monetize the value of the

should be accorded value.  While Plaintiffs' counsel and experts contend that these reforms are substantial in nature, several objectors disagree, arguing that they amount to window dressing cloaking what amounts to nothing more than a strike suit designed to line the pockets of greed-stricken counsel.

### a.        Corporate Governance Reforms

Case law makes clear that corporate governance reforms, unaccompanied by monetary damages, may form the basis for an attorney's fee award where the reforms confer a "substantial benefit" on the plaintiff corporation.  See Mills, 396 U.S. at 395 (holding that "a corporation may receive a 'substantial benefit' from a derivative suit, justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature"); In re Nvidia Corp. Derivative Litig., No. C-06-06110-SBA (JCS), 2008 WL 5382544, at *3 (N.D. Cal. Dec. 22, 2008) (approving an award for attorney's fees in connection with a settlement comprised largely of corporate governance reforms because "strong corporate governance is fundamental to the economic well-being and success of a corporation"); Watts, 2005 WL 2877899, at *5 (concluding the corporate governance reforms conferred a "great benefit" on the plaintiff corporation because the reforms will "serve to prevent and protect [the corporation] from the reoccurrence of certain alleged wrongdoings.") To be considered a substantial benefit, however, the reforms must be more than merely "illusory" or "superficial."  Kaplan v. Rand, 192 F.3d 60, 70-72 (2d Cir. 1999).

As corporate governance reforms are not atypical components of a shareholder derivative settlement, I look to other cases involving such reforms for guidance on evaluating the reforms here.   Many corporate governance settlements include the following unremarkable list of reforms:

---

injunctive relief on the calculation of a reasonable attorney's fee in more detail below.

(1)     A rule requiring a majority or more of the directors to meet existing or enhanced independence requirements;

(2)     A requirement that the board or certain committees of the board meet regularly in executive sessions;

(3)     An agreement to appoint, or enhance the duties of, a lead independent director;

(4)     The addition of one or more independent directors to the board;

(5)     A policy allowing the board and/or its committees to hire advisors;

(6)     A limitation on the number of boards on which the directors can serve;

(7)     A requirement that directors attend a certain percentage of board, committee, or shareholder meetings;

(8)     A requirement or recommendation that the board adopt a "clawback" provision, or a provision requiring executive officers to repay bonuses or other monies in the event of a restatement of the company's financial statements; and

(9)     A provision allowing major shareholders to nominate candidates for the corporation's board of directors.

Erickson, supra at 1804-05.  For these sorts of reforms, corporations have usually agreed to maintain them for two to five years.  Id. at 1805.

The settlement here includes more substantial and tailored terms than these.  Specifically, they provide for J&J's adoption of the Q&C Core Objective, the creation and adoption of a more robust compliance committee than existed prior to the litigation (the RCGC), and the implementation of a PRM Standard.  I address these specific reforms in detail.

**Q&C Core Objective**

The Q&C Core Objective is a Board commitment to create quality control and assurance

systems that will prevent, timely detect, and correct noncompliance with drug marketing laws, cGMP regulations, and the PRM Standard.  What I find significant about this objective is that, by creating company-wide control and assurance systems, it remedies the failings of J&J's decentralized management approach.  As noted, Plaintiffs' experts, Chairman Pitt and Dr. Glass, both conclude in their reports that the corporate governance reforms confer a substantial benefit upon J&J.  In particular, I find compelling Chairman Pitt's reasoning that the objective sends a signal from the Board to all operating companies that they must conduct their business activities in conformity with applicable laws, regulations, and internal policies and, further, that the objective constitutes direction from the leaders of J&J that they expect instances of noncompliance to be reported.  Pitt's reasoning is consistent with Dr. Glass's opinion that adoption of the objective sends an important message to the entire company regarding what the Board considers important.

In addition, the Settlement further provides that the objective must be communicated every year to each J&J employee, and that it will be considered in the evaluation and compensation of the employees, from low-level employees to senior management.  As Dr. Glass notes, this feature underscores, for employees, how seriously the Board considers quality control and assurance, and legal compliance.  Glass Report at ¶ 25 (stating that tying employee compensation to the Core Objective "will create an important linkage between strengthened corporate culture and [employee] compensation ....").  Moreover, as Chairman Pitt notes, the objective also provides for oversight of resource allocations to quality control systems.  This directly addresses another of Plaintiffs' allegations—that the quality control functions at various J&J subsidiaries were vastly underfunded.

