```
                      UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF NEW JERSEY
                      CIVIL ACTION NO. 10-2033 (FLW)


_____
IN RE JOHNSON & JOHNSON     : TRANSCRIPT OF PROCEEDINGS
DERIVATIVE LITIGATION       :
_____:      OCTOBER 18, 2012
```

CLARKSON S. FISHER UNITED STATES COURTHOUSE
402 EAST STATE STREET, TRENTON, NJ  08608


B E F O R E :  THE HONORABLE FREDA L. WOLFSON, USDJ


A P P E A R A N C E S :

CARELLA, BYRNE, CECCHI, OLSTEIN & AGNELLO, ESQUIRES
BY:  JAMES E. CECCHI, ESQUIRE
        -and-
BERNSTEIN, LITOWITZ, BERGER & GROSSMANN, ESQUIRES
BY:  MARK LEBOVITCH, ESQUIRE
        -and-
MORRIS & MORRIS, ESQUIRES
BY:  KAREN L. MORRIS, ESQUIRE
     PATRICK F. MORRIS, ESQUIRE
        -and-
ROBBINS, GELLER, RUDMAN & DOWD, ESQUIRES
BY:  TRAVIS E. DOWNS, III, ESQUIRE
On behalf of the Demand Futility Plaintiffs

KANTROWITZ, GOLDHAMER & GRAIFMAN, ESQUIRES
BY:  GARY S. GRAIFMAN, ESQUIRE
        -and-
ABRAHAM, FRUCHTER & TWERSKY, ESQUIRES
BY:  JEFFREY S. ABRAHAM, ESQUIRE
     PHILIP T. TAYLOR, ESQUIRE
On behalf of the Demand Refused Plaintiffs


                                 (Continued)


                        * * * * *
                  VINCENT RUSSONIELLO, C.C.R.
                  OFFICIAL U.S. COURT REPORTER
           138 PAXSON AVENUE TRENTON, NEW JERSEY 08690
                        (609) 588-9516

A P P E A R A N C E S   C O N T I N U E D:


ROBINSON, WETTRE & MILLER, ESQUIRES
BY:  DONALD A. ROBINSON, ESQUIRE
          -and-
SIDLEY, AUSTIN, ESQUIRES
BY:  WALTER C. CARLSON, ESQUIRE
     KRISTEN R. SEEGER, ESQUIRE
On behalf of the Defendant Johnson & Johnson

WILLIAM E. CRACO, ESQUIRE
In-House Counsel for Johnson & Johnson

RIKER, DANZIG, SCHERER, HYLAND & PERRETTI, ESQUIRES
BY:  EDWIN F. CHOCIEY, ESQUIRE
          -and-
PATTERSON, BELKNAP, WEBB & TYLER, ESQUIRES
BY:  ERIK HAAS, ESQUIRE
     JOSHUA A. GOLDBERG, ESQUIRE
On behalf of the Individual Defendants

CENTER FOR CLASS ACTION FAIRNESS
BY:  THEODORE H. FRANK, ESQUIRE
          -and-
SAMUEL & STEIN, ESQUIRES
BY:  DAVID M. NIEPORENT, ESQUIRE
On behalf of Intervenor/Objector Mark G. Petri

3

# C E R T I F I C A T I O N


PURSUANT TO SECTION 753, TITLE 28 U.S.C., THE FOLLOWING TRANSCRIPT IS CERTIFIED TO BE AN ACCURATE TRANSCRIPTION OF MY STENOGRAPHIC NOTES IN THE ABOVE-ENTITLED MATTER.


S/Vincent Russoniello
VINCENT RUSSONIELLO, C.C.R.
OFFICIAL U.S. COURT REPORTER

**I N D E X**

| **Proceedings** | **Page** |
|---|---|

Response to Plaintiffs' Briefs by Mr. Frank re

| Shareholder value | 8 |
| Qualitative analysis | 19 |
| New compensation structure | 22 |
| Ignore objections | 22 |

Response by Ms. Morris re

| Compensation issue | 26 |

Questions by the Court re

| Intervene and dismiss | 28 |
| By Mr. Frank | 29 |
| Substantial benefit analysis | 30 |
| By Ms. Morris | 31 |
| Objections | 36 |
| Attorney's fees | 37 |
| By Ms. Morris | 37 |

| Rulings by the Court | 49 |

Application
| By Mr. Frank | 50, 52 |
| By Mr. Carlson | 50, 52, 53 |
| By Mr. Cecchi | 51 |

5

```
 1              (In open court.)
 2              THE CLERK:  All rise.
 3              THE COURT:  Thank you.
 4              I'll have the appearances, and everyone else
 5     may be seated.
 6              MR. CECCHI:  Good morning, your Honor.
 7              James Cecchi, Carella, Byrne, on behalf of the
 8     plaintiffs.  With me here today is Karen Morris from
 9     Morris & Morris.
10              MS. MORRIS:  Good morning, your Honor.
11              THE COURT:  Good morning.
12              MR. CECCHI:  Mark Lebovitch, Bernstein,
13     Litowitz.
14              MR. LEBOVITCH:  Good morning, your Honor.
15              MR. CECCHI:  Gary Graifman from his firm.
16              MR. GRAIFMAN:  Kantrowitz, Goldhamer &
17     Graifman, liaison counsel for the demand refused
18     plaintiffs.
19              MR. CECCHI:  And Jeff Abraham.
20              MR. ABRAHAM:  Good morning, your Honor.
21              THE COURT:  Good morning.
22              MR. CECCHI:  And Travis Downs from Robbins
23     Geller.
24              MR. DOWNS:  Good morning, your Honor.
25              THE COURT:  Good morning.
```

6

1          MR. CECCHI:  Frank Morris from Mr. Morris'

2     firm as well.

3          MR. MORRIS:  Good morning, your Honor.

4          MR. CECCHI:  And Phil Taylor from

5     Mr. Abraham's firm.

6          MR. TAYLOR:  Good morning, your Honor.

7          THE COURT:  Good morning.

8          MR. CARLSON:  Good morning, your Honor.

9          Walter Carlson on behalf of Johnson & Johnson.

10    With me today is my partner Kristen Seeger.

11         MS. SEEGER:  Good morning, your Honor.

12         MR. CARLSON:  Don Robinson from Robinson,

13    Wettre & Miller.

14         Bill Craco, Assistant General Counsel at

15    Johnson & Johnson.

16         MR. CRACO:  Good morning, your Honor.

17         THE COURT:  Good morning.

18         MR. HAAS:  Good morning, your Honor.

19         Erik Haas, Patterson, Belknap, Webb & Tyler,

20    on behalf of the individual defendants.

21         MR. GOLDBERG:  Good morning, your Honor.

22         Joshua Goldberg also from Patterson, Belknap,

23    on behalf of the individual defendants.

24         MR. CHOCIEY:  Good morning, your Honor.

25         Edwin Chociey, Riker, Danzig, Scherer, Hyland

7

1    & Perretti, New Jersey counsel for the individual

2    defendants.

3              THE COURT:  Good morning.

4              MR. CARLSON:  Thank you.

5              MR. FRANK:  Theodore H. Frank, for the

6    intervenor and objector Mark Petri.

7              MR. NIEPORENT:  David Nieporent, Samuel &

8    Stein, also for the intervenor and objector.

9              THE COURT:  Thank you.

10             Everyone may have a seat.

11             I have received, obviously, substantial

12   submissions now from counsel for the plaintiffs

13   seeking approval of the settlement as well as the

14   objectors' submissions and then replies.  With all the

15   paper that I have received, frankly, I'm not looking

16   for presentations today.  I have a number of questions

17   that I would like to ask counsel.  But before I do

18   that, let me just ask any of the attorneys that are

19   here if there is anything though you would like to

20   place on the record that was not in your papers that

21   you in some way want to bring to my attention before I

22   begin any questions that you think was left out or

23   because of some filing that you want to respond to at

24   this time.

25             MR. FRANK:  I have several.

1          THE COURT:  You are going to have to come

2     forward where there is a microphone.  So we're going

3     to have to make room for you even if you think they

4     are the enemy.

5          MR. FRANK:  Theodore H. Frank for the

6     objector.

7          Obviously, the plaintiffs submitted two sets

8     of briefs after our last brief that we haven't had an

9     opportunity to respond to.  We were told that you

10    didn't want another brief from us, so we didn't submit

11    a brief.  They made a number of legal arguments I

12    certainly would like to address if you were to

13    consider them, but we can wait for your questions and

14    see to what extent they are relevant.

15         THE COURT:  Go ahead.  If you are going to

16    highlight what they are now, that will be fine.  Maybe

17    it will remove some of my questions.

18         MR. FRANK:  Well, we have a new declaration

19    from Harvey Pitt saying that what he is doing is okay

20    because you can't tell the value of a shareholder

21    benefit from the share price; and that directly

22    contradicts what Bernstein, Litowitz does in every

23    securities litigation where they say what has happened

24    to the corporation has harmed the corporation, is

25    reflected in the share price.  And, in fact, that's

1   the holding of the Supreme Court in Basic, Inc. v.

2   Levinson, 485 U.S. 224, where at 244 they say:

3          "In an open and developed market the

4   dissemination of material misrepresentations or

5   withholding the material information typically affects

6   the price of the stock, and purchasers generally rely

7   on the price of a stock as a reflection of its value."

8          THE COURT:  I'm assuming you are talking about

9   some sort of 10(b)(5) action, or something like that,

10  when you are talking about "misrepresentations."  This

11  is a little bit different.

12         MR. FRANK:  Not in terms of the economic

13  significance of the price of the stock.  And what

14  Mr. Pitt is saying is that he knows the value of the

15  stock better than what the market does.  He actually

16  says you can't tell what is going to happen in the

17  future from the price of the stock.  But that's

18  exactly what you could tell from the market price.

19         The market price reflects -- and this is just

20  Finance 101, the first thing they teach you -- the

21  market price of the stock reflects the expected value

22  of the future income stream, and the income stream is

23  going to change because the company is actually less

24  likely to suffer adverse consequences from future

25  actions in terms of the FCPA in terms of other quality

1   control issues that would be reflected in the stock

2   price.  And, in fact, with other corporate governance

3   changes, you do see it move in the stock price where

4   the corporate governance change does make a material

5   difference in the value of the company.

6          When you have a corporate governance change,

7   that makes the company resistant to hostile takeovers.

8   You see a decline in the stock price.

9          THE COURT:  Well, isn't it really also what

10  Mr. Pitt -- what do you call him, Commissioner Pitt,

11  Chairman Pitt?  To some extent, isn't what he is

12  saying is, there isn't just one way to determine this,

13  and this event study, which is what your professors

14  have opined about, your experts, is one way that has

15  been out there in the academic literature certainly?

16         MR. FRANK:  Ah-huh.

17         THE COURT:  But I don't think that Pitt is

18  necessarily saying maybe it works, maybe it doesn't

19  work; but he is saying it's certainly not the only

20  thing to do, and it hasn't really been accepted by

21  others in real life terms.  I have a hard time seeing

22  where you have presented to me that this kind of event

23  study has been used in cases otherwise.

24         MR. FRANK:  Well, actually, the plaintiffs

25  concede that it's been used in cases otherwise.  They

1    concede that it's used in securities litigation.

2          THE COURT:  That it can be, because I don't

3    think anyone -- has anyone pointed out a case to me

4    where this has been an accepted way of doing it?  They

5    say that you have.  Have you?

6          Who is speaking for that?

7          MS. MORRIS:  Not in derivative litigation.

8          THE COURT:  Right.  All I'm talking about is

9    derivative.  That's why I started you with this,

10   Mr. Frank, which is that even the quote that you gave

11   me about misrepresentations, et cetera -- which come

12   up in a different kind of case, and I really am

13   talking about shareholder derivative cases where you

14   are talking about corporate governance that comes in

15   the injunctive type of relief.

16         Can you point to a case where the event study

17   has been recognized and used by a Court?

18         MR. FRANK:  Well, again, the market is the

19   market, and the fact that it's been used in a

20   shareholder --

21         THE COURT:  Can you just answer my question?

22         MR. FRANK:  It has not been accepted or

23   rejected.

24         THE COURT:  That's all I asked:  Has it been

25   used?  I didn't ask if it's been accepted or rejected.

1    It hasn't come up at all.

2          In many ways, as I have read it, these are

3    some of the academic debates.  In fact, in my own

4    research, we've looked at some other articles that

5    have been written by professors that talk about

6    different ways that we could do this.  Professor

7    Erickson in an article written has talked about it in

8    2010 about some other methods.  So they are all great

9    methods, perhaps academically, and I've just asked,

10   and I hear you that you are suggesting it's something

11   that we should employ here.

12         The problem is, and I think the manner in

13   which you have briefed the issue is, it's not just

14   saying this could be a method, and it wasn't done

15   here, and, Judge, take a look at how they valued it.

16   You've suggested it is the way to do it; and having

17   not done it, we've drawn into question the entire

18   settlement and the value of the settlement.

19         MR. FRANK:  My point is that the plaintiffs

20   have the burden of proving the value of the

21   settlement.

22         THE COURT:  They do.

23         MR. FRANK:  And they can't come up and just

24   say:  Here is an expert, the expert has really good

25   credentials, and he's now just going to say this is a

1  great way to do it, when in fact the expert has given

2  no indication that he's considered the before and the

3  after, the marginal difference.

4       The plaintiffs say:  Look, we now have a

5  corporate resolution, and that's better than the

6  credo.  Before there was a credo; now there is a

7  corporate resolution.

8       THE COURT:  Well, there is more than corporate

9  resolution and --

10       MR. FRANK:  I understand that.

11       THE COURT:  Just one moment, Mr. Frank.

12       When you say they can't get up and say "We've

13  got an expert that says this," first of all, we start

14  with -- and I know that your experts have themselves

15  agreed that the experts that the plaintiffs have

16  retained are eminently qualified.  We start with that

17  on qualifications.  They both said that in their

18  reports.  I read that.

19       MR. FRANK:  Ah-huh.

20       THE COURT:  So the qualifications are not at

21  issue.  So if you have a well-qualified individual in

22  the area, what do you have to argue, that such an

23  expert cannot provide an opinion based upon their

24  experience in the field and explaining why their

25  experience leads them to a particular conclusion?

14

1   That's precisely one of the things experts can opine

2   on.  It does not make it unreliable.

3        MR. FRANK:  We have two arguments on that,

4   your Honor.  The first one is the experience is not

5   enough when there are better ways to do it, when there

6   is a scientifically reliable methodology.  If Harvey

7   Pitt tried to submit a peer-reviewed publication, I

8   think we should have a methodology, and the benefits

9   outweigh the costs for engendering compliance; no

10  academic journal would take that.  It wouldn't be

11  considered economically reliable; it wouldn't be

12  considered scientifically reliable.  And when it's not

13  reliable enough for academia, it's not reliable enough

14  in the justice system.

15       Even the cases they cite -- Kumho Tire v.

16  Carmichael, 526, 137, that case involved the exclusion

17  of an expert who used a methodology that other experts

18  in the industry did not use and was unsupported by any

19  articles or papers that validated the expert's

20  approach.  And here we do have articles and papers

21  that say you don't do it this way; you do it another

22  way.

23       THE COURT:  What was the issue in Kumho?  What

24  were they opining on?

25       MR. FRANK:  Engineering issues.

1          THE COURT:  Exactly.  It was a scientific

2     matter.  We are talking about something very

3     different; and, certainly, in the field when I have

4     pharmaceutical issues, when I have scientific issues,

5     we often have experts because it's an esoteric area

6     and there actually can be testing, objective testing.

7          What we are talking about here is, we are

8     talking about, what is the effect of instituting

9     certain reform in corporate governance and will it

10    have a real impact in avoiding future harm?

11         Now, first of all, the ideas of corporate

12    governance and those improvements have certainly been

13    accepted in many cases.

14         You would agree with that; wouldn't you,

15    Mr. Frank?

16         MR. FRANK:  I would agree that no one has made

17    the challenge we have made here; and, because of that,

18    because of the fact that other adversaries have failed

19    to make the best arguments, other courts have accepted

20    the mere ipse dixit of corporate governance experts.

21    But when you say that this cannot be testified by

22    objective evidence, that's absolutely 100 percent

23    wrong.  As Professor Henderson says in his report, you

24    do test.

25         THE COURT:  They've been wrong before.  Maybe

1   not a hundred percent.  But, okay.  Go ahead.

2        MR. FRANK:  Economists, econometricians have

3   tested the effect of corporate governance reform

4   objectively.  And there is objective evidence that

5   some corporate governance reforms work.  There is

6   objective evidence that other corporate governance

7   reforms have an adverse effect on shareholders, and

8   it's possible to make those objective tests.

