To: The Honorable Freda L. Wolfson, U.S.D.J.:

<u>REPORT AND RECOMMENDATION OF SPECIAL MASTER</u>

## I. Introduction

I was appointed Special Master pursuant to an Order of the Honorable Freda L. Wolfson. My charge included review of "the entire written record" in this shareholder derivative litigation to determine the "lodestar and compensable costs."  My mission was to "analyze the evidence in the record regarding the hourly rates, time, and expenses submitted by Plaintiffs' Counsel in order to prepare a report calculating the lodestar amount..." Order of Judge Wolfson (Oct. 22, 2012), <u>In re Johnson & Johnson Derivative Litig.</u>, No. 10-2033.  The Order contemplated that the Court, upon receipt of my recommendation, would then make the final determination as to the appropriate amount of attorneys' fees and expenses and would thereafter "determine what lodestar multiplier, if any, to apply." <u>Id.</u>

## II. Procedural History and Chronology

This consolidated matter was initiated when several law firms filed shareholder derivative suits against Johnson & Johnson ("J&J"), a New Jersey corporation composed of over 250 subsidiaries, engaged in the business of consumer and pharmaceutical products and medical devices. <u>See</u> <u>In re Johnson & Johnson Derivative Litig.</u>, 865 F. Supp. 2d 545, 550 n.1 (D.N.J. 2011) (citing to J&J's 2011 Security and Exchange Commission Form 10-K filing).   Seven of J&J's two-hundred fifty (250) subsidiaries are implicated in this litigation.  <u>Id.</u>

Although there were eventually eight plaintiffs who filed eight Demand-Futility Complaints,[1] Morris and Morris, Counselors at Law, LLC, filed the first suit on April 21, 2010

---

[1] The first Demand-Futility matters were captioned: <u>Calamore v. Coleman, et al.</u>, Case No. 10-ccv-2033-FLW-DEA, filed April 21, 2010; <u>Carpenters Pension Fund of W. Va. v. Weldon, et al.</u>, Case No. 10-cv2275-FLW-DEA, filed May 5, 2010; <u>Feldman v. Coleman, et al.</u>, Case No. 10-cv-2386-FLW-DEA, filed May 6, 2010; <u>Hawaii Laborers Pension Fund v. Weldon, et al.</u>, Case No. 10-cv-2516-FLW-DEA, filed May 14, 2010; <u>Ryan v. Weldon, et al.</u>, Case

on behalf of Ms. Calamore in the first tranche of Demand-Futility Complaints. Minneapolis Firefighters' Relief Association filed the sixth suit on June 24, 2010. Judge Wolfson consolidated the first six Demand-Futility actions by entry of a Consolidation Order on August 17, 2010 under the caption In re Johnson & Johnson Derivative Litig., No. 10-2033-FLW. Two plaintiffs, whose demands upon the J&J Board of Directors ("Board") to commence litigation against its members had been declined, filed Demand-Refused Complaints. Judge Wolfson has described the two groups who brought actions as "Demand-Futility Plaintiffs" and "Demand-Refused Plaintiffs," respectively, referring to all suits collectively as "the Derivative Suits." [2] In re Johnson & Johnson Derivative Litig., 900 F.Supp. 2d 467, 470 (D.N.J. 2012). The allegations of the Demand-Futility Plaintiffs reference "red flags," such as Food and Drug Administration (FDA) warning letters, FDA reports, State Attorney Generals' subpoenas, qui tam complaints, a criminal plea, a settlement agreement with the United States Department of Justice ("DOJ"), and a DOJ subpoena, that identified generally three areas of alleged corporate wrongdoing: product recalls; off-label marketing of drugs; and illegal kick-backs. The Plaintiffs maintained that these "red flags" put the Members of the Board on notice of problems within the company; but, despite this knowledge of improprieties, they took no action to correct the misconduct. These shareholders also focused on alleged breaches of fiduciary duty by members of the Board and some complaints included violations of Section 14(a) of the Securities Exchange Act of 1934. The Plaintiffs in this group believed that making a demand on the Board was an exercise in futility and did not do so.

---

No. 10-cv-3147-FLW-DEA, filed June 18, 2010; and Minneapolis Firefighters' Relief Ass'n v. Weldon et al., Case No. 10-cv-3215- FLW-DEA, filed June 24, 2010. Two other Demand-Futility actions, Wollman v. Coleman, et al., No. 11-2511-FLW, and Cafaro v. Coleman, et al., No. 11-2652-FLW, filed in May, 2011, focused on violations of fiduciary duties for failure to comply with the Foreign Corrupt Practices Act. These two matters were consolidated under Case No. 11-2511. Robbins Geller, Co-Lead Counsel in the In Re Johnson & Johnson Derivative Litig., is Plaintiffs' Counsel in Case No. 11-2511. The Wollman matter is also being settled.

[2] Three other suits were filed in the Superior Court of New Jersey, essentially alleging identical claims as their federal models and, although initially stayed, are also subject to settlement.

The Demand-Refused Plaintiffs charged the Board with similar fiduciary deviations but they launched their legal battle not with the filing of a complaint but with the transmittal of demand letters to the Board. They challenged the Board inter alia to "investigate, institute litigation and take the necessary remedial measures to institute a system of internal corporate controls designed to prevent a recurrence of the wrongdoings" identified in their letters. These improprieties included allegations of kickbacks and violations of government regulations. See Letter from Abraham, Fruchter & Twersky LLP ("Abraham Fruchter") to the Board (Feb. 17, 2010).[3] A supplemental demand letter asked for an investigation with respect to recalls, off-label marketing and irregular promotional activities of several J&J products. See Letter from Abraham Fruchter to the Board (Jul. 7, 2010).

In April 2010, the Board formed a Special Committee represented by independent counsel to review the allegations of the demand letters.  The responsibility of the Special Committee eventually expanded to review all the demand letters and all the Demand-Futility Complaints which had been filed. As indicated, the Demand-Futility Complaints without demands were consolidated by Order dated August 17, 2010.  As part of that omnibus Order, the law firms of Carella, Byrne, Olstein, Brody & Agnello, P.C. ("Carella Byrne") of Roseland, New Jersey, Morris and Morris Counselors at Law LLC  ("Morris and Morris") of Wilmington, Delaware, Robbins Geller Rudman & Dowd LLP ("Robbins Geller") of San Diego, California, and Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz") of New York, New York were appointed as Co-Lead Counsel  (collectively, "Demand-Futility Counsel").

---

[3]Abraham Fruchter along with Kantrowitz, Goldhamer & Graifman, P.C. ("Kantrowitz Goldhamer") represented shareholders Leslie Katz and Jeffrey and Joan Tarson. At least six other shareholders made demands upon the Board as of November 12, 2010, seeking corrective action with regard to the previously mentioned allegations as well with regard to a lack of good manufacturing practices, referred to as "cGMP." See Report of the Special Committee of Board of Directors of Johnson & Johnson at 5.

While the Special Committee was fulfilling its mission to review all the allegations, shareholders Leslie Katz, Jeffrey Tarson and Joan Tarson[4] moved to intervene in the Demand-Futility suits on July 19, 2010.  All the Demand-Futility Plaintiffs filed opposition as well as J&J.  On October 17, 2010, the Court held a conference in chambers and orally denied Katz's Motion to Intervene without prejudice to future application for intervention. The Judge also stayed discovery. See Joint Declaration of all Counsel at 14 (Aug. 31, 2012), In re Johnson & Johnson Derivative Litig., No. 10-2033. The Motion to Intervene was relisted pursuant to a letter request of April 19, 2011 by counsel for Demand-Refused Plaintiffs who later also filed a Complaint in Intervention.  Again, Demand-Futility Plaintiffs and J&J filed briefs in opposition to the Motion to Intervene.

On December 17, 2010, the Demand-Futility Plaintiffs filed a consolidated Amended Complaint. In February of 2011, J&J filed a Motion to Dismiss the Complaint or to stay the matter while the Special Committee fulfilled its responsibilities.  Officers and Directors named in the Complaint joined in the Motion to Dismiss.

The Special Committee issued its report on June 27, 2011, eschewing litigation against any J&J Board Member or Executive. The full Board adopted this recommendation on July 11, 2011.  The decision to reject litigation was supported by the concomitant adoption of certain internal controls designed to enhance reporting to the Board with respect to quality control and eliminate other misconduct issues which had been at the heart of the allegations. The centerpiece was the expansion of the authority of the Regulatory and Compliance Committee of the Board to work with outside expert consultants and with management to develop "metrics and a report card that would provide insight into and perspective on J&J's Compliance systems and

---

[4] Originally, Shareholders Joan and Jeffrey Tarson joined Plaintiff Leslie Katz in making a demand and filing the Motion for Intervention, but Leslie Katz was the sole Plaintiff when the Complaint was filed.

organizations." See Report of the Special Committee of Board of Directors of Johnson & Johnson at 121.

Oral argument on J&J's Motion to Dismiss took place on July 28, 2011 at which time the Court denied the Motion to Intervene of the Demand-Refused Plaintiffs into the Demand-Futility action. Instead, the Court granted Katz leave to file a new complaint in a separate action. Katz filed his Complaint on August 29, 2011, updating the allegations to include the DePuy product recalls and the Foreign Corrupt Practices Act violations. Katz then filed a Motion to Consolidate his Complaint with the other Demand-Refused Complaint, Copeland v. Prince, et al., No. 11 Civ. 4993 (FLW), and to have his counsel appointed as lead and liaison counsel with respect to Demand-Refused actions. Thereafter, the Court consolidated the two matters and appointed Abraham Fruchter as lead counsel and Kantrowitz Goldhamer as liaison counsel for the Demand-Refused Shareholders ("Demand-Refused Counsel") over the objection of the Copeland Demand-Refused Plaintiff.

As to the Motion to Dismiss, the Court granted the motion without prejudice, finding that the Demand-Futility Plaintiffs did not satisfy Federal Rule of Civil Procedure ("FRCP") 23.1 with its elevated standard of assertion of particularity with regard to demand-futility lawsuits. According to Judge Wolfson, despite the substantial effort at enumerating many "red flags," which should have put the Board on notice of misconduct, the complaints did not sufficiently allege that the Board members had actual knowledge of the "red flags." In re Johnson & Johnson Derivative Litig., 865 F. Supp. 2d at 579. The Demand-Refused Plaintiffs were not subject to this fundamental attack.

The Court issued its opinion on September 21, 2011 and gave Demand-Futility Counsel thirty (30) days to advise whether counsel intended to amend the complaint after which a date for

filing the consolidated second amended complaint would be set. During the time between oral argument and the issuance of the Court's decision, the parties, including Demand-Refused Plaintiffs, conducted settlement negotiations, and J&J provided informal discovery, pursuant to a Confidentiality Agreement signed by the Plaintiffs' Counsel. Plaintiffs sought both corporate governance modifications as well as a pecuniary payment. Once the Court issued its written opinion and granted Defendants' Motion to Dismiss, the Board rejected the payment of any money as part of the settlement and, instead, insisted on granting only aspects of injunctive relief as a remedy.

The parties, both Demand-Futility Plaintiffs and Demand-Refused Plaintiffs, entered a proposed settlement agreement on July 11, 2012.  The reforms are, according to Plaintiffs, intended to

> provid[e] for adoption of management level systems and procedures designed to ensure early detection and remediation of all product-related issues across the array of J&J products, and for corporate governance reforms designed to ensure the flow of information necessary to senior management and the Board to support robust oversight of compliance and quality control issues throughout J&J's worldwide operations.

Brief in Support of Plaintiffs' Motion for Final Approval of Derivative Litigation Settlement at 2, In re Johnson & Johnson Derivative Litig., No. 10-2033. The agreement contemplates the adoption of a Quality and Compliance Core Objective; the creation and adoption of a Regulatory, Compliance & Government Affairs Committee; and the implementation of a Product Risk Management Standard. The Court granted preliminary approval of the settlement upon application of the Plaintiffs by Order dated July 16, 2012 and also ordered that all Shareholders be notified of the proposed settlement with the opportunity to object. On August 31, 2012, Shareholder Mark Petri objected and filed a Motion to Intervene in the litigation as well as a

Motion to Dismiss. The final hearing was delayed until October 18, 2012 to insure that all objectors could be heard.

The Court received fifteen (15) objections, all but one of which focused on the amount of attorneys' fees. With respect to Mr. Petri's Motion to Intervene, Judge Wolfson denied his intervention as of right, finding that both his right to object and his right to appeal were not threatened. The Court also denied his request for permissive intervention, fearing a delay to address the pending Motion to Dismiss, as well as acknowledging that his "substantive challenges raised in his motion can be addressed as objections to the settlement." In re Johnson & Johnson Derivative Litig., 900 F.Supp. 2d at 478.

Focusing on the dictates of FRCP 23.1 to determine if the settlement is "fair, adequate, reasonable and proper and in the best interests of the class and the shareholders," Judge Wolfson explored the Girsh factors articulated in Girsh v. Jepson and found that they were satisfied. Bell Atl. Corp. v. Bolger, 2 F.3d 1310, 1317 (3d Cir. 1993); Girsh v. Jepson, 521 F.2d 153 (3d Cir. 1975); In re Johnson & Johnson Derivative Litig., 900 F.Supp. 2d at 479. Judge Wolfson noted that the Court is authorized to consider additional factors beyond those enumerated in Girsh, and, in doing so, it was "compelling that Plaintiffs' counsel was able to achieve significant injunctive relief that is tailored to remedy the corporate governance failings inherent in J&J's decentralized management structure," despite the absence of a monetary payment. In re Johnson & Johnson Derivative Litig., 900 F.Supp. 2d at 485.

After approving the settlement because it satisfied the Girsh factors, the Court must then determine whether the settlement had conferred a substantial benefit to J&J in order for counsel for the Plaintiffs to be awarded fees. Id. at 487 (citing Shlensky v. Dorsey, 574 F.2d 131, 149 (3d. Cir. 1978)). The Court found that the adoption of the Quality and Compliance Core

Objective, the creation of the Regulatory, Compliance & Government Affairs Committee, and the implementation of a Product Risk Management Standard with a five (5) year commitment and a funding element would "increase director and employee accountability," and were all changes "tailored to remedy the alleged deficiencies in J&J's oversight structure as alleged in the Plaintiffs' complaints," and would confer a substantial benefit.[5] In re Johnson & Johnson Derivative Litig., 900 F.Supp. 2d 467, 491, 490 (D.N.J. 2012).   The Court was particularly impressed that a major deficiency in J&J's oversight of its healthcare operations had been its decentralized structure and that the reforms were intended to address that problem.   Judge Wolfson also disagreed with Mr. Petri's position that it was not Plaintiffs' litigation that was the impetus for the reforms, but rather noted that the Special Committee itself acknowledged that it was the receipt of the demand letters, as well as the allegations set forth in the Demand-Futility Complaints, that were responsible for its creation and dictated its mission. Id. at 494-95. It was also Judge Wolfson's opinion that the reforms specifically addressed the Plaintiffs' allegations that the Board ignored "red flags." Id. at 495.

Judge Wolfson then pointed out that the six firms requested a total of $6,614,268.25 for attorneys' fees and $452,016.76 for expenses. Id. at 496. In addition, they requested the application of a multiplier of 1.5.  Id. Pursuant to the Stipulation and Agreement of Settlement, J&J agreed to pay up to the requested $10 million in attorneys' fees and up to $450,000.00 in costs "subject to Court approval," and J&J agreed not to oppose any fee application. Stipulation of Settlement at ¶ 5.1. This compliance is often considered a "clear sailing" assent from the defendants to pay, without challenge, up to a certain amount. See Weinberger v. Great Northern

---

[5] Judge Wolfson rejected Objector Petri's criticism that the Plaintiffs' experts did not correctly value the corporate governance reforms because they did not conduct event studies to gauge the market's reaction to the proposed reforms. In re Johnson & Johnson Derivative Litig., 900 F.Supp 2d at 491-93.

Nekoosa Corp., 801 F.Supp. 804, 806 n.1 (D.Me 1992); In re Bluetooth Headset Prods. Liab.
Litig., 654 F.3d 935, 940 n.6 (9th Cir. 2011).

Judge Wolfson, citing to several cases, including In re Schering-Plough/Merck Merger
Litig., 2010 U.S. Dist. LEXIS 29121 (D.N.J. Mar. 26, 2010), declared the lodestar analysis is the
proper method of compensation, as opposed to the percentage of recovery method, where there is
no monetary component, as in this matter.  Judge Wolfson found, however, that "counsels' fee
declarations [were] not sufficiently detailed for the court to engage in the sort of searching and
thorough inquiry that a traditional lodestar analysis requires." In re Johnson & Johnson
Derivative Litig., 900 F.Supp. 2d at 498 (D.N.J. 2012). Supplemental submissions from counsel
did not address the concern that the Court was unable to discern the time spent on a particular
activity, such as drafting an amended complaint or a motion.[6]  The Court therefore appointed me
as Special Master[7] to "review counsels' proposed hourly rates, time expended, and costs
requested to determine if they are reasonable, as that term is defined by the case law." Id. at 499.
After Judge Wolfson receives my recommendation, the Court will make a final determination as
to the lodestar amount, determine if a multiplier is appropriate, and, if so, what amount.  The
Court will also determine the appropriate amount of costs to be awarded.

### III. Attorneys' Fees Requested

---

[6] Mr. Petri, the objector, also criticized the timesheets submitted with breakdowns in seven "vague categories" and
noted, "A vague billing schema like this insulates the lodestar amount from proper scrutiny."  Brief of Supplemental
Objection of Mark G. Petri at 15, In re Johnson & Johnson Derivative Litig., No. 10-2033.  He also wrote, "The
deficiencies of the timesheets are exacerbated because the lack of specificity prevents any investigation of
duplicative tasks between firms." Id. at 16 (citing Evans v. Port Auth. of N.Y. & N.J., 273 F. 3d 346, 361 (3d. Cir.
2001)).  He insisted that the information in the fee petitions was "wholly insufficient to descriptively justify nearly
11,000 hours of work, and a lodestar of more than $6.6 million." Id. at 17.

[7] The Third Circuit, noting that a "thorough and searching analysis" of a firm's billing records is required, recently
recommended the appointment of a Special Master to review fee requests which "present a daunting task to a busy
District court, which must handle a multitude of matters with limited resources." Interfaith Cmty. Org. v.
Honeywell Int'l, Inc., 2013 U.S. App. LEXIS 11171 at *35 n.10 (3d Cir. Jun. 4, 2013).

Plaintiffs requested $6,614,268.25 in their Declarations to the Court dated August 2012. The six firms in this matter seek $6,886,851.89, not including expenses, for the period ending October 18, 2012. Demand-Futility Counsel seek $4,758,362.54 while Demand-Refused Counsel seek $2,128,489.35. I reviewed the actual bills of the firms from the inception of the matters until October 18, 2012 to make sure there was consistency in the requests. For a full explanation of billing amounts and lodestars requested, see Appendix XV. The requested amounts and hours are listed below:

| FIRM NAME | LODESTAR REQUESTED | HOURS EXPENDED |
|---|---|---|
| **Demand-Futility Counsel** | | |
| Carella, Byrne | $927,997.95 | 1,701.50 |
| Robbins, Geller | $564,067.50 | 1,158.00 |
| Bernstein Litowitz[8] | $1,084,585.55 | 2,305.50 |
| Morris and Morris | $2,181,711.54 | 4,074.50 |
| | $1,607,587.59 | |
| **Demand-Refused Counsel** | | |
| Kantrowitz, Goldhamer | $520,901.76 | 802.95 |
| Abraham Fruchter | $1,607,587.59 | 2,755.25 |
| **Total** | **$6,886,851.89** | |

I reviewed records for the following periods[9] for the firms:

| Carella Byrne | May 3, 2010 | October 18, 2012 |
|---|---|---|
| Bernstein Litowitz | January 21, 2010 | October 18, 2012 |

---

[8] Bernstein Litowitz is the only firm which does not also record the billing rate for the timekeeper, either by simply providing the hourly rate proximate to the hours or by providing the total cost for the entry.

[9] The original bills I reviewed for Carella Byrne, Bernstein Litowitz, and Morris and Morris ended September 28, 2012, September 25, 2012, and September 28, 2012, respectively, but I allowed all counsel to update their bills to October 18, 2012, for the sake of consistency, when the Demand-Futility Narrative, a document explained hereafter, appeared to be seeking an additional lodestar up until that period. All counsel responded to my request for a re-statement of the definitive amount that they seek. For the two Demand-Refused Counsel, I had already reviewed the bills of Kantrowitz Goldhamer which ran up to October 18, 2012, and Abraham Fruchter supplied bills for the additional time frame and they were reviewed.

| Morris and Morris | January 19, 2010 | October 18, 2012 |
| Robbins Geller | April 4, 2010 | September 21, 2012 |
| Abraham Fruchter | January 18, 2010 | October 18, 2012 |
| Kantrowitz Goldhamer | January 18, 2010 | October 18, 2012 |

According to the Joint Declaration of James E. Cecchi, Mark Lebovitch, Karen L. Morris, Travis E. Downs III, Jeffrey S. Abraham and Gary S. Graifman in Support of Final Approval of Proposed Settlement and Approval of Award of Requested Attorneys' Fees and Reimbursement of Expenses, dated August 31, 2012 and signed by all the named attorneys, "Counsel for other plaintiffs, who will also be compensated by Plaintiffs' Counsel, incurred additional time in their individual cases which is not included in this total."[10] Joint Declaration of all Counsel at 24-25 (Aug. 31, 2012), In re Johnson & Johnson Derivative Litig., No. 10-2033.  In Plaintiffs' Brief Responding to Objections and in Further Support of Settlement of Derivative Action, dated September 21, 2012 and signed by Mr. Graifman and Mr. Cecchi, they wrote in a footnote that they did not want to burden the Court with time submissions from the other law firms who had filed complaints, which were consolidated into this action, but they indicated "those lawyers expect to be compensated for their efforts as well." Brief of Plaintiffs' Responding to Objections and in Further Support of Settlement of Derivative Action at 24 n.9, In re Johnson & Johnson Derivative Litig., No. 10-2033.

In the Demand-Futility Narrative[11] counsel wrote:

The fee that was negotiated here will also be divided amongst Plaintiffs' counsel according to our respective judgment about how each firm contributed to the case. While lodestar plays a role in determining fair compensation, it is by no means

---

[10] I did not inquire further into this matter, but acknowledge that at least sixteen law firms had been involved in the original six Demand-Futility actions.  The law firm of Carella Byrne was involved in two actions.

[11] After I met with all counsel on November 28 2012, I asked them to supply me with a narrative of their undertakings and their interaction in completing the required tasks.  These documents shall be referred to herein as "Demand-Futility Narrative, Demand-Refused Narrative" or "Narratives" when referring to both volumes.

the only factor. Serious consideration is also given to what each lawyer and firm contributed and how effective those contributions were. Put simply, there is no strict correlation between each firm's lodestar and their eventual compensation. Also of note is that there are many lawyers who are not lead counsel, who contributed to these cases, who filed their own complaints and who stepped aside in favor of the lawyers who eventually became lead counsel. That is not uncommon or surprising in complex representative litigation. What is perhaps unknown, however, is that those lawyers *will be paid* by Lead Counsel. It is only fair – those lawyers perform work and subsumed their interests in this particular case, and should, as such, be appropriately compensated. Consistent with Lead Counsel's focus on the benefits achieved rather than a traditional loadstar calculation, Lead counsel have not even put the lodestar of these numerous non-lead firms before the Court. So, when assessing the lodestar that the Court will consider when determining the fee, it is critical to recognize that Lead Counsel's obligations extend beyond the six firms who led the litigation of the derivative actions, and any fee award will necessarily include some allocation to non-lead firms whose time has not been submitted.

Demand-Futility Narrative at 3-4 (emphasis in original).

Demand-Futility Counsel asked that any consideration of loadstar reduction should take into account this additional obligation. I did not do so and take no position on this re-allocation, undertaken presumably in accordance with the relevant Rules of Professional Conduct. Such consideration is not part of the mission assigned to me by Judge Wolfson and, in a sense, negates the concept of lodestar compensation. Additionally, counsel did not cite to any case law requiring such accommodation. In addition, any reduction that I have taken is strictly on the merits for failure to satisfy the substantive law, as explained hereafter, for calculating and awarding the lodestar compensation.

### IV. Lodestar Review Generally

Judge Wolfson has determined that the lodestar review is the correct methodology for determining the appropriate fee in this matter. Such a calculation has long been accepted in the Third Circuit. See Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp., 487 F.2d 161 (3d Cir. 1973). The lodestar formula is the product of the number of hours reasonably

expended multiplied by a reasonable hourly rate. See Hensley v. Eckerhart, 461 U.S. 424 (1983). Importantly, it has been said that the "lodestar method produces an award that roughly approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." Perdue v. Kenny A., 559 U.S. 542 (2010). Hours not reasonably expended must be excluded from the fee calculation, Hensley, 461 U.S. at 434, and hours are not reasonably extended "if they are excessive, redundant, or otherwise unnecessary." Rode v. Dellarciprete, 892 F. 2d 1177, 1183 (3d Cir. 1990). Hourly rates must also be reasonable. Blum v. Stenson, 465 U.S. 886, 895 (1984). "The Court's role 'as the guarantor of fairness obligates it not to accept uncritically what lawyers self-servingly suggest is reasonable compensation for their services.'" Fleet Bank v. Steeves, 793 F.Supp. 18, 20 (D.Me. 1992) (quoting Weinberger v. Great Northern Nekoosa Corp., 925 F. 2d 518, 525 (1st Cir. 1991)). "The party seeking attorney fees has the burden to prove that its request for attorney's fees is reasonable." Rode, 892 F.2d at1183.   "Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." Hensley, 461 U.S. at 434.  Hindsight is not to be used to justify the expenditure of time; instead, the issue is "whether at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." Petruzzi's, Inc. v. Darling-Delaware Co., 983 F.Supp. 595, 603 n.10 (M.D.Pa 1996) (citing Grant v. Martinez, 973 F.2d 96, 99 (2d Cir. 1992), cert. denied, 506 U.S. 1053 (1993)).  Hours that would not generally be billed to one's own client are not properly billed to an adversary. Hensley, 461 U.S. at 434.

James E. Cecchi, Esq. of Carella Byrne, Co-Lead Counsel, immediately contacted me after my appointment as Special Master. After an initial meeting, which I would describe as a "meet and greet," he provided me with all relevant documents.  I received and reviewed the following: the Demand-Futility Complaint; the Demand-Refused Complaint; Plaintiffs' Brief in Support of Motion for Final Approval of Derivative Litigation Settlement and Award of Attorney's Fees and Reimbursement of Expenses; the Declarations of James E. Cecchi, Mark Lebovitch, Karen L. Morris, Travis E. Downs III, Jeffrey Abraham and Gary S. Graifman in support of final approval and for Award of attorneys' fees on behalf of their various firms; The Stipulation and Agreement of Settlement with Exhibits; The Declaration  and Supplemental Declaration of  Harvey Pitt; the Report of Dr. Mitchell Glass in Support of Settlement; the Joint Declaration of all the attorneys in Support of Final Approval of Proposed Settlement; The Declarations of Stephen M. Greenberg, John McGahren and Michael D. Sirota, supporting the requested hourly rates; and the Declarations of  counsel, setting forth hours spent on a particular tasks, pursuant to the request of Judge Wolfson.  I requested and received all of the documents submitted by the Objectors, including Mr. Petri's supplemental objections and copies of his expert reports. I reviewed the Transcript of the Final Approval Hearing, dated October 18, 2012. I also received copies of various Declarations and Exhibits, filed in support of approval of attorneys' fees and copies of the various applications of counsel to be appointed lead or liaison counsel.

Soon after my appointment, I was also contacted by Gary S. Graifman, Esq. on behalf of his firm, Kantrowitz Goldhamer, and the law firm of Abraham Fruchter, who had been appointed as Liaison and Lead counsel, respectively, by Judge Wolfson in the Demand-Refused segment of the derivative litigation.  Mr. Graifman supplied me with a compendium of documents ranging

from the first Demand Letter to the Board, dated February 17, 2010 to the Order of November 21, 2011, consolidating the Demand-Refused matters and appointing the law firms as the primary counsel. This compilation also included the 122 page Report of the Special Committee of the Board.

Demand-Refused Counsel forwarded to me another voluminous book of documents, this time focusing on the extensive motion practice which ensued as Demand-Refused Counsel attempted to participate in the shareholder derivative litigation initiated by the Demand-Futility Plaintiffs.

Both Demand-Futility and Demand-Refused Counsel provided me with their "individual daily time records" in early November 2012. As previously indicated, because their Narratives seemed to request reimbursements for dates subsequent to their initial submissions, I gave counsel an opportunity to provide me the bills for that short period of time and those affected attorneys; Carella Byrne, Bernstein Litowitz, Morris and Morris, and Abraham Fruchter, did so.

I did not ask the firms to provide me with the total billing records for the relevant days for the firms. See In Fine Paper Antitrust Litig., 98 F.R.D. 48, 236 (E.D.Pa. 1983), rev'd on other grounds, 751 F.2d 562 (3d. Cir. 1984).

On November 28, 2012, I met with representatives of the six law firms in my office: Mr. Cecchi (Carella Byrne); Ms. Morris and Mr. Morris (Morris and Morris); Mr. van Kwawegen (Bernstein Litowitz); Messieurs Abraham and Taylor (Abraham Fruchter); Mr. Downs (Robbins Geller); and Mr. Graifman (Kantrowitz Goldhamer). Counsel explained their roles in the prosecution of the lawsuits, emphasizing their cooperation and collaboration and their synergistic relationship. Their presentation was made orally with charts and graphs to support their positions. I asked the attorneys to submit to me in writing a summary of the matters that they

had covered and to create a narrative of their interaction and how they assigned the various tasks performed with a reference to the hours billed. I also asked the attorneys to provide fuller explanation as to expenses. I confirmed in writing to counsel that any submissions by them would not constitute a waiver of attorney client or work/product privilege. As previously referenced, I did receive the Narratives from counsel on a timely basis.

I also received copies of all the relevant documents with respect to the Motion to Dismiss and the transcript of that proceeding and then focused on Judge Wolfson's written opinion.

In early January of 2013, I received an inquiry for the first time from Theodore H. Frank, Esq., counsel for Mr. Petri, who had been denied Intervenor status by Judge Wolfson. Mr. Petri in his written objections and presentation at the Settlement Hearing had raised serious questions as to the propriety of paying attorneys' fees since there was no financial recovery to the shareholders. He sought participation in the matter with the Special Master. Counsel for the Plaintiffs resisted, labeling Mr. Petri "an ideologically driven objector to class and derivative litigation generally." Letter from James E. Cecchi to Special Master (Jan. 9, 2013).

After the parties briefed the issues, I held that Mr. Frank, although not technically a party, could participate on an ongoing basis in any proceeding with the Special Master. Pursuant to my Order of implementation, Mr. Frank was provided with a list of all the documents I was given and redacted copies of the Narratives and the "powerpoint" presentation of November 28, 2012 by counsel.

Mr. Frank wrote to me on April 12, 2013 and presented a critique of the lodestar based on his review of the redacted materials he had received from counsel. He criticized the time spent on the Demand-Futility initial Complaints and Amended Complaint, the "Contest for Appointment of Lead Counsel," and the Settlement Process. Letter from Theodore Frank to

Special Master (Apr. 12, 2013). Mr. Cecchi responded on April 17, 2013 and wrote, "Following consolidation, Plaintiffs' counsel seamlessly worked together as a virtual law firm." Letter from James E. Cecchi to Special Master (Apr. 17, 2013). He also highlighted the benefits from the Settlement which "Plaintiffs' counsel indisputably conferred" upon the shareholders of J&J. Id.

### V.  Problems Inherent in the Structure and Problems Identified in the Lodestar

The six firms are seeking compensation for 12,797.70 hours of work.[12] In determining the lodestar and the hour component, the paramount requirement for the time spent on a given matter is reasonableness. Interfaith Cmty. Org. v. Honeywell Int'l. Inc., 426 F.3d 694 (3d Cir. 2005). Hours must be excluded which are "excessive, redundant, or otherwise unnecessary." Public. Int. Research Group of N.J., Inc. v. Windall, 51 F.3d 1179, 1188 (3d Cir. 1995). To that end, fee applicants must exercise "billing judgment," Hensley, 461 U.S. at 434, and the hours excluded are those that would be unreasonable to bill to a client and therefore to one's adversary irrespective of the skill, reputation or experience of counsel. See generally Public. Int. Research Group of N.J., Inc., 51 F.3d at 1188 (citing Hensley, 461 U.S. at 433-34); Loughner v. Univ. of Pittsburgh, 260 F. 3d 173, 180 (3d Cir. 2001); Maldonado v. Houstoun, 256 F.3d 181 (3d Cir. 2001).

> Attorneys must exercise billing judgment and incorporate this discipline:
>
> Excluding excessive or otherwise unnecessary hours under the rubric of 'billing judgment' means that a lawyer may not be compensated for hours spent on activities for which he would not bill a client of means who was seriously intent on vindicating similar rights, recognizing that in the private sector the economically rational person engages in some cost benefit analysis.