In that regard, I reject Objector Petri's additional contention the Core Objective is merely

a restatement of J&J's Credo, which was developed earlier in J&J's corporate existence, yet only recently posted on its website. That credo provides, in pertinent part: "We must provide competent management, and their actions must be just and ethical [and o]ur final responsibility is to our stockholders." Frank Decl., Exh. B. It further states that, in meeting customer needs "everything we do must be of high quality." Id. Unlike the Core Objective, the credo is aspirational in nature and is not tied to any objective criterion such as employee review and compensation.

In addition, as Dr. Glass notes, the objective helps ensure that critical information is reported upward to the Board. Glass Rep., ¶ 20. This is a key benefit of the objective that directly addresses the alleged lack of reporting to the Board of quality control issues at various J&J subsidiary plants. Moreover, this feature of the objective further distinguishes it from the J&J credo, which does not explicitly address upward reporting.

**RCGC Charter and Operating Procedure**

By agreeing to create and operate RCGC, the J&J Board will further cement its now centralized role in overseeing J&J's compliance with drug marketing laws and cGMP. As noted, the RCGC Charter and Operating Procedure ("C/OP") directs the Committee to assess the information it is receiving to support its oversight functions on an annual basis, and directs the Board to annually review and approve J&J's internal audit plans related to compliance and quality. Chairman Pitt opines that the creation of a standing committee designed to provide oversight over J&J's compliance with regulations and internal policies is historic and significant because the committee will unify the oversight of legal and regulatory compliance and quality control. I find that this reform is tailored to remedy the Plaintiffs' overarching allegation that the Board insulated itself from reporting on quality control issues. In addition, as Dr. Glass notes,

the creation of the committee constitutes a best practice, which is tailored to remedy the Plaintiffs' allegation that J&J failed to institute good manufacturing practices in its subsidiaries.

**PRM Standard**

Like the Q&C Core Objective and the creation of the RCGC Committee, I find that the PRM Standard is tailored to remedy the alleged deficiencies in J&J's oversight structure as alleged in the Plaintiffs' complaints. The PRM standard is, essentially, J&J's own internal quality control framework. As noted, once in effect, the standard will "set forth the independence and role of Quality personnel in the PRM process, and provide that all quality issues subject to the PRM Standard will be managed in accordance with the escalation reporting line defined in the Quality Policy." Stipulation, Ex. A, Section IV., A. New PRM Standard, ¶ 1. I find it significant that the settlement also locates particular oversight responsibility with one individual—J&J's Chief Quality Officer. Designating one individual with ultimate responsibility will make it more difficult for officers and directors to "pass the blame" through the ranks should any quality control issue arise in the future. I also find it significant that the settlement provides that the independent Enterprise Regulatory Compliance Group will oversee the CQO. Id. This adds an additional level of protection for the company.

Another critical component of the PRM Standard is the creation of a timeliness metric designed to evaluate whether quality assurance issues are promptly rectified. This metric, and other aspects of the PRM Standard too lengthy to recount here, will help ensure the early identification and timely resolution of quality control issues. See Glass Rep., ¶ 54. According to Dr. Glass, if this sort of PRM Standard had been in place at the time of the alleged corporate misconduct, much of that conduct could have been avoided. Id. at ¶ 64. In this connection, I note Objector Petri's argument that Plaintiffs have failed to explain how the PRM Standard

improves upon J&J's pre-existing quality policy.  In my view, it is implicit in Dr. Glass's aforesaid statement that a comparable standard was not in place at the time of the alleged corporate misconduct.  See id. at ¶¶ 63-64 (explaining how implementation of the PRM Standard would have prevented the off-label marketing of Risperdal to elderly patients with dementia). Thus, I find Petri's criticism unwarranted.