9   Professor Henderson lists the event study; Professor

10  Litvak lists the event study and four other

11  methodologies that could be used to test.

12       It is possible to objectively test this.  It

13  is possible to objectively test it in this case by

14  using the event study.  How did the market react to

15  the expectation?  What is the future expected value?

16  It's not enough to just say, this will help compliance

17  because there are lots of ways to help compliance that

18  hurts shareholders.

19       For example, the best way to guarantee 100

20  percent FCPA compliance, to absolutely assure that

21  there will never be a bribe to a foreign official in a

22  foreign company, is to shut down Johnson & Johnson's

23  entire international operations and restrict them to

24  the United States.  That would be a hundred percent

25  compliance with the FCPA, but shareholders would be

1    hurt by that because the risk of an FCPA violation --

2            THE COURT:  But the problem I have in your

3    analysis and this notion of hinging your objection on

4    the fact that there are certain academics who have

5    pointed to this market trend or trend event studies as

6    a way of determining when the share price drops, goes

7    up, whatever, what that reaction is, as to what the

8    value is, that is an academic approach, as you have

9    pointed out, neither accepted nor rejected by any

10   Court.

11           I know you believe you are making a novel

12   argument.  It is certainly not something that is

13   universally accepted; and, indeed, as I pointed out, I

14   found very useful an article by another professor,

15   Professor Erickson, who in fact points out, instead --

16   again, an academic, and sometimes I worry about the

17   value of these academics as opposed to real life, like

18   a Pitt, or someone who has been out there doing the

19   work and sees what goes on -- but she has written, for

20   example, that the value of corporate governance

21   reforms can be assessed:

22           "One way to measure the benefits of corporate

23   governance settlements is to examine the link between

24   the alleged misconduct and the specific reforms

25   included in the settlement agreement."

1        And she goes on to say:

2        "If the alleged misconduct in a derivative

3   suit resulted from poor internal controls, for

4   example, and the settlement strengthens these internal

5   controls, then, at least on its face, the settlement

6   has the potential to benefit the plaintiff

7   corporation."

8        That kind of qualitative methodology, frankly,

9   if we are going to talk about what makes sense in

10  valuing a settlement, certainly, in a shareholder

11  derivative context, and when you are talking about

12  reforms or corporate governance, linking those reforms

13  to the problems that arose and addressing them, and do

14  they adequately address them, in my mind is the much

15  better test.

16       Ultimately, what we come down to here,

17  Mr. Frank, is they have essentially -- the plaintiffs,

18  through their experts -- provided that kind of

19  qualitative analysis, and certainly Chairman Pitt has

20  opined, Dr. Glass has opined from a pharmaceutical

21  perspective as well and quality control, how the

22  various reforms would address the harms and avoid them

23  in the future.  I think that qualitative analysis,

24  they have satisfied their burden in that regard by

25  providing an analysis that works by people who can

1    opine on them.  I reject the notion, while I'm not

2    saying that it would never be accepted to use this

3    kind of trend event analysis, it is not the only

4    method, and the Court need not find because they did

5    not do that here that somehow they have failed to meet

6    their burden.

7         So I reject that; I reject the argument that

8    having not employed that kind of analysis, they have

9    already not satisfied their burden.

10        MR. FRANK:  So let's turn, then, to the

11   qualitative analysis because even that is deficient.

12   The difference here, it has to be a substantial

13   benefit.  It has to make a material difference to what

14   the corporation is doing; and to do that, you have to

15   look not just at the --

16        THE COURT:  By the way, Mr. Frank, are you

17   providing arguments you have not already provided?

18   This is the time to be doing that as opposed to --

19        MR. FRANK:  That's correct.  I have not done

20   that before.

21        For example, we have this assertion that a

22   binding resolution is materially different than the

23   long-standing decade's old company credo, that because

24   before there was a company credo and now there is a

25   binding resolution, there will be a material

1   difference in the way the company operates.  But

2   that's not supported by what the experts said.  The

3   words "company credo" appear nowhere in the Pitt

4   report.

5           THE COURT:  That "company credo" -- I have to

6   stop you there because that to me was a nonstarter.

7   That company credo is more in the nature of an

8   aspirational statement:  We are going to do these

9   great things -- one paragraph of essentially talking

10  about what our goals are, what our values are in such

11  a company, and to be right up front.  Terrific,

12  Mr. Carlson, that's nice that you have those

13  aspirational statements.  There is no meat on the

14  bones with that credo.  It doesn't say how you will go

15  about doing it.  It doesn't say how we are going to

16  make sure that you don't do it, and what you need to

17  do is give definition.

18          A "credo" by itself meant nothing.  I know

19  Johnson & Johnson used that credo in many cases, by

20  the way.  But to me that means nothing without what is

21  behind it; and, clearly, with that simple credo in

22  place, as I pointed out in an opinion that I issued

23  about it a year ago now, there were a number of

24  troubling things that have occurred in J&J.

25          So what does the company need to do?  And, of

1  course, this is a suit against the board.  What do we

2  need to do to make sure that the board is aware -- and

3  that was some of the problem with the decentralization

4  that occurred in 2006 and 2007 following whatever

5  advice they got from that wonderful McKenzie Agency of

6  how to decentralize.  But it's how the information

7  moves up.  And, as the plaintiffs know, one of the

8  reasons I dismissed the complaint but gave a right to

9  refile is that I didn't have enough allegations as to

10  what the board members knew.

11       So now we need to put in place a structure

12  where the people who have control of the company can

13  take action, are put in the know.  I didn't ultimately

14  make a finding because it hasn't been adjudicated

15  whether any of them did know or not.  I didn't have

16  enough pled to put me there.  But that's what the

17  reforms are aiming to do:  One, to make sure at the

18  lower levels that every employee -- bonuses, salary,

19  whatever -- is going to be pegged to maintaining

20  certain quality as down to the lowest levels, and then

21  how it moves up the chain for answering at the highest

22  levels.

23       So I stop you with "credo" because, no, that

24  was not the same as what's been done.

25       Now, move on.

1          MR. FRANK:  We have an argument that there is

2    a new compensation structure and the new compensation

3    structure will make a material difference.

4          Again, there is no comparison to the old

5    compensation structure.  There is no evidence that

6    Dr. Glass even considered the old compensation

7    structure.  In fact, there is no evidence that the

8    settlement term is not illusory because it only

9    requires, quote, the furtherance of the quality and

10   compliance core objectives be considered.

11         Now, including furtherance as, say, a 0.1

12   percent factor would comply, but would that make a

13   material difference?  Would it be better or worse than

14   what has gone on before?  I don't know.  The expert

15   says nothing that indicates that he knows.  He just

16   again asserts conclusorily:  We now have this.  This

17   is good.  But what was it before?  Why wasn't it

18   working before?  We don't know because there is no

19   comparison with the before and after; there is no

20   comparison it's a marginal difference.

21         I want to address a new argument that they

22   made in their reply.  They argued that the Court

23   should ignore my objections because I'm the only

24   objector or because Mark Petri is the only objector.

25         THE COURT:  No.  I have a number of individual

 1    objections.

 2          MR. FRANK:  Substantive objections, the only

 3    substantive objection.

 4          THE COURT:  I don't think that's really their

 5    argument.  Let's put it there.  That's not how I

 6    understood their argument.

 7          What they are really saying is when you are

 8    looking at whether a settlement is fair and

 9    reasonable, you look at the number of objections

10    received; and, in that sense, there are limited

11    numbers.  I don't think they say:  Reject your

12    arguments and the quality of the arguments because you

13    are only one.

14          That's not what you meant.  Correct?

15          MR. CECCHI:  Correct, your Honor.  Definitely

16    not.

17          THE COURT:  Right.  It was just simply in the

18    overall thing, the numbers we have, given the number

19    of shareholders and how many objections we received.

20    That's all.  Not the quality of your objections.

21          MR. FRANK:  Okay.

22          Well, even the narrower argument I think is

23    incorrect, and the Third Circuit has said as much in

24    GMC Pickup, the federal truck liability -- that's 55

25    F.3d at 812 -- where the Court said:

1          "The combination of observations about the

2    practical realities of Class Actions has led a number

3    of Courts to be considerably more cautious about

4    inferring support from a small number of objectors to

5    a sophisticated settlement."

6          THE COURT:  It is one of the factors.  It is

7    one of the Girsh factors, that looking at the number

8    of objections -- and I think they point out as well

9    that none of the institutional investors houses have

10   objected who certainly are more sophisticated than an

11   individual investor; and we do have a lot of

12   institutional investors in this that hold the shares.

13         Put that aside.  That's not really the issue.

14   I am prepared to deal with the merits of the

15   objections, and I think that's what I'm hoping that I

16   was reading that they were dealing with.

17         MR. FRANK:  I would like to argue that you

18   should not infer anything from the failure of

19   institutional objectors to object.  Even if an

20   institutional objector holds $1 billion of Johnson &

21   Johnson stock, it would be economically irrational to

22   spend $50,000 on an attorney and their experts to come

23   in and object to the settlement.

24         THE COURT:  I don't know that you have any

25   basis to argue that, by the way.

1          MR. FRANK:  I absolutely do, your Honor,

2    because there is $10 million at stake here, and

3    that's -- to somebody that holds a billion dollars of

4    stock, that's $50,000 to them.  It's a big company.

5          So what's happening here is the salami is

6    being sliced.  The attorneys are asking for

7    $10 million from the shareholders.  It's economically

8    rational for Gerald Walton to spend $1.32 on postage

9    to object.  He's got less than $1.32 at stake.  That's

10   how much they are costing him from what they are

11   taking from the company because it's a multi-billion-

12   dollar company, and that's why they are willing to pay

13   the $10 million to get this to go away, because it

14   would cost them more than $10 million to defend it.

15         I just want to say, it's economically rational

16   for the institutional investors to free-ride off of

17   what we have done here because it doesn't pay for them

18   to spend money on their own lawyers.

19         THE COURT:  Well, we haven't even heard an

20   echo of a letter being sent:  We join in the

21   objections of Mr. Petri in this matter.  They don't

22   have to spend any money to do that.

23         MR. FRANK:  Your Honor, I would be happy to

24   poll the shareholders.

25         THE COURT:  Enough, Mr. Frank, on that.

1          MR. FRANK:  All right.

2          THE COURT:  Everyone has gotten notice now,

3   and I'll make that finding.

4          MR. FRANK:  Well, but nobody got notice of our

5   objection.

6          Again, I return to the Erikson study.  I don't

7   know if it's the same Erikson you are referring to,

8   but there was an Erikson study about the

9   appropriateness of attorney's fees and shareholder

10  derivatives that we cited in our brief.  They didn't

11  mention it in their response or why you should

12  disregard that, given that Erikson notes that the

13  median fee in a case like this, we are talking 120th

14  of what the plaintiffs are asking for here.

15         I'll answer any other questions you have.

16         THE COURT:  Why don't you have a seat for a

17  moment because I'll allow the plaintiffs to respond

18  specifically to anything that you may have now

19  included.

20         Actually, the article that I was citing was

21  Jessica Erikson Corporate Governance in the Courtroom

22  and Empirical Analysis, 51 William and Mary Law

23  Review, 1749, 2010.  That's my cite.

24         MS. MORRIS:  Your Honor, good morning.

25         Karen Morris on behalf of the plaintiffs.

1    Given the comments and the dialogue between
2  you and Mr. Frank, I only have one point of
3  clarification for your Honor.  As you noted, our
4  briefs are quite thorough and lengthy.  We provided
5  them to you.  That's with respect to the compensation
6  piece.  It was a very hard-fought term in the
7  negotiation process, and it is part of the entire
8  system that was built through this settlement, and
9  it's exactly as your Honor understands it.
10    We wanted to get information up to the board.
11  We wanted to have clear responsibility for the people
12  who were going to report to the board about the
13  quintessential issues that were going to percolate up
14  from underneath; and specifically I mention the
15  product versus management piece because that's where
16  it begins.  It begins with product versus management.
17  That's down at the operational level of the company
18  inside of the subsidiaries of which this company has
19  250 or more.
20    So what the compensation piece is going to do,
21  just as your Honor said, it's going to align managers
22  in their assessment and taking into account the core
23  objective that was defined here, which is an
24  operational core objective, as your Honor appreciates.
25  It's a very critical point.  It was hard-fought.

1          In addition, your Honor, the settlement also

2     provides that the RCGC, which is getting the reporting

3     up from the chief quality officer, will be having

4     meetings.  The RCGC will consult with the compensation

5     committee to oversee the implementation of this

6     compensation provision.  So it's not going to go

7     unnoted or unnoticed by the RCGC at the board level.

8     It's an important piece in bringing together the full

9     compliance and governance structure that we've

10    negotiated here.

11         So I wanted to comment on the compensation

12    issue, your Honor.

13         THE COURT:  Thank you.

14         If there are no other additional comments,

15    I'll begin by asking some of my questions.

16         MS. MORRIS:  Please.

17         THE COURT:  Okay.

18         Why don't we first deal with, perhaps, so I

19    can resolve this issue, Mr. Petri's motion to

20    intervene and dismiss.

21         I guess, Mr. Frank, I want to talk to you

22    first.

23         MR. FRANK:  Yes, your Honor.

24         THE COURT:  Now, in your motion to intervene,

25    first of all, I think you do concede that in the Third

 1    Circuit your status as an objector affords you the

 2    right to appeal, and that you do not need to intervene

 3    in order to preserve that right.

 4         Correct?

 5         MR. FRANK:  That's correct, your Honor.

 6         THE COURT:  And, basically, your bases for

 7    seeking dismissal of the complaint and to intervene

 8    for that purpose really mirror your objections.

 9         Is that correct?

10         MR. FRANK:  That's correct, your Honor.

11         THE COURT:  So what we are really talking

12    about is intervention so that you could make the same

13    objections and be heard by the Court, and that's so

14    that you can officially make a motion to dismiss.

15         Correct?

16         MR. FRANK:  That's correct, your Honor.

17         THE COURT:  I don't need to let you intervene

18    to do that; do I?

19         MR. FRANK:  No, your Honor.  Again, this is

20    purely belt and suspenders.

21         THE COURT:  Okay.

22         MR. FRANK:  There is no Circuit split on

23    whether we need to intervene.  I've had a case where

24    the Third Circuit retroactively changed the rules on

25    me and told me I should have anticipated that they

30

1    changed the rules.

2         THE COURT:  Well, whatever it is, I appreciate

3    the argument.  But I don't think -- and I'll make

4    findings in an opinion that I'll render -- that

5    intervention here is appropriate, but, certainly, that

6    I'm going to hear all your objections today.

7         MR. FRANK:  Thank you, your Honor.

8         THE COURT:  So have a seat for a moment.

9    We'll get to objections in a bit.

10        Who is going to be arguing on behalf of the

11   plaintiffs?

12        MS. MORRIS:  I will, your Honor.

13        The COURT:  Now, there is a bit of an overlap

14   between obviously considering the fairness of the

15   settlement and the substantial benefit; and the

16   substantial benefit analysis mostly comes into the

17   attorney fee aspect, but they really do overlap.

18        MS. MORRIS:  Yes, your Honor, they do.

19        THE COURT:  Now, I would like to just ask you

20   a question for my benefit, that you've argued that it

21   is the demand letters, the filing of the derivative

22   actions, as opposed to the numerous governmental

23   investigations that were ongoing and regulatory

24   matters that were ongoing, that led J&J to adopt the

25   corporate governance reforms that are included in the

1    proposed settlement.

2         I would like to ask, apart from reviewing the

3    public records that were available at the time

4    relating to those various investigations, including

5    J&J's 10-Ks, basically the publicly available

6    information, did counsel engage in its own independent

7    research prior to preparing the initial complaint?

8         MS. MORRIS:  Your Honor, we did engage in our

9    own research, and it included building the chronology

10   with respect to all of the off-label activity.  A lot

11   of that was from publicly available sources, but it

12   was not pulled together.  What we had to do was

13   evaluate whether or not there was a basis for a

14   futility claim; or, in the case of Mr. Abraham and his

15   colleagues, their initial demand letter was focused on

16   the recall, but then later was focused on, they said,

17   the supplemental demand with respect to the off-label

18   issues.

19        So it took a tremendous amount of effort to

20   bring together all of the different products, and we

21   worked closely with Dr. Glass because in each instance

22   we needed to understand:  Was there wrongdoing?  Was

23   there underlying wrongdoing?  Was there something

24   about the way J&J proceeded with the particular

25   product that was problematic?  And was there something

1   about the way the governance and the compliance was

2   working that was problematic?

3            We have been through this in other matters.

4   We've cited them.  So, yes, we undertook that.

5            And then, your Honor, you didn't ask this

6   specifically, but for the amended complaint, we also

7   hired investigators, and that work was overseen by the

8   Robbins, Geller firm.  So a tremendous effort was made

9   to talk to former employees and to round out our

10  understanding of the kinds of failings that were going

11  on that led to these problems and permitted them to

12  persist.