Norman v. Housing Authority of Montgomery, 836 F.2d 1292, 1301 (11th Cir. 1988).

---

[12] This number represents the total of all hours on the billing records I received from the inception of the matter to October 18, 2012.

Judge Wolfson charged me with determining whether the volume of time expended by attorneys in this matter was reasonable.  In re Johnson & Johnson Derivative Litig., 900 F.Supp. 2d at 499.

I shall therefore first review the lodestar analysis of the 12,797.70 hours spent by counsel with that criterion in mind, i.e., reasonableness as the benchmark, and with the standard of whether the amount is properly chargeable to a private client or to an adversary.  I shall analyze how the matter was conducted with six law firms representing six plaintiffs; this is essentially a "macro" critique.  I shall then provide general comments and criticism with respect to the presentation and composition of the bills, a "micro" analysis, and shall specify their applications to the bills submitted by the six different firms.  After my discussion of hours, I shall analyze the submitted rates.  Finally, I shall conclude with a review of the expenses sought to be reimbursed.

### A. Competitors become Teammates

The "macro" analysis must begin with an acknowledgement that six law firms who represent the Plaintiffs were at one time all competitors.  The matter was initiated with six Demand-Futility Complaints filed seriatim while, almost during the same relevant period, early to mid-2010, Demand-Refused Plaintiffs were transmitting demands upon the J&J Board. Many Demand-Futility lawyers wanted to participate in the litigation on behalf of their clients. They competed to be lead counsel; they endeavored to bar other counsel from intervening on behalf of their clients. Eventually, four firms agreed to a structure for the Demand-Futility team, which Judge Wolfson accepted. These firms survived a challenge from two Demand-Refused firms as intervenors in August 2010 and the challengers were eventually, but one year later, selected to lead the Demand-Refused team.  The result: six law firms. Admittedly, for a long time, the two teams of lawyers, divided between four firms and two firms, were pursing their own agendas,

determined by their litigation postures as to whether a demand had been made upon the Board or not, and were not working together. When the possibility of a settlement became a reality, the interests of the firms coalesced and they ostensibly merged into a single team with a single goal.

The six law firms were not always working together or redundantly, since for a long time the two factions operated on different tracks with different interests. Bifurcation, of course, creates its own problems. From 2010 until late 2011, only four firms were working together, for example, to oppose the Motion to Dismiss brought by the defendants; two firms toiled to intervene. Still, the reality of four firms "working the file" while two additional firms tried to participate and then all six working with "their meters running" (even in a non-pejorative sense) to conclusion, with their hours intensified by the problematic billing practices of some of the firms, led inexorably to the surplusage of hours noted below.

In this matter, "too many cooks did not spoil the broth;" they just made it more expensive. They did not attain the efficiencies they promised Judge Wolfson when they were vying for inclusion and when Judge Wolfson agreed to their leadership structure. Their experience, which they hailed, did not result in a diminution of hours. As will be developed, there was too much time spent by too many attorneys and no one seemed to be "watching the clock" or exercising restraint. As a result, despite the best intentions (but to some extent increased by their billing protocols), it was inevitable that an amplification of the hours in the lodestar demand would occur.

### B.   Failure to Bill by Standardized Activity

The attorneys request compensation for a total of 12,797.70 hours in this litigation, an extraordinary amount of time for a matter for which there has been very limited discovery and compliance with that discovery was volitional to some degree. Also, a consolidated Amended

Demand-Futility Complaint was dismissed and there is only one extant Demand-Refused Complaint, which has not been addressed by Defendants.[13]  In addition, Plaintiffs' Counsel relied on investigators and expensive experts for whose fees ($376,438.78) they also seek reimbursement.  Judge Wolfson estimated, based on additional submissions by counsel, per the Court's request, that a total of 700 hours had been spent by attorneys with respect to appointing counsel and that a total of over 3,000 hours had been spent on drafting two complaints and an amended complaint.  Transcript of Final Approval Hearing at 43, 46 (Oct. 18, 2012), In re Johnson & Johnson Derivative Litig., No. 10-2033.

Judge Wolfson presciently had seen the potential for inefficiency with so many lawyers participating in the litigation.  In the Order Consolidating Cases and Approving Proposed Organizational Structure, dated August 17, 2010, Judge Wolfson appointed four Demand-Futility Counsel as Co-Lead Counsel and ordered that Co-Lead Counsel "delegate specific tasks to other counsel in a manner to ensure that pretrial preparation for the Plaintiffs is conducted efficiently and effectively" and "monitor the activities of all counsel to ensure that schedules are met and unnecessary expenditures of time and funds are avoided." Order of Judge Wolfson (Aug. 17, 2010), In re Johnson & Johnson Derivative Litig., No. 10-2033.  In the Opinion approving the Settlement in this matter and explaining the earlier appointment of co-counsel, Judge Wolfson wrote that "Counsel [had] stipulated to this arrangement, arguing that appointing them to a co-counsel organizational structure would ensure that their efforts were not duplicated and would streamline representation of all Demand-Futility Plaintiffs." In re Johnson & Johnson Derivative Litig., 900 F.Supp. 2d at 471.[14]  The Court also reminded counsel, "I don't know if there was

---

[13] Defendants filed a Motion to Dismiss in Case No. 11-2511, Wollman v. Coleman, et al., but the matter is also subject to settlement.

[14]  There are representations of efficiency in the Brief in Support of the Motion of the Moving Plaintiffs for Consolidation and Approval of their Organizational Structure, signed by Lisa J. Rodriguez of Trujillo Rodriguez &

duplication. Maybe everything you did was merited. But part of the things that you said to me in your applications for why a structure was appropriate was to avoid that." Transcript of Final Approval Hearing at 45 (Oct.18, 2012), In re Johnson & Johnson Derivative Litig., No. 10-2033.

When Plaintiffs' Counsel applied for their fees as part of the Plaintiffs' Motion for Final Approval of Derivative Litigation Settlement and Award of Attorney's Fees and Reimbursement of Expenses, Judge Wolfson expressed concern that the billing information submitted by counsel did not lend itself to accurate assessment of the time spent on an activity. A representative of each law firm had submitted a Declaration[15] in which he or she averred as to the firm's commitment to this matter. For example, Mr. Cecchi in his Declaration, dated August 31, 2012, provided an Exhibit, which was a "detailed summary indicating the amount of time spent by the attorneys and professional support staff" who worked on the matter. Declaration of James E. Cecchi at 2 (Aug. 31, 2012), In re Johnson & Johnson Derivative Litig., No. 10-2033. The Exhibit divided the areas of work on the matter into six Categories, including the following:

---

Richards, LLC of Haddonfield, New Jersey, who had filed the Calamore Complaint, and bearing the names of Gerald H. Silk, Mark Lebovitch, and Amy Miller for Bernstein Litowitz; James E. Cecchi and Lindsey H. Taylor for Carella Byrne; and Karen L. Morris and Patrick F. Morris for Morris and Morris, dated July 2, 2010. The proposed organizational structure would be as follows:

> All work performed by plaintiffs' counsel in the J&J derivative actions will be at the direction of Co-Lead Counsel. To promote the efficient litigation of these actions, Co-Lead Counsel will establish litigation committees, including a Discovery Management and Merits Analysis Committee, a Governance and Compliance Development and Analysis Committee, a Legal Research and Motion Practice Committee, and an Experts and Damages Committee. To assist in the effective oversight and efficient litigation of the J&J derivative actions, Co-Lead Counsel will require all plaintiffs' firms assigned work in the case to submit lodestar reports every two months, which will include both interim and aggregate lodestar information by attorney and by firm. Only work assigned by the Co-Lead Counsel will be authorized and permitted to be included on lodestar reports.

Brief in Support of the Motion of the Moving Plaintiffs for Consolidation and Approval of their Organizational Structure at 5-6. There are additional promises of cooperation: "Counsel for all of the other plaintiffs have agreed to cooperate in order to prosecute the J&J derivative claims in the most efficient manner according to the organizational structure set forth in the proposed order." Id. at 15. "All six firms will pool their considerable experience, knowledge, skills, talents and resources under the negotiated proposed leadership structure to vigorously and efficiently prosecute the derivative actions proposed for consolidation on behalf of J&J and all of its shareholders." Id. at 20 (emphasis added).

[15] It is interesting to note that only the law firms of Kantrowitz Goldhamer and Robbins Geller indicated whom they represented in their certifications.

1) Investigation, research and drafting original complaints; (2) Investigation, research and drafting amended complaint; (3) Motion practice; (4) Discovery and investigation post filing of amended complaint; (5) Governance and compliance analysis, drafting of settlement proposals, experts; and (6) Settlement negotiation process and documentation ("Categories").

See Declaration of James E. Cecchi at Exhibit 1 (Aug. 31, 2012), In re Johnson & Johnson Derivative Litig., No. 10-2033. The "Lodestar Category Breakdown" appended as Exhibits to all the other Declarations of counsel included a 7th Category, "Post settlement documentation and briefing."[16] Id. The chart provided the hours spent, the hourly rate, and the cumulative lodestar for each attorney and paralegal that worked on the file and included totals for each Category and then a total lodestar.

All of the Demand-Futility Counsel indicated in their initial filings and/or the Narratives that they took some reductions to reflect "billing judgment" or "billing discretion," or, as indicated by the Declaration of Karen Morris, to reflect "any potential duplication or other inefficiencies." Demand-Futility Narrative, Exhibit 7 at 1 n.1; Declaration of Karen Morris at 2 (Aug. 31, 2012), In re Johnson & Johnson Derivative Litig., No. 10-2033.  In addition, Carella Byrne indicated that it had "applied an across-the board hours reduction by approximately ten percent and eliminated much of its paralegal time." Demand-Futility Narrative, Exhibit 4 at 1 n.1.[17]  According to Mr. Lebovitch of Bernstein Litowitz, his review of the fees to insure accuracy and reasonableness included "eliminat[ing]...billing entries of certain lawyers who spent only modest time on the case." Declaration of Mark Lebovitch at 2 (Aug. 31, 2012), In re

---

[16] The first part of the Lodestar Category Breakdown for Bernstein Litowitz, Morris and Morris, and Robbins Geller included "demand letters" although Demand-Futility Counsel filed no demand letters.  Part 1 of the Lodestar Category Breakdown for Kantrowitz Goldhamer and Abraham Fruchter did include that same reference to "demand letters" but, as Demand-Refused Counsel, they did transmit such letters.

[17] Carella Byrne attributed this voluntary reduction to "both internal and external inefficiencies as well as for the time related to those issues that did not directly advance the Demand-Futile Actions, such as the briefing related to the motions for appointment of lead counsel." Demand-Futility Narrative, Exhibit 4 at 1 n.1. See Section V.N., Of Limited or No Value, infra.

Johnson & Johnson Derivative Litig., No. 10-2033.   Robbins Geller also exercised "billing judgment," taking voluntary reductions, including eliminating hours from their billing records. Joint Declaration of Travis E. Downs III and David W. Mitchell at 1 (Aug. 30, 2012), In re Johnson & Johnson Derivative Litig., No. 10-2033; Email from Travis E. Downs III to Special Master (May 23, 2013).

Abraham Fruchter and Kantrowitz Goldhamer indicated that they had assigned work to Stull, Stull, & Brody, but "in an act of billing discretion, we did not submit to the Court the time billed by the Stull, Stull & Brody law firm for its work in this process, which was not insubstantial." Demand-Refused Narrative at 1-2.   The two Demand-Refused firms also indicated that they had agreed to pay attorneys' fees to Milberg LLP, which, after a demand upon the Board, had filed a complaint in state court and to WeissLaw LLP, which did not file a complaint.   Id. at 2. Abraham Fruchter and Kantrowitz Goldhamer advised that they had removed additional time beyond August 31, 2012 to "account for any minor discrepancies which may have existed in their time slips," but Abraham Fruchter did supply them, as previously indicated, when apprised that other law firms had been given an opportunity to do so to be consistent with their requests as set forth in the Demand-Futility Narrative. Id. at 15. Kantrowitz, Goldhamer supplied billing records up to November 4, 2012 with its first transmittal.[18] The two Demand-Refused firms claimed that they also exercised billing discretion by not including time spent negotiating with Demand-Futility Counsel in their submissions to the Court. Id.

The six firms indicated their expenses were reasonable, including the fees for experts, and were reflected on the books and records of the firms.   The six Declarations included biographies of the various partners and associates of the firm and recounted their various successes in shareholder derivative litigation, class actions and other matters.  Gary Graifman of

---

[18] I only reviewed these bills up to October 18, 2012, the date of the hearing before Judge Wolfson.

Kantrowitz Goldhamer indicated in his certification that his firm served as Liaison Counsel and did substantial work as directed by Lead Counsel, Jeffrey Abraham of Abraham Fruchter, and implied that, as a New Jersey based law firm, "we also provided our unique perspective since, as novel and difficult issues of New Jersey law arose in various contexts, my co-counsel looked to KGG (Kantrowitz Goldhamer) to provide the expertise, research and answers to those issues." Declaration of Gary S. Graifman at 2 (Aug. 31, 2012), In re Johnson & Johnson Derivative Litig., No. 10-2033.

Counsel for the Plaintiffs signed a Joint Declaration in Support of Final Approval of Proposed Settlement and Reimbursement of Expenses in late August 2012.  In this submission, the attorneys provided a comprehensive summary of the history of the matter.  It also included a synopsis of how the Settlement Agreement was achieved.

Judge Wolfson's letter to Counsel of October 9, 2012 requested additional information on the hourly rates charged by Counsel and additional information with respect to subparts of their lodestar calculation reflected on the Exhibits to their Declarations. The Court sought additional explication on Category 3 (motion practice), including identification as to each motion, which attorney was involved, and the hours spent, and additional explication on Category 6 (settlement negotiation process and documentation), including the date of each settlement meeting, how it was conducted, and information as to who attended each meeting.  Letter from Judge Wolfson to Plaintiffs' Counsel (Oct. 9, 2012).

Counsel responded and, generally with respect to the motion question, indicated the motions with which they had been involved, the attorneys who worked on the motions and the number of hours spent by each attorney for each motion. They also indicated how many settlement conferences they had attended and who attended and on what dates.  Counsel also

elaborated on their Category 6 settlement efforts, i.e., coordinating with their experts and conferences. See Declaration of James E. Cecchi (Oct. 11, 2012) In re Johnson & Johnson Derivative Litig., No. 10-2033; Declaration of Mark Lebovitch (Oct. 12, 2012) In re Johnson & Johnson Derivative Litig., No. 10-2033; Declaration of Karen L. Morris (Oct. 11, 2012) In re Johnson & Johnson Derivative Litig., No. 10-2033; Declaration of Jeffrey Abraham (Oct. 11, 2012), In re Johnson & Johnson Derivative Litig., No. 10-2033. In the Declaration of Travis E. Downs III of Robbins Geller, he indicated that the firm's attorneys "acted, solely or in conjunction with co-counsel, as principal authors" of seven motions, but his itemization in actuality only included one motion and instead listed the drafting of opposition papers, a reply, and sur-reply, as well as a response to the Report of the Special Committee of J&J Board of Directors. See Supplemental Declaration of Travis E. Downs III at 1 (Oct. 11, 2012), In re Johnson & Johnson Derivative Litig., No. 10-2033. Mr. Downs then indicated the number of hours worked and by which attorneys for each Category. [19]

Mr. Graifman in his Declaration provided a narrative as to the various Motions and explained his role and that of his firm in the various motions, i.e., "counsel wrote and revised portions of the brief in Support of the Motion (Dkt. No. 43)." See Supplemental Declaration of Gary S. Graifman at 2 (Oct. 12, 2012), In re Johnson & Johnson Derivative Litig., No. 10-2033. Although Mr. Graifman did not allocate hours to each undertaking, he did elaborate on his efforts with regard to the motion and provide the total hours per motion. He also indicated the dates of in-person and telephonic settlement meetings.

---

[19] Mr. Downs also indicated that the attorneys of Robbins Geller also assisted with other motions filed by plaintiffs while the litigation was pending, but "as a matter of billing discretion, Robbins Geller did not bill for that time." Declaration of Travis E. Downs III at 3 (Oct. 11, 2012), In re Johnson & Johnson Derivative Litig., No. 10-2033. He also indicated that Robbins Geller did not bill for a December 9, 2011 settlement meeting in which he participated by telephone. Id.

At the oral argument on October 18, 2012, however, Judge Wolfson expressed dissatisfaction with the information received from counsel with regard to the Categories:

> But within the categories themselves, how can the Court determine whether the hours spent on particular things – and the categories are very broad, and obviously I asked for some additional information on the category on motions. I said: Would you please explain what motions you worked on and how many hours were spent? And each firm did that, but, again, in a general fashion, and each firm broke that down for me.
>
> The other problem is each firm didn't do it in a standardized way. What I ended up getting in the way of the affidavits is that they used perhaps different titles to refer to a motion. Some attorneys included the actual court appearances or telephone conferences of things of that nature. I'm not sure what everyone did. Some of them took them out separately and did it in the way of hours. But I've just got an overall number.

Transcript of Final Approval Hearing at 41-42 (Oct. 18, 2012), In re Johnson & Johnson Derivative Litig., No. 10-2033.

In the written opinion, Judge Wolfson continued to express dissatisfaction with the information received:

> While counsel provided additional submissions, their submissions are not standardized. For example, some firms included court appearances in their time spent on a given motion while other firms did not. Moreover, the titles of the motions are not uniform. In a large complex litigation such as this one, where there are six firms co-representing the plaintiffs, and counsel requests over $6 million as a lodestar, the Court requires detailed submissions that provide sufficient information from which the Court can determine whether there has been any duplication in attorney effort or whether the amounts expended were reasonable.

In re Johnson & Johnson Derivative Litig., 900 F.Supp. 2d at 499.

Unless judges know the total consumption of time expended on a project, courts have long maintained that when multiple law firms are involved, it is difficult to assess whether that element of the claim is reasonable or not:

> Keeping time by activity or project seems a good way for a lawyer to document the worth of his services, and it strikes me as the *only* way for a group of lawyers

to show the worth of their *combined* services.  The alternative – and, regrettably, the tradition – is to leave it to the judge to attempt an evaluation of a morass of unrelated time entries which can and often do obscure the existence of duplication and excessive charges.

In re Continental Illinois Sec. Litig., 572 F.Supp. 931, 935 (N.D. Ill. 1983) (emphasis in the original).

Judge Grady in In re Continental Illinois Sec. Litig., referred to In re Fine Paper Antitrust Litig., 98 F.R.D. 48. (E.D.Pa. 1983), a seminal case in the analysis of fee awards in class actions, which had become adversarial among the plaintiffs' attorneys. In In re Fine Paper Antitrust Litig., Judge Joseph L. McGlynn, Jr. had conducted a painstaking analysis in a 468 page opinion of the 97,000 hours spent, with 85,000 hours billed in the two-year period after the initial settlements were obtained.  Judge McGlynn only allowed approximately twenty-five percent (25%) of the $21 million in fees and expenses requested. Aware of Judge McGlynn's exhaustive analysis in In re Fine Paper Antitrust Litig., and acknowledging that in his own class action under federal securities laws twenty-five attorneys from nine law firms had already filed appearances, Judge John F. Grady issued a prophylactic Order at the outset of litigation on how to avoid billing excesses, including keeping time by activity or project.  Judge Grady noted that because Judge McGlynn learned of the time spent on the pre-trial memorandum of 4,500 hours, "it was a simple matter for him to conclude that the claim was absurd. On the other hand, had the time spent on the pre-trial memorandum turned out to be a reasonable number of hours, it would have been equally easy to conclude that the claim should be allowed." In re Continental Illinois Sec. Litig., 572 F.Supp. at 935.

The problem identified by Judge McGlynn and Judge Grady is the same weakness that Judge Wolfson identified.  If the Categories of effort by six different law firms are not maintained by activity, but instead by attorney, and are not congruent and if, as a result, the

entries of hours in each Category are not informative, not capable of rational comparison, how can an assessment be made that the total hours expended on a particular effort are reasonable? See In re First Peoples Bank Shareholders Litig., 121 F.R.D. 219, 225 (D.N.J. 1988) (citing Pawlak v. Greenawalt, 713 F.2d. 972, 978 (3d Cir. 1983), stating, "[t]he nine categories of activities are exceedingly general and are not self-defining, and in the face of the objections are not sufficient to provide 'fairly definite information as to the hours devoted to various general activities.'").

The absence of corresponding information from the firms as to who did what and for how long to advance a particular activity and the resulting inability to dissect the cumulative results to identify redundancy and duplication is what drove Judge Wolfson to appoint me as a Special Master. The lack of uniformity and the lack of equivalence required me as Special Master, in order to fulfill my mandate, to review the billing records, not by sampling and extrapolation, which are acceptable methods of reviewing the lodestar under some circumstances, See In re AOL Time Warner, Inc. Sec. and "ERISA" Litig., 2006 U.S. Dist. LEXIS 78101 at *69 (S.D.N.Y. Sept. 28, 2006), but rather to undertake a painstaking and time consuming item-by-item, line-by-line review of approximately 425 pages of billing records submitted by counsel.[20] "...[I]t is necessary that the Court 'go line, by line, by line' through the billing records supporting the fee request." Evans v. Port Auth. Of N.Y. & N.J., 273 F.3d 346, 362 (3d Cir. 2001). I therefore committed the time and resources to review over 425 pages of billing records so that I could make an appropriate assessment of the hours included in the lodestar.

---

[20] Two first year associates of my law firm, who recently completed judicial clerkships, assisted me over eight days in reviewing the more than 400 pages of bills, line-by-line and item-by-item, and in including them in appropriate spreadsheets and Appendices. Additionally, they calculated the total number of hours spent by each lawyer and staff member during the litigation.

Still, to fulfill my mission dictated by Judge Wolfson's dissatisfaction with the non-standardized submissions, as quoted above, I also attempted to make my own assessment of time spent in several of these Categories.  It was a difficult undertaking since to get what I viewed was an accurate assessment, I had to follow the tasks by both reviewing the bills, where appropriate, and by referring to the Narratives and the various Declarations and Joint Declaration of Demand-Refused and Demand-Futility Counsel. The attorneys did make conscientious efforts to supply the information and elucidate the Categories.  More exact quantification, however, into discrete and comparable groupings was very difficult and standardization was illusive because of overlap and different allocations. It sometimes felt like I was comparing apples, bananas, and oranges.  Adding to the difficulty, as shall be more fully developed in Section V.D., Block Billing, _infra_, the block billing utilized by five of the six firms is sometimes difficult to differentiate and often difficult to evaluate.  It is one thing to simply attempt to tally the hours expended to draft, for instance, the consolidated amended complaint, but it is quite another, more tedious, to make an assessment of how the amended complaint took shape, as expressed on the bills, through several iterations at the hands of several firms, acknowledging that sections were delegated to members of the Demand-Futility team for their input and drafting and then  had to be reassembled by a "master" scrivener for final inclusion, approval and filing.

An additional effort was then made by the two associates of my firm to "pour through" the bills for purposes of deriving a more accurate assessment of the time spent on the various activities by Categories.  Using the time frames provided to me at the oral presentation and in the Narratives, new calculations were made of the projects.  It is my opinion that the associates' work is more accurate because it is more inclusive. Using the dates as benchmarks, it was sometimes difficult to isolate what work was being performed. Opposing the Motion to Dismiss

took place at the same time as the Demand-Futility law firms opposed the Motion to Intervene. I therefore used the tallies we created if I believed they were more accurate and appropriate than the tallies provided by counsel. <u>See</u> Appendix I.

The lack of consistency without standardized Categories and an abundance of overlap made the scrutiny difficult. For instance, Demand-Refused Counsel provided a detailed breakdown of their motion practice by attorney and paralegal, but they combined the Motion to Intervene in 2010 with the motion to consolidate in 2011. <u>See</u> Demand-Refused Narrative, Appendix A at 3-5. My attempt at categorization only highlighted the overlapping and lack of symmetry in the ascribing of time to tasks. The foibles of the firms' individual billing practices, as described hereafter, magnified the problem. As imperfect as the categorizations are, however, they do confirm that, in answer to Judge Wolfson's questions from her October 9, 2012 letter, too many attorneys worked on each motion, spending too much time, and too many people participated in the settlement process and attended too many settlement meetings, also spending too much time.

C. Over-Lawyering

The attorneys in this matter are very experienced. When I met with them, I was very impressed with the breadth of their knowledge and expertise in the prosecution of complex representative litigation; they certainly had what can only be described as gravitas. Also, they achieved a salutary result for the shareholders of J&J but, as shall be explored hereafter, the hours expended in this matter had to be high, given each firm filed or participated in filing a separate complaint (a total of <u>566.25</u> hours[21] for four complaints, per the Demand-Futility

---

[21] Carella Byrne indicated in the Demand-Futility Narrative that it had incurred twenty-five (25) hours attributable to the Complaint on behalf of Minneapolis Firefighters Relief Association, but, according to its billing records, the firm also was involved in researching, reviewing, and e-filing the Carpenter Complaint filed by Robbins Umeda law firm on May 5, 2010. Demand-Futility Narrative at 8.

Narrative, and 264.55 hours for one filed Demand-Refused  complaint and 334.9 hours for a

Complaint in Intervention "worked on," per the Demand-Refused Narrative at 5 and 10,

respectively)[22] for which effort it seeks compensation,[23] and then four of the firms participated in

drafting a consolidated Amended Complaint (1,322.3 hours, according to my calculations, or

1,190.50 hours, according to  the Demand-Futility attorneys), and defending a Motion to Dismiss

(1,708 hours, including opposing a Motion to Intervene, according to my calculations, or 727.30

hours according to Demand-Futility attorneys, including sur-reply briefing).

When additional time was sought to file a new complaint after the first consolidated

Amended Complaint was dismissed in October 2011, four law firms had to agree on the contents

of a single letter sent to Judge Wolfson, seeking an extension of time to file the complaint (13.75

hours).  See Appendix I.C.5. At the conclusion of the matter, six firms had to agree on the

Settlement (3,569.6 hours, according to my calculations; 3,389.90 hours, according to Demand-

Futility Counsel and Demand-Refused Counsel).  See Appendices I.A.5 and I.B.7.

The attorneys are experienced and their work products are excellent, but "the bottom

line" in this quest for ascertaining reasonableness of the hours expended is that too many hours

were consumed to complete activities because of the fundamental problem, aside from any micro

problems, that it was a team effort and subject to  a perceived need for collaborative consensus.

The abundant time spent in the various Categories is a product of practicing law by committee at

least as to defending the Motion to Dismiss and Motion to Intervene and preparing the amended

consolidated complaint.

As to the drafting and filing of the consolidated Amended Complaint by Demand-Futility

Counsel, in reviewing the time sheets and the Demand-Futility Narrative, there is no doubt that

---

[22] This means that the Demand-Refused Counsel spent 718.90 hours drafting complaints. See Appendix I.B.3, 6.
[23] Kantrowitz Goldhamer did not draft a separate complaint.

there was an attempt to delegate tasks among the lawyers of the four firms. I can readily ascertain from reviewing the bills, in conformity with the Demand-Futility Narrative, that Robbins Geller was tasked with researching "inference of knowledge" and charged with interviewing employees with a script prepared and vetted by Carella Byrne. According to a review of the bills, Mr. Oster of Bernstein Litowitz worked on the recall section inter alia and Frank Morris worked on non-recall sections, such as off-label and kickback allegations, along with Robbins Geller. Demand-Futility Narrative at 12. Morris and Morris seemed to create and maintain the master draft. Bernstein Litowitz also worked on the cGMP violations. Id. Carella Byrne assured the pleading conformed to federal practice in New Jersey. Id. The attorneys sent and read endless emails, read and re-read iterations, conducted myriad teleconferences and then spent two days reviewing the draft in the offices of Carella Byrne.[24]

When Morris and Morris drafted the very first complaint in this matter, it took 337.75 hours for the drafting of a very fine and thorough document, the model and to some extent the prototype for subsequent Demand-Futility Complaints; yet the preparation of the consolidated Amended Complaint required the expenditure of 1,190.50 hours per the Demand-Futility Narrative at 14 or 1,322.30 hours per my calculations. See Appendix I.A.2. I am sure that there was a desire to file the most effective and comprehensive consolidated Amended Complaint, but the six previously filed complaints, the demands, which had been made upon the Board by Demand-Refused counsel, and current public filings on J&J were all readily available for inclusion in the pleading. The exponential increase in hours can only be attributable to "diseconomies of committee authorship that may occur in a case where there is no demonstration

---

[24] The billing records of Morris and Morris include 38.75 hours for these two days for Karen Morris and Frank Morris to participate and the billing records of Carella Byrne include 22.00 hours for Mr. Cecchi. I am unable to determine whether lawyers from Bernstein Litowitz, who worked on the amended complaint on those two days, December 15 and 16, 2010, attended as their bills are too non-specific. Attorneys from Robbins Geller were also involved in the editing of the amended complaint, but did not travel to New Jersey.

to the contrary." Weinberger, 801 F. Supp. at 818 n.30 (citing Furtado v. Bishop, 635 F.2d 915, 923 (1st Cir. 1980)).   I can only conclude that the redundant and collaborative effort, essentially drafting by committee, caused the excessive number of hours.

Another activity in this matter that engendered the expenditure of a great deal of hours was the competition to be lead counsel among the Demand-Futility lawyers. Although the Demand-Futility lawyers eventually agreed upon a leadership structure, they nevertheless filed several motions and prepared other unfiled motions to serve as the primary attorney.   See Demand-Futility Narrative, Exhibit 5 at 3 n.5.  This expenditure of time consumed 592.5 hours. Demand-Futility Narrative at 10.  It added no value for the shareholders of Johnson & Johnson. The attorneys have indicated that they have reduced their lodestar requests in the exercise of billing judgment, and Mr. Cecchi particularly referenced a ten percent (10%) reduction for "those issues that did not directly advance the Demand-Futility Actions, such as the briefing related to the motions for appointment of lead counsel." Demand-Futility Narrative, Exhibit 4 at 5 n.1. Morris and Morris noted that it took a twenty-two percent (22%) reduction for Category 3, motion practice.  Demand-Futility Narrative, Exhibit 5 at 3 n.5.

Having agreed on a leadership structure, the Demand-Futility attorneys then resisted the intervention of Demand-Refused Counsel and exhausted 153.5 hours.   Demand-Futility Narrative at 11.  The adversary, Demand-Refused Counsel, in turn expended 756.75 hours to both intervene in the Demand-Futility action, which effort it lost, and then to prevail in the motion to consolidate against other Demand-Refused Counsel and to become lead counsel, which it won. Demand-Refused Narrative, Appendix A at 3. Again, there was no perceived benefit to the shareholders.

Defending the Motion to Dismiss, the Demand-Futility lawyers spent over 1,700 hours. See Appendix I.A.4. I acknowledge, as previously indicated, that a review of billing records of Demand-Futility Counsel and the explication in their Narrative, reveal that there was a delegation of tasks, i.e., facts, and research, and even a certain amount of synergy, but the collaborative process, the endless circulating and reviewing of drafts, exacerbates the "diseconomies of co-authorship" and the hours mount, unmitigated by any accountability. In the relevant time period, when the opposition was being prepared for the Motion to Dismiss, a review of the billing records shows that Carella Byrne was involved in factual research (March 10 and 11, 2011) as was Bernstein Litowitz (March 4, 5, 8, and 9, 2011); the entries of Robbins Geller are too vague to determine with what aspect of the response they were involved. There were endless conferences with the "team." The timing of distribution to "co-counsel" was the subject of a teleconference between Patrick Morris and Karen Morris on March 8, 2011 ("Discussions with Karen L. Morris re: timing of plaintiffs' draft opposition to Motion to Dismiss being assembled and distributed to co-counsel for review and comment").

The Settlement is a good one for the shareholders of J&J; Judge Wolfson has so indicated. The question is, however, why did it require almost 3,600.00 hours to facilitate and finalize? See Appendices I.A.5 and I.B.7. Reviewing the billing records, again, the necessity for four law firms of the Demand-Futility regiment and two law firms of the Demand-Refused regiment to participate and have their input on strategy, negotiation, memorialization, facilitated by a surplus of conference calls, emails, meetings, strategy sessions, reviewing documents, drafting, editing, and re-drafting generated the staggering total. There were several experts to manage. The dynamics of six firms, with experienced counsel, advancing their clients' agendas as they thought appropriate, together with the idiosyncrasies of their billing approaches, as

explained hereafter, generated generous billable hours while the firms never seemed to acknowledge that, perhaps, their accrual of time, their efforts, their contributions had to be tempered by moderation despite the absence of a watchful client – or a difficult adversary.  It is also clear that extra time was incurred because of disharmony, presumably about fee splits, between the Demand-Futility Counsel and Demand Refused Counsel.  See Section V.N., Of Limited or No value, infra.