Finally, and with respect to all of the corporate governance reforms, the settlement binds J&J for five years and requires J&J to fully fund the settlement's measures during that time frame.  Chairman Pitt and Dr. Glass agree that such a funding commitment helps ensure J&J's compliance with the settlement's directives.  Objector Petri assails the five-year time frame and the funding commitment, arguing that Plaintiffs have not demonstrated that a five-year restriction on management discretion and the funding requirement could ultimately harm shareholders "if J&J spends more money to implement cosmetic and superfluous changes than it would have spent in its normal business judgment in pursuit of [J&J's] Credo ...."  Petri Mot. Dismiss at 15.  Of course, his objection is based on the presumption that the corporate governance reforms are of no value.  But, as I have explained, the Credo is merely aspirational while the reforms, in contrast, increase director and employee accountability, among the other benefits described above.  Thus, in my view, the five-year time frame and the funding element of the settlement confer further value on J&J.[9]

**Additional Objections**

As noted, several objectors argue that the corporate governance reforms do not confer a

---

[9]        In addition, the settlement provides for the implementation of a company wide Adverse Event Management Standard and Non-Conformance Management Standard.  Plaintiffs have not pointed to specific expert testimony addressing the benefits these reforms confer.  See Pl. Open. Br. at 21.  Hence I do not rely upon them in my substantial benefit analysis.

substantial benefit on J&J.  The most prominent objector is Petri, who argues that I should find that Plaintiffs' experts' testimony on the value of corporate governance reforms is unreliable because the experts did not conduct event studies to determine the market's response to the proposed reforms.  In support of Petri's view, he provides expert reports by two scholars—Kate Litvak, Professor at  Northwestern University Law School, and M. Todd Henderson, Professor at The University of Chicago Law School.  While both of these experts agree that the credentials of Plaintiffs' experts (Chairman Pitt and Dr. Glass) are excellent, they contend that the Pitt and Glass reports are unreliable because neither expert conducts or relies on event studies or other econometric measures to value the corporate governance reforms in the proposed settlement agreement.  See Henderson Report at 22.[10]

Henderson bases his conclusion on the notion that the only way corporate governance reforms can be valued is by estimating the "shareholder reaction to the disclosure of the proposed changes. If shareholders think they are valuable, the stock price should rise, and this is something that economists can readily determine from available data."  Id. at 21.  According to him, "[w]ithout such evidence, the claims of plaintiffs' experts are rank speculation."  Id.

Litvak opines that there are several common scientific methods used to establish the value of corporate governance, including  measuring the market prices of securities.  Litvak Report at ¶ 12-16 (listing five methods).  In her view, Pitt's and Glass's reports are unreliable because, even assuming "that [the] proposed changes in governance will increase compliance," they have not shown "such increase in compliance benefits shareholders."  Id. at ¶ 17.  Litvak

---

[10]      See id. at 22 ("I . . . conclude that (1) Mr. Pitt and Dr. Glass have failed to support their conclusions using reliable methodology that economists would use in propounding similar conclusions in studies submitted to peer-reviewed journals; and thus (2) plaintiffs have provided no scientifically reliable evidence that the governance changes in this case have positive value

cites economic and finance journals employing this method in support of her contentions.  More generally, she concludes that "the expert reports of Mr. Pitt and Dr. Glass cite no empirical studies supporting their conclusions [and t]his is contrary to the modern scientific approach of estimating the effects of corporate governance through econometric analysis." Id. at ¶ 18.

I disagree.  For one, Petri has not pointed to any legal authority suggesting that event studies are the only method by which the value of proposed reforms may be ascertained.  Moreover, while Petri has submitted expert testimony by two law professors suggesting that the use of econometric studies is the method applied in legal scholarship, my research has revealed competing methodologies.  For example, Erickson proposed alternative methods by which the value of corporate governance reforms can be assessed:

> One way to measure the benefits of corporate governance settlements is to examine the link between the alleged misconduct and the specific reforms included in the settlement agreement. Lawsuits typically arise from specific problems, and the remedies typically relate to these problems. If the alleged misconduct in a derivative suit resulted from poor internal controls, for example, and the settlement strengthens these internal controls, then at least on its face, the settlement has the potential to benefit the plaintiff corporation.

Erickson, supra at 1808.[11]

Importantly, applying this sort of qualitative methodology here suggests that the proposed settlement should be approved because it includes provisions that are uniquely tailored toward remedying the conduct that fueled the corporate misconduct alleged in the Derivative Suits.  As noted, the complaints allege that a key deficiency in J&J's oversight of its healthcare subsidiaries was its overly decentralized structure.  Under that structure, no one officer was responsible for

---

for Johnson & Johnson shareholders.").