13           That's what we undertook, your Honor.

14           THE COURT:  Okay.

15           As I understand your papers, you are not

16  placing any monetary value -- or, rather, you have not

17  quantified the economic value of the injunctive

18  relief.

19           Is that correct?

20           MS. MORRIS:  Yes, your Honor, it is, but not

21  quite.  We think that under Merola -- and we feel it's

22  well supported, and it goes to the very issue your

23  Honor mentioned previously about loss prevention,

24  because what Chairman Pitt and Dr. Glass -- because

25  this is what Mills teaches, and it's picked up in Bell

 1    Atlantic in the Third Circuit.  When we go into these

 2    cases, if we are going to really do some good for the

 3    company, the issue is:  Can we prevent this kind of

 4    problem on this scale in the future?  That's our

 5    seminal question.  And so when you ask about the

 6    economic judgment and your ability to exercise that,

 7    we did put of record, your Honor, the various costs

 8    that J&J has had to now suffer as the result of the

 9    off-label, the anti-kickback, the recalls, and we laid

10    that out for your Honor.

11         And even putting aside an anticipated

12    Government 1.7 billion, whatever it may be, there is

13    over a billion dollars of damage that the company has

14    realized, and this is what Chairman Pitt suggests.

15    It's just common sense, and the Courts say this.  If

16    you ask, if these reforms reduce the likelihood of

17    this kind of problem on this scale in the future,

18    let's imagine it's a 50 percent reduction in the

19    likelihood, you are talking about a half a billion

20    dollars.

21         Now, we are not claiming that you should

22    ascribe that to it.

23         THE COURT:  No, that's not what you have

24    suggested.

25         MS. MORRIS:  That's correct.  But it is a

1    basis for exercising your economic judgment, as Merola

2    might suggest to do it, and that's why we've provided

3    it.

4           THE COURT:  Well, I think it's more in the

5    future, too, if you want to say to me that there has

6    been some substantial benefit.  I know that you

7    provided to me the transcript of a hearing before

8    Judge Rakoff, where the Litowitz firm was involved,

9    where the same kinds of arguments are being made,

10   which is what you are really doing is preventing

11   future harm as well, and that has a real value.  It

12   has a value, but I think that no one has attempted

13   certainly to come up with an economic value or to

14   quantify the economic value.  It would require an

15   expert to somehow come in and say what that economic

16   value is.

17          So I don't have it.  I appreciate there is a

18   value, but there is nothing obviously in the record to

19   say exactly what that value would be.

20          MS. MORRIS:  That's correct, your Honor.  But

21   I'm not sure this is an issue for experts different

22   than the ones we brought to you.  And if I can have a

23   moment to explain what I mean by that.

24          THE COURT:  But I don't think they have opined

25   really on that either.

1          MS. MORRIS:  They haven't opined on a dollar

2     number.

3          THE COURT:  That's all I'm asking about.

4          MS. MORRIS:  That's right.

5          THE COURT:  I think we are on the same page.

6     I said that there is a value, but they have not opined

7     on what that is.

8          MS. MORRIS:  I don't think that's quite right.

9          THE COURT:  Show me where.

10         MS. MORRIS:  In the Pitt --

11         THE COURT:  Remind me which binder I'm going

12    to find the Pitt one in.  I assume you are talking

13    about Pitt, not Glass.

14         Correct?

15         MS. MORRIS:  Yes, your Honor.

16         THE COURT:  Identify a paragraph number that

17    you want me to look at.

18         Does somebody has a loose copy of it so I

19    don't have to go through the binders to look for it?

20    I've tabbed them, but there are just too many.

21         (Pause.)

22         MS. MORRIS:  Your Honor, he does not ascribe a

23    dollar number.

24         I'm going to hand this up to you.  It's right

25    in his conclusion, your Honor, and it goes to the loss

1  prevention.  It's not a dollar number.

2         THE COURT:  That's all I have been asking you.

3         MS. MORRIS:  It's not a specific dollar

4  amount.  That's correct.

5         THE COURT:  So we are on the same page.

6  That's exactly what I said.  I do appreciate he opines

7  it has an economic value in some way because it's

8  preventing future harm, but that no one has quantified

9  anywhere where that is.

10        MS. MORRIS:  That's correct.

11        THE COURT:  Thank you.  We're finished on that

12  point.

13        MS. MORRIS:  Yes.

14        THE COURT:  Now, part of that, by the way, is

15  going to some of the questions I'm going to ask you in

16  a little bit as well when we talk about attorney's

17  fees and the manner in which you evaluate what these

18  are.

19        MS. MORRIS:  Yes, your Honor.

20        THE COURT:  Now, with regard to the

21  objections -- and I'm focusing now, by the way, solely

22  on the settlement itself, not the fees.  I'm going to

23  deal with the fees issue separately in a moment.

24        I think I've already asked Mr. Frank a number

25  of questions actually that already dealt with the

37

1     objections and also the experts.

2          Is there anything else, Mr. Frank, that you

3     wanted to bring out with regard to your objections?

4     We are not on the fees, just on the settlement

5     overall.

6          MR. FRANK:  No, your Honor.

7          THE COURT:  Okay.

8          Is there anything else that counsel want to

9     bring up, respond to, with regard to any of the

10    objections that have been raised to the settlement

11    itself?

12         MS. MORRIS:  No, your Honor.  None.

13         THE COURT:  Okay.

14         Let me turn to the issue at this time of the

15    attorney's fees.

16         Now, one of the things that I want to focus on

17    at the outset is, I think that I, myself, used the

18    terms in speaking with counsel a couple of weeks ago

19    in requesting supplemental information, that I may

20    have used the terms "lodestar" and "lodestar

21    cross-check" interchangeably, and that was not

22    accurate.

23         Now, in this case, because there is no common

24    fund and because plaintiffs have not attempted in any

25    way to quantify an economic value to the injunctive

1   relief, the manner, and really the only manner left to

2   us to calculate attorney's fees, is to begin with a

3   lodestar calculation.

4          Would you agree with that?

5          MS. MORRIS:  Your Honor, there are a number of

6   factors that the Third Circuit considers.  Lodestar is

7   certainly an important piece of that, yes, but there

8   are other factors.

9          The mere absence of a quantified economic

10  benefit alone we don't put aside; that there is

11  substantial benefit here, we believe.  We can speak to

12  that.  In that context of course your Honor has to

13  look at the lodestar, and that's why we offer it to

14  your Honor.

15         THE COURT:  There is no other way to calculate

16  it; is there?  When you have a common fund case, we

17  look at percentages and what the values are, and then

18  you do the lodestar cross-check to say:  Does it make

19  sense or not?  And then you go from there on the

20  percentage.

21         Now, there are two arguments obviously you've

22  got.  You start with your lodestar and then you would

23  like to apply a multiplier.  But you have to start

24  with the lodestar.

25         MS. MORRIS:  Absolutely, your Honor.

```
 1          THE COURT:  That's what I'm talking about.
 2   I'm not at a multiplier yet.
 3          MS. MORRIS:  Yes, we start with the lodestar.
 4          I just want to be clear with the Court that in
 5   addition to the lodestar, you will get other
 6   contextual issues, the comparables, and I know your
 7   Honor is aware of that, and I'm sure we will come to
 8   those factors.
 9          THE COURT:  That's when you are talking about
10   what a reasonable fee is.  The lodestar is not that
11   yet.
12          Looking at comparables as well is really
13   looking at when you start to apply multipliers and
14   things of that nature; because when you look at
15   lodestar, the two inquiries are the hourly rate --
16          MS. MORRIS:  Correct.
17          THE COURT:  -- and the reasonableness of the
18   hours expended.
19          Correct?
20          MS. MORRIS:  Correct.
21          THE COURT:  So we start with that.
22          MS. MORRIS:  Very good.
23          THE COURT:  And we don't compare you to
24   somebody else on what reasonable hours are and things
25   like that.  We look at this case.
```

40

1          MS. MORRIS:  Fair enough.

2          THE COURT:  So the question that I have here

3     is, certainly when you do a lodestar cross-check,

4     because you are not using the lodestar, you are using

5     a different method and you use that to compare, we

6     don't do full flown traditional lodestar analysis.  We

7     don't require all the underlying documentation,

8     et cetera.

9          In this case or type of case, where I must

10    undertake a lodestar analysis, because that is the

11    relief being requested with then the multiplier on

12    top, isn't that the traditional lodestar analysis as

13    we understand it which requires the Court to review

14    the reasonable hourly rate?  And you've provided me

15    with additional information on that.

16         MS. MORRIS:  Yes.

17         THE COURT:  And, as well, to review whether

18    the hours expended were reasonable, duplicative,

19    excessive, the normal analysis.

20         Correct?

21         MS. MORRIS:  Of course, your Honor.

22         THE COURT:  Okay.

23         So with that, does that not require that I

24    have more information than I have?

25         MS. MORRIS:  Well, your Honor, let me tell you

1 what other Courts have done, and you can consider

2 whether or not you think this record is adequate, and

3 I think the record is adequate.

4 No. 1, we did provide a joint attorney

5 declaration to give your Honor a detailed narrative of

6 the progress of the litigation, how it progressed.

7 That was one thing we did.

8 THE COURT: It's a summary. This is really my

9 question to you, Ms. Morris. I'm going to get right

10 to it.

11 MS. MORRIS: Yes.

12 THE COURT: They were all summaries with

13 category breakdowns. I understand some Courts --

14 basically, when I looked at some of these opinions,

15 they are one sentence: "We find it reasonable. We

16 are going to approve it" -- once they've determined

17 it's a reasonable hourly rate.

18 But within the categories themselves, how can

19 the Court determine whether the hours spent on

20 particular things -- and the categories are very

21 broad, and obviously I asked for some additional

22 information on the category on motions. I said:

23 Would you please explain what motions you worked on

24 and how many hours were spent? And each firm did

25 that, but, again, in a general fashion, and each firm

 1    broke that down for me.

 2           The other problem is each firm didn't do it in

 3    a standardized way.  What I ended up getting in the

 4    way of the affidavits is that they used perhaps

 5    different titles to refer to a motion.  Some attorneys

 6    included the actual court appearances or telephone

 7    conferences or things of that nature.  I'm not sure

 8    what everyone did.  Some of them took them out

 9    separately and did it in the way of hours.  But I've

10    got just an overall number.

11           For instance, for lead plaintiff, a

12    consolidation motion:  "All plaintiffs."  That

13    includes demand futility and demand refused

14    plaintiffs -- no, it's not "demand refused."  Excuse

15    me.  "Demand refused" are on the motions to intervene

16    that were filed.

17           So just demand futility plaintiffs, and I had

18    gotten essentially two competing applications, and

19    then you consented to it.  But I had a total of 384

20    hours between all the firms on those two motions.

21           MS. MORRIS:  Your Honor, can I address that

22    process for you so that you can appreciate some of

23    what was happening to that was not directly in front

24    of you?

25           THE COURT:  Let me just also say, and then for

1    the demand refused on their motions to intervene and

2    appoint lead counsel, I had a total of 638 hours and

3    then another 100 hours for the conferences about this.

4    So over 700 hours about appointing counsel.

5            MS. MORRIS:  Your Honor, I can speak to the

6    demand futility side of this, and Mr. Abraham perhaps

7    can speak to his, because I'm not as deeply familiar

8    at this level, and I want to give your Honor the

9    detail you need.

10           We, Morris & Morris, filed our futility

11   case -- and this will take a moment to explain -- on

12   behalf of Ms. Calamore.  Then two other firms came

13   into the case; and being very mindful of this

14   District's caution to try to work together and not

15   burden the Court with motion practice over lead

16   counsel, we reached out to those counsel; and while we

17   were discussing with them forming a group, we drafted

18   a motion, and that's reflected in our time.  That's

19   part of what built our time.  Then Mr. Lebovitch's

20   firm came in and they filed.

21           So I talked to the two firms who were

22   originally in the case with us -- they filed their own

23   cases, but who were going to form a group with us.  I

24   said:  Let's talk about instead, if you want to take a

25   back seat, let's have Mr. Lebovitch come in -- a well

1   known firm, they are highly regarded -- it would be

2   beneficial.  He also brought with him Carella Byrne.

3         In the meantime, while we are negotiating with

4   them -- and, your Honor, I just want you to appreciate

5   what goes on -- while we were discussing with them

6   creating a different leadership structure, we drafted

7   a motion.  That one didn't need to get filed because

8   then along came the Robbins Geller firm.

9         So each of those steps required some work.  So

10  you will see in the Morris & Morris declaration, my

11  declaration, what those steps were.  Even though they

12  didn't get filed, we had to draft them.

13        THE COURT:  Let me just stop you one second,

14  Ms. Morris.  I can't get into the specifics because I

15  don't have the breakdown even from you.

16        What amount of time was spent negotiating with

17  other attorneys?  What amount of time was actually

18  spent drafting briefs?  Because, frankly, let's put it

19  right out there:  These lead-counsel-type briefs and

20  the affidavits, the law is not novel; you all cite the

21  same law as to what the criteria are, and you tell me

22  how wonderful you each are, and why you should be the

23  one that's picked, and then you provide your resumes

24  and attach them, and you highlight what's in the

25  resumes as to who the attorneys will be.  I don't

1    think you are recreating the wheel every time you file

2    these.

3         MS. MORRIS:  This was a little different,

4    actually, your Honor.  This was a little different

5    because this is a situation where we had pled a very

6    different type of complaint than anybody else, and

7    that was one of the reasons we became lead in the

8    case.  We pled a different type of complaint.

9         I just want you to understand, your Honor,

10   people worked very hard to do this as efficiently as

11   they could, and I think you will find, and I could

12   explain for you.

13        THE COURT:  Well, I think today is not the

14   day, I can take every one of these fine points.  I'll

15   talk about that in a while.

16        But I'll point out as well, for instance, then

17   I got the over 600 hours from the various demand

18   refused plaintiffs.

19        And I'm just going to deal with these in

20   general categories.

21        For instance, between all the plaintiffs with

22   regard to the original complaint and demand letters,

23   1,456 hours; drafting the amended complaint, demand

24   refused complaint, 1,849 hours.  I know you also said

25   you hired investigators.  That's an expense, your

1    investigators.

2            MS. MORRIS:  That's correct.

3            THE COURT:  So their time is not included.

4            MS. MORRIS:  That's correct, your Honor.

5            THE COURT:  So we are talking about, between

6    the two complaints, over 3,000 hours.

7            Put that aside.

8            What I'm saying is, and I guess what I really

9    want to come down to is, one of the problems that I

10   have with regard to doing a lodestar calculation is,

11   while you are all very, very experienced, and

12   respected counsel in these areas -- indeed, that's why

13   you presented your various cases and affidavits, to

14   show why you thought you were the right people to

15   handle this, that you could avoid duplication, that

16   you were expert in the field -- and when I see the

17   hours that have been expended in the case, which are

18   staggering, understanding that we never got to

19   discovery, and, indeed, never got to a complaint that

20   was accepted by the Court, it gives this Court

21   obviously pause without further elucidation.

22           I don't know if there was duplication.  Maybe

23   everything you did was merited.  But part of the

24   things that you said to me in your applications for

25   why a structure was appropriate was to avoid that.  I

1   know that in a general fashion the affidavit says that

2   has been provided to me on fees says:  And we worked

3   with our structure to assign tasks and avoid, but I

4   don't know any specifics of that to make an

5   independent determination whether that indeed

6   occurred.  Because, frankly, just looking at the

7   number overall, it is staggering as to what is being

8   provided from all these different firms on many of the

9   same tasks.

10          For instance, on the motion to dismiss the

11   demand futility case, I have from plaintiffs 837

12   hours.  I don't know what each of you were doing on

13   that to respond or how it was divided or if there was

14   duplication or why it took that many hours.  We didn't

15   really have a lot of novel issues in that motion

16   either, and you are expert in the field.  So I have

17   these kinds of questions, and it well may be that

18   every hour spent by every attorney on this case was

19   merited.  I cannot make that determination today.

20          MS. MORRIS:  How can we be helpful to you,

21   your Honor?