The preparation of the Joint Attorney Declaration is a case in point and emblematic of how any filing in this matter was an opportunity to contribute to the effort, which in turn required substantive and textual agreement among the disparate counsel.   Presumably part of the final approval application, drafting the Joint Attorney Declaration and getting all the attorneys "on board" was not an easy matter. Mr. Frank Morris began the draft, circulated it to Carella Byrne, Bernstein Litowitz and Robbins Geller.  "Revisions and edits" then follow per Bernstein Litowitz (August 22, 2012) and then "further revisions" (August 27, 2012), such revisions always preceded by conferences and/or emails.  The document was then forwarded to Demand-Refused Counsel for their comments, which followed, necessitating Ms. Morris on August 29, 2012 to record:

> Reviewed and edited next turn around on Joint Attorney Declaration; circulated same to co-counsel; teleconference with Patrick F. Morris re: coordinating Joint Attorney Declaration revisions with Phil Taylor and Jeff Abraham; reviewed further revisions to Joint Attorney Declaration; teleconferences with Patrick F. Morris re: further Joint Attorney Declaration edits, and teleconferences with Phil Taylor re: revisions; reviewed further co-counsel edits to Joint Attorney Declaration.

Prior to that billing entry, Mr. Graifman's time sheets show his "Review and Revis[ion] of Joint Declaration" on August 26, 20102 and August 30, 2012. Philip Taylor also referenced on August 27, 2012 "changes to joint decl." [25] [26]

The drafting and finalization of the Joint Attorney Declaration, with, at that time, six law firms involved, is an example of the numerous hours required to complete an activity. Reviewing the course of its drafting facilitates an answer to the question of Judge Wolfson as to why so many hours were spent in this matter.   My general answer is that there were too many participants and although the end product may have been excellent ("two heads are better than one"), both in style and substance, nevertheless it appears that several of the firms, particularly, did not exercise billing or staffing restraint and did not acknowledge that accommodating all lawyers at the table added to the number of hours expended. A private client would not accept such multiplicity of lawyers working on his or her matter.   The attempt to assign discrete tasks is commendable, but does not prevent the interim product from being duplicated and the final product from having been over-lawyered.   In the "twilight" of this litigation, some law firms assigned new lawyers to the matter, who had to review the file although they were given a narrow task.  See Section V.P., Adding New Lawyers, infra.  While in requesting their lodestar, the firms all indicated that they had exercised billing judgment in taking voluntary reductions, essentially a double review of the billing records and the Narratives did not disclose any evidence of a contemporaneous effort to moderate their efforts so as to minimize the billing.

---

[25] There may have been other work performed by other attorneys on the Joint Attorney Declaration, but the language of the billing is too vague to determine.

[26]   Demand-Refused Counsel maintained that it did not bill for time spent negotiating with their counterparts: "However, exercising their billing discretion, Demand Reused (sic) Counsel did not include time spent negotiating with Demand Futile Counsel in their submission to the court and appropriately reduced the amount of time reported under Category 6, the settlement Negotiation Process and Documentation."  Demand-Refused Narrative at 15.  In actuality, I saw no evidence of this in a review of the bills.

I shall now proceed to discuss the more micro issues in quantifying the appropriate lodestar.

### D.  Block Billing

Aside from the number of firms involved in this matter, the presentation of the billings was not transparent, exacerbating the problem of determining reasonableness.

In reviewing the records, the first obstacle was the difficulty in analyzing what is known as "block billing" records since all of the attorneys, except Kantrowitz Goldhamer, utilized the block billing format to record the hours spent and for which they seek compensation. Block billing is a method by which each lawyer and paralegal in a matter enter the total hours per day devoted to a matter rather than specifying what individual tasks they performed and for how long. Brown v. City of Pittsburgh, 2010 U.S. Dist. LEXIS 52927 at *27 n.12 (W.D.Pa. May 27, 2010).   In Wade v. State Trooper Michael Colaner, 2010 U.S. Dist. LEXIS 138518 at *18 (D.N.J. Dec. 28, 2010), Judge Wolfson upheld the utilization of block billing in the matter sub judice because the "listed activities reasonably correspond to the number of hours billed." See also Holzhauer v. Hayt, Hayt & Landau, LLC, 2012 U.S. Dist. LEXIS 112740 (D.N.J. Aug. 10, 2012).  Judge Wolfson noted in the Wade opinion that the Third Circuit had addressed the degree of specificity necessary to satisfy a request for fees and had held in Rode v. Dellarciprete that specificity was required "to determine if the hours claimed are unreasonable for the work performed," but it is "not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney." Wade, 2010 U.S. Dist. LEXIS at *18 (citing Rode, 892 F.2d at 1190).

Other courts have not been so kindly disposed to block billing.  The Honorable Susan D. Wigenton has held that attorneys who do not "task bill" and instead block bill, do so at their own

"peril." <u>United States v. NCH Corp.</u>, 2010 U.S. Dist. LEXIS 94486 at *25 (D.N.J. Sept. 10, 2010). "While not prohibited, block billing has a tendency to obfuscate the amount of time expended on distinct tasks and introduces an element of vagueness into a fee application, making it difficult to determine if the reported hours are 'duplicative or unnecessary.'" <u>Ass'n of Holocaust Victims for Restitution of Artwork & Masterpieces v. Bank Austria Creditanstalt AG</u>, 2005 U.S. Dist. LEXIS 28880 at *18 (S.D.N.Y. Nov. 17, 2005) (citing <u>Sea Spray Holdings, Ltd. v. Pali Financial Group, Inc.</u>, 277 F.Supp. 2d 323, 325-26 (S.D.N.Y. 2003)). One court in a stockholder action noted in reviewing a request for fees that "when more than a single service was provided, the services are combined, and there is no information concerning what part of the total charge is allocated to each service. Hercules's challenge of cleansing the Augean Stables pales by comparison with the task presented." <u>Mokover v. NECO Enters, Inc.</u>, 785 F.Supp. 1083, 1090 (D.R.I. 1992).

Some courts will take an across the board reduction for block billing. <u>See</u> <u>Role Models Am., Inc. v. Brownlee</u>, 353 F.3d 962, 970-71 (D.C. Cir. 2004) (reducing requested hours because block billing "lump[ed] together multiple tasks, making it impossible to evaluate their reasonableness."). In <u>In re Olsen</u>, the time sheets were organized on a daily basis, not by the task. <u>In re Olsen</u>, 884 F.2d 1415 (D.C. Cir. 1989). "Thus, when an attorney billed for more than one task in a day, the court is left to approximate the amount of time which should be allocated to each task. With such inadequate descriptions the court cannot determine with a high degree of certainty, as it must, that the billings are reasonable." <u>Id.</u> at 1428-29. (Internal quotation marks omitted). Attorneys who utilize block billing are answerable for the confusion it generates. <u>NCH Corp.</u>, 2010 U.S. Dist. LEXIS 94486 at *25.

The individual bills submitted to me by counsel maintained in block billing form exacerbate the problem identified by Judge Wolfson as to how much time was spent on a given activity. Not only is it difficult to ascertain the total time spent preparing a certain motion, but it is even more challenging to ascertain the reasonableness of the hours on a daily basis that contribute to the production of such motion. As previously indicated, in the billing records for all the firms except Kantrowitz Goldhamer, we see the total time for the day with no breakdown as to specific tasks. "Many billing records group different activities within the same time entry" and, as a result, "such grouping prevents an accurate breakdown of time for such activities…" Weinberger, 801 F.Supp. at 816 n.21.

Here are some examples of block billing which epitomize the problem and for which I have subtracted time, as explained hereafter. The Morris and Morris firm on July 26, 2011 billed 11.00 hours for "Frank" (Patrick Morris) at $685.00 an hour for a total of $7,535.00 for an entry that reads as follows:

> Reviewed various filings by defendants responding to last Friday's filings in connection with SLC Report; discussed issues re: same with Karen L. Morris; drafted memo of principal arguments raised by defendants in their response to our filing with argument in opposition to same; meeting to discuss same with Karen L. Morris in detail; teleconference with Mitchell Glass re: scope of discovery we would want to support actual off-label promotion at company; discussed issues re: same with Karen L. Morris and Michael Lindsey: reviewed PSE&G case and drafted memo of chronology of facts and events as they unfolded reflecting knowledge by board and board reaction; discussed same with Karen L. Morris, conference call with Mark Lebovitch and Karen L. Morris re: distinguishing cases and strategy for oral argument; pulled copies of relevant cases; drafted memo re: relevant red flags supporting ongoing nature of alleged misconduct; reviewed background materials in support of same; provided same to Karen L. Morris and Mark Lebovitch; further communication with Karen L. Morris and Mark Lebovitch re: issues raised re: same.

(emphasis added).

This entry has several problems, some of which will be further explained in this Report. However, the block billing commendably included a great deal of information so vagueness or lack of specificity is not an issue as it is with the block billing of some other firms who are generally more inexplicit. But, in general, how do I know how much time was spent on each activity? How much time was spent conferencing with Karen Morris?

As to the specific problems identified in this July 26, 2011 block billing entry, they include using a $685.00 per hour partner with twenty-eight (28) years' experience to do the work that a less expensive associate could do, i.e., "pulled copies of relevant cases." See Section V.G., Michelangelo Paints the Barn, infra. How do I know how much to deduct for that time? Also, Mr. Morris reviewed the "PSE&G case," a fundamental case of the New Jersey Supreme Court, on the standard of review to be applied as to whether a board of directors responded appropriately to a demand letter. In re PSE&G Shareholder Litigation, 173 N.J. 258 (2002). Did not the averments of Morris and Morris to be lead counsel represent they had experience in shareholder derivative actions? See Section V.H., Area of Expertise, infra. What is the correct debit for that task from the block bill of 11.00 hours? Also, 11.00 hours is a great deal of time to spend on these issues by Mr. Morris. In and of itself, I might not have a problem, but this day of 11.00 hours is preceded by days starting July 13, 2011 of 8.75, 8.50, 8.50, 9.00, 10.25, 3.75, 1.25, 13.25, 5.25, 6.75, and 2.75 hourly charges for this experienced attorney and begins to feel excessive and therefore unreasonable.[27] The constant consulting with Karen Morris is also

---

[27] On the other hand, when Mr. Morris wants to accomplish a great deal in a short amount of time he apparently can do so even including conducting multi-conferences with Karen L. Morris. Here is a Morris and Morris entry for March 9, 2012 in which he indicated he spent only 0.75 of an hour:

> Discussed with Karen L. Morris results of her email communications with co-counsel re: progress of settlement negotiations; discussed with Karen L. Morris results of her call with Kristen Seeger re: timing of our receiving J&J's comments on our settlement proposals; conference call with Karen L. Morris and Mitchell Glass re: same and availability of Mitchell Glass for our review and analysis of J&J's comments on our settlement proposals next week; discussed with Karen L. Morris open issues on Stipulation, including David Mitchell's [David Mitchell is not identified]

problematic and shall be discussed hereafter. See Section V.M., Constant Conferencing, Collaboration and Individual Responsibility, infra. See Appendix II for additional examples of block bills from Morris and Morris.

Abraham Fruchter requests $6,360.00 for 8.00 hours of work by Jeffrey Abraham at $795.00 per hour on May 9, 2012 and $3,577.50 for 4.50 hours (total 12.50 hours and $9,937.50) on the same day for the following entries:

> A104 Review/analyze
> Engagement agreement with Dr. Higham. Draft letter to Kristen re: dilemma faced by Demand-Refused plaintiffs of valuable settlement consideration prior to completion of necessary discovery and bases for complete release of all defs. including officers, research re: collusive and reverse action (sic) let briefs (letter not sent).

> A 104 Review/analyze
> Review draft settlement agreement prepared by demand futility counsel and redlined version of the same prepared by Phil; draft letters to Karen Horns detailing problems with same (not sent) and telephone conferences with Graifman re: same, telephone conference with Kristen re: same and telephone conference with Erik Haas.

These two entries raise the following issues: time is being charged for work that did not advance this matter ("letter not sent"); research is spent on collusion and reverse auction, an issue never raised and for which experienced counsel at $795.00 per hour should be aware; a letter is drafted to Karen Horns, who is not identified, and the letter is not sent; no information is provided on the subject of the conversation with Erik Haas. See also Appendix II for more examples of block billing of Abraham Fruchter.

Block billing does not have to mention multiple projects to be problematic. Consider this terse block bill for 10.0 hours from Abraham Fruchter: "August 11, 2010 JA (Jeffrey Abraham)

---

> proposed changes; teleconference with David Mitchell to discuss same; discussed results of call with Karen L. Morris; created revised stipulation reflecting results of discussions with David Mitchell and Karen L. Morris and provided same to Karen L. Morris for dissemination to co-counsel.
> (emphasis added).

E-mails from Longman, work on brief." This block billing entry has several problems, including lack of specificity. Did Mr. Abraham spend fifteen (15) minutes, the minimum charge of Abraham Fruchter, on the e-mail and 9.75 hours on some brief or did he spend 9.75 hours or less on the email and fifteen (15) minutes on the brief or some permutation in between?   Another terse, but nevertheless, obtuse block bill is represented by the entry "Draft/revise verification, letter draft to court" for 3.50 hours on April 5, 2011 by Mr. Taylor. An experienced lawyer who bills at $425.00 per hour seems to be spending an inordinate amount of time preparing a verification and an unknown letter to the Court.   On April 4, 2012, that same lawyer spent 5.25 hours for a "call with Walter and Kristen and Risperdal."   Who are Walter and Kristen? What about Risperdal? Not knowing what was done makes it almost impossible to ascertain its reasonableness or whether the time spent on each disparate aspect of that entry was reasonable.

Here is a final example of the block billing problem. For the Carella Byrne firm on March, 7, 2011, the entry for AEP (Audra Petrolle) is "Review electronic filing notice re: brief in opposition to redesignation of counsel; review electronic filing notice from nominal defendant joining in on opposition brief; review briefs; draft fact sections."   The fee request is seven hours at $475.00 per hour for a total of $3,325.00 for this day. This entry is problematic because I do not know what briefs were reviewed, do not know for what document a fact section was drafted, or how long it took to review the electronic filing or review the brief.

As a result of the lack of transparency implicit in block billing with five of the six law firms, in a matter where the Court has expressed concerned about the inability to quantify the time spent on a given activity because of the asymmetry in the Categories, I have subtracted hours from the billing times for extreme cases of block billing where, when I reviewed the entire block as a whole and compared the listed activities and the time spent, I determined that the

hours did not reasonably correlate to all of the activities performed.  See NCH Corp., 2010 U.S.
Dist. LEXIS 94486 at *20.

It must be borne in mind that block billing has two problems: the first is the inability to
assess whether a given block of hours is reasonable in and of itself and the second problem is the
inability to carve out from a block billing whether too much time was spent on a particular
activity in the block bill and thus assess its reasonableness. I also want to stress that I did not
subtract for all block bills; if I had, I would have had to strike a great portion of the entries.  I
generally subtracted time for the defect of block billing when there were additional infirmities in
the entry and it became impossible to estimate the time for the deficient activity within each
block billing.  This is because in a situation where a block billing had additional problems and
the block billing did not lend itself for a reasonable allocation, it is difficult to subtract only a
portion for the unreimbursable item from an entire block of time.

In Citibank v. Hicks, when the court awarded attorneys' fees pursuant to the terms of a
Note and wanted to deduct excessive attorney conferencing time, it noted that it was required to
estimate the time expended because of the block bill in order to subtract for the particular task:
"As such, our determination of the hours spent on attorney conferencing in Section III, B, 3 are
based on reasonable estimates where those tasks are listed with others in a block-style entry.
While this method may be less than precise, it is a necessary consequence of the attorneys'
decisions to bill in this format." Citibank, N.A. v. Hicks, 2004 U.S. Dist. LEXIS 30432 at *21
n.6 (E.D.Pa. Aug. 24, 2004).

Appendix II is included which lists the problematic block billing by each law firm.  I
have taken what I believe to be reasonable reductions after engaging in a "fair amount of
'judgment calling' based upon [my own] experience with the case and [my] general experience

as to how much time a case requires," or how much time an activity should require.  Bell v. United Princeton Properties, Inc., 884 F.2d 713, 721 (3d Cir. 1989); Evans, 273 F.3d at 362.  As indicated, the block billing entries generally have additional problems, but I did not subtract for each individual problem.  If a reduction is taken for an incomprehensible block bill, but also reveals problems of inconsistency, vagueness, or excessiveness, I only took one aggregate reduction.  As a result, the entry for a given day may be included on several of the Appendices I have created that enumerate problems, but there is only one reduction in toto.

I want to reiterate that I did not attempt to allocate among block billing issues and the other various micro problems, such as duplication or vagueness; my reduction reflects a total charge for the entire entry and is not double counted.  There were over four hundred pages of bills for six law firms.  I made a good faith, conservative effort to deduct on a reasonable and consistent basis the total problem for the block bill.  Because of the block bill format, aside from inconsistent times that were capable of verification from the counterpart attorney (unless subsumed in another block bill), it would be difficult to estimate which particular separate activity was excessive, which was vague, or which was of no value.   The result: an aggregate reduction.

### E. "Excessive, Redundant, or Otherwise Unnecessary"

The United States Supreme Court announced the controlling imperative in fee shifting cases: "Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission."  Hensley, 461 U.S. at 434.  (emphasis added).  The prohibition against excess, redundancy and lack of necessity has been embraced in the Third Circuit.  See also Rode, 892 F.2d at 1183 ("Hours are not

reasonably expended if they are excessive, redundant, or otherwise unnecessary."). The imprimatur of the United States Supreme Court in Hensley demands reasonableness in fee shifting and hours that are not "reasonably expended" must be excluded from a fee award. Hensley, 461 U.S. at 434. Hours are excessive if they represent more time than is reasonably necessary to complete the task. Rode, 892 F.2d at 1192.

Focusing on the issue of excessive hours in this case, I have calculated that of the 12,797.70 hours billed by six law firms, 2,652.10 hours in my opinion are excessive for one reason or another and sometimes for multiple reasons. Here is the breakdown:

| Law Firm | Hours Billed | Excessive Hours | % of Excess |
|---|---|---|---|
| Carella, Byrne | 1701.50 | 100.80 | 5.92% |
| Bernstein Litowitz | 2305.50 | 576.60 | 25.01% |
| Morris and Morris | 4074.50 | 990.00 | 24.30% |
| Robbins Geller | 1158.00 | 234.00 | 20.21% |
| Abraham Fruchter | 2,755.25 | 710.00 | 25.77% |
| Kantrowitz Goldhamer | 802.95 | 40.70 | 5.07% |
| Total | 12797.70 | 2652.10 | |

Excess hours come in many forms and shapes. It can be a plain vanilla excessive number of hours spent on a necessary task or a few hours spent on an unnecessary task. It can become excessive in the aggregate after numerous instances of billing for the same project.[28] It can be excessive because it is inadequately explained. It is excessive because the attorneys represented to Judge Wolfson that they should be Lead Counsel as they were experienced in the area of shareholder derivative litigation in New Jersey, that they had New Jersey counsel upon which to rely, and that they would operate efficiently. It is excessive to utilize a $685.00 per hour attorney

---

[28] I have no problem awarding hours for the law firm of Abraham Fruchter preparing a Complaint in Intervention, but if the hours of Philip Taylor alone are reviewed on the drafting, they begin to appear excessive, especially since it has been acknowledged that every attorney was using every other attorney's work in this matter. Reply Brief in Further Support of Motion to Intervene and Appoint Abraham Fruchter at 14, In re Johnson & Johnson Derivative Litig., No. 10-2033. Philip Taylor beginning on August 8, 2011 billed to "Draft/Revise complaint research" with some minor variations in descriptions 2.75, 4.75, 7.50, 7.25, 3.00, 6.25, 7.75, 8.50, 8.50, 6.50, 5.00, 8.75, 11.25, 10.25, 8.50, 13.75, 2.00, 7.25, and 2.75 hours.

with almost thirty years' experience to research a basic Federal Rule of Civil Procedure. <u>See</u> Section V.G., Michelangelo Paints the Barn, <u>infra</u>. It is excessive when multiple attorneys work on one letter to Judge Wolfson and it takes 13.75 hours to prepare that letter, simply asking to extend time to file a new amended complaint. It is excessive when a new lawyer comes in at the end of a matter and has to review all the documents all over again. <u>See</u> Section, V.P, Adding New Lawyers, <u>infra</u>. It is excessive when it is acknowledged that such experienced lawyers have libraries of templates and boilerplate motions, memoranda, and forms of orders from which to draw and need not "re-invent" the wheel with each drafting.

Case law holds that "[t]he higher the hourly rate charged by an attorney based upon his or her skill and experience, <u>the shorter the time</u> it should take the attorney to perform a particular task." <u>Access4All, Inc. v. Boardwalk Regency Corp.</u>, 2012 U.S. Dist. LEXIS 113617 at *17 (D.N.J. Jun. 28, 2012) (citing <u>Apple Corps. Ltd. v. Int'l Collectors Soc.</u>, 25 F.Supp. 2d 480, 490-91 (D.N.J. 1998)) (emphasis added). That tenet is often ignored in this matter and the failure to adhere to it has generated a great deal of excessive billing. Also, a court "will not allow an award of fees based on attorneys unreasonably performing the same work, the performance of unnecessary work, or expending an unreasonable number of hours on simple straightforward tasks." <u>Perez v. Midland Funding LLC</u>, 2011 U.S. Dist. LEXIS 126404 at *16 (D.N.J. Aug. 11, 2011), <u>adopted</u> 2011 U.S. Dist. LEXIS 124759 (D.N.J. Oct. 27, 2011). The pattern of unreasonableness continues in having multiple attorneys from one firm on a phone call, at a court appearance, and at settlement conferences. <u>See</u> Section V.L., Duplication of Entries and Duplication of Effort, <u>infra</u>. Constant time entries by a $975.00 per hour or $800.00 per hour attorney reviewing the case over and over again, without further detail or justification, or endless hours billed for strategizing is unreasonable. <u>See</u> Section V.K., Case Strategy and

Review, infra.  Researching without limitation can become excessive.   An office protocol that has  two attorneys reporting to a third attorney all that they have  learned, read, and researched all day, every day is not reasonable. See Section V.M., Constant Conferencing, Collaboration and Individual Responsibility, infra.

Bernstein Litowitz submitted charges for Martin Braxton, a paralegal billing at $225.00 per hour, beginning on July 23, 2010, who submitted the following description of his daily effort: "Download news articles from google alerts and LexisNexis news article searches, place them onto DM5 & send to attorney team for review."  On that day he billed for that activity 1.00 hours (and again on July 26, 2010).  He then billed 3.00 hours for this same effort on August 23, 2010, 1.00 hour on August 24, 2010, 1.00 hour on August 25, 2010, 1.50 hours on August 27, 2010, 2.00 hours on September 8, 2010, 2.00 hours on September 23, 2010, 2.50 hours on September 24, 2010, 1.00 hour on September 28, 2010, and 1.50 hours on September 29, 2010.

For the month of October, Martin Braxton billed a total of 16.25 hours for this same online researching of articles, incredibly not deriving any timesaving from multiple prior efforts on the Internet or bookmarking his sources.  In November 2010, he billed 6.75 hours and in December he billed 24.75 hours for the same task.  January, February, and March 2011 also reflect a large number of hours for the same effort, culminating in an extraordinary charge of 20.00 hours for one day on March 18, 2011.  See Appendix I.C.7, which shows a total of 223.00 hours billed by Bernstein Litowitz for Mr. Braxton's repetitive services at a cost of $50,175.00.

Bernstein Litowitz also submitted a charge of 11.00 hours for Matt Mulligan on April 16, 2012 for "Prospectus supplement research" at $375.00 per hour or a total of $4,125.00. The details of this effort are not specified and would appear to be of little or no value if it relates to

J&J's prospectus since the case at this time is in deep settlement mode.  See also Section V.N.,

Of Limited or No Value, infra.

Morris and Morris, as indicated, seems to do all work in collaboration.  See Section

V.M., Constant Conferencing, Collaboration and Individual Responsibility, infra.  Just prior to

filing responses to the Objection as to fees and Mr. Petri's request to intervene, the three lawyers

of the firm billed  a total of  28.25[29], 22.75, 23.25, 25.00, and 23.50 hours for the period

September 17-21, 2012.[30]   The block billing reveals a plethora of teleconferences with each

other.

Excesses can be measured in small increments.  Abraham Fruchter's Jeffrey Abraham

billed one hour on June 6, 2011 for "Review/analyze Letter regarding status conference before

Judge Wolfson, efforts to reschedule" and one hour on June 7, 2011 for "Email and telephone

conference regarding scheduling issues."  Darryl Alvarado of Robbins Geller billed 27.50 hours

over five (5) days commencing April 18, 2012 in block billing form to research "New Jersey law

on books and records request."   New Jersey counsel, Carella Byrne, presumably familiar with

New Jersey law, also billed 2.70 hours on April 18, 2012 for "Research corporate record

demand."[31]   According to his block bills, Arthur Chen of Abraham Fruchter spent 90.00 hours at

$35,550.00 over the month of December 2011, drafting a memo on "corporate therapeutics."

Vagueness accentuates excess: On January 9, 2012 Mr. Taylor billed 4.00 hours or

$1,700.00 for "Draft/revise letter."  Is that the letter to one Seeger referenced in the succeeding

entry of Mr. Abraham?  Mr. Taylor has six (6) years of experience and bills 7.25 hours, 4.25

---

[29] Michael Lindsey billed 16.25 hours on September 17, 2012.
[30] In addition to the 6.25 hours that Frank Morris billed on September 19, 2012, he also indicated that he spent 4.50 hours for which he was not seeking compensation for "work on fee aspects of response to objection," and on September 20, 2012 when he submitted an entry for 8.25 hours, he also indicated that he was not billing for 6.5 hours on the same fee objection.
[31] Mr. Graifman of Kantrowitz Goldhamer, also a New Jersey attorney, does not submit any charges with respect to that issue at that time.

hours, and 1.75 hours on December 5 through 7, 2011 for discovery research and requests and then an additional 7.00 hours on December 8, 2011 on the same subject.  For reviewing a transcript, which is never identified, Mr. Taylor bills over hundred hours during the months of February through May 2012, some in block billing items and most simply designated as "transcript." Obviously, this last issue reveals both excessiveness and vagueness. Without knowing what Mr. Taylor was reading or why he was reading it, it cannot be determined if the hours spent were reasonable and whether it would be reasonable to ask a paying client to absorb this cost.

Another area of excess is preparation for oral argument. The firms spent a total of 156.65 hours ($106,280.75) in this case to prepare for Motion to Dismiss in July, 2011.  See Appendix I.C.3. Only one attorney, Mark Lebovitch of Bernstein Litowitz, was designated to argue yet a total of ten attorneys prepared or assisted other attorneys in preparing.  Mr. van Kwawegen of that firm lists a block bill of 10.50 hours on July 27, 2011, which references preparing for oral argument, and a bill of 6.00 hours on July 28, 2011 for "Assist[ing] M. Lebovitch with oral argument; travel to Trenton, NJ."

Attorneys have been warned about over-preparing:

> A reasonable fee for hours spent preparing for a legal argument should be limited to hours reasonably necessary for a lawyer to become familiarized with the facts and the law pertaining to the issue to be argued, an analysis of the opponent's argument, and questions anticipated to be posed by the court. Under the fee shifting statute, the losing party is expected to pay for hours reasonably spent in the argument and its preparation, but not for excessive hours, or hours spent in learning or excessively rehearsing appellate advocacy.

Maldonado, 256 F.3d at 187.

After the excessive preparation, too many attorneys attended the motion. A presence as a mere spectator is not compensable. In re Fine Paper Antitrust Litig., 98 F.R.D. at 81. For the

hearing on the Motion to Dismiss on July 28, 2011, four of the firms each had two attorneys appear. Only Mr. Lebovitch spoke.[32]   The Morris law firm had two attorneys present in the courtroom for a total of 14.50 hours [33] and the Abraham Fruchter firm had two attorneys present for a total of 15.25 hours.  See Section V.L., Duplication of Entries and Duplication of Effort, infra.  A Motion to Dismiss is an important proceeding so I can appreciate that Hawaii Laborers Pension Fund would want its California counsel present, but two attorneys attended the hearing. It is true, however, that Mr. Downs did not bill for his time at the hearing and only Mr. Mitchell billed 3.50 hours, but Mr. Downs submitted preparation time of 13.00 hours and Mr. Alvarado, who did not attend, assisted him with 18.00 hours of preparation.  See Section V.L, Duplication of Entries and Duplication of Efforts, infra.

A similar problem exists with respect to the attendance of supernumerary attorneys at court conferences and settlement conferences.  Unless the magnitude of a case demands it, "in many cases, the attendance of additional counsel representing the same interests as the lawyers actually conducting [the litigation is] wasteful and should not be included in a request for counsel fees from an adversary." Planned Parenthood v. AG, 297 F.3d 253, 272 (3d Cir. 2002) (citing Halderman v. Pennhurst State Sch. & Hosp., 49 F.3d 939, 943 (3d Cir. 1995)).  When extra attorneys are present at a hearing, compensation can be denied for the gratuitous attorney. Lanni v. New Jersey, 259 F.3d 146 (3d Cir. 2001).

In this matter, with respect to Demand-Futility counsel, there were always at least three attorneys in attendance at conferences and motions from the constituent Demand-Futility firms and Demand-Refused firms could always count on their co-counsel to attend.  As settlement

---

[32] Mr. van Kwawegen may have affirmatively assisted Mr. Lebovitch since the transcript reveals that Mr. Lebovitch's "colleague" reminded him about certain paragraphs of the complaint. Transcript of Motion to Dismiss Hearing at 42 (Jul. 28, 2011), In re Johnson & Johnson Derivative Litig., No. 10-2033.
[33] Mr. Lindsey's time sheet indicated that he "sat at counsel table for argument and discussed issues as raised during argument."

negotiations proceeded and interests became aligned, there were six firms available to send representatives. Philip Taylor attended all settlement conferences[34] with Jeffrey Abraham from Abraham Fruchter. Patrick Morris joined Karen Morris in New York at four of the six settlement conferences she attended. Mr. van Kwawegen accompanied Mr. Lebovitch to two settlement meetings although no Bernstein Litowitz representative appeared at the December 2, 2011 conference. Robbins Geller only sent one representative, and, indeed, Mr. Downs participated by telephone on December 9, 2011 and did not attend nor participate in the August 7, 2011 and December 2, 2011 meetings. Mr. Graifman was the only attendee for Kantrowitz Goldhamer at five settlement meetings.

A great deal of time was spent reviewing the Special Committee Report which was issued by J&J in July, 2011. I reviewed the Report myself. It was a thorough and comprehensive document, not easily read. The lawyers spent 318.45 hours reading this Report. See Appendices I.A.3 and I.B.4. I did not start to subtract for reading this Report until I found that the time spent and the concomitant billing became excessive.

As for the problem of excessiveness, as I indicated, it comes in all sorts of shapes and sizes and can be the product of overreaching. I have been admitted to the New Jersey Bar for almost thirty-five (35) years and have a wide range of experience in private practice, public office, and the judiciary, overseeing, reviewing, and approving billing. I have used my sense of the case and its demands and my sense of the time necessary to perform certain tasks, as well as my insight into the ramifications of multiple firms participating in the activity, to take reasonable reductions for what I believe to be excessive time.

As with other problems in billing in this matter, I used my best judgment based on my knowledge of the case and my experience as a private attorney and jurist. Appendix III reflects

---

[34] No attorney from the Demand-Refused contingent appeared at the December 2, 2011 meeting.

reductions that I took for entries that I found to be excessive. If an entry had more than one

defect, I only subtracted an aggregate amount for the entry.  In Rode, the Third Circuit was

critical of the District Court for failing to adequately explain why hours were considered

excessive and grouping "the hours it eliminated for excessiveness with hours it excluded for

inadequate description." Rode, 892 F.2d at 1187. In this matter, the reductions for excessiveness

set forth in Appendix III in a sense speak for themselves, both as to task and as to the reduction.

My reasoning on what is excessive is explained above and informs each discount. I want to

reiterate that an entry with multiple defects was penalized only in toto and the quantification of

the reduction was usually based on the excessiveness criterion, the most egregious imperfection

in my mind compared to other issues.  As a result, there were no double reductions so although

multiple problems are recorded on several different Appendices, there is only one reduction

recommended. See Appendix III for reductions on excessive, redundant, and unnecessary hours.