[11]     Notably, Petri cites the article in which this method is discussed, but only in

reporting regulatory compliance issues or instances of criminal conduct to the RCGC.  The proposed settlement seeks to correct this failing by directing J&J's Chief Compliance Officer to report directly to the RCGC "regarding the global implementation, monitoring, and effectiveness of the Company's health care compliance . . . programs."  Stipulation of Settlement at 7.  This report must take place at least once a year.  Id.  Another alleged deficiency in J&J's oversight mechanism was its undercapitalization of the quality assurance department.  The Settlement seeks to address this failing by requiring J&J's Chief Quality Officer to report to the RCGC, on a quarterly basis, about the "adequacy of resource allocation to the Company's quality systems and operations."  Id.  Although one could argue that J&J might have ultimately made these reforms on its own in response to the several regulatory actions brought against it, such a presumption is speculative.  Rather, under the Erickson test, that these reforms are documented and part of a binding settlement agreement effective for at least five years suggests that the reforms confer a substantial benefit upon J&J.

More to the point, and responding more directly to Petri's contention that event studies are the only means for valuing corporate governance reforms, contrary to Petri's contention, my citation to the Erickson study, supra, suggests that the legal literature recognizes more than one method for valuing such reforms.  In this connection, Plaintiffs have submitted a supplemental report from Chairman Pitt in which he states that "in my experience, the objectors' focus on event studies is disconnected from real world practice.  Companies do not conduct 'event studies' to measure—either prospectively or retrospectively—the benefits that will be, or have been, derived from any particular corporate reforms . . . . [I]n my forty plus years of experience, I am unaware of any company that conducted an 'event study' for either of these purposes."  Supp.

_____

support of his attorney's fees objection.

Pitt Report, ¶ 18.

To the extent that Petri is asking this Court to require experts to follow a particular methodology when more than one exists, Petri misapprehends the Court's gatekeeping function. Federal Rule of Evidence 702 imposes an obligation upon a district court to ensure that expert testimony is relevant and reliable. ZF Meritor, LLC v. Eaton Corp., --- F.3d ----, 2012 WL 4483899, *25 (3d Cir. 2012). And, in conducting this analysis, courts are to consider "all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." Id. (quoting Heller v. Shaw Indus., Inc., 167 F.3d 146, 155 (3d Cir. 1999)). Thus, the Court's role under Rule 702 is to ensure that expert testimony reflects accepted standards within the relevant scientific and business communities—it is not to serve as an umpire between competing subsets of a given community. See U.S. v. Vaghari, 735 F.Supp.2d 197, 203 (E.D.Pa. 2010) (concluding that competing expert testimony should be tested by the adversary process, not excluded by the court); see id. ("The evidentiary requirement of reliability is lower than the merits standard of correctness.") (quoting In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 744 (3d Cir. 1994)).

Furthermore, contrary to Petri's suggestion, Plaintiffs' experts are not precluded from relying on their pharmaceutical industry and corporate compliance experience to form their opinions. Indeed, the Supreme Court has recognized that the touchstone for a Daubert analysis is "that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999) (emphasis added). Betterbox Communications Ltd. v. BB Technologies, Inc., 300 F.3d 325, 329 (3d Cir. 2002) (noting that expert testimony may be based on personal experience).

At oral argument, Petri argued that where there is a quantitative method available, an expert must choose to use that method. However, the only citation that Petri offered in support of this argument is a case involving engineering principles—Kumho, supra. Needless to say, no such scientifically technical principles are presented here. Moreover, Petri has not pointed to authority indicating that, for the sort of injunctive relief here, Plaintiffs' experts must employ a quantitative analysis. The focus of a Daubert inquiry is to ensure that an expert's conclusion are based on more than intuition and speculation; "Daubert does not require a paradigm of scientific inquiry as a condition precedent to admitting expert testimony ...." Oddi v. Ford Motor Co., 234 F.3d 136, 156 (3d Cir. 2000).