22          THE COURT:  I think that ultimately we are

23   going to need a lot more information, and, frankly,

24   the Court's resources can't be expended that way.  I'm

25   going to appoint a Special Master to consider the

```
 1    issue of the attorney's fees, and you can provide

 2    whatever materials that individual will feel are

 3    necessary to review, the hours expended, the work

 4    done, and how it was done, and it could be also done

 5    by formal submissions, and also that person can

 6    actually communicate with each one of you to get

 7    further explanation, if necessary, because they will

 8    have the time to do it, and it will be a better use of

 9    this Court's resources, and then make that

10    recommendation to me.

11         I think that is the best way to proceed.  I

12    tried to start to break it down by asking for

13    supplemental information but realized that wasn't

14    where I needed to be and what I would really require.

15         What we do require when we do a traditional

16    lodestar analysis is obviously substantially more than

17    summaries, particularly with the amount at stake here,

18    and I want to make sure you are fairly compensated.  I

19    don't want to give short shrift to it and have you

20    think that I think the numbers sound high because it

21    may be merited.

22         MS. MORRIS:  I understand, your Honor, of

23    course.

24         THE COURT:  So that's what I think is the best

25    way to proceed, and we will not have to take further
```

49

1    argument on the lodestar today.

2              MS. MORRIS:  Very good.  Thank you, your

3    Honor.

4              Did you have any other questions for me at

5    this time?

6              THE COURT:  No.

7              I'll hear briefly from Mr. Frank because I

8    know, Mr. Frank -- I don't know that you have anything

9    really more to say.  I know it all goes to you

10   thinking that a substantial benefit was not realized

11   for the class and the fees are excessive.

12             MR. FRANK:  That's correct, your Honor.  We

13   can rest on our papers.

14             THE COURT:  Fine.  Thank you very much.  I

15   appreciate that.

16             Let me then briefly say the following:

17             One, I am going to deny the motion to

18   intervene.  I think it was fair from the discussion I

19   also had -- and I'll give my reasons in an opinion --

20   with Mr. Frank that, really, I will consider his

21   objections and have considered them, and he has

22   preserved his right to appeal and that is appropriate.

23             Two, I will go through all the factors in the

24   opinion, but I will approve the settlement.  I find it

25   will satisfy all the factors here, and that there was

1    a substantial benefit in this matter that was

2    rendered.

3         It will all be included in an opinion with my

4    reasons.  Some of you have sat here before while I've

5    read lengthy opinions into the record, and, frankly,

6    I'm still working on it, but I'm not going to read

7    something into the record today and waste your time.

8    I'll issue a formal opinion that everyone can review.

9         With regard to the attorneys fees, that will

10   be left open until it can be reviewed and a

11   recommendation made.

12        I will not be asking the Special Master to

13   make a recommendation on a multiplier.  Once the

14   lodestar is established, I will come back and

15   determine what multiplier, if any, is appropriate in

16   this case, and I will rule on it at that point.

17        Yes, Mr. Frank.

18        MR. FRANK:  One thing, your Honor.

19        We accept that you have denied our motion to

20   intervene.  But just as a procedural matter, if you

21   could withhold issuing that order until you've issued

22   the order on attorney's fees, that would be very

23   procedurally helpful because issuing the denial of the

24   motion to intervene starts the 30 days for us to

25   appeal that to the Third Circuit, and we might not

1   appeal anything.

2          THE COURT:  It will be interlocutory until I

3   issue a final order on the fees.

4          Mr. Carlson, you wanted to say something?

5          MR. CARLSON:  Your Honor, it was our hope that

6   you would approve the settlement promptly.  I don't

7   know whether what Mr. Frank is asking for would defer

8   approval of the settlement.  I frankly think we have a

9   form of judgment order.  It probably needs to be

10  modified.

11         THE COURT:  I'm not entering any judgment

12  until I issue my opinion.

13         MR. CARLSON:  I understand that.  And the

14  judgment order will need to be updated for the

15  supplemental notice that your Honor authorized us to

16  do, which we did do.  But once you have your opinion

17  and once we have that supplemental order, I would like

18  the judgment order dismissing these cases entered

19  without waiting for the attorney's fee issues to be

20  decided because that was the agreement we had, and

21  without waiting for the attorney's fee issue with

22  Mr. Frank and the intervention to be delayed.

23         THE COURT:  Mr. Cecchi, you wanted to say

24  something?

25         MR. CECCHI:  My only comment, your Honor,

1   observation would be that we are happy to proceed as

2   fast as necessary to get the issue back before your

3   Honor and to start working with the Special Master as

4   soon as practical.

5           THE COURT:  Mr. Frank, I can't speak to the

6   question of when your clock will begin to run because

7   while there will be -- look, the way the Third Circuit

8   normally looks at it, but I'm not going to tell you

9   what the Third Circuit would do is, while I may be

10  issuing a judgment and order approving the settlement,

11  normally if there is still an issue of fees -- and

12  this happens always in the employment cases,

13  whatever -- there is an issue of fees outstanding, and

14  we reflect that that's to be decided, it will not be

15  final for appeal purposes, is my belief.

16          MR. FRANK:  The Supreme Court holds that a

17  denial of a motion to intervene is a final judgment

18  that starts the 30 days running with respect to that

19  motion.

20          THE COURT:  Okay.

21          If that's the only thing you want me to hold

22  off on, does anybody have a problem if I hold off just

23  on that aspect?

24          MR. CECCHI:  No, your Honor.

25          MS. MORRIS:  No, your Honor.

1          THE COURT:  Mr. Carlson?  I don't know if it

2    makes sense.  That's my problem with it.

3          MR. CARLSON:  I actually don't know if you can

4    approve a final judgment dismissing the case when

5    there is a pending motion to intervene.

6          THE COURT:  I don't think I can either.

7          MR. CARLSON:  I hear it.  I would like to make

8    Mr. Franks' life easier, but I don't think in the

9    circumstances here his desire to avoid -- it may be he

10   needs to take two appeals.

11         THE COURT:  He may have to, or you can present

12   to the Third Circuit whether they stay their

13   consideration until the fees are decided.  I think I

14   do have to rule on it.  But I appreciate what your

15   argument is, Mr. Frank.  You will have to do what you

16   think is appropriate.

17         MR. FRANK:  Thank you, your Honor.

18         THE COURT:  Thank you.

19         Anything else, counsel?

20         MS. MORRIS:  No, your Honor.

21         THE COURT:  I guess it will really only apply

22   to the plaintiffs with regard to the Special Master

23   because you are not taking any position.

24         Correct?

25         MR. CARLSON:  Right.  Our settlement agreement

54

1    is very clear on this.  We are prepared to pay what we

2    agreed to pay.  We are not taking any position with

3    respect to their fees, and it's for your Honor to

4    decide what's a fair fee.

5              THE COURT:  Okay.

6              We can go off the record.

7              (Brief discussion off the record.)

8              THE CLERK:  All rise.

9              (Proceedings concluded.)

10   ///

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

55

1                **C E R T I F I C A T E.**

2

3

4

5        I, **Vincent Russoniello**, Official United States

6    Court Reporter and Certified Court Reporter of the

7    State of New Jersey, do hereby certify that the

8    foregoing is a true and accurate transcript of the

9    proceedings as taken stenographically by and before me

10   at the time, place, and on the date hereinbefore set

11   forth.

12        I do further certify that I am neither a relative

13   nor employee, nor attorney, nor counsel of any of the

14   parties to this action, and that I am neither a

15   relative nor employee of such attorney or counsel and

16   that I am not financially interested in this action.

17

18

19

20

21

22

23        S/Vincent Russoniello
          Vincent Russoniello, CCR
24        Certificate No. 675
          Date:  December 26, 2012

25

**$**

**$1.32** [2] - 25:8, 25:9
**$10** [4] - 25:2, 25:7, 25:13, 25:14
**$50,000** [2] - 24:22, 25:4

**0**

**0.1** [1] - 22:11
**08608** [1] - 1:6
**08690** [1] - 1:25

**1**

**1** [2] - 24:20, 41:4
**1,456** [1] - 45:23
**1,849** [1] - 45:24
**1.7** [1] - 33:12
**10(b)(5** [1] - 9:9
**10-2033** [1] - 1:2
**10-Ks** [1] - 31:5
**100** [3] - 15:22, 16:19, 43:3
**101** [1] - 9:20
**120th** [1] - 26:13
**137** [1] - 14:16
**138** [1] - 1:25
**1749** [1] - 26:23
**18** [1] - 1:4
**19** [1] - 4:6

**2**

**2006** [1] - 21:4
**2007** [1] - 21:4
**2010** [2] - 12:8, 26:23
**2012** [1] - 1:4
**22** [2] - 4:7, 4:7
**224** [1] - 9:2
**244** [1] - 9:2
**250** [1] - 27:19
**26** [1] - 4:9
**28** [2] - 3:8, 4:12
**29** [1] - 4:12

**3**

**3,000** [1] - 46:6
**30** [3] - 4:13, 50:24, 52:18
**31** [1] - 4:13
**36** [1] - 4:14
**37** [2] - 4:14, 4:15
**384** [1] - 42:19

**4**

**402** [1] - 1:6
**485** [1] - 9:2
**49** [1] - 4:16

**5**

**50** [3] - 4:17, 4:18, 33:18
**51** [2] - 4:18, 26:22
**52** [2] - 4:17, 4:18
**526** [1] - 14:16
**53** [1] - 4:18
**55** [1] - 23:24
**588-9516** [1] - 1:25

**6**

**600** [1] - 45:17
**609** [1] - 1:25
**638** [1] - 43:2
**675** [1] - 55:24

**7**

**700** [1] - 43:4
**753** [1] - 3:8

**8**

**8** [1] - 4:6
**812** [1] - 23:25
**837** [1] - 47:11

**A**

**ability** [1] - 33:6
**ABOVE** [1] - 3:11
**ABOVE-ENTITLED** [1] - 3:11
**Abraham** [3] - 5:19, 31:14, 43:6
**ABRAHAM** [3] - 1:19, 1:19, 5:20
**Abraham's** [1] - 6:5
**absence** [1] - 38:9
**absolutely** [4] - 15:22, 16:20, 25:1, 38:25
**academia** [1] - 14:13
**academic** [5] - 10:15, 12:3, 14:10, 17:8, 17:16
**academically** [1] - 12:9
**academics** [2] - 17:4, 17:17
**accept** [1] - 50:19
**accepted** [10] - 10:20,

11:4, 11:22, 11:25, 15:13, 15:19, 17:9, 17:13, 19:2, 46:20
**account** [1] - 27:22
**accurate** [2] - 37:22, 55:8
**ACCURATE** [1] - 3:9
**ACTION** [2] - 1:2, 2:16
**action** [4] - 9:9, 21:13, 55:14, 55:16
**Actions** [1] - 24:2
**actions** [2] - 9:25, 30:22
**activity** [1] - 31:10
**actual** [1] - 42:6
**addition** [2] - 28:1, 39:5
**additional** [3] - 28:14, 40:15, 41:21
**address** [5] - 8:12, 18:14, 18:22, 22:21, 42:21
**addressing** [1] - 18:13
**adequate** [2] - 41:2, 41:3
**adequately** [1] - 18:14
**adjudicated** [1] - 21:14
**adopt** [1] - 30:24
**adversaries** [1] - 15:18
**adverse** [2] - 9:24, 16:7
**advice** [1] - 21:5
**affects** [1] - 9:5
**affidavit** [1] - 47:1
**affidavits** [3] - 42:4, 44:20, 46:13
**affords** [1] - 29:1
**Agency** [1] - 21:5
**AGNELLO** [1] - 1:10
**ago** [2] - 20:23, 37:18
**agree** [3] - 15:14, 15:16, 38:4
**agreed** [2] - 13:15, 54:2
**agreement** [3] - 17:25, 51:20, 53:25
**ah-huh** [2] - 10:16, 13:19
**ahead** [2] - 8:15, 16:1
**aiming** [1] - 21:17
**align** [1] - 27:21
**allegations** [1] - 21:9
**alleged** [2] - 17:24, 18:2
**allow** [2] - 26:17
**alone** [1] - 38:10
**amended** [2] - 32:6, 45:23
**amount** [5] - 31:19, 36:4, 44:16, 44:17, 48:17
**AN** [1] - 3:9
**Analysis** [1] - 26:22

**analysis** [15] - 4:6, 4:13, 17:3, 18:19, 18:23, 18:25, 19:3, 19:8, 19:11, 30:16, 40:6, 40:10, 40:12, 40:19, 48:16
**answer** [2] - 11:21, 26:15
**answering** [1] - 21:21
**anti** [1] - 33:9
**anti-kickback** [1] - 33:9
**anticipated** [2] - 29:25, 33:11
**apart** [1] - 31:2
**appeal** [5] - 29:2, 49:22, 50:25, 51:1, 52:15
**appeals** [1] - 53:10
**appear** [1] - 20:3
**appearances** [2] - 5:4, 42:6
**Application** [1] - 4:17
**applications** [2] - 42:18, 46:24
**apply** [3] - 38:23, 39:13, 53:21
**appoint** [2] - 43:2, 47:25
**appointing** [1] - 43:4
**appreciate** [7] - 30:2, 34:17, 36:6, 42:22, 44:4, 49:15, 53:14
**appreciates** [1] - 27:24
**approach** [2] - 14:20, 17:8
**appropriate** [5] - 30:5, 46:25, 49:22, 50:15, 53:16
**appropriateness** [1] - 26:9
**approval** [2] - 7:13, 51:8
**approve** [4] - 41:16, 49:24, 51:6, 53:4
**approving** [1] - 52:10
**area** [2] - 13:22, 15:5
**areas** [1] - 46:12
**argue** [3] - 13:22, 24:17, 24:25
**argued** [2] - 22:22, 30:20
**arguing** [1] - 30:10
**argument** [10] - 17:12, 19:7, 22:1, 22:21, 23:5, 23:6, 23:22, 30:3, 49:1, 53:15
**arguments** [8] - 8:11, 14:3, 15:19, 19:17, 23:12, 34:9, 38:21

**arose** [1] - 18:13
**article** [3] - 12:7, 17:14, 26:20
**articles** [3] - 12:4, 14:19, 14:20
**ascribe** [2] - 33:22, 35:22
**aside** [4] - 24:13, 33:11, 38:10, 46:7
**aspect** [2] - 30:17, 52:23
**aspirational** [2] - 20:8, 20:13
**assertion** [1] - 19:21
**asserts** [1] - 22:16
**assessed** [1] - 17:21
**assessment** [1] - 27:22
**assign** [1] - 47:3
**Assistant** [1] - 6:14
**assume** [1] - 35:12
**assuming** [1] - 9:8
**assure** [1] - 16:20
**Atlantic** [1] - 33:1
**attach** [1] - 44:24
**attempted** [2] - 34:12, 37:24
**attention** [1] - 7:21
**attorney** [6] - 24:22, 30:17, 41:4, 47:18, 55:13, 55:15
**Attorney's** [1] - 4:14
**attorney's** [8] - 26:9, 36:16, 37:15, 38:2, 48:1, 50:22, 51:19, 51:21
**attorneys** [6] - 7:18, 25:6, 42:5, 44:17, 44:25, 50:9
**AUSTIN** [1] - 2:8
**authorized** [1] - 51:15
**available** [3] - 31:3, 31:5, 31:11
**AVENUE** [1] - 1:25
**avoid** [5] - 18:22, 46:15, 46:25, 47:3, 53:9
**avoiding** [1] - 15:10
**aware** [2] - 21:2, 39:7

**B**

**based** [1] - 13:23
**bases** [1] - 29:6
**Basic** [1] - 9:1
**basis** [3] - 24:25, 31:13, 34:1
**BE** [1] - 3:9

**became** [1] - 45:7
**begin** [4] - 7:22, 28:15, 38:2, 52:6
**begins** [2] - 27:16
**behalf** [12] - 1:16, 1:20, 2:10, 2:15, 2:19, 5:7, 6:9, 6:20, 6:23, 26:25, 30:10, 43:12
**behind** [1] - 20:21
**belief** [1] - 52:15
**BELKNAP** [1] - 2:14
**Belknap** [2] - 6:19, 6:22
**Bell** [1] - 32:25
**belt** [1] - 29:20
**beneficial** [1] - 44:2
**benefit** [12] - 4:13, 8:21, 18:6, 19:13, 30:15, 30:16, 30:20, 34:6, 38:10, 38:11, 49:10, 50:1
**benefits** [2] - 14:8, 17:22
**BERGER** [1] - 1:12
**Bernstein** [2] - 5:12, 8:22
**BERNSTEIN** [1] - 1:12
**best** [4] - 15:19, 16:19, 48:11, 48:24
**better** [6] - 9:15, 13:5, 14:5, 18:15, 22:13, 48:8
**between** [6] - 17:23, 27:1, 30:14, 42:20, 45:21, 46:5
**big** [1] - 25:4
**Bill** [1] - 6:14
**billion** [6] - 24:20, 25:3, 25:11, 33:12, 33:13, 33:19
**binder** [1] - 35:11
**binders** [1] - 35:19
**binding** [2] - 19:22, 19:25
**bit** [4] - 9:11, 30:9, 30:13, 36:16
**board** [6] - 21:1, 21:2, 21:10, 27:10, 27:12, 28:7
**bones** [1] - 20:14
**bonuses** [1] - 21:18
**break** [1] - 48:12
**breakdown** [1] - 44:15
**breakdowns** [1] - 41:13
**bribe** [1] - 16:21
**brief** [5] - 8:8, 8:10, 8:11, 26:10, 54:7