### F. Billing in Quarter Hour Segments

The number of hours sought by counsel in this matter is staggering.  A review of the bills

identifies that four of the six law firms bill in quarter hour segments;[35] two of the firms, both

based in New Jersey, bill in six minute segments.  The result of quarter hour minimum charges is

that a phone call that takes an attorney from the Carella Byrne or the Kantrowitz Goldhamer law

---

[35] Morris and Morris has taken a voluntary reduction of "approximately 17% in three of the seven categories." which would address to some extent the excess generated from quarter hour billing.  Demand-Futility Narrative, Exhibit 5 at 1 n.1. In Category 1 the firm took a twenty-eight percent (28%) reduction for the initial investigation and drafting of the Calamore complaint "to reflect the time the firm spent getting up the learning curve on this intensive research effort." Id. at  1-2 n.3. (emphasis added).  The firm took a twenty-two percent (22%) reduction for Category 3, Motion Practice, acknowledging that the firm "spent substantial time working on multiple leadership briefing some of which were never filed because of the fluid dynamics of the negotiations among the parties regarding leadership over the course of June through August, 2010." Id. at 3 n. 5.  For its participation in drafting the Amended Complaint , Category 3, it took a thirty percent (30%) reduction, not wishing to pass along the time "related to its extensive re-analysis in support of the proposed new approach to alleging red flags." Id. at 4 n.6.  Morris and Morris took no voluntary time reduction for the three Categories dealing with "Discovery and Investigation post-filing of Amended Complaint"; "Governance and compliance analysis, and drafting of settlement proposals"; "Settlement negotiation process and documentation."  Id. at 8 n.9. No reduction was taken for Category 7, "Post Settlement documentation and briefing." Id. at 10 n.10.

firms five (5) minutes could be billed as fifteen (15) minutes by the Bernstein Litowitz, Morris and Morris, Robbins Geller and Abraham Fruchter law firms.  As a consequence, ten five (5) minute phone calls, in a block billing paradigm, could generate an hour of billing by Carella Byrne, but 2.50 hours of billing by Abraham Fruchter.  This overstatement of minutes, and then hours, is the result of imprecision in the system and is exacerbated by such phone calls being obscured by block billing. Of course, one assumes that the phenomenon of multiple minute calls being quantified as totaling an hour does not actually occur because it would be the epitome of unreasonableness and demonstrate a total lack of billing judgment, but it is feasible.  I provide some of the examples of the quarter hour problem below.

Judge Wolfson has criticized fifteen (15) minute billing cycles and subtracted time where appropriate:  "While such billing methods are readily used among attorneys and firms, and generally accepted by courts when calculating fees, courts in this district have rejected the use of such billing increments where the fees have been unreasonably inflated as a result. Wade, 2010 U.S. Dist. LEXIS 138518 at * 50 (citing U.S. v. NCH CORP., 2010 U.S. Dist. LEXIS 94486 at *9 (D.N.J. Sept. 10, 2010)).  Other courts have been less than sympathetic to such augmentation and held that a quarter hour increment "inherently inflates and distorts the time actually expended, and hence is unacceptable." In re Price, 143 B.R. 190, 194 (Bankr. N.D. Ill. 1992). See also Welch v. Metro. Life Ins. Co., 480 F.3d 942, 949 (9th Cir. 2007) ("…the court found the hours were inflated because counsel billed a minimum of 15 minutes for numerous phone calls and emails that likely took a fraction of the time."); In re Jefsaba, Inc., 172 B.R. 786, 801 (Bankr. E.D.Pa. 1994) ("…minimum charges of .10-hour increments more fairly reflect actual time involved, than do quarter hour segments"); In re St. Joseph's Hosp., 102 B.R. 416, 418 (Bankr.

E.D.Pa. 1989) (to do other than bill in one-tenth of an hour increments "suggests the opportunity for padding on short tasks…").

Abraham Fruchter lists on October 27, 2010 for Jeffrey Abraham "Conference, Review News reports regarding $4750 mm fine and office conference with Phil (Taylor) regarding same," $993.75 for 1.25 hours.  If this reading and office conference only took sixty-one (61) minutes, the firm would still record seventy-five (75) minutes.  Similarly, Jeffrey Abraham billed 0.25 or fifteen (15) minutes to read one news article from The Star Ledger on December 28, 2010 and billed 0.50 or thirty (30) minutes to read one New York Times article on January 17, 2011 and to do some filing. The later entry reads as follows "NYT article or (sic) J&J recall, attn. to filing."  Of course, the filing is an administrative task, which should not be billed at $795.00 per hour. See Section V.O., Administrative and Clerical Tasks, infra.

Reading emails are also recorded in fifteen (15) minute intervals so that on March 8, 2011 Jeffrey Abraham read one email from Mr. Graifman for fifteen (15) minutes.  A telephone call that Mr. Graifman records with Mr. Abraham and Mr. Taylor on March 18, 2011 for 0.40 or twenty-four minutes (24) with regard to the complaint in intervention is billed by Philip Taylor at 0.50 or thirty minutes (30) and is recorded by Mr. Abraham in a block bill with other tasks of 1.50 hours.   Jack Fruchter records at 0.25 a "Meeting with Jeff" on November 4, 2011 as the only entry for the day as does partner Mr. Twersky who both bill at $725.00 per hour.  Was this meeting with Jeff Abraham for 0.25 or fifteen (15) minutes or was it in actuality only one (1) minute, or four (4) minutes or (12) twelve minutes since any time from one (1) minute to fifteen (15) is billed at 0.25?[36] An even more egregious example is an item for March 19, 2012 of

---

[36] The answer is not resolved by reviewing Mr. Abraham's time for November 4, 2011 since although he references a meeting "Jack and Mitch," the conference time is subsumed in Mr. Abraham's block bill of 3.25 hours.

Jeffrey Abraham, submitting a request for payment of $397.50 for 0.50 or thirty (30) minutes for the following: "Telephone conference with Kristen (left message) email from her."

While I have noted that block billing has the capacity to increase fees requested or to prevent ascertaining the extent of overbilling, ironically billing separately in quarter hour increments can also overstate bills because of the "grossing up" phenomenon. Former Magistrate Patty Shwartz, now a Judge of the Third Circuit Court of Appeals, in O'Brien v. Brain Research Labs, LLC, pointed this out when she noted, "Because no billing entry is below 0.25 hours and the entries often include multiple tasks, the Court is left without a way to more precisely determine exactly how long each task took class counsel to perform. As a result, the Court could not separate out certain tasks in each of the entries described herein that uniquely required a lawyer's attention." O'Brien v. Brain Research Labs, LLC, 2012 U.S. Dist. LEXIS 113809 at *97 n.18. (D.N.J. Aug. 8, 2012). Judge Shwartz cited to In re Bluetooth Headset Prods. Liab. Litig., which identified the problem albeit billing was done in six minute intervals. 2012 U.S. Dist. LEXIS 168324 at *13 (C.D. Cal., July 31, 2012). ("Just as block billing can improperly result in increased billing, billing separately to take advantage of the inherent overstatement of billing in tenths of an hour when less than 6, 12, or 18 minutes (for example) is spent on any individual task, can result in significant overbilling.").

Although this quarter hour billing has enormous potential for overstating time and creating excess hours, I did not take any reductions for this issue per se, but reductions are reflected in block billing adjustments made for other issues, such as excessiveness, and are thus negatively impacted by the use of quarter hour increments.

G.  Michelangelo Paints the Barn

In this matter, the six law firms often used the highest paying attorney in the firm to perform associate level or paralegal tasks.   Here are some examples:  On September 17, 2010, Morris and Morris utilized Frank Morris, a partner with twenty-eight (28) years' experience, to review "Fed.R.Civ. Procedure 16 re pre-trial conference." [37] Aside from the fact that this is an area of claimed expertise by the firm, as explained in Section V.H., Area of Expertise, infra, why could not the firm have used a less expensive associate to do that research?  Similarly, on March 2, 2011, Frank Morris in a block bill request of 4.75 hours [38] at a total of $3,253.75 researches the first year law school civil procedure issue of citing to extraneous materials in a Motion to Dismiss.   He further continued to research that issue on March 4, 2011 and in a block bill entry requested 7.50 hours or  $5,137.50 at his $685.00 per hour  rate to do "Continued legal research re: ability of defendants to cite to extraneous materials in their Motion to Dismiss; continued drafting of proposed insert re: same."  On the day before, March 3, 2011, he performed the same work and requested $2,568.75 for 3.75 hours of effort at his hourly rate of $685.00.  That issue necessitated a 5.00 hour entry on March 7, 2011 admittedly including other items in a block bill[39] for a request of $3,425.00.  Why could not a younger associate with fewer years' experience and a lower billing rate have undertaken the research?

Michael Lindsey of that same firm, who charges $625.00 an hour researched "New Jersey Statute of Limitations law, including review prior research; identify discovery rule case

---

[37] In the Demand-Futility Narrative, counsel wrote, "As reflected in the time sheets, counsel allocated the work efficiently, with partners involved in strategic decisions, associates preparing initial drafts, and paralegals performing most of the necessary clerical functions."  Demand-Futility Narrative at 8. The problem is that Frank Morris did most of the drafting for Morris and Morris when it was the firm's work assignment to do so and Morris and Morris only has one associate who bills at $625.00 per hour.

[38] The block billing entry for that day reads "Continued legal research re: ability of defendants to cite to extraneous materials in their Motion to Dismiss; discussed issues re: same with Karen L. Morris." (emphasis added).

[39] The block bill reads as follows: 'Further discussions with Karen L. Morris re: issues: materials outside of complaint insert; additional legal research in support of same; revised and edited same; discussed same with Karen L. Morris; final review and edits to two inserts and provided same to co-counsel for insertion in draft opposition to Motion to Dismiss brief." (emphasis added).

law: begin review of selected cases" in a block bill with other assignments of 9.50 hours on April 28, 2010 and continued his research on New Jersey's statute of limitations on April 29, 2010 (block bill for 9.00 hours); April 30, 2010 (block bill for 9.50 hours); May 2, 2010 (block bill for 7.00 hours); August 23, 2010 (block bill for 8.00 hours); August 24, 2010 (block bill for 5.00 hours); and August 25, 2010 (block bill for 4.50 hours). Teleconferences would then follow with Karen Morris on almost every day or succeeding day: April 30, 2010 (0.75 hours); May 2, 2010 (block bill of 3.00 hours); August 23, 2010 (referenced in Mr. Lindsey's entry); August 24, 2010 (0.50 hours); and August 25, 2010 (block bill of 2.50 hours); as well as August 26, 2010 when Mr. Lindsey and Ms. Morris had a conference and Mr. Lindsey then revised his draft on the subject. Although at the time this statute of limitation research was undertaken, in the Spring and Summer of 2010, an agreement as to lead counsel had not yet been resolved among the counsel for Demand-Futility Plaintiffs, nevertheless Morris and Morris' Calamore complaint had been filed on its behalf by a New Jersey firm, Trujillo Rodriguez & Richards, LLC of Haddonfield, New Jersey on April 21, 2010, who should have been more familiar with New Jersey law.

In addition, Mr. Morris, who bills at $685.00 per hour, "Check[ed] dockets in all derivative actions" for 0.50 hours on July 12, 13, 14, 15, 16, 2010. Is there a reason why a paralegal could not have performed this task, whose purpose presumably was to ascertain whether additional Demand-Futility Complaints had been filed?

The Morris and Morris firm is not alone in upgrading work. On July 19, 2010, Robbins, Geller used a $380.00 per hour associate to do the following work: "gather exhibits; work with paralegal to file same." This task could easily have been done exclusively by a less expensive

paralegal.   Travis E. Downs, III, a partner billing at $725.00 per hour, does a factual investigation with regard to recalls on September 14, 2010 for 2.25 hours.

Philip Taylor of Abraham Fruchter on August 25, 2010 has an entry that reads "Review/analyze review br. and cite check."[40]  The firm requests $2,125.00 for 5.00 hours.  The firm employs at least two paralegals who bill at $150.00 per hour.  Would it not make more economic sense and be more reasonable to use the less costly auxiliary staff to do cite checking?  Timekeeper Arthur Chen of Abraham Fruchter bills on November 28, 2011 and November 29, 2011 2.50 hours and 1.00 hour, respectively, to "Find for Jack" information on other pharmaceutical settlements.   Again, a paralegal could have performed this work at a more reasonable cost.

The Third Circuit criticizes this practice.

> Nor do we approve the wasteful use of highly skilled and highly priced talent for matters easily delegable to non-professionals or less experienced associates. Routine tasks, if performed by senior partners in large firms, should not be billed at their usual rates. A Michelangelo should not charge Sistine Chapel rates for painting a farmer's barn.

Ursic v. Bethlehem Mines, 719 F.2d 670, 677 (3d Cir. 1983) (emphasis added).

Judge Grady in In re Continental Illinois Sec. Litig., 572 F.Supp. at 933, warned law firms that  "[s]enior partner rates will be paid only for work that warrants the attention of a senior partner.  If a senior partner spends his time reviewing documents or doing research a beginning associate could do, he will be paid at the rate of a beginning associate." Id.; See In re Fine Paper Antitrust Litig., 98 F.R.D. at 83 ("In this litigation, it was not unusual for senior partners to devote a great deal of time to clerical, administrative and investigative tasks such as document review. Partners will not be compensated at partner-level rates for tasks which are customarily performed by junior associates or paralegals.").

---

[40] This presumably is a brief and based on earlier entries it apparently relates to a reply with regard to intervention.

Morris and Morris, which is a small boutique firm consisting of only three attorneys and a paralegal,  cannot be heard to use the size of its professional staff as an excuse for generating high rates for tasks that could be performed by less experienced and therefore less expensive attorneys.[41]  See In re Bluetooth Headset Prods. Liab. Litig., 2012 U.S. Dist. LEXIS 168324 at *8 (C.D.Ca July 31, 2012)   ("Had the court known that neither firm had the proper staffing available, it likely would not have found them to be appropriate as class counsel."). "A component of counsel's adequacy to represent the class is his ability to bill at rates commensurate with the nature of the work performed even if he must perform that work himself because he employs no lower-billing staff." O'Brien, 2012 U.S. Dist. LEXIS 113809 at *94.

No justification is shown for the above-cited examples of upgrading counsel.  No proof is provided that the use of a more experienced and expensive attorney actually effected a cost saving or efficiency. See Daggett v. Kimmelman, 811 F.2d 793, 798 (3d Cir. 1987); In re Bluetooth, 2012 U.S. Dist. LEXIS 168324 at * 7 (C.D.Ca July 31, 2012).

As a general rule in this litigation, it was not unusual for senior partners, in addition to their more weighty responsibilities, such as studying and  editing pleadings, to also devote a great deal of time to administrative and investigative tasks, including document review and review of news and information on J&J, as well as attending to scheduling matters. Nevertheless, while many cases do not authorize compensation for "partner-level rates for tasks which are customarily performed by junior associates or paralegals," Weinberger, 801 F. Supp. at 814,  and while a failure to utilize the appropriately priced professionals permeated this matter, I have not deducted time for this abuse unless I thought it was an egregious misuse of a higher price attorney and then  I either disallowed or reduced the  hours for activities that were inappropriate

---

[41] I reiterate that Morris and Morris did take a voluntary reduction of its fee request for some Categories.  Demand-Futility Narrative, Exhibit 5 at 1 n.1.

for senior counsel to perform at senior counsel rates.  See Lindy Bros., 487 F.2d at 167. I did not,

however, make adjustments to hourly rates, i.e., downgrading, based on the above phenomenon.

See Appendix IV listing reductions for "Michelangelo" charges.

## H. Area of Expertise

The flip side of the Michelangelo problem is that all six law firms, hoping to be named

lead or liaison counsel, promoted themselves to Judge Wolfson as highly experienced attorneys

and, in actuality, they are.  In the Brief in Support of the Motion of Minneapolis Firefighters'

Relief Association for Consolidation, Appointment of Lead Plaintiff and Appointment of Co-

Lead Counsel, dated June 25, 2010, submitted by Carella Byrne and Bernstein Litowitz, the

hopeful attorneys on behalf of their clients, Minneapolis Firefighters' Relief Association, NECA-

IBEW Pension Trust Fund and NECA-IBEW Welfare Trust Fund, state, "Here, there is no

question that Bernstein Litowitz and Carella Byrne have experience in handling derivative

actions and complex lawsuits as both firms have prosecuted some of the most significant

securities and derivative shareholder cases in history, and therefore, possess substantial

knowledge about the applicable law." Brief in Support of the Motion of Minneapolis

Firefighters' Relief Association for Consolidation, Appointment of Lead Plaintiff and

Appointment of Co-Lead Counsel at 9, In re Johnson & Johnson Derivative Litig., No. 10-2033.

Morris and Morris touted itself in a Brief in Support of the Motion of the Moving

Plaintiffs for Consolidation and Approval of their Organizational Structure,[42] dated July 2, 2010,

and signed by Lisa Rodriguez[43] of the law firm of Trujillo Rodriguez & Richards, LLC of

---

[42] This Memorandum dated July 2, 2010 also promoted Bernstein Litowitz and Carella Byrne as the "musical chairs" continued and some Demand-Futility firms joined forces.  The "Moving Plaintiffs" were Minneapolis Firefighters' Relief Association, Ms. Calamore, NECA-IBEW Pension Fund Trust Fund, NECA-IBEW Welfare Fund, Mr. Ryan, and Mr. Feldman.

[43] The law firm of Trujillo Rodriguez was not included as a named attorney when the parties submitted their agreement to Judge Wolfson as to who should be lead and liaison counsel.

Haddonfield, NJ, with a listing of Gerald H. Silk, Mark Lebovitch, and Amy Miller of Bernstein Litowitz and Karen L. Morris, Patrick F. Morris, and R. Michael Lindsey of Morris and Morris LLC as "Of Counsel" on the brief.   Morris and Morris boasted that it had "developed a unique depth of experience and expertise in the negotiation of transformative governance, compliance, and medical risk management changes at major international pharmaceutical companies." Brief in Support of the Motion of the Moving Plaintiffs for Consolidation and Approval of their Organizational Structure at 19, In re Johnson & Johnson Derivative Litig., No. 10-2033.   The brief cites the criteria set forth in FRCP 23(g) and pledges that the six law firms[44] have the "experience in handling class actions, other complex litigation, and the types of claims asserted in the action," and have "knowledge of the applicable law," as well as the resources to commit to representing the class. Id. at 20.

In the Hawaii Laborers Pension Fund matter, Robbins Geller sought to be appointed as Lead Counsel and filed a Memorandum of Points and Authorities in Support of Plaintiff Hawaii Laborers Pension Fund's Motion to Consolidate Actions and Appoint Lead Plaintiff, Lead Counsel and Liaison Counsel, submitted by Cohn Lifland Pearlman Herrmann and Knopf LLP of Saddle Brook, New Jersey, who sought itself to serve as Liaison Counsel. The brief dated June 30, 2010 states that, "Put simply, Robbins Geller is the largest, most successful class action firm in the nation. It is a national law firm of over 190 lawyers with extensive experience litigating complex shareholder derivative actions on behalf of injured companies." Brief of Points and Authorities in Support of Plaintiff Hawaii Laborers Pension Fund's Motion to Consolidate Actions and Appoint Lead Plaintiff, Lead Counsel and Liaison Counsel at 9, In re Johnson & Johnson Derivative Litig., No. 10-2033. David W. Mitchell of Robbins Geller submitted a

---

[44] The New Jersey law firm Trujillo Rodriguez & Richards, LLC signed the Memorandum which actually listed six other law firms.

certification in support of the Memorandum, annexing a substantial resume of the firm which referenced participation in numerous class actions and derivative suits.

Abraham Fruchter and Kantrowitz Goldhamer promoted their firms on at least two occasions, once when they sought to intervene in the Demand-Futility litigation and once when they sought to be lead counsel in the Demand-Refused litigation.  In the Brief in Support of Motion to Intervene and Appoint Abraham, Fruchter & Twersky, LLP and Kantrowitz, Goldhamer and Graifman, P.C. as Respectively, Lead Counsel and Liaison Counsel,  dated July 19, 2010, the Abraham Fruchter firm advances its cause: "Importantly, AF&T has extensive experience litigating shareholder derivative actions including having served as a lead counsel in the Merck and Schering derivative actions both which, like this action, involved major pharmaceutical corporations incorporated under New Jersey law." Brief in Support of Motion to Intervene and Appoint Abraham, Fruchter & Twersky, LLP and Kantrowitz, Goldhamer and Graifman, P.C. as Respectively, Lead Counsel and Liaison Counsel at 13, In re Johnson & Johnson Derivative Litig., No. 10-2033. Kantrowitz Goldhamer was no less immodest: "KG&G is also well qualified to litigate shareholder derivative actions having served as liaison counsel in the Merck shareholder derivative action. KG&G specializes in consumer class actions, securities class action and derivative matters." Id. at 14.  The law firm listed its New Jersey "successes." Id. at 14-15.

One year later, after being frozen out of the Demand-Futility actions by way of a Motion to Intervene,[45] the two firms were seeking to be lead counsel in the Demand-Refused front and filed a Motion to Consolidate with a pre-existing Demand-Refused Plaintiff, M. J. Copeland. In a

---

[45]On July 28, 2011, Judge Wolfson heard oral argument on a Motion to Dismiss for failure to plead with particularly the Demand-Futility Complaint. The Judge also considered a motion by Plaintiff Katz to intervene.  Judge Wolfson denied the motion of Katz to intervene, but ordered that Katz, addressing the Board's response, could file a new complaint.

Brief In Support of Motion to Consolidate Related Actions and Appoint Abraham, Fruchter &

Twersky, LLP and Kantrowitz, Goldhamer & Graifman, P.C. as, Respectively, Lead Counsel

and Liaison Counsel, dated September 20, 2011, the sales pitch continued: "Plaintiff's counsel

has extensive experience in successfully representing shareholders of New Jersey corporations in

derivative actions…" Brief in Support of Support of Motion to Consolidate Related Actions and

Appoint Abraham, Fruchter & Twersky, LLP and Kantrowitz, Goldhamer & Graifman, P.C. as,

Respectively, Lead Counsel and Liaison Counsel at 11, In re Johnson & Johnson Derivative

Litig., No. 10-2033.    Abraham Fruchter supported its selection by emphasizing its experience

with New Jersey based companies, citing its extensive experience litigating shareholder

derivative actions in the Merck and Schering matters as lead counsel. Id. at 12.

All of the law firms had boasted of their experience, but the hours sought do not reflect

any savings for their expertise:

> A fee applicant cannot demand a high hourly rate – which is based on his or experience,
> reputation, and a presumed familiarity with the applicable law – and then run up an
> inordinate amount of time researching that same law.   Double dipping, in any form,
> cannot be condoned.   Our cases supply no authority for rewarding non-stop meter
> running in law offices.

Ursic, 719 F.2d at 677.

> Judge Grady warned attorneys on generating legal research fees:

> Counsel who are sufficiently experienced to represent the class are presumed to
> have an adequate background in the law applicable to the case.   While it is
> recognized that particular questions requiring research will arise from time to
> time, no fees will be allowed for general research on law which is well known to
> practitioners in the area of law involved.

In re Cont'l Illinois Sec. Litig., 572 F.Supp. at 933.

Nevertheless, attorneys who represented to the Court that they had a great deal of

experience in shareholder derivative actions, especially for companies incorporated in New

Jersey, spent many hours on areas in which they should be experienced. Morris and Morris on September 30, 2011 has a block bill for Frank Morris of 6.00 hours at $685.00 per hour for a total of $4,110.00 to "research re: N.J.S.A. 14:5-28; legal research re: court interpretation of same." Another block bill for Frank Morris on October 25, 2011 of 8.25 hours or $5,651.25 also indicates that he "reviewed language of N.J.S.A. 14A: 5-28, right of inspection of books and records..."

Although Morris and Morris researched whether to bring a books and records claim under New Jersey law, the firm of Robbins Geller also did the same work several months later. [46] On April 18, 2012, Darryl Alvarado in a block bill of 5.00 hours for a total claim of $1,900.00 recorded that he "research[ed] New Jersey law on books and records requests." Mr. Alvarado continued to work on researching the books and records issue on April 19, 2012, April 20, 2012, and April 23, 2012 for block bill requests of 7.75 hours ($2,945.00), 5.50 hours ($2,090.00), and 7.25 hours ($2,755.00), respectively. At approximately the same time, April 18, 2012, Carella Byrne, local counsel, which had promoted itself based on its familiarity with New Jersey law, billed 2.70 hours for the time of Lindsey H. Taylor, a partner with twenty-six (26) years' experience, billing at $600.00 per hour, to "Research corporate record demand." A portion of another block billing entry for October 26, 2011 is reflective of general knowledge that an experienced attorney should possess as well as the Michelangelo effect in view of the fact that Mr. Morris with twenty-eight (28) years of experience bills at $685.00 per hour: "reviewed

---

[46] Abraham Fruchter, which also claims familiarity with shareholder derivative litigation under New Jersey law, had already researched the assertion of a books and records claim in 2010 prior to sending its first demand letter to the Board. Its billing records reflect in block bills research on the issue on June 30, 2010 for 4.50 hours at $3,577.50, July 9, 2010 for 3.25 hours for $1,381.25, July 12, 2010 for 6.50 hours at $2,762.50 for Mr. Taylor and $6,757.50 for 8.50 hours for Mr. Abraham. This is actually ironic since the Kantrowitz Goldhamer firm had touted its familiarity with New Jersey law. (Abraham Fruchter indicated that although it had started to prepare a "books and records action in 2010, it did not file the pleading after a similar effort had been dismissed in New Jersey Superior Court.).

Federal Rules of Civil Procedure and N.J. local rules re: measuring time."   Further discussion on the calculation of time ensued on October 27, 2011 in a block bill of 1.25 hours by Frank Morris where among other tasks he entertained a "discussion with Karen L. Morris re: analysis of Federal Rule of Civil Procedure 6 re: determination of 30 day period under Court order."

Robbins Geller also billed excessive hours at high rates for areas with which they should be familiar:  Darryl Alvarado on October 22, 2010 billed 1.50 hours at $380.00 per to perform "Legal research regarding demand futility allegations," an area in which his firm boasted of its attorneys' experience, but, more importantly, the block bill shows that Mr. Alvarado also researched the "standard on Motion to Dismiss."

In the Demand-Refused Narrative, it states that "…. AF&T  (Abraham Fruchter) would often turn to KG&G to conduct a preliminary survey of New Jersey law which would be incorporated into Demand-Refused Counsel's pleadings, motions, and strategic considerations" Demand-Refused Narrative at 1.  I found no evidence to support this deference as Philip Taylor researched New Jersey law on books and records and researched discovery requests on multiple occasions.

It should also be kept in mind that I did not adjust for some general research, but it sometimes became excessive after awhile for an experienced attorney.  For example, on July 14, 2011, Karen Morris billed 2.75 hours in a block bill that includes "23.1 research," presumably FRCP 23, which had been researched the day before by Michael Lindsey and also discussed by Ms. Morris as part of a block bill of 4.50 hours on July 13, 2011 with Mr. Morris and Mr. Lindsey.

Counsel is always free to research basic areas of the law or areas with which they are familiar, but desire confirmation; it just may not be appropriate to bill a client or adversary for

basic work. I took reductions for researching, reviewing and discussing areas with which the attorneys, based on their years of experience and their representations of experience to the Court in their quest to be appointed lead counsel, should be familiar.

## I.  Inconsistent Time

As I reviewed the bills for each firm with my two associates, we undertook a cross check with attorneys from other firms or the same firms whose names were cited.   In In re AOL Time Warner, Inc. Sec. & "ERISA" Litig., 2006 U.S. Dist. LEXIS 78101 (S.D.N.Y. Sept. 28, 2006), the Special Master described certain disallowances for conferences he had taken because one participant's time was recorded while another participant's time  was not.  Although the Special Master thought the problem might stem from inadequate recordkeeping and that "the remedy of disallowing the recorded time may seem harsh," he acknowledged that the law is clear and that an attorney "applying for a fee bears the burden of recording all corresponding entries." Id. at 71. See Carrero v. New York City Housing Authority, 750 F.Supp. 660, 662 (S.D.N.Y. 1990) ("…inconsistencies in the records of the two counsel will be resolved against them"); see also Furtado v. Bishop, 635 F.2d 915 (1st Cir. 1980); Role Models America, Inc., 353 F.3d at 972; Souza v. Southworth, 564 F.2d 609, 612 (1st Cir. 1977); Inmates of Maine State Prison v. Zitnay, 590 F.Supp. 979, 984 (D.Me. 1984).

In my review of the very first page of the Abraham Fruchter and Kantrowitz Goldhamer bills, I encountered a glaring inconsistency between the two firms who later became Lead and Liaison, Demand-Refused Counsel, respectively.  Jeffrey Abraham, billing at $795.00 per hour, billed 4.50 hours ($3,577.50) for "Telephone conference with Graifman and Longman re: possible shareholder derivative action based upon recent fines being assessed against a J&J subsidiary."  Mr. Graifman, on the other hand, billing at $735.00 per hour, billed 0.40 hours

($294.00) for "Telephone Conference with Jeff Abraham and Howard Longman regarding Derivative Shareholder Case and Review my Notes on Article."

There are many other inconsistencies in billing between the two Demand-Refused Counsel. On February 9, 2011, in a block bill[47] of 5.50 hours, Jeffrey Abraham described that he undertook the following: "Review minute order administratively terminating Motion to Intervene and direction to relist one of J&Js (sic) motions is fixed. Telephone conference with Gary [Graifman] regarding the same. Office conference with Phil and Jack re: same, research." By contrast, Mr. Graifman for a total of 0.80 hours lists "Receive and Review Court Order: Conference with co-counsel; Send Order in B&R Matter."

Demand-Futility Counsel also had inconsistent entries. On October 3, 2011, Robbins Geller shows an entry for David Mitchell of 1.00 hour, reflecting, "Call with co-counsel re MTD [Motion to Dismiss] order, next steps." Participant in the call, Karen Morris, has an entry of only 0.75 and her block bill includes other activities.

Inconsistencies in time keeping also highlight the excess hours some attorneys bill on a matter by comparing it to their colleagues who  perform the same undertaking.  For example, on May 2, 2011, Jeffrey Abraham claimed 5.50 hours for the following work:  "Read defs opposition to to (sic) re-listed Motion to Intervene, read demand futility brief and analyze." Performing a similar task, Gary Graifman of Kantrowitz Goldhamer billed 0.40 hours for "Receive and Review Brief in Opposition to Our Motion to Intervene and be appointed."  Of course, Mr. Abraham had additional reference to "read demand futility brief and analyze," but the block billing prevents ascertaining the reasonableness of the effort.

---

[47] As previously indicated, the use of block billing aggravates the billing defects because it is hard to carve out the offending task, but Philip Taylor did not bill for an office conference on that day, February 9, 2011, with Jeffrey Abraham so it could not have been too long and the balance of the entries do not justify 5.50 hours.

As pointed out in Section V.F., Billing In Quarter Hour Segments, supra, inconsistencies in fee requests are also exacerbated by the use of quarter hour billing.  Philip Taylor of Abraham Fruchter billed 0.50 or thirty (30) minutes, requesting $212.50, on March 18, 2011 for a phone call with Jeffrey Abraham[48] and Gary Graifman.[49] Gary Graifman billed 0.40 for that same call, requesting $294.00.  So while the duration of the call may actually have been nineteen (19) minutes for which Mr. Graifman would bill 0.40 (rounding up from 0.30), Mr. Taylor would round up to 0.50.

I have appended Appendix VI, which lists the temporal inconsistencies I have identified among the firms and within the firms and the relevant reductions for such inconsistencies. Again, entries often have multiple problems and may be recorded in one or more Appendices, but only one reduction has been taken.

### J. Vagueness or Lack of Specificity.

Unfortunately, some of the billing entries reflect a violation of the most basic tenet of a fee request, i.e., specificity:  "The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly." Hensley, 461 U.S at 433. See also Ursic, 719 F.2d at 677; Rode, 892 F.2d at 1183; Loughner, 260 F.3d at 178.   Judge McGlynn refused to compensate attorneys in In re Fine Paper Antitrust Litig. for "[h]undreds of hours which were described by vague or meaningless terms or insufficiently documented…" In re Fine Paper Antitrust Litig., 98 F.R.D. at 81.  "The description of the work done should be sufficient to demonstrate that it benefitted the class or contributed to the recovery of the common fund.

---

[48] Mr. Abraham's block bill for that day is 1.50 as he includes other items, "Call with Eakley and recap, review pleadings, telephone conference with Graifman."
[49] The issue of multiple people from the same firm participating in a single telephone conference is discussed in Section V.L., Duplication of Entries and Duplication of Effort, infra.

Notations such as 'research re class action' will not suffice.  The particular question researched should be described." In re Cont'l Illinois SEC. Litig., 572 F.Supp. at 934. Time records which lack detail and do not describe the legal work render it "impossible for the court to verify the reasonableness of the billings, either as to the necessity of the particular service or the amount of time expended on a given legal task." Role Models America, Inc., 353 F.3d at 971.  "Similarly inadequate are the numerous entries in which attorneys billed simply for 'research' and 'writing,' or for the time spent in teleconferences or meetings – over one hundred in total – the purposes of which are not provided." Id.; See also Weinberger, 801 F.Supp. at 816.[50] Time entries that are described as "attention to" or "research on various issues" are plagued by vagueness.  Ass'n of Holocaust Victims, 2005 U.S. Dist. LEXIS 28880 at *18-19.