Petri further argued, at oral argument, that Chairman Pitt's and Dr. Glass's opinions are unreliable because their valuation methods would not be publishable in academic journals. It is true that courts look to whether there are any non-judicial uses of a scientific method to determine if the touted methodology was created solely for the purpose of litigation. There is a concern among courts that "the hiring of reputable scientists, impressively credentialed, to testify for a fee to propositions that they have not arrived at through the methods that they use when they are doing their regular professional work [and instead, merely paying such scientists] to give an opinion helpful to one side in a lawsuit" will corrupt the judicial process. Warner Chilcott Laboratories Ireland Ltd. v. Impax Laboratories, Inc., Civil Action No.08–cv–06304 (WJM), et al., 2012 WL 1551709 (D.N.J. Apr. 30, 2012) (quoting Braun v. Lorillard Inc., 84 F.3d 230, 235 (7th Cir. 1996)). Here, however, this concern is unwarranted as Petri has not suggested that Chairman Pitt and Dr. Glass typically employ methods that they have ignored here for the sole purpose of providing expert opinions in support of the settlement. Moreover, while an economist may be held to the academic publishing and practical standards in the field of

econometrics, see Dura Automotive Systems of Indiana, Inc. v. CTS Corp., 285 F.3d 609, 614 (7th Cir. 2002), Petri has not cited any authority requiring that industry experts be held to that same standard.   And, this is obviously not a case involving scientists and the technical requirements underlying their opinions.   Accordingly, I reject Petri's contention that the declarations and opinions of Plaintiffs' experts' are unreliable for failure to incorporate econometric-based event studies.[12]

### b.   Remaining Factors

Having addressed Petri's attacks against corporate governance reforms generally, I now briefly address the specific substantial benefit factors not already encompassed by my earlier analysis.  As noted, those factors are (a) the skill and efficiency of the attorneys involved, (b) the amount of time devoted to the case by plaintiff's counsel; (c) the awards in similar cases; (d) the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations; and (e) any 'innovative' terms of settlement.

As Plaintiffs' counsel correctly points out, several courts in this district have approved attorney's fees awards nearing, and in some instances exceeding, $10 million dollars in corporate governance cases.   See, e.g., Plymouth County, 2012 WL 664827 at *5 (collecting cases); Watts, supra.  These amounts are comparable to the $10 million fee award requested here.  To be clear, however, the Court is making no determination as to the reasonableness of the fees requested at this juncture.  As explained below, the Court is appointing a special master to recommend an appropriate lodestar before the Court makes its final fee determination.

---

[12]     Petri further objects on the basis that the named shareholder plaintiffs do not adequately represent the interests of the non-named shareholders.  I reject this argument for the

The factor of the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations, is another area in which Petri voices objection.  Petri contends that it was not Plaintiffs' litigation that served as the impetus for the corporate governance reforms but, rather, the various governmental investigations, charges, and high-profile regulatory settlements caused J&J to institute such reforms.        While this argument has intuitive force, Petri has not pointed to any record evidence to support this contention.  More importantly, the timing of this suit belies his contention.  It was not until the demand plaintiffs filed their demands with the Board that the Board convened a Special Committee and hired independent counsel to review the Board's role in the areas of alleged corporate misfeasance that led to regulatory review and condemnation of J&J's actions.  Moreover, the Special Committee states in its report that it was the demand letters that sparked the creation of the committee and its review, and that the committee expanded its review to include the allegations of the demand futility and other derivative complaints. See Report of the Special Committee at 2-3.[13]  Additionally, as noted, the reforms adopted here are specifically tailored to the demand futility plaintiffs' allegations that the Board ignored "red flags."  Petri has not pointed to allegations or findings in the various regulatory investigations that highlight this specific flaw, nor could he because Plaintiffs have alleged that it was the investigations themselves that were the red flags that should have alerted the Board to J&J's actions.

Moreover, the proposed settlement terms flesh out the Special Committee

same reasons expressed in connection with my ruling on his motion to intervene.

[13]      For this reason, I reject Petri's contention that the Special Committee's creation and its recommendations were motivated solely by "J&J's desire to improve investor confidence and avoid further litigation."  Petri Mot. Dismiss at 11-12.

recommendations by providing more teeth to the committee's recommendations.  The Special Committee recommended that the Regulatory and Compliance Committee ("RCC") be authorized to retain outside expert consultants, and that the RCC committee develop a metric and report card.  It, further, suggested that members of the Special Committee would "make themselves available" to confer with the RCC committee about their experiences.  Report of the Special Committee at 121.  These suggestions, while arguably of some value, do not address the key allegations in Plaintiffs' complaints.  Unlike the proposed settlement terms, the Special Committee recommendations do not designate one individual responsible for quality control policy at J&J, nor do the recommendations tie compliance with J&J's internal quality control measures to compensation and employee reviews.  Thus, in my view, counsel obtained a greater benefit for J&J by building upon the recommendations of the Special Committee.