**briefed** [1] - 12:13
**briefly** [2] - 49:7, 49:16
**Briefs** [1] - 4:5
**briefs** [4] - 8:8, 27:4, 44:18, 44:19
**bring** [4] - 7:21, 31:20, 37:3, 37:9
**bringing** [1] - 28:8
**broad** [1] - 41:21
**broke** [1] - 42:1
**brought** [2] - 34:22, 44:2
**building** [1] - 31:9
**built** [2] - 27:8, 43:19
**burden** [5] - 12:20, 18:24, 19:6, 19:9, 43:15
**BY** [12] - 1:11, 1:12, 1:14, 1:16, 1:18, 1:19, 2:7, 2:9, 2:13, 2:14, 2:17, 2:18
**Byrne** [2] - 5:7, 44:2
**BYRNE** [1] - 1:10

**C**

**C.C.R** [2] - 1:24, 3:14
**Calamore** [1] - 43:12
**calculate** [2] - 38:2, 38:15
**calculation** [2] - 38:3, 46:10
**cannot** [2] - 13:23, 15:21, 47:19
**Carella** [2] - 5:7, 44:2
**CARELLA** [1] - 1:10
**CARLSON** [9] - 2:9, 6:8, 6:12, 7:4, 51:5, 51:13, 53:3, 53:7, 53:25
**Carlson** [5] - 4:18, 6:9, 20:12, 51:4, 53:1
**Carmichael** [1] - 14:16
**case** [22] - 11:3, 11:12, 11:16, 14:16, 16:13, 26:13, 29:23, 31:14, 37:23, 38:16, 39:25, 40:9, 43:11, 43:13, 43:22, 45:8, 46:17, 47:11, 47:18, 50:16, 53:4
**cases** [11] - 10:23, 10:25, 11:13, 14:15, 15:13, 20:19, 33:2, 43:23, 46:13, 51:18, 52:12
**categories** [3] - 41:18,

41:20, 45:20
**category** [2] - 41:13, 41:22
**caution** [1] - 43:14
**cautious** [1] - 24:3
**CCR** [1] - 55:23
**CECCHI** [12] - 1:10, 1:11, 5:6, 5:12, 5:15, 5:19, 5:22, 6:1, 6:4, 23:15, 51:25, 52:24
**Cecchi** [3] - 4:18, 5:7, 51:23
**CENTER** [1] - 2:16
**certain** [3] - 15:9, 17:4, 21:20
**certainly** [13] - 8:12, 10:15, 10:19, 15:3, 15:12, 17:12, 18:10, 18:19, 24:10, 30:5, 34:13, 38:7, 40:3
**Certificate** [1] - 55:24
**CERTIFIED** [1] - 3:9
**Certified** [1] - 55:6
**certify** [2] - 55:7, 55:12
**cetera** [2] - 11:11, 40:8
**chain** [1] - 21:21
**Chairman** [4] - 10:11, 18:19, 32:24, 33:14
**challenge** [1] - 15:17
**change** [3] - 9:23, 10:4, 10:6
**changed** [2] - 29:24, 30:1
**changes** [1] - 10:3
**check** [3] - 37:21, 38:18, 40:3
**chief** [1] - 28:3
**CHOCIEY** [2] - 2:13, 6:24
**Chociey** [1] - 6:25
**chronology** [1] - 31:9
**Circuit** [10] - 23:23, 29:1, 29:22, 29:24, 33:1, 38:6, 50:25, 52:7, 52:9, 53:12
**circumstances** [1] - 53:9
**cite** [3] - 14:15, 26:23, 44:20
**cited** [2] - 26:10, 32:4
**citing** [1] - 26:20
**CIVIL** [1] - 1:2
**claim** [1] - 31:14
**claiming** [1] - 33:21
**clarification** [1] - 27:3
**CLARKSON** [1] - 1:6
**Class** [1] - 24:2

**class** [1] - 49:11
**CLASS** [1] - 2:16
**clear** [3] - 27:11, 39:4, 54:1
**clearly** [1] - 20:21
**CLERK** [2] - 5:2, 54:8
**clock** [1] - 52:6
**closely** [1] - 31:21
**colleagues** [1] - 31:15
**combination** [1] - 24:1
**comment** [2] - 28:11, 51:25
**comments** [2] - 27:1, 28:14
**Commissioner** [1] - 10:10
**committee** [1] - 28:5
**common** [3] - 33:15, 37:23, 38:16
**communicate** [1] - 48:6
**company** [20] - 9:23, 10:5, 10:7, 16:22, 19:23, 19:24, 20:1, 20:3, 20:5, 20:7, 20:11, 20:25, 21:12, 25:4, 25:11, 25:12, 27:17, 27:18, 33:3, 33:13
**comparables** [2] - 39:6, 39:12
**compare** [2] - 39:23, 40:5
**comparison** [3] - 22:4, 22:19, 22:20
**compensated** [1] - 48:18
**compensation** [10] - 4:7, 22:2, 22:5, 22:6, 27:5, 27:20, 28:4, 28:6, 28:11
**Compensation** [1] - 4:9
**competing** [1] - 42:18
**complaint** [10] - 21:8, 29:7, 31:7, 32:6, 45:6, 45:8, 45:22, 45:23, 45:24, 46:19
**complaints** [1] - 46:6
**compliance** [8] - 14:9, 16:16, 16:17, 16:20, 16:25, 22:10, 28:9, 32:1
**comply** [1] - 22:12
**concede** [3] - 10:25, 11:1, 28:25
**concluded** [1] - 54:9
**conclusion** [2] - 13:25, 35:25

**conclusorily** [1] - 22:16
**conferences** [2] - 42:7, 43:3
**consented** [1] - 42:19
**consequences** [1] - 9:24
**consider** [4] - 8:13, 41:1, 47:25, 49:20
**considerably** [1] - 24:3
**consideration** [1] - 53:13
**considered** [6] - 13:2, 14:11, 14:12, 22:6, 22:10, 49:21
**considering** [1] - 30:14
**considers** [1] - 38:6
**consolidation** [1] - 42:12
**consult** [1] - 28:4
**context** [2] - 18:11, 38:12
**contextual** [1] - 39:6
**continued** [1] - 1:22
**contradicts** [1] - 8:22
**control** [3] - 10:1, 18:21, 21:12
**controls** [2] - 18:3, 18:5
**copy** [1] - 35:18
**core** [3] - 22:10, 27:22, 27:24
**corporate** [17] - 10:2, 10:4, 10:6, 11:14, 13:5, 13:7, 13:8, 15:9, 15:11, 15:20, 16:3, 16:5, 16:6, 17:20, 17:22, 18:12, 30:25
**Corporate** [1] - 26:21
**corporation** [4] - 8:24, 18:7, 19:14
**correct** [23] - 19:19, 23:14, 23:15, 29:4, 29:5, 29:9, 29:10, 29:15, 29:16, 32:19, 33:25, 34:20, 35:14, 36:4, 36:10, 39:16, 39:19, 39:20, 40:20, 46:2, 46:4, 49:12, 53:24
**cost** [1] - 25:14
**costing** [1] - 25:10
**costs** [2] - 14:9, 33:7
**Counsel** [2] - 2:11, 6:14
**counsel** [16] - 5:17, 7:1, 7:12, 7:17, 31:6, 37:8, 37:18, 43:2, 43:4, 43:16, 44:19, 46:12, 53:19, 55:13, 55:15
**couple** [1] - 37:18

**course** [4] - 21:1, 38:12, 40:21, 48:23
**court** [2] - 5:1, 42:6
**COURT** [97] - 1:1, 1:24, 3:15, 5:3, 5:11, 5:21, 5:25, 6:7, 6:17, 7:3, 7:9, 8:1, 8:15, 9:8, 10:9, 10:17, 11:2, 11:8, 11:21, 11:24, 12:22, 13:8, 13:11, 13:20, 14:23, 15:1, 15:25, 17:2, 19:16, 20:5, 22:25, 23:4, 23:17, 24:6, 24:24, 25:19, 25:25, 26:2, 26:16, 28:13, 28:17, 28:24, 29:6, 29:11, 29:17, 29:21, 30:2, 30:8, 30:13, 30:19, 32:14, 33:23, 34:4, 34:24, 35:3, 35:5, 35:9, 35:11, 35:16, 36:2, 36:5, 36:11, 36:14, 36:20, 37:7, 37:13, 38:15, 39:1, 39:9, 39:17, 39:21, 39:23, 40:2, 40:17, 40:22, 41:8, 41:12, 42:25, 44:13, 45:13, 46:3, 46:5, 47:22, 48:24, 49:6, 49:14, 51:2, 51:11, 51:23, 52:5, 52:20, 53:1, 53:6, 53:11, 53:18, 53:21, 54:5
**Court** [18] - 4:11, 4:16, 9:1, 11:17, 17:10, 19:4, 22:22, 23:25, 29:13, 39:4, 40:13, 41:19, 43:15, 46:20, 52:16, 55:6
**Court's** [2] - 47:24, 48:9
**COURTHOUSE** [1] - 1:6
**Courtroom** [1] - 26:21
**Courts** [4] - 24:3, 33:15, 41:1, 41:13
**courts** [1] - 15:19
**CRACO** [2] - 2:11, 6:16
**Craco** [1] - 6:14
**creating** [1] - 44:6
**credentials** [1] - 12:25
**credo** [12] - 13:6, 19:23, 19:24, 20:3, 20:5, 20:7, 20:14, 20:18, 20:19, 20:21, 21:23
**criteria** [1] - 44:21
**critical** [1] - 27:25

**cross** [3] - 37:21, 38:18, 40:3
**cross-check** [3] - 37:21, 38:18, 40:3

---

**D**

**damage** [1] - 33:13
**Danzig** [1] - 6:25
**DANZIG** [1] - 2:12
**date** [1] - 55:10
**Date** [1] - 55:24
**David** [1] - 7:7
**DAVID** [1] - 2:18
**days** [2] - 50:24, 52:18
**deal** [4] - 24:14, 28:18, 36:23, 45:19
**dealing** [1] - 24:16
**dealt** [1] - 36:25
**debates** [1] - 12:3
**decade's** [1] - 19:23
**decentralization** [1] - 21:3
**decentralize** [1] - 21:6
**decide** [1] - 54:4
**decided** [3] - 51:20, 52:14, 53:13
**declaration** [4] - 8:18, 41:5, 44:10, 44:11
**decline** [1] - 10:8
**deeply** [1] - 43:7
**defend** [1] - 25:14
**Defendant** [1] - 2:10
**defendants** [3] - 6:20, 6:23, 7:2
**Defendants** [1] - 2:15
**defer** [1] - 51:7
**deficient** [1] - 19:11
**defined** [1] - 27:23
**definitely** [1] - 23:15
**definition** [1] - 20:17
**delayed** [1] - 51:22
**Demand** [2] - 1:16, 1:20
**demand** [15] - 5:17, 30:21, 31:15, 31:17, 42:13, 42:14, 42:15, 42:17, 43:1, 43:6, 45:17, 45:22, 45:23, 47:11
**denial** [2] - 50:23, 52:17
**denied** [1] - 50:19
**deny** [1] - 49:17
**DERIVATIVE** [1] - 1:4
**derivative** [6] - 11:7,

11:9, 11:13, 18:2, 18:11, 30:21
**derivatives** [1] - 26:10
**desire** [1] - 53:9
**detail** [1] - 43:9
**detailed** [1] - 41:5
**determination** [2] - 47:5, 47:19
**determine** [3] - 10:12, 41:19, 50:15
**determined** [1] - 41:16
**determining** [1] - 17:6
**developed** [1] - 9:3
**dialogue** [1] - 27:1
**difference** [8] - 10:5, 13:3, 19:12, 19:13, 20:1, 22:3, 22:13, 22:20
**different** [15] - 9:11, 11:12, 12:6, 15:3, 19:22, 31:20, 34:21, 40:5, 42:5, 44:6, 45:3, 45:4, 45:6, 45:8, 47:8
**directly** [2] - 8:21, 42:23
**discovery** [1] - 46:19
**discussing** [2] - 43:17, 44:5
**discussion** [2] - 49:18, 54:7
**dismiss** [4] - 4:12, 28:20, 29:14, 47:10
**dismissal** [1] - 29:7
**dismissed** [1] - 21:8
**dismissing** [2] - 51:18, 53:4
**disregard** [1] - 26:12
**dissemination** [1] - 9:4
**DISTRICT** [2] - 1:1, 1:1
**District's** [1] - 43:14
**divided** [1] - 47:13
**dixit** [1] - 15:20
**documentation** [1] - 40:7
**dollar** [5] - 25:12, 35:1, 35:23, 36:1, 36:3
**dollars** [3] - 25:3, 33:13, 33:20
**don** [1] - 6:12
**DONALD** [1] - 2:7
**done** [9] - 12:14, 12:17, 19:19, 21:24, 25:17, 41:1, 48:4
**DOWD** [1] - 1:15
**down** [7] - 16:22, 18:16,

21:20, 27:17, 42:1, 46:9, 48:12
**Downs** [1] - 5:22
**DOWNS** [2] - 1:16, 5:24
**Dr** [4] - 18:20, 22:6, 31:21, 32:24
**draft** [1] - 44:12
**drafted** [2] - 43:17, 44:6
**drafting** [2] - 44:18, 45:23
**drawn** [1] - 12:17
**drops** [1] - 17:6
**duplication** [3] - 46:15, 46:22, 47:14
**duplicative** [1] - 40:18

---

**E**

**easier** [1] - 53:8
**EAST** [1] - 1:6
**echo** [1] - 25:20
**econometricians** [1] - 16:2
**economic** [10] - 9:12, 32:17, 33:6, 34:1, 34:13, 34:14, 34:15, 36:7, 37:25, 38:9
**economically** [4] - 14:11, 24:21, 25:7, 25:15
**economists** [1] - 16:2
**Edwin** [1] - 6:25
**EDWIN** [1] - 2:13
**effect** [3] - 15:8, 16:3, 16:7
**efficiently** [1] - 45:10
**effort** [2] - 31:19, 32:8
**either** [3] - 34:25, 47:16, 53:6
**elucidation** [1] - 46:21
**eminently** [1] - 13:16
**Empirical** [1] - 26:22
**employ** [1] - 12:11
**employed** [1] - 19:8
**employee** [3] - 21:18, 55:13, 55:15
**employees** [1] - 32:9
**employment** [1] - 52:12
**ended** [1] - 42:3
**enemy** [1] - 8:4
**engage** [2] - 31:6, 31:8
**engendering** [1] - 14:9
**engineering** [1] - 14:25
**entered** [1] - 51:18

**entering** [1] - 51:11
**entire** [3] - 12:17, 16:23, 27:7
**ENTITLED** [1] - 3:11
**Erickson** [2] - 12:7, 17:15
**ERIK** [1] - 2:14
**Erik** [1] - 6:19
**Erikson** [5] - 26:6, 26:7, 26:8, 26:12, 26:21
**esoteric** [1] - 15:5
**ESQUIRE** [17] - 1:11, 1:12, 1:14, 1:14, 1:16, 1:18, 1:19, 1:20, 2:7, 2:9, 2:9, 2:11, 2:13, 2:14, 2:15, 2:17, 2:18
**ESQUIRES** [11] - 1:10, 1:12, 1:13, 1:15, 1:17, 1:19, 2:7, 2:8, 2:12, 2:14, 2:18
**essentially** [3] - 18:17, 20:9, 42:18
**established** [1] - 50:14
**et** [2] - 11:11, 40:8
**evaluate** [2] - 31:13, 36:17
**event** [8] - 10:13, 10:22, 11:16, 16:9, 16:10, 16:14, 17:5, 19:3
**evidence** [5] - 15:22, 16:4, 16:6, 22:5, 22:7
**exactly** [5] - 9:18, 15:1, 27:9, 34:19, 36:6
**examine** [1] - 17:23
**example** [4] - 16:19, 17:20, 18:4, 19:21
**excessive** [2] - 40:19, 49:11
**exclusion** [1] - 14:16
**excuse** [1] - 42:14
**exercise** [1] - 33:6
**exercising** [1] - 34:1
**expectation** [1] - 16:15
**expected** [2] - 9:21, 16:15
**expended** [5] - 39:18, 40:18, 46:17, 47:24, 48:3
**expense** [1] - 45:25
**experience** [3] - 13:24, 13:25, 14:4
**experienced** [1] - 46:11
**expert** [10] - 12:24, 13:1,