Time records must indicate the subject matter of the conference, meeting, email or telephone call.  A court must receive a description to "adequately assess that such review of documents and telephone conversations are relevant and necessary to prosecute this case." Wade, 2010 U.S. Dist. LEXIS 138518 at *54.  Documenting hours allows the court to determine "with a high degree of certainty that such hours were actually and reasonably expended." Role Models America, Inc., 353 F. 3d at 970.

Examples of vague and non-specific activities abound: On March 11, 2011 timekeeper Donald A. Ecklund of Carella Byrne billed 3.50 hours or $1,732.50 for "Review current brief; factual research per BLB&G; email correspondence; review articles" and did not disclose what brief, what research, what email and what articles.  Mark Lebovitch of Bernstein Litowitz on

---

[50] Here is an example of a specific and commendable explication of what was researched by "JG" of Carella Byrne on September 1, 2010 for 5.70 hours: Conducted legal research on concurrent conflicts of interest, nature of shareholder derivative actions, and adequacy of representation; drafted memo to DAE and DGG re same."  On the other hand, here is an example from that firm that is lacking: On April 27, 2011, Mr. Ecklund reported that for 4.10 hours he did the following: "Discussion with LHT. Finalize supplemental brief in opposition to Motion to Intervene. Legal research. Email Correspondence. Discussion with JEC." What legal research, and what email correspondence and, finally, what did Mr. Ecklund discuss with JEC?

July 26, 2010 "[met] w/team; review documents" and did not elaborate with whom he met, what the purpose of the meeting was, and what documents he reviewed, but billed 1.00 hour at $700.00 per hour. Frank Morris recorded 8.50 hours in a block bill on October 28, 2010 for "Continued review of legal case law in support of discussion re: same with Karen L. Morris; discussion of strategy for pleading case with Karen L. Morris; continued review of factual analysis in light of legal analysis; created 'master' draft amended complaint for use by small team in drafting amended complaint."[51] (emphasis added). On September 24, 2010, Darryl Alvarado billed 3.00 hours for a "conference call with LRHA; investigate for amended complaint," but did not indicate the subject of the call or what he investigated.  On October 6, 2010, Mr. Lindsey "conduct[ed] additional legal research" in a block bill of 6.50 hours with other items, including a reference to preparing a ripeness argument so, perhaps, that is the subject of his legal research, but, perhaps, it is not. Similarly, Mr. Morris of the same firm billed 8.50 hours on October 28, 2010  for a block bill that included the obtuse entry,  "Continued review of legal case law in support of discussion re: same with Karen L. Morris."

References to conferences are inscrutable. On December 15, 2010,  the day several Demand-Futility attorneys met in Mr. Cecchi's office to work on the draft of the amended complaint, Mr. Downs entered a 2.00 hour conference "re: consolidated complaint." There are no corresponding entries from other attorneys in the office to elucidate so it is unknown with whom Mr. Downs had the conference. Did he call into the conference in Roseland?  Similarly, on March 21, 2012, Mr. Downs indicated he had a 0.75 hour "Conference re: settlement strategy," but no further details of the participants are provided.  The billing entries of Ms. Morris for that date indicate that she had a conference call with several Demand-Futility

---

[51] Ms. Morris for the same day bills 0.50 for "Discussions with Patrick F. Morris re:legal case law and strategy for pleading case."

attorneys, including Mr. Downs, on the subject of "re: Pitt edits" for 2.00 hours in a block bill, including other tasks. Neither Mr. Lebovitch nor Mr. Cecchi recorded any time. Mr. Downs' entries provide too little information as to how he spent this time and incurred this charge.

The bills of Kantrowitz Goldhamer, which commendably are not block billed and are usually more specific, however, include a cryptic entry on May 16, 2012 for "Conference" for 0.30 hours.

The quintessential vague entry may be typified by the following submission by Mr. Philip Taylor of Abraham Fruchter who billed 7.50 hours on May 13, 2011 for "Draft/revise Reply." Perusing preceding entries would allow one to conclude that the effort was with respect to the firm's intervention pleadings, but that is only a surmise. Similarly, Mr. Taylor has an entry requesting 4.00 hours for January 9, 2012, which succinctly reads "Draft/revise letter." This letter is even more enigmatic since a preceding email, January 5, 2012, references a draft of a letter never sent to Karen Morris and a succeeding entry, January 10, 2012, references a letter to Kristen (presumably an attorney associated with the defendants). Mr. Taylor's entry for August 31, 2010 for 2.50 hours is again just "Research," as is his entry for July 22, 1011 for the same enigmatic effort. Such lack of transparency is unreasonable.

Darryl Alvarado of Robbins Geller billed 4.00 hours on September 11, 2010 for "Research regarding amended complaint."[52] Laurence Hasson of Bernstein Litowitz billed 1.00 hours for "J&J. Legal Research" on September 28, 2010 without further edification.

An additional problem with vague entries is visualized when the entries are studied because their repeated opaqueness soon makes the entries appear excessive. On successive days starting with September 22, 2010 running to September 29, 2010, Philip Taylor of Abraham

---

[52] It is possible, but not capable of verification that Robbins Geller eliminated this entry in the exercise of its billing judgment and reduction of its requested lodestar amount.

Fruchter billed a total of 33.25 hours for "Research facts demand made cmplt," "Research facts," "Research facts," "Draft/revise cmplt; research facts," "Draft/revise cmplt; research facts;" and "draft/revise cmplt; research facts." Working on this same project, drafting a Demand-Refused Complaint, although no complaint was actually filed until August, 2011 by this law firm, Mr. Taylor does not supply sufficient detail to determine if the amount of time spent is reasonable because I do not know what he actually did. The lack of clarity soon renders this time spent as excessive. See Section V.E., "Excessive, Redundant, or Otherwise Unnecessary," supra. "But because the time records contain so little information, we have no basis for concluding that hours that appear to be excessive and redundant are in fact anything other than excessive and redundant." Role Models America, Inc., 353 F. 3d at 972.

I have attached Appendix VII which sets forth reductions for non-specific and vague time entries, but again there are no double reductions for multiple problems.

### K.  Case Strategy and Review

Two attorneys at Bernstein Litowitz, Gerald Silk with seventeen (17) years' experience, who bills at $800.00 per hour, and Max Berger with forty-one (41) years' experience, who bills at $975.00 per hour, repeatedly submitted entries with regard to their strategizing and review. Some examples of their high priced consideration include the following:  "work on case strategy" (Mr. Silk, June 21, 2010, 6.00 hours); "Case strategy & review" (Mr. Silk, July 20, 2010, 6.00 hours); "Case strategy & review" (Mr. Silk, August 3, 2010, 3.00 hours); "Case strategy and review" (Mr. Silk, July 19, 2011, 5.00 hours); "Case analysis and review" (Mr. Silk, July 21, 2011, 4.00 hours);  "Case Review" (Mr. Berger, October 5, 2011, 3.00 hours) and "Case

Review" (Mr. Berger, January 4, 2012, 3.50 hours).  On January 4, 2012, Mr. Silk also billed 4.00 hours for "Case review and Strategy."[53]

Presumably, attorneys of the firm assigned to this litigation deferred to the more senior colleagues for inspiration, insight, and advice.   Yet, Bernstein Litowitz assured Judge Wolfson that the attorneys in their firm were experienced litigators in this area.  Why then the need for the strategic blessing of Mr. Berger and Mr. Silk at $975.00 and $800.00 per hour, respectively?  Of course, it is very possible that Mr. Berger and Mr. Silk provided sage advice and intuition and their "Case strategy and review" was well worth the investment, but it is impossible to tell from the vague and generic description of their activities.  Furthermore, Mr. Berger's total hours on the Category of Settlement Negotiations, Review of J&J Documents and Settlement Documentation was 15.00 hours and Mr. Silk's total hours in this Category was 68.50 hours, Demand-Futility Narrative, Exhibit 7 at 6-7, and yet Bernstein Litowitz was using the services of former Securities and Exchange Commission ("SEC") Chairman Harvey L. Pitt, who was paid $75,000, to help "close the deal."

In total, the efforts of Mr. Berger and Mr. Silk at Bernstein Litowitz generated billing for strategy and review for 162.50 hours or $132,625. There is absolutely no support in the record for this expenditure.   See Appendix I.C.6.

In the Demand-Futility Narrative, further information is provided with respect to the work of these two senior attorneys, but the description is hardly more edifying.   Under the Category for Settlement Negotiations, Review of J&J Documents and Settlement Documentation, Bernstein Litowitz wrote:

Max W. Berger, senior partner and co-founder of BLB&G (15 hours)

---

[53] The bill to the defendants for the "Case review and Strategy" on January 4, 2012 is $6,612.50 (3.50 hours at $975.00 and 4.00 hours at $800.00).

Provide strategic advice to G. Silk and M. Lebovitch concerning new developments during 2 ½ years of litigation, with a particular focus on settlement discussions; analyze alternatives among settlement and litigation, and adequacy of settlement terms.

Gerald H. Silk, senior partner (68.5 hours)
Review and analyze settlement proposals and response during protracted settlement negotiations; strategic discussions with M. Berger and M. Levovitch regarding same; review settlement documentation.

Demand-Futility Narrative, Exhibit 7 at 6-7.

In <u>In re Olson</u>, the court criticized "strategy" conferences:

The attorneys also engaged in a plethora of conferences, most often denoted simply as 'strategy' conferences, consuming the time of several attorneys who bill at very high rates. The hourly rates charged are of such magnitude as to indicate that the attorneys should have been able to decide on the proper strategy without the great number of strategy conferences attended by numerous firm lawyers.

<u>In re Olson</u>, 884 F.2d at 1429; <u>see also</u> <u>Daggett</u>, 811 F.2d at 797; <u>Citibank</u>, 2004 U.S. Dist. LEXIS 30432 at *18.

In <u>In re Washington Pub. Power Supply Sys. Sec. Litig.</u>, 779 F. Supp. 1063, 1107, (D.Ariz. 1990), <u>vacated and remanded</u>, 19 F.3d 1291 (9th Cir. 1994), Mr. Berger was part of the Bernstein Litowitz team which petitioned for 358.75 hours at the 1990 rate of $275.00 per hour for Mr. Berger's lodestar amount of $98,656.25. The Court gave Mr. Berger credit for facilitating the settlement, which he may very well have done in this matter, but awarded the firm only $22,000.00 or approximately twenty-two percent (22%) of its request, "representative of 80 hours of his time reasonably expended to the benefit of Class members." <u>Id.</u>

This same court, which only reduced the lodestar request of a founding partner of the firm, the late Paul M. Bernstein, by five percent (5%) on a request of almost four (4) million dollars, noted the difficulty in appraising the reasonableness of Mr. Bernstein's individual activity in one total amount for a day (presumably block billing), but found it was adequately

described ("the names of the individuals with whom he spoke were routinely disclosed and meaningful"), and only penalized the firm with regard to Mr. Bernstein for some travel time, lunch and dinner conferences, and drafting his fee petition. Id. at 1104.

The Honorable William D. Browning, however, in Washington Power had harsh words for the fee petition of Mr. Bernstein's colleague, Mr. Berger:

> It is difficult to perceive that substantial benefit accrued to Class members as a result of Mr. Berger's described activities. In 1983, his time records indicate that he spent approximately 30 hours solely on "review of case" and review of "newspaper articles," "SEC documents," and "Complaint." Therefore, almost all remaining time was attributed to "consideration," "strategy," "discussion," "conference" or "meeting." Other participants in these reported deliberations were rarely mentioned. When they were, they were generally other partners in the Bernstein Litowitz firm. The subject matter of the conversations or reflections concerned the "status of the case," "developments," "settlement prospects," "staffing" and other general themes. Most conversations, from early 1985 onward, concerned prospects for settlement of the litigation. A number of charges were to "settlement review," "strategy re: settlement" or, often, simply to "settlement."

> Mr. Berger's time charges to the above activities almost invariably ranged from .5 to 2 hours, and such amounts were charged regularly until the conclusion of the litigation. He also read several memoranda, Court orders and other documents.

> The Court does not mean to disparage the importance of settlement negotiations, or indeed the value of settlement strategy, to this litigation. It was, after all, ultimately resolved in that fashion. However, the Court is unable to conclude that the thought processes and conversations evidenced by Mr. Berger's inexplicit time records substantially contributed to the achievement of those goals. It is, however, probable that some advantage arose out of his communications with Mr. Bernstein that led to the settlements ultimately achieved. The Court will grant what it perceives to be a reasonable allowance for such presumed benefit.

Id. at 1107.

Appendix I.C.6 indicates the reductions attributable to entries with generic items like, "case strategy and review," which, in addition, are also vague and excessive and therefore unreasonable.

## L. Duplication of Entries and Duplication of Effort

The child of excess is duplication. Obviously, duplication in time entries is not compensable and presumably is an innocent mistake.[54] Duplication by multiple attorneys in performing an activity, however, has the potential to dramatically increase the number of hours spent and is not compensable. "Duplication of effort is another basis on which [the] hours seem excessive." Role Models America, Inc., 353 F.3d at 972.  Judge Wolfson was concerned that there would be duplication.  The attorneys gave assurances that they would work collaboratively and cooperatively; the attorneys assured me that their efforts were collaborative and cooperative. As part of their oral presentation, they insisted that they had worked synergistically, but the numbers sometimes tell a different story.  The hours speak to the "duplication of effort and diseconomies of committee authorship." Weinberger, 801 F.Supp at 818 n.30 (citing Furtado, 635 F.2d at 923). Reasonableness again tempers the issue and "[a] reduction for duplication 'is warranted only if the attorneys are unreasonably doing the same work." Rode, 892 F.2d at 1187 (citing Jean v. Nelson, 863 F.2d 759, 773 (11th Cir. 1988).  A court may reduce or exclude time which is duplicative of other services.  Souza, 564 F.2d at 612; Inmates of Maine State Prison, 590 F.Supp. at 984.

Originally, six law firms, which filed Demand-Futility Complaints, worked to keep Demand-Refused Counsel out of the case.  Four law firms (after two law firms were apparently by agreement excluded from the leadership role) worked on drafting and filing the consolidated Amended Complaint. "After the dust settled," six law firms (the four Demand-Futility Counsel and the two Demand-Refused Counsel) reviewed the Special Report issued by J&J, six law firms

---

[54] On May 14, 2012, paralegal Einerson of Abraham Fruchter billed 1.00 hours for "Draft/revise organized and sent certificate of services" and has an exact duplicate entry for that day.  On July 3, 2012, Philip Taylor of that firm has two entries of 0.50 hours: The first undertaking is "Review/analyze settlement stip review" and the second undertaking for the same time is "Review/analyze settlement stip."  On April 28, 2012 Gary Graifman records "Receive & Review DePuy Dos; Review: Prepare Notes and Memos" for 1.70 hours and then repeats the exact same notation for 1.80 hours.

worked on the Settlement Agreement and six law firms worked on the Motion to Approve the Settlement.

Document review by multiple firms is also an avenue of redundancy and duplication. Obviously, in this case once a law firm was joined, someone in the firm had to read, for example, the decision on a motion, but, with the team approach within the law firm, several people often read the same motion albeit at different times. On the other hand, Gary Graifman was the only attorney of his firm to review Judge Wolfson's Decision on the Motion to Dismiss in the Demand-Refused case, billing 1.50 hours on September 30, 2011. At the Abraham Fruchter firm, Mr. Abraham read the Opinion on October 2, 2011 and billed in a block bill 4.50 hours while Mr. Taylor billed 1.00 hour for reading the opinion on October 3, 2011.[55] At Carella Byrne, Mr. Cecchi on September 30, 1011 billed 3.10 hours for reviewing the opinion and Mr. Taylor billed 4.20 hours in a block bill which included "research options." At Bernstein Litowitz, Mr. Lebovitch billed 1.50 hours and Mr. van Kwawegen billed 0.75 hours, including a telephone call with Mr. Lebovitch "re.same." Karen Morris and Frank Morris each read the opinion on September 30, 2011, billing in block bills, which included, especially for Frank Morris, other items, 1.50 and 6.00 hours, respectively. The only Robins Geller lawyer who read (or billed) the Opinion was David Mitchell. He billed 2.25 hours on September 30, 2011, and his time indicates, "Read MTD order, corr./call re same," but we do not know whom he called or to whom he wrote. On October 2, 2011 Mr. Mitchell read the Opinion again, billed 1.00 hours, and switched the sequence of his description, "Correspondence/review re MTD order," but we still do not know with whom he corresponded.

---

[55] Mr. Abraham read it again on October 3, 2011 in a block bill with other activities for a total of 4.50 hours.

The six law firms spent 318.45 hours reading the Special Committee Report, not an easy document to comprehend, spending as few as 16.10 hours for the Carella Byrne firm and as many as 120.75 for Morris and Morris. See Appendices I.A.3 and I.B.4.

I did not reduce all duplicative time for what I could plainly see was a redundancy in the system. All of the firms seem to read the Wall Street Journal ("WSJ") or follow the wire services or SEC filings and I allowed these hours, unless they become otherwise excessive. See Weinberger, 801 F.Supp. at 820 ("Although Plaintiffs' counsel testified that their monitoring of the case included reading the WSJ, the Court finds that they should not be fully compensated for time spent in duplicative activity among several of the law firms. Therefore, the Court will disallow 80 percent of amount billed, totaling $8,583.11 for reading the WSJ and other newspapers..."). A total of 490.30 hours was spent reading the WSJ and the wire services, including 223.00 hours for Mr. Braxton of Bernstein Litowitz, which activity was previously described. Could not the law firms have delegated one law firm from the Demand-Refused sector and one law firm from the Demand-Futility sector to follow current events?

In addition, there was a great deal of time consumed reviewing the work product of other firms, but I did not take any reductions unless such entries were otherwise objectionable. Weinberger, 801 F.Supp. at 819 ("Although Plaintiffs urge that there was an allocation of responsibility to prevent duplication, it is clear that each of the law firms expended substantial time to review what the other firms were doing, if only to remain current with the proceeding.").

Duplication also results from multiple parties on a telephone call. On June 15, 2011, four attorneys from Carella Byrne participated in a telephone conference with the Court: Mr. Cecchi, Mr. Taylor, Mr. Ecklund, and Ms. Petrolle. We know from Mr. Taylor's single entry of 0.40 hours for that call on that day that the duration was between nineteen (19) and twenty-four (24)

minutes (the other attorneys have block bills for additional time and additional tasks). Therefore, the cost of that call utilizing the rates requested for the four attorneys, ranging from a high of $750.00 for Mr. Cecchi to a low of $475.00 for Ms. Petrolle, would cost the defendant $928.00, just for the Carella Byrne firm, for a call regarding scheduling.  That charge caused by three extraneous people on the phone is unreasonable. Mr. van Kwawegen of Bernstein Litowitz billed 0.50, using his quarter hour breakdown.  Frank Morris billed 1.00, including "discuss[ing] issues with Karen L. Morris for the conference call with Court while  Ms. Morris merely indicated that for 0.25 hour she participated in a "teleconference with Patrick Morris re: conference call with court."  David Mitchell's billing for June 15, 2011 reflects 1.00 for the conference call with the Court and also includes "corr before and after re same."

Abraham Fruchter has a block bill of 2.50 hours for Jeffrey Abraham for "participation in call with court" for the same date of June 15, 2011 and Kantrowitz Goldhamer has the same time as Mr. Taylor of Carella Byrne (both firms bill in six (6) minute intervals) for the call or 0.40. Cost to defendant for this scheduling call with the Court with at least nine attorneys on the call at the requested rates would be $2,983.00.

Bernstein Litowitz similarly had three attorneys on a call on August 27, 2010, Mark Lebovitch, Spencer Oster, and Amy Miller, with "team" or "co-counsel" for at least 1.75 hours. The cost of this charge from Bernstein Litowitz is $2,887.50.  Mr. Cecchi who was on the call lists 2.00 hours, but no other attorneys from Carella Byrne were on the phone, or billed for it. Mr. Cecchi's charge would be $1,500.00. Morris and Morris had two attorneys on this call and, assuming the duration was 2.00 hours, would generate a charge of $2,780.00 for Morris and Morris.  Darryl Alvarado was on this call for Robbins Geller in a block billing entry of 2.50 for the assignment of participating in the call and "research[ing] media regarding amended

complaint." Again, assuming the call were two hours, the charge for Mr. Alvarado was $760.00. The total cost to the defendant for this call whose subject matter is "amended complaint," per entry of Mr. Alvarado, is $7.927.50.

A law firm should have as many partners and associates on a call as it feels necessary, but the charge for such duplication should not be passed along to the defendant; it is unlikely it would be shifted to a paying client.[56]

When attorneys for the Demand-Futility Plaintiffs divided into three factions[57] and brought three separate motions to be appointed lead counsel and liaison counsel, Mr. Abraham representing a Demand-Refused Plaintiff who was still awaiting a response from J&J, brought a Motion to Intervene.  In his Brief in Support of Motion to Intervene and Appoint Abraham, Fruchter & Twersky, LLP and Kantrowitz, Goldhamer & Graifman, P.C. as, Respectively, Lead Counsel and Liaison Counsel, dated July 19, 2010, Mr. Abraham wrote to the Court:

> The Moving Plaintiffs are proposing three firms for the position of co-lead counsel, one law firm be appointed as a liaison counsel and an executive committee consisting of another three law firms.[58]  Each of those seven separate law firms is likely qualified to act as lead counsel. However, having seven firms leading the charge in a litigation will inevitably result in massive and inefficient duplication of effort.

---

[56] From my own experience, I can appreciate the interest in having junior attorneys who are working on the project get "real time" information and experience or sometimes provide valuable information or factual insight; I have done it myself many times.   That indulgence, however, does not mean that it is reasonable to pass the cost along to the defendant.

[57] See Brief in Support of the Motion of Minneapolis Firefighters' Relief Association for Consolidation, Appointment of Lead Plaintiff and Appointment of Co-Lead Counsel (Jun. 15, 2010); Brief of Points and Authorities in Support of Plaintiff Hawaii Laborers Pension Fund's Motion to Consolidate Actions and Appoint Lead Plaintiff, Lead Counsel and Liaison Counsel (Jun. 30, 2012); Brief in Support of the Motion of the Moving Plaintiffs for Consolidation and Approval of their Organizational Structure (Jul. 2, 1010);  Brief in Support of Plaintiff Carpenters' Pension Fund of West Virginia's Motion to Consolidate and Appoint Lead Plaintiff and Lead Counsel (Jul. 2, 2010).

[58] Plaintiffs Minneapolis Firefighters' Relief Association, NCA-IBEW Pension Trust Fund, Calamore, Ryan, and Feldman, as "Moving Plaintiffs," advocated the leadership structure of six law firms: Bernstein Litowitz; Carella Byrne; and Morris and Morris, and three other firms. See Brief in Support of the Motion of the Moving Plaintiffs for Consolidation and Approval of their Organization Structure at 1.

Brief in Support of Motion to Intervene and Appoint Abraham, Fruchter & Twersky, LLP and Kantrowitz, Goldhamer & Graifman, P.C. as, Respectively, Lead Counsel and Liaison Counsel at 15, (internal citations omitted) (citing In re Party City Sec. Litig., 189 F.R.D. 91, 115 (D.N.J. 1999) ("The potential for duplicative services and the concomitant increase in attorneys' fees work against the approval of more than one law firm, especially in cases in which one law firm has the proven ability to adequately manage and litigate securities class actions.") (emphasis added).

Finally, it is probably inevitable that with so many "cooks in the kitchen" that there will be duplication even under the best of circumstances. See Appendix VIII. The reductions are generally for multiple people participating on telephone conferences or making superfluous court appearances. Again, some entries noted as duplicative may also be properly labeled as "excessive," but no double deductions were taken.

## M. Constant Conferencing, Collaboration and Individual Responsibility

"Courts may reduce the number of hours attorneys in a firm bill for communication with co-counsel if, based on the facts of a particular case, the court finds that the hours billed are unreasonable." Holzhauer, 2012 U.S. Dist. LEXIS 112740 at *21. While there can be "value of attorney communication and conferencing in preparation and daily management of a lawsuit," nevertheless constant conferencing can be excessive. Id. The billing records reveal incessant conferences with attorneys within the same firm, and incessant conferences with attorneys from the other firms while also including other attorneys from the first firm. According to my calculations, the attorneys spent 1,426.05 hours in telephone conferences with each other for a total requested fee of $1,023,476.50. See Appendix I.C.1. In addition, most of the entries do not explain the reason for the conferences. See In re Olson, 884 F.2d at 1429.

Judge Grady in In re Cont'l Illinois Sec. Litig., warned the attorneys in the derivative action brought on behalf of the shareholders of Continental Illinois Corporation to "work independently, without the incessant 'conferring' that so often forms a major part of the fee petition in all but the tiniest cases. Counsel who are not able to work independently should not seek to represent the class." In re Cont'l Illinois Sec. Litig., 572 F.Supp. at 933. He noted that while the motion for class certification was pending, there were "more lawyers on the plaintiffs' side of the case than I or anyone else could possibly keep track of. This came about because different law firms filed four separate complaints, each alleging essentially the same cause of action ..." Id. at 932.  In In re Cont'l Illinois SEC Litig., three firms had been appointed "lead counsel" of which two were also designated "liaison counsel" by a predecessor judge. Twenty-five attorneys had filed appearances from among the three lead firms and from six additional firms representing other plaintiffs. Id. Notwithstanding so many attorneys in the matter, Judge Grady ordered, "When it is necessary for the plaintiffs to be represented in court on a motion or argument, or for a conference, no more than one lawyer should appear for them.  Id. at 933 (emphasis added).

Judge Grady made the same point with respect to document review. "But under no circumstances will it be compensable for a multiplicity of lawyers to review the same document simply as a matter of interest, whether it be a pleading, a brief or a document produced in discovery.  Again, the keynote is individual responsibility." Id. at 933-34, (citing In re Fine Paper Antitrust Litig., 98 F.R.D. at 86 ("...every attorney cannot possibly be compensated for reading every piece of paper over the course of three years of litigation...")).

Many of the lawyers in this litigation traveled in tandem, never without their teammates. Yet, all of the firms touted their experience and the depth and breadth of their firm resumes and

individual lawyers. Jeffrey Abraham with twenty-five (25) years' experience and who bills at $795.00 per hour never made an appearance without Philip Taylor, a six (6) year associate who bills at $425.00 per hour. This means that an hour's time of Jeffrey Abraham at a conference or at a motion, whether he argues or not, is really $1,220.00 per hour.  For the Motion to Dismiss of July 28, 2011, Messieurs Abraham and Taylor prepared for 14.00 hours and traveled and attended for 15.25 hours, but did not argue and were simply told by Judge Wolfson to file a complaint. See Appendix I.C.3; See Transcript of Motion to Dismiss Hearing at 65 (Jul. 28, 2011), In re Johnson & Johnson Derivative Litig., No 10-2033.

Karen Morris of Morris & Morris, an attorney with twenty-eight (28) years' experience who bills at $765.00 per hour, never appears without her colleague Patrick Morris who also has twenty-eight (28) years' experience and bills at $685.00, whether or not Ms. Morris is scheduled to argue. They both traveled from Delaware to New York or New Jersey.  Total for the Morris' appearances per hour: $1,450.00 per hour.  At the same Motion to Dismiss, they prepared 9.00 hours, but did not participate.  Three attorneys from Morris and Morris attended the settlement conference on August 24, 2011 in New York. They billed 32.25 hours, coming from Delaware, for a total of $22,241.25 for the day.

The Demand-Refused Narrative explained Mr. Taylor's participation as follows: "Mr. Taylor also prepared for, traveled to and attended conferences and hearings along with Mr. Abraham because of his intimate knowledge of the factual underpinnings of the action and ability to act as an effective second chair to Mr. Abraham, which freed Mr. Abraham up to concentrate on the task at hand while Mr. Taylor handled the logistics and note taking. (31 hours)." Demand-Refused Narrative, Exhibit A at 4.   I do not know what logistics are involved. As for second chair, Mr. Abraham did not speak at the Motion for Final Approval of Derivative

Litigation Settlement on October 18, 2012 so there was no need for a backup. All of the hearings were recorded with transcripts available. If Mr. Abraham had a question, he could certainly have asked one of his fellow Plaintiffs' Counsel; there was no need to bring an assistant. The same excess applies to Mr. Taylor's participation on telephone calls with regard to settlement negotiations, generating 18.75 hours or $7,968.75 in billable time for him to again serve as "second chair" to Mr. Abraham.  Demand-Refused Narrative, Exhibit A at 11.  Mr. Abraham, participating in these calls presumably in his own office, could have had his secretary take notes or recorded the calls or simply not billed for Mr. Taylor's redundant time.

The firm of Morris and Morris presents an interesting model. Its roster of attorneys includes only a Managing Partner of twenty-eight (28) years' experience, a Partner with twenty-eight (28) years' experience, and Associate with twenty-three (23) years' experience. The firm utilized one paralegal on this matter. I have already indicated that the firm, because it lacks less senior attorneys, has a tendency to have experienced and high priced attorneys performing tasks which could have been undertaken by less expensive attorneys. See Section V.G., Michelangelo Paints the Barn, supra. Judging from the Calamore Complaint, the first filed Demand-Futility Complaint, the firm does excellent legal work, but the prosecution of the matter seems to be a cooperative and collaborative effort. There are endless, repetitive, and constant daily conference calls by and among Karen L. Morris, Patrick F. Morris, and Michael Lindsey.  They discuss, they confer, they review and they report in tandem. There are endless entries in the billing records that read like the following from Frank Morris:  "May 16, 2012. Discussion with Karen L. Morris re: her conversations with co-counsel."  Billing data often indicate that all three attorneys were on teleconferences with attorneys from other firms.  The July 27, 2011 block billing entry of Frank Morris includes, "conference call with Karen L. Morris, Michael Lindsey and Mark Lebovitch,"

apparently in response to Mr. Lebovitch's emails with regard to "red flags demonstrating ongoing nature of wrongdoing." Karen Morris will often speak with Patrick Morris prior to a conference call in which Mr. Morris participates and then the two attorneys have a conference call to dissect the prior conference call as Karen Morris recorded on September 19, 2011: "Teleconference with Patrick F. Morris re: letter strategy; conference call with Patrick F. Morris, Mark Lebovitch, Jim Cecchi, and Travis Downs re: call and letter strategy; teleconference with Patrick F. Morris following conference call."

The two lawyers in this firm never seem to perform a task without reporting to Karen L. Morris. It appears as if they operate a cooperative law firm, constantly briefing and debriefing each other. This is, of course, the prerogative of Morris and Morris to conduct its practice in any way it chooses, but it does not mean that it is reasonable to pass that cost along to the defendant. In preparing motions on the leadership briefing, Morris and Morris expended 236.75 hours out of the total 592.50 hours expended by the four firms and it expended 84.25 hours out of the total 153.50 hours for all the four Demand-Futility attorneys to oppose the Motion to Intervene.[59] Demand-Futility Narrative at 10-11. According to my calculations, during the course of this litigation there were 653.25 hours of in-house office conferences by Morris and Morris for a total cost of $466,206.25.[60] See Appendix I.C.2. The firm, as I previously indicated, did take a voluntary reduction for several of the Categories, but it did not take any reduction for the

---

[59] Robbins Geller also spent a great deal of time on the leadership brief, 231.50 hours, while Bernstein Litowitz expended 93.75 hours and Carella Byrne expended 30.50 hours for the leadership effort. To oppose the intervention, Bernstein Litowitz expended 14.50 hours while Robbins Geller and Carella Byrne expended 25.75 and 29.00 hours, respectively. Demand-Futility Narrative at 10-11. Although Morris and Morris spent considerably more hours drafting the first complaint in this matter, 337.75 hours, compared to the time spent on the subsequently filed complaints by these same law firms (99.50, 104.00, and 25.00 hours), I have no criticism for that effort, noting the Calamore Complaint was the first pleading in this matter, set the standard and was probably the model for subsequent filings.

[60] All six firms totaled 840.35 hours at a cost of $597,829.50 for in-house conferences. See Appendix I.C.2.

Settlement process, which included a plethora of these conferences.   See Demand-Futility Narrative, Exhibit 5 at 8, 10.

Courts have not hesitated to subtract time for a superfluous attorney. "For, example, where three attorneys are present at a hearing when one would suffice, compensation should be denied for the excess time." Copeland v. Marshall, 641 F.2d 880, 891 (D.C.Cir. 1980). See also Evans, 273 F.3d at 361. Judge Renee Marie Bumb, in FTC v. Circa Direct LLC, also subtracted time for a partner and associate attending the same conference: "It was only necessary for one attorney to attend the conference and, because Larkin was the sole partner on the matter, it was appropriate that he attend." FTC v. Circa Direct LLC, 2012 U.S. Dist. LEXIS 178021 at *27 (D.N.J. Dec. 17, 2012). Judge Bumb then subtracted time for the two associates accompanying Mr. Larkin. Id. Following this judicial model, I deducted time for the participation of more than one attorney.