Furthermore, as Plaintiffs' counsel noted at oral argument, the government investigations had not been culled together into a cohesive form until counsel for the Demand-Futility Plaintiffs drafted their complaints in that fashion.  Therefore, I conclude that, although the government investigations certainly provided fodder for Plaintiffs' allegations, Plaintiffs' demands and suits were the primary impetus for the reforms embodied in the Settlement.

With regard to whether terms of the settlement are innovative, I find that this factor is in equipoise.  As I explained above, the reforms here are more tailored than those prevalent in the case law.  That said, several recent cases cited by Plaintiffs' counsel have included corporate governance reforms similar to those advanced here.  See, e.g., Schering, 2008 WL 185809 at *5; Shell Deriv. Litig., 2005 WL 2877899 at *9.  See also Lilly, 2010 WL 2985946 at *1-2.

Finally, in terms of the skill and efficiency of the attorneys involved, I conclude that counsel are highly skilled in prosecuting shareholder derivative actions and class actions

generally.  Each counsel has submitted biographies detailing the large number of such actions he or she has litigated.  In addition, their briefing reflects their substantial knowledge of this area of law, and their past successes demonstrate that they possess the requisite skills to negotiate the settlement here.

With regard to the amount of time they devoted to their representation, counsel's attorney's fees submissions and their Joint Declaration recount that a significant number of hours were spent in prosecuting and settling the Derivative Suits.  While I have yet to rule on the reasonableness of those hours for purposes of my lodestar analysis, for purposes of my substantial benefit analysis, I conclude that counsel spent a sufficient number of hours to satisfy me that they worked diligently toward obtaining a substantial benefit for J&J.  In sum, I conclude that the settlement confers a substantial benefit on J&J and that, accordingly, an award of attorney's fees is appropriate.[14]

### 2.    Lodestar Calculation

Plaintiffs counsel request over $6 million in attorney's fees, and $452,016.76 in costs. The six plaintiffs' law firms have each submitted their own declarations regarding the fees incurred as reflected in the following chart.

### SUMMARY LODESTAR AND EXPENSE CHART

| Firm Name | Lodestar | Expenses |
|---|---|---|
|  |  |  |

---

[14]    Plaintiffs further argue that the Court should consider that the agreement is the result of an arms length transaction, and that the fees were negotiated only after settlement on the substantive terms had been finalized.  In addition, Plaintiffs cite the social benefits of derivative litigation as another factor demonstrating that a substantial benefit was conferred here.  I need not rely upon these factors because, as my foregoing analysis makes clear, I am satisfied that a substantial benefit was conferred.

| | | |
|---|---:|---:|
| Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C. | $833,753.00 | $8,016.47 |
| Robbins Geller Rudman & Dowd LLP | $564,067.50 | $94,998.48 |
| Kantrowitz, Goldhamer & Graifman, P.C. | $506,916.50 | $4,718.49 |
| Bernstein Litowitz Berger & Grossmann LLP | $1,060,237.50 | $88,975.44 |
| Morris and Morris Counselors at Law LLC | $2,033,770.00 | $224,305.48 |
| Abraham, Fruchter & Twersky, LLP | $1,615,523.75 | $31,002.40 |
| **Total** | **$6,614,268.25** | **$452,016.76** |

Counsel requests that the Court apply a 1.5 multiplier to the $6,614,268.25 lodestar figure, which results in approximately $10 million in fees.

As noted, in terms of each firm's role in the litigation, Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C., along with Morris and Morris Counselors at Law LLC, Robbins Geller Rudman & Dowd LLP, and Bernstein Litowitz Berger & Grossmann LLP served as co-lead counsel on the demand futility actions.  Abraham, Fruchter & Twersky, LLP served as lead counsel, and Kantrowitz, Goldhamer & Graifman, P.C. served as liaison counsel, in the demand refused action.      Per the parties' Stipulation and Agreement of Settlement, J&J has agreed to pay up to the requested $10 million in attorney's fees and up to $450,000 in costs "subject to Court approval."  Stipulation of Settlement at ¶ 5.1.  J&J agrees not to oppose any fee or cost award under those threshold amounts.

"Courts must thoroughly analyze an application for attorneys' fees in a class action settlement."  O'Brien v. Brain Research Labs, LLC, Slip Copy, 2012 WL 3242365 (D.N.J. Aug.