13:13, 13:23, 14:17, 22:14, 34:15, 46:16, 47:16
**expert's** [1] - 14:19
**experts** [12] - 10:14, 13:14, 13:15, 14:1, 14:17, 15:5, 15:20, 18:18, 20:2, 24:22, 34:21, 37:1
**explain** [4] - 34:23, 41:23, 43:11, 45:12
**explaining** [1] - 13:24
**explanation** [1] - 48:7
**extent** [2] - 8:14, 10:11

---

**F**

**F.3d** [1] - 23:25
**face** [1] - 18:5
**fact** [9] - 8:25, 10:2, 11:19, 12:3, 13:1, 15:18, 17:4, 17:15, 22:7
**factor** [1] - 22:12
**factors** [7] - 24:6, 24:7, 38:6, 38:8, 39:8, 49:23, 49:25
**failed** [2] - 15:18, 19:5
**failings** [1] - 32:10
**failure** [1] - 24:18
**fair** [4] - 23:8, 40:1, 49:18, 54:4
**fairly** [1] - 48:18
**fairness** [1] - 30:14
**FAIRNESS** [1] - 2:16
**familiar** [1] - 43:7
**fashion** [2] - 41:25, 47:1
**fast** [1] - 52:2
**FCPA** [4] - 9:25, 16:20, 16:25, 17:1
**federal** [1] - 23:24
**fee** [6] - 26:13, 30:17, 39:10, 51:19, 51:21, 54:4
**fees** [18] - 4:14, 26:9, 36:17, 36:22, 36:23, 37:4, 37:15, 38:2, 47:2, 48:1, 49:11, 50:9, 50:22, 51:3, 52:11, 52:13, 53:13, 54:3
**field** [4] - 13:24, 15:3, 46:16, 47:16
**file** [1] - 45:1
**filed** [6] - 42:16, 43:10, 43:20, 43:22, 44:7,

44:12
**filing** [2] - 7:23, 30:21
**final** [4] - 51:3, 52:15, 52:17, 53:4
**Finance** [1] - 9:20
**financially** [1] - 55:16
**findings** [1] - 30:4
**fine** [3] - 8:16, 45:14, 49:14
**finished** [1] - 36:11
**firm** [11] - 5:15, 6:2, 6:5, 32:8, 34:8, 41:24, 41:25, 42:2, 43:20, 44:1, 44:8
**firms** [4] - 42:20, 43:12, 43:21, 47:8
**first** [7] - 9:20, 13:13, 14:4, 15:11, 28:18, 28:22, 28:25
**FISHER** [1] - 1:6
**flown** [1] - 40:6
**FLW** [1] - 1:2
**focus** [1] - 37:16
**focused** [2] - 31:15, 31:16
**focusing** [1] - 36:21
**following** [2] - 21:4, 49:16
**FOLLOWING** [1] - 3:9
**FOR** [2] - 1:1, 2:16
**foregoing** [1] - 55:8
**foreign** [2] - 16:21, 16:22
**form** [2] - 43:23, 51:9
**formal** [2] - 48:5, 50:8
**former** [1] - 32:9
**forming** [1] - 43:17
**forth** [1] - 55:11
**forward** [1] - 8:2
**fought** [2] - 27:6, 27:25
**four** [1] - 16:10
**FRANK** [40] - 2:17, 7:5, 7:25, 8:5, 8:18, 9:12, 10:16, 10:24, 11:18, 11:22, 12:19, 12:23, 13:10, 13:19, 14:3, 14:25, 15:16, 16:2, 19:10, 19:19, 22:1, 23:2, 23:21, 24:17, 25:1, 25:23, 26:1, 26:4, 28:23, 29:5, 29:10, 29:16, 29:19, 29:22, 30:7, 37:6, 49:12, 50:18, 52:16, 53:17
**frank** [2] - 7:5, 11:10

**Frank** [22] - 4:5, 4:12, 4:17, 6:1, 8:5, 13:11, 15:15, 18:17, 19:16, 25:25, 27:2, 28:21, 36:24, 37:2, 49:7, 49:8, 49:20, 50:17, 51:7, 51:22, 52:5, 53:15
**frankly** [7] - 7:15, 18:8, 44:18, 47:6, 47:23, 50:5, 51:8
**Franks'** [1] - 53:8
**FREDA** [1] - 1:8
**free** [1] - 25:16
**free-ride** [1] - 25:16
**front** [2] - 20:11, 42:23
**FRUCHTER** [1] - 1:19
**full** [2] - 28:8, 40:6
**fund** [2] - 37:24, 38:16
**furtherance** [2] - 22:9, 22:11
**Futility** [1] - 1:16
**futility** [6] - 31:14, 42:13, 42:17, 43:6, 43:10, 47:11
**future** [11] - 9:17, 9:22, 9:24, 15:10, 16:15, 18:23, 33:4, 33:17, 34:5, 34:11, 36:8

### G

**Gary** [1] - 5:15
**GARY** [1] - 1:18
**GELLER** [1] - 1:15
**Geller** [3] - 5:23, 32:8, 44:8
**general** [3] - 41:25, 45:20, 47:1
**General** [1] - 6:14
**generally** [1] - 9:6
**Gerald** [1] - 25:8
**Girsh** [1] - 24:7
**given** [4] - 13:1, 23:18, 26:12, 27:1
**Glass** [5] - 18:20, 22:6, 31:21, 32:24, 35:13
**GMC** [1] - 23:24
**goals** [1] - 20:10
**GOLDBERG** [2] - 2:15, 6:21
**Goldberg** [1] - 6:22
**Goldhamer** [1] - 5:16
**GOLDHAMER** [1] - 1:17

**governance** [16] - 10:2, 10:4, 10:6, 11:14, 15:9, 15:12, 15:20, 16:3, 16:5, 16:6, 17:20, 17:23, 18:12, 28:9, 30:25, 32:1
**Governance** [1] - 26:21
**Government** [1] - 33:12
**governmental** [1] - 30:22
**GRAIFMAN** [3] - 1:17, 1:18, 5:16
**Graifman** [2] - 5:15, 5:17
**great** [3] - 12:8, 13:1, 20:9
**GROSSMANN** [1] - 1:12
**group** [2] - 43:17, 43:23
**guarantee** [1] - 16:19
**guess** [3] - 28:21, 46:8, 53:21

### H

**Haas** [1] - 6:19
**HAAS** [2] - 2:14, 6:18
**half** [1] - 33:19
**hand** [1] - 35:24
**handle** [1] - 46:15
**happy** [1] - 25:23, 52:1
**hard** [4] - 10:21, 27:6, 27:25, 45:10
**hard-fought** [2] - 27:6, 27:25
**harm** [3] - 15:10, 34:11, 36:8
**harmed** [1] - 8:24
**harms** [1] - 18:22
**Harvey** [2] - 8:19, 14:6
**hear** [4] - 12:10, 30:6, 49:7, 53:7
**heard** [2] - 25:19, 29:13
**hearing** [1] - 34:7
**help** [2] - 16:16, 16:17
**helpful** [2] - 47:20, 50:23
**Henderson** [2] - 15:23, 16:9
**hereby** [1] - 55:7
**hereinbefore** [1] - 55:10
**high** [1] - 48:20
**highest** [1] - 21:21
**highlight** [2] - 8:16, 44:24
**highly** [1] - 44:1
**hinging** [1] - 17:3
**hired** [2] - 32:7, 45:25

**hold** [3] - 24:12, 52:21, 52:22
**holding** [1] - 9:1
**holds** [3] - 24:20, 25:3, 52:16
**Honor** [75] - 5:6, 5:10, 5:14, 5:20, 5:24, 6:3, 6:6, 6:8, 6:11, 6:16, 6:18, 6:21, 6:24, 14:4, 23:15, 25:1, 25:23, 26:24, 27:3, 27:9, 27:21, 27:24, 28:1, 28:12, 28:23, 29:5, 29:10, 29:16, 29:19, 30:7, 30:12, 30:18, 31:8, 32:5, 32:13, 32:20, 32:23, 33:7, 33:10, 34:20, 35:15, 35:22, 35:25, 36:19, 37:6, 37:12, 38:5, 38:12, 38:14, 38:25, 39:7, 40:21, 40:25, 41:5, 42:21, 43:5, 43:8, 44:4, 45:4, 45:9, 46:4, 47:21, 48:22, 49:3, 49:12, 50:18, 51:5, 51:15, 51:25, 52:3, 52:24, 52:25, 53:17, 53:20, 54:3
**HONORABLE** [1] - 1:8
**hope** [1] - 51:5
**hoping** [1] - 24:15
**hostile** [1] - 10:7
**hour** [1] - 47:18
**hourly** [3] - 39:15, 40:14, 41:17
**hours** [18] - 39:18, 39:24, 40:18, 41:19, 41:24, 42:9, 42:20, 43:2, 43:3, 43:4, 45:17, 45:23, 45:24, 46:6, 46:17, 47:12, 47:14, 48:3
**House** [1] - 2:11
**houses** [1] - 24:9
**hundred** [2] - 16:1, 16:24
**hurt** [1] - 17:1
**hurts** [1] - 16:18
**HYLAND** [1] - 2:12
**Hyland** [1] - 6:25

### I

**ideas** [1] - 15:11
**identify** [1] - 35:16
**Ignore** [1] - 4:7

**ignore** [1] - 22:23
**Ill** [1] - 1:16
**illusory** [1] - 22:8
**imagine** [1] - 33:18
**impact** [1] - 15:10
**implementation** [1] - 28:5
**important** [2] - 28:8, 38:7
**improvements** [1] - 15:12
**IN** [2] - 1:3, 3:10
**In-House** [1] - 2:11
**Inc** [1] - 9:1
**included** [7] - 17:25, 26:19, 30:25, 31:9, 42:6, 46:3, 50:3
**includes** [1] - 42:13
**including** [2] - 22:11, 31:4
**income** [2] - 9:22
**incorrect** [1] - 23:23
**indeed** [4] - 17:13, 46:12, 46:19, 47:5
**independent** [2] - 31:6, 47:5
**indicates** [1] - 22:15
**indication** [1] - 13:2
**Individual** [1] - 2:15
**individual** [7] - 6:20, 6:23, 7:1, 13:21, 22:25, 24:11, 48:2
**industry** [1] - 14:18
**infer** [1] - 24:18
**inferring** [1] - 24:4
**information** [10] - 9:5, 21:6, 27:10, 31:6, 37:19, 40:15, 40:24, 41:22, 47:23, 48:13
**initial** [2] - 31:7, 31:15
**injunctive** [3] - 11:15, 32:17, 37:25
**inquiries** [1] - 39:15
**inside** [1] - 27:18
**instance** [5] - 31:21, 42:11, 45:16, 45:21, 47:10
**instead** [2] - 17:15, 43:24
**instituting** [1] - 15:8
**institutional** [5] - 24:9, 24:12, 24:19, 24:20, 25:16
**interchangeably** [1] - 37:21

**interested** [1] - 55:16
**interlocutory** [1] - 51:2
**internal** [2] - 18:3, 18:4
**international** [1] - 16:23
**intervene** [14] - 4:12, 28:20, 28:24, 29:2, 29:7, 29:17, 29:23, 42:15, 43:1, 49:18, 50:20, 50:24, 52:17, 53:5
**intervenor** [2] - 7:6, 7:8
**Intervenor/Objector** [1] - 2:19
**intervention** [3] - 29:12, 30:5, 51:22
**investigations** [2] - 30:23, 31:4
**investigators** [3] - 32:7, 45:25, 46:1
**investor** [1] - 24:11
**investors** [3] - 24:9, 24:12, 25:16
**involved** [2] - 14:16, 34:8
**ipse** [1] - 15:20
**irrational** [1] - 24:21
**IS** [1] - 3:9
**issue** [20] - 4:9, 12:13, 13:21, 14:23, 24:13, 28:12, 28:19, 32:22, 33:3, 34:21, 36:23, 37:14, 48:1, 50:8, 51:3, 51:12, 51:21, 52:2, 52:11, 52:13
**issued** [2] - 20:22, 50:21
**issues** [9] - 10:1, 14:25, 15:4, 27:13, 31:18, 39:6, 47:15, 51:19
**issuing** [3] - 50:21, 50:23, 52:10
**itself** [3] - 20:18, 36:22, 37:11

**J**

**J&J** [4] - 20:24, 30:24, 31:24, 33:8
**J&J's** [1] - 31:5
**James** [1] - 5:7
**JAMES** [1] - 1:11
**Jeff** [1] - 5:19
**JEFFREY** [1] - 1:19
**Jersey** [2] - 7:1, 55:7
**JERSEY** [2] - 1:1, 1:25
**Jessica** [1] - 26:21
**Johnson** [13] - 2:10,

2:11, 6:9, 6:15, 16:22, 20:19, 24:20, 24:21
**JOHNSON** [2] - 1:3
**Johnson's** [1] - 16:22
**join** [1] - 25:20
**joint** [1] - 41:4
**JOSHUA** [1] - 2:15
**Joshua** [1] - 6:22
**journal** [1] - 14:10
**Judge** [2] - 12:15, 34:8
**judgment** [9] - 33:6, 34:1, 51:9, 51:11, 51:14, 51:18, 52:10, 52:17, 53:4
**justice** [1] - 14:14

**K**

**Kantrowitz** [1] - 5:16
**KANTROWITZ** [1] - 1:17
**KAREN** [1] - 1:14
**Karen** [2] - 5:8, 26:25
**kickback** [1] - 33:9
**kind** [8] - 10:22, 11:12, 18:8, 18:18, 19:3, 19:8, 33:3, 33:17
**kinds** [3] - 32:10, 34:9, 47:17
**known** [1] - 44:1
**knows** [2] - 9:14, 22:15
**KRISTEN** [1] - 2:9
**Kristen** [1] - 6:10
**Kumho** [2] - 14:15, 14:23

**L**

**label** [3] - 31:10, 31:17, 33:9
**laid** [1] - 33:9
**last** [1] - 8:8
**law** [2] - 44:20, 44:21
**Law** [1] - 26:22
**lawyers** [1] - 25:18
**lead** [5] - 42:11, 43:2, 43:15, 44:19, 45:7
**lead-counsel-type** [1] - 44:19
**leadership** [1] - 44:6
**leads** [1] - 13:25
**least** [1] - 18:5
**LEBOVITCH** [2] - 1:12, 5:14
**Lebovitch** [5] - 5:12, 43:25

**Lebovitch's** [1] - 43:19
**led** [3] - 24:2, 30:24, 32:11
**left** [3] - 7:22, 38:1, 50:10
**legal** [1] - 8:11
**lengthy** [2] - 27:4, 50:5
**less** [2] - 9:23, 25:9
**letter** [2] - 25:20, 31:15
**letters** [2] - 30:21, 45:22
**level** [3] - 27:17, 28:7, 43:8
**levels** [3] - 21:18, 21:20, 21:22
**Levinson** [1] - 9:2
**liability** [1] - 23:24
**liaison** [1] - 5:17
**life** [3] - 10:21, 17:17, 53:8
**likelihood** [2] - 33:16, 33:19
**likely** [1] - 9:24
**limited** [1] - 23:10
**link** [1] - 17:23
**linking** [1] - 18:12
**lists** [2] - 16:9, 16:10
**literature** [1] - 10:15
**litigation** [4] - 8:23, 11:1, 11:7, 41:6
**LITIGATION** [1] - 1:4
**Litowitz** [3] - 5:13, 8:22, 34:8
**LITOWITZ** [1] - 1:12
**Litvak** [1] - 16:10
**lodestar** [21] - 37:20, 38:3, 38:6, 38:13, 38:18, 38:22, 38:24, 39:3, 39:5, 39:10, 39:15, 40:3, 40:4, 40:6, 40:10, 40:12, 46:10, 48:16, 49:1, 50:14
**long-standing** [1] - 19:23
**look** [11] - 12:15, 13:4, 19:15, 23:9, 35:17, 35:19, 38:13, 38:17, 39:14, 39:25, 52:7
**looked** [2] - 12:4, 41:14
**looking** [6] - 7:15, 23:8, 24:7, 39:12, 39:13, 47:6
**looks** [1] - 35:18
**loose** [1] - 35:18
**loss** [2] - 32:23, 35:25
**lower** [1] - 21:18

lowest [1] - 21:20

**M**

maintaining [1] - 21:19
management [2] - 27:15, 27:16
managers [1] - 27:21
manner [4] - 12:12, 36:17, 38:1
marginal [2] - 13:3, 22:20
mark [1] - 5:12
Mark [3] - 2:19, 7:6, 22:24
MARK [1] - 1:12
market [9] - 9:3, 9:15, 9:18, 9:19, 9:21, 11:18, 11:19, 16:14, 17:5
Mary [1] - 26:22
Master [4] - 47:25, 50:12, 52:3, 53:22
material [7] - 9:4, 9:5, 10:4, 19:13, 19:25, 22:3, 22:13
materially [1] - 19:22
materials [1] - 48:2
matter [4] - 15:2, 25:21, 50:1, 50:20
MATTER [1] - 3:11
matters [2] - 30:24, 32:3
McKenzie [1] - 21:5
mean [1] - 34:23
means [1] - 20:20
meant [2] - 20:18, 23:14
meantime [1] - 44:3
measure [1] - 17:22
meat [1] - 20:13
median [1] - 26:13
meet [1] - 19:5
meetings [1] - 28:4
members [1] - 21:10
mention [2] - 26:11, 27:14
mentioned [1] - 32:23
mere [2] - 15:20, 38:9
merited [3] - 46:23, 47:19, 48:21
merits [1] - 24:14
Merola [2] - 32:21, 34:1
method [3] - 12:14, 19:4, 40:5
methodologies [1] -