See Appendix I.C.1 for a list of Telephone Conferences/Phone Calls and Appendix I.C.2 for a list of In-House Conferences.

### N. Of Limited or No Value

Another truism of reimbursement for legal fees is that work that does not benefit the class is not compensable. See In re Fine Paper, 98 F.R.D. at 54. Additionally, as previously indicated, hours which an attorney would not charge his or her own client cannot be billed to an adversary. Public Int. Research Group of N.J., Inc., 51 F.3d at 1199.  The work performed must be "useful and of a type ordinarily necessary" to secure the final result obtained from the litigation. Planned Parenthood, 297 F.3d at 266 (citing Pennsylvania v. Del. Valley Citizens' Council, 478 U.S. 546, 561 (1986)).

Unfortunately, in this matter there are many examples of time spent on activities which were not useful or productive. I have subtracted for some of the hours where they were easily identifiable. For instance, Morris and Morris in March 2010 and early April 2010, just before it filed its Demand-Futility Complaint, spent over 100.00 hours drafting a demand letter which it never sent. See Appendix IX. Work that adds no value to plaintiffs' case should not be compensated. Brown, 2010 U.S. Dist. LEXIS 52927 at *48-49. In September 2010, Philip Taylor of Abraham Fruchter spent many hours on apparently preparing a "books and records" complaint, which was never filed after it learned that a contemporaneous New Jersey Superior Court action had been summarily dismissed. Mr. Taylor also traveled on September 30, 2010 to Washington, D.C., billing 10.00 hours or $4,250.00 to attend Congressional hearings at which J&J officials testified when he could have ordered the transcript of the proceedings. Mr. Braunstein of Kantrowitz Goldhamer billed 6.70 hours on May 11, 2012 to "Review depositions," but he does not disclose whose depositions and none was taken in this matter.

Morris and Morris spent time investigating a judge not assigned to this case, Judge Pisano,[61] and then researching the judge who was assigned, Judge Wolfson.[62] On June 22, 2010 Mr. Lindsey of Morris and Morris spent 1.25 hours to "Review filing in case re: change of judge; research new judge; draft email to Karen L. Morris and Patrick F. Morris re: same."

---

[61] The billing entry of Morris and Morris for April 23, 2010, just after it filed its Demand-Futility complaint, charges 7.50 hours and reads, "Discussions with Karen L. Morris; locate and collect key Judge Pisano cases; read selected cases; begin review of Richard Greenfield draft demand letter." (emphasis added). I also note that this valueless work could have at least been performed by a less expensive attorney than Mr. Lindsey who bills at $625.00 per hour.

[62] "[C]heck out Judge Wolfson's experience re derivative litigation with Jeff Salas" is part of a block bill of 7.00 hours on August 3, 2010 for Frank Morris. That attorney has an additional submission of time with respect to Judge Wolfson on August 4, 2010 to "read email from Jeff Salas re: Judge Wolfson's experience with derivative litigation." (emphasis added). Jeff Salas is never identified.

An adversary would not be charged for the time spent engaging a client. Bernstein Litowitz billed 1.75 hours for Ryan S. Ting,[63] who is unidentified, on May 11, 2010 for "Research[ing] current holders of Johnson & Johnson stock." This is interesting because by this date the firm had already billed 10.00 hours on this matter and did not appear to have a client as yet. Indeed, on January 21, 2010, four months earlier, Nick DeFillippis,[64] who is also unidentified, had billed 8.00 hours for "Case Analysis of Potential New Matter: Johnson & Johnson." The billing records of Robbins Geller also include time on July 1, 2010 for "review and confer with counsel re case and potential client" for 1.00 hour by Darren Robbins at $790.00 when the complaint on behalf of its client, Hawaii Laborers, had been filed on May 14, 2010. Now it is possible that this reference to a "potential client" is relevant to this matter and not a reference to a new client for a separate matter, as it seems, but the vagueness and ambiguity of the description prevent me from ascertaining the significance of this entry.

Extra attorneys in attendance at conferences and court proceedings, where they have no role except to memorialize the colloquy or provide insight, are unreasonable indulgences that add no value and should not be charged to a client or an adversary. See Section V.L., Duplication of Entries and Duplication of Effort, supra.

Another area of enormous lack of value to the success of the litigation and which devoured hundreds of hours, 592.50, and cost $361,800.00, per the Demand-Futility Narrative at 10,[65] was the conflict over who would be the Demand-Futility Lead Counsel in this matter as

---

[63] In his declaration to the Court with regard to fees, dated August 31, 2012, Mr. Lebovitch indicated that he had reviewed the bills and had eliminated the billing entries of certain lawyers "who spent only modest time on the case." The breakdown of his lodestar, however, does have a category of "Financial Investigators, Analyst, and Support Staff" with an hourly rate ranging from $150.00-$465.00 and seeks a total of $36,757.50 out of his original requested lodestar amount of $1,060,237.50. It cannot be determined what the status of Mr. Ting is from the billing entry since no title is provided and no hourly rate or total cost is provided.

[64] Again, no information is provided as to the status of Mr. Nick DeFilippis.

[65] As pointed out to me by counsel for the objector, Mr. Petri, the Calamore Complaint, the intensive work product of Morris and Morris, generated only 337.75 hours or $224,618.75 towards the lodestar.

previously described. Six Demand-Futility complaints had been filed by six different Plaintiffs, many of them iterations of the first complaint, Calamore, filed by Morris and Morris on April 21, 2010. As many as sixteen law firms, as previously indicated, were associated with these matters. The Demand-Futility competitors broke into three rival factions and submitted four motions[66] and three oppositions to serve as lead or liaison counsel, singing their own praises and implicitly criticizing their adversaries. Mr. Cecchi of Carella Byrne[67] acknowledged that the briefing related to these motions, "did not directly advance the Demand-Futile Actions."   Demand-Futility Narrative, Exhibit 4 at 1.

In the meantime, Abraham Fruchter and Kantrowitz Goldhamer, Demand-Refused Counsel, who were still awaiting a response from the Board, moved to intervene in the Demand-Futility arena and to be appointed as lead counsel.  They moved on behalf of plaintiffs, Leslie Katz and Mr. and Mrs. Jeffrey Tarson. These two law firms claimed that their clients had proceeded the favored way, albeit slower, by filing demands upon the Board while the Demand-Futility attorneys had rushed to the courthouse.  The former contenders then rallied against the possibility of an interloper successfully prevailing.  Memoranda were submitted to the Court, claiming Katz and Tarson lacked standing and had not supplied a pleading. Also, Demand-Futility Counsel insisted that the participation of Katz and Tarson was premature and their intervention was unnecessary to protect the shareholders of J&J. A Demand-Futility Plaintiff claimed the intervenors were attempting to "commandeer the Demand-Futile Actions." Brief of Plaintiff Carpenters Pension Fund of West Virginia's Opposition to Motion to Intervene and Appoint Abraham Fruchter & Twersky, LLP and Kantrowitz Goldhamer & Graifman, P.C. as,

---

[66] Bernstein Litowitz and Carella Byrne filed both a Motion for Appointment of Lead Counsel and a Motion for Appointment of a Consolidated Lead Structure.

[67] The law firm of Carella Byrne was associated with both the Carpenters Complaint filed by the law firm of Robbins Umeda on May 5, 2010 and the Minnesota Firefighters and NECA-IBEW Complaints filed by Bernstein Litowitz on May 14, 2010.

Respectively, Lead Counsel and Liaison Counsel at 3, In re Johnson & Johnson Derivative Litig., No. 10-2033.

The exchange of charges between the alliances became intense with Abraham Fruchter claiming that the five subsequent firms to file complaints after Morris and Morris had filed the initial Calamore Complaint had borrowed from that initial complaint and with the Demand-Futility Plaintiffs charging that Abraham Fruchter had served a supplemental demand upon the Board based on their complaints.

The Demand-Futility Plaintiffs then resolved their dispute and sought approval from the Court. Abraham Fruchter in its last salvo pointed out to the court that there still would be difficult issues for the Demand-Futility Plaintiffs to overcome, such as the particularity requirement of Rule 23, while Demand-Refused Plaintiffs had entirely avoided that issue by proceeding cautiously and conservatively and taking the time to file the demand. The Demand-Refused Counsel had proceeded the correct way by first filing demands upon the Board: "Moreover, even with the extremely tortuous allegations of the Calamore complaint – which provide a high water mark, albeit in a very shallow pool, for detail among all the complaints filed by the Demand Futility Plaintiffs – it is still highly doubtful whether the complaint meets the substantial burden associated with pleading demand futility." Reply Brief in Further Support of Motion to Intervene and Appoint Abraham Fruchter at 10, In re Johnson & Johnson Derivative Litig., No.10-2033.  Accused of appropriating allegations of the Demand-Futility Complaint in its letter Demands upon the Board, Abraham Fruchter described this charge as "an artful piece of slander." Id. at 13.

Judge Wolfson then signed the Order Consolidating Cases and Approving Proposed Organizational Structure and Carella Byrne, Bernstein Litowitz, Morris and Morris, and Robbins

Geller retained seats in the skirmish. The firms had expended 592.50 hours or $361,800.00 to prevail in the leadership process. Demand-Futility Narrative at 10. The Court also denied Demand-Refused Counsel's Motion to Intervene without prejudice.   A total of 153.50 hours or $98,363.75, was incurred by Demand-Futility Counsel to prevent the intervention. Demand-Futility Narrative at 11. Demand-Refused Counsel incurred 756.75 hours for a total lodestar of $495,280.75, per Demand-Refused Narrative, to intervene in the Demand-Futility action and then succeed as lead counsel in the Demand-Refused action.  See Demand-Refused Narrative, Appendix A at 3.

On April 19, 2011, Abraham Fruchter on behalf of its client Katz re-filed an Intervention Motion, this time including a complaint in intervention, and a Motion to be Appointed Lead Counsel. Once again, the Demand-Futility Plaintiffs – as well as J&J – filed briefs in opposition to the intervention. The Demand-Futility Plaintiffs insisted that Katz had still not satisfied the requirements for intervention.  They expressed concern that the two Demand-Refused law firms might replace the Demand-Futility law firms as Lead Counsel "or be belatedly foisted onto them as a fifth wheel on a moving bus."  Supplemental Brief in Opposition to the Motion to Intervene at 3, In re Johnson & Johnson Derivative Litig., No. 10-2033. Demand-Futility Plaintiffs were also concerned that appointing two sets of lead counsel, which Katz had alternatively promoted, was "an invitation to duplicate efforts and waste time and resources without any benefit to the Company." Id. at 5. Per my calculations, Demand-Futility Counsel expended 1,708.00 hours (or $923,915.25) to respond to both the Motion to Dismiss by Defendants and Demand-Refused Counsel's second attempt to intervene.[68] See Appendix I.A.4.

---

[68] Since the Motion to Dismiss and Motion to Intervene were occurring contemporaneously, it is very hard to differentiate from the billing records how much time was spend on merely defending the Motion to Dismiss and how much time was spent opposing the intervention.

On July 28, 2011 the Court denied the Motion to Intervene, but granted Katz the right to file a new complaint in a separate action, which he did on August 29, 2011. A further conflict ensued with another Demand-Refused Plaintiff who had filed, Copeland. After motion practice with this plaintiff, the matters were consolidated and Abraham Fruchter was appointed Lead Counsel and Kantrowitz Goldhamer was appointed Liaison Counsel for the Demand-Refused Plaintiffs.

The tension by and among the competing Demand-Futility attorneys and the competing Demand-Refused attorneys, as well as the tension between the Demand-Futility and Demand-Refused attorneys, necessitated the expenditure of over 1,500.00 hours or almost twelve percent (12%) of the hours sought.[69]   A great deal of time and money was spent to secure a spot on the team.  All of the attorneys are experienced and capable; anyone of them could have handled the matter alone – for both the Demand-Futility Plaintiffs and the Demand-Refused Plaintiffs—and would have effectively protected the shareholders of J&J. Of course, it is true that "at the end of the day," the Demand-Refused Plaintiffs would not have had to deal with a Motion to Dismiss for failure to satisfy the particularity requirements FCRP 23.1   For the Demand-Futility attorneys, yesterday's adversary became today's ally; for the Demand-Refused attorneys, yesterday's gatekeeper became today's partner.  It is not clear that this internal dispute brought any value to the shareholders of J&J.  Nevertheless, I did not deduct any time for this audition to join the "team,"[70] unless it was otherwise objectionable.

---

[69]  Calculated as follows: 592.50 hours for leadership by Demand-Futility Counsel, per Demand-Futility Narrative at 10; 153.50 hours to oppose Demand-Refused Counsel's Motion to Intervene, per Demand-Futility Narrative at 11; and 756.75 hours for Motion to Intervene and Motion to Consolidate and Appoint Lead and Liaison Counsel, per Demand-Refused Narrative, Appendix A at 3.

[70]  In the Demand-Futility Narrative, counsel acknowledged the competition: "While the lawyers in this case are friends and colleagues, they are also competitors." Demand-Futility Narrative at 1.

After the appointment of the leadership positions on the Demand-Refused side, it is clear that the "arranged marriage" had some problems. The billing entries of Morris and Morris for December 29 and 30, 2011 are replete with references to "coordination with Jeff Abraham and issues with Jeff Abraham."  The entry of 0.25 hours for December 30, 2011 for Frank Morris reads: "Teleconference with Karen L. Morris re: her attempts to contact Jeff Abraham and strategies for going forward in case with proposed settlement in light of Jeff Abraham's refusal to return phone calls."  I deducted this time for providing no value to the matter.  Apparently, Demand-Refused and Demand-Futility Counsel were having difficulty "getting on the same page."[71]  A billing time of January 5, 2012 in a block bill of 5.20 hours is the most revealing of the lack of accord among at least Mr. Abraham and members of the Demand-Futility team, particularly Karen Morris. Mr. Abraham's entry reads, "Draft letter to Karen Morris explaining how her tactics casued (sic) a failure to coordinate (never sent)..." (emphasis added). Interestingly, Mr. Berger and Mr. Silk, not recently active in the case, each render time with respect to "Case review" (3.50 hours) and "Case review and strategy" (4.00 hours) on January 4, 2012.  Because these entries are so vague, I do not know if Messieurs Silk and Berger were advising on the merits of the matter and resolution with J&J or rendering advice on how to deal with Mr. Abraham.

The billing record of Frank Morris on January 20, 2012 has a charge of 1.50 hours for a block bill which includes "discussion with Karen L. Morris re: strategy in settlement discussions vis-à-vis Jeff Abraham." I did not subtract any time for this charge.  Mr. Lebovitch of Bernstein Litowitz records 1.25 hours on December 22, 2011 for "Review confidentiality stip; calls with team re J. Abraham and next steps with defendants." (emphasis added).  Similarly, Mr. Abraham

---

[71] Demand-Futility Counsel in their Narrative indicated that there were no issues among the six lawyers and stated, "Other than during this initial phase of research and filing complaints and organizing leadership, Plaintiffs' counsel effectively worked together as a virtual law firm." Demand-Futility Narrative at 2.

has two revealing block billings for February 28, 2012. The first entry of 4.50 hours reads: "Letter to Carlson,… telephone call with Lebovich (sic) re: docs and defy (sic) situations (hostile)" and a second entry of 5.50 hours which reads: "[Review] contentious email from Lebovich (sic); oc Jack and Mitch; letter to demand counsel." (emphasis added).   On February 27, 2012, the day before Mr. Abraham's reference to "hostile," Mr. Silk bills 2.00 hours for "Case status and review" and on February 29, 2012 he bills 4.00 hours for "Case status and review."

Mr. Abraham's  billing record of 7.50 hours  for May 18, 2012 includes the following revealing language in the block billing, "emails re: trying to restore calm among plaintiff's (sic) counsel …" (emphasis added).   On June 15, 2012, Karen Morris lists "Multiple teleconferences with Jim Cecchi re:splits with Abraham Fruchter" for 1.75 hours, which is notated as "Do Not Bill." (emphasis added).  Ms. Morris has a similar "Do Not Bill" on June 18, 2012 for 2.00 hours for "Multiple teleconferences with Jim Cecchi and Mark Lebovitch re: fee splits; devised internal fee splits…" (emphasis added).

The strained dialogue continued. The entry of Karen Morris of Morris and Morris for July 10, 2012 and 2.00 hours reads, "Multiple teleconferences with and emails with Patrick F. Morris and Jim Cecchi, and Mark Lebovitch and Jim Cecchi re: Jeff Abraham side letter demand."   Abraham Fruchter and Kantrowitz Goldhamer acknowledged that they spent 22.75 hours and 11.80 hours, respectively, on "Negotiations with Demand Futility Counsel." Demand-Refused Narrative, Appendix A at 19. In addition, the Demand-Refused Narrative acknowledged that because the two versions of the derivative suit  had "proceed[ed] on separate tracks, counsel for both Actions were required to negotiate an agreement amongst themselves as to how to allocate any potential award of attorneys' fees." Demand-Refused Narrative at 15. Therefore, in

an exercise of billing discretion, "Demand Reused (sic) Counsel did not include time spent negotiating Demand Futility Counsel in their submission to the Court and appropriately reduced the amount of time reported under Category 6 the 'Settlement negotiation process and documentation.'" Id.

While I have described some of the negative comments among the attorneys, I do not believe that the in-fighting among plaintiffs and their counsel reached the internecine nadir of Drazin v. Horizon Blue Cross Blue Shield of N.J., Inc., 832 F.Supp. 2d 432 (D.N.J. 2011). In that case, Judge Faith S. Hochberg described the "palpable hostility" between two law firms who had "litigated the same case in parallel actions" and who had wasted the court's time and that of the Magistrate "on spurious motions, some of which were really just warfare tactics between law firms." Id. at 435.

The objector, Mr. Petri, asked me to exclude what he calculated to be $1,150,000.00 for this "internal warfare," but I decline to do so unless the entries clearly referenced a fee dispute. To the extent, any hours spent on this effort, however, were otherwise objectionable, i.e., excessive or vague, I have taken a reduction. For instance, it appears that Mr. Taylor spent 8.75 hours on August 31, 2011 "Comparing complaint, drafting leading mot." While at first blush this appeared just merely vague, it is clearly excessive when the task is identified. As part of its Brief in Support of Motion to Consolidate Related Actions and Appoint Abraham Fruchter and Kantrowitz Goldhamer & Graifman, dated September 20, 2011, Abraham Fruchter appended a redlined copy of the Calamore Complaint and a chart comparing the Calamore and Copeland Complaints for the court. This unnecessary expenditure of time was undertaken to make the point that the Copeland attorney had copied, "in whole or in part," whole portions of the Calamore Complaint. Because of this offense, Judge Wolfson was importuned inter alia not to

appoint Copeland's counsel as lead counsel. Could not the point of adopting and adapting the Calamore Complaint been explained to Judge Wolfson in a paragraph? Undertaking this extraordinary effort was not reasonable and would not be charged to an adversary. For this excessive charge, I only deducted one hour, but could have deducted much more.[72]

Finally, billing records that added absolutely no value to this litigation are three entries by Bernstein Litowitz that can only be described as advertising for the firm.[73] On October 15, 2010, Dalia El-Newehy performed the following work: "Create new case page on website and post documents" for 0.75 hours. On the same day the same individual posted 2.50 hours for undertaking the following: "Follow up with attorney re new cases and whether or not they need write ups for website. Organize responses and follow up as necessary." Presumably, the work of Dalia El-Newehy continued with advertising on December 15, 2010 with the following task: "Design a diagram for M. Lebovich (sic) in consultation with same and A. Cox." The time: 4.00 hours. Even if I am wrong, and this effort is not related to advertising, then I do not know what purpose it served and it must be eliminated for vagueness and lack of specificity.

### O.  Administrative and Clerical Tasks.

As Judge Wolfson noted "Generally clerical work is not properly billed at the rate of a senior attorney." Wade, 2010 U.S. Dist. LEXIS 138518 at *51 (citing Halderman v. Pennhurst State Sch. & Hosp., 49 F.3d 939, 942 (3d Cir. 1995)).  In Holzhauer, Judge Wolfson found that "numerous entries are non-compensable because they involve intra-office communication related to administrative tasks...Thus, administrative tasks, which are not the type normally billed to a

---

[72] Demand-Refused Narrative, Appendix A at 5 indicates that a paralegal, Rosanne Balasabas, spent 4.00 hours participating in this effort, but her time is not shown on the billing of Abraham Fruchter although it is reflected in the time spent by the firm for its motion practice in the Narrative.

[73] It is quite possible that in the exercise of billing discretion these two entries were subtracted from the lodestar sought by Bernstein Litowitz, but I have no way of confirming that. Also, no rate, as in all Bernstein Litowitz times, is displayed for the person rendering services.

paying client, may not be recovered by a party through a fee petition." Holzhauer, 2012 U.S. Dist. LEXIS 112740 at *23-24 (citing Alexander v. NCO Fin. Sys., 2011 U.S. Dist. LEXIS 64211 at *19 (E.D.Pa. Jun. 16, 2011) (citations omitted).

Lindsey Taylor of Carella Byrne has a block bill of 2.70 on January 12 2012, which includes several hours and concludes with a fax to Judge Wolfson. Because the balance of the entry was specific, I only subtracted 0.30 for this clearly administrative effort that an attorney who bills at $600.00 per hour should not be performing or if he does, he should not reasonably impose the charge on a client – or a defendant. Carella Byrne also billed 0.20 hours on October 2, 2012, October 8, 2012, October 10, 2012, October 11, 2012 and October 16, 2012 for M.R., a paralegal, to schedule conference calls. Bernstein Litowitz billed 2.00 hours on January 11, 2012,[74] 2.00 hours on February 1, 2012, and 2.00 hours on March 1, 2012 for Michael Hartling to "Download files and copy to server, process files, create load files and OCR, export and upload to database." These are non-compensable administrative tasks.

Frank Morris of Morris and Morris has several entries related to transporting the firm's expert, Mitchell Glass. His block bill for 5.75 hours on October 13, 2011 at his hourly rate of $685.00 indicated that the attorney "picked up and dropped off Mitchell Glass" and his block bill for 5.25 hours on October 18, 2011 includes "Transport Mitchell Glass to and from meeting at Karen L. Morris's house."

There is no justification for the inflated charge for these services; these are not compensable administrative tasks that attorneys should not delegate because "the time spent delegating the task could well exceed the time spent by the attorney performing the task herself" or "the tasks did not take up much of the attorneys' time." Planned Parenthood, 297 F.3d at 267

---

[74] No reduction was taken for Mr. Hartling's first effort on January 11, 2012.

(quoting Marisol A. v. Giuliani, 111 F.Supp. 2d 381, 395 (S.D.N.Y. 2000)). Reductions for administrative tasks are clearly set forth on the Appendix X attached hereto.

Although closely akin to administrative tasks, I have not taken any reductions for the efforts of paralegals as long as their work and time were reasonable.

### P. Adding New Lawyers.

Most of the firms had their consistent team of lawyers involved in this case, which did not vary.  One or two added new attorneys at the end of the matter, after settlement discussions had started, who had to acquaint themselves with the issues in this matter. To add novice attorneys, who read enormous sections of the record and billed for this effort, when the matter is near resolution is unreasonable and excessive under the circumstances.   For instance, Bernstein Litowitz suddenly introduced two new attorneys into this matter in January, 2012 when on January 10, 2012 Thomas Keevins and Matt Mulligan are initiated into the matter. Both gentlemen enter "Background education; case file review" and "Review background materials; review Volumes 1&2 of J&J production," for 3.75 hours and 6.75 hours, respectively[75] on their time records.  Abraham Fruchter authorized Mr. Rozzi to spend 8.00 hours on "background reading" on May 8, 2012 and 12.50 hours on May 9, 2012 at a time when the matter is almost resolved.

Reductions for the excessive hours of these lawyers, who must spend time "getting up to speed" on a nearly resolved matter is reflected on Appendix IX.

### Q. Pro Hac Vice Applications

Many attorneys involved in this case were not licensed to practice law in New Jersey and local firms spent many hours preparing pro hac vice admission packages for the attorneys.

---

[75] Michael Hartling has an entry at this time for "Add[ing] users, create login credentials and database securities, email login credentials to users" for 1.00  hour on January 10, 2012 to apparently accommodate Messrs. Keevins and Mulligan's participation on the firm's computers.

36.35 hours of research and drafting were spent for ten lawyers at a cost of almost $19,000.00 without regard to filing fees. See Appendix XI. First of all, the time appears to be excessive. The documents are standard forms or templates which most New Jersey firms have on their computers and include the filing of a notice, affidavit, certification and proposed order. A brief is not required and a standard form of motion will suffice. New Jersey Court Rule 1:21-2 is not esoteric; some of the forms are provided on the website of the Administrative Office of the Courts for New Jersey.   Presumably, based on their claims of substantial experience, at least several of these attorneys were admitted pro hac vice in New Jersey before and those papers could serve as a template.

Abraham Fruchter has a block bill of 6.00 hours for July 20, 2010 for Jeffrey Abraham to undertake the following work: "Review/analyze Pro Hac vice application, review scheduling issues, email from Gary of Lead Plaintiff record materials." Philip Taylor billed 2.50 hours on the same day and 1.25 hours on July 21, 2010 with respect to pro hac vice "for Jeff." Carella Byrne spent 7.10 hours in that same time frame and Bernstein Litowitz spent 2.25 hours. There were additional entries by these firms in 2011 for pro hac vice applications.

The Court in NCH Corp. faced with what it regarded as the "excessiveness" of the petitioner's billing practices for spending so much time on what should be a routine exercise, such as pro hac vice applications, was highly critical of the practice: "It should not take a firm as sophisticated as B&D nine (9) business days to create and finalize pro hac vice applications. The Court realizes that some of this time was discounted; however the fact that it was entered by B&D and billed to Sun in the first place is problematic." NCH Corp., 2010 U.S. Dist. LEXIS 94486 at *29-30.  The court disallowed the entire time. See also Westberry v. Commonwealth Fin. Sys., 2013 U.S. Dist. LEXIS 14381 (D.N.J. Feb. 4, 2013).

Secondly, the cost of seeking admission to the New Jersey Bar should be a cost of doing business. See Role Models America, Inc., 353 F.3d at 973. Lawyers who want to participate in the "game," should buy their own tickets of admission. No benefit is derived from the participation of these attorneys; there are experienced New Jersey firms able to handle the "ball"[76] and if lawyers from outside of New Jersey want to participate, they should pay their own way. In Role Models America, Inc., the court was unhappy that a prevailing plaintiff attempted to pass along the time spent for researching and completing an application to gain admission to the District of Columbia Circuit Bar: "Not only do we assume that a Washington law firm offering itself as a specialist in federal court litigation would treat the cost of joining the bar of this court as an expense of doing business not chargeable to clients – much less to the federal government [defendant] – but this partner did not even participate in the oral argument." Id. at 973. The Role Models court also cited to Miller v. Alamo, 983 F.2d 856, 862 (8th Cir. 1993), where the court refused to pay for the "enhancement of an attorney's versatility or capability."

Pro hac vice applications were made for three attorneys from Morris and Morris, three attorneys from Bernstein Litowitz, and three attorneys from Robbins Geller. Assuming it makes sense to have one out-of-state attorney admitted from each firm, for the pursuit of this litigation, it makes no sense for three attorneys to be admitted when only one will speak. It is not reasonable to pass this cost of doing business onto the defendant; a client would not tolerate being charged for these superfluous attorneys.

I intend to follow the model of the court in Employers Ins. Co. of Wausau v. Harleysville Ins. Co., 2008 U.S. Dist. LEXIS 95003 at *6-7 (D.N.J. Nov. 20, 2008), which was also concerned by the excessive hours logged for pro hac vice applications. The court reduced the

---

[76] The law firms of Trujillo Rodriguez of Haddonfield, New Jersey and Sheffield Finkelman Miller & Shah of Collingswood, New Jersey filed complaints in this matter, but did not became part of the leadership counsel for Demand-Futility Plaintiffs.

4.10 hours to 2.00. I have therefore subtracted 50% for all the time spent by the various law firms on <u>pro hac vice</u> matters for an entry that had no other problems. If a <u>pro hac vice</u> entry was referenced in, for instance, an offending block bill that I also regarded as excessive, I did not take an additional reduction. <u>See</u> Appendix XI.

To be consistent, I shall also only allow reimbursement of the expense of this temporary licensure for only one attorney per firm. <u>See</u> Section VII, Reasonable Expenses or Compensable Costs, <u>infra</u>.

R. Travel Time

Travel time is compensable in New Jersey if legal work is performed. <u>Planned Parenthood</u>, 297 F.3d at 267; <u>Glass v. Snellbaker</u>, 2008 U.S. Dist. LEXIS 73012 at *28 (D.N.J. Sept. 23, 2008). The court has the discretion to reduce the requested travel time to fifty percent (50%) of the attorney's usual rate if there is no "indication that legal services were rendered en route." <u>Glass</u>, 2008 U.S. Dist. LEXIS 73012 at *29. <u>See also</u> <u>Access4All, Inc.</u>, 2012 U.S. Dist. LEXIS 113617. The question is whether the full travel time should be compensated since attorneys traveled from California, New York and Delaware and within New Jersey. Except for Morris and Morris, counsel generally submitted no information in their block bills to show that they were engaged in legal work for plaintiffs during their billed travel time and thereby justify taking a full hundred percent for their travel time – and often for the travel time of other attorneys in their firm who accompanied them, but did not participate in the proceeding. <u>See</u> <u>Weinberger</u>, 801 F.Supp. at 824 n.54. Morris and Morris frequently, but not always, referenced that they conducted discussions with regard to the case en route. For the July 28, 2011 travel from Delaware for the Motion to Dismiss, Ms. Morris billed 6.00 hours ("discussion of hearing preparation with Patrick F. Morris during travel") and Mr. Morris billed 8.50 ("review of

materials and discussion with Karen L. Morris during travel re: issues with argument"), but explained, albeit in a block bill with other entries, that at least some of their time was dedicated to this matter.[77] If attorneys do not explain what they did during their travel time, it is quite possible that the attorneys may have been performing work for other clients. At the hearing on the Motion to Dismiss, both Mr. Downs and Mr. Mitchell attended, but Robbins Geller only billed for one attorney.   I did not take any across the board reductions for travel time, but debited those entries that represented duplication of attorneys' attendance.  See Appendix VIII.

S.   Reimbursement for Fee Requests

Although there is some case law that denies compensation for completing fee requests involving a fund, Lindy Bros. Builders v. Am. Radiator & Standard Sanitary Corp., 540 F.2d 102 (3d Cir. 1976), there is also case law that authorizes payment. See FTC, 2012 U.S. Dist. LEXIS 178021; Access4All, Inc., 2012 U.S. Dist. LEXIS 113617.  I have not made any reductions for such applications, including the work associated with the Joint Fee Declarations unless there were other disqualifying reasons, i.e., excessive. I have accepted the voluntary exclusions made by Morris and Morris, denominated "Do Not Bill" with respect to non-compensable fee items, for such days as May 22, 2012,  June 15, 2012 and June 18, 2012, presumably including time devoted to achieving agreement  among the many firms about  the fee allocation. For fairness and consistency, I have applied that reduction to other firms who were less candid about the work they were undertaking on days designated as "non-billable" by Morris and Morris. The rates that I am allowing were also not reduced although fee applications can be performed by paralegals because "the act of preparing a fee application does not involve complex legal analysis." Public Int. Research Group v. Stone, 156 F.R.D. 568, 574 (D.N.J. 1994).  I also

---

[77] For this effort, I subtracted time for the presence of the extra lawyers or excessive hours from a block bill, but did not reduce the time an additional fifty percent (50%).

allowed time for fee related matters driven by Judge Wolfson's October 12, 2012 letter seeking additional information on the fee request although an honest argument could be made that such an exercise confers no benefits on the shareholders and only benefits the lawyers in pursuit of the judicial imprimatur for their fee requests.

## VII. Reasonable Hourly Rates

I now turn to the second prong of the lodestar calculation, hourly billing rates.   The attorneys in this matter are seeking hourly rates that range from a high of $975.00 to a low of $380.00 for attorneys and a high of $295.00 to a low of $125.00 for paralegals. Focusing on attorneys, the Carella Byrne firm hourly requests progress from a high of $750.00 to a low of $475.00; Bernstein Litowitz from a high of $975.00 to a low of $450.00; Morris and Morris from a high of $765.00 to a low of $625.00; Robbins Geller from a high of $725.00 to a low of $380.00; Abraham Fruchter from a high of $795.00 to a low of $350.00; and Kantrowitz Goldhamer from a high of $735.00 to a low of $575.00; Abraham Fruchter from a high of $795.00 to a low of $350.00.

As with the calculation of hours, the party seeking attorney fees bears the burden of demonstrating that the hourly rates it seeks are reasonable.  Interfaith Cmty. Org., 426 F.3d at 703. The fee applicant must "submit evidence supporting the hours worked and rates claimed." Rode, 892 F.2d at 1183 (citing Hensley, 461 U.S. at 433). Generally, a reasonable hourly rate is "to be calculated according to the prevailing market rates in the relevant community."  Blum, 465 U.S. at 895.