9, 2012) (quoting In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 299 (3d Cir. 2005)).  The same

holds true for shareholder derivative suits.  It is of no moment that the parties have consented to

the proposed attorney's fees.  See Yong Soon Oh v. AT & T Corp., 225 F.R.D. 142, 146 (D.N.J.

2004).  Because there is a risk that "lawyers might urge a class settlement at a low figure or on a

less-than-optimal basis in exchange for red-carpet treatment for fees,"  In re Gen. Motors Corp.,

55 F.3d 768, 820 (3d Cir. 1995) (citation and quotation marks omitted), courts must be vigilant

in ensuring that the fees are reasonable.

 There are two valuation methods used to ascertain the reasonableness of attorney's fee

requests—the lodestar method and the percentage-of-recovery method.  The lodestar method

involves multiplying the number of hours expended by the attorneys' reasonable hourly rate.

See generally Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp., 487

F.2d 161 (3d Cir. 1973) cited in Merola v. Atlantic Richfield Company, 515 F.2d 165, 166 (3d

Cir. 1975).  The percentage-of-recovery method, unlike the lodestar method, is used in cases that

involve a monetary settlement or common fund.  Id. at 821-22.  In percentage-of-recovery cases,

court often engage a lodestar "cross-check," which is an abbreviated version of the traditional

lodestar analysis.  In re AT&T Corp., 455 F.3d at 169 n.6.

 Courts generally apply the lodestar method in cases where, like here, the settlement

"evades the precise evaluation needed for the percentage-of-recovery method."  In re Gen.

Motors Corp., 55 F.3d at 821.  See generally In re N.M. Indirect Purchasers Microsoft Corp., 140

N.M. 879, 899 (N.M.App. 2006) (cataloging cases).  A lodestar analysis is fitting where there is

no monetary component to the settlement and no valuation of the non-monetary award upon

which the Court could base a percentage of recovery calculation.[15]  See In re Schering-Plough/Merck Merger Litigation, Civil Action No. 09-CV-1099 (DMC), 2010 WL 1257722, *17 (D.N.J. Mar. 26, 2010); Charles v. Goodyear Tire and Rubber Co., 976 F.Supp. 321, 325 (D.N.J. 1997) ("As a result of the difficulty in making some reasonable assessment of the settlement's value, this Court will utilize the lodestar method in awarding class counsel's attorneys' fees."); Osher v. SCA Realty I, Inc., 945 F.Supp. 298, 306-07 (D.D.C. 1996) (applying lodestar in shareholder derivative settlement involving only injunctive relief) (relying on In re General Motors Corp., 55 F.3d at 821).  But see Peter Fabrics, Inc. v. S.S. Hermes, 765 F.2d 306, 319 (2d Cir. 1985) (suggesting that something less than full blown lodestar is appropriate for fee awards not made pursuant to statute); id. (distinguishing between "court awarded" fees and calculating appropriate fees under a contract).   Here, there is no record evidence from which the Court could quantify in monetary terms the corporate reforms—neither of Plaintiffs' experts provide the Court with such an assessment.  Indeed, Plaintiffs' counsel conceded at the settlement hearing that the Court must apply a traditional lodestar analysis as opposed to the percentage-of-recovery method with a lodestar cross-check.  See Hrg. Tr. at 40:1-16; see also Pl. Open. Br. at 37.

---

[15]       There is language in the Third Circuit's decision in Shlensky, supra that, for settlements involving intangible benefits, "the district court must attempt to evaluate the benefit in monetary terms or, at the least, make a comparison between the value of the legal services in question and the benefit 'on the basis of its best economic judgment.'"  Id. at 150 n.12 (quoting Merola v. Atlantic Richfield Company, 515 F.2d 165, 172 (3d Cir. 1975)).  This statement is Shlensky is tied to language in the 1975 decision of Merola, where the circuit indicated that, in determining whether the lodestar should be adjusted upward or downward to reflect the degree of counsel's success in settling a suit, the court must use its economic judgment to assess the value of the injunctive relief.  515 F.2d at 172.  This, of course, does not mean that the court must reduce the injunctive relief to a monetary figure.  Rather, as more recent Third Circuit case law makes clear, courts may use the lodestar method, without attaching a monetary value to injunctive relief, where "the nature of the settlement evades the precise evaluation ...."  General

In conducting a traditional lodestar analysis, courts bear the "responsibility [of] closely scrutiniz[ing] all fee arrangements to ensure fees do not exceed a reasonable amount." In re AT&T Corp., 455 F.3d at 169.