16:11
methodology [4] - 14:6, 14:8, 14:17, 18:8
methods [2] - 12:8, 12:9
microphone [1] - 8:2
might [2] - 34:2, 50:25
MILLER [1] - 2:7
Miller [1] - 6:13
million [4] - 25:2, 25:7, 25:13, 25:14
Mills [1] - 32:25
mind [1] - 18:14
mindful [1] - 43:13
mirror [1] - 29:8
misconduct [2] - 17:24, 18:2
misrepresentations [3] - 9:4, 9:10, 11:11
modified [1] - 51:10
moment [6] - 13:11, 26:17, 30:8, 34:23, 36:23, 43:11
monetary [1] - 32:16
money [2] - 25:18, 25:22
morning [20] - 5:6, 5:10, 5:11, 5:14, 5:20, 5:21, 5:24, 5:25, 6:3, 6:6, 6:7, 6:8, 6:11, 6:16, 6:17, 6:18, 6:21, 6:24, 7:3, 26:24
Morris [14] - 4:8, 4:13, 4:15, 5:8, 5:9, 6:1, 26:25, 41:9, 43:10, 44:10, 44:14
MORRIS [47] - 1:13, 1:14, 1:14, 5:10, 6:3, 11:7, 26:24, 28:16, 30:12, 30:18, 31:8, 32:20, 33:25, 34:20, 35:1, 35:4, 35:8, 35:10, 35:15, 35:22, 36:3, 36:10, 36:13, 36:19, 37:12, 38:5, 38:25, 39:3, 39:16, 39:20, 39:22, 40:1, 40:16, 40:21, 40:25, 41:11, 42:21, 43:5, 45:3, 46:2, 46:4, 47:20, 48:22, 49:2, 52:25, 53:20
Morris' [1] - 6:1
mostly [1] - 30:16
motion [16] - 28:19, 28:24, 29:14, 42:5,

42:12, 43:15, 43:18, 44:7, 47:10, 47:15, 49:17, 50:19, 50:24, 52:17, 52:19, 53:5
motions [5] - 41:22, 41:23, 42:15, 42:20, 43:1
move [2] - 10:3, 21:25
moves [2] - 21:7, 21:21
MR [68] - 5:6, 5:12, 5:14, 5:15, 5:16, 5:19, 5:20, 5:22, 5:24, 6:1, 6:3, 6:4, 6:6, 6:8, 6:12, 6:16, 6:18, 6:21, 6:24, 7:4, 7:5, 7:7, 7:25, 8:5, 8:18, 9:12, 10:16, 10:24, 11:18, 11:22, 12:19, 12:23, 13:10, 13:19, 14:3, 14:25, 15:16, 16:2, 19:10, 19:19, 22:1, 23:2, 23:15, 23:21, 24:17, 25:1, 25:23, 26:1, 26:4, 28:23, 29:5, 29:10, 29:16, 29:19, 29:22, 30:7, 37:6, 49:12, 50:18, 51:5, 51:13, 51:25, 52:16, 52:24, 53:3, 53:7, 53:17, 53:25
MS [43] - 5:10, 6:11, 11:7, 26:24, 28:16, 30:12, 30:18, 31:8, 32:20, 33:25, 34:20, 35:1, 35:4, 35:8, 35:10, 35:15, 35:22, 36:3, 36:10, 36:13, 36:19, 37:12, 38:5, 38:25, 39:3, 39:16, 39:20, 39:22, 40:1, 40:16, 40:21, 40:25, 41:11, 42:21, 43:5, 45:3, 46:2, 46:4, 47:20, 48:22, 49:2, 52:25, 53:20
multi [1] - 25:11
multi-billion [1] - 25:11
multiplier [5] - 38:23, 39:2, 40:11, 50:13, 50:15
multipliers [1] - 39:13
must [1] - 40:9
MY [1] - 3:10

**N**

narrative [1] - 41:5

narrower [1] - 23:22
nature [3] - 20:7, 39:14, 42:7
necessarily [1] - 10:18
necessary [3] - 48:3, 48:7, 52:2
need [12] - 19:4, 20:16, 20:25, 21:2, 21:11, 29:2, 29:17, 29:23, 43:9, 44:7, 47:23, 51:14
needed [2] - 31:22, 48:14
needs [2] - 51:9, 53:10
negotiated [1] - 28:10
negotiating [2] - 44:3, 44:16
negotiation [1] - 27:7
never [4] - 16:21, 19:2, 46:18, 46:19
NEW [2] - 1:1, 1:25
New [2] - 7:1, 55:7
new [5] - 4:7, 8:18, 22:2, 22:21
nice [1] - 20:12
NIEPORENT [2] - 2:18, 7:7
Nieporent [1] - 7:7
NJ [1] - 1:6
NO [1] - 1:2
nobody [1] - 26:4
none [2] - 24:9, 37:12
nonstarter [1] - 20:6
normal [1] - 40:19
normally [2] - 52:8, 52:11
noted [1] - 27:3
notes [1] - 26:12
NOTES [1] - 3:10
nothing [4] - 20:18, 20:20, 22:15, 34:18
notice [3] - 26:2, 26:4, 51:15
notion [2] - 17:3, 19:1
novel [3] - 17:11, 44:20, 47:15
nowhere [1] - 20:3
number [17] - 7:16, 8:11, 20:23, 22:25, 23:9, 23:18, 24:2, 24:4, 24:7, 35:2, 35:16, 35:23, 36:1, 36:24, 38:5, 42:10, 47:7
numbers [3] - 23:11, 23:18, 48:20
numerous [1] - 30:22

**O**

**object** [3] - 24:19, 24:23, 25:9
**objected** [1] - 24:10
**objection** [3] - 17:3, 23:3, 26:5
**objections** [19] - 4:7, 22:23, 23:1, 23:2, 23:9, 23:19, 23:20, 24:8, 24:15, 25:21, 29:8, 29:13, 30:6, 30:9, 36:21, 37:1, 37:3, 37:10, 49:21
**Objections** [1] - 4:14
**objective** [7] - 15:6, 15:22, 16:4, 16:6, 16:8, 27:23, 27:24
**objectively** [3] - 16:4, 16:12, 16:13
**objectives** [1] - 22:10
**objector** [7] - 7:6, 7:8, 8:6, 22:24, 24:20, 29:1
**objectors** [2] - 24:4, 24:19
**objectors'** [1] - 7:14
**observation** [1] - 52:1
**observations** [1] - 24:1
**obviously** [8] - 7:11, 8:7, 30:14, 34:18, 38:21, 41:21, 46:21, 48:16
**occurred** [3] - 20:24, 21:4, 47:6
**OCTOBER** [1] - 1:4
**OF** [3] - 1:1, 1:3, 3:10
**off-label** [3] - 31:10, 31:17, 33:9
**offer** [1] - 38:13
**officer** [1] - 28:3
**official** [1] - 16:21
**Official** [1] - 55:5
**OFFICIAL** [2] - 1:24, 3:15
**officially** [1] - 29:14
**often** [1] - 15:5
**old** [3] - 19:23, 22:4, 22:6
**OLSTEIN** [1] - 1:10
**once** [4] - 41:16, 50:13, 51:16, 51:17
**one** [29] - 10:12, 10:14, 13:11, 14:1, 14:4, 15:16, 17:22, 20:9, 21:7, 21:17, 23:13, 24:6, 24:7, 27:2, 34:12, 35:12, 36:8, 37:16, 41:7, 41:15, 44:7,
44:13, 44:23, 45:7, 45:14, 46:9, 48:6, 49:17, 50:18
**ones** [1] - 34:22
**ongoing** [2] - 30:23, 30:24
**open** [3] - 5:1, 9:3, 50:10
**operates** [1] - 20:1
**operational** [2] - 27:17, 27:24
**operations** [1] - 16:23
**opine** [2] - 14:1, 19:1
**opined** [6] - 10:14, 18:20, 34:24, 35:1, 35:6
**opines** [1] - 36:6
**opining** [1] - 14:24
**opinion** [9] - 13:23, 20:22, 30:4, 49:19, 49:24, 50:3, 50:8, 51:12, 51:16
**opinions** [2] - 41:14, 50:5
**opportunity** [1] - 8:9
**opposed** [3] - 17:17, 19:18, 30:22
**order** [9] - 29:3, 50:21, 50:22, 51:3, 51:9, 51:14, 51:17, 51:18, 52:10
**original** [1] - 45:22
**originally** [1] - 43:22
**otherwise** [2] - 10:23, 10:25
**outset** [1] - 37:17
**outstanding** [1] - 52:13
**outweigh** [1] - 14:9
**overall** [4] - 23:18, 37:5, 42:10, 47:7
**overlap** [2] - 30:13, 30:17
**oversee** [1] - 28:5
**overseen** [1] - 32:7
**own** [5] - 12:3, 25:18, 31:6, 31:9, 43:22

**P**

**Page** [1] - 4:3
**page** [2] - 35:5, 36:5
**paper** [1] - 7:15
**papers** [5] - 7:20, 14:19, 14:20, 32:15, 49:13
**paragraph** [2] - 20:9, 35:16
**part** [4] - 27:7, 36:14,
43:19, 46:23
**particular** [3] - 13:25, 31:24, 41:20
**particularly** [1] - 48:17
**parties** [1] - 55:14
**partner** [1] - 6:10
**PATRICK** [1] - 1:14
**Patterson** [2] - 6:19, 6:22
**PATTERSON** [1] - 2:14
**pause** [2] - 35:21, 46:21
**PAXSON** [1] - 1:25
**pay** [4] - 25:12, 25:17, 54:1, 54:2
**peer** [1] - 14:7
**peer-reviewed** [1] - 14:7
**pegged** [1] - 21:19
**pending** [1] - 53:5
**people** [5] - 18:25, 21:12, 27:11, 45:10, 46:14
**percent** [6] - 15:22, 16:1, 16:20, 16:24, 22:12, 33:18
**percentage** [1] - 38:20
**percentages** [1] - 38:17
**percolate** [1] - 27:13
**perhaps** [4] - 12:9, 28:18, 42:4, 43:6
**permitted** [1] - 32:11
**PERRETTI** [1] - 2:12
**Perretti** [1] - 7:1
**persist** [1] - 32:12
**person** [1] - 48:5
**perspective** [1] - 18:21
**petri** [1] - 25:21
**Petri** [3] - 2:19, 7:6, 22:24
**petri's** [1] - 28:19
**pharmaceutical** [2] - 15:4, 18:20
**Phil** [1] - 6:4
**PHILIP** [1] - 1:20
**picked** [2] - 32:25, 44:23
**Pickup** [1] - 23:24
**piece** [5] - 27:6, 27:15, 27:20, 28:8, 38:7
**Pitt** [15] - 8:19, 9:14, 10:10, 10:11, 10:17, 14:7, 17:18, 18:19, 20:3, 32:24, 33:14, 35:10, 35:12, 35:13
**place** [4] - 7:20, 20:22, 21:11, 55:10
**placing** [1] - 32:16

**plaintiff** [2] - 18:6, 42:11
**plaintiffs** [22] - 5:8, 5:18, 7:12, 8:7, 10:24, 12:19, 13:4, 13:15, 18:17, 21:7, 26:14, 26:17, 26:25, 30:11, 37:24, 42:12, 42:14, 42:17, 45:18, 45:21, 47:11, 53:22
**Plaintiffs** [2] - 1:16, 1:20
**Plaintiffs'** [1] - 4:5
**pled** [3] - 21:16, 45:5, 45:8
**point** [8] - 11:16, 12:19, 24:8, 27:2, 27:25, 36:12, 45:16, 50:16
**pointed** [5] - 11:3, 17:5, 17:9, 17:13, 20:22
**points** [2] - 17:15, 45:14
**poll** [1] - 25:24
**poor** [1] - 18:3
**position** [2] - 53:23, 54:2
**possible** [3] - 16:8, 16:12, 16:13
**postage** [1] - 25:8
**potential** [1] - 18:6
**practical** [2] - 24:2, 52:4
**practice** [1] - 43:15
**precisely** [1] - 14:1
**prepared** [2] - 24:14, 54:1
**preparing** [1] - 31:7
**present** [1] - 53:11
**presentations** [1] - 7:16
**presented** [2] - 10:22, 46:13
**preserve** [1] - 29:3
**preserved** [1] - 49:22
**prevent** [1] - 33:3
**preventing** [2] - 34:10, 36:8
**prevention** [2] - 32:23, 36:1
**previously** [1] - 32:23
**price** [13] - 8:21, 8:25, 9:6, 9:7, 9:13, 9:17, 9:18, 9:19, 9:21, 10:2, 10:3, 10:8, 17:6
**problem** [8] - 12:12, 17:2, 21:3, 33:4, 33:17, 42:2, 52:22, 53:2
**problematic** [2] - 31:25, 32:2
**problems** [3] - 18:13,

32:11, 46:9
**procedural** [1] - 50:20
**procedurally** [1] - 50:23
**proceed** [3] - 48:11,
48:25, 52:1
**proceeded** [1] - 31:24
**PROCEEDINGS** [1] - 1:3
**Proceedings** [2] - 4:3,
54:9
**proceedings** [1] - 55:9
**process** [2] - 27:7, 42:22
**product** [3] - 27:15,
27:16, 31:25
**products** [1] - 31:20
**Professor** [4] - 12:6,
15:23, 16:9, 17:15
**professor** [2] - 16:9,
17:14
**professors** [2] - 10:13,
12:5
**progress** [1] - 41:6
**progressed** [1] - 41:6
**promptly** [1] - 51:6
**proposed** [1] - 31:1
**provide** [4] - 13:23, 41:4,
44:23, 48:1
**provided** [8] - 18:18,
19:17, 27:4, 34:2, 34:7,
40:14, 47:2, 47:8
**provides** [1] - 28:2
**providing** [2] - 18:25,
19:17
**proving** [1] - 12:20
**provision** [1] - 28:6
**public** [1] - 31:3
**publication** [1] - 14:7
**publicly** [2] - 31:5, 31:11
**pulled** [1] - 31:12
**purchasers** [1] - 9:6
**purely** [1] - 29:20
**purpose** [1] - 29:8
**purposes** [1] - 52:15
**PURSUANT** [1] - 3:8
**put** [9] - 21:11, 21:13,
21:16, 23:5, 24:13, 33:7,
38:10, 44:18, 46:7
**putting** [1] - 33:11

---

**Q**

**qualifications** [2] -
13:17, 13:20
**qualified** [2] - 13:16,

13:21
**qualitative** [5] - 4:6, 18:8,
18:19, 18:23, 19:11
**quality** [7] - 9:25, 18:21,
21:20, 22:9, 23:12,
23:20, 28:3
**quantified** [3] - 32:17,
36:8, 38:9
**quantify** [2] - 34:14,
37:25
**Questions** [1] - 4:11
**questions** [10] - 7:16,
7:22, 8:13, 8:17, 26:15,
28:15, 36:15, 36:25,
47:17, 49:4
**quintessential** [1] -
27:13
**quite** [3] - 27:4, 32:21,
35:8
**quote** [2] - 11:10, 22:9

---

**R**

**raised** [1] - 37:10
**Rakoff** [1] - 34:8
**rate** [3] - 39:15, 40:14,
41:17
**rather** [1] - 32:16
**rational** [2] - 25:8, 25:15
**RCGC** [3] - 28:2, 28:4,
28:7
**RE** [1] - 1:3
**re** [3] - 4:5, 4:8, 4:11
**reached** [1] - 43:16
**react** [1] - 16:14
**reaction** [1] - 17:7
**read** [4] - 12:2, 13:18,
50:5, 50:6
**reading** [1] - 24:16
**real** [4] - 10:21, 15:10,
17:17, 34:11
**realities** [1] - 24:2
**realized** [3] - 33:14,
48:13, 49:10
**really** [22] - 10:9, 10:20,
11:12, 12:24, 23:4, 23:7,
24:13, 29:8, 29:11,
30:17, 33:2, 34:10,
34:25, 38:1, 39:12, 41:8,
46:8, 47:15, 48:14, 49:9,
49:20, 53:21
**reasonable** [7] - 23:9,
39:10, 39:24, 40:14,
40:18, 41:15, 41:17