The initial analysis in determining a reasonable hourly rate is "the attorney's usual billing rate, but this is not dispositive." Public Int. Research Group of N.J., Inc., 51 F.3d at 1185.  The petitioning attorneys must establish "sufficient evidence of what constitutes a reasonable market

rate for the essential character and complexity of the legal services rendered in order to make out a prima facie case." FTC, 2012 U.S. Dist. LEXIS 17802 at *17 (citing L.J. v. Audubon Bd. of Educ., 373 F.App'x 294, 296 (3d Cir. 2010)). The court must establish the relevant community. In Interfaith Cmty. Org., the Court did an extensive analysis of the history and rationale in favor of the forum rate rule, finding only two exceptions. The two exceptions are whether there was a need for "the special expertise of counsel from a distant district" and whether local counsel was "unwilling to handle the case," neither of which concern is an issue in this matter.   Interfaith Cmty. Org., 426 F.3d at 705-07.

After the forum is selected, the Court is obligated to "assess the experience and skill of the prevailing party's attorneys and compare their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." Rode, 892 F.2d at 1183.  To sustain the requisite prima facie case, the petitioner has the initial burden of providing sufficient evidence of a reasonable market rate for the essential character and complexity of the services.  FTC, 2012 U.S. Dist. LEXIS 178021 at *17. Affidavits from attorneys in the relevant community will usually suffice. Id. (citing Access4All, Inc., 2012 U.S. Dist. LEXIS 113617 at *4).  If the initial analysis is satisfied, the burden then shifts to the opponent to rebut the reasonableness of the proposed fees. FTC, 2012 U.S. Dist. LEXIS 178021 at *17 (citing T.B. v. Mount Laurel Bd. of Ed., 2012 U.S. Dist. LEXIS 44848 at *3 (D.N.J. Mar. 30, 2012)). If appropriate evidence in rebuttal is submitted, the court will be compelled to conduct a hearing unless the court can "fairly decide disputed questions of fact," but if insufficient evidence is provided, the court will be bound by the petitioner's request. T.B., 2012 U.S. Dist. LEXIS 44848 at *3.

By contrast, if the proponent does not sustain its burden of proof as to a reasonable market rate, "[a Court] may use its discretion to determine the market rate" without the necessity of a hearing. FTC, 2012 U.S. Dist. LEXIS 178021 at *18.

Judge Wolfson has already ruled that the relevant forum community is New Jersey. See Letter from Judge Wolfson's to Plaintiffs' Counsel (Oct. 9, 2012). Judge Wolfson held that the situs of the litigation controls the designation of the litigation, i.e., Trenton, New Jersey. Wade, 2010 U.S. Dist. LEXIS 138518 at *42 (citing Interfaith Cmty. Org. v. Honeywell Int'l Inc., 426 F.3d 694, 704 (3d Cir. 2005) (applying "forum rate rule" where out-of-town lawyers receive "the hourly rate prevailing in the district where the litigation is lodged."); In re Fine Paper Antitrust Litig., 751 F.2d 562, 590 (3d Cir. 1984).

Plaintiffs' counsel then has the "burden to establish that their requested rates were reasonable for the market." FTC, 2012 U.S. Dist. LEXIS 178021 at *20. An attorney's customary billing rate can serve as "an indicator for [the] Court to find the rate to be reasonable." Wade, 2010 U.S. Dist. LEXIS 138518 at *16 (citing Cunningham v. City of McKeesport, 753 F.2d 262, 268 (3d Cir. 1985) (an attorney's customary billing rate is the proper starting point in determining reasonableness of the hourly rate); Lindy Bros., 487 F.2d at 169; Glass, 2008 U.S. Dist. LEXIS 73012 at *4.

It is also interesting to bear in mind that two southerly New Jersey law firms, Trujillo Rodriguez & Richards, LLC and Shepherd, Finkelman, Miller & Shah, LLP, located in Haddonfield, New Jersey and Collingswood, New Jersey, respectively, participated in the roulette to be part of this action but were eventually excluded, either voluntarily (Trujillo had filed the Demand-Futility Calamore Complaint and Shepherd had filed the Demand-Futility

Ryan Complaint) or by judicial decision (Shepherd had also filed the Demand-Refused Copeland complaint).  No information on their hourly rates is supplied.

In support of their fee applications, each of the six law firms submitted a Joint Declaration and individual declarations to the Court, as well as a separate declaration or information to me as part of the Narratives. In their applications to the Court, the law firms initially relied on a copy of the National Law Journal Billing Survey of New Jersey firms ("Survey").    A Federal Judge in New Jersey, The Honorable Renee Marie Bumb, sitting in Camden Vicinage, recently rejected the Survey as offering no value because of the following deficiencies:

> (1) [It] is unsworn and based on self-reported figures by firms; (2) provides only a broad range of attorney's fees, without regard to the nature of the work performed or experience and skill of those performing it; and (3) contains no information as to reasonable rates for non-attorney personnel.

FTC, 2012 U.S. Dist. LEXIS 178021 at *20.

Judge Wolfson also was critical of the Survey, citing to the Third Circuit opinion in Interfaith Cmty. Org., which held that the Survey, "standing alone," offers little support and is better used to "bolster" other evidence in the record. Letter from Judge Wolfson to Plaintiffs' Counsel (Oct. 9, 2012) (citing Interfaith Cmty. Org., 426 F. 3d at 703 n.5).  The Survey also does not indicate if the "type of work performed by the firms was similar to the work performed here in nature or complexity, and they do not indicate whether the professionals performing them are similar to the professionals here."  FTC, 2012 U.S. Dist. LEXIS 178021 at *6.  Plaintiffs' Counsel do not point to any cases that have adopted the Survey as evidence of the prevailing market rate. See Westberry, 2013 U.S. Dist. LEXIS 14381 at *9.

The Survey selects four prominent firms from New Jersey, closer to New York, than Trenton, which is the relevant locus, and indicates that their Partner Rates at the high end run

from $960.00 down to $575.00 with Partner Rates at the low end running from $380.00 to $295.00. The average rate then descends from $537.00 to $350.00. Associates at the high end at these four firms bill from $470.00 down to $325.00 and at the low end from $235.00 to $185.00 with the average running from $317.00 to $250.00. Presumably, these are not contingent fees, but rather periodic, non-contingent hourly rates, but there is no way of knowing. Nor is there any way of knowing the type of matter and whether the rates are for services rendered bearing any similitude to this matter.

With respect to the Survey, which again in and of itself is insufficient evidence, for Carella Byrne, Mr. Cecchi's requested rate of $750.00 exceeds the high billing rate of two of the firms and the low billing rate and average rate of all of the firms on the Survey. The rates requested for a Carella Byrne associate, $495.00 and $475.00 [78] exceed all the low billing rates and the average rates on the Survey. At the high end, one firm bills a higher amount, $660.00, one firm equals the amount, and two are lower.

Morris and Morris of Wilmington, Delaware, with rates of $765.00 and $685.00 for partners and $625.00 for an associate, does not bill as high as the highest partner billing rate for two firms in the Survey, but exceeds the low billing rate and the average billing rate of all four cited firms. One associate on the high end of the Survey bills higher than Morris and Morris' associate but the low and average billing rates and associate billing rates are much lower on the Survey than that of the rates of Morris and Morris.

Max Berger of Bernstein Litowitz, a New York firm whose rates for partners run from $975.00 to 700.00 bills higher than any attorney listed in the Survey at $975.00 per hour in this matter. Every Bernstein Litowitz attorney bills higher than the average and low billing rates for both partners and associates (associate rates run from $575.00 to $450.00). Compared with

---

[78] This associate, Audra Petrolle, has only three (3) years' experience.

Abraham Fruchter of New York (with partner rates ranging from $795.00 to $725.00 and associate rates ranging from $495.00 to $350.00), two of the four firms on the Survey bill higher in the higher billing category, but the firm's rates for partners exceed all four firms on the Survey in the average and low partner category. The associates of Abraham Fruchter actually bill less than the firm with the highest billing average associate rate, but exceed all four firms in the low associate billing range. Abraham Fruchter's associate's billing rates roughly fall within the average associate billing rate (with two associates above the average associate billing rate and two associates within the average associate billing rate).

At Robbins Geller of San Diego, California, rates for partners exceed the low and average rate on the Survey, with their rates running from $790.00 to $630.00 for partners. They list one associate at $380.00 per hour whose rate exceeds all rates on the low end and exceeds two firms on the average track. Kantrowitz Goldhamer of New Jersey utilizes one partner whose rate is $735.00. This rate exceeds all average and low billing on the Survey and exceeds two rates on the high end. For associates, the rate runs from $595.00 to $575.00.[79] The associate rate is higher than all but those of one law firm at the highest end and exceeds the average and lowest billing rates.

No explanation is provided as to why the law firms listed are selected and why they offer comparability information. One cannot discern if the "hourly rates charged by counsel are commensurate with the prevailing New Jersey rates for similar services by lawyers of reasonably comparable skill, experience, and reputation." Letter from Judge Wolfson to Plaintiffs' Counsel at 2 (Oct.12, 2012).

At Judge Wolfson's request, the law firms submitted declarations from three practitioners, "assessing the experience and skill of counsel, and comparing their proposed rates

---

[79] One associate, William T. Schiffman, has thirty-seven (37) years' experience.

to the rates prevailing in the county for similar services by lawyers of reasonably comparable skill, experience, and reputation." Id. The attorneys are very well respected and experienced practitioners. The rates of two of these attorneys are $835.00 and $785.00; one declarant indicated that his rate exceeds the requested rates.

All of the attorneys know the reputations of Mr. Cecchi and his law firm, Carella Byrne, and two are familiar with the reputation of Bernstein Litowitz, including Mr. Berger. One voucher attorney has experience in reviewing the fairness of counsel requests as both a mediator and a fee examiner. All experts opine that they reviewed the resumes of all the attorneys and their firms and that the hourly rates being sought "are in line with the prevailing hourly rates currently being charged by New Jersey attorneys with comparable skill, experience, and reputation for legal services rendered in complex civil litigation in the federal and state courts in New Jersey." Declarations of Stephen M. Greenberg, John McGahren, and Michael D. Sirota, In re Johnson & Johnson Derivative Litig., No. 10-2033.

The three attorneys who provided the declaration did not comment on the fact that their billing rates may be applicable for periodic non-contingent clients while the clients in this matter are not contractually obligated to ever pay the designated rate – or any other rate. The failure to address this issue in their declarations detracts from their effectiveness.   The attorneys also do not offer specific comparisons or provide specific references. The laudatory portion of their conclusions offers no particulars.[80]   The affidavits do not say that the "requested rates are commensurate with this District's prevailing market rates." Westberry, 2013 U.S. Dist. LEXIS

---

[80] I wish to point out that Mr. Berger of Bernstein Litowitz does have forty-one (41) years of experience, far exceeding any other attorney in this matter. Karen Morris and Patrick Morris each have twenty-eight (28) years of experience. All the other partners in this matter have twenty-five (25) or fewer years, except for Mr. Taylor of Carella Byrne with twenty-six (26) years; Mr. Cecchi of Carella Byrne has twenty-two (22) years; Mr. Lebovitch of Bernstein Litowitz has thirteen (13); Messieurs Downs, Mitchell, and Robins of Robbins Geller enjoy twenty-two (22), fourteen (14), and nineteen (19) years' experience, respectively; Mr. Abraham has twenty-five (25) years and Mr. Fruchter and Mr. Twersky have twenty (20) and twenty-one (21) years of experience, respectively; and Mr. Graifman of Kantrowitz Goldhamer has over twenty-two (22) years of experience.

14381 at *7-8. The affidavits do not cite to a single specific case where counsel's proposed rates were awarded in a shareholder derivative action.  In addition, all three lawyers seem to know Mr. Cecchi and two lawyers know the firm of Bernstein Litowitz, but no one knows the other attorneys and instead were relying on their resumes for a frame of reference.  Most important of all, the attorneys do not practice law in the relevant geographic area.

Interestingly, one of the attorney advocates, Stephen Greenberg, is associated with the law firm on the Survey with the lowest rates. The highest rates for partners of the law firm of McElroy, Deutsch, Mulvaney & Carpenter on the Survey are $575.00 and are lower than <u>all</u> the partner rates sought in this matter.  Their lowest partner rate, $295.00, is lower than the associate rate sought for every associate attorney in this matter.

Affidavits of this sort are not helpful to construct a case for the relevant market rate: "…[T]he fee applicants' affiants attest only to the reasonableness of the requested fee with hardly a mention of prevailing market rates. This sort of affidavit might properly be characterized by a reviewing court as one given out of courtesy, but provides little or no evidentiary support for an award." <u>Norman</u>, 836 F.2d at 1304.

In order to justify their fees, the petitioning attorneys submitted a Joint Declaration to the Court. The Declaration provides a history of the matter, both substantively and procedurally. As to their fees, all the firms represented that they undertook the prosecution of this matter "entirely on a contingency fee basis and assumed significant risks in bringing these claims.  From the outset, Plaintiffs' Counsel understood that they were undertaking an expensive and complex litigation with no guarantee of receiving compensation for the enormous investment in time and money that the case would require."  Joint Declaration of Counsel at 24 (Aug. 31, 2012), <u>In re Johnson & Johnson Derivative Litig.</u>, No. 10-2033.  They indicated that their current hourly rates

are "consistent with standards for complex litigation in federal court and fees awarded in other similar contingent litigation." Id. at 25 (emphasis added). No specific information was provided.

Each law firm then submitted a separate declaration in which it summarized the time spent by each attorney and members of the professional staff. The lodestar was then quantified by the Categories, at the relevant billing rate. A breakdown of expenses by category was also provided.  The Narratives provided to me also included separate Declarations or explanations by each law firm. In the  Demand-Futility Narrative, which is unsigned,[81] the author(s) opine that the hourly rates used in this matter are the "normal and usual hourly rates for each of the attorney's (sic) involved" and have been "repeatedly approved by Federal Courts in this district and elsewhere."  Demand-Futility Narrative at 4. Demand-Futility Counsel argue that the rates are fully competitive and sometimes lower than that of defense counsel. The rates are the "usual rates for Lead Counsel, and the rates have been approved as reasonable many times over." Id. at 4.  The firms did not provide specific information on fees awarded.

It is worth reviewing the declarations of counsel. In Mr. Cecchi's Declaration to the Court, he indicated he had reviewed the billing rates of the attorneys involved in the matter to assure himself that they were reasonable and consistent with rates charged in similar matter by his colleagues and attorneys at other New Jersey firms. Declaration of James E. Cecchi at 2 (Aug. 31, 2012), In re Johnson & Johnson Derivative Litig., No. 10-2033.  He indicated that the hourly rate he charges for his services ranged from "$550.00 per hour to $750.00 per hour for hourly paying clients."[82] "In fact, as to Carella, Byrne and Robbins Geller, these are the hourly

---

[81] The Demand-Refused Narrative is also unsigned.

[82] On July 9, 2012, Mr. Cecchi appeared as a member of the plaintiffs' legal team in Glover v. Ferrero USA, Inc., Case 3:11-cv-01086-FLW-DEA, before Judge Wolfson. When she asked him if the rates that he had submitted were the rates generally charged by his firm, he responded, "Judge, these are the rates and forms that we utilize in every contingent case that I have been involved in, and my hourly practice. And I do a huge amount of hourly work.  The rates vary, depending upon a particular retainer, all the way from almost _$500 to $650._" Transcript of Hearing to Approve Settlement and Fees at 16 (Jul. 9, 2012), Glover v. Ferrero USA, Inc., No. 11-01086 (emphasis added).

rates utilized in high-end high stakes litigations for hourly bill paying clients."[83] Id. In his Declaration submitted with the Demand-Futility Narrative, Mr. Cecchi indicated that the hourly rates billed by his firm "have been the basis of numerous successful fee awards in this district." Demand-Futility Narrative, Exhibit 3 at 2.

In the Declaration in Support of Final Approval for Bernstein Litowitz, Mark Lebovitch, who was in charge of the litigation for the firm, averred that the hourly rates are the "usual and customary rates charged" for the participating attorneys and paraprofessionals." Declaration of Mark Lebovitch at 2 (Aug. 31, 2012). In re Johnson & Johnson Derivative Litig., No. 10-2033. An overview of the firm submitted with the Demand-Futility Narrative emphasizes, without details, that the hourly rates of Bernstein Litowitz "have been approved by scores of courts around the country, including the District of New Jersey." Demand-Futility Narrative, Exhibit 7 at 1.

The initial Declaration of Morris and Morris listed the rates of the various professionals, but made no further comment on the rates. It attached a compendium of the many matters with which it has been associated.   In an unsigned description of its work, Morris and Morris relates without detail that it has "routinely been awarded fees in complex derivative and class action litigation based on the firm's current rates or then-current comparable rates of the firm." Demand-Futility Narrative, Exhibit 5 at 1 n.2.

Travis E. Downs III and David W. Mitchell of Robbins Geller also attested in their Declaration on behalf of their firm in the application for approval of Settlement that the listed

---

Perhaps, this reference to $650 in the transcript is in error since Judge Wolfson in response to that comment states, ".... And you may actually charge $750 for your work..." Id. at 17.

[83] When I asked for non-contingent rates from the lawyer firms, Mr. Downs replied in a letter dated May 23, 2013 to me that "For the period January 1, 2010 to October 12, 2012, Robbins Geller Rudman & Dowd LLP ("RGRD") performed work for clients solely on a contingency basis." Letter from Travis E. Downs III to Special Master (May 23, 2013) (emphasis added).

rates for professionals were "usual and customary."  Joint Declaration of Travis E. Downs III and David W. Mitchell (Aug. 30, 2012), In re Johnson & Johnson Derivative Litig., No. 10-2033.  In the unsigned Exhibit for Robbins Geller attached to the Demand-Futility Narrative, the rates are provided and the following footnote added with respect to the rates: "Robbins Geller submitted rates similar to those here in the following actions pending before United States District Courts and received a fee."  Demand-Futility Narrative, Exhibit 6 at 1 n.1.  The firm does not reveal the amount of the fees although it does list several cases.

Gary Graifman provided the August 2012 Declaration on behalf of Kantrowitz Goldhamer and listed the hourly rates of its professionals and provided an extensive resume.   In the Declaration of Gary S. Graifman submitted as part of the Demand-Refused Narrative, he avers that "Rates similar to the rates requested herein by KGG have been approved by Courts in connection with similar complex class action litigation in which the firm served as one of the plaintiff's counsel."  Demand-Refused Narrative, Exhibit H at 3.  Mr. Graifman indicated that he requested $725.00 per hour in two matters and that the fees were approved. He did not actually disclose the breakdown of rates he and other members of the firm received. Id. at 3-4. Mr. Graifman billed $735.00 per hour in this matter.

Mr. Abraham, who bills at $795.00 per hour, in his Declaration repeated that the "rates utilized by counsel in this matter are reasonable and the normal and usual rates charged by attorneys in New Jersey doing this type of complex commercial litigation in the federal courts."  Demand-Refused Narrative, Exhibit I at 2.  He also indicated that courts in matters where the firm served as one of the plaintiffs' counsel have approved rates comparable to the requested rates.  Mr. Abraham averred that he received similar hourly rates, but did not provide more

specific information.  He also indicated that he applied for a rate of $750.00 per hour in another shareholder derivative action. Id. at 3.

 "Absent extraordinary circumstances, an attorney's reasonable rate for fee awards is the market rate charged to private clients." Cooperstock v. Pennwalt Corp., 820 F.Supp. 921, 927 n.9 (E.D. Pa. 1993) (citing Student Public Interest Research Group v. AT&T Bell Lab, 842 F.2d 1436, 1442 (3d Cir. 1988)).  Rates should be "in conformity with the regular hourly rates billed to noncontingent client by private law firms." In re Fine Paper Antitrust Litig., 98 F.R.D. at 83. The emphasis is again on reasonable.

 In this case, four firms[84] have no paying clients and always depend on the vagaries of fee shifting and the approval of courts for payment of their declared rates, but contingent rates in this context, where it is anticipated that at the end of the case the defendant will be required to pay the fees of plaintiff's counsel, offer no gauge of a reasonable fee.[85]

 The rates in the context of a fee shifting contingency matter are not instructive; they provide no useful paradigm.  The certifications of the three attorneys vouching for the rates in this case did not discuss the lack of a "living, breathing" fee-paying plaintiff. See Declarations of Stephen M. Greenberg, John McGahren, and Michael D. Sirota, In re Johnson & Johnson Derivative Litig., No. 10-2033.  The Plaintiffs in this matter would have agreed to pay any rate; there were no circumstances in which they would have been "out of pocket" and although one

---

[84] Bernstein Litowitz indicates that its work is undertaken almost "exclusively" on a contingent basis. Letter from Mark Lebovitch to Special Master (May 22, 2013). The practice of Abraham Fruchter only handles contingent matters. Letter from Jeffrey S. Abraham to Special Master (May 22, 2013). Robbins Geller also apprised me that for the period January 1, 2010 to October 1, 2012, it "performed work for clients solely on a contingency basis." Letter from Travis E. Downs III to Special Master (May 23, 2013). Morris and Morris also has no non-contingent clients. Demand-Futility Narrative at 4 n.1.

[85] By focusing on the issue of contingency and other considerations, I am not seeking to impose a Fifth Circuit Johnson type inquiry into multiple factors, including  whether the fee is fixed or contingent, Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974),  which  has become disfavored. See Perdue v. Kenny A., 559 U.S. 542 (2010); Shim v. Millennium Group, 2010 U.S. Dist. LEXIS  68922 at *2 n.3 (E.D.N.Y. Jun. 21, 2010); Trustees of the Empire State Carpenters Welfare v. M.R. Drywall Services, Inc., 2012 U.S. Dist. LEXIS 123937 at *9 (E.D.N.Y. Aug. 6, 2012).  I think the consideration is relevant, however, to what is a reasonable fee in the forum for which a paying client would be willing to pay.

could argue that if there had been a pecuniary recovery, that amount might have been reduced, still the burden on plaintiffs was non-existent.[86]   Judge Dale Fischer captured the lack of accountability:

> Class representatives do not interview prospective counsel, do not require an RFP (request for proposal), do not negotiate a reduced rate, do not provide guidance or supervision to counsel concerning what tasks they are – or are not – willing to pay for, and <u>do not review, critique, and reduce</u> amounts charged by the attorneys.

<u>In Re Bluetooth</u>, 2012 U.S. Dist. LEXIS 168324 at *9 n.6 (emphasis added).

The point is that fee shifting requires a rule of reason and contemplates that "in the private sector the economically rational person engages in some cost benefit analysis." <u>Norman</u>, 836 F.2d at 1301. No such testing goes on in this context.

Judge Wolfson acknowledged this lack of a "paying customer" in <u>Glover v. Ferrero USA</u>, Case 3:11-cv-01086-FLW-DEA. When the court performed a lodestar cross check,[87] it awarded twenty-five percent (25%) of a $2.5 million common fund instead of the requested thirty percent (30%) (plus $500,000.00 for the value of certain injunctive relief) to the attorneys who had brought this case against Nutella, the popular hazelnut spread, for deceptive advertising:

> Court: I also want to question each of plaintiffs' counsel that has submitted a declaration with regard to the hourly rate rates being provided to me. I want to know if what you are representing to me is that the hourly rates that you have listed are the hourly rates that your firm, that these lawyers in your firms – whether these are the hourly rates that these attorneys charge your clients generally, those who actually pay hourly fees, and that is what you receive, as opposed to whether these are rates that you claim to use in class actions for which no one is ever paying an hourly rate because they are taken on contingency.
>
> Court: You can set the moon for your contingent fee hourly rate, because you're never collecting an hourly rate…And I say this particularly, because putting aside, Mr. Cecchi, you may be a very able and experienced attorney, and you may actually charge $750.00 for your work, I don't believe your associates --- that any

---

[86] I have not reviewed the retainer agreements signed by the plaintiffs.
[87] A lodestar is utilized to crosscheck the reasonableness of a percentage-of-recovery fee award.   <u>In re AT&T Corp.</u> <u>Secs. Litig.</u>, 455 F.3d 160, 164 (3d Cir. 2006).

client you got is paying $550.00 for your associates for hourly work in a New Jersey firm, not that I know of.

The Court: All right. I think counsel appreciates what I'm saying with regard to when I apply the lodestar check, how I will be looking at it, because, as I said, it's really not fair, I believe, that in these contingent fee cases to essentially come up with a number that's not your real hourly billing rate number for purposes of the cross-check, and that's my view because, as I said, in a contingent fee case where you never intend to collect against the client or charge him for that hourly rate, you can charge him $10,000.00 an hour and it would make no difference, and it's not appropriate for the Court to consider that rate if it's not the real rate.

Transcript of Hearing to Approve Settlement and Fees at 15-20 (Jul. 9, 2012), Glover v. Ferrero USA, Inc., No. 11-01086.

The fees for the attorneys in this matter are, indeed, contingent. They may never have been paid since the Plaintiffs never promised to pay and the defendants may have prevailed. On the other hand, one has to wonder how uncertain recovery was if attorney after attorney kept filing law suits against J&J and attorney after attorney kept making demands on the Board. No one seemed discouraged by the risk.[88] Once multiple Demand-Futility Complaints were filed, the attorneys competed to stay in the game, touting their expertise and impliedly criticizing other Demand-Futility attorneys and then explicitly criticizing the Demand-Refused counsel. No attorney hesitated to file an additional complaint, thinking, perhaps, experienced attorneys with whom they had previously dealt, but had beaten them to "clerk's office," or, in federal court, to an electronic filing, could handle the matter alone and vindicate the rights of J&J shareholders.[89]

---

[88] The attorneys in their in camera documents have explained to me the financial perils of their practice and that, indeed, some cases are lost and uncompensated and some are transferred to other districts, resulting in a loss of the case and corollary loss of lodestar reimbursement.

[89] Counsel for the Demand-Refused plaintiffs pointed out this incongruity in the Reply Brief in Further Support of Motion to Intervene and Appoint Abraham Fruchter Twersky, LLP and Kantrowitz, Goldhamer & Graifman, P.C. as, Respectively, Lead Counsel and Liaison Counsel and wrote: "In the multitude of pleadings filed before this Court, none have (sic) explained why they filed additional and largely copycat complaints after the first complaint in the Calamore action were long on file. Given that they now endorse Calamore's counsel (Morris & Morris) as one of the proposed lead counsel, their doing so is even more perplexing." Reply Brief in Further Support of Motion to Intervene and Appoint Abraham Fruchter Twersky, LLP and Kantrowitz, Goldhamer & Graifman, P.C. as, Respectively, Lead Counsel and Liaison Counsel at 14, In re Johnson & Johnson Derivative Litig., No. 10-2033.

Of course, eventually the same attorneys who filed successive complaints and thereafter vied for participation, then yielded to Carella Byrne, Morris and Morris, Bernstein Litowitz, and Robbins Geller in forming a leadership structure. Interestingly, not a single law firm of which I am aware offered to lower its fee to participate. Everyone wanted "a piece of the action," despite the contingency.

I have also never understood why the element of contingency should generate a higher rate for taking the risk; it would seem to me that practitioners who have undertaken an uphill legal battle would be happy to settle for some compensation – unless it was not uphill at all and was in actuality almost a certainty. In this contingent matter, with J&J as a defendant, a dozen firms were "falling all over themselves" to participate.[90] In any event, the possibility of losing one contingent case and therefore compensating with higher rates in another matter is not the problem of the defendant in the second matter.

---

[90] Not that prevailing in this case was an absolute. The Motion to Dismiss brought by the defendants and Judge Wolfson's thorough opinion, In re Johnson & Johnson Derivative Litig., 865 F.Supp. 2d 545, 556 (D.N.J. 2012), demonstrate that the Demand-Futility Plaintiffs had an uphill battle to satisfy the particularity requirement of FRCP 23.1, justifying the failure to make a demand in a shareholder derivative action. Plaintiffs have to do this in the face of difficult case law requiring pleading with particularity that the directors were not disinterested and independent or that the challenged transaction was otherwise the product of a valid exercise of business judgment. In re PSE&G Shareholder Litig., 173 N.J. 258, 282 (2002). This is the so-called "Aronson" test. Aronson v. Lewis, 473 A.2d 805, 815 (Del.1984), overruled on other grounds by Brehm v. Eisner, 746 A.2d 244 (Del. 2000). According to Judge Wolfson, the claims are subject to the theory of liability articulated in In re Caremark Int'l, 698 A.2d 959 (Del. Ch. 1996), which requires a plaintiff to prove that the directors knew or should have known that violations of law were occurring and took no steps in a good faith effort to prevent or remedy that situation. King v. Badino, 409 Fed. Appx. 535, 537-38 (3d Cir. 2010). Caremark is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." In re Caremark Int'l, 698 A.2d at 967. Allegations of bad faith are important to litigating a successful Caremark red-flag pleading and often the Caremark theory is considered based on allegations of bad faith. In re Johnson & Johnson Derivative Litig., 865 F.Supp. 2d at 558. The burden becomes even greater if the plaintiff must prove bad faith allegations when the certificate of incorporation has an exculpatory clause for acts or omissions as the certificate of J&J does. Overcoming this issue would not have been easy because the plaintiffs would have had to prove fraudulent or illegal behavior or bad faith conduct and "plead particularized facts that demonstrate that the directors acted with scienter." Id. at 558. Judge Wolfson's opinion makes it clear that the Demand-Futility case in terms of liability was by no means "a sure thing" in her scholarly step-by-step analysis of the case law and the relevant standards. Judge Wolfson also pointed out that if the Demand-Futility Plaintiffs refiled an amended complaint, after belatedly instituting a books and records action, she had the discretion to deny lead plaintiff status to the named plaintiff, dismiss the named plaintiff from the suit or direct the plaintiffs to pay the defendants' attorneys' fees. Id. at 581. See King v. VeriFone Holdings, Inc., 12 A.3d 1140 (Del. 2011). Of course, the Demand-Refused Plaintiffs were in a different position and, following the issuance of the Special Committee Report, would have had to prevail on the appropriate standard of liability for evaluating the claims. See Letter from Abraham Fruchter to the Board (Jul. 22, 2011).

And certainly it was not the case of an impecunious defendant who might not be able to pay a judgment. Indeed, it was probably the "deep pockets" of J&J that attracted so many "players." See Goldberger v. Integrated Resources, 209 F.3d 43 (2d Cir. 2000).

Several of plaintiffs' counsel point to the high rates charged by defense counsel. Mr. Cecchi in his Declaration in the Demand-Futility Narrative, dated December 21, 2012, indicated his familiarity with Defendants rates;

> [B]ased upon personal experience – that the hourly rates charged by the Lowenstein firm (counsel for the Special Committee) for partners working on similarly sophisticated federal court matters, are higher than my highest hourly rate of $750.00 per hour. I also know from reviewing public filings by Sidley Austin (counsel for J&J), that partners at that firm also routinely charge rates above $800.00 per hour."

Declaration of James E. Cecchi at 2 (Dec. 21, 2012), In re Johnson & Johnson Derivative Litig., No. 10-2033. Mr. Graifman and Mr. Abraham make similar comments in their Declarations, dated December 18, 2012 and December 19, 2012. Mr. Graifman also took this position when he submitted information to me in camera about his firm's rates. Plaintiffs fail to acknowledge, however, that "the higher rates ordinarily charged may effectively be tempered where there is a client scrutinizing bills before paying." In re KeySpan Corp. Sec. Litig., 2005 U.S. Dist. LEXIS 29068 at *48 n.13 (E.D.N.Y. Aug. 25, 2005).

Plaintiffs' lawyers all charged the Board with substantial allegations of misfeasance. The first Demand-Futility Complaint filed by Morris and Morris in April 2010 was very impressive as was  the consolidated Amended Complaint of the Demand-Futility Plaintiffs (which the defendants successfully moved to dismiss), and the Demand-Refused Complaint in intervention is also comprehensive. Reviewing the iterations of the multiple Demand-Futility Complaints, letter Demands upon the Board, and Demand-Refused Complaints, one can appreciate that each document  improved upon the other, gathering new charges, new violations,

and new allegations, following news articles in the <u>New York Times</u> and <u>Wall Street Journal</u> and on Bloomberg, reviewing SEC filings and Congressional hearings, and pursuing Freedom of Information Act avenues until finally establishing a critical mass of substantial negative information about the Fortune 500 company.

At my meeting with counsel, several attorneys made an effective presentation on the difficulties of pursuing a "pharma" (pharmaceutical) case, although pointing out their substantial experience in that regard, but most of the material which they harvested was in the public domain. Even counsel for Demand-Refused Plaintiffs whose Demand letters had been challenged by Demand-Futility Counsel as having been copied, acknowledged the source of its own and the allegations of Demand-Futility Plaintiffs:

> Nor is there any need for the Demand Plaintiffs to go and copy any of the Demand Futility Complaints because the facts upon which the Demand Plaintiffs relied upon in making demand on the Board were all available in, and culled from, the public record in the form of press reports, Securities and Exchange Commission ("SEC") filings, court filings, and open publicly available sources.