> The first step in applying the lodestar formula is to determine the appropriate hourly rate. In determining the appropriate hourly rate, the court should first consider the attorney's usual billing rate. The Supreme Court has indicated that the district court can also consider the prevailing market rates in the relevant community to assist in the determination of an appropriate hourly rate. In calculating the second part of the lodestar formula, the time reasonably expended, the district court should review the time charged, decide whether the hours set out were reasonably expended for each of the particular purposes described and then exclude those that are excessive, redundant, or otherwise unnecessary. Time expended is considered reasonable if the work performed was useful and of a type ordinarily necessary to secure the final result obtained from the litigation.

Schering-Plough, 2010 WL 1257722, at *17 (internal quotation marks and citations omitted).

In sum, the lodestar formula is a two-part process: first, the Court must determine the appropriate hourly rate for each counsel and, second, the Court must determine the reasonableness of the time expended, reducing the number of hours claimed where appropriate. Once the lodestar amount is determined, the court may decrease or increase that amount by applying a multiplier, i.e., "a device that attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work." In re Diet Drugs, 582 F.3d 524, 540, 540 n.33 (3d Cir. 2009).

Here, counsels' fee declarations are not sufficiently detailed for the Court to engage in the sort of searching and thorough inquiry that a traditional lodestar analysis requires. Counsels' declarations set forth seven broad categories of fees, with the total number of hours expended by

_____

Motors, 55 F.3d at 821.

counsel and/or support staff for each category.  The categories are: (1) investigation, research, drafting original complaints, and demand letters; (2) investigation, research, and drafting amended complaint/demand refused complaint; (3) motion practice; (4) discovery and investigation post filing of amended complaint/demand refused complaint; (5) governance and compliance analysis, and drafting of settlement proposals; (6) settlement negotiation process and documentation; and (7) post-settlement documentation and briefing.[16]  With such broad categories, the Court cannot discern how many hours were spent on drafting an amended complaint versus a demand letter, nor how many hours were spent on a given motion.

For this reason, the Court requested supplemental evidence from counsel regarding the specific motions upon which each counsel worked, as well as more detail about the number of settlement meetings and who attended those meetings.  While counsel provided additional submissions, their submissions are not standardized.  For example,  some firms included court appearances in their time spent  on a given motion while other firms did not.  Moreover, the titles of the motions are not uniform.  In a large complex litigation such as this one, where there are six firms co-representing the plaintiffs, and counsel requests over $6 million as a lodestar, the Court requires detailed submissions that provide sufficient information from which the Court can determine whether there has been any duplication in attorney effort or whether the amounts expended were reasonable.

Counsel has offered to produce time records for the Court's in camera review, however, the Court's full docket prevents it from expending further judicial resources on reviewing time records or other information relating to over 10,000 hours of attorney time claimed to have been

---

[16]     To be clear, the firms Bernstein Litowitz Berger & Grossmann, LLP, Morris and Morris LLC, Abraham, Fruchter & Twerksy, LLP, and Kantrowitz, Goldhamer & Graifman,

spent on this matter.  Such a review is necessitated in order to engage in the careful lodestar analysis required.   Accordingly, as indicated at the settlement approval hearing and without any objection by counsel, the Court exercises its discretion to appoint a special master pursuant to Federal Rule of Civil Procedure 53 to provide the Court with a recommendation as to the appropriate lodestar amount.  The special master will review counsels' proposed hourly rates, time expended, and costs requested to determine if they are reasonable, as that term is defined by the case law.  Once the special master's recommendation is received, the Court will first make a final determination as to the lodestar amount, then determine if a multiplier is appropriate and, if so, in what amount. Lastly, the Court will decide the appropriate amount of costs to be awarded.

## IV.    CONCLUSION

For the foregoing reasons, the Court approves the settlement.  With regard to the attorney's fees and costs, the Court appoints a special master to recommend an appropriate lodestar amount.  The Court's final ruling on Plaintiffs' counsel's requests for fees and costs will be filed thereafter.  An Order accompanies this Opinion.


Dated: October 26, 2012


                                            /s/  Freda L. Wolfson
                                           Hon. Freda L. Wolfson, U.S.D.J.

---

P.C., include the seventh category, while the other firms do not.