**reasonableness** [1] -
39:17
**reasons** [4] - 21:8, 45:7,
49:19, 50:4
**received** [4] - 7:11, 7:15,
23:10, 23:19
**recognized** [1] - 11:17
**recommendation** [3] -
48:10, 50:11, 50:13
**record** [9] - 7:20, 33:7,
34:18, 41:2, 41:3, 50:5,
50:7, 54:6, 54:7
**records** [1] - 31:3
**recreating** [1] - 45:1
**reduce** [1] - 33:16
**reduction** [1] - 33:18
**refer** [1] - 42:5
**referring** [1] - 26:7
**refile** [1] - 21:9
**reflect** [1] - 52:14
**reflected** [3] - 8:25, 10:1,
43:18
**reflection** [1] - 9:7
**reflects** [2] - 9:19, 9:21
**reform** [2] - 15:9, 16:3
**reforms** [10] - 16:5, 16:7,
17:21, 17:24, 18:12,
18:22, 21:17, 30:25,
33:16
**Refused** [1] - 1:20
**refused** [7] - 5:17, 42:13,
42:14, 42:15, 43:1,
45:18, 45:24
**regard** [8] - 18:24, 36:20,
37:3, 37:9, 45:22, 46:10,
50:9, 53:22
**regarded** [1] - 44:1
**regulatory** [1] - 30:23
**reject** [4] - 19:1, 19:7,
23:11
**rejected** [3] - 11:23,
11:25, 17:9
**relating** [1] - 31:4
**relative** [2] - 55:12, 55:15
**relevant** [1] - 8:14
**reliable** [5] - 14:6, 14:11,
14:12, 14:13
**relief** [4] - 11:15, 32:18,
38:1, 40:11
**rely** [1] - 9:6
**remind** [1] - 35:11
**remove** [1] - 8:17
**render** [1] - 30:4

**rendered** [1] - 50:2
**replies** [1] - 7:14
**reply** [1] - 22:22
**report** [3] - 15:23, 20:4,
27:12
**REPORTER** [2] - 1:24,
3:15
**Reporter** [2] - 55:6
**reporting** [1] - 28:2
**reports** [1] - 13:18
**requested** [1] - 40:11
**requesting** [1] - 37:19
**require** [5] - 34:14, 40:7,
40:23, 48:14, 48:15
**required** [1] - 44:9
**requires** [2] - 22:9, 40:13
**research** [3] - 12:4, 31:7,
31:9
**resistant** [1] - 10:7
**resolution** [5] - 13:5,
13:7, 13:9, 19:22, 19:25
**resolve** [1] - 28:19
**resources** [2] - 47:24,
48:9
**respect** [5] - 27:5, 31:10,
31:17, 52:18, 54:3
**respected** [1] - 46:12
**respond** [5] - 7:23, 8:9,
26:17, 37:9, 47:13
**response** [1] - 26:11
**Response** [2] - 4:5, 4:8
**responsibility** [1] - 27:11
**rest** [1] - 49:13
**restrict** [1] - 16:23
**result** [1] - 33:8
**resulted** [1] - 18:3
**resumes** [2] - 44:23,
44:25
**retained** [1] - 13:16
**retroactively** [1] - 29:24
**return** [1] - 26:6
**review** [4] - 40:13, 40:17,
48:3, 50:8
**Review** [1] - 26:23
**reviewed** [2] - 14:7,
50:10
**reviewing** [1] - 31:2
**ride** [1] - 25:16
**Riker** [1] - 6:25
**RIKER** [1] - 2:12
**rise** [2] - 5:2, 54:8
**risk** [1] - 17:1
**Robbins** [3] - 5:22, 32:8,

44:8
**ROBBINS** [1] - 1:15
**ROBINSON** [2] - 2:7, 2:7
**Robinson** [2] - 6:12
**room** [1] - 8:3
**round** [1] - 32:9
**RUDMAN** [1] - 1:15
**rule** [2] - 50:16, 53:14
**rules** [2] - 29:24, 30:1
**Rulings** [1] - 4:16
**run** [1] - 52:6
**running** [1] - 52:18
**RUSSONIELLO** [2] -
1:24, 3:14
**Russoniello** [2] - 55:5,
55:23

**S**

**salami** [1] - 25:5
**salary** [1] - 21:18
**SAMUEL** [1] - 2:18
**Samuel** [1] - 7:7
**sat** [1] - 50:4
**satisfied** [2] - 18:24, 19:9
**satisfy** [1] - 49:25
**scale** [2] - 33:4, 33:17
**Scherer** [1] - 6:25
**SCHERER** [1] - 2:12
**scientific** [2] - 15:1, 15:4
**scientifically** [2] - 14:6,
14:12
**seat** [4] - 7:10, 26:16,
30:8, 43:25
**seated** [1] - 5:5
**second** [1] - 44:13
**SECTION** [1] - 3:8
**securities** [2] - 8:23, 11:1
**see** [5] - 8:14, 10:3, 10:8,
44:10, 46:16
**Seeger** [1] - 6:10
**SEEGER** [2] - 2:9, 6:11
**seeing** [1] - 10:21
**seeking** [2] - 7:13, 29:7
**sees** [1] - 17:19
**seminal** [1] - 33:5
**sense** [5] - 18:9, 23:10,
33:15, 38:19, 53:2
**sent** [1] - 25:20
**sentence** [1] - 41:15
**separately** [2] - 36:23,
42:9
**set** [1] - 55:10

**sets** [1] - 8:7
**settlement** [24] - 7:13,
12:18, 12:21, 17:25,
18:4, 18:5, 18:10, 22:8,
23:8, 24:5, 24:23, 27:8,
28:1, 30:15, 31:1, 36:22,
37:4, 37:10, 49:24, 51:6,
51:8, 52:10, 53:25
**settlements** [1] - 17:23
**several** [1] - 7:25
**share** [3] - 8:21, 8:25,
17:6
**Shareholder** [1] - 4:6
**shareholder** [5] - 8:20,
11:13, 11:20, 18:10,
26:9
**shareholders** [6] - 16:7,
16:18, 16:25, 23:19,
25:7, 25:24
**shares** [1] - 24:12
**short** [1] - 48:19
**show** [2] - 35:9, 46:14
**shrift** [1] - 48:19
**shut** [1] - 16:22
**side** [1] - 43:6
**SIDLEY** [1] - 2:8
**significance** [1] - 9:13
**simple** [1] - 20:21
**simply** [1] - 23:17
**situation** [1] - 45:5
**sliced** [1] - 25:6
**small** [1] - 24:4
**solely** [1] - 36:21
**someone** [1] - 17:18
**sometimes** [1] - 17:16
**soon** [1] - 52:4
**sophisticated** [2] - 24:5,
24:10
**sort** [1] - 9:9
**sound** [1] - 48:20
**sources** [1] - 31:11
**speaking** [2] - 11:6,
37:18
**Special** [4] - 47:25,
50:12, 52:3, 53:22
**specific** [2] - 17:24, 36:3
**specifically** [3] - 26:18,
27:14, 32:6
**specifics** [2] - 44:14,
47:4
**spend** [4] - 24:22, 25:8,
25:18, 25:22
**spent** [5] - 41:19, 41:24,

44:16, 44:18, 47:18
**split** [1] - 29:22
**staggering** [2] - 46:18,
47:7
**stake** [3] - 25:2, 25:9,
48:17
**standardized** [1] - 42:3
**standing** [1] - 19:23
**start** [9] - 13:13, 13:16,
38:22, 38:23, 39:3,
39:13, 39:21, 48:12,
52:3
**started** [1] - 11:9
**starts** [2] - 50:24, 52:18
**STATE** [1] - 1:6
**State** [1] - 55:7
**statement** [1] - 20:8
**statements** [1] - 20:13
**STATES** [2] - 1:1, 1:6
**States** [2] - 16:24, 55:5
**status** [1] - 29:1
**stay** [1] - 53:12
**STEIN** [1] - 2:18
**Stein** [1] - 7:8
**STENOGRAPHIC** [1] -
3:10
**stenographically** [1] -
55:9
**steps** [2] - 44:9, 44:11
**still** [2] - 50:6, 52:11
**stock** [11] - 9:6, 9:7,
9:13, 9:15, 9:17, 9:21,
10:1, 10:3, 10:8, 24:21,
25:4
**stop** [3] - 20:6, 21:23,
44:13
**stream** [2] - 9:22
**STREET** [1] - 1:6
**strengthens** [1] - 18:4
**structure** [10] - 4:7,
21:11, 22:2, 22:3, 22:5,
22:7, 28:9, 44:6, 46:25,
47:3
**studies** [1] - 17:5
**study** [8] - 10:13, 10:23,
11:16, 16:9, 16:10,
16:14, 26:6, 26:8
**submissions** [3] - 7:12,
7:14, 48:5
**submit** [2] - 8:10, 14:7
**submitted** [1] - 8:7
**subsidiaries** [1] - 27:18
**substantial** [9] - 4:13,

7:11, 19:12, 30:15,
30:16, 34:6, 38:11,
49:10, 50:1
**substantially** [1] - 48:16
**substantive** [2] - 23:2,
23:3
**suffer** [2] - 9:24, 33:8
**suggest** [1] - 34:2
**suggested** [2] - 12:16,
33:24
**suggesting** [1] - 12:10
**suggests** [1] - 33:14
**suit** [2] - 18:3, 21:1
**summaries** [2] - 41:12,
48:17
**summary** [1] - 41:8
**supplemental** [5] -
31:17, 37:19, 48:13,
51:15, 51:17
**support** [1] - 24:4
**supported** [2] - 20:2,
32:22
**Supreme** [2] - 9:1, 52:16
**suspenders** [1] - 29:20
**system** [2] - 14:14, 27:8

**T**

**tabbed** [1] - 35:20
**takeovers** [1] - 10:7
**tasks** [2] - 47:3, 47:9
**TAYLOR** [2] - 1:20, 6:6
**Taylor** [1] - 6:4
**teach** [1] - 9:20
**teaches** [1] - 32:25
**telephone** [1] - 42:6
**term** [2] - 22:8, 27:6
**terms** [6] - 9:12, 9:25,
10:21, 37:18, 37:20
**terrific** [1] - 20:11
**test** [5] - 15:24, 16:11,
16:12, 16:13, 18:15
**tested** [1] - 16:3
**testified** [1] - 15:21
**testing** [2] - 15:6
**tests** [1] - 16:8
**THE** [99] - 1:1, 1:8, 3:8,
3:10, 5:2, 5:3, 5:11,
5:21, 5:25, 6:7, 6:17,
7:3, 7:9, 8:1, 8:15, 9:8,
10:9, 10:17, 11:2, 11:8,
11:21, 11:24, 12:22,
13:8, 13:11, 13:20,

14:23, 15:1, 15:25, 17:2, 19:16, 20:5, 22:25, 23:4, 23:17, 24:6, 24:24, 25:19, 25:25, 26:2, 26:16, 28:13, 28:17, 28:24, 29:6, 29:11, 29:17, 29:21, 30:2, 30:8, 30:19, 32:14, 33:23, 34:4, 34:24, 35:3, 35:5, 35:9, 35:11, 35:16, 36:2, 36:5, 36:11, 36:14, 36:20, 37:7, 37:13, 38:15, 39:1, 39:9, 39:17, 39:21, 39:23, 40:2, 40:17, 40:22, 41:8, 41:12, 42:25, 44:13, 45:13, 46:3, 46:5, 47:22, 48:24, 49:6, 49:14, 51:2, 51:11, 51:23, 52:5, 52:20, 53:1, 53:6, 53:11, 53:18, 53:21, 54:5, 54:8
**themselves** [2] - 13:14, 41:18
**THEODORE** [1] - 2:17
**Theodore** [1] - 7:5
**theodore** [1] - 8:5
**they've** [2] - 15:25, 41:16
**thinking** [1] - 49:10
**Third** [9] - 23:23, 28:25, 29:24, 33:1, 38:6, 50:25, 52:7, 52:9, 53:12
**thorough** [1] - 27:4
**Tire** [1] - 14:15
**TITLE** [1] - 3:8
**titles** [1] - 42:5
**TO** [2] - 3:8, 3:9
**today** [8] - 5:8, 6:10, 7:16, 30:6, 45:13, 47:19, 49:1, 50:7
**together** [4] - 28:8, 31:12, 31:20, 43:14
**took** [3] - 31:19, 42:8, 47:14
**top** [1] - 40:12
**total** [2] - 42:19, 43:2
**traditional** [3] - 40:6, 40:12, 48:15
**TRANSCRIPT** [2] - 1:3, 3:9
**transcript** [2] - 34:7, 55:8
**TRANSCRIPTION** [1] - 3:10
**Travis** [1] - 5:22

**TRAVIS** [1] - 1:16
**tremendous** [2] - 31:19, 32:8
**trend** [3] - 17:5, 19:3
**TRENTON** [2] - 1:6, 1:25
**tried** [2] - 14:7, 48:12
**troubling** [1] - 20:24
**truck** [1] - 23:24
**true** [1] - 55:8
**try** [1] - 43:14
**turn** [2] - 19:10, 37:14
**TWERSKY** [1] - 1:19
**two** [11] - 8:7, 14:3, 38:21, 39:15, 42:18, 42:20, 43:12, 43:21, 46:6, 49:23, 53:10
**TYLER** [1] - 2:14
**Tyler** [1] - 6:19
**type** [5] - 11:15, 40:9, 44:19, 45:6, 45:8
**typically** [1] - 9:5

**U**

**U.S** [3] - 1:24, 3:15, 9:2
**U.S.C** [1] - 3:8
**ultimately** [3] - 18:16, 21:13, 47:22
**under** [1] - 32:21
**underlying** [2] - 31:23, 40:7
**underneath** [1] - 27:14
**understood** [1] - 23:6
**undertake** [1] - 40:10
**undertook** [2] - 32:4, 32:13
**United** [2] - 16:24, 55:5
**UNITED** [2] - 1:1, 1:6
**universally** [1] - 17:13
**unnoted** [1] - 28:7
**unnoticed** [1] - 28:7
**unreliable** [1] - 14:2
**unsupported** [1] - 14:18
**up** [16] - 11:12, 12:1, 12:23, 13:12, 17:7, 20:11, 21:7, 21:21, 27:10, 27:13, 28:3, 32:25, 34:13, 35:24, 37:9, 42:3
**updated** [1] - 51:14
**USDJ** [1] - 1:8
**useful** [1] - 17:14

**V**

**validated** [1] - 14:19
**value** [24] - 4:6, 8:20, 9:7, 9:14, 9:21, 10:5, 12:18, 12:20, 16:15, 17:8, 17:17, 17:20, 32:16, 32:17, 34:11, 34:12, 34:13, 34:14, 34:16, 34:18, 34:19, 35:6, 36:7, 37:25
**valued** [1] - 12:15
**values** [2] - 20:10, 38:17
**valuing** [1] - 18:10
**various** [5] - 18:22, 31:4, 33:7, 45:17, 46:13
**versus** [2] - 27:15, 27:16
**Vincent** [2] - 55:5, 55:23
**VINCENT** [2] - 1:24, 3:14
**violation** [1] - 17:1

**W**

**wait** [1] - 8:13
**waiting** [2] - 51:19, 51:21
**WALTER** [1] - 2:9
**Walter** [1] - 6:9
**Walton** [1] - 25:8
**waste** [1] - 50:7
**ways** [4] - 12:2, 12:6, 14:5, 16:17
**Webb** [1] - 6:19
**WEBB** [1] - 2:14
**weeks** [1] - 37:18
**well-qualified** [1] - 13:21
**WETTRE** [1] - 2:7
**Wettre** [1] - 6:13
**wheel** [1] - 45:1
**William** [1] - 26:22
**WILLIAM** [1] - 2:11
**willing** [1] - 25:12
**withhold** [1] - 50:21
**withholding** [1] - 9:5
**WOLFSON** [1] - 1:8
**wonderful** [2] - 21:5, 44:22
**words** [1] - 20:3
**works** [2] - 10:18, 18:25
**worry** [1] - 17:16
**worse** [1] - 22:13
**written** [3] - 12:5, 12:7, 17:19
**wrongdoing** [2] - 31:22, 31:23

**Y**

**year** [1] - 20:23