Reply Brief in Further Support of Motion to Intervene at 13-14, <u>In re Johnson & Johnson Derivative Litig.</u>, No. 10-2033.

Plaintiffs' Counsel were able to garner the information they needed to pursue the matter from the work performed by others. See <u>In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.</u>, 2006 U.S. Dist. LEXIS 78101 at *50. All the complaints capitalized on SEC filings, wire service stories, the work of the Justice Department and several Attorneys General, Freedom of Information Act inquiries, public Congressional hearings; no one "reinvented the wheel" and all the firms, very experienced in shareholder derivative suits and class actions, presumably had forms of complaints in their databases. "The dominant paradigm in securities class actions [and

shareholder derivative actions] is probably not careful investigation to discover hidden abuses,[91] but rapid filing in response to abuses publicized by regulators, the media, or the issuer itself." In re Cendant Corp. Sec. Litig., 404 F.3d 173, 194 (3d Cir. 2005).  The issues, despite the protestations of counsel, are not as complicated as a patent infringement suit, an ERISA (Employees Retirement Security Act), or a complex monetary derivative matter.   The lawyers also were very experienced in "pharma" matters, having participated in litigation against Eli Lilly and Company, Schering-Plough Corporation, and Merck.

The status of the case is also important. When counsel submitted the Settlement Agreement to the Court for approval, along with their Joint Declaration supporting their fee requests, Defendants had already successfully prosecuted a Motion to Dismiss against the Demand-Futility Plaintiffs.  Only the Demand-Refused Plaintiffs had an extant complaint, which had not been tested by a motion.  Limited discovery had been undertaken.   Plaintiffs were in a position of strength from the benefits included in the settlement, not from their litigation posture.

If this were the end of the inquiry, I would find that counsel for the Plaintiffs did not satisfy their burdens of proof as to their entitlement to the requested hourly rates.  Counsel assured me in their Declarations and Narratives of receiving comparable fees to those requested, but they did not provide specific information. The Survey information and the perfunctory affidavits of Messieurs Greenberg, Sirota and McGahren did not advance the burden of proof for the applicants.  Furthermore, I thought the rates requested for senior partners with many years' experience at almost a thousand dollars an hour and for young attorneys with few years' experience at over $400.00 an hour was simply just  too high and not in conformity with billing reality.

---

[91]  After the initial complaint and for purposes of filing the consolidated amended complaint, the law firms did use the services of investigators to uncover information to support their allegations and strengthen their claims, including interviewing employees.

I do, however, acknowledge that a firm's non-contingent rate is probative. Cunningham, 753 F.2d at 268. A lead New Jersey law firm in this matter has a dual practice, undertaking both matters that are contingent and subject to fee shifting and matters for which clients are billed in a periodic, non-contingent process. Mr. Cecchi with twenty-three (23) years' experience in complex federal and state litigation indicated he currently charges up to $750.00 per hour.[92] There is no reason then why the fees charged by Carella Byrne to its non-provisional clients should not be the standard for this matter – and the ceiling. "An attorney's customary billing rate is the proper starting point in determining reasonableness of the hourly rate." Wade, 2010 U.S. Dist. LEXIS 138518 at *16.

Additionally, a court should make an assessment of the experience and skill of the attorney, comparing their rates to the rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." Rode, 892 F.2d at 1183. The case law suggests that references to other matters in the District of New Jersey where rates have been approved for "similar work in similar cases" is instructive and, if similar, would be considered reasonable. Holzhauer, 2012 U.S. Dist. LEXIS 112740 at *9 ("The Court finds that the hourly rates proposed by K&S are reasonable. In cases in the District of New Jersey and the Eastern District of Pennsylvania, equal or greater hourly rates for K&S have been approved for similar cases."). See also Wade, 2010 U.S. Dist. LEXIS 138518 at *15-16; FTC, 2012 U.S. Dist. LEXIS 178021 at *6.

I therefore deferred to the case law, especially noting that the attorneys all assured me that they had received similar rates in similar cases, but oddly had never provided me with specific details. I reached out to the attorneys and asked them to provide me with specific

---

[92] In camera information provided to me by Carella Byrne sustains Mr. Cecchi's non-contingent rate at $750.00 per hour.

information as to the fees they had requested and the fees they had received in similar matters in this vicinage.[93] I also initially asked the firms to provide me with information as to what matters, if any, had been uncompensated, trying to derive whether "contingent matters" were as contingent as the attorneys often contended, but withdrew my request. Several firms voluntarily supplied the information in camera.

After protestations as to the confidential nature of the information, even vis á vis each other, and some assurances as to my review in camera of the information, I received historical, court awarded information from the firms that also supports the $750.00 rate, the ceiling of a non-contingent fee of the lead counsel. Apparently, the law firms have received comparable fees from several District Courts in the vicinage. If the District Courts, however, provided "a concise but clear explanation of its reasons for [the] fee award," no analysis was provided to me. Loughner, 260 F.3d at 178. "The District Court 'has a positive and affirmative function in the fee fixing analysis, not merely a passive role.'" Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 2013 U.S. App. LEXIS 11171 at *32 (3d Cir. Jun. 4, 2013) (citing Interfaith Cmty. Org., 426 F.3d at 713). I do not know if a thorough review or cursory evaluation was undertaken by the various District Courts nor what was the justification for the various fee awards. Did an awarding court authorize all rates or modify or reject some requests? How were the rates calibrated? How were they differentiated?

Nevertheless, despite the lack of available judicial analyses explaining the bases for the various awards and the difficulties in making informed comparisons and although I believe the fees awarded by the various District Courts are too high based on my significant experience in the private and public sectors and on the Superior Court Bench and in view of the lack of a

---

[93] I also sought a schedule of "all periodic, non-contingent (hourly) rates" for the relevant period.

"check-writing" client, nevertheless the information is compelling.  I believe I lack the authority to ignore what several District Courts have already ordered.

Carella Byrne effectively made the case that in contingent matters it has been awarded the amount it requested for its highest partner rate, i.e., $750.00. [94]  In several District of New Jersey matters, including one from Trenton, since 2007, its partners have received fees ranging from $625.00 to $750.00 and the request was enhanced by a multiplier, thereby elevating the rate effectively beyond the $750.00 requested.  See In re Mercedes Tele-Aid Contract Litig., Civil Action No. 07-2720 (Newark); Hall v. AT&T Mobility, Civil Action No. 07-05325 (Newark); Ramirez v. Epana Networks, Civil Action No. 08-4040 (Trenton); Ramirez v. Lycatel Group, Civil Action No. 07-5533 (Newark).  This list is not exhaustive.

Mr. Graifman of Kantrowitz Goldhamer eloquently in his in camera submission wrote to me of the hazards of class action and derivative litigation, focusing on the "risks" and the "rewards," both from the economic benefit and from the success in sometimes "right[ing] a wrong."   He also described receiving his hourly request of $735.00 per hour from Judge Sheridan in Brody v. Merck & Co., Inc., Civil Action No. 12-04774 (D.N.J.), in 2013 and $725.00 per hour from Judge Brown in 2011 in In re FleetBoston Financial Corp. Sec. Litig., Civil Action No. 08-04947.  Morris and Morris referenced several cases out of the District, but in 2008 in In Re Schering-Plough Corp. S'holder Derivative Litig., Civ. Action No. 01-1412 (D.N.J.), Karen Morris received a rate of $585.00 leveraged by a multiplier to exceed $800.00.

In camera information received from Bernstein Litowitz implies that the high partnership rate of $975.00, the same rate sought for the work of Mr. Berger although Mr. Lebovitch, the

---

[94] I am only going to focus on the highest senior partner request or the most active partner in this matter.  There is too much variation and variables among attorneys at a more junior and associate levels.  I shall, however, make recommendations for those levels.

primary attorney on the matter, seeks only $700.00 per hour in this matter, was received in one matter in 2012. The partnership rate of $895.00 was received in another matter in 2008 and a rate of $850.00 was received in two matters in 2008. Three suits are from Newark and one is from Camden. The most recent matter was In re Medco/Express Scripts Merger Litig., Civil Action No 11-4211 (Newark). The rates listed for the four matters range from $310.00 to $975.00, but there is no individual breakdown for partners or associates or any analysis provided.

Abraham Fruchter's submission for cases from this District since 2010 only included Brody v. Merck & Co., Inc., Civil Action No. 12-04774 (D.N.J.), in which Mr. Mitchell Twersky from the firm requested and received $750.00 per hour; the main attorney in this matter, Jeffrey Abraham, was not involved. Mr. Twersky billed at $725.00 in Brody.

Robbins Geller, a California law firm, with offices all over the country, has received rates ranging as high as $855.00 in one matter (Alaska Electrical Pension Fund v. Pharmacia Corp., Civil Action No. 03-01519) with two others at $770.00 and $775.00 (Conditionally Certified Class of Certain Former Summit Bancorp S'holder v. FleetBoston Fin. Corp., Civil Action No. 08-094947 and Charta v. Avaya, Inc., Civil Action No. 05-02319) in the last three years in the vicinage of Trenton. Its fees were determined based on a percentage recovery of a fund, tested by the lodestar cross check, but no further information or analyses of the Court were specifically provided except a reference to the cases themselves. The highest rate sought by Robbins Geller is $790.00 for Mr. Robbins while $725.00 is requested for Mr. Downs.

I therefore believe the record is adequate to find that the maximum partner $750.00 rate of Carella Byrne's attorney, James E. Cecchi, falls within the prevailing rate "in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." Rode, 892 F.2d at 1183. Mr. Cecchi, as previously indicated, is a very experienced attorney in

class action and other representative litigation and is Co-Lead Counsel in this matter.   I do note that the request of Gary Graifman of Kantrowitz Goldhamer, New Jersey Liaison counsel, also with more than twenty-two (22) years' experience, is lower at $735.00 per hour.

On the other hand, no evidence has been provided nor burden of proof satisfied that any attorney in this matter deserves more than $750.00 per hour.   $750.00 shall be the ceiling. Partners with more than twenty (20) years of experience shall be awarded an amount equal to the lesser of $750.00 or the amount they requested. For instance, Mr. Berger with forty-one (41) years' experience shall be awarded not the $975.00 he requested, but $750.00 per hour. Mr. Lebovitch requested $700.00 and he shall be awarded $700.00.

Importantly, counsel insist they have been awarded similar rates by other courts for similar work in the Narratives and their Declarations, but based on the in camera information I received it is clear that such rates are often only reached when a multiplier or enhancer is applied.  No analyses of how a Court arrived at the fees are provided. With respect to rates for the both senior and less senior partners and with respect to the rates for associates, it is impossible to interpolate the appropriate rate for each attorney based on the information submitted. No analysis from any District Court was provided. Additionally, the various burdens of proof have not been satisfied to receive the requested, and what I believe are inflated, amounts for partners and associates.   Indeed, some of the in camera information supports much lower rates for associates.[95] I have relied upon my own discretion and experience, both in association with a law firm, as a mediator and an arbitrator, and as a former Superior Court Judge who reviewed hundreds of fee applications, to create what I consider to be a reasonable schedule based on the attorneys' years of experience. See Loughner, 260 F.3d at 180 ("having rejected the

---

[95] Carella Byrne is seeking $475.00 per hour for an associate with three (3) years' experience.

prevailing party's evidence of rates, the District Court was free to affix an adjusted rate."); see also FTC, 2012 U.S. Dist. LEXIS 178021 at *6.

The schedule I have devised is as follows:

| Position | Experience | Rate |
|---|---|---|
| Partner | 20 plus years | $750.00 |
| | 10-19 years | $700.00 |
| | 0-9 years | $650.00 |
| | | |
| Associate | 20 plus years | $500.00 |
| | 10-19 years | $450.00 |
| | 6-9 years | $400.00 |
| | 0-5 years | $350.00 |
| | | |
| Staff Attorney | | $250.00 |
| Paralegal | | $125.00 |
| Research Assistant | | $125.00 |

The fee request of Carella Byrne for paralegals of $125.00 per hour is reasonable and shall control. Carella Byrne is a New Jersey firm, closest to the litigation situs, and its rate is strong evidence of the market rate in the community. Loughner, 260 F.3d at 180.

For a list of the rates accorded to the attorneys and staff in this matter, see Appendix XIII.

## VII. Reasonable Expenses or Compensable Costs

The law firms seek reimbursement for expenses in the total amount of $445,379.10. This is approximately $6,600.00 less than the original expense request as Carella Byrne and

126

Morris and Morris took voluntary reductions. Judge Wolfson has authorized the payment of reasonable expenses to the law firms. See also Yong Soon O. v. AT&T Corp., 225 F.R.D. 142, 154 (D.N.J. 2004); McCoy v. Health Net, Inc., 569 F.Supp. 2d 448 (D.N.J. 2008). I was charged with determining if the costs are "compensable." Order of Judge Wolfson (Oct. 22, 2012), In re Johnson & Johnson Derivative Litig., No. 10-2033. Plaintiffs' counsel bear the burden of persuasion as to the reasonableness of their expenses. See Grendel's Den, Inc. v. Larkin, 749 F.2d 945, 956-57 (1st Cir. 1984). Expenses must be "adequately documented, reasonable, and appropriately incurred." In re Cendant Corp., 232 F.Supp. 2d 327, 343 (D.N.J. 2002). Expenses are compensable if they are normally charged to a fee-paying client. Planned Parenthood, 297 F.3d at 267.

Representatives of the law firms certified that full documentation of the costs has been maintained in the firms' books and records. They seek reimbursement of expenses for several categories:

> Expert fees
> Investigator fees
> On-line legal research and Pacer
> On-line factual research
> Long Distance Telephone
> Travel, including airfare, hotels, meals, and taxicabs
> Photocopying and Fax
> Filing fees and Transcripts
> Postage
> FedEx/UPS/messenger service
> Overtime
> Miscellaneous expenses

The law firm of Robbins Geller provided a well-documented, chronological breakdown of its expenses for each category. At our meeting in November 2012, I suggested to counsel that they replicate what Robbins Geller had submitted. Although counsel provided some additional information, no one supplied the detailed breakdown, particularly on travel, that Robbins Geller

did.  Abraham Fruchter provided additional information on Lexis Nexis and a further breakdown on its document retrieval costs.

The costs incurred for experts in this matter are very high.  The total amount sought is $298,907.75. Compensation for experts, even those not called upon to testify at a deposition or at a trial, may nevertheless be reimbursed. Interfaith Cmty. Org., 426 F.3d at 716 ("Experts are not only hired to testify; sometimes they are hired, also or instead, to educate counsel in a technical matter germane to the suit") (citing Friedrich v. Chicago, 888 F.2d 511, 514 (7th Cir. 1989)). Apparently, the experts in this matter were helpful in analyzing the issues in which J&J was vulnerable at an early stage and at the end of the matter during settlement negotiations to fashion a beneficial resolution for the shareholders.  The costs of experts appear high, especially given the hours of work claimed by the attorneys and their professed expertise in dealing with "pharmas," but still within the realm of reasonableness.

Two law firms are also seeking reimbursement for $77,531.09 for investigators. Robbins Geller hired investigators who conducted inquiries into alleged off-label promotion activity and recalls and "assisted plaintiffs and enabled them to increase both their knowledge of Johnson & Johnson and the pharmaceutical industry as well as the products, services and conduct at issue in this Action." See Joint Declaration of Travis E. Downs III and David W. Mitchell (Aug. 30, 2012), In re Johnson & Johnson Derivative Litig., No. 10-2033. Carella Byrne seeks reimbursement of $866.06 for one Bill Kelly whose role is not explained. Ordinarily, reasonable expenses of litigation can be shifted to a defendant in the appropriate fee shifting case where they are adequately documented and reasonable. See Yong Soon Oh, 225 F.R.D. at 154.

As to on-line research for Westlaw, LEXIS, and Pacer, an on-line source for government filings, it is not uncommon practice in this District to reimburse attorneys for the use of on-line

legal research, See McCoy, 569 F.Supp. 2d at 479; In re Cendant Corp., 232 F.Supp 2d at 343, although some other courts around the country do deny such reimbursement, regarding the expense as an item of firm overhead.  See Winter v. Cerro Gordo County Conservation Bd., 925 F.2d 1069, 1074 (8th Cir. 1991); Weinberger, 801 F.Supp. at 827.

Only the law firms of Abraham Fruchter and Robbins Geller provided breakdowns of their monthly on-line fees and Robbins Geller's list was very detailed.  I assume, as was explained by Morris & Morris, that the bills represent a monthly allocation of basic charges for this matter, plus any extra charges relative to this litigation.  Reimbursement requests range from $1,474.03 to $10,408.45.  Under the circumstances, since I took exception to the number of hours requested in the loadstar, for a variety of reasons, I believe anything in excess of $5,000.00 is excessive, especially since the expenses are largely undocumented.

In addition, it appears reasonable to reimburse counsel for the use of Pacer since that on-line service facilitates accessing documents, transcripts, Orders, etc.  The federal court system has promoted on-line filing.  Counsel, with the exception Abraham Fruchter, did not differentiate in its bills as to the costs of on-line research and the cost of Pacer. To the extent charges for Pacer are included separately, they shall be reimbursed, but the total for undifferentiated on-line research and Pacer shall not exceed $5,000.00.

I recommend reimbursement for Fed Ex/UPS/ Messenger Service although arguably the costs are higher because of the duplicative activity in this matter among the several firms.  See In re Cendant Corp., 232 F.Supp. 2d at 343; Weinberger, 801 F.Supp. at 828.

To the extent copying costs are reasonable, they should be reimbursed. A good frame of reference is the Third Circuit L.A.R. 39.3(c) ("L.A.R."), which authorizes the cost of reproduction at $0.10 per page. See Interfaith Cmty. Org., 426 F.3d at 717.  I shall allow

reasonable copying costs.   Requests for reimbursement in this matter run from $30.00 for Kantrowitz Goldhamer and $105.00 for both Carella Byrne and Robbins Geller to a high of $1,500.00 requested by Abraham Fruchter.  Morris and Morris seek no reimbursement for "in-house copying costs" and is seeking reimbursement only for "external copying charges." Demand-Futility Narrative, Exhibit 5 at 2. Under the circumstances of an electronic world, I authorize maximum reimbursement of $250.00 and reimbursement for outside copying charges.

In addition, I shall allow filing fees and transcripts, but only allow the cost of pro hac vice filings, $150.00, for one attorney per firm.[96] In re Cendant Corp., 232 F.Supp. 2d at 343. See Section, V.Q., Pro Hac Vice Applications, supra. Telephone costs will not be reimbursed to the extent they appear excessive and, perhaps, again were generated from the constant telephone conferencing in this case Id. at 343; Weinberger, 801 F.Supp at 828.  See Section V.M., Constant Conferencing, Collaboration and Individual Responsibility, supra. Robbins Geller, a California firm, requests $64.14 for telephone and facsimile. Abraham Fruchter did not bill at all for telephone usage while Kantrowitz Goldhamer billed $2.83. Carella Byrne seeks $1,455.43 and Morris and Morris seeks $927.81. This variation can only be attributable to some firms having negotiated better contracts with their long distance carriers. It may be also that some firms did not initiate the multiple conference calls, which are usually charged by the conference call carrier. Because of the huge discrepancy and because there was an immoderation with respect to conducting conference calls, I am going to impose a limit of $500.00 for conference calls.

Travel and meals are reimbursable to the extent their proofs are documented and reasonable. In re Cendant Corp., 232 F.Supp. 2d at 343.  Carella Byrne took a fifty percent (50%) reduction for travel and meals and I believe under the circumstances that is an appropriate

---

[96] While there is a cost to the New Jersey Lawyers' Fund for Client Protection, which Robins Geller quantifies because of the variations in categories by the firms, I shall only deduct $150.00 per attorney for the sake of simplicity.

reduction for all the firms, especially since, as described in Section V.R., Travel Time, supra, no firm has sustained its burden to justify travel and meals for more than one attorney.

A few comments are in order for each firm. As indicated, Carella Byrne has reduced its request for reimbursement of travel and meals by the amount of $3,570.70 to $1,702.53, but it does not provide adequate documentation. On the other hand, Robbins Geller provided the date, name, location of the restaurant and the amount and for which attorney the amount was expended. Carella Byrne lists a total amount and indicates the purpose of the Transportation and Meals was "Prepare for and attend settlement meeting with defendants' counsel" and lists five such meetings in New York, New York.[97] Demand-Futility Narrative, Exhibit 4 at 1. I am aware that Mr. Cecchi traveled to Trenton on several occasions, but did not include those trips. I therefore believe that it is reasonable to reimburse Carella Byrne for one hundred percent (100%) of its requested travel and meals or $1,702.53.[98] The $866.00 bill for Kelly investigative services cannot be reimbursed because no information is supplied to explain the task undertaken and the billing records for that time frame do not elucidate the purpose of the investigator.

Bernstein Litowitz did not supply any additional information or documentation in the Demand-Futility Narrative beyond its original application to the Court. I recommend reimbursement for Mr. Pitt, former Chairman of the SEC, who apparently was very helpful in developing the resolution of this matter with respect to corporate governance enhancements. His fee was high, $75,000.00, but still within reason. To the extent Bernstein Litowitz seeks $1,062.00 for court fees, I am reducing that amount by $300.00 since presumably the costs of two attorneys are included for pro hac vice costs and, as previously indicated, there was no need

---

[97] I believe there was an additional settlement conference on February 16, 2012, which Ms. Petrolle attended and presumably Mr. Cecchi attended although his billing entry for that day reads "Prepare for settlement meeting with defense; review Pitt analysis."
[98] I note that the Declaration of Mr. Cecchi, dated August 31, 2012 requests $3,570.70, but its billing records submitted to me show only $1,715.74: $202.53 for meals and $1,513.21 for travel.

for the admission of three attorneys.  On-line legal research will be reduced from the request of $6,552.20 to the ceiling of $5,000.00.   The requested charge of $1,856.26 for "Online Factual Research" should not be reimbursed as it is undocumented and unexplained, excessive and part of administrative overhead.   Also, the charges for Martin Braxton who performed on-line research have been accepted except to the extent that they were excessive. See Section V.E., "Excessive, Redundant or Otherwise Unnecessary," supra. It is unreasonable to seek reimbursement for such an overhead type charge in addition to reimbursement for the employee performing the work. See Weinberger, 801 F. Supp. at 827.

Bernstein Litowitz also seeks reimbursement of $2,209.09 for transportation and $506.81 for working meals, but does not provide any supporting information.   If the meals are not travel related, they should not be reimbursed since the time for the attorney is already being charged.  If they are travel related, the total for local transportation and meals of $2,715.91 is very high for a New York law firm; the settlement meetings were in New York.  How many times did Bernstein Litowitz attorneys travel to Trenton?   The costs should be similar to those requested by Carella Byrne, which also conducted two drafting meetings in its offices.  I recommend reimbursement of fifty percent (50%), which is the voluntary reduction Carella Byrne took, or $1,357.96 for reimbursement of travel and meals.  In actuality, no amount should be reimbursed because the costs are undocumented, but I am giving the law firm the benefit of the doubt.

No staff overtime will be approved for Bernstein Litowitz.  The firm requests $130.22, but does not document the need, identify the employee or the date, or explain why this should be regarded as anything but overhead.  See Weinberger, 801 F.Supp. at 827.   The firm seeks $1,107.24 for copying costs, but provides no foundation and I will therefore only allow $250.00.

Morris and Morris had a huge outlay for experts in the amount of $200,700.00 for Dr. Mitchell Glass, who was involved in all aspects of the case, and Mr. David Dugan, who provided an ethics opinion on interviewing former J&J employees. The firm should be reimbursed for these expenditures. The firm has taken a voluntary reduction of $4,769.53 with respect to its travel and meals, including meals for Dr. Glass, and seeks $5,904.11. This is an appropriate reduction and consistent with my position that it was unnecessary for Ms. Morris, the spokesperson for the firm, to travel from Wilmington accompanied sometimes by both Mr. Morris and Mr. Lindsey; furthermore, the expenses are not adequately documented (only name, date, destination and purpose are provided). I shall allow $2,952.06 for reimbursement of travel costs and meals. To the extent the firm had external copying charges, they will be reimbursed in the amount of $571.00, including document retrieval. The charge for on-line research is exorbitant at $10,408.45 and only $5,000.00 shall be allowed. To the extent the filing fees include $450.00 for three attorneys to be admitted pro hac vice, only $150.00 will be allowed and $300.00 deducted, thereby authorizing $402.00 for the category, "Filing fees and transcripts." No money will be reimbursed for a $64.15 charge for a miscellaneous item, which is not explained.

Robbins Geller, as indicated, submitted an exceedingly detailed account of its expenses. The firm utilized an investigator, L.R.Hodges & Associates, Ltd., and paid $76,665.03. This item should be reimbursed. With respect to "Lexis, Westlaw, Online Library Research," it seeks $1,450.86, explaining that this cost included payments to vendors such as Disclosure, Inc., Dow Jones Interactive, Dow Jones & Co., Inc., CDA Investment Technologies, Pacer Service Center and West Publishing Corporation. "These databases were used to obtain access to SEC filings, legal research and cite-checking of briefs." Demand-Futility Narrative, Exhibit 6 at 4. No

breakdown is provided. The firm should be reimbursed its requested $1,450.86. Although the firm's charge for copying is low, $0.25 per page, that rate exceeds the L.A.R, as previously indicated, and only $0.10 per page will be allowed or $42.30.[99]

For travel including transportation and meals, the firm commendably provided a very specific and detailed accounting. Every entry for a restaurant provided the date, name of attorney and the name and location of the restaurant. Some of the entries looked on the high side for airfare, running from $1,932.77 and $2,557.40, and including transportation to the courthouse by taxicab from the Philadelphia airport. Travel to Trenton is easily accessible by flying to Newark Liberty Airport and taking New Jersey Transit to Trenton. The names of specific hotels were also provided and do not seem excessive. I believe that a similar reduction of fifty percent (50%) should be taken for the travel and meals incurred by Robbins and Geller who often had two attorneys attending events. This is consistent with voluntary reductions taken by Carella Byrne and Morris & Morris. In house photocopying of 423 pages will be reimbursed at $0.10 per page. Filing fees for pro hac vice will only be allowed for one attorney in the amount of $150.00.

The expense summary of Kantrowitz Goldhamer requested $1,925.00 for its expert, ORC International, Inc., and that charge shall be allowed. Its on-line research request is $1,699.96 and shall be reimbursed. A New Jersey firm, it requests $286.04 for travel expenses, but provides no information. This expense will be reduced by fifty percent (50%) to $143.02. Its other expenses for FedEx and fax for a total of $ 207.31 are reasonable.

Abraham Fruchter requests reimbursement of $31,002.40. It is seeking $21,282.75 for experts. These are presumably charges for Dr. Israel and Dr. Higham and shall be reimbursed.

---

[99] I acknowledged that to some extent Robbins Geller is penalized for its candor with respect to the number of pages copied, 423, since I am allowing a ceiling of $250.00 for unspecified calculations.

The firm has a very nominal submission for travel and meals of $250.10 ($58.15 for meals and $191.95 for travel), presumably for both Mr. Abraham and Mr. Taylor. This amount, although undocumented in detail, appears to be very reasonable since the firm is located in New York City, but will be reduced by fifty percent (50%) to deduct for the presence of an extra attorney. The firm requests a great deal of money, $1,751.56 for Pacer usage. Abraham Fruchter also requests a total of $3,625.14 for Lexis fees, actually providing monthly breakdowns. Since the firm differentiated between the cost of Pacer and its Lexis Fees and since the cost of on-line fees is less that $5,000.00, I shall allow both. The firm seeks reimbursement of $185.00 for Exhibits from the Clerk of the Court in St. Landry Parish, Louisiana and $1,792.00 for the transcripts from the Risperdal Trial. I am not sure that reading the Risperdal transcripts added value to this matter and many hours for that effort were reduced, but I shall allow reimbursement for the costs of the Transcript and Clerk costs. The firm claims that it photocopied more than 10,000 pages of paper at $0.15 per page, capping its costs at $1,500.00. The generation of 10,000 pages appears excessive, especially in view of the electronic world in which we live. I will allow $250.00 for copying. I do note that Abraham Fruchter indicated that it did not bill for the expense of "obtaining analysts reports and other information" from the various news services and omitted "analyst reports [which] typically cost hundreds of dollars a piece." Demand-Refused Narrative, Exhibit J at 1.

See Appendix XII which lists the amounts I recommend be reimbursed to the law firms for their reasonable and compensable expenses.

### VIII. Conclusion

I believe that I have completed my mission as Special Master and identified to the Court the appropriate lodestar and reimbursement of expenses for each law firm. A review of all the

submissions and a review of all the bills, although time consuming, was necessary to assess what was reasonable in this matter. Six law firms, with very experienced attorneys, were all involved and even with the best intentions the number of hours expended was extraordinary. The excessive hours were a function, I believe, of two dynamics: first, the macro aspect, the number of lawyers involved in this matter and often what I regard as law practice by committee, and secondly, the firms' different approaches to staffing and billing, the micro aspects. It is almost inevitable that there will be superfluous and unjustifiable hours innocently charged by a firm, but the situation becomes serious when there are four  (Demand-Futility) or six (Demand-Futility and Demand Refused) firms all working on the same matter, occasionally at cross-purposes, albeit even if there are separate assignments.

The "diseconomies of co-authorship," with the symbiotic need to constantly confer, check, and confirm, accounted for surplus hours.  The synergy that the firms promised to Judge Wolfson and described to me is a laudable goal, but not always achievable in implementation; repetition and redundancy are inevitable by-products of a collaborative system in which attorneys practice law in teams and prepare and file successive pleadings but also prepare many pleadings that sometimes go unfiled without accountability. Every firm wanted to participate at the outset and at the conclusion. In addition, several of the firms have idiosyncratic methods of operation that result in overindulgence in billing and, in a contingent matter, with no real client to hold a law firm accountable on an interim basis or at conclusion, the immoderation can become innocently exponential. The result: 12,797.70 hours of billing. Nevertheless, as Judge Wolfson pointed out in approving the Settlement, there was a benefit conferred upon the shareholders of J&J and the attorneys deserve to be paid their lodestar, albeit reduced to conform

to the tenets of our fee shifting case law and the realities of the reasonable standard:   Would a fee paying client absorb these costs and are they reasonably imposed on an adversary?

While all of the firms indicated that they did not submit all their hours for reimbursement and/or had exercised billing judgment and taken voluntary reductions, the lodestar awarded by me is less than any lodestar requested.  I also believe I appropriately focused on the most reliable source of information, the billing records.

As to the rates, I have allowed, as a ceiling, the requested rate of one of the two New Jersey law firms for senior partners at $750.00 per hour, which, while I personally believe is high, was established mostly through the in camera submissions in which historic rates and other information were presented to me.  I have prepared what I believe is an appropriate schedule based on years of experience for partners and associates.

I recognize that I have subjected the review of the billing records to a retrospective magnifying glass inspection. The rewards of fee shifting, however, invite accountability.

To avoid the problems endemic to this lodestar request, on a macro level when more than one firm is involved, tasks should be performed by individual firms and not by committee. Under no circumstances, should fee disputes be billed.  On a micro level, to avoid billing issues, law firms should utilize more activity and task dominated software.  A hierarchy of reporting should be required.  The first entry should be the task, which must require specificity, i.e., research Caremark claims, followed by the Category or event, i.e., motion to dismiss, or the software should reject the entry.   Each undertaking must be allocated and quantified as to specific time to eliminate the conundrum of block billing.  Quarter hour billing must be eliminated.  Monthly reviews of bills should be made, both for errors and for a sense of where excessive hours are accumulating.   It is easier to elaborate on the language of a computer entry on a

contemporaneous basis rather than at the conclusion of the matter, two or three years after the entry is made.  The Court should be presented with information by relevant and consistent Categories so that it can readily determine how much time was spent on a particular activity, i.e., Motion to Dismiss.  Fee requests in excess of $1,000,000.00 should include an explanation of the services provided and if, as in this case, there is more than one firm applying for fees, a description of the allocation and implementation of discrete tasks should be included.  The incursion of expenses should be guided by a concern for practicality and accountability, and expense requests should be fully documented and specified.

The lodestar amount I recommend for each firm as set forth in Appendix XV is as follows:

| FIRM | LODESTAR AWARD |
|---|---|
| Carella Byrne | $777,265.00 |
| Bernstein Litowitz | $676,630.63 |
| Morris and Morris | $1,946,323.75 |
| Robbins Geller | $487,718.75 |
| Abraham Fruchter | $1,032,173.13 |
| Kantrowitz Goldhamer | $463,794.50 |
| **TOTAL** | **$5,383,905.76** |

Annexed here is Appendix XV, provides further lodestar analyses and Appendix XII which lists reimbursement of expenses for each firm.

Dated: Warren, New Jersey
June 13, 2013

Respectfully Submitted,

/s/ Harriet Derman

Harriet Derman, J.S.C. (Ret.)
Special Master